1 | **Daniel Rigmaiden**
Aka: Steven Brawner #10966111
2 | CCA-CADC
PO Box 6300
3 | Florence, AZ 85232
Telephone: none
4 | Email: none

5 | Daniel David Rigmaiden
Defendant as Defendant

6 |

FILED
RECEIVED        COPY

JUN 0 8 2009

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ M DEPUTY

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | No. CR08-814-PHX-DGC |
| Plaintiff, | |
| v. | PRETRIAL MEMORANDUM RE NOTICE OF TOM CROWE'S INEFFECTIVE ASSISTANCE AND MISCONDUCT |
| Daniel David Rigmaiden, | |
| Defendant. | |

Defendant, Daniel David Rigmaiden, appearing as defendant, notifies this Court of Tom Crowe's ("Crowe") ineffective assistance and misconduct. The factual basis for the defendant's claims is outlined in the defendant's Bar complaint filed against Crowe. **(Ex. [01])**

///
///
///
///
///
///
///
///
///

1

1 | Respectfully submitted: June 2, 2009

2

3 | DANIEL DAVID RIGMAIDEN
Defendant as Defendant

4

5

6 | Daniel D. Rigmaiden
Defendant

7

8

9 | CERTIFICATE OF SERVICE

10 | I hereby certify that on June 2, 2009 I caused the

11 | following to be placed into the CCA-CADC mailing system for United

12 | States Postal Service delivery:

13 | Original attached document plus one copy addressed to:

14 | Clerk, United States District Court
Sandra Day O'Connor U.S. Courthouse, Suite 130

15 | 401 W. Washington St., SPC 1
Phoenix, AZ 85003

16

17 | One copy each of original document addressed to:

18 | Frederick A. Battista
Assistant U.S. Attorney

19 | 40 N. Central Ave., Suite 1200
Phoenix, AZ 85004

20 | Mark A. Paige

21 | 111 W. Monroe St., Suite 1212
Phoenix, AZ 85003

22 | BY Daniel Rigmaiden

23

24

25

26

27

2

EXHIBIT [01]
United States v. Rigmaiden
08CR814

# STATE BAR OF ARIZONA
## CHARGE AGAINST A LAWYER

| NAME AND ADDRESS OF CONSUMER | NAME AND ADDRESS OF LAWYER |
|---|---|
| Daniel Rigmaiden<br>Booked As Steven Brawner<br>CCA-CADC #10966111<br>PO Box 6300<br>Florence, AZ 85232 | Thomas N. Crowe, Esq.(#002180)<br>1100 E. Washington St.<br>Suite 200<br>Phoenix, AZ 85034 |
| **Telephone No.** None | **Telephone No.** (602) 252-2570 |

1. **Did or does this lawyer represent you?**

   YES XX NO ____

   If "YES", provide the approximate dates the lawyer represented you, and the amount, if any, paid to the lawyer. **PLEASE PROVIDE A COPY OF YOUR FEE AGREEMENT.**
   September 30, 2008 to February 27, 2009. See CJA payment
   vouchers for the amount, if any, paid to the lawyer.

   If "NO", how did you come into contact with this lawyer?

2. **Do you currently have a lawyer other than the one named in this charge form?**

   YES XX NO ____

   If "YES", provide your lawyer's name and address.
   Mark A. Paige, 111 W. Monroe St. Suite 1212, Phoenix, AZ 85003

3. **If your charge is about conduct in a lawsuit, provide the following information:**

   Case number of the lawsuit: CR08-814-PHX-DGC

   Title of the lawsuit (for example, *Smith v. Jones*): United States v. Daniel
   Rigmaiden

   Name of court (for example, Superior or Municipal Court, and name of county of city): _____
   United States District Court in Phoenix Arizona.

Approximate date the lawsuit was filed:  July 23, 2008

What is your connection to the lawsuit (for example, plaintiff or defendant): _____

_____

_____

**4.**  Is the lawyer in possession of money or other property (for example, your original documents or client file) that you believe should be returned to you?

YES_____   NO _XX_

If "YES" please identify the money or property:

_____

_____

_____

**5.**  What type of legal work was/is involved?  (Check all that apply)

- ❑ **Collections**
- ❑ **Family Law/Divorce**
- ☒ **Criminal Law/Traffic Offenses**
- ❑ **Personal Injury**
- ❑ **Immigration**
- ❑ **Worker's Compensation**
- ❑ **General Civil**
- ❑ **Other** _____

**6.**  What is the general nature of your charge against the lawyer (Check all that apply)

- ☒ **Delay or lack of diligence**
- ❑ **Failing to Answer letters or phone calls**
- ❑ **Refusing to return your files or papers**
- ❑ **Conflict of interest**
- ❑ **Improper handling of your money or property**
- ❑ **Not keeping you informed of progress on your case**
- ☒ **Not following instructions**
- ☒ **Other** _See attached charges._

**7.**  State your charge in your own words.  Please follow the instructions contained in "Information about Filing a Charge Against a Laywer."  Include all important dates, times, places, and details so that the specific nature of your charge can be understood.

Use additional sheets if necessary. **PLEASE DO NOT USE THE BACK OF THIS FORM.**

See attached charges.
///
///
///
///

## STATE BAR OF ARIZONA CHARGE AGAINST A LAWYER

Consumer: Daniel Rigmaiden
Lawyer:   Thomas N. Crowe
Case No.: CR08-814-PHX-DGC


Thomas N. Crowe ("Crowe") has violated the following Arizona Rules Of Professional Conduct:

1. ER 1.3. Diligence.

2. ER 3.2. Expediting Litigation.

3. ER 3.3. Candor Toward the Tribunal.

4. ER 8.4. Misconduct.


My specific charges are outlined in the attached "Memorandum Of Points And Authorities In Support Of Motion To Dismiss With Prejudice For Violation Of Sixth Amendment Speedy Trial Right" that was used to support the referenced motion filed under my criminal case number. Please see page 5 line 11 through page 16 line 9 for the factual basis of my charges against Crowe.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

DATE: May 18, 2009          SIGNATURE: Daniel Rigmaiden

I understand that most written charges against lawyers eventually become a public record. I understand that all information on this form, including my name and address, will be available for review by the lawyer and others who may view the file. This charge form and other submissions by me will be sent to the lawyer.

## SUBMIT COMPLETED FORM TO:

### STATE BAR OF ARIZONA
### 4201 North 24th Street, Suite 200
### Phoenix, Arizona  85016-6288

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Court: Honorable David G. Campbell

United States v. Rigmaiden
08CR814

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO
DISMISS WITH PREJUDICE FOR VIOLATION OF SIXTH AMENDMENT
SPEEDY TRIAL RIGHT

TABLE OF CONTENTS

TABLE OF AUTHORITIES

TABLE OF EXHIBITS

MEMORANDUM

EXHIBITS [01]-[16]

Table of Contents

Page(s)

Table of Authorities.................................... i-ii

Table of Exhibits......................................  iii

I.     APPLICABLE AUTHORITY.................................. 1

II.    ARGUMENT............................................. 1

       A.    The length of the delay (Barker test part 1)...... 1

       B.    The reason for the delay (Barker test part 2)..... 5

             1.    The Battista/Crowe 5 month "wait out
                   period".................................. 5

                   a.    The defendant chose to exercise
                         his right to remain silent........... 6

                   b.    Battista and Crowe ignored the
                         defendant's choice to exercise his
                         right to remain silent............... 7

                   c.    Deliberate delay regarding
                         discovery.......................... 11

                   d.    General lack of diligence by
                         Battista and Crowe................. 13

                   e.    General collusion between Battista
                         and Crowe.......................... 14

                   f. In conclusion......................... 15

             2.    The Battista/Paige continuing "wait
                   out period"............................. 16

                   a.    Battista and Paige are ignoring
                         the defendant's choice to
                         exercise his right to remain silent.. 17

                   b.    Paige holds discovery and other
                         relevant documents hostage in an
                         attempt to harass and coerce the
                         defendant into a cooperation
                         agreement with the government........ 20

                   c.    In conclusion....................... 21

             3.    The defendant bears no weight............. 22

             4.    In conclusion............................ 24

C.   Whether and how the defendant asserted the
     speedy trial right (Barker test part 3)......... 25

     1.   Express assertion of speedy trial right..... 26

     2.   Implied assertion of speedy trial right..... 29

     3.   The defendant's fundamental right to
          go to trial is violated and, in
          effect, his right to a speedy trial
          is violated.............................. 33

D.   The prejudice to the defendant (Barker test
     part 4).................................... 34

     1.   Oppressive pretrial incarceration.......... 34

     2.   Anxiety and concern....................... 39

     3.   Impairment of the defense................. 40

III.   IN CONCLUSION..................................... 44

Exhibits [01]-[16]........................................ NA

## Table of Authorities

Cases                                                          Page(s)

Ballard v. Walker,
772 F.Supp. 1335 (E.D.N.Y 1991)............................... 24

Barker v. Wingo,
407 U.S. 514 (1972).............. 1, 2, 5, 6, 17, 25, 26, 29, 34

Boykin v. Alabama,
395 U.S. 238 (1969)........................................... 33

Coe v. Thurman,
922 F.2d 528 (9th Cir. 1990).............................. 22, 29

Doggett v. U.S.,
505 U.S. 647 (1992)..................................... 2, 3, 34

Johnson v. Zerbst,
304 U.S. 458 (1983)........................................... 26

Prince v. State of Ala.,
507 F.2d 693 (5th Cir. 1975).................................. 25

Strunk v. U.S.,
412 U.S. 434 (1973)........................................... 45

U.S. Const. Amend. VI..................................... 1, 41

U.S v. Aguirre,
994 F.2d 1454 (9th Cir. 1993)................................. 34

U.S v. Beamon,
992 F.2d 1009 (9th Cir. 1993).............................. 3, 41

U.S. v. Dryer,
533 F.2d 112 (3rd Cir. 1976).................................. 44

U.S v. Geelan,
520 F.2d 585 (9th Cir. 1975).................................. 26

U.S. v. Guerra de Aguilera,
600 F.2d 752 (9th Cir. 1979).............................. 22, 29

U.S. v. Herman,
576 F.2d 1139 (5th Cir. 1978)................................... 1

U.S. v. Hill,
310 F.2d 601 (4th Cir. 1962).................................. 25

U.S. v. Loud Hawk,
474 U.S. 302 (1986)................................. 2, 6, 17, 25

U.S. v. MacDonald,
456 U.S. 1 (1982)........................................ 35, 41

U.S. v. Marion,
404 U.S. 307 (1971)................................... 2, 25, 41

U.S. v. Sandoval,
990 F.2d 481 (9th Cir. 1993).................................. 26

U.S. v. Sears, Roebuck And Co., Inc.,
877 F.2d 734 (9th Cir. 1989)................................... 2

U.S. v. Simmons,
536 F.2d 827 (9th Cir. 1976).............................. 2, 39

U.S. v. Tanh Huu Lam,
251 F.3d 852 (9th Cir. 2001)...................... 3, 4, 23, 35

U.S. v. Valentine,
783 F.2d 1413 (9th Cir. 1986)............................. 2, 34

Wells v. Petstock,
941 F.2d 253 (3rd Cir. 1991)................................. 35

Table of Exhibits

| Exhibit | Exhibit Number |
|---|---|
| Battista's September 8, 2008 letter to Humy | [01] |
| Crowe's October 23, 2008 letter to Defendant | [02] |
| Defendant's November 20, 2008 letter to Crowe | [03] |
| Crowe's January 5, 2009 letter to Defendant | [04] |
| Crowe's December 22, 2008 letter to Battista | [05] |
| Crowe's January 12, 2009 letter to Battista | [06] |
| Crowe's January 12, 2009 letter to Defendant | [07] |
| Crowe's October 22, 2008 letter to Battista (1) | [08] |
| Crowe's October 22, 2008 letter to Battista (2) | [09] |
| Battista's September 5, 2008 letter to Humy | [10] |
| Crowe's January 22, 2009 letter to Defendant | [11] |
| Defendant's CCA-CADC attorney visit log | [12] |
| Defendant's April 20, 2009 letter to Paige | [13] |
| Legal Visit Log #0002 for Defendant/Paige, May 1, 2009 | [14] |
| USMS/CCA-CADC business contract, MS-99-D-0057 | [15] |
| Prisoner Information Request: Defendant is low custody non escape risk | [16] |

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS WITH PREJUDICE FOR VIOLATION OF SIXTH AMENDMENT SPEEDY TRIAL RIGHT

## I. APPLICABLE AUTHORITY

Compliance with the Speedy Trial Act, 18 U.S.C. 3161 et seq., does not bar a claim that the defendant's Sixth Amendment speedy trial right was violated. See e.g., U.S. v. Herman, 576 F.2d 1139 (5th Cir. 1978). The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy... trial." U.S. Const. Amend. VI. The Supreme Court jurisprudence responsible for "clarifying" that specific fundamental right is announced in Barker v. Wingo ("Barker") as a four-part test for Sixth Amendment speedy trial claims. "The test balances (1) the length of the delay; (2) the reason for the delay; (3) whether and how the defendant asserted the speedy trial right; and (4) the prejudice to the defendant." Barker v. Wingo, 407 U.S. 514, 529-33 (1972). Significantly, in the words of the Barker Court, "We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." Barker, 407 U.S. at 533. This memorandum applies the "four-part Barker test" to the deprivation of the defendant's Sixth Amendment right to a speedy trial.

## II. ARGUMENT

### A. The length of the delay (Barker test part 1)

The Sixth Amendment speedy trial right attaches upon "either a formal indictment or information or else the actual restraints

1

imposed by arrest and holding to answer a criminal charge." U.S. v. Marion, 404 U.S. 307, 320 (1971). "The delay is measured from the time of the indictment to the time of the trial..." U.S. v. Sears, Roebuck And Co., Inc., 877 F.2d 734, 739 (9th Cir. 1989) (quoting U.S. v. Loud Hawk, 474 U.S. 302, 314 (1986)). The defendant's speedy trial right attached July 23, 2008, the date of his indictment.

Courts are not to consider the other factors of the Barker analysis unless there is a presumptively prejudicial delay. Postaccusation delay is considered presumptively prejudicial as it approaches one year. See Barker, 407 U.S. at 530. As the Court stated in Doggett, "Depending on the nature of the charges, the lower courts have generally found post-accusation delay 'presumptively prejudicial' at least as it approaches one year." Doggett v. U.S., 505 U.S. 647, 652 (1992). The Ninth Circuit has found that a six month delay constitutes a "borderline case." See U.S. v. Valentine, 783 F.2d 1413, 1417 (9th Cir. 1986) (involving a single count of firearms possession by a convicted felon); U.S. v. Simmons, 536 F.2d 827 (9th Cir. 1976) (involving a two-count indictment for forging and uttering a U.S. Treasury check). The postaccusation delay for the instant case, as of June 1, 2009, is 313 days (roughly 10.25 months). The delay for the instant case is "approaching one year" and 4.25 months longer than the Ninth Circuit "borderline case" delay standard.

Doggett breaks part one of the four-part Barker test, length of delay, into two steps. See Doggett, 505 U.S. at    . Doggett step one requires that the accused show a threshold  presumptively

2

1  prejudicial delay. If the threshold showing is made, Doggett step

2  two requires that this Court consider the extent to which the delay

3  exceeds the threshold point in light of the degree of diligence by

4  the government and acquiescence by the defendant to determine

5  whether sufficient prejudice exists to warrant relief. See Doggitt,

6  505 U.S. at    . In U.S. v. Beamon, the Ninth Circuit applied part

7  one of the four-part Barker test using the Doggitt two step

8  process. See U.S. v. Beamon, 992 F.2d 1009, 1012-13 (9th Cir. 1993).

9      The instant case satisfies Doggett step one considering it

10  shows a threshold presumptively prejudicial delay "approaching one

11  year" and longer than the Ninth Circuit's "borderline case" delay

12  standard. Doggett step two requires that this Court conduct an

13  examination into parts two through four of the four-part Barker

14  test, applied to the instant case in the proceeding sections of

15  this memorandum, before determining if passing of part one of the

16  four-part Barker test is merited. That examination will show that

17  Doggitt step two is satisfied with delays heavily weighted towards

18  the government and extreme prejudice to the defendant.

19      In U.S. v. Tanh Huu Lam, the Ninth Circuit did not note the

20  Doggitt two step process and instead applied part one of the

21  four-part Barker test in a more abstract manner. See U.S. v. Tanh

22  Huu Lam, 251 F.3d 852, 856-57 (9th Cir. 2001). In Lam, the Court

23  made a determination based on the seriousness of the charges and

24  the complexity of the case. The Lam Court noted that the nature of

25  the charges against Lam (arson resulting in death) were

26  significantly more serious and complex than those at issue in the

27  Ninth Circuit's Valentine and Simmons cases. Specifically, Lam's

3

1  case "required considerable scrutiny of physical and circumstancial

2  evidence, substantial cross-examination of expert witnesses, and

3  potentially involved the death penalty." Tanh Huu Lam, 251 F.3d at

4  856. Given those facts, the Lam Court found that the 14.5 month

5  delay in Lam's trial did not greatly exceed the threshold needed to

6  trigger judicial examination. However, even after failing Lam at

7  part one of the four-part Barker test the Lam Court still conducted

8  an examination into Barker parts two through four before making a

9  ruling. See Tanh Huu Lam, 251 F.3d at 857-60.

10      The instant case is nowhere near as serious or complex as Lam.

11  The defendant is the sole individual charged in a 50 count

12  indictment, however, all 50 counts encompass a common scheme. The

13  indictment alleges 24 counts of wire fraud involving wire transfers

14  sent from a government controlled bank account (U.S. Treasury) to

15  another government controlled bank account (law enforcement sting

16  bank account). The indictment indicates that the $48,236.00 in

17  alleged wire transfers never left the government's possession or

18  control. The indictment alleges 24 counts of aggravated identity

19  theft involving identities of individuals who are all deceased.

20  Those 24 witnesses will not be available for interviews or

21  testimony. The indictment alleges a conspiracy charge while the

22  defendant is the sole individual charged. The indictment indicates

23  that all other members of the alleged conspiracy were either

24  confidential informants or government agents. The indictment

25  alleges one count of mail fraud involving a package of U.S.

26  currency sent via FedEx. The indictment indicates that the package

27  was sent and tracked by the government. The instant case falls

4

1  more in line with the Ninth Circuit's Valentine and Simmons cases

2  than with Lam.

3      When applying the same standard as used in Beamon, the 10.25

4  month delay coupled with the Doggett two step process being

5  satisfied merits passing of part one of the four-part Barker test.

6  When applying the same standard as used in Lam, the 10.25 month

7  delay coupled with the specific circumstances of the instant case

8  merits passing of part one of the four-part Barker test. The 10.25

9  month delay is presumptively prejudicial and this Court must apply

10  the other factors of the Barker analysis.

11      B. The reason for the delay (Barker test part 2)

12      Delays designed to give the government a tactical advantage

13  weigh most heavily against the government. See Barker, 407 U.S. at

14  531. The delay in the instant case is a result of heavily weighted

15  deliberate delays purpetrated through the government's misconduct

16  in collusion with the defendant's previous defense counsel, Tom

17  Crowe ("Crowe"), and now continuing with the defendant's current

18  defense counsel, Mark Paige ("Paige"). The deliberate delays were

19  unnecessary and used in a bad faith effort to harass, coerce and

20  prejudice the defendant in hopes that he would agree to enter into

21  a substantial assistance/cooperation ("cooperation") agreement with

22  the government. The documented evidence is overwhelming, attached

23  hereto in a number of exhibits, and supports the above claims.

24      1. The Battista/Crowe 5 month "wait out period"

25      Assistant U.S. Attorney Frederick A. Battista ("Battista")

26  first colluded with Crowe to deliberately delay proceedings by

27  working towards virtually no progress in the instant case and using

the defendant's incarceration coupled with holding the defendant's discovery hostage in an attempt to harass and coerce the defendant into a cooperation agreement. Their collusion began as early as September 30, 2008 and continued until February 27, 2009. During that 180 day delay (roughly 5 months) there was virtually no progress in the instant case. That deliberate 5 month delay was used as a tactical advantage on the part of the government, with Crowe as an active and aiding party, in a bad faith attempt to "wait the defendant out" until he cooperates.  Where government's conduct is characterized by deliberate effort to prejudice or harass the defendant, its bad faith must be weighed heavily against it in ruling on defendant's Constitutional speedy trial claims. See U.S. v. Loud Hawk, 474 U.S. 302, 315-16 (1986); Barker, 407 U.S. at 531.

      a. The defendant chose to ˑexercise his right to remain silent

On about September 9, 2008 in the Northern District of California, the defendant's attorney, Nicholas P. Humy ("Humy") presented the defendant with a written cooperation agreement sent to Humy by Battista. **(Ex. [01])** Humy informed the defendant that he could sign the agreement, stay in California and "resolve the case" without having to be transferred to Arizona. Humy further informed the defendant that he could refuse to sign, be transferred to Arizona, fight his case and go to trial. The defendant informed Humy that he was excercising his right to remain silent, was refusing to sign the cooperation agreement and wished to be transfered to Arizona to fight his case and go to trial. The

6

1 defendant informed Humy that he wished to be transferred to Arizona
2 immediately so there would be no further unnecessary delays. Humy
3 followed the defendant's instructions and argued for immediate
4 transfer during the final court hearing in the Northern District of
5 California. Humy's arguments were in opposition to the government's
6 arguments asking for more time to transfer the defendant to Arizona.
7 The defendant arrived in Arizona on September 25, 2008. Crowe was
8 appointed defense counsel for the defendant, nunc pro tunc, on
9 September 30, 2008.

10        b. Battista and Crowe ignored the defendant's choice to
11            exercise his right to remain silent

12     During the Battista/Crowe 5 month "wait out period", Battista
13 and Crowe filed no relevant motions and made virtually no progress
14 in the instant case. See Crowe's "Motion To Withdraw As Counsel For
15 Defendant", p. 2 at 17-20, January 23, 2009 ("No motions have been
16 filed... the bulk of the discovery remains to be provided.").
17 Instead, they colluded in the background to intentionally delay the
18 instant case in an attempt to harass and coerce the defendant into
19 a cooperation agreement all the while attempting to lead the
20 defendant to believe that his case was progressing. They used the
21 intentional delay to cause anxiety and stress for the defendant in
22 an attempt to "wait the defendant out" until he agrees to enter
23 into a cooperation agreement. Battista and Crowe continued with
24 their misconduct while fully aware that the defendant refused to
25 sign the cooperation agreement presented to him in California and
26 chose to exercise his right to remain silent. Battista and Crowe
27 continued with their misconduct while fully aware that the

defendant chose to be transfered to Arizona to fight his case and go to trial.

In Crowe's October 23, 2008 letter to the defendant, page 6 paragraph 1, Crowe asked the defendant if he is interested in a "free talk", i.e., cooperation agreement. (**Ex. [02]**) On November 20, 2008 the defendant responded to Crowe's October 23, 2008 letter. In the defendant's November 20, 2008 letter to Crowe, page 7-8 section 9, the defendant informed Crowe that he is not interested in a "free talk", i.e., cooperation agreement. (**Ex. [03]**) In that same letter, page 2 section 4, the defendant instructed Crowe to unseal the case. On January 5, 2009 Crowe responded to the defendant's November 20, 2008 letter. In Crowe's January 5, 2009 letter to the defendant, page 3 paragraph 1, Crowe stated that during the December 22, 2008 status conference hearing, Battista informed the Court that the case was sealed "pending determination as to whether the defendant elected to cooperate." (**Ex. [04]**) Battista's cooperation agreement was clearly rejected on about September 9, 2008, 104 days (roughly 3.5 months) prior to Battista's statements during the December 22, 2008 status conference hearing. Furthermore, on November 20, 2008 the defendant reiterated to Crowe, via his letter, his original decision to remain silent and to not enter into a cooperation agreement with the government. (**Ex. [03]**) Crowe was notified, in writing, of the preceding fact nearly a full month before the December 22, 2008 status conference hearing. Despite Crowe's knowledge of the facts, he made no attempt to inform the Court that his client chose to remain silent, chose to not enter into a cooperation agreement

1  and that Battista's "determination" was not pending but concluded.

2  Despite Crowe's knowledge of the facts, he made no attempt to have

3  the case unsealed.

4       After the December 22, 2008 status conference hearing, Crowe

5  sent a letter to Battista later that day. In Crowe's December 22,

6  2008 letter to Battista, page 1 paragraph 2, Crowe stated, "it

7  would be more useful for me to... explore whether [the defendant]

8  has any interest in pursuing the government's tentative proposal

9  regarding cooperation..." (Ex. [05]) Crowe made those statements

10 nearly a month after the defendant reiterated to Crowe, via his

11 letter, his original decision to remain silent and to not enter

12 into a cooperation agreement with the government. (Ex. [03])

13      In Crowe's January 5, 2009 letter to the defendant, page 2

14 paragraph 2 continuing to page 3 paragraph 1 and page 6 paragraph

15 5 continuing to page 7 paragraph 1, Crowe acknowledged the

16 defendant's November 20, 2008 reiteration to remain silent and to

17 not enter into a cooperation agreement with the government.

18 (Ex. [04]) In that same letter, Crowe informed the defendant that

19 he would notify Battista of the defendant's previous reiteration

20 and perform the needed actions to unseal the instant case.

21 Specifically, Crowe stated, "Having ruled out [cooperation], I will

22 request that the government move to unseal the indictment. Should

23 there be any reticence on the part of the government, which I

24 doubt, I will make the motion directly to the court." However, 7

25 days later, in Crowe's January 12, 2009 letter to Battista, page 1

26 paragraph 3, Crowe stated, "The defendant has not authorized me to

27 state that he wishes to proceed [with cooperation]. Of course,

9

should he decide otherwise, I will be in contact with you."
(Ex. [06]) Crowe made no affirmative statement to Battista that
would send the message that cooperation has been "ruled out" by the
defendant. Crowe created a record that led the defendant in one
direction and the government in another. In that same letter, page
1 paragraph 4 continuing to page 2 paragraph 1, Crowe stated,
"regardless of whether the defendant elects to cooperate, I assume
that the government will be moving to unseal the case." Crowe made
no affirmative statement to Battista that could be taken as a
"request" to unseal the case. Crowe simply informed Battista of
his "assumption" regarding what he thought the government might do
next. Again, Crowe created a record that led the defendant in one
direction and the government in another. In Crowe's January 12,
2009 letter to the defendant, page 1 paragraph 3, Crowe stated,
"I reminded [Battista] that he was at liberty to move to unseal the
proceedings if he so chose." (Ex. [07]) Crowe informed the
defendant that unsealing the proceedings was now a "choice" left
up to Battista. Neither Battista nor Crowe filed a motion to
unseal the case.

Battista and Crowe ignored the defendant's choice to remain
silent and to not enter into a cooperation agreement with the
government. Battista and Crowe refused to unseal the case despite
the defendant's instruction to do so. Battista deliberately delayed
the case, with Crowe as an active and aiding party, to gain a
tactical advantage through a bad faith effort to "wait the
defendant out" in hopes that he would be harassed and coerced
into a cooperation agreement with the government.

### c. Deliberate delay regarding discovery

Beginning October 6, 2008 the defendant began requesting that Crowe obtain specific discovery from Battista. On October 22, 2008 Crowe mailed Battista a standard initial discovery request along with a request for specific discovery. **(Ex. [08] and Ex. [09])** Two months later, in Crowe's December 22, 2008 letter to Battista, page 1 paragraph 2, Crowe stated, "it would be more useful for me to... explore whether [the defendant] has any interest in pursuing the government's tentative proposal regarding cooperation... [t]hereafter, depending upon the indications I received from the defendant, we may pursue additional discovery as may be warranted." **(Ex. [05])** Crowe's December 22, 2008 statements completely contradict his previous statements contained in his October 22, 2008 discovery request. Crowe's October 22, 2008 discovery request clearly sent the message that additional discovery **is** warranted and not **may be** warranted. Crowe's October 22, 2008 discovery request was passed off as an official authoritative request and a prerequisite to filing a motion to compel the government to disclose discovery. Crowe's December 22, 2008 letter to Battista clearly shows that Crowe's October 22, 2008 discovery request was merely a "paper tiger" designed to deceive the defendant into thinking that his case was progressing.

On January 22, 2009 Crowe provided the defendant with a copy of Crowe's December 22, 2008 letter to Battista. From October 22, 2008 to January 22, 2009, 92 days (roughly 3 months), Crowe led the defendant to believe that he was actively pursuing discovery, however, in actuality that time period was in furtherance of the

1  unnecessary delay designed to harass and coerce the defendant into
2  a cooperation agreement with the government.

3  Battista made no effort to provide any discovery to Crowe until
4  February 24, 2009, 125 days (roughly 4 months) after Crowe's
5  initial discovery request. Battista used the excuse that some of
6  the discovery contains personal identifiers to partially support
7  the reason for delay. However, Battista did not file a motion for
8  a protective order regarding use of discovery until January 13,
9  2009, 83 days (roughly 3 months) after Crowe's initial October 22,
10  2008 discovery request. The protective order was granted on
11  February 3, 2009, however, Battista still witheld further discovery
12  until February 24, 2009 "conveniently" one day before the Honorable
13  David G. Campbell ("Campbell") required that Battista explain the
14  delay. Furthermore, prior to the protective order being granted,
15  Battista made no attempt to provide discovery to Crowe that did not
16  require redaction or release under a protective order. On February
17  25, 2009, at the Court hearing regarding Crowe's motion to withdraw
18  as counsel for defendant, Battista stated to the Court that the
19  roughly 4 month delay was attributed to the lengthy process of
20  redacting information from the discovery. Oddly, even with a
21  protective order granted  due to the inpracticality of redaction,
22  Battista still stated to the Court that the delay was attributed to
23  the redaction process. The roughly 4 months that Battista
24  attributed to redaction is an unnecessary delay.

25  The only discovery provided by Battista, up until February 24,
26  2009, was "preliminary discovery" provided to Humy as outlined in
27  Battista's September 5, 2008 letter sent to Humy. **(Ex. [10])**

1  The discovery listed in that letter is minimal at best. In Crowe's

2  second motion for a continuance, Crowe stipulated that "[t]he

3  government has produced a wide range of discovery in this matter."

4  See Crowe's "Motion To Extend Pretrial Motions Deadlines And Motion

5  To Continue Trial [Second Request]", p. 1 at 24-25, December 17,

6  2008. However, the only discovery provided at that point was the

7  noted "preliminary discovery" and in no way the "wide range of

8  discovery" stipulated in Crowe's motion. Crowe filed a motion for

9  a continuance stipulating a false fact and Battista did not oppose.

10      Battista witheld discovery, with Crowe as an active and aiding

11  party, to gain a tactical advantage through a bad faith effort to

12  "wait the defendant out" in hopes that he will be harassed and

13  coerced into a cooperation agreement with the government.

14          d. General lack of diligence by Battista and Crowe

15      To support section II(B)(1)(a) through (c) and to offer further

16  proof, this section sets out to prove a general lack of diligence

17  by Battista and Crowe. Their general lack of diligence encompasses

18  their overall strategy to deliberately delay the case to gain the

19  government a tactical advantage.

20      In Crowe's October 23, 2008 letter to the defendant, page 6

21  paragraph 1, Crowe stated, "It is my intention to meet and confer

22  with Mr. Battista in order that he can "explain" the case.

23  Thereafter, I will schedule a video conference at which time you

24  and I can discuss the matter in more detail." (**Ex. [02]**) However,

25  91 days later (roughly 3 months), in Crowe's January 22, 2009

26  letter to the defendant, page 2 section 7, Crowe informed the

27  defendant that he had no such meeting and would not have a meeting

1  until discovery is provided. **(Ex. [11])** The above noted video

2  conference never occured and, in fact, Crowe engaged the defendant

3  in absolutely no video conferences or legal visits for the entire

4  Battista/Crowe 5 month "wait out period". See attached the

5  defendant's Corrections Corporation of America, Central Arizona

6  Detention Center legal visit log showing no legal visits.

7  **(Ex. [12])** The defendant met Crowe for the first time on February

8  25, 2009, roughly 5 months into their attorney-client relationship,

9  at the hearing regarding Crowe's motion to withdraw as counsel for

10  defendant.

11         e. General collusion between Battista and Crowe

12      To support section II(B)(1)(a) through (c) and to offer further

13  proof, this section sets out to prove a general collusion between

14  Battista and Crowe. Their general collusion encompasses their

15  overall strategy to deliberately delay the case to gain the

16  government a tactical advantage.

17      During the Battista/Crowe 5 month "wait out period", Crowe

18  revealed defense strategies to Battista and made statements to

19  Battista, that Crowe seemingly regarded as fact, regarding elements

20  in dispute pertaining to the instant case. The defendant never

21  authorized Crowe to reveal defense strategies to the government and

22  never authorized Crowe to make clarifying statements regarding

23  elements in dispute pertaining to the instant case.

24      In Crowe's October 22, 2008 letter to Battista, page 1 paragraph

25  2, Crowe stated,

26      "certain computer storage devices and related equipment
    belonging to Mr. Brawner/Rigmaiden (hereafter, "the

27      defendant") were seized by the government during searches

1   of his apartment and storage unit. I have, of course, not
    had access to the data and do not know what it consists of.
2   However, the defendant reports that, "The data contains
    exculpatory evidence."" (Ex. [09])
3

4   The defendant had not made any stipulations to the Court as to

5   knowledge of the renter or resident of the apartment in question,

6   as to the renter or user of the storage unit in question, as to the

7   owner of any items seized or as to the exculpability of any

8   evidence in the government's possession- nor did the defendant

9   claim to possess knowledge thereof. Likewise, the defendant never

10  authorized Crowe to make any of the above quoted statements to

11  Battista.

12       During the period that Crowe was representing the defendant,

13  the defendant informed Crowe of his desire to challenge the

14  validity of the search affidavit in support of the search warrants

15  used to search the apartment and storage unit in question. The

16  defendant revealed to Crowe complex legal strategies. In Crowe's

17  December 22, 2008 letter to Battista, page 1 paragraph 2, Crowe

18  stated, "I believe that it would be more useful for me to address

19  the defendant's concerns regarding the validity of the search

20  warrant..." (Ex. [05]) The defendant never authorized Crowe to

21  reveal any planned legal strategies to Battista.

22            f. In conclusion

23       Battista deliberately delayed the instant case, with Crowe as

24  an active and aiding party, to gain a tactical advantage. Battista

25  and Crowe, through their collusion, made a bad faith effort  to

26  "wait the defendant out" in hopes that he would be coerced to give

27  up his right to remain silent and enter into a cooperation

15

1 | agreement with the government. Battista and Crowe ignored the
2 | defendant's choice to remain silent, to have the case unsealed, to
3 | be provided with discovery and to have a timely progression of the
4 | proceedings. Instead, for roughly 5 months, they deliberately
5 | delayed the proceedings by working towards virtually no progress in
6 | the instant case and using the defendant's incarceration coupled
7 | with holding the defendant's discovery hostage in an attempt to
8 | harass the defendant until he agrees to enter into a cooperation
9 | agreement with the government.
10 |     2. The Battista/Paige continuing "wait out period"
11 |     Paige was appointed counsel for defendant on February 27, 2009
12 | after Crowe withdrew noting his likely "future" ineffective
13 | assistance. See Crowe's "Motion To Withdraw As Counsel For
14 | Defendant", p. 2 at 2-5, January 23, 2009. Paige took Crowe's place
15 | in both representation and as Battista's partner in collusion to
16 | deliberately delay the instant case. Battista and Paige, through
17 | their collusion, are ignoring the defendant's choice to remain
18 | silent, to have the case unsealed, to be provided with discovery
19 | and to have a timely progression of the proceedings. To help
20 | Battista achieve his goal of coercing the defendant into a
21 | cooperation agreement, Paige continues to ignore the defendant's
22 | choice to pursue a defense strategy that does not involve a
23 | cooperation agreement with the government. In doing so, Paige is
24 | aiding the government in deliberately delaying the case as a means
25 | of harassment against the defendant. Paige is refusing to provide
26 | the defendant with full copies of his discovery, refusing to
27 | respond to the defendant's letters, refusing to provide relevant

1  documents, refusing to file a motion to have the case unsealed and
2  refusing to accecpt the defendant's decision to remain silent. See
3  the defendant's "Pretrial Memorandum RE Notice Of Mark Paige's
4  Ineffective Assistance And Misconduct" and the Bar complaint
5  attached thereto ("Bar complaint filed against Paige") for further
6  details. Battista is deliberately delaying the proceedings, with
7  Paige as an active and aiding party, to gain a tactical advantage
8  through a bad faith effort to "wait the defendant out" until he
9  cooperates. Paige is working to meet Battista's goals, not his
10 client's, and in doing so he is aiding the government in their
11 causing of deliberate unnecessary delays. Where government's
12 conduct is characterized by deliberate effort to prejudice or
13 harass the defendant, its bad faith must be weighed heavily against
14 it in ruling on defendant's Constitutional speedy trial claims.
15 See Loud Hawk, 474 U.S. at 315-16; Barker, 407 U.S. at 531.
16        a. Battista and Paige are ignoring the defendant's choice
17           to  exercise his right to remain silent
18 Beginning as early as February 27, 2009, Battista and Paige
19 have been colluding to intentionally delay the instant case in an
20 attempt to harass and coerce the defendant into a cooperation
21 agreement with the government. They are using the intentional delay
22 to cause anxiety and stress for the defendant in an attempt to
23 "wait the defendant out" until he agrees to give up his right to
24 remain silent. Battista and Paige continue with their misconduct
25 while fully aware that the defendant refused to sign the
26 cooperation agreement presented to him in California and chose to
27 exercise his right to remain silent. Battista and Paige continue

17

1  with their misconduct while fully aware that the defendant chose

2  to be transfered to Arizona to fight his case and go to trial.

3      On March 20, 2009 during the first legal visit between Paige

4  and the defendant, the defendant informed Paige that his previous

5  attorney, Crowe, had been colluding with Battista to intentionally

6  delay the case. The defendant summarized for Paige what is outlined

7  in section II(B)(1) et seq. of this memorandum. The defendant

8  further informed Paige that he chose to remain silent and is not

9  interested in a cooperation agreement with the government. The

10  defendant informed Paige that he wants the instant case unsealed

11  and that a defense strategy involving a cooperation agreement will

12  not be pursued. Paige informed the defendant that he will not be

13  pursuing a defense strategy that does not involve a cooperation

14  agreement and that he will not be having the case unsealed. Paige

15  supported his reasoning with the argument that the defendant may

16  suffer head trauma causing him to change his mind. See the

17  defendant's Bar complaint filed against Paige for further details.

18      In the defendant's April 20, 2009 letter to Paige, page 6

19  section 6 continuing to page 7, the defendant instructed Paige to

20  have the instant case unsealed immediately and noted his concerns

21  regarding vindictive prosecution resulting from Paige and other

22  attorneys leading the government on with respect to a cooperation

23  agreement. (Ex. [13]) Paige has failed to follow or even respond

24  to the above noted instruction. See the defendant's Bar complaint

25  filed against Paige for further details.

26      During the May 1, 2009 video teleconference

27  ("video teleconference") between Paige, the defendant and Mr.

18

Dworken ("Dworken"), a computer forensics specialist, Paige informed the defendant that Battista is still expecting the defendant to enter into a cooperation agreement with the government. During that video teleconference, Paige attempted to coerce the defendant into a "show and tell" meeting with the government. The means of coercion used by Paige are outlined in the proceeding section of this memorandum. Paige informed the defendant that at the meeting the defendant would remain silent and the government's entire case would be explained including the investigative techniques used to track the broadband access card. Paige informed the defendant that the "show and tell" meeting would also be a prerequisite or gateway to a cooperation agreement that would require future meetings where the defendant would make statements. The defendant informed Paige that he already chose to remain silent and has nothing to offer the government regardless. Paige informed the defendant that the "show and tell" meeting would not be dictated by a written agreement designed to protect the defendant's rights. See attached the May 1, 2009 "Legal Visit Log" page 3 section 6(5) for further details. **(Ex. [14])**

   Battista continues to ignore the defendant's choice to remain silent and to not enter into a cooperation agreement with the government. Battista continues to instruct Paige to "convince" the defendant to give up his right to remain silent even though both Battista and Paige are fully aware of the defendant's decision otherwise. Battista and Paige are refusing to unseal the instant case despite the defendant's instruction to do so. Battista and Paige, through their collusion, continue with their attempts to

19

1  harass and coerce the defendant into giving up his right to remain

2  silent and in doing so are putting the progression of both the

3  defense and prosecution on indefinite hold. Battista continues to

4  deliberately delay the instant case, with Paige as an active and

5  aiding party, to gain a tactical advantage through a bad faith

6  effort to "wait the defendant out" in hopes that he will be

7  harassed and coerced into a cooperation agreement with the

8  government.

9          b. Paige holds discovery and other relevant documents

10                hostage in an attempt to harass and coerce the

11                defendant into a cooperation agreement with the

12                government

13  Crowe provided Paige with the "preliminary discovery" and

14  February 24, 2009 discovery Crowe received from Battista. Since

15  that time, out of thousands of pages of discovery, Paige has only

16  provided the defendant with 32 pages. The defendant has engaged in

17  repeated written and verbal communications with Paige where he

18  instructs Paige to provide copies of all discovery and other

19  relevant documents. Paige has refused to provide copies and has

20  failed to even let the defendant view anything past the 32 pages.

21  The defendant has sent Paige three letters dated March 17, 2009,

22  March 31, 2009 and April 20, 2009 all of which are permeated with

23  instructions to Paige to release copies of all discovery and other

24  relevant documents to the defendant. Paige acknowledged receipt of

25  those letters but refuses to respond. Paige has flat out refused to

26  provide the defendant with anything in writing and has, in fact,

27  followed through with that refusal other than the 32 pages of

1  discovery provided to the defendant thus far. See the defendant's

2  Bar complaint filed against Paige for further details.

3      During the video teleconference, the defendant informed Paige

4  that he needs copies of all discovery so that he can understand

5  the case and that it is not an unreasonable request. Paige informed

6  the defendant that he does not see how providing copies of

7  discovery would help the defendant. Paige insisted that the

8  defendant enter into the "show and tell" agreement with the

9  government to learn about his case instead of learning from the

10  discovery. See attached the May 1, 2009 "Legal Visit Log" page 4

11  section 6(7) for further details. (Ex. [14])

12      Paige is attempting to harass and coerce the defendant into a

13  "show and tell" meeting, a prerequisite to a cooperation agreement,

14  by appealing to the defendant's need for information regarding the

15  instant case. Paige is holding the defendant's discovery hostage,

16  denying the defendant the needed information to establish a

17  defense, while requiring that the defendant blindly attend a "show

18  and tell" meeting with the government (e.g. Battista et al.) to

19  obtain information that would otherwise be part of the discovery

20  already in Paige's possession.

21          c. In conclusion

22      Battista continues to deliberately delay the instant case, with

23  Paige as an active and aiding party, to gain a tactical advantage.

24  Battista and Paige, through their collusion, are making a bad faith

25  effort to "wait the defendant out" in hopes that he will be coerced

26  to give up his right to remain silent and enter into a cooperation

27  agreement with the government. Battista and Paige are ignoring the

21

defendant's choice to remain silent, to have the case unsealed, to
be provided with discovery and to have a timely progression of the
proceedings. Instead, they continue to deliberately delay the
proceedings by working towards virtually no progress in the instant
case and using the defendant's incarceration coupled with holding
the defendant's discovery hostage in an attempt to harass the
defendant until he agrees to enter into a cooperation agreement
with the government.

      3. The defendant bears no weight

      The period of time between the defendant's arrest, August 3,
2008, and the day that the defendant informed Humy that he chose to
remain silent, roughly September 9, 2008, is neutrally weighted
delay. The period of time from roughly September 9, 2008 to the
present is delay heavily weighted towards the government even with
the defendant's last two attorneys partially responsible. "Litigants
are generally bound by the conduct of their attorneys, absent
egregious circumstances." U.S. v. Guerra de Aguilera, 600 F.2d 752,
753 (9th Cir. 1979). The instant case is engulfed in egregious
circumstances. As outlined in preceding sections of this memorandum,
both Crowe and Paige were/are in collusion with the government to
deliberately delay the case. Whether it be a complete lack of
diligence over a 5 month period as with Crowe or deceitful and
deceptive tactics (i.e. holding discovery hostage as a means of
coercion) as with Paige, both defense attorneys failed the
defendant. The Ninth Circuit has previously stated, "failures of
court appointed counsel... are attributable to the state." Coe v.
Thurman, 922 F.2d 528, 531 (9th Cir. 1990). For the instant case,

22

1  not only did the defendant's court appointed attorneys fail but

2  they did so while in collusion with the government. They

3  deliberately delayed the case so that the delay itself would gain

4  the government a tactical advantage.

5      In U.S. v. Tanh Huu Lam, the delay was attributable to Lam's

6  court appointed attorney, however, "Lam ultimately benefited from

7  the time [his attorney] invested in preparing his case" and "Lam

8  never moved to substitute counsel or dismiss the indictment prior

9  to trial." Tanh Huu Lam, 251 F.3d at 858. For those reasons, the

10 Lam court weighted the trial delay towards Lam and not towards the

11 government. In the instant case, the defendant has not benefited

12 from the time Crowe and Paige invested into harassing the defendant

13 in an attempt to coerce him into giving up his right to remain

14 silent. The defendant has not benefited from Crowe and Paige

15 colluding with the government to deliberately delay the

16 proceedings. Furthermore, the defendant entertained Crowe's

17 decision to withdraw, where Crowe noted his likely "future"

18 ineffective assistance; the defendant filed a pretrial memorandum,

19 with an attached Bar complaint copy, notifying the Court of Paige's

20 ineffective assistance; and the motion attached to this memorandum,

21 which the defendant filed, moves this Court to dismiss the

22 indictment with prejudice.

23     A minor portion of the delay resulted from the transition

24 period where Paige took over Crowe's position as counsel for the

25 defendant. An indigent defendant may not delay trial by finding

26 fault with his assigned counsel absent showing of how alleged

27 fault would adversely affect the defendant's representation. See

1   Ballard v. Walker, 772 F.Supp. 1335 (E.D.N.Y. 1991). Crowe's lack
2   of diligence and choice to deliberately delay the case to gain the
3   government a tactical advantage was certainly a fault that
4   adversely affected the defendant's representation. Crowe's choice
5   to pursue a defense strategy requiring, at some point, that the
6   defendant give up his right to remain silent, while the defendant
7   refused to do so, is certainly a fault that adversely affected the
8   defendant's representation. At the hearing regarding Crowe's
9   motion to withdraw, the defendant informed the Court that Crowe had
10  a complete lack of understanding regarding certain elements of the
11  case. Furthermore, the defendant informed the Court that Crowe had
12  done absolutely nothing for the 5 months he represented the
13  defendant and, considering that, it would make no difference if
14  another attorney took his place.

15       4. In conclusion

16       Entering into a cooperation agreement is a decision that needs
17  to made early on in the proceedings by the **defendant**. A defense
18  strategy involving a cooperation agreement is an entirely different
19  vehicle compared to a defense strategy not involving a cooperation
20  agreement. Neither defense strategy can commence until there is an
21  affirmative determination made by the defendant to either exercise
22  his right to remain silent or give up that right. The defendant
23  chose early on in the proceedings to exercise his right to remain
24  silent. The government and the defendant's last two attorneys
25  refuse to accept the defendant's choice to remain silent and in
26  doing so they were/are deliberately delaying the proceedings.

27       In order for this Barker factor to be weighted heavily against

the government, the trial delay must result from bad faith or a dilatory purpose by the government. See Loud Hawk, 474 U.S. at 315-16. Bad faith encompasses a deliberate effort to prejudice or harass the defendant, while a dilatory purpose will include efforts made by the government to gain a tactical advantage. See Loud Hawk, 474 U.S. ay 315; Barker, 407 U.S. at 531; Marion, 404 U.S. at 325.

For the instant case, the reason for the delay weighs heavily on the side of the government considering that the reason for the delay **is the delay.** The government is using the deliberate delay itself, in collusion with the defendant's last two attorneys, as a tactical advantage to "wait the defendant out" as a means of harassment and coercion in hopes that the defendant will give up his right to remain silent and enter into a cooperation agreement with the government.

C. Whether and how the defendant asserted the speedy trial right (Barker test part 3)

Courts have ruled that relevant factors to be considered in determining the sufficiency of the accused's attempts to assert the speedy trial right include whether the defendant had the assistance of counsel, whether the defendant was properly advised by counsel, whether the defendant was ignorant of his rights, whether the defendant was incarcerated and whether there were deliberate acts of government prosecutors and investigators that resulted in long delays. See e.g., U.S. v. Hill, 310 F.2d 601 (4th Cir. 1962); Prince v. State of Ala., 507 F.2d 693 (5th Cir. 1975). For the instant case, although the defendant received ineffective assistance of counsel, was improperly advised by counsel, was ignorant of his

25

rights, was incarcerated and suffered from deliberate delays weighted towards the government he still made numerous assertions of his 6th Amendment right to a speedy trial. A waiver of the right to speedy trial must be an intentional relinquishment or abandonment of the right. See U.S. v. Geelan, 520 F.2d 585 (9th Cir. 1975). "[I]f delay is attributable to the defendant, then his [speedy trial] waiver may be given effect under standard waiver doctrine, the demand rule aside. Standard waiver doctrine defines waiver as an intentional relinquishment or abandonment of a known right or privilege." U.S. v. Sandoval, 990 F.2d 481, 483 (9th Cir. 1993) (internal quotation marks and emphasis omitted)(quoting Barker, 407 U.S. at 529;  Johnson v. Zerbst, 304 U.S. 458, 464 (1938)). For the instant case, the delay is not attributable to the defendant and the defendant did not waive, relinquish or abandon his 6th Amendment right to a speedy trial.

1. Express assertion of speedy trial right

On about September 9, 2008 the defendant chose to be transported out of his home state of California to the state of Arizona where he had absolutely no resources or contacts. His previous attorney, Humy, gave him the option of remaining in California if he chose to "resolve the case" without trial or be transfered to Arizona to proceed with trial. The defendant's desire to proceed with trial without unnecessary delays was so great that he chose to abandon his home state and he had Humy argue for his immediate transfer in opposition to the government's counter arguments asking for further delays.

On September 25, 2008 the defendant arrived in Arizona and had

26

a court appearance at the federal courthouse in Phoenix. The
defendant's stand in attorney was Craig Orent ("Orent") from the
Federal Defender's office. Within minutes of meeting Orent, the
defendant stated to Orent, "I want to exercise my right to a speedy
trial." Orent responded with, "You need to slow down, alright? It
isn't up to you anyways, it is up to your attorney and up to the
prosecutor." Orent led the defendant to believe that the decision
to assert the defendant's 6th Amendment right to a speedy trial is
a decision to be made by the defendant's court appointed attorney
and the prosecutor. At the time, the defendant was completely
ignorant of his rights and had never studied criminal or
Constitutional law. Orent, in fact, failed to follow a direct
instruction given to him by the defendant. Orent, through his
improper advice, shied the defendant away from addressing the Court
on his own behalf considering he was led to believe that aggressive
express assertion of his 6th Amendment speedy trial right  was
"not up to him". The defendant remained ignorant and illadvised of
his 6th Amendment right to a speedy trial and statutory rights under
the Speedy Trial Act ("STA") up until roughly May 1, 2009.

The defendant realizes, and would have realized on September 25,
2008, that a trial within 70 days pursuant to the STA is not
realistic and typically never occurs. The defendant, with his
instruction to Orent, intended to assert his speedy trial right in
the effect that he wanted the trial to commence without unnecessary
delays and with motions for continuances filed only when absolutely
necessary. Although unknown to the defendant at the time, that
assertion falls perfectly in line with the provisions of the STA.

1 | The STA sets out provisions for "excludable delay" to ensure that
2 | continuances are granted only when absolutely necessary. If the
3 | government and the defendant's attorneys would have used the STA as
4 | intended, and not violated his 6th Amendment speedy trial right,
5 | then the defendant posits that his trial would have commenced no
6 | later than March 23, 2009, 8 months from the date of his indictment.
7 | Instead, the defendant's attorneys used frivolous continuances
8 | supported by needs for more time, however, those needs were created
9 | by the government's own dalliance, i.e., deliberate delays weighted
10 | towards the government to gain a tactical advantage.

11 |     Given the fact that the defendant's attorneys abused the STA to
12 | mask the violation of the defendant's 6th Amendment right to a
13 | speedy trial, it would have made no difference if the defendant
14 | would have stood up in court and made an aggressive express demand
15 | for a speedy trial. However, had the defendant not been improperly
16 | advised and led to believe that assertion of his 6th Amendment
17 | speedy trial right was "not up to him" then he would have certainly
18 | made an aggressive express demand for a speedy trial to every judge
19 | he was brought before.  Had the defendant been properly advised, he
20 | would have made said aggressive assertion with an understanding
21 | that merited "excludable delay" continuances may be filed and he
22 | would have aggressively objected to any continuances, or other
23 | delay, setting the trial date past 8 months from the date of his
24 | indictment. Naturally, neither Crowe nor Paige counseled the
25 | defendant on his speedy trial right considering they were/are in
26 | collusion with Battista to deliberately delay the instant case in a
27 | bad faith effort to gain the government a tactical advantage. The

28

1 | The defendant never aggressively and expressly objected to any
2 | continuances, however, in the words of the Barker court, "We do not
3 | hold that there may never be a situation in which an indictment may
4 | be dismissed on speedy trial grounds where the defendant has failed
5 | to object to continuances. There may be a situation in which the
6 | defendant was represented by incompetent counsel[] [or] was severely
7 | prejudiced... ." Barker, 407 U.S. at 536. The defendant was clearly
8 | ignorant up until roughly May 1, 2009, as outlined in preceding
9 | paragraphs of this section, and under advisement by ineffective
10 | incompetent counsel, as outlined in preceding sections of this
11 | memorandum. "Litigants are generally bound by the conduct of their
12 | attorneys, absent egregious circumstances." Guerra de Aguilera, 600
13 | F.2d at 753. "[F]ailures of court appointed counsel... are
14 | attributable to the state." Coe, 992 F.2d at 531. The defendant was
15 | hoodwinked by a handful of very clever attorneys where deceit and
16 | dishonesty was part of their artfulness.

17 | On roughly March 14, 2009 the defendant examined the majority
18 | of the attached exhibits. After that examination, the defendant
19 | became aware that the delay involving Crowe and Battista was
20 | deliberate and used in a bad faith effort to "wait the defendant
21 | out" in an attempt to coerce the defendant into a cooperation
22 | agreement. On May 1, 2009, after the video teleconference, the
23 | defendant became aware that his current attorney, Paige, was
24 | involved in a similar collusion with Battista. Once the defendant
25 | became aware, he began researching the speedy trial issue and then
26 | began work on this memorandum and attached motion.

27 | 2. Implied assertion of speedy trial right

29

1   The defendant made a profound effort to advance the instant
2   case which resulted in numerous aggressive implied demands for a
3   speedy trial. The defendant's aggressive implied demands show that
4   even while improperly advised by his attorney and, for the majority
5   of the time, completely hoodwinked with respect to the deliberate
6   delays he still did everything in his power to assert his speedy
7   trial right.
8       On September 27, 2008 the defendant began actively developing
9   pretrial and trial defense strategies relevant to the instant case.
10  Beginning October 6, 2008 continuing to January 18, 2009, the
11  defendant sent his legal strategies to Crowe, via letters, and
12  instructed Crowe to act upon them. None of the strategies involved
13  a cooperation agreement, a plea agreement or any other strategy that
14  does not involve a speedy trial. Crowe failed to pursue any legal
15  strategy and either ignored or marginalized the defendant's
16  strategies. As previously discussed, Crowe instead worked in
17  collusion with Battista to coerce the defendant into a cooperation
18  agreement.
19      In Crowe's January 22, 2009 letter to the defendant, page 3
20  paragraph 2, Crowe stated that he was filing a motion to withdraw
21  as counsel for the defendant. **(Ex. [11])** Realizing that Crowe had
22  done absolutely nothing to progress the case, the defendant began
23  work on a number of pro se motions that Crowe had failed to file.
24  The bulk of the motions pertained to the defense strategies
25  developed by the defendant that were sent to Crowe previously. Once
26  completed, the pro se motions were filed with the Court along with
27  a motion urging the Court to accept the motions despite the

30

1  defendant's representation. The defendant argued that the Court
2  should accept the motions in lieu of having the defendant be exposed
3  to Crowe's future or present ineffective assistance. See defendant's
4  pro se "Ex Parte Order Application For Filing Accepting And Ruling
5  On Recent Pro Se Motions", p. 3 at 5-8, February 17, 2009 ("The
6  defendant requests this Court to rule on the noted motions in lieu
7  of having the defendant suffer from the future possibility, or the
8  present certainty, of ineffective assistance of counsel."). See
9  also Crowe's "Motion To Withdraw As Counsel For Defendant", p. 2 at
10 4-5, January 23, 2009 ("... the Defendant's right to receive the
11 effective assistance of counsel under present arrangements will
12 likely be compromised."). Furthermore, additional pro se motions
13 were filed by the defendant after Campbell granted Crowe's motion
14 to withdraw. Prior to this motion, the defendant has filed the
15 following pro se motions relevant to his defense:
16 1) Motion For Appointment Of Specialized Defense Counsel Admitted
17 To CJA Panel Pro Hac Vice Pursuant To This Court's General Order
18 07-08; filed February 6, 2009.
19 2) Brief In Response To Defense Counsel's "Motion To Withdraw As
20 Counsel For Defendant"; filed February 6, 2009.
21 3) Ex Parte Order Application For Appointment Of Specialized
22 Defense Counsel Admitted To CJA Panel Pro Hac Vice Pursuant To This
23 Court's General Order 07-08; filed February 6, 2009.
24 4) Motion For In Camera Examination Of Grand Jury Transcripts To
25 Find Perjurous Testimony And Evidence Of Prosecutorial Misconduct
26 Pursuant To Fed. R. Crim. P. 6(e)(3)(E)(ii); filed February 17,
27 2009.

31

5) Motion For Order Granting The Defendant Grand Jury Transcripts Pursuant To Fed. R. Crim. P. 6(e)(3)(E)(ii); filed February 17, 2009.

6) Motion For Order Granting Defendant Bill Of Particulars Pertaining To Confidential Informant Identities And Other Information As Required Under Roviaro; filed February 17, 2009.

7) Ex Parte Order Application For Filing, Accepting And Ruling On Recent Pro Se Motions; filed February 17, 2009.

8) Motion To Take Judicial Notice Of The Definition Of "Person" As An Adjudicative Fact Pursuant To Fed. R. Evid. 201; filed March 3, 2009.

9) Motion To Compel The Government To Disclose Specific Discovery As Requested Pursuant To Fed. R. Crim. P. 16 And Other Applicable Authority; filed March 3, 2009.

Many of the pro se motions filed by the defendant reflect upon instructions given to Crowe by the defendant that Crowe failed to follow. None of the above listed motions suggest that the defendant was trying to avoid trial, delay trial or enter into a cooperation agreement with the government. The defendant filed a motion requesting bills of particulars regarding confidential informants and, in another motion, alleged investigator perjury and prosecutorial misconduct against the very people seeking his "cooperation". The defendant would not have filed those motions if he had any intention of waiving his right to a speedy trial or any intention of entering into a cooperation agreement with the government.

On February 25, 2009, during the hearing regarding Crowe's

1 | motion to withdraw, the defendant notified the Court that he had not
2 | met Crowe until that very hearing, roughly 5 months into their
3 | attorney-client relationship. The defendant further notified the
4 | Court that Crowe had done absolutely nothing to progress the case
5 | and that discovery had not been provided. The defendant exhibited
6 | an overall concern regarding the delay and lack of progress. If the
7 | defendant was seeking to avoid a speedy trial then he would not have
8 | exhibited such concern.

9 | Beginning March 17, 2009 continuing to May 1, 2009, the
10 | defendant actively engaged his current attorney, Paige, with
11 | his intentions to go to trial. The defendant's implied assertions of
12 | his right to a speedy trial, during that period, are evident
13 | throughout preceding sections of this memorandum and referenced
14 | documents.

15 |     3. The defendant's fundamental right to go to trial is
16 |        violated and, in effect, his right to a speedy trial is
17 |        violated

18 | Rights that have been found to be inherently personal and of
19 | fundamental importance such that only the defendant, not counsel,
20 | may waive them include the right to go to trial. See Boykin v.
21 | Alabama, 395 U.S. 238, 242 (1969). The defendant has been actively
22 | seeking a speedy trial and in doing so actively seeking to go to
23 | trial. The defendant's attorneys, while in collusion with Battista,
24 | actively sought/seek to deliberately delay the instant case in an
25 | attempt to coerce the defendant into a cooperation agreement
26 | against his wishes. If there is to be a cooperation agreement then
27 | there is to be no trial. If there is to be no trial then there is to

33

1  be no speedy trial. By failing to pursue a trial, the defendant's

2  attorneys are, in effect, waiving the defendant's right to go to

3  trial and, in effect, waiving the defendant's right to a speedy

4  trial.

5      D. The prejudice to the defendant (Barker test part 4)

6      The final Barker factor requires this Court to consider

7  prejudice to the defendant: (1) oppressive pretrial incarceration;

8  (2) anxiety and concern; and (3) impairment of the defense. See

9  Barker, 407 U.S. at 532. This Court "should presume prejudice []

10 [considering] the defendant isn't responsible for the delay." U.S.

11 v. Aguirre, 994 F.2d 1454, 1457 (9th Cir. 1993) (quoting Doggett,

12 505 U.S. at    ). "Where the government is negligent in pursuing a

13 defendant, prejudice will be presumed and its weight in defendant's

14 favor will depend on the length of the delay." Aguirre, 994 F.2d

15 at 1456 (quoting Doggett, 505 U.S. at    ). For the instant case,

16 prejudice is clearly presumed resulting in this Barker factor being

17 weighted towards the government, albeit not heavily considering the

18 length of the delay is not incredibly severe as was in Doggett.

19 Presumptions aside, due to the government's dalliance, the

20 defendant has suffered significant actual non speculative prejudice.

21 The actual prejudice suffered by the defendant adds considerable

22 weight towards the government in this Barker factor.

23      1. Oppressive pretrial incarceration

24     In Valentine, the Ninth Circuit found that "one month's

25 imprisonment is a serious matter," however, they further found that

26 "it was [not] overly oppressive." Valentine, 783 F.2d at 1418.

27 Being of significant concern, the defendant has been incarcerated

34

1  since August 3, 2008, ten times longer than in the Valentine case.
2  "[I]ncarceration, along with the attendant anxiety to an accused, is
3  of significant concern given the centrality of the liberty
4  component of the prejudice inquiry." Lam, 251 F.3d at 860; See also
5  U.S. v. MacDonald, 456 U.S. 1, 8 (1982). The oppressive pretrial
6  incarceration experienced by the defendant weighs heavily against
7  the government in this Barker factor.
8       From September 25, 2008 to the present, the defendant has been
9  incarcerated at Corrections Corporation of America, Central Arizona
10 Detention Center ("CCA-CADC"), a for profit private detention
11 center under contract with the United States Marshal Service
12 ("USMS"). CCA-CADC operates with virtually no government oversight
13 and, due to that lack of oversight, the defendant has suffered from
14 treatment falling below established standard levels. Typically,
15 merely being incarcerated is not considered oppressive in and of
16 itself. "However, were the oppressiveness of such conditions to
17 worsen or the treatment of the accused to fall below established
18 standard levels, so as to place the physical or mental integrity of
19 the accused in jeopardy for example, the length of pretrial delay
20 which a just system in a civilized society could tolerate would
21 have to be reconsidered." Wells v. Petstock, 941 F.2d 253
22 (3rd Cir. 1991). The established standard levels that CCA-CADC is
23 to operate under is dictated by the USMS/CCA-CADC business contract
24 awarded effective November 4, 1999, identified as MS-99-D-0057
25 ("USMS/CCA-CADC contract"). Portions of the USMS/CCA-CADC contract
26 are attached. (Ex. [15]) The government drafted the USMS/CCA-CADC
27 contract, in part, to protect federal pretrial detainees housed at

35

1 CCA-CADC from oppressive pretrial incarceration. CCA-CADC has

2 violated numerous sections of the USMS/CCA-CADC contract causing the

3 defendant to suffer from severe oppressive pretrial incarceration.

4     Chapter 6 section O(3) of the USMS/CCA-CADC contract (page C-23)

5 states in part, "Strip searches must take place in a location where

6 visual privacy is ensured and without television monitors."

7 **(Ex. [15])** On February 25, 2009 at the federal courthouse in

8 Phoenix, after the hearing regarding Crowe's motion to withdraw,

9 the defendant was strip searched by CCA-CADC staff in a manner that

10 violated chapter 6 section O(3) and the defendant's rights. The

11 defendant was 1 of 7 detainees ordered into a cell having a 4 foot

12 by 6 foot standing floor area (roughly estimated). The defendant

13 and the other detainees were ordered to strip fully naked as a

14 group and were then subjected to visual cavity searches as a group.

15 The standing floor area of the cell was so small that skin on skin

16 contact was unavoidable. This was especially the case when the

17 detainees were ordered to bend over as a group for the visual anus

18 searches. The strip searches were also conducted in plain view of

19 stationary USMS surveillance cameras that were surely connected to

20 "television monitors." On September 25, 2008 at the federal

21 courthouse in Phoenix, the defendant was subjected to a similar

22 search under similar circumstances. CCA-CADC has a general policy

23 to conduct strip searches in large groups, in tight spaces and in

24 front of television monitors.

25     Being strip searched in the manner explained above is

26 oppressive.

27     Chapter 6 section N(5) of the USMS/CCA-CADC contract

1 (page C-22-23) states in part, "Two (2) sets of handcuffs or one set
2 of handcuffs with a black box, should be used on federal prisoners
3 who are escape risks." (Ex. [15]) A "black box" is a device that
4 covers up access to each cuff's locking mechanism. By doing so, the
5 cuffs are no longer flexible and become rigid. This restraint is not
6 only uncomfortable, it is also painful, particularly in the manner
7 utilized by CCA-CADC. After their use,  wrists hurt and shoulders
8 ache for days. The defendant submitted a "Prisoner Informatoin
9 Request" form to CCA-CADC Chief of Security Harold Newton asking if
10 the defendant was designated as an escape risk. The response
11 indicates that the defendant is not an escape risk and is designated
12 as low custody. (Ex. [16]) Despite the defendant's low custody non
13 escape risk status, the defendant is always transported by
14 CCA-CADC while under restraint of the painful "black box". The
15 defendant was transported, under restraint of a "black box", from
16 the federal courthouse in Phoenix to CCA-CADC on September 25, 2008
17 and to and from the federal courthouse in Phoenix on February 25,
18 2009.

19     Being transported in painful restraints reserved for high
20 custody escape risks while being designated a low custody non
21 escape risk is oppressive.

22     On March 27, 2009 there was a serious "detainee disturbance" in
23 700 unit at CCA-CADC (the defendant is currently housed in 500
24 unit). Multiple federal detainees were stabbed while under the
25 supervision of CCA-CADC. The stabbings purportedly resulted in one
26 death. Chapter 6 section H of the USMS/CCA-CADC contract
27 (page C-21) states in part, "The contractor shall conduct thorough

1  searches for contraband at least twice monthly of all federal
2  prisoner living quarters and other areas to which federal prisoners
3  have access." **(Ex. [15])** From September 25, 2008 to April 5, 2009,
4  the defendant neither experienced nor witnessed CCA-CADC fulfilling
5  their contractual obligations under chapter 6 section H. The
6  defendant reports that there had been absolutely no thorough
7  searches for contraband prior to the serious "detainee disturbance"
8  that occured on March 27, 2009. After the serious "detainee
9  disturbance," CCA-CADC staff finally conducted a thorough search
10  for contraband pursuant to chapter 6 section H. Since that time,
11  roughly 6 weeks prior to June 1, 2009, CCA-CADC has continued to
12  ignore their contractual obligations under chapter 6 section H. An
13  audit of the Log Books required under chapter 6 section E of the
14  USMS/CCA-CADC contract would reveal, unless fabricated, evidence
15  that CCA-CADC conducted only one thorough search between September
16  25, 2008 and June 1, 2009. Incidents such as stabbings are less
17  likely to occur if CCA-CADC took seriously their contractual
18  obligations. Considering CCA-CADC ignores chapter 6 section H, the
19  defendant and all other detainees at CCA-CADC are at risk of being
20  victims of serious "detainee disturbances."
21      Being incarcerated at a facility that fails to conduct thorough
22  searches for contraband on a regular basis, even after a clear
23  need for such is shown, is oppressive.
24      The USMS/CCA-CADC contract provides an explanation for the term
25  "Rated Capacity" which is the original architectural design
26  capacity plus or minus capacity changes resulting from building
27  additions, reductions or revisions. Capter 3 section C(II) states

1  that CCA-CADC is to "at all times staff the facility to accommodate

2  the maximum rated capacity of its facility." CCA-CADC has 9 units

3  each architecturally rated for 256 detainees distributed through 6

4  pods. Each unit has 2 "gang cell" pods designed to hold 50 detainees

5  and 4 pods of individual 2 man cells that are designed to hold 38

6  to 40 detainees. Additionally, CCA-CADC has a small medical ward

7  and what is known as "old segregation" of an unknown capacity. Each

8  of those is substantially smaller. Thus, the facility has a rated

9  capacity of about 2350 detainees. Therefor, as long as CCA-CADC

10  staffs for that capacity they comply with chapter 3 section C(II)

11  even though they continuously load most units at 150% of the

12  architectural capacity, e.g., 3 detainees housed in 2 man cells.

13  With all the extra detainees, staffing is insufficient to handle the

14  needs of the actual detainee population.

15      Being incarcerated at a facility that is overcrowded and under

16  staffed is oppressive.

17      The above matters are not all inclusive of the oppressive

18  pretrial incarceration experienced by the defendant.

19      2. Anxiety and concern

20      The Ninth Circuit has previously noted that "[c]onclusory

21  allegations of general anxiety and depression are present in almost

22  every criminal prosecution... therefor... such allegations...

23  constitute a minimal showing of prejudice." Simmons, 536 F.2d at

24  831-32. For the instant case, the anxiety and concern suffered from

25  by the defendant is not conclusory but actual. The actual anxiety

26  and concern suffered from by the defendant weighs heavily against

27  the government in this Barker factor.

1    The defendant suffers from anxiety and concern over the
2    oppressive pretrial incarceration outlined in section II(D)(1) of
3    this memorandum. Whether it be oppressive strip searches,
4    unnecessary painful restraints, lack of security, overcrowding or
5    any of the other matters not specifically listed, the defendant
6    suffers from anxiety and concern over his oppressive pretrial
7    incarceration.

8        The very purpose of the government's deliberate delay, in
9    collusion with Crowe and Paige, is to cause anxiety and concern for
10   the defendant as a means of coercion. Although not to the point of
11   being coerced, the government has succeeded in causing anxiety and
12   concern for the defendant. The defendant suffers from anxiety and
13   concern over the fact that the government is using bad faith
14   tactics and over the fact that his defense attorneys were/are
15   advocating for the government and not for him. The fact that the
16   defendant is forced to file numerous motions without the aid of
17   legal counsel causes anxiety and concern for the defendant.

18       Other than his September 25, 2008 appearance, the defendant has
19   had only one court appearance in roughly 8 months. CCA-CADC failed
20   to transport the defendant to the December 22, 2008 hearing where
21   the defendant was ordered to appear. The defendant experiences
22   anxiety and concern over his lack of court appearances as expressed
23   in various letters sent to his attorneys.

24       The above matters are not all inclusive of the anxiety and
25   concern experienced by the defendant.

26       3. Impairment of the defense
27       "[T]he major evils protected against by the speedy trial

40

1 | guarantee exists quite apart from actual or possible prejudice to an
2 | accused's defense." Marion, 404 U.S. at 320. "[P]rejudice of this
3 | sort cannot be proved easily," therefor, "[w]e must then balance
4 | that impairment with the degree of government's dalliance." Beamon,
5 | 992 F.2d at 1013. While postaccusation delay may impair ability to
6 | present effective defense, speedy trial guarantee primarily protects
7 | against undue impairment of liberty. See MacDonald, 456 U.S. at 8;
8 | Marion, 404 U.S. at 320. For the instant case, both the defendant's
9 | liberty and his ability to present an effective defense have been
10 | impaired. When the impairment of the defendant's defense is balanced
11 | with the degree of the government's dalliance, that impairment
12 | weighs heavily against the government in this Barker factor.

13 |     The defendant is indigent and has been appointed various defense
14 | attorneys by the Court. The trial delay in the instant case is a
15 | result of heavily weighted deliberate delays purpetrated through
16 | the government's misconduct in collusion with the defendant's
17 | previously defense counsel, Crowe, and now continuing with the
18 | defendant's current defense counsel, Paige. Part of the government's
19 | delay tactic, while in collusion with the defendant's attorneys, is
20 | to delay the unsealing of the case. The case being sealed for 10.25
21 | months, against the defendant's wishes, aids the purpose of the
22 | government's deliberate delay, i.e., coerce the defendant into a
23 | cooperation agreement. The case being sealed is attributable to
24 | the delay considering having the case sealed is intertwined with
25 | the delay and part of the speedy trial issue. This is not unlike
26 | the Constitution intertwining "public trial" with "speedy trial".
27 | See U.S. Const. Amend. VI.

1    Delaying the unsealing of the case prevents the defendant from
2    discussing or sharing elements of the case with interested parties
3    that will be able to help him prepare his defense. Considering the
4    defendant has been provided with only ineffective incompetent
5    assistance, he drastically needs this option available to him. The
6    defendant's defense was/is being impaired due to the unavailability
7    of this option. Without this option, the defendant only had/has
8    access to ineffective incompetent assistance.

9    Delaying the unsealing of the case prevents the defendant from
10   obtaining certain documents relevent to his defense. For example,
11   the defendant instructed Paige to provide him with a copy of the
12   master docket, copies of all filed motions and copies of search
13   affidavit returns that still have not been provided to the defendant
14   despite statutory requirements and a court order. Obviously, Paige
15   refused to follow those instructions. If the case had been unsealed
16   then the defendant could have worked around the ineffective
17   incompetent assistance that has been provided and obtained
18   documents on his own. Many documents, such as the master docket and
19   all filed motions, would be available on PACER if the case was not
20   sealed. Not having a copy of the master docket and all filed
21   motions has impaired the defendant's ineffective/incompetent
22   assistance defense, due process right violation defense and also
23   this speedy trial right violation defense. Having access to those
24   documents, up to this point, would have further helped the
25   defendant in establishing those defense strategies.

26   The government failed to provide discovery, other than the
27   minimal "preliminary discovery", until roughly 4 months after it

42

1  was formally requested. During that period, the government had all
2  the needed information to build their prosecution strategies while
3  the defendant and his attorney had only "preliminary discovery" to
4  build their defense strategies. Now that it is absolutely clear to
5  the Court that the defendant asserted his speedy trial right with
6  his decision to be transfered to Arizona nearly 9 months prior to
7  filing the attached motion, the Court, if the attached motion is
8  denied, will likely drastically excel the proceedings to a
9  significant degree. If that is the case then the government would
10 have had roughly an extra 4 months to prepare their prosecution
11 with access to discovery that the defendant had no access to during
12 that period. Under this scenerio, that roughly 4 month loss in
13 defense preparation time will never be regained and the defendant's
14 defense will be impaired. In the alternative, if the Court grants
15 continuances for a 4 month "make up period" then the defendant's
16 claim of that roughly 4 month delay period being attributable to
17 the government will be further substantiated. In either case,
18 impairment of the defendant's defense was/is unavoidable.
19      As previously mentioned, the defendant posits that if he would
20 have had effective competent assistance from the day of his arrest,
21 and if the government was not deliberately delaying the case, then
22 his trial should have commenced on March 23, 2009. If the Court
23 denys  this motion then it will be faced with an altimatum. The
24 Court would either have to (1) put the trial off until, for example,
25 February 1, 2010--incidently roughly the date Paige posits the trial
26 will commence if he is to remain counsel--or (2) drastically excel
27 the proceedings. Doing (1) of the altimatum would further

43

1 substantiate the defendant's speedy trial right violation claims as
2 outlined in this memorandum. At that point, continuing on with the
3 proceedings, while their is a clear showing that the defendant's
4 speedy trial right has been violated, would put the case in a state
5 of self purpetuating mootness considering the indictment should have
6 already been dismissed. Further explained, making a finding that
7 the case should commence, for example, 8 months from June 1, 2009,
8 further substantiates the fact that the trial should have already
9 commenced 8 months from July 23, 2008, the date of the indictment.
10 Doing (2) of the altimatum would act to mitigate the defendant's
11 current claims, however, it would also impair the defendant's
12 defense considering he would not have the needed 8 months, with the
13 assistance of effective competent counsel, to prepare for trial.
14 The cause of the drastic exceleration would be the speedy trial
15 issue, therefor, the speedy trial issue is the cause of the
16 impairment. Further explained, if, as a result of the speedy trial
17 issue, the Court sets the trial date on, for example, August 1,
18 2009, then the defendant's speedy trial right violation claims, as
19 outlined in this memorandum, would be further substantiated.
20     Prejudice as a factor in a speedy trial claim is not confined
21 to merely an impairment of the defense but includes any threat to
22 what has been termed an accused's significant stakes, psychological,
23 physical and financial, in the prompt termination of a proceeding
24 which may ultimately deprive him of life, liberty or property. See
25 U.S. v. Dreyer, 535 F.2d 112 (3rd Cir. 1976).
26 III. IN CONCLUSION
27     Barker requires dismissal of the indictment for violation of

1  6th Amendment speedy trial right and district courts may not fashion
2  less extreme remedies. See Barker, 407 U.S. at 522; Strunk v. U.S.,
3  412 U.S. 434, 439-40 (1973). A dismissal with prejudice in this
4  case would help ensure that no one else is subjected to deliberate
5  trial delays, purpetrated through government misconduct, in a bad
6  faith effort to harass and coerce the accused into giving up his
7  right to remain silent.
8      For the foregoing reasons, the defendant respectfully requests
9  that this Court dismiss the indictment with prejudice due to
10 violation of the defendant's 6th Amendment speedy trial right.
11 ///
12 ///
13 ///
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///

45

EXHIBIT [01]
United States v. Rigmaiden
08CR814

CLIENT'S COPY

U.S. Department of Justice

United States Attorney
District of Arizona

| | |
|---|---|
| *Two Renaissance Square* | *Main:* (602) 514-7500 |
| *40 North Central Avenue, Suite 1200* | *Main Fax:* (602) 514-7693 |
| *Phoenix, Arizona 85004-4408* | *Direct Line:* (602) 514-7636 |
| | *Direct Fax:* (602) 514-7450 |

September 5, 2008

Received
SEP 8 2008
Federal Public Defender
San Jose, CA

Nicholas P. Humy
Supervising Attorney
San Jose Federal Public Defender's Office
160 West Santa Clara Street, Suite 575
San Jose, California 95113

Re:   United States v. Steven Travis Brawner/Daniel David Rigmaiden
      CR-08-814-PHX-DGC

Dear Mr. Humy:

You and your client have advised the United States Attorney's Office that you are interested in your client cooperating in the investigation of criminal charges by this District and the Northern District of California. The following procedure is necessary in order to place the United States in a position to adequately evaluate whether or not your client's cooperation is in its best interest. It has been proposed that you and your client meet with investigating agents for the purpose of an "off-the-record" proffer or discussion. We are willing to consider such an "off-the-record" proffer or discussion in formulating an appropriate resolution of this matter. Specifically, it is necessary to assess the value of your client's information and cooperation. For the purpose of allowing the prosecution to assess the credibility and value of the evidence and possible testimony that he says he can provide, it has been agreed that your client will first reveal everything that he knows about crimes in Arizona and all other states and countries, and that he will do so completely, truthfully and without guile. It is also understood in this regard that your client is not entitled at this juncture to any specific consideration regarding possible charges against him just because he will have given to the prosecution such a statement. Any consideration, if any at all, will be unilaterally determined by me only after the statement is made.

In order to assure that there are no misunderstandings concerning the meaning of "off-the-record", I am writing to clarify the ground rules for any "off-the-record" proffer or discussion. First, no statements made by or other information provided by you during the "off-the-record" proffer or discussion will be used against you in the Government's case-in-chief. Second, the Government may make derivative use of and may pursue any investigation leads suggested by any statements made by or other information provided by you. This provision is necessary in order to eliminate the necessity for a Kastigar [406 U.S. 441 (1972)] hearing at which the Government would have to prove that the evidence it would introduce at trial is not tainted by any statements made by or other information provided by you during the "off-the-record" proffer or discussion. Third, in the event that your client is a witness at the trial of the above-captioned criminal matter and offers testimony materially different from any statements made or other information provided during the "off-the-record" proffer or discussion, the attorney for the Government may cross-examine him

Letter to Nicholas P. Humy
Re: <u>United States v. Steven Travis Brawner/Daniel David Rigmaiden</u>
Page 2

concerning any statements made or other information provided. This provision is necessary in order to assure that your client does not abuse the opportunity for an "off-the-record" proffer or discussion, does not make materially false statements to a Government agency, and does not commit perjury when testifying at trial. Fourth, after we discover what he has to say, our unilateral evaluation of his position will be under taken in good faith.

I trust that you will find these ground rules fair and reasonable. If you wish to engage in an "off-the-record" proffer or discussion under these ground rules, please sign this letter where indicated below. Once signed, please return the original to me and retain the copy for your files.

Sincerely yours,

DIANE J. HUMETEWA
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Assistant United States Attorney

_____
DANIEL DAVID RIGMAIDEN
Defendant

_____
NICHOLAS P. HUMY
Counsel for Defendant

EXHIBIT [02]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

October 23, 2008

Steven Brawner
U.S. Marshal No. 10966111
c/o CCA
P.O. Box 6300
Florence, AZ 85232

*Personal and Confidential*
*Legal Mail-Privileged*

Re:    **United States v. Daniel Rigmaiden aka Steven Brawner
       Case No. CR08-814-PHX-DGC**

Dear Daniel:



The first matter on which I need your input is whether you have any interest whatsoever in participating in any so-called "free talk" with the government in this case. At present, I am not in a position to make any recommendation to you as to whether such action would be in your best interests. It is my intention to meet and confer with Mr. Battista in order that he can "explain" the case. Of course, I do not take what I hear from Mr. Battista at face value, but I will benefit from learning more about the government's theory of the case and its intentions. I will conclude the meeting with Mr. Battista by stating that I will confer with you and be in further contact with him. Thereafter, I will schedule a video conference at which time you and I can discuss the matter in more detail.



Sincerely,

Tom Crowe

TC/cam
Enclosures

EXHIBIT [03]
United States v. Rigmaiden
08CR814

Case 2:08-cr-00814-DGC   Document 100   Filed 06/08/09   Page 66 of 121

Thomas Crowe
Attorney Client Correspondance
100 East Washington, Suite 200
Phoenix, AZ 85034

Daniel Rigmaiden aka
Steven Brawner #10966111
PO Box 6300
Florence, AZ 85232

Tom:

the case.

coupled with a motion to unseal

Letter to The
Daniel Rigmaiden/Steven Brawner

1. Cooperation

In your letter dated 10-23-2008 you asked for my input regarding cooperation with the government.

One thing is for certain, Fred's letter sent to Nicholas Humy on 9-5-2008 regarding the terms of a "cooperation deal" is laughable to say the least. Fred's letter has some confusing wording in regards to his assumption that I expressed interest in cooperation.

EXHIBIT [04]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

January 5, 2009

Steven Brawner
U.S. Marshal No. 10966111
c/o CCA
P.O. Box 6300
Florence, AZ 85232

*Personal and Confidential*
*Legal Mail-Privileged*

Re:   **United States v. Daniel Rigmaiden aka Steven Brawner**
      **Case No. CR08-814-PHX-DGC**

Dear Daniel:



Steven Brawner
Daniel Rigmaiden
January 5, 2009
Page 2

I simply needed to ascertain whether

Steven Brawner
Daniel Rigmaiden
January 5, 2009
Page 3

you had an interest in cooperating fully and completely with the government for the purpose of obtaining a possible reduction in the sentencing guidelines offense level by reason of the "substantial assistance" provision of § 5K1.1. You have made it clear that you are not in a position to proceed in that fashion and, of course, I respect your decision. (**) There was another reference in your letter that ties into the issue of cooperation which I do not believe was separately numbered; namely, the unsealing of the indictment. As you know, it is unusual for a proceeding in which only one defendant is named to remain sealed. The court had the same question at our last hearing. Usually the reason offered is that other persons in the case have yet to be apprehended. Here, according the government, the matter remain sealed pending determination as to whether you elected to cooperate and for no other reason. Having ruled out that factor, I will request that the government move to unseal the indictment. Should there be any reticence on the part of the government, which I doubt, I will make the motion directly to the court.

Steven Brawner
Daniel Rigmaiden
January 5, 2009
Page 6



Based on the foregoing, our next steps will include the following: (a) I will inform the government that we will not be providing "substantial assistance" in connection with its investigation and, therefore, that the government should move to unseal the case;

More specifically, I can explain to Mr. Battista that you are simply not in a position to cooperate (the government understands that collateral consequences can

Steven Brawner
Daniel Rigmaiden
January 2009
Page 7

result from cooperation which are not necessarily in a defendant's best interests) and seek
to secure the best plea agreement possible.

Sincerely,

Tom Crowe

TC/cam

Enclosure

EXHIBIT [05]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

December 22, 2008

Frederick A. Battista
Assistant United States Attorney
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004-4408

Re:   **United States v. Steven Brawner aka Daniel Rigmaiden**
      **Case No. CR08-814-PHX-DGC**

Dear Fred:

Enclosed please find a copy of each of the defendant's five (5) motions filed herein on November 8, 2008, copies of which were provided to me by the clerk in open court this morning.

Under the circumstances, I do not believe that it would productive for me to attempt to persuade the defendant to withdraw the motions. He has obviously invested considerable time and effort in drafting them on or about November 3, 2008. Instead, I believe that it would be more useful for me to address the defendant's concerns regarding the validity of the search warrant and explore whether he has any interest in pursuing the government's tentative proposal regarding cooperation and a possible plea coupled with a possible §5K1.1 recommendation. Thereafter, depending upon the indications I received from the defendant, we may pursue additional discovery as may be warranted.

The clerk pointed out to me that the motions are technically pending and need to be addressed. Accordingly, I would suggest that the government file a response to those motions. The responses, or combined response, would obviously be timely since the government was not served with a copy of said motions at the time they were filed. I will be in further contact with you after the first of the year. Best regards.

Frederick A. Battista
December 22, 2008
Page 2

Sincerely,

Tom Crowe

TC/cam
Enclosures

P.S.
PRINTER CATRIAGE DEFECTIVE.

EXHIBIT [06]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

January 12, 2009

Frederick A. Battista
Assistant United States Attorney
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004-4408

Re:     **United States v. Steven Brawner aka Daniel Rigmaiden**
        **Case No. CR08-814-PHX-DGC**

Dear Fred:

First, in supplement to our recent communications, I understand that the government will be filing its motion in the relatively near future to facilitate providing additional discovery to the defendant; namely, a motion which addresses the manner in which certain discovery which contains confidential information will be handled.

Second, as you know, I have inquired of the defendant with regard to what action, if any, he wants me to take regarding the (5) motions which he sought to file on November 8, 2008. As you know, copies of those papers were not previously provided to me or to the government. I will be in further contact with you as soon as I receive his instructions.

Third, I have informed the defendant that the government remains interested in having representatives of the IRS and your office engage in a "free talk" for the purpose of discussing his role and the role of others in the alleged offenses. Subject to the nature and value of the information provided, I have informed the defendant that this may present the possibility of a § 5K1.1 recommendation at sentencing. To date, the defendant has not authorized me to state that he wishes to proceed in that fashion. Of course, should he decide otherwise, I will be in contact with you. I appreciate the fact that timeliness may be an issue.

Finally, and regardless of whether the defendant elects to cooperate, I assume that the government will be moving to unseal the case based, in part, on the colloquy among the court and counsel at our last court appearance. You may indicate in your motion that the defendant

Frederick A. Battista
January 12, 2009
Page 2

does not oppose the motion.  Best regards.

Sincerely,

Tom Crowe

TC/cam

EXHIBIT [07]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**

A Professional Association
Established in 1979

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

January 12, 2009

Steven Brawner
U.S. Marshal No. 10966111
c/o CCA
P.O. Box 6300
Florence, AZ 85232

*Personal and Confidential*
*Legal Mail-Privileged*

Re:   **United States v. Daniel Rigmaiden aka Steven Brawner**
      **Case No. CR08-814-PHX-DGC**

Dear Daniel:



On a separate note, Mr. Battista again stated that he believed that the IRS would be interested in speaking with you in the event you elected to cooperate with them. I reiterated the fact that you had not authorized me to pursue such cooperation. Regardless, I reminded him that he was at liberty to move to unseal the proceedings if he so chose. Best regards.

Steven Brawner
January 12, 2009
Page 2

Sincerely,

Tom Crowe

TC/cam

EXHIBIT [08]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

CLIENT'S COPY

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

October 22, 2008

Frederick A. Battista
Assistant United States Attorney
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004-4408

**Re:** **United States v. Steven Brawner aka Daniel Rigmaiden**
**Case No. CR08-814-PHX-DGC**

Dear Mr. Battista:

This letter will constitute our initial discovery request on behalf of Mr.Rigmaiden, charged by indictment under the name of Steven Brawner, with respect to the above captioned matter.

Pursuant to Rule 16, *Federal Rules of Criminal Procedure*, we request the government to provide us with the following discovery and, as appropriate, to furnish or permit inspection and copying of the following:

1.      Any relevant written or recorded statements made by the Defendant, or copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government; the substance of any oral statements whether before or after arrest in response to interrogation by any person then known to the Defendant to be a government agent. *Fed. R. Crim. P.* 16(a)(1)(A) and (B).

2.      Identification of the content and, as precisely as possible, the date, time and place of any utterances, statements or actions by the Defendant upon which the government intends to rely at trial in order to establish the offenses charged in the information.

Frederick A. Battista
October 22, 2008
Page 2

    3.     Identification of the names and addresses of all persons who may have been present at or have personal knowledge of the utterances, statements or actions of the Defendant upon which the government intends to rely at trial to establish the offenses charged in the information.

    4.     The Defendant's prior criminal record. *Fed. R. Crim. P.* 16(a)(1)(D).

    5.     All other acts of the Defendant which the government will use at trial pursuant to *Fed. R. Crim. P.* 404(b).

    6.     Books, papers, documents, photographs, tangible objects or copies or portions thereof which are within the possession, custody or control of the government, and which are material to the preparation of the Defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belonged to the Defendant. *Fed. R. Crim. P.* 16(a)(1)(E).

    7.     Any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

    8.     All statements of all witnesses, including reports, supplements, notes, memoranda, tapes, videos, etc.

    9.     Evidence of the criminal conduct - - local, state or federal - - on the part of any person whom the government intends to call as a witness at trial.

    10.    Identification of any judicial proceedings in any criminal case involving (as a witness, defendant or otherwise) any person whom the government intends to call as a witness at the trial of this case.

    11.    Identification of any and all promises, understandings or agreements, formal or informal, between the government, its agents and representatives and persons (including counsel for such persons) whom the government intends to call as witnesses at trial, together with copies of all documentation pertaining thereto. This request includes, but is not limited to, such promises, understandings, or agreements as may have been made in connection with other cases or investigations.

    12.    Any information as to whether any evidence obtained or derived from the

Frederick A. Battista
October 22, 2008
Page 3

execution of a search warrant will be used against the Defendant at trial.

13.    The names and addresses of all persons whom the government, its agents and representatives, believe to have relevant knowledge and/or information with reference to the charge contained in the information but whom the government does not propose to call as witnesses at trial.

14.    Any information in any form whatsoever the existence of which is known or, by the exercise of due diligence, may become known to the government bearing upon the credibility of any person whom the government intends to call as a witness at trial, including but not limited to any prior criminal record, any pending criminal indictment or information, and any pending criminal investigation related to any activity of such person.

15.    Identification of any statement reflecting, relating or referring to any discussion or conversation in which the government suggested that an individual might be afforded more favorable treatment in any regard in the event such individual offered evidence against the Defendant.

16.    The existence and identification of each occasion on which a government witness has testified before or, or his/her testimony or information has been presented to any court or grand jury.

17.    Identification of any orders of immunity and the applications therefore for any person whom the government intends to call as a witness at trial, together with any documentation which was submitted to the Department of Justice with regard thereto.

18.    The names and addresses of those persons, along with a summary of the testimony the government intends to use under Rules 702, 703 or 705 under the *Federal Rules of Evidence* during its case in chief at trial.   The written summary shall include the opinions the expert will offer at trial, the basis and reasons therefor, and the qualifications of the expert.   *Fed. R. Crim. P.* 16(a)(1)(G).

19.    In addition to the information and material requested above, any documents, books, papers, photographs, scientific tests or experiments, tangible objects, written or recorded statements, grand jury transcripts, oral statements, reports, memoranda, or other evidence or information which either tends to exculpate the Defendant, or tends to be favorable or useful to the defense as to either guilt or punishment, or tends to affect the weight or credibility of the evidence to be presented against the Defendant, or which may lead to evidence favorable or exculpatory to the Defendant, which is within the possession, custody or control of the government, the existence of which is known or, by the exercise of

Frederick A. Battista.
October 22, 2008
Page 4

due diligence, may become known to the attorneys for the government. *Fed. R. Crim. P.* (a)(1)(E).

Each of these requests is of a continuing nature, and calls for supplementation of any answer as soon as the government discovers additional evidence, information or material which is responsive to the foregoing. In addition, each request in each paragraph of this letter incorporates the government's obligations pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and other applicable law.

Sincerely,

Tom Crowe

TC/cam

Frederick A. Battista.
October 22, 2008
Page 5


bcc:   Steven Brawner # 10966111
       CCA
       P.O. Box 6300
       Florence, AZ 85232

EXHIBIT [09]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

CLIENT'S COPY

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

October 22, 2008

Frederick A. Battista
Assistant United States Attorney
40 North Central Avenue, Suite 1200
Phoenix, AZ 85004-4408

> **Re:   United States v. Steven Brawner aka Daniel Rigmaiden**
> **Case No. CR08-814-PHX-DGC**

Dear Fred:

Enclosed please find our standard discovery request. In addition, I wanted to direct your attention to certain specific items which the defendant believes are material to his defense, which may contain exculpatory information and which may be in jeopardy of being otherwise disposed of prior to the conclusion of these proceedings.

Briefly, certain computer storage devices and related equipment belonging to Mr. Brawner/Rigmaiden (hereinafter, "the defendant") were seized by the government during searches of his apartment and storage unit. I have, of course, not had access to the data and do not know what it consists of. However, the defendant reports that, "The data contains exculpatory evidence."

I wanted to bring this matter to your attention as promptly as possible because the same or similar property appears to be the subject of pending administrative forfeiture proceedings initiated by the Internal Revenue Service . Among other things, the IRS indicates that absent a valid and timely claim being filed by the defendant, the property will be subject to being "disposed of" on or after November 5, 2008.

I have reviewed the applicable provisions of the Criminal Justice Act and have also inquired of the Federal Public Defender for the District of Arizona as to whether the scope of my appointment extends to the pending administrative forfeiture proceedings. The

Frederick A. Battista.
October 22, 2008
Page 2

response I have received is less than categorical. At a minimum, however, it appears to me at this early juncture that the two matters are clearly related and may well overlap one another. Having not seen or reviewed the materials, I have no way of independently determining whether the materials sought to be forfeited and disposed of contain evidence relevant to this case including possible *Brady*-related material.

Accordingly, this is to request that the government not only refrain from disposing of any materials seized in connection with the foregoing searches and seizures conducted in relation to the defendant, but also that the government affirmatively take such steps are may be necessary to preserve any and all such evidence pending our opportunity to review it and determine its evidentiary value. Best regards.

Sincerely,

Tom Crowe

TC/cam

Frederick A. Battista.
October 22, 2008
Page 3


bcc:    Steven Brawner # 10966111
        CCA
        P.O. Box 6300
        Florence, AZ 85232

EXHIBIT [10]
United States v. Rigmaiden
08CR814



CLIENT'S COPY

**U.S. Department of Justice**

United States Attorney
District of Arizona

Received
SEP 8 2008
Federal Public Defender
San Jose, CA

*Two Renaissance Square*
*40 North Central Avenue, Suite 1200*
*Phoenix, Arizona 85004-4408*

Main: (602) 514-7500
Main Fax: (602) 514-7693
Direct Line: (602) 514-7636
Direct Fax: (602) 514-7450

September 5, 2008

Nicholas P. Humy
Supervising Attorney
San Jose Federal Public Defender's Office
160 West Santa Clara Street, Suite 575
San Jose, California 95113

     Re:   <u>United States v. Steven Travis Brawner/Daniel David Rigmaiden</u>
           CR-08-814-PHX-DGC

Dear Mr. Humy:

     Enclosed please find a package of preliminary discovery for your consideration in the above-cited case. The discovery includes the following information:

     In Hard Copy:

-   Search Warrant Application and Affidavit – Apartment – 08-70503
-   Order Authorizing Disclosure of Search Warrant Application and Affidavit – Apartment – 08-70503
-   Order Authorizing Disclosure of Search Warrant Application and Affidavit – Apartment – 08-70460

     On Disc:

-   ATM Video – 4/22/08
-   ATM Video – 4/21/08
-   ATM Photos Nos. 1-5 – 4/21/08
-   Defendant's Computer Ledger of His Assets – "Books"
-   FedEx Kinkos Videos of $68,000 Pick-Up – Cameras Nos. 1, 7, 8 & 10
-   Santa Clara Police Department Reports of Defendant's Arrest – 8/3/08
-   Defendant's Booking Photo – Monterey, California – 1999
-   Search Warrant Application and Affidavit – Apartment – 08-70460
-   Search Warrant and Return – Apartment – 08-70503
-   Search Warrant and Return – Apartment – 08-70460
-   List of Serial Numbers of $68,000.00 in $100 .00 Bills Sent to Defendant in Course of Undercover Operation

Letter to Nicholas P. Humy
Re: <u>United States v. Steven Travis Brawner/Daniel David Rigmaiden</u>
Page 2


Obviously, there is additional discovery to be disclosed at a later date. In light of the detailed information set forth in the search warrant affidavits, we believe this is sufficient information to permit the defendant to decide how to proceed regarding the upcoming removal hearing and the government's offer to participate in a free-talk/off-the-record discussion. Please be advised that the keys to defendant's apartment were found on his person during the search incident to his arrest. Please also be advised that an order is pending regarding the related storage unit search warrant.

Thank you for your ongoing assistance in this case. If I can be of further assistance, please do not hesitate to contact me at (602) 514-7636.

Sincerely yours,

DIANE J. HUMETEWA
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Assistant United States Attorney


Enclosures

EXHIBIT [11]
United States v. Rigmaiden
08CR814

**CROWE & SCOTT**
A Professional Association
Established in 1979

ATTORNEYS AT LAW

1100 East Washington
Suite 200
Phoenix, Arizona 85034-1090
www.crowescott.com

Tom Crowe

Arizona State Bar Certified Specialist
Criminal Law

Telephone
(602) 252-2570
Fax
(602) 252-1939
Voice Mail
(623) 566-5033

January 22, 2009

Steven Brawner
U.S. Marshal No. 10966111
c/o CCA
P.O. Box 6300
Florence, AZ 85232

*Personal and Confidential*
*Legal Mail-Privileged*

Re:   **United States v. Daniel Rigmaiden aka Steven Brawner**
      **Case No. CR08-814-PHX-DGC**

Dear Daniel:



Steven Brawner
January 22, 2009
Page 2



     7. *Meeting with Battista.*  I have had no personal meeting with Mr. Battista.  I had planned to do so until I learned that he would be providing us with additional discovery. Accordingly, it was my determination that any such meeting would be more fruitful after I received and reviewed such discovery.

Steven Brawner
January 22, 2009
Page 3



After considerable reflection on the matter, I believe that it serves your best interests
to be represented by another lawyer.   Therefore, I have moved to withdraw as your counsel.
My motion is relatively brief simply because I do not want to compromise your interests or
disclose the content of your confidential and privileged communications to me in any way.
I will, of course, continue to represent you until the court enters an order for withdrawal and
substitution of counsel.  I will also be pleased to coordinate with your new counsel.  Best
regards.

Sincerely,

Tom Crowe

TC/cam
Enclosures

EXHIBIT [12]
United States v. Rigmaiden
08CR814



Name: BRAWNER, STEVEN
Section 500    Block Y
Cell 210    Bed A    Location CADC

| Birth | Sex | Race | Release | Admt Type | SS# | Agency ID# | Permanent# | Booked Date | Classification |
|-------|-----|------|---------|-----------|-----|-----------|-----------|-------------|----------------|
| 09/12/1980 | M | W | 00/00/0000 | DE | 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 | 10966111 | 121 2093 | 09/25/2008 | |

Add   Delete   Receipt   Save   Abort

Print ...

EXHIBIT [13]
United States v. Rigmaiden
08CR814

April 20, 2009
Daniel Rigmaiden
RE: Everything in writing; Unseal case; Other
Page # 2 of 9

Daniel Rigmaiden
Aka: Steven Brawner
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85232

Mark Paige
Attorney at Law
111 W. Monroe St. Suite 1212
Phoenix, AZ 85003

Mark:



April 20, 2009
Daniel Rigmaiden
RE: Everything in writing; Unseal case; Other
Page # 6 of 9



6. I need my case unsealed immediately.

I instruct you to file a motion to unseal my case immediately.
I have been instructing each and every one of my attorneys to
have my case unsealed since mid August of 2008. I will not
entertain any more excuses. You once stated that I may, for
example, hit my head, fall unconscious, wake up and then decide
that I wish to cooperate/offer substantial assistance. You stated
that under those circumstances it would be better if the case
remained sealed. Again, I have absolutely no intention to
cooperate/offer substantial assistance and, in fact, have nothing
to offer the government.

Having my case sealed is detrimental to my defense for
numerous reasons. I am unable to discuss my case and share documents
pertaining to my case with interested parties. All proceedings
are significantly delayed due to restraints on electronic filing
and due to the need to have individual documents unsealed as the
case progresses. Furthermore, leading on the government in the
way all of my attorneys have insisted opens me up to the
possibility of vindictive prosecution. You once stated to me that
it would be detrimental to my defense to do anything that may
aggravate the government with respect to their investigation and

April 20, 2009
Daniel Rigmaiden
RE: Everything in writing; Unseal case; Other
Page # 7 of 9

---

prosecution. Leading the government on with respect to cooperation/
substantial assistance will certainly aggravate them when they
finally learn that I have nothing to offer them.

I refer you to Tom Crowe's December 23, 2008 letter, addressed
to me, page 1 paragraph 2; Tom Crowe's January 5, 2009 letter,
addressed to me, page 2 paragraph 2 continuing to page 3 paragraph
1; Tom Crowe's January 12, 2009 letter, addressed to me, page 1
paragraph 3; and the December 22, 2009 status conference hearing
transcripts (you still have not provided those to me). The above
noted documents indicate that the case is still sealed because
the government has the impression that I am willing to cooperate/
offer substantial assistance. Please immediately file a motion to
unseal the majority of the instant case including all documents'
pertaining to all warrants. I require that you use your
professional judgement to determine what elements of the case
should remain sealed. The portion of the February 25, 2009 court
hearing transcripts recorded when the government was out of the
court room should remain sealed. The financial statement I was
required to complete in order to qualify for court appointed
counsel should remain sealed as well.

In the event of your "hit my head" scenerio, I completely
and unequivically indemnify and hold you harmless with respect to
any detrimental effect unsealing the case will have on my
defense. I, as your client, kindly instruct you to follow the
instructions contained in this section of this letter.

EXHIBIT [14]
United States v. Rigmaiden
08CR814

May 1, 2009 (date log drafted)
Daniel Rigmaiden
Legal Visit Log # 0002 - CR08-814-PHX-DGC
page # 2 of 4

---

                    Legal Visit Log # 0002 - CR08-814-PHX-DGC

1. Date log drafted: May 1, 2009

2. Date/time of legal visit: May 1, 2009/9:25am to May 1, 2009/
10:00am (times are approximate)

3. Type of legal visit: video teleconference

4. Location of legal visit: Corrections Corporation of America,
Central Arizona Detention Center 1155 North Pinal Parkway,
Florence, AZ 85232 in "VTC"

5. Participants:

1) Daniel Rigmaiden ("DR"), defendant; participant # 1 of 3

2) Mark Paige ("MP"), counsel for defendant; participant # 2 of 3

3) [first name inaudible] Dworken ("Dworken"), computer forensics
specialist; participant # 3 of 3

6. Matters discussed and events that took place (in summary):

May 1, 2009 (date log drafted)
Daniel Rigmaiden
Legal Visit Log # 0002 - CR08-814-PHX-DGC
Page # 3 of 4



5) MP informed DR that Battista stated at their meeting that the government is interested in having DR engage in a "show and tell" meeting. MP informed DR that at this meeting the government would make statements and DR would remain silent. MP informed DR that at the meeting the government's entire investigation would be explained including the investigative techniques used to track down the broadband access card. MP informed DR that the meeting would also be a prerequisite or gateway to a substantial assistance/cooperation agreement that would require future meetings where DR would make statements. DR informed MP that he already chose to remain silent and has nothing to offer the government regardless. DR asked MP to mail him a copy of the written "show and tell" agreement contract. MP informed DR that there would be no written contract and that he does not see why a contract would be needed.

May 1, 2009 (date log drafted)
Daniel Rigmaiden
Legal Visit Log # 0002 - CR08-814-PHX-DGC
Page # 4 of 4



7) DR informed MP that he needs copies of all discovery so that he can understand the case and that it is not an unreasonable request. DR reminded MP that he has made numerous requests regarding the matter. MP informed DR that he does not see how providing DR with discovery would help DR. MP informed DR that 600 pages of the discovery he recently viewed were just photocopies of U.S. currency and MP used that example to support his argument to provide DR with only a very minor portion of the discovery. DR informed MP that he needs copies of everything no matter how relevant or irrelevant. MP informed DR that he does not see the point in providing DR with copies of his discovery due to MP's belief that some of it, such as photocopies of U.S. currency, would not be relevant. DR informed MP that instead of wasting time "picking and choosing" what evidence to provide DR he should just provide DR with copies of everything. MP insisted that DR enter into the "show and tell" agreement with the government to learn about his case instead of learning from the discovery.

EXHIBIT [15]
United States v. Rigmaiden
08CR814

| AWARD/CONTRACT | 1. THIS CONTRACT IS A RATED ORDER<br>UNDER DPAS (15 CFR 350) | RATING | PAGE OF PAGES |
|---|---|---|---|
| | | | 2 |

| 2. CONTRACT (Proc. Inst. Ident.) NO.<br>MS-99-D-0057 | 3. EFFECTIVE DATE<br>Nov 4, 1999 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO.<br>0 |
|---|---|---|

| 5. ISSUED BY | CODE | COD | 6. ADMINISTERED (if other than Item 5) | CODE |
|---|---|---|---|---|

UNITED STATES MARSHALS SERVICE
Procurement Office
600 ARMY NAVY DRIVE, CS#3, 1121
ARLINGTON, VIRGINIA 22202-4210

**7. NAME AND ADDRESS OF CONTRACTOR** *(No., street, city, county, State and ZIP Code)*

Corrections Corporation of America
Attn: Brent Turner
10 Burtons Hills Boulevard
Nashville, TN 37215

**8. DELIVERY**
[ ] FOB ORIGIN   [X] OTHER   *(See below)*

**9. DISCOUNT FOR PROMPT PAYMENT**
NET 30

**10. SUBMIT INVOICES** *(4 copies unless other wise specif)* TO THE ADDRESS SHOWN IN:   ► ITEM: Section G

| CODE | | FACILITY CODE | |
|---|---|---|---|

**11. SHIP TO/MARK FOR**   CODE   COD

AS SPECIFIED ON INDIVIDUAL TASK ORDERS

**12. PAYMENT WILL BE MADE BY**   CODE

U.S. Marshals Service
111 W. Monroe, Suite 1020
Phoenix, AZ 85003-1798

| 13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION: | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| [ ] 10 U.S.C. 2304(c) ( )   [ ] 41 U.S.C. 253(c) ( ) | |

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | PRE-TRIAL DETENTION SERVICES FOR HOUSING OF AN ESTIMATED 2,000 PRE-TRIAL ADULT DETAINEES WITHIN 100 MILES OF THE FEDERAL COURT CITIES OF PHOENIX AND TUCSON, ARIZONA | | | | |

Total over 3 years

**15G. TOTAL AMOUNT OF CONTRAC** ► $147,964,287

**16. TABLE OF CONTENTS**

| (X) | sec. | PART I - THE SCHEDULE | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICIATATION/CONTRACT FORM | 2 | X | I | CONTRACT CLAUSES | 6 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 3 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 51 | X | J | LIST OF ATTACHMENTS | 1 |
| X | D | PACKAGING AND MARKING | 1 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 2 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 12 |
| X | F | DELIVERIES OR PERFORMANCE | 3 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 4 | | L | INSTRS. CONDS., AND NOTICES TO OFFEROR | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 8 | | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

**17. [X] CONTRACTOR'S NEGOTIATED AGREEMENT** *(Contractor is required to sign this document and return   3   copies to issuing office)* Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. ( *Attachments are listed herein.*)

**18. [ ] AWARD** Contractor is not required to sign this document.) Your offer on Solicitation Number _____ including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

| 19A. NAME AND TITLE OF SIGNER *(TYPE OR PRINT)* | 20A. NAME OF CONTRACTING OFFICER |
|---|---|
| Linda G. Cooper, V.P. Legal Affairs | Peter Reese |

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| BY *(Signature of person authorized to sign)* | 4.15.99 | BY *(Signature of Contracting Officer)* | 9/7/99 |

nsn 7540-01-152-8069
PREVIOUS EDITION UNUSABLE

STANDARD FORM 26 (REV. 4-85)
Prescribed by GSA

**H.    Control of Contraband.**

The contractor shall conduct thorough searches for contraband at least twice monthly of all federal prisoner living quarters and other areas to which federal prisoners have access, as well as, all vehicular traffic and supplies entering and leaving the facility.   Searches shall be unannounced and irregularly timed and shall be conducted with minimum disturbance to federal prisoner possessions.   Any contraband items shall be confiscated.   Records of searches shall be prepared and maintained.   A copy shall be provided to the COTR as part of the daily incident or activity report.

**I.    Keys and Locks.**

The contractor shall provide a written policy and procedure governing the control and use of keys.   These procedures shall include, but are not limited to:

1.    Method of inspection to expose compromised locks or locking mechanisms and method of replacement for all damaged keys and locks;

2.    A preventive maintenance schedule for servicing locks and locking mechanisms and method of logging all work performed on locks and locking mechanisms; and

3.    Policy for restricting security keys from 24-hour issue and removal from the institution and method of issuing emergency keys.   Emergency keys shall be available for <u>all</u> areas of the facility to which emergency access or egress may be necessary.

Procedures shall include the requirement to notify the COTR immediately in the event a key or locking mechanism is compromised.

**J.    Tools and Culinary Equipment.**

The contractor shall provide written policy and procedures governing the control and use of tools and culinary equipment.   The control system must provide for tools brought into the facility by outside maintenance persons.

**K.    Control of Chemicals.**

The contractor shall ensure that federal prisoners are never in possession of items such as lye, insecticide, antifreeze, or any flammable materials.   Such materials shall be stored in secure areas that are unaccessible to federal prisoners.   This requirement must comply with OSHA regulations.

**L.    Post Orders.**

The contractor shall prepare comprehensive post orders for each staffed post in the facility and provide to the COTR for review and approval prior to implementation.   Copies of post orders and changes to post orders shall be submitted in writing and approved by the COTR prior to implementation.   Post orders shall be available to all employees.   All correctional officers shall certify in writing that they fully understand and agree to comply with all post orders prior to the officer being initially assigned to that post.   Correctional officer certifications shall be retained by the contractor and made available to the COTR upon request.

**M.    Use of Force.**

The use of physical force by correctional officers is restricted to instances of justifiable self-protection, protection of others, protection of property,

prevention of escapes, and only to the degree necessary to safeguard the well being of the federal prisoner(s) and others in the immediate area. A verbal report shall be provided to the COTR or designee immediately. A written report shall be prepared prior to the responsible correctional officer(s) being relieved of their shift. A copy of the report shall be submitted within forty-eight (48) hours to the COTR through the CEO.

1.  The physical force report shall include:

    a.  An accounting of the events leading up to the use of force;

    b.  An accurate and precise description of the incident and reasons for employing force;

    c.  A description of the injuries suffered, if any, and the treatment given and/or received; and;

    d.  A list of all participants and witnesses to incident.

2.  In no case shall physical force be used as punishment or discipline.

3.  The Policy Statement on the use of deadly force attached in Section J is informational only. It does not in any way authorize the contractor to use deadly force not authorized by state law.

4.  The contractor's written policy shall identify appropriate responses under different circumstances and locations (e.g., confined areas, living quarters, facility grounds, transporting federal prisoners, pursuing escapees from the facility) and differentiate between the use of lethal and non-lethal force.

5.  All instances of use of force shall be communicated to the COTR or designee when reasonably practicable. A detailed written report reviewed and approved by the CEO shall be provided to the COTR within 48 hours of the incident.

N.  Use of Restraints.

The contractor shall provide written policy and procedure governing the use of restraint equipment on USMS federal prisoners.

1.  The restraining equipment routinely used consists of handcuffs, waist chains, and leg irons. Disposable nylon straps may be used in lieu of handcuffs or leg irons only in emergencies or mass arrest situations. They also may be used when an federal prisoner's wrists or ankles are too large for conventional restraints. Authorized supplemental restraining devices are pad locks, lead chains, black or blue boxes, tape (to cover locks only) and, under special circumstances, straight jackets and cargo straps. All other devices are prohibited.

2.  A federal prisoner should not be secured to a fixed object under circumstances that would endanger the federal prisoner's life.

3.  Handcuffs and leg irons will be double locked when in use. The keyhole on handcuffs will face away from the body. The keyhole on leg irons will face the ground. Restraints will be inspected frequently to discourage escape manipulation.

4.  Correctional officers responsible for federal prisoner custody, production, and transport must ensure the safeguarding of all security equipment and upkeep of such equipment.

5.  When federal prisoners are transported by automobile, station wagon, bus or van, handcuffs, waist chains and leg irons will be used on each federal prisoner. Two (2) sets of handcuffs or one set of handcuffs



with a black box, should be used on federal prisoners who are escape risks.

6.    Leg irons will be used on federal prisoners confined to a hospital bed which does not have a jail ward.  If leg irons must be removed for medical or other compelling purposes, handcuffs will be applied prior to removal of the leg irons, and handcuffs will not be removed prior to applying leg irons.  Leg irons and/or handcuffs will not be removed from a federal prisoner undergoing medical care when he bathes or showers.  When compelling medical reasons dictate, restraining devices will not be used.

7.    All instances of use of restraints for purposes of long term immobilization or in conjunction with the use of force, shall be communicated to the COTR or designee when reasonably practicable.

8.    A detailed written report reviewed and approved by the CEO, shall be provided to the COTR or designee within 48 hours of the incident.

9.    The routine uses of restraints for movement and incidental control of federal prisoners does not have to be reported to the COTR.

O.    **Searches.**

The contractor shall provide a written policy and procedure for the following:

1.    Pat down searches, strip searches, body cavity searches, including those searches that require intrusion or digital intrusion into body cavities, and X-ray searches.

2.    The contractor's written policy shall require, at a minimum, that strip searches be performed during the admission process, and prior to removal of a federal prisoner from the facility for the purposes of a courtroom appearance, and prior to federal prisoners transportation via the Justice Prisoner and Alien Transportation System (JPATS).  Contractor shall ensure that federal prisoners do not possess tobacco products when scheduled to appear in court or as otherwise directed by the COTR or designee.

3.    Strip searches must take place in a location where visual privacy is ensured and without television monitors.  Searches of body areas covered by bandages or dressings should be conducted by a physician, physician's assistant, or nurse, if at all possible.  Strip searches will be conducted only by a member of the same sex, if at all possible.

4    An intrusion or digital intrusion search will be undertaken only when there is probable cause to believe that the federal prisoner has concealed contraband in a body cavity.  Intrusion and digital intrusion searches will be conducted by a physician, physicians assistant, or nurse unless exceptional circumstances require emergency action by non-medical personnel.  The reason for such a search and the results thereof must be documented in detail in a report that shall be made available to the COTR or designee upon request.  If circumstances indicate that an intrusion search is justified, but not immediately required for personal security reasons, the U.S. Attorney should be contacted regarding the advisability of a search warrant in light of recent case law regarding internal searches of federal prisoners.

5.    A photographic search using x-rays for swallowed contraband, contraband hidden in casts, prosthetic devices in federal prisoners property.  The reasons for this search and the results thereof must be documented in detail in a report that shall be made available to the COTR upon

6.   Federal prisoners will not be permitted medication except that prescribed by a physician or as indicated by a physician. Medication which must be administered by hypodermic syringe will be injected only by medical personnel.

7.   Handcuff and leg iron keys will not be carried on the same key ring as motor vehicle ignition keys or other general use keys.

8.   Guests, hitchhikers, and persons not serving in an official capacity, or other persons not in the custody of the USMS will not be permitted in vehicles while federal prisoners are being transported.

**B.   Form USM-553 Medical Summary of Federal Prisoner/Alien in Transit.**

USMS federal prisoner's TB test results are to be documented by a health care professional in the TB Clearance section at the upper hand corner of Form USM-553. The sections entitled <u>TB Clearance</u>, <u>Current Medical Problems</u>, <u>Medication Required for Care En Route</u> and <u>Special Needs Effecting Transportation</u> of the Form USM-553 (all medical information) are to be completed by appropriate health care professionals at the jail. If the federal prisoner refuses to undergo TB testing, the refusal should be documented and the jail should notify the U.S. Marshal immediately. The sections entitled <u>Medication Required for Care En Route</u> and <u>Special Needs Effecting Transportation</u> of the Form USM-553 are to be completed by the jail medical staff or the attending physician upon request from the U.S. Marshal or guard who picks up the federal prisoner for transfer from the jail. The Form USM-553 will be given to the Deputy U.S. Marshal.

**C.   Rest Stops.**

Vehicles will be parked as close to the rest rooms as possible. Police facilities should be used when possible. Rest areas on interstate highways should be avoided and facilities should be selected at random after departing the interstate highway. Federal prisoners will not be left unguarded at any time. All federal prisoners will remain under close surveillance at rest stops, both in the vehicle and in the rest rooms. A thorough search of rest stop facilities will be conducted for contraband and items that may be used as weapons, and any item that may be used in an escape attempt prior to permitting federal prisoners use of the facility. Restraining devices will not be removed. Each time a federal prisoner is placed in or removed from a vehicle, all restraints will be thoroughly checked to determine that each device used is secured.

**D.   Transportation Staffing.**

The contractor shall provide a driver and two armed guards if transporting federal prisoners by bus. The contractor shall provide an armed driver and one armed guard if transporting federal prisoners by van or automobile. Additionally, the guards hired for transportation and stationary guard services shall have the same qualifications, receive the same training, complete the same security clearances, and wear the same uniforms as correctional officers provided for in the other areas of this contract.

**E.   Vehicle Loads.**

The contractor shall not attempt to transport more than a full load of federal prisoners per trip in any vehicle. A full load for automobile trips is three federal prisoners in the rear seat behind the barrier. The number of federal

prisoners assigned to a bus or van will not exceed the designed passenger load for that vehicle.

**F.    Vehicles.**

The contractor shall ensure the vehicle, whether bus, van or automobile, includes a secure barrier to separate the federal prisoners from the armed guards. All vehicles used to transport federal prisoners shall be air-conditioned. Inside rear door handles will be removed or rendered inoperable on all sedans used for federal prisoner transport. The driver and guard personnel will be separated from federal prisoners by security screens constructed of plexiglass or steel mesh.

**G.    Vehicle Security.**

Vehicles will be searched prior to use for federal prisoner movements and after each federal prisoner trip. The search will include not only an inspection of the federal prisoner area, but the entire interior of the vehicle, front and back. If the trip involves more than one day, the search shall be completed prior to loading federal prisoners at the beginning of the day and at the end of each day. The contractor shall establish a communications system that has direct and immediate contact with all vehicles and post assignments.

**H.    Stationary/Hospital Guard Services.**

When federal prisoners must be removed from the facility for medical purposes, the contractor shall continue to be responsible for the security of the federal prisoners during the medical appointment. Under no circumstances will a federal prisoner be provided with advance notice of any medical appointments. If the federal prisoner is hospitalized, the contractor shall place guards with the federal prisoner in accordance with instructions from the U.S. Marshal.

1.    Standard hospital guard procedures require federal prisoners in custody to have two armed guards.

2.    Federal prisoners shall be either handcuffed to the bed or in leg irons chained to the bed.

3.    Guards shall keep the federal prisoner under constant supervision 24 hours per day until the federal prisoner is ordered released from the hospital and returned to the jail.

4.    Visits by family and friends will not be allowed without the approval of the U.S. Marshal. Attorney visits may be permitted under conditions of appropriate security. U.S. Marshals may authorize visits to federal prisoners by family members under certain circumstances such as terminal or major illnesses. A list of approved visitors will be developed by the contractor during intake/screening process and provided in advance to guard personnel. Guards are to maintain a visitor register showing name (established with proper identification), address, date, and time of visit. Visits should be limited in length as dictated by USMS policy and hospital policy.

5.    Guards are to instruct hospital personnel that all packages, mail, flowers, etc., must be carefully searched for contraband by guards prior to delivery to federal prisoners. Guards are required to notify the U.S. Marshal or the duty officer regarding any item in question before

EXHIBIT [16]
United States v. Rigmaiden
08CR814

**CORRECTIONS CORPORATION OF AMERICA**
**CENTRAL ARIZONA DETENTION CENTER**

## PRISONER INFORMATION REQUEST
## SOLICITUD DE INFORMACION

TO/PARA _CHIEF OF SECURITY HAROLD NEWTON_

SUBJECT/ASUNTO _I am inquiring as to whether I have been designated_
_an "escape risk" requiring any extra security measures. Please_
_send me back a written response. Thank-you_

_Steven Brawner, detainee book'd as_          _1096611_
PRISONER'S NAME (PRINTED)                      PRISONER'S NUMBER

PRISONER'S SIGNATURE          _B-204-500_        _3-3-2009_
PRIMA DEL PRISONERO           CELL/CELDA         DATE/FECHA

RESPONSE/CONTESTACION _is there a red flag on him?_
_NO REDFLAG; MULTIPLE ALIASES; LOW CUSTODY AT THIS TIME;_
_CUSTODY LEVEL SUBJECT TO CHANGE BASED UPON FURTHER UPDATES &_
_INFORMATION_
                                                _3-7-09_
OFFICIAL'S SIGNATURE/FIRMA DE OFFICIALES         DATE/FECHA

IF RESPONSE IS UNSATISFACTORY, CHECK BELOW AND RESUBMIT THIS FORM FOR REVIEW BY THE FACILITY ADMINISTRA-
TOR. SI LA RESPUESTA NO ES SATISFACTORIA PONGA UNA CRUZ ABAJO Y VUELVA A SOMETER ESTA FORMA PART QUE EL
ADMINSTRADOR DE ESTA INSTITUCION LO REVISE.

(    ) PLEASE REVIEW/REVISE POR FAVOR
                                               SIGNATURE/FIRMA

RESPONSE/CONTESTACION: _____



WARDEN'S SIGNATURE/FIRMA DEL WARDEN          DATE/FECHA

FORM SEC112-P                                      600901-3201