1 | **Daniel Rigmaiden**
Aka: Steven Brawner #10966111
2 | CCA-CADC
PO Box 6300
3 | Florence, AZ 85232
Telephone: none
4 | Email: none

5 | Daniel David Rigmaiden
Defendant as Defendant

6 |

7 | UNITED STATES DISTRICT COURT

**SEALED**

DISTRICT OF ARIZONA

8 |

9 | United States of America,

    Plaintiff,

No. CR08-814-PHX-DGC

10 |

v.

MOTION FOR EMERGENCY ORDER TO
ENSURE PROPER DETENTION
11 | CONDITIONS RE CCA-CADC SECURITY
PROVISIONS FOR DEFENDANT'S USE
12 | Daniel David Rigmaiden,

    Defendant.

OF DISCOVERY
(FILED EX PARTE AND UNDER SEAL)

13 |

14    Defendant, Daniel David Rigmaiden, appearing as defendant,

15 requests this Court to issue an order requiring that Corrections

16 Corporation of America, Central Arizona Detention Center

17 ("CCA-CADC") meet certain conditions when implementing security

18 provisions for the defendant's use of discovery. CCA-CADC is a

19 facility with a history of carelessness, neglect and misconduct.

20 The security provisions suggested by CCA-CADC will likely subject

21 the defendant to oppressive pretrial treatment violating his 5th

22 Amendment right to not be punished at all. The security provisions

23 suggested by CCA-CADC will also certainly violate the defendant's

24 5th Amendment right to due process of law. These assertions are

25 based on the defendant's own personal experiences while detained

26 at CCA-CADC over the last 9 months.

27    Attached is a copy of an email between Mark Paige and his

1

paralegal, Laurianne Litzau, regarding security provisions proposed
by CCA-CADC with respect to the defendant's use of discovery.
**(Ex. [01])** CCA-CADC plans to provide the defendant with a "private
storage locker" and plans to let the defendant view "a box" during
any given period. The defendant is quite familiar with the failures
of the suggested security provisions. Two other CCA-CADC detainees,
Randy Jenkins ("Jenkins") and Ira Gentry ("Gentry") - Case No.
CR06-464-PHX-SRB, were subjected to the exact same security
provisions with respect to their discovery. The "private storage
locker" is an empty janitorial closet in the "new arrival" intake
wing of the facility refered to as "1000 unit." Jenkins and Gentry
were provided with roughly 30,000 pages of discovery. Due to the
amount of discovery, they were housed in 1000 unit so that they
could use the empty janitorial closet to store all the documents.
They were permitted to possess and view one box at a time, i.e.,
the "a box" security provision. Jenkins and Gentry reported to the
defendant that once they were finished viewing "a box", it "took
days" to exchange the box for another. They further reported to the
defendant that, due to the security provisions, they were unable to
cross reference documents that were contained in different boxes.
Jenkins and Gentry reported to the defendant that their defense was
significantly prejudiced due to only having access to one box at a
time. Eventually, through events unknown to the defendant, they
were granted permission to fill their cell from floor to ceiling,
against one cell wall, with multiple boxes of discovery. The third
bed in their 3 man cell was removed and replaced with a table.
Jenkins and Gentry reported to the defendant that only then were

1   they able to adequately prepare their defense. CCA-CADC is well

2   aware of the failures of the "a box" security provision yet they

3   still try to implement it with the defendant.

4       Due to the fact that 1000 unit was the only unit with an empty

5   janitorial closet, Jenkins and Gentry were moved to that unit. The

6   conditions of 1000 unit are well below established standard levels

7   for pretrial detention conditions. Attached is a letter written by

8   Jenkins outlining various conditions of confinement issues at

9   CCA-CADC. **(Ex. [02])** The letter outlines the overall poor

10  conditions of CCA-CADC, however, page 3 to page 4; page 6 section

11  10; page 8 last paragraph to page 9 (regarding extreme cold)

12  describes his experiences while housed in 1000 unit over the years

13  2008 and 2009. 1000 unit is not intended for long term confinement.

14  Jenkins and Gentry were confined in 1000 unit for over a year as a

15  result of CCA-CADC's security provisions with respect to their

16  discovery. Jenkins's letter reports on the following conditions of

17  confinement issues in 1000 unit:

18      1) Detainee population exceeds 200% of rated capacity.
        2) 4 showers to serve 100+ detainees.
19      3) 24 hour detainee receiving and discharge.
        4) Interuptions of sleep.
20      5) Never ending cycle of noise/constant yelling.
        6) Extremely cold temperatures.
21

22  Again, 1000 unit is not intended for long term confinement, it is

23  a "new arrival" intake housing unit where most new detainees spend

24  no more than 14 days.

25      The temperature in 1000 unit is deliberately kept extremely

26  low to "calm down" the new detainees. The defendant has a condition

27  called Raynaud's disease. Those with Raynaud's lose some blood

3

circulation in their outer extremities at the slightest change in temperature. The fingers and toes turn white or take on a bluish tinge as they get colder. They may feel painful or numb. When they warm again, they become red as the blood returns and may throb with pain for a few minutes to several hours. In advanced stages it can weaken the fingers and dangerously damage one's sense of touch. Raynaud's disease runs in the defendant's family. His mother's brother was/is legally disabled partially due to Raynaud's disease. Placing the defendant into 1000 unit will subject him to CCA-CADC's low temperature "calm down" treatment and put his health in jeopardy. The unit the defendant is currently housed in is kept moderately cool, however, the defendant still wears two sweatshirts, two prison garb shirts and two pairs of socks at all times possible, to help combat his Raynaud's disease. The defendant sleeps in the same along with one to two blankets. Moving the defendant to 1000 unit will make his Raynaud's even more difficult to handle. In Gaston v. Coughlin, the court held that "an Eighth Amendment claim may be established by proof that the inmate was subjected for a prolonged period to bitter cold." Gaston v. Coughlin, 249 F.3d 156, 164 (2nd Cir. 2001). Although the temperature in 1000 unit could not be considered "bitter cold," it is cold enough to put the defendant's health in jeopardy.

1000 unit is significantly understaffed considering it has a detainee population exceeding 200% of the rated capacity instead of the typical 150%. Jenkins and Gentry reported to the defendant that obtaining legal copies and legal notary services in 1000 unit is almost impossible. The defendant is currently housed in 500 unit,

pod Y, cell 210. The defendant has invested considerable time
to build a rapport with the staff in 500 unit so that his rights to
legal copies and legal notary services are not violated. The
defendant needs many documents notarized and hundreds of legal
copies made each week. If the defendant is unable to obtain legal
copies and legal notary services then his due process rights will
be violated. For the instant case, this will especially be true if
the Court ever forces the defendant to choose between incompetent
counsel and no counsel at all.

The defendant wishes to avoid the harsh conditions of 1000 unit
and the defendant wishes to not have his right to due process of
law violated. Therefore, the defendant requests that this Court
order CCA-CADC to follow the following conditions when implementing
security provisions for the defendant's use of discovery:

1) The defendant is to remain in 500 unit, pod Y.

2) The defendant is to be provided with all of his discovery
and he will be permitted to store all of his discovery in his
cell.

If the Court is concerned with documents being stolen that
contain personal identifiers then the defendant suggests that the
Court order the government to redact all personal idetifiers from
all discovery or order CCA-CADC to provide the defendant with
lockable boxes to **keep in his cell**. The defendant should not have
to suffer due to the government's lack of knowledge regarding the
"find and replace" feature available on their word processing
software or due to their laziness and unwillingness.

The defendant files this motion as defendant, however, the
defendant respectfully requests that this Court rule on this motion

5

1 and grant the requested order considering the defendant's attorney,

2 Mark Paige ("Paige"), neglected to follow the defendant's

3 instructions on the matter. In the defendant's April 20, 2009 letter

4 to Paige, the defendant recommended to Paige that he seek a court

5 order requiring that CCA-CADC provide the defendant with multiple

6 lockable boxes that the defendant will have access to on a daily

7 basis, i.e., keep in his cell. Instead, Paige wasted court money

8 and the defendant's time by placing the discovery onto CD-ROMs for

9 the defendant. Even the most inexperienced attorneys would know

10 that CCA-CADC detainees are not permitted to possess CD-ROMs. If

11 Paige would have maintained adequate communication with the

12 defendant, e.g., read and respond to the defendant's letters, then

13 Paige's naivete could have been curtailed.

14      It is for the facts, points and authorities setforth herein,

15 that the defendant requests this Court to grant the requested order.

16      LRCrim 12.2 requires the undersigned to include the following

17 in all motions: "Excludable delay under 18 U.S.C. 3161(h) will

18 occur as a result of this motion or of an order based thereon."

19 However, the defendant posits that this motion will not cause any

20 "delay" and objects to any delay as a result of this motion or of

21 an order based thereon.

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

1    Respectfully submitted: June 17, 2009

2

3                                          DANIEL DAVID RIGMAIDEN
                                           Defendant as Defendant

4

5

6                                          Daniel Rigmaiden
                                           Daniel D. Rigmaiden

7                                          Defendant

8

9                        CERTIFICATE OF SERVICE

10       I hereby certify that on June 17, 2009            I caused the

11   following to be placed into the CCA-CADC mailing system for United

12   States Postal Service delivery:

13   Original attached document plus one copy addressed to:

14   Clerk, United States District Court
     Sandra Day O'Connor U.S. Courthouse, Suite 130

15   401 W. Washington St., SPC 1
     Phoenix, AZ 85003

16

17

18

19

20

21

22   BY Daniel Rigmaiden

23

24

25

26

27

                                   7

EXHIBIT [01]
United States v. Rigmaiden
08CR814

**Mark Paige**

| | |
|---|---|
| **From:** | Litz2 |
| **Sent:** | Tuesday, May 19, 2009 3:04 PM |
| **To:** | mpaige |
| **Subject:** | USA V. RIGMIDEN; AKA STEVEN BRAWNER |

Spoke with CCA - Chief of security - Mr. Nooten. Nooten stated inmates cannot have CD's (can make dangerous instruments out of them.) Brawner will be provided a private storage locker that is utilized for him only to store his documents. Either Chief Nooten or his assistant chief Tracy Dickey will have the key. When Rigmiden/Brawner wants to view a box of documents, either of the above will retrieve it for him, give it to him in his cell, and when he is finished return it to the storage locker. Chief Nooten will take receipt of the protective order.

Please call Chief Nooten a few days prior to delivering the boxes.

Nooten - cell
Dickey - cell

Recession-proof vacation ideas. Find free things to do in the U.S.

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 8.5.339 / Virus Database: 270.12.34/2122 - Release Date: 05/19/09 06:21:00

EXHIBIT [02]
United States v. Rigmaiden
08CR814

Corrections Corporation of America
Contract Compliance
10 Burtons Hill Boulevard
Nashville, TN 37215

April 6, 2009

RE: MS-99-D-0057
      Central Arizona Detention Center

     I am an inmate at Central Arizona Detention Center, and have been for nearly three years. I believe I have a good grasp on the duties and responsibilities undertaken by CCA with respect to the above referenced contract. Likewise, I am aware of the many shortfalls which, in my opinion, breach the contract.

     Unfortunately, much of the staff are unaware of the requirements, and for those who are aware, do their best to justify noncompliance. The same can be said for many of the CCA Corporate and Facility Policies.

     My attempts to grieve at a local level are not taken seriously. The grievance process, though reasonable in theory and on its face falls woefully inadequate in the real world implementation.

     On Friday, March 27, there was a serious incident in one of the pods in Unit 700. Several inmates were hospitalized. Rumor has it that stabbings occurred. Such incidents are less likely to occur if CCA took serious their contractual obligation in the Statement of Work, chapter 6, paragraph H.

     An audit of the Log Books required by paragraph E of Chapter 6 would likely reveal no evidence of the contractor conducting thorough searches for contraband.

     Unfortunately, the knee jerk reaction to the incident has been determined by Warden Charles Keeton which further makes unreasonable the conditions of confinement with exacerbated noncompliance of contractual obligations. I enclose his memo to the inmate population for your review.

     On Saturday, March 28, the entire facility was put into lockdown. Today marks the 10th day of lockdown. In that time, inmates have been allowed out of their cells four times each period for 15 minutes. The particular pod I am assigned typically allows 12 to 18 inmates out at a time to have access to 3 phones and 4 showers. Do the math, its hardly adequate.

     One of the 15 minute escapes from the cell for hygiene and phones was at midnight, hardly a good time to make a phone call, especially disrespectful to the families accepting the call. At other times more reasonable, too bad if the intended party called is busy or unavailable.

     In the Statement of Work, chapter 12, paragraph H, laundry uniforms are to be cleaned, dried and reissued at least twice weekly. The cleaning of undergarments is every other day. Notwithstanding this contractual obligation, no laundry has been done during the period of lockdown.

Nor has there been any change in linen as required in paragraph I of the same chapter.

In the Statement of Work, chapter 13, paragraph C, Religious Practices; the contractor is under the duty to insure that "every reasonable effort shall be made by the detention center staff to facilitate the free practice of religion, limited only by legitimate security and operational considerations. All federal prisoners shall have access to religious resources, services, instruction or counseling on a voluntary basis." Notwithstanding the lockdown, a written request was made to have access to televised sessions of religious services available, and if not in the day room to watch the Semi-Annual General Conference sessions, then to listen to them in the cell via headphones tuned into the TV stations. This request was effectively denied.

Chapter 13, paragraph H mandates a minimum of one hour per day of recreation. This is impossible when inmates do not have access to outside recreation or day room time.

Chapter 14, Food Service, paragraph G requires a minimum of two hot meals per day, and the combined meals are to consist with the full number of servings which meet the provisions of the recommended dietary allowance. This isn't happening. Paragraph E requires emphasis on flavor, texture, temperature, appearance and palatability. Sack lunches are cold and woefully inadequate. During lockdown, medically recommended special diets have been ignored in violation of paragraph F.

Chapter 15 Visitation and Prisoner Accounts, paragraph E and F requires assurance that federal prisoners will not be denied access to visitation with persons of their choice except where the contractor reasonably believes that such visits jeopardize the security of the facility, or the safety of the prisoners or visitors. Because such "family visits" are non-contact, it is hard to imagine any such reasonable belief in the behalf of the contractor. Further, the undersigned has been told that he has no right to appeal the denied visitation decision contrary to the right of appeal provided in paragraph F.

Paragraph J of chapter 15 deals with commissary. Sub-paragraph 2 indicates that at minimum, once a week opportunity to purchase from the commissary. Commissary has not been available since Friday, March 20th. At the last opportunity to purchase from commissary, no notice was provided that it would not be available the following week, nor that it would be suspended during any lockdown. As circumstances would have it, the commissary was unable to provide all of the postage ordered, and was also out of numerous articles desired by the inmates. As a result, many inmates do not have the ability to mail communications to their attorneys, the courts, or to family and friends. Further, there is no way to presently supplement nutritional needs or to obtain bottled water for the maintenance of good health and hydration.

Although inmates are supposed to have continued access to law library material, despite written request as well as conversational communications to the appropriate unit even daily legal phones have not been made available notwithstanding similar written requests and conversational communications.

All of the above identified problems need immediate attention. Below, I provide an incomplete listing of numerous deficiencies noted over the duration of my incarceration that should also be addressed.

Roughly a little more than 10% of my pre-sentence incarceration has been in 24 hour lockdown

2

allowing for out of cell every other day for hygiene purposes only. All visits, indoor recreation and outdoor yard is suspended, none of which was as the result of my acts. On average, I was in lockdown about half the day in the ordinary course of business. Additionally, any disturbance within the facility, no matter how remote can and does trigger lockdown. Even problems in other facilities will often cause lockdown. Occasionally lockdown will occur due to the misscheduling or shortage of staff, and if not, then restricted to the day room, but all other activities are eliminated for that shift, such as outside recreation, library, visitation, education classes and religious services.

The United States Marshals Service has contracted with Corrections Corporation of America (CCA) to provide pre-trial detention services for adult detainees. The contract was awarded effective November 4, 1999, identified as MS-99-D-0057. CCA agreed to supply all required labor, material, facilities and equipment to provide the services set forth in the Statement of Work, Section C to the contract.

The contract provides an explanation for the term "Rated Capacity" which is the original architectural design capacity plus or minus capacity changes resulting from building additions, reductions, or revisions. Section C(I)(g). Under Section C(II) Chapter 3 Staffing Plan CCA is to "at all times staff the facility to accommodate the maximum rated capacity of its facility."

CCA has 9 units each architecturally rated for 256 inmates – distributed through 6 pods. Two "gang cell" pods designed to hold 50 inmates and 4 pods of individual 2 man cells that are designed to hold 38 to 40 inmates. The difference being whether the pod has a fire escape which eliminates one of the cells. Additionally they have a small medical ward and what is known as "old segregation" of an unknown capacity. Each of these is substantially smaller. Thus, the facility has a rated capacity of about 2350 inmates. So, as long as they staff for this capacity, they comply even though they overload most units and cells by 50%. With these extra inmates staffing is insufficient to handle the needs of the actual inmate population.

I have always been housed in a pod where the actual population has exceeded its rated capacity. During the years 2008 and 2009, I have been housed in unit 1000, block TT. This pod is a gang pod with a rated capacity of 50. However, it has increased the number of beds to 101. For example, in cells designed for 6 inmates, they have inserted an additional three sets of bunk beds to house 12. They have done the same for cells designed for 8 inmates increasing the occupancy to 14. Virtually all two-man cells have added an extra bed, the exception being cells set aside for the physically handicapped which would make it impossible for wheelchair accessibility. Additional bunk beds have been brought into the day room and those are utilized regularly. Despite doubling the number of beds, the number of sinks, showers and toilets remained as originally built. In actuality, half the showers have been decommissioned due to a re-occurring maintenance issue. This makes for 4 showers to service 100+ men.

Living in a pod operating at greater than 200% capacity is difficult, even unhealthy in the best of circumstances. Unit 1000 is an intake pod for new arrivals and provides additional stresses not seen elsewhere. There is increased activity with bedding assignments made for the new arrivals in the middle of the night, thus disturbing or otherwise interrupting sleep and engendering insomnia. During the day, there is constant commotion with guards yelling into the day room every time a group needs to go in for classification, mental health screening, medical evaluation, security threat group assessment, prison rape reduction training, facility orientation and the like. Its a never ending cycle of interruptions

and noise.

Unit 1000 is also used as a holding cell for inmates who are being discharged from the facility. This occurs once or twice a week where a group will have been dressed out for transport, usually a Marshall's airlift or courier, and are gathered and kept in the day room – this too occurs during the middle of the night and into the early morning hours and is rather noisy with the excitement of inmates finally leaving CCA coupled with the anxiety of their assignment to a BOP facility.

Notwithstanding the lack of peace and quiet and the severe overcrowding, CCA is in apparent breach of the Statement of Work in the following regard which adversely affects me and increases the harshness of pre-sentence confinement.

1) Inmates who are an escape risk are to be transported with two sets of handcuffs or one set of handcuffs with a black box.

The black box is a device that covers up access to each cuff's locking mechanism. By doing so the cuffs are no longer flexible and become rigid. This restraint is not just uncomfortable, it is painful, particularly in the manner utilized by CCA. After their use, wrists hurt and shoulders ache for days. I put in a request for information to Harold Newton, Chief of Security; and asked whether I had been determined to be an escape risk. The response was in the negative. I should have been transported without the black box, but was routinely subjected to the infliction of such a painful restraint each and every time I was brought to court.

These restraints were routinely placed on me at about 3:00 A.M and not removed until after delivery to the courthouse between 7:30 and 8:00 A.M. They were re-installed again for transport back to the facility from the court and generally stayed on for 2 ½ to 3 hours every time I left the court. I was brought to the courthouse several times even though no court was scheduled. Every court run required black box suffering for no less than 75% and as much as 1/3 of the day.

2) All vehicles used to transport inmates shall be air-conditioned. While CCA provides vehicles that are equipped with air conditioning, more often than not, the air conditioning was inoperable or not working adequately.

3) The contractor shall provide for the cleaning of undergarments every other day. Inmates are allowed three pair of underwear.

CCA has scheduled the washing of "whites" three times a week. This makes it impossible for the cleaning of undergarments every other day. It shorts the cleaning at least 26 times a year, as well, Anytime there is a lockdown or pod restriction that affects the unit's laundering on a "whites" scheduled day, undergarments are skipped until the next scheduled "whites" day. Additional delays are occasioned by shortages of hot water, laundry supplies and equipment failures. There have been at least 71 days where I have not had access to hot water, the longest stretch being 18 consecutive days.

4) The contract shall provide the appropriate seasonal outerwear when necessary for movement of federal prisoner(s) outside the facility. Seasonal outerwear is provided to some inmates on early morning winter court runs. However, the inmate is already shackled and in black boxes so the jacket is merely draped over the shoulders and provides minimal retention of body heat and insulation from the

4

cold. I have requested and been denied seasonal outerwear even when outside temperatures were 46 degrees.

5) The contractor shall provide hair care, services by individuals skilled in hair care. The hair care area shall meet all applicable state and local sanitation requirements. All services must comply with all applicable state and local laws.

The barbering conducted at CCA is contrary to the policy of the State of Arizona and in fact is actually criminal conduct.

The Arizona Revised Statutes, Title 32, Chapter 3 provides the statutory scheme for barbers. Particularly, CCA and its Wardens, Management Teams and Correctional Officers are guilty of class 1 misdemeanors for at least one or more of the following:

a) Permitting an employee or another person under his supervision or control to practice barbering without a license issued ...
b) Display a sign or in any way advertise ... as being engaged in the ... business of barbering without being licensed.
c) Operating a shop or salon unless it is under the direct supervision of a barber. These people commit these crimes because they employ inmates, many if not most of whom have no legal right to work in the United States, that attempt to practice barbering without a current barber license issued. See generally ARS §32-355 A & D.

As well, upon information and belief the unlicensed barber shops and barbers at CCA do not follow the Arizona State Board of Barbers rules relating to sterilization and antiseptics and diseases of the skin, hair and glands.

6) Strip searches must take place in a location where visual privacy is ensured.

This is routinely violated and I have been subjected to numerous strip searches adjacent to and in front of multiple staff and inmates.

7) Sentenced and unsentenced federal prisoners shall be housed separately.

This requirement is violated as a matter of routine rather than exception.

8) The contractor shall recognize the right of federal prisoners to practice the religion of their choice. Every reasonable effort shall be made by the detention staff to facilitate the free practice of religion, limited only by legitimate security and operational considerations.

CCA makes the practice of religion difficult, restricts weekly service and have obstructed rather than facilitated my religious worship.

As an example, the LDS Services are always open to visitors. CCA mandates that inmates be on a roster requiring the filing out of a Religious Preference Form, sending it outside the institution to an authorized church representative and then returning it to the chaplain for inclusion on the roster. This process is not required for Catholics, the predominant religion of the majority of Hispanic inmates. Until this process is complete, the inmate desiring to attend LDS Services is denied

5

attendance.  Even when actually listed on the roster, inmates are regularly denied access to the meeting

.        LDS Services are scheduled on all but the fifth Saturday of the month.  Why CCA won't allow meetings to be scheduled for all Saturdays is without reason.  The appointed time is 8 to 9 A.M., however, outside visitors who preside over the meetings are not allowed entry to the facility before 8, and must wait for an escort.  Often this delays the actual start of the Service 10 to 20 minutes.  Because Formal Count occurs at 9:30 A.M., all inmate movement is scheduled to cease at 9 A.M., thus, though the facility makes it impossible to start on time, it ensures that it ends when scheduled.

Inmates are often told that the LDS Services are not meeting because the scheduled room has no volunteers present.  However, the presence of the volunteer is delayed by the facility itself, so even if it starts late, the inmate is told to return to his unit.

9)  The contractor shall provide plans, policies and procedures for documenting all federal prisoner complaints concerning food and other living conditions.  The procedures shall require the contractor to investigate the complaints, determine if they have merit, propose corrective actions and provide written report to [U.S. Marshall Service].

While a grievance policy  is in place, staff circumvent the process by refusing to make available the forms which initiate the procedure.  The denial of the grievance process is in and of itself a grievable issue – but therein lies the rub.  Complaints about food are rarely addressed and when they are, favorable changes don't last very long.

10)  The contractor shall insure federal prisoners are offered a minimum of one (1) hour per day of recreation.

CCA does not schedule outside yard on weekends or holidays.  It is the first  thing to be canceled for whatever reason staff feels is justified.  Because I am housed in an intake pod, getting outside recreation has yet to occur 5 consecutive days and is more likely to be available 3 days per week.  The weeks where it is offered 4 times in a week are about the same as where it is offered only twice.  If the facility or the unit or the pod is in lockdown then no recreation is offered at all.     Outside recreation in unit 1000 is often called prior to daylight in the winter.  While the staff has jackets, gloves, scarves and knit caps to retain heat, the inmates are provided nothing to keep them comfortable. This is a way to say that it was at least offered.  All of the units other than 1000 have a weight lifting exercise station.  Some units have volleyball courts.  Unit 1000 does not.

11)  The contractor shall serve only meals that fully comply with the approved menu.

While CCA has a menu certified in compliance with the dietary allowances published by the National Academy of Sciences – the actual portions provided of vegetable is routinely less than stated on the menu.  Additionally, while the menu is loaded with cheap carbohydrates it is fundamentally lacking in fresh fruits and vegetables.  For example, since incarceration began May 9, 2006, I have been served only 6 pieces of fresh fruit, 3 oranges, and 3 slices of watermelon.  The only other fruit has been canned applesauce which is scheduled about 5 times per month.

Because salt and pepper is evenly distributed to the units, the higher occupancy pods such as mine, often go without because the same number of disposable shakers are used by a greater number of

6

inmates.

Every meal is to provide 8 oz cup of beverage. A 5 gallon jug of each beverage is provided to each pod. There are sixteen 8 ounce cups per gallon. Thus a 5 gallon jug provides for 64 servings if the jug is filled to the brim at the start and if there is no ice. Needless to say, unit 1000TT pod has yet to see a meal where every inmate gets his alloted serving of beverage.

Sack lunches are to be provided only when an inmate is away from the facility for court or medical runs. Contrary to this term of contract, CCA does not provide a regular meal to those who are in visitation during their meal time. If anything, a sack lunch. Additionally more than once each month, every inmate is not provided the scheduled meal, but a sack lunch.

12) The contractor shall immediately provide for special dietary needs. . . to the extent possible in compliance with the recognized religious or medical needs of the population.

CCA provides diabetics with a fresh piece of fruit with nearly every meal. Jews and Muslims are provided kosher meals and additional trays loaded with juice, fresh fruits and vegetables. When brought to the attention of the chaplain that members of the Church of Jesus Christ of Latter-day Saints follow a scripturally based diet encouraging "every herb in the season thereof, and every fruit in the season thereof" and that "hot drinks are not for the body or belly" he was unwilling to create a menu that would avoid coffee or tea or provide supplemental fresh fruits and vegetables as is provided to others.

13) The contractor shall provide three meals at regular meal times during each 24 hour period. No more than 14 hours between the evening meal and breakfast shall be allowed.

CCA regularly and routinely violates this 14 hour rule. I have been housed in units where the evening meal was served prior to 4:00 P.M and breakfast served after 9:00 A.M., thus creating a gap of 17 hours between meals.

14) The contractor shall provide alternative meals for federal prisoners who are away from the facility. The alternative meal must be nutritionally adequate to ensure good health.

CCA provides two sack meals, one for lunch and another for dinner. Each meal, identical, consisting of four slices of white bread and 2 slices of bologna, (none of which is green). Also two cookies that are more like what you find as the wafers of a small ice cream sandwich. Not very appetizing. With the lunch we also get a four ounce carton of juice, kind of what you might see given out at kindergarten.

15) The contractor shall ensure that all incoming and outgoing mail and correspondence is not held for more than 24 hours.

CCA provides each unit with an outgoing mail box. Mail deposited in the box is picked up each night. However mail placed in the box on Friday, Saturday or Sunday is routinely retained at CCA for more than 24 hours, if Monday is a legal holiday outgoing mail can sit for nearly 100 hours before taken to the Post Office.

7

On March 3, 2009 I put an important letter to my defense team to be copied and sent out immediately in the mail receptacle. As you can see by the postmark it was held for 21 days longer than the 48 hours allowed.

16) The contractor shall provide written policy and procedure providing for the inspection of federal prisoner mail in the presence of the federal prisoner to intercept cash, checks, money orders, identify documents and contraband. If contraband is discovered [ ], it shall be confiscated. Only illegal items and items that threaten the security of the facility shall be considered contraband.

CCA refuses to abide by the condition of this term of contract. Even legal mail, clearly identified by Attorney Michael J. Bresnehan has been opened without my presence. Other mail has had its contents confiscated as contraband, such contents were clearly not illegal items or anything that threatened the security of the facility, such as religious literature, books from publishers, unused post cards from the San Diego Zoo, among other things. As well, the Arizona Republic and Adventure Magazine published by National Geographic have been declared contraband and confiscated.

17) All federal prisoners shall have the opportunity to purchase from the commissary a minimum of once a week.

CCA does not allow weekly commissary.

18) The price of the items (sold in the commissary) shall not be higher than the average community retail price.

CCA charges higher than the average community retail price on many items.

19) The commissary shall be operated in accordance with BOP P.S. 4500.04.

CCA does not comply with this program statement, which approves the sale of fresh fruit and processed fruit. It also requires that healthier snacks represent approximately 25% of snacks available for sale. Healthier snacks are identified as including fresh fruit, fruit juices, dried fruit, applesauce, fruit snack packs, graham crackers, fig newtons, pretzels, bagels, low fat frozen yogurt, low fat pudding cups, low calorie or reduced calorie low-cholesterol or cholesterol-free and low saturated fat snacks. None of these are made available on the CCA commissary list. As well, a minimum of four kosher/Halal certified entrees are to be stocked or sold through the special purpose order program. CCA provides no such entrees. The commissary must have available sufficient stamp denominations to allow mailing of domestic letters, letters in excess of 1 ounce but not requiring an additional first class stamp, however, CCA does not provide such denominations. Thus a letter in excess of 1 oz that would cost 59 cents actually costs 84 cents to mail.

20) The standard issue of bedding shall include 2 sheets, 1 pillow, 1 pillow case. One non-combustible mattress with cover and clean blankets to provide comfort under existing temperature conditions.

CCA does not provide each inmate with a pillow, nor do they provide more than 1 blanket, even when I have indicated my discomfort with the cold. I have slept in sweat pants, sweat shirt and under the blanket provided and still been awakened at night with shivers from the cold.

8

Although the Marshall's contract does not provide for a temperature setting, and while reasonable minds can differ on comfort, it makes reason stare why CCA with its facility in the middle of the Sonoran Desert would have the Air Conditioning set so low in the middle of the summer that inmates would sit in the day room to watch television and do so wrapped up in the blanket provided for their bedding.  In addition to that, the majority of guards wear their jackets inside the facility all summer long.  Perhaps this is better than being hot, however, it sure has been an extremely harsh condition of confinement.

21)  CCA provides for visitation on certain prescribed days and time.  My schedule is Tuesday/ Thursday/Saturday at 7:00 A.M  Visitors, however must check in between 6:00 and 6:30 A.M.  This makes it very difficult for people to visit, especially for those who live any distance from Florence.  Because of lockdowns and other restrictions, visitors who have made the effort have been turned away on numerous occasions.   The schedule has made it effectively a very difficult proposition to visit with family, especially my children.  Visiting schedule on Saturday requires that I forgo attendance at my religious service.  I have been denied contact visits.

22)  Endeavors to maintain and strengthen family ties telephonically are costly.  Prepaid telephone time to call the greater Phoenix area is 25 cents per minute.  There is no way around being within a captured market subject to a monopoly.  Calling collect only raises the cost by an additional $1.55 for making the connection.  Each pod has three phones with overcrowding and necessary servicing and repairs there are often long waits to use the phone, especially the evenings when communicating with family is the most accommodating due to their work and school schedules.

23)  At one period of time, I was assigned housing in a medical pod.  This assignment was difficult because of the many varied issues involving sick and infirm people.  The most disgusting condition was that of the lack of cleanliness.  Sharing shower facilities with inmates who had colostomy bags or who could not control their bowels was an ordeal, particularly in light of the fact that the porters who were charged with cleaning were likewise unhealthy or heavily medicated and unable to keep the shower clean.  Showering with fecal matter from other inmates clearly should not be the norm.

24)  CCA has a law library in name only.  Access is extremely limited.  For a facility detaining federal inmates, it is horribly lacking and out of date.  There are no Supreme Court Reports.  Shepherds is ten years old, and reference materials are few and far between.  They get around the mandates of the law by claiming they have engaged a "person trained in the law" to assist with access to the courts.  However, the rigmarole to request assistance is an administrative nightmare, cumbersome and slow.  There is no reasonable expectation to be able to rely on any results obtained.  BOP facilities provide access to online legal data bases which are denied at CCA.

1.  CCA's mechanism to provide me access to case files and other materials is shameful.  Although Ryan Henricks volunteered and promised the court to be responsible for seeing that I had access to same, he demonstrated no diligence in my day to day needs.  Each request was met with dilatory efficacy.  When it became apparent that such was the case, I would report weekly on the status of each to his attorney who, under local rules of court, had control of the case.  It wasn't until after many months of such weekly reporting that the matter was brought to the attention of the court shortly before trial.  This contributed to the prevention of my effective

9

defense preparation.

25) Inmates are not allowed to view the availability of reading material at the recreational library. Instead, a cart which holds roughly 18 linear feet of books is brought to each unit a couple of times per month. Needless to say, the selection is meager and all pods after the first to have access to the cart, get slim pickings.

26) CCA does provide a movie schedule. However, notwithstanding a published schedule, the movies rarely start on time. This is only a problem because the movie is rarely finished before a formal count requires a return to the cell for lockdown. More often than not, the inmates are unable to see the ending. This is because the movies aren't paused, or if paused, resumes play before the inmate is allowed to return to the day room. Despite complaints, this is a condition of confinement that could be changed, but isn't, because it is but a simple display of the institutionalized disrespect evidenced toward those detained.

1. CCA denies detainee restorative dental care. Unless the detainee wants a tooth pulled, no dental care will be provided. Caps and crowns that become loose will not be recemented. I had requested and been denied by CCA medical the drug Terberifina, a generic of Lamisil, for a foot infection. A 3 month supply can be obtained in many pharmacies for $10 to $12. I was willing to have it prescribed and shipped in and paid for-but was denied. Pill call is scheduled twice daily. Often the first as late as 9:30 A.M and the last as early as 4 P.M. I suffered through a cough and congestion and could only get partial relief. The dosage for Robitussin, the cough syrup with the active ingredient Guifasen, for suppressant and expectorant is indicated at 2 to 4 teaspoons every four hours.

I am a reasonably understanding person. Exceptions to the general rule are allowable on occasion. However, the exceptions appear to have become the rule. This is not right, and should not be an acceptable form of conduct on behalf of the contractor. Further, it seems ill-advised to effectively punish nearly 50 pods with a lockdown and serious disruptions to the morale of over 3000 inmates for the actions of a few in one pod. How sad that professionals in corrections have conducted themselves as they have. I remain,

Sincerely yours,

Randy Jenkins

Enclosures:
1. The CCA Way
2. Envelope