DENNIS K. BURKE
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Assistant U.S. Attorney
Maryland State Bar Member
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Fred.Battista@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>Daniel Rigmaiden,<br>a.k.a. Steven Travis Brawner,<br>a.k.a. Travis Rupard, and<br>a.k.a. Patrick Stout,<br><br>　　　　Defendant. | CR 08-814-PHX-DGC<br><br>**RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL DISCLOSURE OF GRAND JURY TRANSCRIPTS SO THAT DEFENDANT MAY BRIEF THE ISSUE OF PREJUDICE AND DISMISSAL OF INDICTMENT**<br><br>**(Filed Under Seal)**<br><br>SEALED |

　　　　The United States, by and through undersigned counsel, hereby requests that this Honorable Court deny defendant's Motion for Partial Disclosure of Grand Jury Transcripts So that Defendant May Brief the Issue of Prejudice and Dismissal of Indictment. This response is supported by the attached Memorandum of Points and Authorities.

　　　　Respectfully submitted this 19th day of March, 2010.

　　　　　　　　　　　　　　　　　　　　　DENNIS K. BURKE
　　　　　　　　　　　　　　　　　　　　　United States Attorney
　　　　　　　　　　　　　　　　　　　　　District of Arizona

　　　　　　　　　　　　　　　　　　　　　　　　　S/

　　　　　　　　　　　　　　　　　　　　　FREDERICK A. BATTISTA
　　　　　　　　　　　　　　　　　　　　　Assistant U.S. Attorney

**Memorandum of Points and Authorities**

## I. Introduction

Defendant appears to contend that the government's decisions to allege certain facts in a July 30, 2008, affidavit in support of a search warrant for his residence and related facts with respect to the conduct charged in the original indictment, returned on July 23, 2008, form a basis for the partial release of the Grand Jury transcript relating to the original indictment. The factual allegations in each document form no such basis. The particular excerpts of the indictment and search warrant affidavit read in their entirety as follows.

With respect to the original Indictment, Overt Act 12 (Superseding Indictment, Over Act 27):

> (12) On about March 14, 2008, defendant STEVEN TRAVIS BRAWNER, and others known and unknown to the Grand Jury, directed a confidential informant working on behalf of the government to ship $9,000.00 of fraudulently obtained income tax refunds, previously deposited in Meridian Bank business checking account No. XXXXXX0007, in Phoenix, Arizona, to a commercial mail receiving agency located in the State of Utah.

With respect to the original Indictment, Paragraph 17, Mail Fraud Count 50 (Superseding Indictment, Paragraph 52, Mail Fraud Count 73):

> 17. On or about the date listed below, in the District of Arizona and elsewhere, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of materially false and fraudulent pretenses, representations and promises, defendant STEVEN TRAVIS BRAWNER, along with others known and unknown to the Grand Jury, deposited and caused to be deposited for delivery by a private and commercial interstate carrier, from the District of Arizona to the District of Utah, as set forth in the chart below, the instance being a separate Count of this Indictment:

| Ct | Date Sent – On or About | Sent From (Carrier) [State Sent to] | Items Sent (Materially False Representations) |
|---|---|---|---|
| 50 | 4/1/08 | Tempe, Arizona (Federal Express) [Utah] | $9,000.00 in U.S. Currency – Federal Express Package Bearing Tracking No. XXXXXXXXX339 (Deceased taxpayers earned income through wages in 2007, paid income taxes on the wages in 2007, and were owed income tax refunds in various amounts claimed.) |

With respect to Search Warrant No. 08-70460 HRL, N.D. CA (Authorizing the search of defendant's residence), Paragraph 24 reads in its entirety as follows:

24.     After the aforementioned deposits, CI 1 contacted SN 1 and informed him money had been deposited in the account. CI 1 told SN 1 he/she would withdraw $9,000.00 in mid-March 2008 and ship it to SN 1 on March 18, 2008, via FedEx. CI 1 further advised he/she would withdraw money from the account every week and ship $9,000.00 to SN 1 every other week. The withdrawn money not "shipped" was to be CI 1's cut. **SN 1 provided CI 1 with the name and address where the money was to be shipped. SN 1 also told CI 1 to provide the tracking number so he could monitor the shipment of the package.**

(Emphasis added.)

## II.     Background

Briefly stated, this case arose when Internal Revenue Service - Criminal Investigation (IRS-CI) became aware of a scheme to fraudulently obtain income tax refunds from the government through a sophisticated e-filing scheme. As the investigation progressed, IRS-CI initially relied on an individual identified as CI-1 to assist them to identify and arrest the primary participants. CI-1 was able to establish contact with SN-1 (JP) who later became CI-2 in this case. While communicating with SN-1, via e-mail and telephone, CI-1 and IRS-CI were able to learn that SN-1 was a middleman for the defendant who at that time was unknown and

referred to as the "Hacker." In his role as middleman, SN-1 assisted the Hacker by finding individuals who could assist them by opening bank accounts into which the Hacker could direct the deposit of fraudulently obtained refunds, withdraw the money and then get the money to SN-1 and the Hacker while the two remained undetected. The challenge for the Hacker and SN-1 was to obtain the money once it was deposited without being tied to the bank account or traced to the money. Numerous admissions by SN-1 during the undercover contacts clearly identified SN-1 and the Hacker as co-conspirators jointly engaged in the subject scheme up to the time of SN-1's arrest and agreement to cooperate. The following are excerpts of e-mail and telephone contact between CI-1 and SN-1. By way of context, when SN-1 is talking about another person, he is generally referring to defendant, a.k.a. the Hacker; CI-1's contact is a fictional corrupt bank employee.

1.      02/14/08 E-Mail From SN-1 to CI-1 (Discovery 2/19/09 P. 5052)
> this is a question my contact (presumably defendant) gave me on his cut... let me know what you = can find out.
>
> "How is this bank setup any different than before when I was given $0 for = my efforts? **If your guys can't figure out how to do a bank wire without getting = caught then your side can get the money any way you guys think is best.** Once = you have the cash, then what about getting a cashier=E2=80=99s check using = the cash for the total of my cut? Then that cashier=E2=80=99s check won't be = associated with the original account. The check can be mailed out to an investment = company of my choice under terms I set up. All the bank people have to do is = set up a second bank account under a name I give and get a cashier=E2=80=99s = check using cash under that account. Then you mail the check to a company that= sets up an investment account under the name on the check. As long as the check= clears then I will assume all risks afterwards. The check will have to have = the name of the account holder on it and be payable to the investment company.= I am not going to start funding the account until you start tell me exactly how I = Am getting my money. I am not accepting cash in the mail. I also need absolute = Guarantees." (Emphasis added.)

2.      02/26/08 Telephone Call Between CI-1 and SN-1 Transcript (Discovery 2/19/09 P. 5059 – 60)

JP:     Not really quite. He just he I don't think he really trust you completely yet until he gets paid.

CI-1:   Oh ok. So it's a possibility it'll extend longer?

4

| | | |
|---|---|---|
| 1 | JP: | I I I think it's a very true possibility. If I could figure out a way once you get me his cut. If I could figure out how to get it to him and he actually gets it in his hands or he actually believes true blue that I have it in my hand. He'll probably be like have me take pictures; send it to him encrypted all. (Inaudible). |
| 2 | | |
| 3 | | |
| 4 | CI-1: | Dude, send pictures? You gotta take pictures and send it to him? |
| 5 | JP: | Well like an example of picture of cash with like a newspaper article or something like that with of a recent date. |
| 6 | CI-1: | Right oh ok |
| 7 | JP: | You see what I'm saying. |
| 8 | | |
| 9 | 3. | 3/05/08 Telephone Call Between CI-1 and SN-1 Transcript (Discovery 2/19/09 P. 5075 – 76, 5077 – 78) |
| 10 | JP: | Just so you have that. Um he did hit me with a question and I don't know if you can pose it to your guy or not. Um he's asking let's see (inaudible) ok here it is. Can you get cashier's checks using cash from the bank without having an account and have the check have the from field of the name I pick. If possible I want my cut in a cashier's check for the entire amount. Then you can mail it to an investment company then I'll take it over from there. |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | CI-1: | Yeah you yeah you asked me that last time. |
| 15 | JP: | Well, we we was talking multiple. Multiple checks. |
| 16 | CI-1: | Yeah. |
| 17 | JP: | So instead he's looking for just like just like one one cut check. Cashier's check with the from field with of one of the name that he picks. |
| 18 | CI-1: | Yeah. |
| 19 | JP: | I mean would that be possible. |
| 20 | CI-1: | Not without an account. You |
| 21 | JP: | Not without an account? |
| 22 | CI-1: | Not without an account. They don't do that no where here in Arizona. You have to have an account in order to get a cashier's check. |
| 23 | JP: | All right. |
| 24 | CI-1: | You have to |
| 25 | JP: | **I'll check them. I'll check on my side. Um because if you end up sending me a box full of with with everything.** I'll see if maybe on my side if I can do. But it sounds pretty doubtful based on what you already know on your side. (Emphasis added.) |
| 26 | | |
| 27 | | |
| 28 | | 5 |

1  CI-1: Yeah. No no bank out here anywhere would let you do that. Every bank you go in now, it's at a such a point to where um the cashier's that are like it's like. They even ask you for ID if you gotta get one for like $2500. You gotta present ID.

2  

3  JP: Exactly. Exactly. Wow.

4  CI-1: Yeah.

5  JP: All right. Any alternative that your friend can come up with to give money to. If that's much he just wants to get it to an investment company.

6  

7  CI-1: Yeah. See that's the problem. See that creates paper trail between the two institutions.

8  JP: Ok

   (5075 – 76)

9                                    * * *

10 JP: **See what I'm saying? So if he if he has some ideas um I mean basically I guess what I'm asking you is if you don't mind asking how I can get the guy who's putting the money in there. How can we get him his cut?** (Emphasis added.)

11

12 CI-1: Ok

13 JP: As as much under the radar as possible. Just asking about investment company. Um cause it sounds like he's got something that.

14

15 CI-1: Yeah yeah it's that I don't why and that's one thing I'm not understanding. Ok. Why do we have to bust our chops to get figure out how to get him is. If he's already in, it seems like he's in the investment industry. You know what I'm saying.

16

17 JP: I I actually no I don't think he is

18 CI-1: You know Ok then why would you want it to go to an investment house. Cause if you're not investment house.

19 JP: Let me let me tell ya. (Inaudible) like I would be saying to you. You know. I mean he he he's the guy putting the money there

20

21 CI-1: Right

22 JP: And you know he's filing mill a million dollars worth of returns. He's working an average of 12 to 16 hours per day.

23 CI-1: Ok

24 JP: To do this.

25 CI-1: I'm listening.

26 JP: So I mean so he's busting his butt to make us our cut, in my opinion.

27 CI-1: I right

28

6

1  JP:     So um you know I mean if

2  CI-1:   But look at it though. Who's he got to go through?

3  JP:     I'll tell ya right now, bottom line, is you don't find anything that ends up in my hands. I'll figure something out.

4  CI-1:   Ok

5  JP:     I I I'm asking you for your help

6  CI-1:   Ok

7  JP:     **If you guys could help me come up with alternatives to get it to him, um like I say bottom line if it ends up in a box in my spot. So be it. At least I got his cut and I can tell him I got your cut. We gotta just you and I now you and I gotta figure out. What what I'm trying to do and it's not just save money at. I'm trying to take a lot of middle transactions out.** (Emphasis added.)

8  CI-1:   Right. Ok.

(5077 – 78)

4.  3/14/08 Telephone Call Between CI-1 and SN-1 Transcript (Discovery 2/19/09 P. 5099, 5103 - 04)

JP:     I've had him look at it and if if you see something wrong you tell me ASAP. It uh he's doing the same shit he did last year.

CI-1:   **Ok now, let me ask you this question here so that we get everything straight and everybody's happy with the amount of money that's flowing and everybody's on the same page. And you just let me know how you feel about this. Now, let's say I go pull $9,000. And I'll ship you that whole $9,000 and then the next week I'll pull $9,000 for me. And then we'll alternate weeks until April 15 and then after the 15th we can incorporate your guy Daniel to start pulling out large chucks of money. And then you take one large chunk and then I will take 1 large chunk.** (Emphasis added.)

JP:     **Ok.** Now how based on based on what we've talked about last year. I split was gonna be 40, 40, 20 right? (Emphasis added.)

(5099)

\* \* \*

Telephone ringing.

Automated Voice: The person you are trying to reach is not available. Please leave a message after the beep.

Beep

CI-1:   **Hey JP I forgot to get the address where you wanted me to send this money to so um**

7

1          **just give me a call back. Thanks.** (Emphasis added.)

2 CI-1: The time is 12:39. I have completed the conversation and I'm turning off the recorder.

3 CI-1: Hello

4 JP: Hey boss

5 CI-1: Hey, what's up man?

6 JP: Uh you got a pen and paper.

7 CI-1: Yeah go ahead.

8 JP: All right now this this address is your eyes only. You know that right?

9 CI-1: I got you.

10 JP: All right. It's uh send it to the initial XXX. first name. uh last name uh XXXXXXXX

11 CI-1: Ok

12 JP: Address address is XXXXXXXXX, number XXXXXX (a commercial mail receiving agency located in the State of Utah)

13                                        \*   \*   \*

14-15 JP: And make sure you hit me with the tracking so that I an [can] monitor every step of the way.

16 CI-1: I so will

17 JP: All right [1/]

18 (5103 – 04)

19-20 5.    3/19/08 Telephone Call Between CI-1 and SN-1 Transcript (Discovery 2/19/09 P. 5118)

21 CI-1: Ok that's cool that's cool. Having fun with your loot?

22 JP: I haven't done nothing with it. It all gets set aside right now until I know that everyone gets paid.

23 CI-1: Oh ok.

24-25 JP: So I I yeah I don't I'm not in a rush to dig in. I'm in a rush to make sure everybody gets paid so

---

26-27     [1/] As a result of the above listed communications, including the March 14, 2008 telephone call, on March 18, 2008, a shipment was directed as alleged in Over Act 12 of the original Indictment.)

28                                                    8

1. CI-1: Yeah.

2. JP: Once I know you guys get paid, then I'll feel more comfortable you know spending my part.

3. CI-1: Yeah.

4. JP: I got to hold on to this (his?) part. So he and I are working out on how I get it to him so.

5. 6. 3/27/08 Telephone Call Between CI-1 and SN-1 Transcript (Discovery 2/19/09 P. 5138, 5139)

7. CI-1: You know I I I've been through (inaudible). it took me a week to 2 weeks to get back to you about this guy. I drilled this guy up one side and the other. I I gave him all the scenarios that there is to give. You know what I'm saying, so I I and my whole thing is is just like yours I want all the money. I need all the money. I gotta have it. I can't have no hang ups. Can't do nothing. You know you're talking about.

10. JP: All right I'll I'll completely lose my credibility with him if he doesn't get paid.

11. CI-1: Well, that's why

12. JP: Even go so far as he's he's happy even at the first 9k. I I could almost feel it through an email. Literally through an email. Like a

13. CI-1: Yeah

14. JP: Breathe of fresh air. Cause he cause he trusts me that I got it in my hand. Actually you sent me 9k exactly right?

16. CI-1: Yeah.

17. JP: Ok. all right. I just wanted to make sure, cause I actually mixed other money in it and I miscounted. So thank you for telling me.

18. CI-1: No no no yeah. it was 9k and and we'll keep it you know we'll keep it flowing. And that's that's the deal.

20. JP: You see I'm I I I've actually figured out how to get his cut to him you know suffieciently [sufficiently]. I'm not gonna have problems. I'm not gonna hit you guys up for anymore of that. That's that's we're done with that.

22. CI-1: Ok

23. JP: **All you got to do is what you already did. You have the same address. So that that's cleared up.** The sooner the better and my recommendation I would push with him, there is unless he can provide me with other information because the again he did the same clearing that I did. So your guy needs to say something if he's f_____ up. We can't do it because of this reason. In in his opinion there's no reason why you can't on Tuesday pull 9k and and and then on Thursday um pull you know maybe 900. (Emphasis added.)

(5138)

9

                          \*    \*    \*

JP: I'm I'm pushing him for patience. And the thing is I know the greed part is killing him. And that's where I'm still on point so so like I say when I present to you what he's saying. It's not actually coming from my mouth. I'm actually fine. If we did 9k a week, I'm perfectly happy. To be honest with you.

CI-1: All I'm doing is man I'm trying to not let this uh bite us in the ass. That that's the only thing I don't. just like you were trying to save face. Everybody's trying to save face right now. Everybody wants to go get paid and it's working.

JP: I'll tell ya what. I know right now I'll be cool with this guy even with all his bitching. Which I'll always keep you updated on just so that you

CI-1: Yeah

JP: Are aware of what's going to happen on what's going in the account. And I mean that's important right?

CI-1: Yeah it is. yeah it is. that that's very important so I know.

JP: **Bring that like I say if he doesn't get a certain amount in his hands by the 4th um he's he's gonna pull back.** (Emphasis added.)

CI-1: Ok [2/]

(5139)

A review of these materials clearly shows that SN-1, while acting on behalf of defendant in furtherance of their conspiracy to defraud, was directly engaged in deciding and directing how and where the money fraudulently obtained money was to be shipped on or about March 18 and April 1, 2008.

**III. Discussion**

In United States v. Perez, 67 F.3d 1371, 1381 (9th Cir. 1995), *left intact on rehearing en banc*, 116 F.3d 840 (9th Cir. 1997), the Ninth Circuit discussed, in detail, the legal standard that applies to a requests for the release of a grand jury transcript:

> Federal Rule of Criminal Procedure 6(e)(3)(C)(ii) provides that grand jury transcripts may be disclosed "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." A party seeking disclosure of the grand jury transcripts must demonstrate a "particularized need" for the

---

[2/] As a result of the above listed communications, including the March 27, 2008 telephone call, on April 1, 2008, a shipment was directed as alleged in Count 50 of the original Indictment.)

disclosure. <u>Dennis v. United States</u>, 384 U.S. 855, 870, 86 S.Ct. 1840, 1849, 16 L.Ed.2d 973 (1966); <u>United States v. Walczak</u>, 783 F.2d 852, 857 (9th Cir.1986). The standards the trial court should apply in granting disclosure of the grand jury transcripts are "(1) that the desired material will avoid a possible injustice, (2) that the need for disclosure is greater than the need for continued secrecy, and (3) that only the relevant parts of the transcripts should be disclosed." <u>Plummer</u>, 941 F.2d at 806 (citing <u>Douglas Oil Co. v. Petrol Stops Northwest</u>, 441 U.S. 211, 222, 99 S.Ct. 1667, 1674, 60 L.Ed.2d 156 (1979)).

In this case, defendant has failed to show any particularized need. Prior to the execution of the subject affidavit on July 30, 2008 and the return of the original indictment on July 23, 2008, the government was aware of a multitude of facts, as set forth above, that showed that defendant's middleman, SN-1, was actively engaged, on defendant's and his own behalf and in furtherance of the conspiracy, in directing how and where portions of the fraudulently obtained money should be shipped. The mere fact that the government chose to allege different portions of the evidence available to it in different documents does not give rise to any "particularized need" on the part of defendant.

## IV. Conclusion

For the foregoing reasons, defendant's Motion for Partial Disclosure of Grand Jury Transcripts So that Defendant May Brief the Issue of Prejudice and Dismissal of Indictment should be denied.

Respectfully submitted this 19th day of March, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Assistant U.S. Attorney

/
/
/

11

# CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2010, I caused the attached document to be filed under seal with the Clerk's Office and a copy to be mailed to defendant and defendant's shadow counsel Philip A. Seplow at the following addresses:

Daniel Rigmaiden
Agency No. 10966111
CCA-CADC
Post Office Box 6300
Florence, Arizona 85132

Philip A. Seplow
Attorney at Law
2000 North 7th Street
Phoenix, Arizona 85006

FREDERICK A. BATTISTA
Assistant U.S. Attorney

12