UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **CR 08-0814-PHX-DGC** |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | November 9, 2010 |
| **Daniel David Rigmaiden**, | ) | 1:34 p.m. |
| **Ransom Marion Carter III**, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

STATUS CONFERENCE


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                    **A P P E A R A N C E S**

2


3    For the Government:

4              U.S. Attorney's Office
             By:  **FREDERICK A. BATTISTA**, ESQ.
5              40 North Central Avenue, Suite 1200
             Phoenix, AZ  85004
6
     For the Defendant Rigmaiden:
7
               **DANIEL DAVID RIGMAIDEN**
8              In Propria Persona
             Central Arizona Detention Center
9              P.O. Box 6300
             Florence, AZ  85132
10
         Advisory Counsel to Defendant Rigmaiden:
11
               Law Office of Philip A. Seplow
12             By:  **PHILIP AUSTIN SEPLOW**, ESQ.
             2000 North 7th Street
13             Phoenix, AZ  85006

14   For the Defendant Carter:

15             **TAYLOR WILLIAM FOX**, ESQ.
             2 North Central Avenue, Suite 735
16             Phoenix, AZ  85004

17

18

19

20

21

22

23

24

25

1           THE CLERK:  Criminal case 08-814, United States of

2   America versus Daniel David Rigmaiden and Ransom Marion

3   Carter III.  This is the time set for status hearing.

4           MR. BATTISTA:  Good afternoon, Your Honor.  Fred

5   Battista on behalf of the United States.

6           THE COURT:  Good afternoon.

7           MR. RIGMAIDEN:  Good afternoon, Your Honor.  Daniel

8   Rigmaiden on behalf of himself.

9           THE COURT:  Good afternoon.

10          MR. SEPLOW:  Good afternoon, Your Honor.  Philip

11  Seplow with Mr. Rigmaiden.

12          THE COURT:  Good afternoon.

13          MR. FOX:  Good afternoon.  Taylor Fox on behalf of

14  Ransom Carter, whose presence is waived.

15          THE COURT:  All right.  Good afternoon.  All right.  I

16  wanted to get you all in and just find out what is happening in

17  this case.  When we were here at the end of May, Mr. Rigmaiden,

18  you provided the government with your 74-page reply that laid

19  out lots of discovery issues.

20          When we were here in July, it was the intention --

21  your intention, Mr. Rigmaiden, to file two discovery motions,

22  one on sensitive investigative techniques or material and the

23  other on all other discovery issues.  And the goal was to file

24  those by the end of July, which did not happen.

25          When we were here on September 8th, some issues had

1   arisen with respect to your ability to get that work done at

2   CCA.  And on that day you indicated, Mr. Battista, that you had

3   provided the requested triangulation information, that you were

4   gathering e-mails and notes related to the aircard issue, and

5   that you expected to have them to Mr. Rigmaiden by the end of

6   the next week, which would have been about September 17th.  And

7   also you delivered to them that day a letter that addressed 22

8   other discovery issues.

9           And it was your expectation at that point,

10  Mr. Rigmaiden, that once you got that information and those

11  issues sorted out at CCA, you should be able to file the

12  discovery motions within about 30 days, which would have been

13  early October.

14          And so we set this hearing to see where things stood.

15  And as of today, those motions have not been filed.  And so I

16  wanted to get you all in and find out the status of discovery,

17  what issues, if any, remain, and what the timing is on those

18  motions for additional discovery.

19          So, Mr. Battista, maybe you could tell me if in fact

20  those materials were delivered as you expected they would be in

21  early September.

22          MR. BATTISTA:  Your Honor, all of the outstanding

23  requests for discovery that the defendants made we've responded

24  to.  We've either turned items over to him or specifically

25  advised him of which items we would not turn over.  Obviously

```
1    the defendant is interested in the operations and the workings
2    relating to the equipment pertaining to the aircard.  We
3    specifically told him cert -- the specific requests we choose
4    not to respond because it's a sensitive investigative
5    technique.
6             So with respect to the aircard mission, there's a
7    period of time of approximately June 30th of 2008 up to the
8    date of the defendant's arrest, we are treating that as the
9    time period of the, quote-unquote, aircard mission.  And well
10   over 95 percent of any notes or e-mails or anything relating to
11   that period have been turned over to the defendant.  I can't
12   say with a certainty that every single item that is out there
13   has been turned over.  I've still continued to -- Because I'm
14   dealing with the FBI, the IRS, the postal inspection service,
15   FBI in Arizona, FBI in California.  But all substantive
16   materials have been turned over to the defendant, Your Honor.
17            And all the materials basically are repetitions of the
18   same thing of what the agents were doing, their approach to
19   locating the defendant, identifying him, finding his apartment,
20   arresting him, searching his apartment.
21            So all substantive materials with respect to the
22   nature of the government's investigation, particularly with
23   respect to the location of the defendant's apartment, how we
24   located it, and then what we did once we located it have been
25   turned over to the defendant, Your Honor.  So --
```

1      THE COURT:  And by when was that accomplished,
2  Mr. Battista?
3      MR. BATTISTA:  It's been an ongoing process, Your
4  Honor.  I don't have all of the dates here.  But the
5  information -- By the dates that I provided to the Court in
6  court, that response either went out that week or the week
7  after that week.  But it has been turned over to the defendant.
8      The defendant recently sent the government a letter
9  with a single discovery request about something.  We responded
10  back to that letter.  So my understanding is that we don't have
11  any outstanding specific requests from the defendant, and there
12  haven't been any for some -- a specific period -- a lengthy
13  period of time.
14      And we've endeavored to respond to all of his requests
15  either by turning over the material or formally advising him
16  that we would not respond.
17      THE COURT:  All right.  Thank you.  Mr. Rigmaiden,
18  could you tell me where you are on these discovery motions
19  please.
20      MR. RIGMAIDEN:  Well, the discovery that -- The last
21  set of discovery they gave me was on October 18th, and that was
22  134 pages.  And then on around September 17th or 18th, they
23  gave me the 295 pages, which were mostly e-mails and memos and
24  things of that nature.  And they're a bit more extensive than I
25  thought.  There is a lot of discussions back and forth.  And

UNITED STATES DISTRICT COURT

1   there's new information in those e-mails and memos that I need

2   to incorporate into the motions.  And I actually need to make

3   other requests based off of those e-mails and memos.

4         And I know it's the government's position that they've

5   given me everything that they know of, but there is stuff that

6   they may not know of just because there's so many different

7   agencies involved.  And I'm trying to point those things out so

8   that the prosecutors on the case can go out and make those

9   additional requests.

10        And since then, in the e-mails that I'm talking about,

11  I've learned some of these sensitive investigative techniques,

12  not necessarily from the e-mails, but they've kind of clued to

13  certain things.  And then from various other sources and people

14  who are helping me have given me information.

15        So now I can make more detailed requests for

16  information that maybe the prosecutors don't even know exist

17  because the FBI has a policy not to turn that information over

18  to the U.S. Attorney's Office unless they have a specific need

19  and actually have to get clearance from somebody high up in the

20  FBI.

21        So if the U.S. Attorney's Office is making these

22  requests to the FBI, they're just telling them, well, this is

23  sensitive information we're not even allowed to tell you, so

24  just go ahead and forward on to the defendant that it's

25  sensitive and he can't have it.

1          So my problem with that is that there's not really

2     anybody who can be held accountable, because if they're just

3     contacting people at the -- I guess it's the Science,

4     Technology and Law Unit at the FBI, I assume that's who they're

5     consulting with.  But if these other attorneys that work for

6     the FBI aren't appointed to the case, and they're the ones

7     making the decisions on what's sensitive and what's not

8     sensitive without turning over the full information to the

9     U.S. Attorney's Office, then it makes it sort of difficult for

10    them to claim that they've turned everything over when there

11    might be little bits and pieces of information that are

12    relevant that I've identified and now I have to spend time

13    bringing it to their attention just because they don't know.

14    And then that takes additional time for them to address that.

15          This is something that I've read about in -- The FBI

16    has a Manual of Investigative Operations and Guidelines.  And

17    Part 2, Page 10 to 10.13, covers their policies about not

18    turning information over.  They're not even allowed to turn

19    information over to the general case agents on the case.  So

20    people like Richard Murray wouldn't even have this type of

21    information because -- And he even has technical training.  But

22    he's not even at a level where, in the FBI, where they would

23    turn that information over unless they have, you know, certain

24    clearances or if they're given certain permission for that.

25          So they may claim they've given me everything, but

1    I've identified new things that I didn't know existed before

2    just because I'm being kept so much in the dark.  And it's kind

3    of like I'm having to play this game of 20 questions where I

4    say, well, maybe you guys did this, and they come back and say

5    we didn't do that, but we're not going to elaborate any further

6    because it's sensitive techniques.

7            And then I have to come up with a different theory,

8    and then they say they didn't do that.  And it just kind of

9    keeps on going back and forth like that.  And I think it would

10   be a lot easier if there was actually somebody addressing my

11   requests who actually has the proper clearances and has the

12   information needed in order to really understand what I'm

13   asking for.

14           THE COURT:  Well --

15           MR. RIGMAIDEN:  So --

16           THE COURT:  Go ahead.

17           MR. RIGMAIDEN:  -- as far as the motions are

18   concerned, I'm preparing an additional discovery request based

19   on the information that I found out and stuff that I don't

20   think that the prosecutors even know about.  So I'm going to

21   bring these new issues to their attention, and hopefully they

22   can get in contact with the FBI, whoever it is that they're

23   consulting with that knows about the technology.  And hopefully

24   they'll turn that information over to them so they can make the

25   determination on whether or not it's Brady material, because if

```
1    they're just forwarding, you know, something that the FBI tells
2    them is sensitive on to me, then there's no way I can hold
3    anybody accountable for that later because they can just claim
4    that they're being kept in the dark.
5            THE COURT:  Well, so if I understand you correctly,
6    Mr. Rigmaiden, you're saying you want to send additional
7    discovery requests to the government and get their response
8    before you file the discovery motions?
9            MR. RIGMAIDEN:  Yes.
10           THE COURT:  How long do you think that's going to
11   take?
12           MR. RIGMAIDEN:  Well, I already have -- It's all
13   handwritten, and I had about maybe 25 pages typed before my
14   private investigator just pulled the plug on me.  He was upset
15   about not getting paid quickly.  So that was one of the
16   problems I had.
17           So I'm just trying to get it finished -- finish typing
18   it right now.
19           THE COURT:  Well, my concern, as I think you know, is
20   that this case has been pending for two years.  You've been
21   incarcerated for more than two years.  We've been leading up to
22   these discovery motions now for several months.  I'm concerned
23   that this process could go on for months more before we get to
24   the point of discovery motions, which aren't even the point of
25   the motion to suppress you ultimately are aiming toward.
```

UNITED STATES DISTRICT COURT

1    I don't want to put this off another 60 days to come

2    back and find out when the motions are going to be filed,

3    because I just see this going on for too long a period of time.

4    Are these issues that you're now raising issues that

5    could be raised in the motions?

6    MR. RIGMAIDEN:  They -- I suppose they could be, but

7    they are -- they're pretty detailed.  I'm not sure if, you

8    know, if the government had to respond in a motion and make

9    a lot of legal points, then that might be longer than if they

10   actually addressed them through a letter and said, okay, we can

11   give you this stuff or maybe they can't, because all this stuff

12   is found in public information anyway.  So I don't really see

13   how they're coming across this claim that it's sensitive

14   techniques.

15   The things that I'm looking for are just small details

16   to fill in the gaps as far as, like, the specific information

17   that pertains to my case.  But I guess I could raise it in a

18   motion.

19   But another thing, as far as how long it's taking for

20   the discovery motions, is that the facts -- it's really the

21   facts that I'm having difficulty with because they keep giving

22   me more discovery.  And I have to re-incorporate all this new

23   information in the facts I've already written, and it changes

24   everything.

25   So I've been having to do that over and over again.

1   And the last set of discovery I got was on October 18th, and

2   that causes a delay.  But as far as putting the facts together,

3   this is the same set of facts that will be used for the motion

4   to suppress.  So it may seem like the discovery issues are

5   being delayed longer than they need to be, but I can probably

6   just carry over the same facts to the motion to suppress, so it

7   wouldn't -- It's kind of like killing two birds with one stone,

8   I guess you could say.

9          But I don't know whether or not to put those requests

10  in a motion or mail them to the government.  I guess I could do

11  it either way.  I would prefer to mail it to the government

12  before putting it in a motion.

13         THE COURT:  These are matters that you have not raised

14  with the government before; is that right?

15         MR. RIGMAIDEN:  Yeah, not specifically to this detail.

16  They were just sort of broad requests.  And I would figure that

17  if they asked the FBI, they would just say, "Oh, well, this is

18  sensitive information we can't tell you," even to them, not

19  only to me, but I don't even think that they're telling the

20  prosecutors everything.

21         So if the prosecutors don't know everything, how can

22  they make a decision on whether or not I should get the

23  information or not?

24         THE COURT:  How soon do you think you can get that in

25  the mail to them?

1          MR. RIGMAIDEN:  Well, that depends on if my private

2     investigator is going to bring the computer back on legal

3     visits so I can keep typing this.  I mean, they kind of have a

4     habit of they show up, and then all of a sudden they say, well,

5     we're not going to come anymore, and then a couple weeks later

6     they show up again.

7          I really don't know what's going on behind the scenes

8     as far as what the problems are as far as them getting paid or

9     not getting paid.  I try not to ask too many questions about

10    the money anymore.  But as far as getting it in the mail,

11    there's the fact that I need to just get access to this laptop

12    to finish typing it.

13         THE COURT:  Well, you could put it in handwriting,

14    couldn't you, what's left of the letter?

15         MR. RIGMAIDEN:  Well, it's pretty -- It's -- It's so

16    technical that there's a lot of different punctuations, and it

17    would be really difficult for me to put it in handwriting.  I

18    mean, it would be even hard for me to type it on a typewriter.

19    There's a lot of references to other documents and things like

20    that, so it would be difficult for me to handwrite it.

21         I mean, it would probably take -- It would probably be

22    quicker if I just waited for them to bring the computer back

23    and typed it over three or four days than for me to sit here

24    and try to handwrite it before that would even happen, because

25    I have it handwritten in a rough draft, but it's -- I mean, I

```
1    would have to keep handwriting it over until it gets to a point
2    where it's comprehendible.
3              THE COURT:  Well, if you would prefer to answer this
4    next question ex parte, let me know, but I am not aware of any
5    outstanding bills from your investigators.  Every one I've seen
6    I've approved within 48 hours, I think.
7              You're the one who submits the bills for them, I do
8    believe.
9              MR. RIGMAIDEN:  Not me personally, no.
10             THE COURT:  Who does?
11             MR. SEPLOW:  I am now resubmitting them, because I
12   know that I signed one recently -- I'm sorry.  Dan at my office
13   gave me one to sign last week I'm pretty sure I signed.  I
14   don't keep track of it.
15             THE COURT:  I guess what I'm saying is, Mr. Rigmaiden,
16   I haven't been aware of an issue on them getting paid.  I don't
17   think there's been any delay on our side.  If it's a matter of
18   getting their invoices submitted through Mr. Seplow's office or
19   something else, that seems to be something you could take care
20   of.  Is there something I can do to assist in getting them back
21   in with the computer so you can finish this up?
22             MR. RIGMAIDEN:  Well, I know they said that there
23   was -- the one problem was that they weren't paid for past
24   invoices they submitted.  But I think that was -- I don't think
25   that was a problem with the Court.  I think that was something
```

1    to do with either them or not getting them submitted quick

2    enough.  I don't really know who is responsible for that.

3            MR. SEPLOW:  Your Honor, could I make a call real

4    quick while you are talking to him and find out what the status

5    is?

6            THE COURT:  Sure.

7            MR. SEPLOW:  Because I'll ask Dan what happened.

8            THE COURT:  Yeah, go ahead.

9            MR. RIGMAIDEN:  And then in addition to that, they

10   said that as far as approved funds are concerned, that they've

11   gone through all of that.  So I was trying to submit another

12   motion for more funds.  But the day that I was going to get it

13   finished was when they said, well, this is the last day, and

14   they didn't bring the -- I'm going to have to sign these

15   motions by hand and then scan the signatures back.  I'm doing

16   the motions on the computer now so I'm not having to type them

17   out and mail them in.  But I still need to print out the

18   signature page and sign that and then scan that back into the

19   document so that there's an original signature on the record.

20           One thing that would go quicker for me would be if I

21   could just do a digital signature.  I don't know how that would

22   work.  I know that if you're not registered with the ECF --

23           THE COURT:  I don't think that does work.  I think you

24   need to sign it.

25           Well, it is important, as I think you already

1    understand, that you keep their authorizations ahead of their

2    billings.

3              MR. RIGMAIDEN:  Yeah.

4              THE COURT:  The statute only allows me to approve $500

5    in billings that weren't authorized in advance.  And we've had

6    problems in other cases with investigators getting ahead of

7    those billings and me having to deny some portion of their fees

8    because they went beyond that $500.  So that is important.

9              Well, obviously my concern is the delay.  I understand

10   what you say about the work you've been doing to try to get

11   these letters out and to get the motions prepared.

12             I just don't want to see this drag on for another six

13   months with us going through this discovery process and only

14   then get to the motion to suppress.

15             MR. SEPLOW:  Yes.  I found out that three of the

16   requests are sitting in the Ninth Circuit right now.

17             THE COURT:  That's the delay.  Okay.  When I

18   authorized them --

19             MR. SEPLOW:  You're authorizing them right away.

20             THE COURT:  Okay.

21             MR. RIGMAIDEN:  Well, maybe if another -- more

22   approval for more spending is ordered, then maybe they would be

23   willing to come back down even though -- at least maybe for a

24   few days just so I can get the letter done.  I would think that

25   I can probably convince them to do that.

1      THE COURT:  Well, why don't you do that, if you would,

2  and get this letter out, so that we can get to the motions and

3  get it decided and get that motion to suppress teed up, which,

4  to me, is the big hurdle we need to clear in order to get this

5  case to trial if I deny the motion or end the case if I grant

6  the motion.

7      Mr. Fox, do you have any thoughts on the schedule that

8  we're pursuing in this case?  I know you already had told us

9  you had some trial issues through the end of this year.

10     MR. FOX:  Actually my lone trial conflict resolved --

11  it resolved itself, postponed itself to February of next year.

12  So I have no trials between now and then.  But I will --

13  Because I've been in trial seven out of the last ten months and

14  because of that continued trial, the capital trial, in all

15  honesty, that's where a substantial portion of my workday is

16  being devoted right now.  And also my last trial date, my most

17  recent trial concluded on October 14th.  I was out of the state

18  from the 15th of October until the 19th.

19     So really it's only been since October 19th that I've

20  had time to really, I guess, re-engage myself, review the

21  discovery in this case, which I have.  And admittedly an

22  overwhelming percentage of it is devoted to the government's

23  case against Mr. Rigmaiden.  But because of the conspiracy

24  charges, I have to familiarize myself with a -- at least know

25  to what extent my client's alleged involvement is under the

1    conspiracy theory, where those boundaries are.

2            THE COURT:  All right.  We have a trial date set in

3    this case of December 14th.  And another purpose for this

4    hearing was to talk about what we have to do with that trial

5    date.  Tell me what your thoughts are, Mr. Rigmaiden, with

6    respect to that date.

7            MR. RIGMAIDEN:  I think we should move it up.

8            THE COURT:  You mean push it back?

9            MR. RIGMAIDEN:  Yeah, yeah.  I'm sorry.  Push it back.

10            THE COURT:  All right.  In order for that to happen, I

11    need a motion from the defense.

12        (Messrs. Rigmaiden and Seplow confer off the record.)

13            MR. SEPLOW:  Mr. Rigmaiden's given me authority to

14    make that particular motion, so I'll make sure that's done this

15    week.

16            THE COURT:  All right.  What I would ask, Mr. Seplow,

17    I mean, even if Mr. Rigmaiden thinks it will take longer -- and

18    it probably will, given the schedule we're on -- that you just

19    seek a 60-day continuance.  That way we'll be triggered off and

20    enough to stay on top of this.

21            Any objection on behalf of Mr. Carter to a 60-day

22    continuance?

23            MR. FOX:  No.

24            THE COURT:  All right.  Mr. Seplow, if you'll file

25    that motion, then I will continue the trial until the second

1    Tuesday in February.

2         MR. SEPLOW:  Do you want me to put the actual date in

3    there, or will you do that?

4         THE COURT:  Either way.

5         MR. SEPLOW:  I'll just make a 60-day and keep it an

6    open order for you.

7         THE COURT:  That's fine.  Lisa can fill in the date.

8         And then what I think I would like to do is set

9    another status conference in this case just to see where we are

10   on these issues.  It sounds as though, Mr. Battista, what

11   you're going to get from Mr. Rigmaiden is going to be fairly

12   detailed, and you may have to consult with folks in the

13   Department of Justice on it.  Does that sound right?

14        MR. BATTISTA:  That's correct, Your Honor.

15   Mr. Rigmaiden is correct that we are -- there is a section

16   within the FBI and the Department of Justice that we are in

17   communication with with these matters, the sensitive matters

18   regarding the equipment that was used to locate the aircard.

19        THE COURT:  I know it's hard to say, but if you get

20   this detailed letter from Mr. Rigmaiden, what generally would

21   be the time frame for you to get responses back from those

22   folks?

23        MR. BATTISTA:  It can be with -- you know, it can be

24   within a week, Your Honor.  We literally scan it and send it to

25   them so they get a hard copy.  And then we have telephone

```
1    conferences where we have conference calls where we respond.
2    And they are aware of this case.  They're aware of the issues.
3    They know that more issues will arise.
4            So I have a contact, a specific contact within that
5    section that I deal with on a regular basis.  So we're taking
6    this seriously.  We are attempting to, as Mr. Rigmaiden makes
7    the responses, we do address them.
8            And if we feel it's appropriate, we do respond and
9    furnish the materials.  And if we do feel that it's not
10   appropriate, then we specifically tell him that we're not going
11   to respond.
12           THE COURT:  All right.  I think what I'd like to do, I
13   mean, in addition to granting the motion to continue -- and if
14   you think you need additional funds authorized for the
15   investigator, submit that as well, Mr. Rigmaiden -- I'd like to
16   set another status conference in this case for Tuesday,
17   December 14th, at 3:00 p.m.  Hopefully by then you'll have your
18   responses to this letter, Mr. Rigmaiden.  You may even have
19   your motions prepared.  That would be good.  But I want to make
20   sure that we are on top of this so that we can keep it moving
21   along.
22           Mr. Battista, I assume you don't have an objection to
23   the motion to continue that we've discussed?
24           MR. BATTISTA:  No, Your Honor.
25           THE COURT:  Do you have other matters that you wish to
```

1    raise today?

2              MR. BATTISTA:  No, Your Honor.

3              THE COURT:  Okay.  Mr. Rigmaiden, do you have other

4    matters you'd like to raise today?

5              MR. RIGMAIDEN:  No, Your Honor.

6              THE COURT:  Is there anything ex parte we need to talk

7    about?

8              MR. RIGMAIDEN:  I don't believe so, no.

9              THE COURT:  All right.  Mr. Fox?

10             MR. FOX:  Nothing.

11             THE COURT:  Okay.  We will plan to see you then on the

12   14th.  Thanks very much.

13        (Proceedings recessed at 1:59 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1          **C E R T I F I C A T E**

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4   appointed and qualified to act as Official Court Reporter for

5   the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7   a full, true, and accurate transcript of all of that portion of

8   the proceedings contained herein, had in the above-entitled

9   cause on the date specified therein, and that said transcript

10  was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 25th day of January,

12  2011.

13

14                                      s/Linda Schroeder
                                 Linda Schroeder, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT