1          **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3              _____

4    **United States of America,**         )
                                            )
5                        Plaintiff,         )     **CR 08-00814-PHX-DGC**
                                            )
6           vs.                             )     Phoenix, Arizona
                                            )     **February 10, 2011**
7    **Daniel David Rigmaiden,** and **Ransom** )
     **Marion Carter, III,**                )
8                                           )
                         Defendants.        )
9    _____)

10

11

12

13       **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14       **REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

15                  <u>**STATUS CONFERENCE**</u>

16             (EX PARTE DISCUSSION NOT INCLUDED)

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RPR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

14:26:43   1                       **A P P E A R A N C E S**

         2

         3   For the Government:

         4              U.S. Attorney's Office
                   By:  **FREDERICK A. BATTISTA**, ESQ.

14:26:43   5             40 North Central Ave., Ste 1200
                   Phoenix, AZ  85004

         6

         7

         8   The Defendant, Pro Per:

         9              **Daniel David Rigmaiden**
                   Central Arizona Detention Center – Florence

14:26:43 10             P.O. Box 6300
                   Florence, AZ  85132

       11

       12   Shadow Counsel for the Defendant:

       13              Law Office of Philip A. Seplow
                   By:  **PHILIP A. SEPLOW**, ESQ.

       14              2000 N. 7th St.
                   Phoenix, AZ  85006

14:26:43 15

       16

       17   For Defendant Carter:

       18              Taylor W. Fox, PC
                   By: **TAYLOR W. FOX**, ESQ.

       19              2 N Central Ave, Ste 735
                   Phoenix, AZ 85004

14:26:43 20

       21

       22

       23

       24

       25

**P R O C E E D I N G S**

THE COURTROOM DEPUTY:  Criminal case 08-814, United States of America versus Daniel David Rigmaiden and Ransom Marion Carter, III.  This is the time set for status hearing.

MR. BATTISTA:  Good afternoon, Your Honor.  Fred Battista on behalf of the United States.

THE COURT:  Good afternoon.

MR. SEPLOW:  Good afternoon, Your Honor.  Philip Seplow, shadow counsel for Mr. Rigmaiden.

THE COURT:  Good afternoon.

THE DEFENDANT:  Good afternoon, Your Honor.  Daniel Rigmaiden on behalf of himself.

THE COURT:  Good afternoon, Mr. Rigmaiden.

MR. FOX:  Taylor Fox on behalf Mr. Carter, whose presence has been waived.

THE COURT:  All right.  Good afternoon.

When we were here on January 6th, we agreed, Mr. Battista, that the government would respond to the extensive discovery letter that you had received by January 28th.  Did that happen?  And if so, would you describe the response for me.

MR. BATTISTA:  Yes, Your Honor.  We provided the defendant a point-by-point response to his request.  One of the most critical things that I believe he was looking for was what

15:07:00  1   is considered the raw data that the government received from

2   Verizon Wireless.  That was obtained on disk and has been

3   furnished to him.  And we did, to the best of our abilities,

4   either provide the information that had not been provided to

15:07:18  5   that date or formally advised him that we would not be

6   providing the information.  And the only information that was

7   requested that we did not provide was the information regarding

8   the background information regarding the equipment used to

9   locate the air card in this case.

15:07:37  10         THE COURT:  So the basis, I assume, for withholding

11   that was --

12         MR. BATTISTA:  It's sensitive law enforcement

13   investigative equipment, Your Honor.  And our concern -- the

14   basic concern, Your Honor, is that if the actual information

15:07:53  15   regarding how this equipment is disclosed, it can be subject to

16   being defeated or avoided or detected.  So that's the primary

17   concern.

18         THE COURT:  What can you tell me that is publicly

19   known about this equipment?

15:08:09  20         MR. BATTISTA:  Well, Your Honor, it's kind of an

21   interesting issue in terms of what's publicly known because the

22   government is under constant -- is under a constant barrage of

23   requests of information from numerous sources.  So there is

24   Freedom of information Act requests, there's people within the

15:08:31  25   government who are not aware of the sensitivity of this

15:08:35   1   equipment.  So on occasion information possibly is released in

2   error or without detailed consideration.  So in terms of this

3   day and age with the Internet, in terms of what's possibly

4   publicly out there in some format, it's hard for me to say.

15:08:58   5        But I can say that the FBI takes the position that

6   the actual equipment and how it's operated and the software

7   that's used to operate the equipment is law-enforcement

8   sensitive and that if the actual -- the nature of the

9   equipment, how it's operated, programs used to operate the

15:09:18  10   equipment, if that information is formally confirmed by the

11   government, then people could use that information, again, to

12   avoid detection or defeat the equipment.

13        THE COURT:  So what, if anything, have you disclosed

14   to Mr. Rigmaiden about the equipment?

15:09:37  15        MR. BATTISTA:  What we've disclosed, Your Honor, is

16   that we obtained the two court orders in California to

17   authorize us to use this equipment; that the equipment was used

18   to assist the investigation, the prosecution team.  Several

19   members are present here in the courtroom.  What the equipment

15:10:00  20   was used to do was to narrow down a possible location of where

21   the air card was.

22        The situation in the case, Your Honor -- if I may

23   have a couple minutes, I'll give the Court some background.

24        The Internal Revenue Service was -- had detected a

15:10:20  25   very sophisticated scheme to file income tax refunds

15:10:27  1    electronically requesting that the refunds then be

2    electronically deposited into different accounts.  And the

3    returns were fraudulent.  The bulk of the returns were filed

4    in names of people who were deceased.  But some were filed in

15:10:49  5    names of people who were alive.

6         So what happens, then, is the IRS detects the fact

7    that it's receiving these fraudulent returns.  So the question

8    is where are the fraudulent returns coming from?  The

9    fraudulent returns are being electronically filed.  The IP

15:11:10 10    addresses for the vast majority of the returns come back to

11    unsuspecting third parties.  In other words, the vast majority

12    of the returns in the case, the actual computer that was

13    filing the returns is masking in a sense its number.

14         It's the equivalent of like -- an IP address, in very

15:11:36 15    poor analogy, would be IP address is in a sense the cell phone

16    number for the computer.  The serial number for the computer.

17         In other words, so what is the source of these

18    returns?  So in the course of the investigation, what was

19    determined is that systems called botnet proxies, botnet

15:11:57 20    proxies, were being used to mask the actual identity of the

21    computer that was being used to file the fraudulent returns.

22         So the initial investigation shows that the returns

23    are being filed all over the United States from different

24    computers, but in reality what's happening is that these

15:12:19 25    computers are -- have been taken control of by someone unknown

15:12:27   1   to the actual owners of the computers, and these returns are

2   going through these computers.

3          But in the course of the investigation, the

4   investigators were able to determine a certain IP address

15:12:38   5   slipped through the system several times.  In other words,

6   thousands of fraudulent returns are filed and almost all of

7   the IP addresses are noise because they're not the real

8   computer that's filing the returns.  But fortunately for the

9   investigators, the actual IP address slipped through several

15:13:01  10   times.  Either the botnets failed or the operator of the

11   computer failed to properly activate the botnets or proxies,

12   so this particular IP address started to come through and that

13   became a red flag.

14          So the question was where's this coming from?  We

15:13:19  15   have a particular IP address.

16          We were able to determine that this information was

17   being filed through the use of a particular Verizon Wireless

18   air card.  This air card then would allow someone who's, let's

19   say, using a computer to plug the air card into the computer

15:13:37  20   and then connect to the Internet.

21          So if the botnets and proxies had worked all the

22   time, we may never have located this air card.  But what

23   happened was, is we were able to locate the air card in terms

24   of an account for the air card.

15:13:55  25          The account had been obtained under a fraudulent

15:13:58   1   identity, so there was no billing -- accurate billing

2   information for the account.

3         One of the things we did was to try to determine how

4   was this account being paid for.  It turned out that Verizon

15:14:15   5   has kiosks in some of their stores, similar to like an ATM

6   machine, where an account holder can actually go into a store

7   and pay and keep the account active.  We were able to see

8   Verizon records and determine that this particular air card

9   that was what we believed was being used to file all these

15:14:36   10   fraudulent accounts was actually being paid for in person by

11   someone going to a Verizon store in San Francisco and keeping

12   the account active by either paying -- by paying -- I don't

13   recall off the top of my head if it was cash or how it was

14   being paid, but somehow the account was being paid through a

15:14:52   15   kiosk in a Verizon store.

16         So now we're looking for this air card because we

17   believe that when we find the air card it will be attached to

18   the computer which will have the records of all these

19   fraudulent tax returns.

15:15:07   20         So we get historical information regarding the use of

21   this air card from Verizon, and the historical information

22   shows us that the air card is primarily hitting off certain

23   towers in Northern California.  So in other words, now we have

24   a particular area in Northern California where most likely

15:15:32   25   this is the first place to look for the air card.  In other

15:15:34   1   words, because these particular towers are the ones the air

2   card is connecting to.

3          So once we get the two orders, court orders from

4   Northern California authorizing us to use the equipment to

15:15:48   5   locate the air card, a team goes out and uses the equipment.

6   And that equipment was used and was accurate enough to advise

7   the investigation team -- again, three of the members are

8   present here in the courtroom -- that the team that operated

9   the equipment was able to tell the investigators we believe

15:16:12  10   that the air card on July 16th of 2008 is transmitting from an

11   area the size of approximately three to four apartment units

12   within an apartment complex.

13          In other words, that's all the equipment could tell

14   the agents.  No content of what the air card was transmitting

15:16:35  15   was examined or looked at.  And the equipment was not used to

16   determine which of the three or four apartments the air card

17   was in or determine the exact location of the air card within

18   a particular apartment.

19          So now the agents have an area the size of three or

15:16:55  20   four apartments.

21          I think you can tell I've told this story once or

22   twice before.

23          So now the agents start to do the classic legwork of

24   investigators and contact the apartment management company to

15:17:15  25   try to find out who occupies these four -- three to four

15:17:20  1    units.

2              Grand jury subpoena's issued.  We gained access to

3         the rental agreements and names of the different occupants of

4         the apartments.

15:17:32  5              I believe two of the apartments are vacant.  One of

6         the apartments is occupied by an elderly gentleman, 50, 60, 70

7         years old, no criminal history.

8              The fourth apartment is occupied by a young, white

9         male, approximately in his twenties, who's obtained the

15:17:57 10    apartment using a false identity and in the course of

11        submitting the lease application for the apartment, has

12        provided a fraudulent tax return that comes back to a person

13        who I believe was deceased.

14             So in a sense, what had happened was by using the

15:18:18 15    false identity to obtain the apartment, in a sense unknowingly

16        Mr. Rigmaiden, we believe, in a sense painted a bull's eye on

17        the door to that particular unit.  Because we were looking for

18        a person -- the air card had been obtained using a false

19        identity.  The apartment had been obtained using a false

15:18:42 20    identity.  So it was -- we were able then to, using these

21        different classic investigative techniques, zero in on this

22        one particular apartment.

23             We obtained a search warrant for that apartment and

24        then we surveilled the apartment.  And we had a concern that

15:19:00 25    we didn't want to execute the search warrant without tipping

15:19:05  1    off the occupant to the apartment.  At this time we had no

2    idea who the owner, the actual owner or, excuse me, the renter

3    of the apartment was.

4         At that time the apartment was rented under the name

15:19:17  5    of Brawner.  So we were using that alias.  But we didn't know

6    who was actually living in that apartment.

7         What we had was the information about the means used

8    to obtain the apartment and the advice that the air card was

9    transmitting within the area.  We also had a photograph of

15:19:39 10    Mr. Brawner because when Mr. Rigmaiden, who we believed was

11    acting as Mr. Brawner, rented the apartment, a fraudulent

12    driver's license was used and a photocopy of that was

13    collected by the rental company.  So we had a basic image of

14    who the occupant in the apartment was.

15:19:59 15         So what then happened is, through surveillance,

16    Mr. Rigmaiden was observed outside the apartment.  There was a

17    chase.  He was arrested.  We had an outstanding warrant for

18    Mr. Brawner's arrest and he was arrested pursuant to the

19    warrant.

15:20:16 20         The keys to the apartment were found in

21    Mr. Rigmaiden's pocket.  The apartment was entered pursuant to

22    the warrant.  The air card was found in the apartment,

23    connected to a computer.  The computer was running.  The

24    computer was examined pursuant to the search warrant, and then

15:20:34 25    records that we expected to find were found on the computer

15:20:40   1   with respect to the fraudulent income tax filing scheme.

2        Also contained in the computer, leading up to the

3   arrest and the search, we were working with a confidential

4   informant who had been communicating via e-mail extensively

15:20:55   5   with the person who we initially called a hacker because we

6   didn't know what his name was, and then he was called

7   Mr. Brawner because that is who was renting the apartment, and

8   then when Mr. Rigmaiden was arrested and fingerprinted he was

9   arrested and identified.

15:21:11   10        The second -- one-half of all the e-mail

11   communications -- in other words, we have copies of the

12   e-mails that we sent through the informant to the person that

13   we called the hacker.  All those e-mails were then found on

14   the computer that was attached to the air card.

15:21:31   15        So in a nutshell, that's how the case came together.

16   And the equipment was used only to assist us to get into the

17   general area of the apartment, but not a particular apartment

18   or not an exact location within the apartment of where the air

19   card was.  And no content of the transmissions of the air card

15:21:57   20   were ever examined by the investigation team.

21        THE COURT:  Out of all of what you just described to

22   me, what aspects of that investigation have not been disclosed

23   to defendant under the sensitive law enforcement techniques?

24        MR. BATTISTA:  The only thing, Your Honor, that we've

15:22:18   25   not disclosed is the team that was called in to operate the

15:22:22  1   equipment to locate the air card.  We have not disclosed any

       2   information in terms of that team.  In terms of who the people

       3   were, what the equipment they used, what software.

       4         The defendant in essence is requesting the names of

15:22:41  5   the people who operated the equipment.  We have not disclosed

       6   that.  The exact make and model number of the equipment, we've

       7   not disclosed that.  The software to operate the equipment,

       8   we've not disclosed that.  And the manner and means of

       9   operation of the equipment.

15:22:57 10         The FBI takes the position that all of this

      11   information, if disclosed in detail in particular, would allow

      12   other people to, once it becomes public, to allow other people

      13   to, again, avoid detection or defeat the equipment.

      14         Even the identities of the people who operate the

15:23:21 15   equipment, Your Honor, I mean once -- if their images are

      16   posted -- obviously they to have physically go out into

      17   neighborhoods and look for the equipments and the air cards.

      18   If all of a sudden their faces are on the Internet, then they

      19   end up on a watch list.  Hey, if you see these guys in your

15:23:39 20   neighborhood -- I mean there's just many, many issues that we

      21   can address.

      22         But it's the government's position that this

      23   equipment is highly sensitive and it was not used in a manner

      24   that would have violated the defendant's expectations of

15:23:58 25   privacy in this case.

15:23:59  1          And the FBI is willing, as I said earlier, if the

2      Court has primary -- has additional concerns, the FBI is

3      willing to bring in people to testify in camera for the Court,

4      to explain to the Court their concerns and the sensitive

15:24:17  5      nature of the equipment.

6          And the sensitive nature of the equipment goes beyond

7      issues of law enforcement to matters of national security in

8      terms of obviously some of this equipment is not only used in

9      the law enforcement realm, it's used in the national security

15:24:32 10      realm.

11          THE COURT:  Of the matters that were raised in

12      Mr. Rigmaiden's extensive discovery letter to you, have you

13      disclosed everything in the government's possession other than

14      what you consider to be sensitive law enforcement material?  Or

15:24:54 15      is there other information you're still collecting?

16          MR. BATTISTA:  Right now the primary focus of that

17      discovery request, Your Honor, is the air card.  In all

18      sincerity, I believe that within the realm of information

19      that's available, that we have disclosed that.  Now, I

15:25:14 20      cannot -- I'm not going to stand here and say that there isn't

21      an e-mail that we've missed or an agent's note or something

22      like that, but we have made a good faith effort in terms of all

23      the agents' reports, all the agents' e-mails, all the agents'

24      notes.  In other words, the investigation team and myself.

15:25:33 25      Anything that remotely relates to the air card mission was

15:25:37  1   gathered, and I have personally reviewed it, reviewed it with

2   Agent Medrano, reviewed it with Agent Fleischmann, and we have

3   processed that and turned it over to the defendant.

4          Again, the only thing that we've been withholding is,

15:25:54  5   again, anything related to the operation or nature of the

6   equipment used to locate the air card.

7          THE COURT:  What is the volume of material you turned

8   over with your January 28th response?

9          MR. BATTISTA:  Your Honor, it was not a significant

15:26:10 10   amount of material.  I think one of the things that was

11   important for the defendant was he wanted the data that was in

12   the format that we originally received it from Verizon.

13          In other words, the information comes to the

14   government from Verizon and then it's downloaded into a

15:26:28 15   spreadsheet or put through a program and then processed.  We

16   had given him all the end use.  You know, the end product.  He

17   wanted to see the original information.  So we've made a very

18   good effort then to locate the original information as it

19   was -- came from Verizon, and we attempted to give it to him

15:26:54 20   in a chronological order.

21          It generally came in through attachments to e-mails,

22   so we recreated all the e-mails, put them in order, loaded all

23   the information on a disk, and gave it to him.

24          So in terms of volume, it's not a great deal of

15:27:10 25   information, but it was very detailed and specific.  The

15:27:13  1    defendant -- also, there were a number of either e-mails or

       2    notes and things where there were redactions, and the

       3    defendant had asked specific questions about specific

       4    redactions.  We redacted ten -- thousands and thousands of

15:27:31  5    pages.  There were several pages were items were redacted but

       6    we had not specifically identified for the defendant what was

       7    being withheld.

       8         We then -- everything that the defendant cited to us,

       9    we went back and processed line by line and either disclosed

15:27:45 10    it or gave him a much more detailed explanation of what had

      11    been redacted.

      12         One of the issues, I think, that the parties have

      13    been working through is the investigation team in the course

      14    of -- obviously, we needed to find where the air card was and

15:28:07 15    we needed to use equipment to locate the air card.  So the

      16    agents in many, many e-mails and different things used generic

      17    terms for this equipment because none of the agents here or on

      18    the investigation team were trained on the equipment or

      19    operate the equipment.  So there was just a multitude of

15:28:25 20    generic names that were used.

      21         What we've done is we've gone through and deleted all

      22    the generic names or terms that generally fit into the

      23    overview of this particular equipment.  But none of the

      24    redactions actually specifically name the actual make, model

15:28:42 25    number of the equipment that was used because none of us knew

15:28:46   1   what that was.

         2          But, again, there were 70 pages of attachments to the

         3   discovery request.  And the defendant was very well organized.

         4   He gave us copies of what he was looking for and we processed

15:29:03   5   all 70 pages and we responded point by point to all 70 pages.

         6          So I think with respect to the air card mission, that

         7   question, again, we made a good faith effort.  I think we

         8   disclosed almost all there is.  Again, if there's something

         9   out there, it's just because it's been inadvertently missed

15:29:27  10   and it would be a note or e-mail or something like that.  But

        11   we're down to the point now where the defendant is saying he

        12   wants the information about everything there is to know about

        13   that equipment and our response is we don't want to tell you

        14   that information because we think it's law enforcement

15:29:43  15   sensitive.  So that's I think where we are, Your Honor.

        16          THE COURT:  So I take it there's no additional follow

        17   up you're planning to make on the January 28th letter?

        18          MR. BATTISTA:  I mean, again --

        19          THE COURT:  I know if he asks for more you may

15:29:58  20   respond.  But there wasn't anyplace in the letter which said

        21   "we'll get back to you on this"?

        22          MR. BATTISTA:  No, no, Your Honor.  We responded point

        23   by point and I sent it out on the 28th.  I coordinated with the

        24   FBI in Albuquerque and FBI on the east coast.  They reviewed

15:30:14  25   the letter.  I specifically told -- I specifically told the FBI

15:30:21  1    that if it can be given up, let's give it up.  And if it's

2    something that you feel strongly about, then you have to feel

3    strongly about it now.  This isn't a gradual process.  This

4    isn't something, well, we'll give a little bit out and see how

15:30:40  5    it goes.  This is an all or nothing.  I specifically advised

6    them it's all or nothing, Your Honor.

7         If you can give it out under any circumstances, give

8    it out.  If you're willing to look Judge Campbell in the eye

9    in camera and explain to him why you don't think it should be

15:30:58 10    released, that's fine.  But if you're not willing to look

11    Judge Campbell in the eye in an ex parte hearing and explain

12    to him why it should be withheld, then give it up now.  And

13    that's where we are, Your Honor.

14         THE COURT:  Okay.  Thanks.

15:31:11 15         Mr. Rigmaiden, you probably have a few thoughts.

16         THE DEFENDANT:  Yes.  One key point that Mr. Battista

17    leaves out is that they've actually already identified what the

18    device is.  Postal Inspector Wilson identified it as a StingRay

19    and he indicated FBI used the device to locate the air card,

15:31:31 20    and I suspect those so called generic terms he's talking about

21    they redacted out of all these documents, I'm willing to bet

22    that most of these terms actually read "StingRay."

23         And I know from research that has been done by the

24    defense is that the StingRay's made by Harris Wireless

15:31:49 25    Products Group and it's a trademark term.  There's only one

15:31:54  1   StingRay in existence, it's not generic, and that's the

2   device.

3          So for them to sit there and say they didn't know

4   that that's what they were using, I kind of find that hard to

15:32:03  5   believe.  And I don't think that it's really sensitive.

6   Especially when I have pictures of a StingRay here, and other

7   Harris products that they manufacture.  There's a StingRay,

8   StingRay 2, the KingFish and the AmberJack.  And these are

9   pretty much the devices the government uses -- the FBI used to

15:32:23  10   locate cell phones.

11          And it's one thing if they don't want to tell me

12   exactly how these devices work, that's something I'll address

13   in my motion, I'll try to convince you to order them to do

14   that, but I think today at least what they should do is

15:32:36  15   confirm exactly which one of these devices were used to locate

16   the air card, whether it be the StingRay, or maybe a

17   combination of devices.

18          But if I have pictures of these devices and I have a

19   pretty good idea what they are, it's going to make it a lot

15:32:52  20   easier for me to ask for this information.  I mean, I can do

21   one thing, I can lay out exactly how each one of these devices

22   work in my motion and ask them to point out which one they

23   used.  I don't know why they want me to do that.

24          Or they can identify the devices they did use and I

15:33:07  25   can focus in on those.  And not only would it make things a

15:33:10  1    lot easier for everybody involved in the case, but it will

2    also keep secret whatever it is they want to keep secret, even

3    though I don't think it's secret to begin with because if it

4    was I wouldn't have -- I wouldn't have some of the

15:33:22  5    information.  I don't have all the information but I have a

6    good amount.  I need them to fill in some of these blanks for

7    me so I can complete my arguments for the motion to suppress.

8         So I would appreciate if the government could at

9    least today look at the pictures and tell me which device they

15:33:35  10   actually used to locate the air card.  Especially when they've

11   already told me it was a StingRay.  So if that's the device, I

12   think it would be easier for them to point that out.

13        THE COURT:  Well, Mr. Rigmaiden, do you agree with

14   Mr. Battista's assertion that they've given you everything

15:33:52  15   you've asked for other than the information they're withholding

16   as law enforcement sensitive?

17        THE DEFENDANT:  Yes, I would say they have.  As far as

18   what I've asked for.  But I talked to my proposed expert.  He

19   said he read the discovery request we were discussing and he

15:34:09  20   said there's a few other things I needed to request, but I

21   don't think it will be very much.  I couldn't get into too many

22   details with him because he hasn't been officially appointed.

23   But other than a few other items that I haven't requested yet.

24   But as far as everything I've asked for, I think they've turned

15:34:25  25   over everything.  It seems like they turned over everything

15:34:28   1   they have, as far as I'm concerned, other than the sensitive

2   evidence.  So I would agree with the government on that.

3          THE COURT:  All right.  Well, it seems to me we may

4   reach a point where I need to rule on whether it's properly

15:34:39   5   withheld or not.  I'm not going to do it today on the basis of

6   the information you have and that you've handed it to them.  I

7   don't know whether it will require some sort of in camera

8   hearing or not.

9          What I do want to understand more fully,

15:34:55  10   Mr. Rigmaiden, both for purposes of deciding how we schedule

11   things in the case and for purposes of my addressing your

12   ex parte needs for resources to prepare your defense, is to

13   understand why the nature of the equipment and how it works is

14   important to your motion to suppress.  Now, if that's defense

15:35:19  15   strategy that you don't want to share with the government, I'm

16   happy to have them step out and hear you ex parte.

17          But one of the things I need to conclude is that

18   there really is a reason that we ought to press to resolve

19   this issue, is it sensitive, and getting it to you because

15:35:38  20   knowing the nature of it is necessary for the motion to

21   suppress.

22          If the motion to suppress will turn not on the

23   specifics of the equipment but on the general idea of what it

24   does, that it pinpoints the location of an air card, it seems

15:35:51  25   to me the details might not be necessary for a Fourth

15:35:54  1    Amendment analysis.

         2            So the question I want to ask you is whether you are

         3    comfortable with the government personnel in the room

         4    describing for me why you think the details are necessary for

15:36:06  5    your Fourth Amendment argument, or whether you want me to hear

         6    that ex parte in connection with the resources issue I need to

         7    decide.

         8            THE DEFENDANT:  I'd rather explain it ex parte.

         9            THE COURT:  Okay.

15:36:18 10            Mr. Battista, I take it from what you said that with

        11    the exception of the sensitive information that has been

        12    withheld, you believe the government has completed its

        13    disclosure obligations?

        14            MR. BATTISTA:  Your Honor, with respect to the air

15:36:32 15    card, I've advised the defendant that all the formal reports

        16    have been given to him.

        17            With respect to his computer, we're working with the

        18    defendant in terms of how he can get a copy of his computer so

        19    that -- he has to acquire certain information.  We've advised

15:36:53 20    him today what size of hard drives he'll need to have his

        21    computer.

        22            The only information that we have not released, Your

        23    Honor, is we're still in the process of processing it, is just

        24    e-mail traffic from the investigators in the course of the

15:37:11 25    investigation, the notes of the investigators, and matters

15:37:15  1  relating to possible impeachment of the confidential

2  informant.  And we're still in the process of processing that.

3  But any -- obviously the trial issues we've been

4  trying to respond to the defendant's most significant request,

15:37:33  5  is the air card issue, so all the e-mail traffic with respect

6  to the air card issue has been examined and turned over.  All

7  the notes, including my notes, with respect to the air card

8  issue have been examined and turned over.  All the reports.

9  All the orders.  All the material that we received from

15:37:50  10  Verizon Wireless.  All of that has been turned over.

11  So in terms of the air card issue, Your Honor, I'm

12  comfortable in saying -- again with the caveat there may be

13  one or two small items out there that we've missed but nothing

14  significant that has crossed my desk.

15:38:08  15  THE COURT:  So when it comes to, I assume what you're

16  talking about is proving merits of the case, in other words the

17  underlying investigation into the allegedly fraudulent tax

18  returns, there is still some additional disclosure you're going

19  to make on those issues?

15:38:23  20  MR. BATTISTA:  Right.  And, again, all the formal

21  reports have been disclosed, all the spreadsheets, all the

22  evidence that's gathered, all the tax returns, all of that

23  information has been disclosed.

24  But there were five agents and myself working around

15:38:39  25  the clock at times to locate the air card and ultimately

15:38:44  1    locate Mr. Rigmaiden.  So there was a tremendous amount of

2    e-mail traffic that we still have to process.  But the vast

3    majority of e-mail traffic may be what time are we going to

4    meet, just logistical things.  Requests for approval for

15:39:01  5    travel, things like that.  We have to process that.

6         But in terms of all formal reports, all the

7    significant evidence except information that would relate to

8    impeachability of the informants, that's been disclosed, Your

9    Honor.

15:39:21 10         THE COURT:  If we were going to start this trial next

11   month, Mr. Battista, how long do you think it would last?

12         MR. BATTISTA:  Your Honor, I think from the

13   government's side maybe three weeks.  It would depend how -- I

14   don't know -- certain things -- Mr. Rigmaiden and the

15:39:46 15   government, we've been able to reach certain accommodations and

16   things have flowed smoothly.  Obviously with respect to the air

17   card we're at loggerheads.  I've never tried a case with

18   Mr. Rigmaiden so I don't know how the trial would go.  I would

19   say at least three weeks.

15:40:03 20         THE COURT:  Okay.  Did you have other matters you

21   wanted to take up before I speak with Mr. Rigmaiden ex parte?

22   I'll have you wait outside so we can talk after that, but were

23   there other general matters you wanted to raise?

24         MR. BATTISTA:  Just, Your Honor, I think one thing for

15:40:17 25   the Court to consider is -- which I think is the Court is

15:40:21   1    heading down the right road.  The question is looking at the

           2    issue of the air card in a multi-step approach in terms of what

           3    is the Fourth Amendment issue being raised.

           4         In this particular case, if the air card -- if the

15:40:39   5    equipment used to locate the air card only put the agents in

           6    the general vicinity of an area the size of three or four

           7    apartment units, in other words that's as close as we got,

           8    where is the violation of -- potential violation of Fourth

           9    Amendment rights in this particular case?

15:41:02  10         So if we can address it in terms of a step-by-step

          11    process, in other words without going to the exact make, model

          12    number of the equipment, I think that that's a good idea.  And

          13    that's the only thing I would like to concur or propose, that

          14    the Court be open to that.  And, again, the FBI is willing to

15:41:27  15    bring the team out to testify ex parte with the Court.

          16         And another thing I have said before on the record is

          17    that if the defendant has specific concerns about potential

          18    Fourth Amendment issues or rights having been violated, the

          19    team would be willing to respond ex parte to the Court's

15:41:57  20    asking those questions.

          21         In other words, if the defendant is aware of what he

          22    believes is a potential Fourth Amendment violation and it

          23    relates to the operation of the particular equipment, I would

          24    again propose at least attempting to address it ex parte

15:42:14  25    instead of having to go on the record.  I just put that out as

15:42:20  1    a possibility.

2              We'll step outside, Your Honor.

3              THE COURT:  Okay.  Please do.

4                                    *  *  *

15:42:24  5    (The sealed ex parte discussion was reported but not

6    transcribed herein.)

7                                    *  *  *

8              THE COURT:  All right.  Thanks for your patience,

9    folks.

16:16:21 10             Mr. Battista, a few questions that I assume is all

11   public and not sensitive information since you've been making

12   disclosures.  Were there warrants obtained in connection with

13   the use of this device?

14             MR. BATTISTA:  Your Honor, there was -- it wasn't --

16:16:40 15   it's an -- it's a court order that satisfied Rule 41 language.

16   There were two -- there was two orders that were obtained in

17   the Northern District of California.  They've been disclosed to

18   the defense.

19             THE COURT:  Yeah, Mr. Rigmaiden made mention of those

16:16:55 20   to me.

21             MR. BATTISTA:  Yes.

22             THE COURT:  And how was it that the government was

23   able to get an order from a court authorizing the use of this

24   technology without disclosing the technology to the court?

16:17:09 25             MR. BATTISTA:  It's -- it was a standard practice,

16:17:11  1    Your Honor.  The magistrates were familiar with the warrant.

        2    This wasn't a unique scenario.  This particular style of order

        3    had been sought before, before the magistrates.  I can file a

        4    copy with the court.  The Court can see it.  It lays out a

16:17:30  5    certain amount of information, but it obviously doesn't

        6    disclose the exact nature of the equipment.

        7            THE COURT:  Well, how precise is the order in

        8    identifying the equipment that can be used?

        9            MR. BATTISTA:  I don't think it specifically names the

16:17:47 10    equipment, Your Honor.

       11            THE COURT:  So what is the judge -- I mean, the reason

       12    I'm asking this is a search warrant, as you know, is very

       13    specific.  It says you can search during daylight hours at this

       14    location and these are pertinent buildings for the following

16:18:03 15    items.  How did this order authorize the use of this equipment

       16    without saying specifically what it was?

       17            MR. BATTISTA:  It puts certain limitations on the

       18    equipment in terms of what it can be used to do.  So obviously

       19    I believe -- and, again, it's been a while since I've read the

16:18:23 20    order.  I don't want to misstate to the Court exactly what it

       21    authorized to do because I have not read the particular order

       22    in quite some time.

       23            So the best thing for me to do, Your Honor, would be

       24    to file a copy with the court or to reread it and give it to

16:18:41 25    you in detail.  Because I just don't want to misstate exactly

28

16:18:45  1    what we were authorized to do.

2        THE COURT:  All right.  Well, and that's obviously

3    public and that can be litigated whether those orders were

4    appropriate.

16:18:54  5        MR. BATTISTA:  Absolutely.

6        THE COURT:  Let me ask you this question:  I can't

7    claim to be current on them, but I know there are an evolving

8    line of cases about when technology does or does not implicate

9    Fourth Amendment concerns.  And there's the thermal imaging

16:19:17 10   case that I think Justice Scalia wrote the opinion on, I can't

11   remember the name of the case.

12        MR. BATTISTA:  I'm familiar with the case, Your Honor.

13        THE COURT:  There had been a decision going that way

14   out of the Tenth Circuit; there'd been a decision going the

16:19:32 15   opposite way out of Ninth Circuit, and others.  The Supreme

16   Court, as I recall, said it was a violation of the Fourth

17   Amendment to use thermal imaging equipment that can effectively

18   look inside of the home and see where people are moving in the

19   home and to some degree what they're doing.  Am I remembering

16:19:48 20   that right?

21        MR. BATTISTA:  That's correct, Your Honor.  And that's

22   one of the reasons why I stressed several times in discussing

23   the efforts in this case in that we were -- the equipment only

24   was able to advise the agents of an area the size of three to

16:20:02 25   four apartment units.

16:20:04  1          So, in other words, we didn't know -- the agents --

        2     the investigators believed the air card was in the vicinity,

        3     but we didn't know which apartment or we didn't know if it

        4     was -- where it was in a particular apartment.

16:20:18  5          THE COURT:  Well, I understand that point you made

        6     before.  Here's the question I have:  The litigation about the

        7     thermal imaging device that occurred in the circuit courts and

        8     ultimately in the Supreme Court turned heavily on the precise

        9     nature of the equipment and what it could do.

16:20:37 10          MR. BATTISTA:  Right.

       11          THE COURT:  How can we litigate in this case whether

       12     this technology that was used in this case violates the Fourth

       13     Amendment without knowing precisely what it can do?

       14          MR. BATTISTA:  Your Honor, I think the position of the

16:20:50 15     government is that regardless of what the equipment is capable

       16     of, in this particular case even if it was capable of that, it

       17     wasn't used in this case, and I think the issue in the Supreme

       18     Court case was that imaging equipment was used to zero in on a

       19     very specific location and violate that particular person's

16:21:12 20     expectation of privacy.  Whereas in this case it just led us to

       21     a general vicinity.

       22          THE COURT:  Well, I understand that.  But how does the

       23     defendant know that?  I mean does the defendant just have to

       24     take the government's word that that's how it was used?

16:21:28 25          The defendant might, looking at the same facts you're

16:21:31  1    looking at, disagree and say, no, this did get much more

2    specific than a three or four apartment area and I disagree

3    with the government's claim that it didn't, and that would be

4    one of the issues to be resolved in litigating the Fourth

16:21:43  5    Amendment issue.

6         MR. BATTISTA:  And that's why, Your Honor, before we

7    reach that point the FBI is strongly requesting that we have an

8    ex parte hearing for them to explain to the Court.  In other

9    words, there has to be a balancing here in terms of the Court

16:21:58 10    would have to do a balancing in terms of on the one hand the

11    defendant forcing the government to prove a negative versus on

12    the other hand the defendant being given access to information

13    that the FBI strongly believes is law enforcement sensitive and

14    could also have implications with respect to national security.

16:22:18 15         THE COURT:  Well, so if we went down that road and I

16    were to rule that this is law enforcement sensitive and it

17    can't be disclosed, then is the consequence of that that

18    Mr. Rigmaiden just has to give up what might be a very potent

19    Fourth Amendment argument if the true technology were revealed?

16:22:37 20    Is that the balancing you're talking about?

21         MR. BATTISTA:  Yes, Your Honor.  But --

22         THE COURT:  So I'm going to be balancing law

23    enforcement sensitivity issues against his Fourth Amendment

24    rights?

16:22:48 25         MR. BATTISTA:  A Fourth Amendment right, Your Honor,

16:22:52  1    to whether or not the defendant has an expectation of privacy

        2    for the government being able to locate the general vicinity of

        3    an air card which he obtained using a false identity, using it

        4    in an apartment he obtained using a false identity, which an

16:23:09  5    air card which transmits regularly to Verizon Wireless which he

        6    has no expectation of privacy in the air card transmitting

        7    regularly to Verizon Wireless.  Verizon Wireless has its own

        8    records in terms of the fact that this air card was regularly

        9    transmitting in this area and regularly transmitting and

16:23:30 10    hitting certain cell towers.

       11         So the expectation of privacy in this particular

       12    case, Your Honor, I see as being very small or nil.  Assuming

       13    the facts as the government sees them.

       14         In other words, we're not entering his apartment, we

16:23:49 15    have no idea which apartment it is, we don't know what's going

       16    on inside the particular apartment.  This is a device that is

       17    regularly communicating with Verizon Wireless.  Everyone who

       18    has a cell phone gets a bill --

       19         THE COURT:  Well, I understand what you're saying on

16:24:05 20    that.  The problem I'm having, Mr. Battista, is, and I haven't

       21    read this thermal imaging case recently, but --

       22         MR. BATTISTA:  Sure.

       23         THE COURT:  -- my memory is the argument against a

       24    Fourth Amendment violation in this case was that this device

16:24:20 25    does nothing more than pick up heatwaves external to the house.

16:24:25   1    It doesn't drill a hole and look in the house.  It doesn't send

2    a camera in the house.  It's doing nothing more than picking

3    up, sensing things in the environment outside of the house and

4    by extrapolating from those it can pinpoint what's going on in

16:24:42   5    the house.  And Supreme Court said, no, it's looking in the

6    house.  It maybe doing it with external heatwaves, but it's

7    looking in the house.

8         But if you're going to be arguing on this motion the

9    only thing this secret device picks up are cell card

16:25:00  10    transmissions, or air card transmissions, there's no

11    expectation of privacy in those transmissions, they're sent

12    all the time to a third party like Verizon, it seems to me

13    that for Mr. Rigmaiden to litigate that issue he's got to be

14    able to say, no, it's more than that because this is the way

16:25:21  15    it interprets or this is the way it intercepts what the air

16    card is sending.  This is what it causes to happen in my

17    house, or in a house, on a computer, without a search warrant,

18    in order to make it work.

19         I mean, guess I'm saying it seems to me we'd get into

16:25:38  20    the same sort of technological issues that were discussed in

21    the thermal imaging case except he couldn't make the argument

22    because he wouldn't know how it's working and what it's doing.

23         So I'm wrestling with how we really litigate this

24    issue if he doesn't know it.

16:25:55  25         And if what you're saying is, yeah, that's true, but

16:25:57 1    balanced against national security and law enforcement

2    interest, that's just the price we have to pay, then I can

3    decide that issue.  Is that what you're saying in effect?

4         MR. BATTISTA:  Yes, Your Honor.  In other words, I've

16:26:10 5    asked the FBI, this -- how -- where's this going and -- because

6    the defendant obviously is making very strenuous arguments he

7    wants this information.  And I've explained to them that

8    they're going to have to be -- because I think where this is

9    going, I hope where it will be going is at least we'll have the

16:26:38 10   opportunity to address the Court ex parte.

11        I understand that the Court is very concerned about

12   the defendant's Fourth Amendment rights and wants to give the

13   defendant every opportunity to protect those rights.  But I

14   think the FBI -- I'm asking on behalf of the FBI that they are

16:26:58 15   requesting the opportunity to address this matter in camera so

16   the Court can be educated with respect to what the issues are

17   with respect to the operation of this equipment.

18        THE COURT:  I understand that request.  Obviously, as

19   you can appreciate, I'm very uncomfortable with ex parte --

16:27:15 20   with those kinds of ex parte communications where I will be

21   hearing, presumably, facts about this device and why it's

22   sensitive that will never be revealed to the defendant and then

23   I've got to make decisions without him knowing what I know.

24        It may be that we do that.  Maybe what I need is case

16:27:35 25   law which lays out the parameters for when a judge can do that

16:27:39  1    kind of ex parte hearing.  I assume you have some.

          2         But let me ask this question:  Would it be possible,

          3    and I have no idea if this works, but would it be possible to

          4    litigate this Fourth Amendment motion on the basis of assumed

16:27:58  5    or stipulated facts?  Where the FBI is not acknowledging the

          6    workings of the device, but there's some assumptions I can

          7    make about how it works, assumptions that the defendant is

          8    aware of for purposes of the Fourth Amendment analysis.

          9         MR. BATTISTA:  I'm open to considering it, Your Honor.

16:28:20 10    Again, I would have to consult.  But I'm willing to consider it

         11    and propose it.  If the defendant has a particular scenario,

         12    I'm willing to run it by FBI.

         13         THE COURT:  Are you aware of law that describes when

         14    it's appropriate for a court to hold ex parte hearings with the

16:28:44 15    government on law enforcement sensitive information?

         16         MR. BATTISTA:  The FBI staff, the attorney that I'm

         17    dealing with in Virginia, Your Honor, have said they have in

         18    other jurisdictions actually participated in ex parte hearings.

         19    So there's precedent for these hearings being conducted.  I

16:29:02 20    haven't drilled down to particular citations.  But if the Court

         21    requests it, obviously -- I mean obviously we would provide you

         22    with briefing on that.

         23         THE COURT:  Well, certainly before I'm going to order

         24    that kind of hearing I want to be sure I'm authorized to do it

16:29:26 25    by the law.  I think -- and it sounds like we're at the point

16:29:29   1    on this discovery issue where you basically have given

2    Mr. Rigmaiden all of the information related to the motion to

3    suppress that's not being withheld under this concern of law

4    enforcement sensitive information.

16:29:46   5        So I think what we've got to do in order to get the

6    motion to suppress decided is decide the issue of whether you

7    can continue to withhold that information or not, and I think

8    to do that I need to see your explanation for why it's

9    appropriate in a -- really on two things.  One is why it's

16:30:07  10    appropriate to do something like this ex parte, and, number

11    two, where does the ex parte hearing lead to?  Does it lead to

12    me saying, yeah, this is really important law enforcement

13    information and therefore he loses some of his Fourth

14    Amendment argument?  Is that the balance that I'm to strike?

16:30:25  15    And does the case law say that that balance can be struck?

16        So I think what I'm going to ask you to do,

17    Mr. Battista, is to prepare and file a memorandum on those two

18    subjects:  When and under what circumstances an ex parte

19    hearing is appropriate, number one; and, number two, what is

16:30:47  20    the balancing exactly that I'm to do with the information I

21    hear at that hearing.  And then obviously Mr. Rigmaiden should

22    have an opportunity to respond to that.

23        And I want to do that before I decide that I'm going

24    to hold the ex parte hearing.

16:31:01  25        In the meantime, I would encourage you to talk to

16:31:08   1    folks at the FBI about whether there are sort of assumed or

2    stipulated facts that allows them to avoid saying this is the

3    technology, but gives me an array of facts from which

4    Mr. Rigmaiden -- assume to be true from which Mr. Rigmaiden

16:31:25   5    could argue, and that you'd to have live with in my ruling.

6            It may be impossible.

7            But just as an example, when you say that this

8    technology got down to a three or four apartment area, that

9    sounds surprising to me only because in other cases I have

16:31:44  10    seen the triangulation of cell phones that have allowed the

11    government to say there's somebody in that house using the

12    cell phone.

13            I had another case where a wiretap application was

14    obtained on the basis of agents triangulating a cell phone and

16:32:02  15    saying there's a cell phone in that house being used.

16            GPS technology allows you to pinpoint yourself within

17    a foot or two.  It just seems modern technology, whatever this

18    device is, would have the capability of being more precise

19    than three or four apartments.

16:32:18  20            MR. BATTISTA:  Several things, Your Honor.  And,

21    again, this is a learning process.  The air card, unlike a cell

22    phone, didn't have GPS technology in it.  In other words,

23    obviously my Blackberry I'm wearing right now has GPS

24    technology.  The GPS technology in the phone is placing me

16:32:36  25    where I'm standing.  But the air card did not have GPS

16:32:44 1    technology.  Because the air card only transmits data, it's not

2    like a cell phone, it didn't have cell phone capabilities.

3        In order for triangulation, which we've advised the

4    defendant, if you use more equipment, in other words if you

16:33:01 5    have multiple pieces of equipment, let's say, in a sense --

6    you have equipment that detects the air card.  But if you then

7    use three pieces of the equipment, the same equipment, and

8    you're all moving and then you can, quote, triangulate or zero

9    in.  In other words, you can get down to that point.  But that

16:33:27 10   was not done in this case, Your Honor.  In other words, the

11   government only used equipment of a limited capability to only

12   get to this area.

13       THE COURT:  So you're saying, if I understand you,

14   that the government consciously said "we could be more precise

16:33:45 15   with this equipment, but we're not going to be."

16       MR. BATTISTA:  My understanding is -- I mean in this

17   day and age in technology, Your Honor, I'm not going to stand

18   here and say the government doesn't have abilities beyond what

19   was done in this case.  But I have spoken to the team and we

16:34:07 20   have addressed this because we've tried to, you know, where is

21   the line.

22       THE COURT:  So this was Fourth Amendment consideration

23   by the government?  Right?

24       MR. BATTISTA:  Yes, Your Honor.

16:34:20 25       THE COURT:  Okay.  I think what we ought to do so that

16:34:21  1    we can decide what is the next step in this courtroom in terms

        2    of either getting the information or saying that it can't be

        3    had, is to have you file that memorandum addressing those two

        4    issues, if you would.

16:34:34  5              MR. BATTISTA:  Yes.

        6              THE COURT:  When in your schedule is it feasible to do

        7    that?

        8              MR. BATTISTA:  Your Honor, unfortunately starting next

        9    week I'm not going to be in the office for the next two weeks.

16:34:44 10    So that's my one consideration.  I don't -- so I'm physically

       11    not in the office for two weeks.

       12              THE COURT:  So when's it reasonable for you to file

       13    it?

       14              MR. BATTISTA:  What I'm thinking is I would like two

16:35:06 15    weeks after I return, if possible.  So that would be the end of

       16    the second week in March.  That would give me two weeks.  In a

       17    sense I would have two weeks, then.  And I'll obviously put the

       18    FBI and my office on -- to start working on it while I'm not in

       19    the office.

16:35:22 20              THE COURT:  Is that March 11?

       21              MR. BATTISTA:  I don't have a calendar in front of me.

       22              THE COURT:  March 1 is a Tuesday.  Friday of that week

       23    is March 4.  Friday of the next week is March 11.

       24              MR. BATTISTA:  11, yes, Your Honor.

16:35:37 25              THE COURT:  Mr. Rigmaiden, assuming you get that memo

16:35:40  1   that's filed on March 11, what do you think?  You know the

2   issues we're talking about, but you'll obviously need to see it

3   to respond.  What do you think is the time you'll need to

4   respond?

16:35:51  5          THE DEFENDANT:  Probably two weeks if I'm getting

6   legal visits.  Probably a lot quicker if other ex parte motions

7   go through.

8          THE COURT:  All right.  So we'll say March 25th for

9   your response.

16:36:05  10          I think we ought to do that briefing.  I'll look at

11   it and see if I need a reply.  I don't want this to drag out

12   too long.

13          But I want to look at that information to decide

14   whether we should hold an ex parte hearing, and if I am to

16:36:18  15   hold it, what is the balancing I'm being asked to do, just so

16   that we can decide going forward.

17          And in the meantime, perhaps Mr. Rigmaiden --

18   Mr. Rigmaiden.  Mr. Battista you could ask the FBI about

19   whether there's some stipulated facts or assumptions we could

16:36:33  20   make that allow Mr. Rigmaiden to make as strong an argument as

21   he could if he had the information.

22          Stated differently, if you really are of the view

23   that sending out signals from an air card do not have any

24   expectation of privacy and therefore do not create a Fourth

16:36:58  25   Amendment issue, then what's the problem with the device

16:37:01  1   pinpointing the air card in a particular house?  It's doing it

       2   on the basis of signals in which the person has no expectation

       3   of privacy.

       4          Think about it.  Whether there's -- I guess what I'm

16:37:18  5   saying is would the FBI be willing to stipulate that this

       6   equipment does have the ability to pinpoint it in a particular

       7   house and litigate whether that is a Fourth Amendment

       8   violation?

       9          Or here's another way to look at it.  If what you're

16:37:34 10   saying is that the government in this case consciously did not

      11   do that because of Fourth Amendment concerns and consciously

      12   drew a larger circle, is there discovery you can give

      13   Mr. Rigmaiden that establishes that fact?  Communications or

      14   other things that happened that doesn't disclose the sensitive

16:37:54 15   security information?

      16          MR. BATTISTA:  We've tried to do that as best we can

      17   in terms of the e-mails and the information documenting the

      18   fact that the information that the team that operated the

      19   equipment provided to the investigation team only pointed to an

16:38:14 20   area of three to four apartments.

      21          What I'll do, Your Honor, I'll ask the paralegal to

      22   order the transcript from this proceeding so we can get an

      23   accurate summary of what you're asking us to address.

      24          And I would ask the defendant if the defendant has a

16:38:30 25   particular scenario or particular facts that he thinks that

16:38:38   1    should be included in a potential stipulation, that could

2    assist me in dealing with the FBI.

3              THE COURT:  If you can think of possible stipulations

4    you want to propose, Mr. Rigmaiden, then feel free to do that.

16:38:51   5              THE DEFENDANT:  It might take me a while to put those

6    together.  I'd have to -- I'd probably have to do a lot of work

7    for that, but I'll try.

8              Could I make a brief comment --

9              THE COURT:  Sure.

16:39:02  10              THE DEFENDANT:  -- on what the government said about

11   GPS and triangulation?

12             I have looked up the air card and there isn't a GPS

13   chip in the air card, but in the StingRay there's a GPS.  And

14   even though you can't -- you can do triangulation with

16:39:16  15   multiple devices, you can also do it with one device by moving

16   the device, take a reading in one spot, move it to another

17   spot, take another reading.  You can keep doing that.

18             In fact, if you look at a picture of the StingRay,

19   too, there's actually a connector that's a GPS antenna, so I

16:39:32  20   know these devices have GPS.  If they were moving with the

21   device, it could do a new triangulation calculation every, you

22   know, ten milliseconds.  They could do multilateration timing.

23   What these devices do is far more complex, far more advanced

24   than simple basic triangulation that when you look at basic

16:39:51  25   geometry.  So I think the government really needs to look into

16:39:55    1    the details of these devices in order for them to really

2    determine where the Fourth Amendment issues lie and what

3    evidence they think that they may need to generalize and

4    provide if that's what they're going to do.

16:40:09    5         THE COURT:  One other thought that this prompted that

6    I had before, which is this, just to think about:  If we were

7    to go down the road of my holding an ex parte hearing and if we

8    were to -- if I were to agree with the government and say this

9    is law enforcement sensitive, Mr. Rigmaiden doesn't get it, and

16:40:28   10    if he was then to file a Fourth Amendment motion with an expert

11    attached, an expert affidavit attached, or bring somebody in to

12    testify that the kind of device the government used had the

13    capability of pinpointing in the apartment the location of this

14    computer and that I ought to assume that for purposes of the

16:40:50   15    motion, if I get that evidence from him, how does the

16    government rebut that if you're not going to be disclosing the

17    nature of this information?

18         MR. BATTISTA:  I don't know, Your Honor.  I'd have to

19    address that, but --

16:41:04   20         THE COURT:  I'm not asking you to address it now.  But

21    that's one of the problems I see is it's going to be really

22    hard to litigate this issue with the kind of specificity that

23    the thermal imaging cases have if we've got no information from

24    this side but we've got expert assertions coming from this

16:41:21   25    side.

16:41:22  1          And I don't think what I can do is say, well, I hear

2    what the expert's saying but it's factually wrong because of

3    what I heard in the ex parte hearing.  I don't think I can --

4    I may be able to use the ex parte hearing to say it's

16:41:36  5    privileged, but I don't think I can use the ex parte hearing

6    to make factual findings against Mr. Rigmaiden.  If I'm going

7    to do that, he should see the evidence that I'm using to make

8    findings against him.  That's one of the problems I see as we

9    go down this road that I would encourage you to think about.

16:41:54  10          MR. BATTISTA:  One of the problems of the flip side of

11    that is the defendant is saying -- in a sense accusing the

12    government of doing something that it didn't do.  And if it

13    didn't do it, then why would we then be required to disclose

14    law enforcement sensitive techniques that the government may or

16:42:12  15    may not be capable of doing in a situation that they didn't do

16    it.

17          THE COURT:  Well, if he -- I don't know if he will,

18    and he didn't tell me this, I'm not repeating what I heard

19    ex parte, but if he had an expert who came in and said the only

16:42:25  20    way it could have happened with this technology was to pinpoint

21    it in the house, do I accept that as true or do you rebut it?

22    And if you rebut it, how do you rebut it without putting on the

23    record the very stuff you're trying to keep confidential?

24          It just creates a real problem for traditional fact

16:42:43  25    finding in a court if some of the information is out of

16:42:48  1    bounds.  So I think, among other things, that's what we need

        2    to think about.

        3            Okay.  I'll look for another memoranda from both of

        4    you.  I will set another status hearing after we get the

16:43:01  5    briefing done, so probably early April.

        6            I'll work on the ex parte matters we talked about,

        7    Mr. Rigmaiden.

        8            Anything else we need to address?

        9            THE DEFENDANT:  No, Your Honor.

16:43:10  10           MR. BATTISTA:  One thing.  The defendant had sent --

       11    Defendant Rigmaiden had sent a request regarding the handling

       12    of the physical discovery that's located at CCA, and I spoke

       13    with my contact in CCA and I've given him a written offer of

       14    how we could possibly handle the physical discovery, and if the

16:43:32  15   defendant had an opportunity to read it, if he had a response

       16    so we can go forward on that.

       17           THE COURT:  What is the basics of your proposal?

       18           MR. BATTISTA:  The defendant is in a particular unit

       19    now at CCA.  And what CCA's willing to do is allow the

16:43:49  20   defendant the opportunity to physically -- my understanding is

       21    it's approximately eight boxes of physical discovery.  What CCA

       22    will do is allow the defendant to personally move the discovery

       23    from a storage unit in the 600 unit to the 500 unit.  It will

       24    be stored in I believe it's like a storage closet in the 500

16:44:12  25   unit.  The defendant would have the -- be allowed to have one

16:44:16  1    box of the discovery in his cell at a time so he can continue

2    to go through the discovery.

3              Once the defendant has advised the government that he

4    needs to analyze the discovery one last time and then he'll

16:44:28  5    work from -- my understanding is he'll then work from digital

6    discovery.  So that once he finally analyzes the physical

7    discovery, he would like it to be removed from CCA and

8    destroyed.

9              Two options for destruction.  One, defense team goes

16:44:49 10    to CCA, collects it, and then has it shredded.  The other

11    option is, is that Mr. Rigmaiden boxes up the discovery, I

12    send the agents out, the agents collect the boxed material,

13    the agents turn it over to administrative people in my office

14    who are not members of the team and they put it in secured

16:45:11 15    bins that all sensitive material in the U.S. Attorney's Office

16    are placed in.  We have a contractor that handles all the

17    secured sensitive -- not classified, but the sensitive

18    materials, and then that will be shredded pursuant to the

19    government contract.

16:45:27 20              So the government's investigation team would not

21    examine the materials.

22              That way it saves the defense team having to

23    transport and shred it.  We're willing to do that.  Whichever

24    the defendant -- however he wants to do it we'll do that.

16:45:46 25    Whatever he'd like to do.

```
16:45:47   1              THE COURT:  Any thoughts on that, Mr. Rigmaiden?

           2              THE DEFENDANT:  Their proposal's fine with me about

           3   moving discovery over as long as -- my main concern is that I

           4   wouldn't get moved to where the discovery is.  So as long as

16:46:01   5   the discovery gets moved to where I'm at, that's fine.

           6              As far as getting it out of the facility, I'll have

           7   to decide which way to have it shredded.  I'll let the

           8   government know what my decision is.

           9              MR. BATTISTA:  That's fine.

16:46:12  10              THE COURT:  Okay.

          11              MR. BATTISTA:  And CCA advised me that they would

          12   allow Mr. Rigmaiden to package the material.  He can seal it.

          13   But obviously he can't then give it to the defense team but he

          14   could seal it and then in a sealed condition the staff at CCA

16:46:30  15   would then turn it over to the defense team so they could take

          16   it out of CCA and then destroy it.

          17              THE COURT:  All right.

          18              Okay.  Thanks very much.

          19              (End of partial transcript.)

16:46:39  20                           *  *  *  *  *

          21

          22

          23

          24

          25
```

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 23rd day of February, 2011.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter