# ATTACHMENT B

# UNITED STATES DISTRICT COURT
## *Northern District of California* FILED

### In the Matter of the Search of
(Name, address or brief description of person or property to be searched)

AMENDED    2008 JUL 30  P 2: 38

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

Residence of Steven Travis Brawner
431 El Camino Real, Apartment No. 1022
Santa Clara, California 95050

SEALED BY ORDER
OF THE COURT

Case Number:

## 08-70460  HRL

I, Michael P. Fleischmann , being duly sworn depose and say:

I am a Special Agent with Internal Revenue Service – Criminal Investigation and have reason to believe that on the premises known as:

### SEE ATTACHMENT A – LOCATION TO BE SEARCHED

in the Northern District of California, there is now concealed certain property, namely:

### SEE ATTACHMENT B – ITEMS AND PERSON TO BE SEIZED
### SEE ATTACHMENT C – COMPUTER SEARCH PROTOCOL

which is property that constitutes evidence of criminal offenses, or property designed or intended for use, or used as a means to commit criminal offenses, or a person to be arrested (that is, Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a. Patrick Stewart), in violation of 18 U.S.C. § 286, Conspiracy to Defraud the Government; 18 U.S.C. § 287, False, Fictitious or Fraudulent Claims;18 U.S.C. § 371, Conspiracy; 18 U.S.C. § 1028, Identity Fraud; 18 U.S.C. § 1028A, Aggravated Identify Theft; 18 U.S.C. § 1029, Fraud with Access Devices; 18 U.S.C. § 1030, Computer Abuse and Fraud; 18 U.S.C. § 1341, Mail Fraud; and 18 U.S.C. § 1343, Wire Fraud.  The facts to support the issuance of a Search Warrant are as follows:

### SEE ATTACHED AFFIDAVIT AND ATTACHMENT D –  DESCRIPTION OF ACRONYMS
### INCORPORATED BY REFERENCE HEREIN

Approved as to form by:

AUSA Shawna Yen – Northern District of California, San Jose Division
AUSA Frederick A. Battista – District of Arizona

Continued on the attached sheets and made a part hereof.    **X**  Yes    ___  No

_____

Signature of Affiant

Sworn to before me, and subscribed in my presence

Date  July 30, 2008    at    San Jose, CA

City and State

PATRICIA V. TRUMBULL
United States Magistrate Judge

Signature of Judicial Officer

**AFFIDAVIT**

**AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT APPLICATION**

<u>INTRODUCTION</u>

Your affiant, Michael P. Fleischmann, Special Agent with the Internal Revenue Service - Criminal Investigation (IRS-CI), Phoenix Field Office, being duly sworn and deposed, states the following:

1.      Your affiant is submitting this affidavit in support of an application seeking the issuance of  a search warrant, in connection with a joint IRS-CI,  Federal Bureau of Investigation (FBI), and United States Postal Inspection Service (USPIS) investigation for the location set forth in Attachment A - Location to be Searched, hereby incorporated by reference herein, for evidence, of the offenses listed in Paragraph 3 below,  as set forth in Attachment B – Items and Person to be Seized and Attachment C – Computer Search Protocol, all hereby incorporated by reference herein.   Specifically the location to be searched is as follows:

a.      431 El Camino Real; Apartment 1122; Santa Clara, California, 95050

As an aid to the consideration of this affidavit, Affidavit Attachment D - Description of Acronyms is also being provided and is hereby incorporated by reference herein.

2.    Your affiant has been actively involved in the investigation of a yet to be fully identified individual who has assumed the name Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a. Patrick Stout, and a.k.a. the Hacker (herein after the "Hacker"); and others yet unknown.

a.      The information contained in this affidavit is based on your affiant's personal knowledge, information your affiant received from other law enforcement officials assisting in the investigation, and information your affiant has gathered from other sources as noted throughout this affidavit.  This affidavit does not purport to set forth all of your affiant's knowledge or efforts with respect to the investigation of this case.

b.      Your affiant previously submitted an affidavit in support of a prior search warrant for the above address (431 El Camino Real; Apartment 1122; Santa Clara, California, 95050).  Magistrate Judge Howard R. Lloyd authorized that warrant (# 08-

1

70460 HRL) on July 22, 2008. That warrant has been returned unexecuted due to the ongoing nature of the investigation. This affidavit is substantially the same as the prior affidavit, with the exception of the information added in paragraphs 2b, 2c, 34a and 126, and the additions of items 21 (gold) and 22 (the person of Steven Travis Brawner) in Attachment B.

      c.   A grand jury in Phoenix, Arizona has returned a felony indictment against Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a. Patrick Stout, and an arrest warrant has issued, in case number CR08-814-PHX-DGC.

      3.   IRS-CI, FBI, and the USPIS are presently investigating the "Hacker" and others known and unknown for possible violations for the following criminal statutes:

      a.   18 U.S.C. § 286 – Conspiracy to Defraud the Government;

      b.   18 U.S.C. § 287 – False, Fictitious or Fraudulent Claims;

      c.   18 U.S.C. § 371 – Conspiracy;

      d.   18 U.S.C. § 1028 – Fraud Related to Identity Information;

      e.   18 U.S.C. § 1028A – Aggravated Identity Theft;

      f.   18 U.S.C. § 1029 – Fraud with Access Devices;

      g.   18 U.S.C. § 1341 – Mail Fraud;

      h.   18 U.S.C. § 1343 – Wire Fraud;

      i.   18 U.S.C. § 1030 – Computer Abuse and Fraud

There is probable cause to believe that the "Hacker", is committing, and will continue to commit the above mentioned offenses collectively hereinafter referred to as "the Specified Federal Offenses;"

<u>AFFIANT'S BACKGROUND AND EXPERIENCE</u>

      4.   Your affiant is a Special Agent with IRS-CI and has been so employed since March 2005. As a special agent with IRS-CI, your affiant's duties and responsibilities include conducting criminal investigations of individuals and business entities that have allegedly violated federal criminal statutes set forth in Titles 18, 26, and 31 of the United States Code.

5.     Your affiant has a Bachelor of Science in Business Administration in Finance and Accounting from the University of Arizona.   Your affiant graduated from the Criminal Investigator Training Program and the IRS-CI Special Agent Basic Training Program at the Federal Law Enforcement Training Center, Glynco, Georgia, which encompassed detailed training in conducting criminal and financial investigations.  Your affiant is familiar with IRS-CI procedures in conducting search warrants and has participated in the execution of multiple search warrants for financial records.

6.     Your affiant is a Certified Public Accountant (CPA) in the State of Arizona.

7.     In order to gain additional information regarding fraudulent income tax refund schemes, your affiant consulted IRS-CI Special Agent Denise Medrano.  Special Agent Medrano has been a special agent with IRS-CI since September 2001, and has participated in numerous criminal investigations relating to financial crimes.  Special Agent Medrano was assigned as the Phoenix Field Office Questionable Refund Program (QRP) Coordinator from 2005 through 2007.  As the QRP Coordinator, she received ongoing specialized training with respect to the identification and investigation of fraudulent tax refund schemes.

<u>THE SCHEME</u>

8.     The investigation in this matter is a joint investigation involving IRS–CI, FBI, and the USPIS.  The investigation to date has revealed the existence of a sophisticated scheme to fraudulently obtain tax proceeds filed in the name of innocent third parties and deceased individuals, and illegally obtain the proceeds from these tax returns.  The "Hacker" of this investigation, who operates in the United States, is involved in acquiring identity information of deceased and living individuals including their social security numbers, and using that information to conduct a bulk tax filing scheme, and directing the deposit of the proceeds of those fraudulent tax returns to bank accounts and debit cards where the funds can be accessed by the "Hacker" and co-conspirators.

9.     For tax year 2006, refunds totaling approximately $1,112,040.00 were falsely claimed via these electronically filed returns.   Based on the significant similarities associated with the IP addresses, return format, and e-mail addresses, the IRS Fraud Detection Center located in Austin, Texas (AFDC) identified approximately 1,272 returns, 175 IP addresses, and 73 bank accounts that are believed to be linked to this scheme for tax year 2007.  As of June 26, 2008, refunds totaling approximately $2,133,824.00 have been falsely claimed via these electronically filed returns for the 2007 tax year.

A.     Electronic Filing of Income Tax Returns

3

10.     The Internal Revenue Service (IRS) encourages taxpayers to prepare and electronically file (e-file) their Federal income tax returns.  Taxpayers can submit their returns via e-file through authorized IRS e-file providers.  Each authorized IRS e-file provider is assigned one or more Electronic Filing Identification Numbers (EFIN), which the IRS uses to identify and monitor e-file provider activity.  The IRS Electronic Tax Administration (ETA) administers the e-file program.

11.     The Free File program is a free federal tax preparation and electronic filing program for eligible taxpayers developed through a partnership between the IRS and the Free File Alliance LLC, a group of private sector tax software companies.  Since Free File's debut in 2003, more than 15.4 million returns have been prepared and e-filed through the program.  Free File allowed taxpayers with an Adjusted Gross Income (AGI) of $52,000.00 or less in 2006, and $54,000.00 or less in 2007, to e-file their federal tax returns for free.  Approximately 70 percent of all taxpayers (95 million taxpayers) are eligible to electronically file their income tax returns under the Free File program.

12.     Many e-file providers offer home use web-based tax preparation software applications.  The application allows the end-user to self-prepare a tax return on their home computer and electronically transmit the tax return via the Internet by means of a personal computer and modem.  After the e-file provider receives the information from the end-user, the e-file provider electronically files the tax return with the IRS, thereby completing the electronic filing process.  In order for the end-user to connect and transmit an e-filed return over the Internet, the end-user must have access to the Internet via an Internet Service Provider (ISP).

13.     Once the customer obtains an IP address and logs onto the Internet, each customer can utilize the web-based application offered by e-file providers to transmit their tax return information.  When the e-file provider transmits a tax return to the IRS, they are required to include the IP information of the customer, consisting of the IP address, IP Date, IP Time and IP Time Zone.  The IP information can normally be used to trace back to the individual filing the return.

B.     Carter Tax and Accounting

14.     In May 2007, IRS-CI Phoenix Field Office became aware of questionable activity involving an account in the name of CARTER TAX & ACCOUNTING LLC.  Ransom Marion Carter was the authorized signer for the account.  Between May 22 and May 25, 2007, 75 U. S. Treasury electronic credits totaling approximately $129,364.00 labeled "tax refund" were posted to the account.  On May 26, 2007, Ransom Carter withdrew $24,500.00 from the account and purchased two cashier's checks with the funds.

15.     On June 5, 2007, EFile Tax Returns, Inc., an authorized IRS e-file provider and member of the Free File Alliance LLC, contacted the ETA, regarding a large volume

of returns filed through its website using what appeared to be an automated process. EFile Tax Returns, Inc., identified approximately 200 returns for tax year 2006 and 400 for tax year 2005, which appeared to be related to this automated scheme.

16.     The AFDC researched the returns identified by EFile Tax Returns, Inc., and identified Ransom Carters' Compass Bank account as one of the accounts destined to receive refunds claimed on those returns.  A search was conducted for all electronically filed returns with refunds destined for the above referenced Compass Bank account. Approximately 209 returns, claiming over $339,000.00 in refunds, were identified bearing this particular bank account number and routing number.

17.     Analysis of the subject returns revealed multiple fraudulent returns filed from single IP addresses within short time periods, indicating the use of some type of computerized bulk filing system.  Based on analysis of the IP addresses, it appeared the returns were filed from multiple locations around the United States.  However, the real IP address was apparently hidden, possibly by utilizing illicit proxies or intermediary computers to submit the returns and prevent the identification of the individual filing the returns.

        C.     CI 1 and CI 2

18.     In January 2008, an individual pending unrelated felony fraud charges, in the Superior Court of Arizona, agreed to provide information to IRS-CI and USPIS in order to potentially gain consideration with respect to his/her pending state charges. This individual will hereinafter be referred to as CI 1.  To date, based on information provided by IRS-CI, your affiant believes CI 1 to be credible and his/her information has been corroborated and documented through independent investigation, recorded telephone calls, and recorded e-mails.  In a debriefing, CI 1 advised that an individual he/she knew only by his/her street name (hereinafter SN 1) and another unknown individual CI 1 referred to as the "Hacker", had been operating an automated system to file fraudulent tax returns using the names and Social Security Numbers of deceased individuals.

19.     CI 1 further stated Ransom Carter's receipt of refunds through the Compass Bank account Carter established in 2006, in the name of CARTER'S TAX & ACCOUNTING LLC, represented a successful test run of the scheme.  CI 1 said SN 1 and his associates intended to pursue the same scheme for the 2008 filing season (for income earned in 2007).  CI 1 also stated he/she believed that during prior years, going back as far as 2005, the fraudulent tax returns had directed refunds be credited to pre-paid debit cards.

20.     Based on the information provided by CI 1 and CI 1's agreement to work as a confidential informant on behalf of law enforcement, an undercover operation was

5

initiated by IRS-CI and USPIS to determine the true identity of SN 1, the "Hacker" and their associates, and gather evidence concerning the nature and extent of the bulk filing scheme.  Per SN 1's instructions to CI 1, IRS-CI and USPIS, with the assistance of CI 1, established an undercover shell business and a related undercover bank account at Meridian Bank ("Meridian undercover bank account").

21.     In the course of the scheme, SN 1 asked CI 1 to open a safe-mail.net e-mail account.  The purported purpose of using this e-mail service was to avoid detection.  In February 2008, CI 1 e-mailed the account number and routing numbers for the Meridian undercover bank account to SN 1.  SN 1 subsequently advised CI 1 the "Hacker" would begin to e-file fraudulent returns which directed refunds be sent to the Meridian undercover bank account.

22.     Throughout the initial stages of the undercover operation, CI 1 communicated with SN 1 via telephone and his safe-mail.net account.  Incoming e-mails from SN 1 revealed his IP address as 76.27.37.158, which an internet directory service revealed is owned by Comcast Cable Communications, Inc.  In late February 2008, in response to a Grand Jury subpoena, Comcast reported IP address 76.27.37.158 was leased by SN 1 at SN 1's residential address.  It was determined SN 1 was, in fact, the subscriber.

23.     In early March 2008, the AFDC identified 72 electronically filed tax returns with refunds, totaling approximately $117,496.00, destined for the Meridian controlled undercover bank account.  Over $62,000.00 was deposited to the Meridian undercover bank account in mid-March 2008.

24.     After the aforementioned deposits, CI 1 contacted SN 1 and informed him money had been deposited in the account.  CI 1 told SN 1 he/she would withdraw $9,000.00 in mid-March 2008 and ship it to SN 1 on March 18, 2008, via FedEx.  CI 1 further advised he/she would withdraw money from the account every week and ship $9,000.00 to SN 1 every other week.  The withdrawn money not "shipped" was to be CI 1's cut.  SN 1 provided CI 1 with the name and address where the money was to be shipped.  SN 1 also told CI 1 to provide the tracking number so he could monitor the shipment of the package.

25.     In late March 2008, an IRS-CI agent withdrew $9,000.00 in currency from the Meridian undercover bank account and on April 1, 2008, the $9,000.00 was shipped overnight priority mail to SN 1.  For the first and second shipments, agents witnessed SN 1 leave his/her personal residence, arrive at the destination of the package delivery, leave the destination with a package appearing to be the undercover package, and return to his/her residence.

26.     On April 14, 2008, a third shipment in the amount of $9,000.00 currency was sent overnight priority mail to SN 1.  On April 15, 2008, SN 1 was arrested when leaving the destination location carrying the third and final shipment of $9,000.00 currency.  The second and third of these shipments were in violation of 18 U.S.C. § 1341.

27.     After his/her arrest on related federal charges, SN 1 agreed to act as a confidential informant and assist law enforcement in identifying and apprehending the "Hacker" and will be hereinafter referred to as CI 2.  CI 2 has advised he/she has never met the "Hacker" in person and has never spoken to the "Hacker" telephonically or via Voice Over Internet Protocol (VOIP).  CI 2 maintains ongoing contact with the "Hacker" via encrypted e-mail using a safe-mail.net e-mail account.  Safe-mail.net is located in the country of Israel.  CI 2 has also indicated the "Hacker" previously operated a website (www.fakeid.tv) where the "Hacker" sold fake California driver's licenses.

D.      Controlled Delivery of $68,000.00

28.     The "Hacker" has been led to believe CI 2 has an associate, "Daniel," who works in the banking industry and is willing to assist CI 2 in moving the "Hacker's" fraudulent tax return proceeds from the Meridian undercover bank account quickly and without detection.

29.     On April 17, 2008, CI 2 sent an encrypted e-mail to the "Hacker" explaining he/she had received an additional $9,000.00 in currency from the Meridian undercover bank account, and was expecting to receive an additional $75,000.00 by April 22, 2008.  CI 2 inquired how the "Hacker" wanted his cut ($68,000.00) of the money.  The "Hacker" provided CI 2 detailed instructions regarding how to physically wash $68,000.00 in currency in lantern fuel to remove any drug or explosive residues which might cause a detection dog to alert on the package.  CI 2 was further instructed to double vacuum seal the currency, to place the sealed currency in the cavity of a toy, gift wrap the toy so it appeared to be a present, attach a birthday card for a dying child, package it for overnight FedEx delivery, and have the package held for pickup at the destination location.

30.     Additionally, the "Hacker" informed CI 2 he would send a courier, armed with an AR-15 in a duffle bag, to pick up the package.  The "Hacker" added the courier would be prepared to shoot anyone who attempted to arrest him while he was in possession of the package.  The "Hacker" informed CI 2 he would send details of the operation in an encrypted format to the media before the pickup date.  If law enforcement conducted a sting on the pickup, the "Hacker" would then provide information to the media to decrypt his prior message.  The "Hacker" advised this would make law enforcement look bad by proving that law enforcement knew the potential for violence at a public place before conducting the sting.

7

31.     On May 5, 2008, the "Hacker" sent CI 2 an encrypted e-mail with directions to send a package containing $68,000.00 in currency to Patrick Stout, to a commercial address in Palo Alto, California, and to arrive the morning of May 6, 2008.  This location was determined to be a FedEx/Kinko's retail store open 24 hours a day.  Prior to the shipment, CI 2 provided the "Hacker" with the undercover package's tracking number via another encrypted e-mail.

32.     The package containing $68,000.00 in currency was delivered to the FedEx/Kinko's store on May 6, 2008.  On May 7, 2008, at approximately 5:00 am, an unknown white male, average build, wearing a dark jacket with a hood, who appears to be in his twenties and presented identification in the name "Patrick Stout," was observed entering the back entrance of the Fed Ex/Kinko's on foot and retrieving the package.  The male carried the box to a nearby corner where he ripped open the box, removed the contents containing the currency and discarded the packaging in a nearby dumpster.  The unknown male proceeded toward a nearby train station.  Agents conducting surveillance were unsuccessful in efforts to identify the unknown male or follow the unknown male to his final destination.

33.     On or about May 8, 2008, the "Hacker" e-mailed CI 2 and confirmed receipt of the money.  The "Hacker" indicated in his e-mail the money was picked up by a third party.  The "Hacker" advised CI 2 that the courier who retrieved the package believed that he was being followed by police.  According to the "Hacker", the courier advised he noticed a "car circling around the area after he left with the driver acting like he was looking for someone.  There were also some suspect characters walking around on foot 'trying to follow him' so he said he did a 180 and 'came right at them' but they did not do anything about it.  The "Hacker" then advised that the courier was "likely just really paranoid."

34.     Investigation of the name "Patrick Stout" has led the investigation team to a Post Office Box located in Sacramento, California, that was opened under the name "Patrick Stout" on November 21, 2007 and was closed on May 31, 2008.  Investigation of the information provided to open the Post Office Box has determined that the California Driver's License number used to open the Post Office Box was actually assigned to a female with a different name in California.

       a.     In addition, approximately two weeks after the "Hacker's" receipt of the $68,000 controlled delivery at the FedEx/Kinkos located in Palo Alto, California, an account was opened with Bullion Direct in the name of "Patrick Stout".  According to its website, Bullion Direct holds itself out to be an online source to buy and sell precious metals, including gold, silver, platinum and palladium coins and bars.  Bullion Direct ships precious metals to customers via UPS/FedEx or United States Postal Service registered mail.  The investigation has further revealed an unknown individual used a

debit card, which was linked to fraudulent tax refunds, to purchase United States Postal Money Orders. The postal money orders were then used to purchase gold through Bullion Direct for the "Patrick Stout" account.  Two separate shipments of gold, totaling approximately $18,000, were mailed via FedEx to "Patrick Stout", to the same FedEx/Kinkos location as the $68,000 controlled delivery.

35.     CI 2 and the "Hacker" soon thereafter agreed "Daniel" would withdraw all of the money from the Meridian undercover bank account and deposit the money in an account controlled by "Daniel."   CI 2 informed the "Hacker", "Daniel" is able to make very large one-time withdrawals only at the end of each quarter, the next quarter ending June 30, 2008.

36.     On May 16, 2008, CI 2 informed the "Hacker" that "Daniel" had moved $364,260 (the remaining cut for CI 2 and the "Hacker") from the Meridian undercover bank account into another bank account believed to be controlled by "Daniel."  CI 2 provided a Bank of America routing number and undercover account number to the "Hacker" where future tax refunds could be deposited.  Per the "Hacker"'s request, the funds in the Bank of America account would be swept weekly into another account controlled by "Daniel."

37.     On May, 27, 2008, the "Hacker" informed CI 2 he had filed approximately 200 additional fraudulent tax returns seeking refunds destined for the new undercover account located at Bank of America.  As of June 26, 2008, the AFDC identified 249 fraudulent tax returns claiming approximately $404,382 destined for this account.  The returns were filed from multiple IP addresses.

E.      Travis Rupard

38.     On March 1, 2008, a fraudulent tax return for James A. Johnson (xxx-xx-3549) was filed with the Internal Revenue Service using IP address 75.208.105.186, with a refund amount of $2,099.00 destined for a debit card issued by Galileo Processing (See paragraph 88).  This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts.   The account holder is listed as James Johnson (xxx-xx-8024) with an address in Alameda, California.  The AFDC identified additional tax returns electronically filed claiming refunds destined for same account as follows:

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|------|------|-------------|-------------|--------|------------|
| 01/19/08 | James L Johnson | xxx-xx-5366 | Culver City, CA | $2,397 | 24.205.80.123 |

| 02/07/08 | James Johnson | xxx-xx-4889 | Bentonville, AR | $2,437 | 76.195.145.182 |
|---|---|---|---|---|---|
| 02/29/08 | James B Johnson | xxx-xx-1692 | Rocky Ridge, MD | $717 | 67.82.193.84 |
| 02/29/08 | James B Johnson | xxx-xx-8023 | Culver City, CA | $1,384 | 76.250.136.120 |
| 03/01/08 | James D Johnson | xxx-xx-7537 | North Wilkesboro, NC | $2,249 | 68.36.156.35 |
| 03/01/08 | James C Johnson | xxx-xx-4542 | Chicago, IL | $1,061 | 68.36.156.35 |

39.     On March 1, 2008, a fraudulent tax return for Michael S. Deshields (xxx-xx-8782) was filed with the Internal Revenue Service using IP address 75.208.105.186, with a refund amount of $1,988.00 destined for a debit card issued by NetSpend (See paragraph 87).  This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts.  The account holder is listed as Barbara L. Piper (xxx-xx-8344) with an address in Detroit, Michigan.  The AFDC identified three additional tax returns electronically filed claiming refunds destined for the same debit card account as follows:

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|---|---|---|---|---|---|
| 01/22/08 | Barbara Piper | xxx-xx-8344 | Marion, IN | $5,514 | 24.251.75.193 |
| 02/29/08 | Arjuna Desilva | xxx-xx-6629 | Phoenix, AZ | $1,463 | 208.97.32.251 |
| 02/29/08 | Banhdasack Detsadachanh | xxx-xx-5124 | Lake Havasu City, AZ | $1,861 | 68.36.156.35 |

40.     On March 5, 2008, a tax return for Robert W. Galletly (xxx-xx-7628) was filed with the Internal Revenue Service using IP address 75.209.41.104, with a refund amount of $1,093.00 destined for a debit card issued by Account Now (See paragraph

86).  This debit card account was linked by the investigation team to the Meridian undercover bank account through analysis of connected IP addresses and bank accounts.  The account holder is listed as Margaret Murray (xxx-xx-0901) with an address in Petersburg, Virginia.  The AFDC identified three additional tax returns electronically filed claiming refunds destined for the same debit account number as follows:

| Date | Name | Social Sec # | City, State | Refund | IP Address |
|------|------|--------------|-------------|--------|------------|
| 01/17/08 | Margaret Murray | xxx-xx-0901 | Millville, NJ | $3,907 | 68.44.96.153 |
| 03/05/08 | Beth A Gallamore | xxx-xx-5092 | Phoenix, AZ | $1,490 | 99.130.28.126 |
| 03/25/08 | Justin P Hopper | xxx-xx-9313 | West Chester, PA | $980 | 24.61.51.52 |

41.     On March 26, 2008, a tax return for Kevin Furman (xxx-xx-8975) from Eugene, Oregon, was filed with the Internal Revenue Service using IP address 75.209.101.132, with a refund amount of $1,282.00 destined for the Meridian undercover bank account.  Furman died on August 30, 1989.

42.     Investigation revealed the IP addresses associated with the James Johnson, Michael Deshields, Robert Galletly, and Kevin Furman tax returns, are registered to Verizon Wireless.  In response to a Federal Grand Jury subpoena, Verizon Wireless reported that IP addresses 75.208.105.186, 75.209.41.104, and 75.209.101.132 were utilized by a person who opened the account in the name of Travis Rupard, with Post Office Box 730031, San Jose, California, and telephone number (206) 666-3620.  The above mentioned IP addresses were linked via the following mobile device number (MDN): (415) 264-9596.  Verizon Wireless issued the Travis Rupard Broadband Access Card, with ESN 005-00717190, assigned telephone number (415) 264-9596 and Verizon Wireless account number 270691733, to the customer claiming to be "Travis Rupard" on May 23, 2006.  This device will hereinafter be referred to as the "Travis Rupard Broadband Access Card."

43.     USPIS conducted an investigation of Post Office Box 730031 in San Jose, California and determined this PO Box was opened on March 31, 2006 and was closed on August 31, 2006.  The application indicated an individual purporting to be Travis

Rupard presented a California Driver's License, number D2740168 and a Student ID Card, and provided a physical address of 1780 Oakland Road, #17, San Jose, California, 95131. Further investigation showed the California Driver's License number is assigned to a female with a Bakersfield, California address. Based on information provided by the San Jose, California, Post Office, the address 1780 Oakland Road is a physical street address for the Leasing Offices of an apartment complex in San Jose. There are no apartment numbers or suite numbers associated with 1780 Oakland Road, San Jose, California.

44. CI 2 has advised he/she has been involved with the "Hacker" in a number of fraudulent schemes over a period of several years and in the past he/she had had sent money to the "Hacker" by sending it to e-gold account XXXX337. A Federal Grand Jury subpoena was issued for documents related to this account. Records show that this account was created on August 16, 2006, in the name of Sam Blat and Benjamin Cohan. Records corroborate that CI 2 sent the "Hacker" $7,640 on August 17, 2006. The Sam Blat account sent money to an account in the name of Aaron Johnson on five occasions beginning on November 19, 2006 through December 22, 2006. On July 31, 2006, an account in the name of Travis Rupard, 6447 Ivy Lane, San Jose, California, 95129, e-mail address travisrupard@safe-mail.net, telephone number (408) 252-1678, sent $9.50 to the Aaron Johnson account. The name Aaron Johnson is listed as the account holder of a Southwest Bank Account used to receive fraudulent tax refunds. The "Hacker" recently asked CI 2 to inquire about the Southwest Bank Account with "Daniel" to determine if the "Hacker" could obtain proceeds in the account. The "Hacker" has advised CI 2 that he has been unable to withdraw the proceeds from the scheme out of this account.

F.     Time Zones

45. On or about June 25, 2008, in response to an Order issued pursuant to 18 U.S.C. § 2703(d), Verizon Wireless provided IP transaction information related to the IP addresses utilized by the Travis Rupard account, and identified in Section E. Verizon Wireless reports connection times in Greenwich Mean Time (GMT). GMT was researched on www.greenwichmeantime.com. The website indicated that during Daylight Saving Time (DST), which began on Sunday, March 9, 2008, that Pacific Daylight Saving Time (PDST) for California, the suspected location of the "Hacker", is GMT − 7 hours. During DST, Arizona is on the same time as California.

G.     IP transaction records for "Hacker" – CI 2 e-mails

46. On May 15, 2008, the "Hacker" sent CI 2 an e-mail using from IP address 67.187.132.91 at 07:37:13 a.m. GMT. Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP

address on the same date as early as 01:29:34 a.m. GMT and as late as 08:40:23 a.m. GMT, including multiple connections at 07:35 a.m. GMT, two connections at 07:36 a.m. and multiple connections at 07:37 a.m. GMT.

47.     On May 16, 2008, the "Hacker" sent CI 2 an e-mail from IP address 212.62.97.23 at 05:38:25 a.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to IP same address on the same date as early as 5:29:40 a.m. GMT and as late as 11:29:05 a.m. GMT, including multiple connections at 5:31 a.m. GMT and one connection at 5:32:07 a.m. GMT.

48.     On May 17, 2008, the "Hacker" sent CI 2 an e-mail from IP address 81.27.4.177 at 02:32:23 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 12:20:10 a.m. GMT and as late as 06:06:10 a.m. GMT, including multiple connections at 2:23 a.m. GMT, a connection at 02:24:00 a.m. GMT and a connection at 02:32:28 a.m. GMT.

49.     On May 18, 2008, the "Hacker" sent CI 2 an e-mail from IP address 80.73.48.232 at 17:00:28 GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 12:39:12 p.m. GMT and as late as 5:07:37 p.m. GMT including multiple connections at 4:58 p.m. GMT and one connection at 5:00:30 p.m. GMT.

50.  On May 19, 2008, the "Hacker" sent CI 2 an e-mail using e-mail address from IP address 67.187.132.91 at 4:00:38 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address as early as 3:28:45 a.m. GMT and as late as 5:58:36 p.m. GMT, including a connection at 3:50:10 a.m. GMT and a connection at 04:00:43 a.m. GMT.

51.     On May 21, 2008, the "Hacker" sent CI 2 an e-mail from IP address 66.177.227.9 at 17:56:40 p.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address as early as 5:48:45 p.m. GMT and as late as 11:53:08 p.m. GMT, including one connection that lasted from 5:52:07 p.m. to 11:53:08 p.m. GMT.

52.     On May 22, 2008, the "Hacker" sent CI 2 an e-mail using IP address 24.3.79.57 at 9:14:05 a.m. GMT.  Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 8:31:33 a.m. GMT and as late as 4:39:40 p.m. GMT, including one connection beginning at 9:13:47 a.m. GMT.

53.   On May 23, 2008, the "Hacker" sent CI 2 an e-mail using IP address 24.3.79.57 at 01:00:29 a.m. GMT and at 03:05:11 a.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 12:29:43 a.m. and as late as 7:00:41 p.m. GMT, including two connections at 12:59 a.m. GMT, one connection at 1:00:36 a.m. GMT and multiple connections at 3:05 a.m. GMT.

54.   On May 27, 2008, the "Hacker" sent CI 2 an e-mail using IP address 67.187.132.91 at 03:40:53 a.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 02:54:47 a.m. GMT and as late as 03:58:26 a.m., including multiple connections at 03:40 a.m. GMT.

55.   On May 28, 2008, the "Hacker" sent CI 2 an e-mail using IP address 80.73.48.232 at 18:47:04 p.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same address on the same date as early as 06:05:40 p.m. and as late as 07:34:21 p.m. GMT, including two connections at 06:45 p.m. GMT and one connection at 06:47:07 p.m. GMT.

56.   On May 29, 2008, the "Hacker" sent CI 2 an e-mail using IP address 200.51.41.29 at 18:37:42 p.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 06:20:55 a.m. and as late as  09:53:54 p.m. GMT, including a connection at 06:37:41 p.m. GMT.

57.   On May 30, 2008, the "Hacker" sent CI 2 an e-mail using IP address 85.181.29.196 at 22:44:30 p.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 10:41:36 p.m. GMT and as late as 10:57:42 p.m. GMT, including multiple connections at 10:44 p.m. GMT.

58.   On June 1, 2008, the "Hacker" sent CI 2 an e-mail using IP address 98.194.41.225 at 02:02:20 a.m. GMT.   Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to the same IP address on the same date as early as 01:39:17 a.m. and as late as 05:45:02 p.m. GMT, including multiple connections at 2:01 a.m. GMT and one connection at 02:02:27 a.m. GMT.

H.     Undercover Meridian Bank Account Access and Gmail Access

59.   CI 2 provided logon credentials to access the Meridian undercover bank account to the "Hacker".   In order to access account information online, the "Hacker" utilized the username "Mike1," which is reserved for his exclusive use.  Meridian Bank's

online banking service requires a user to authenticate his or her identity when logging into an account from a computer not recognized by the bank. When this occurs, the user is challenged and must enter a one time security code. The "Hacker" receives the one-time security code at Gmail account andersonsats@gmail.com.

60.     On May 16, 2008, the "Hacker" attempted to logon to the Meridian undercover bank account from IP address 81.27.4.177. At 05:42:36 a.m., Arizona Time, the bank rejected the logon because the computer was not recognized and challenged the user. At 05:44:45 Arizona Time, after entering the one time security code and enrolling the computer, the "Hacker"'s login was authenticated. The "Hacker" accessed Account Summary and Account History."

61.     On May 16, 2008, at 12:43:34 p.m. GMT, IP address 81.27.4.177 accessed the e-mail account andersonsats@gmail.com.    This e-mail access is after the logon rejection yet before the successful logon to the Meridian undercover bank account by IP address 81.27.4.177. Verizon Wireless broadband access card connection records reported the Travis Rupard Account connected to IP address 81.27.4.177 multiple times on May 16, 2008 including connections during 12:42 p.m. 12:43 p.m. and 12:44 p.m. GMT.

62.     On May 24, 2008, the "Hacker" attempted to logon to the Meridian undercover bank account from IP address 68.199.62.250. At 11:00:02 Arizona time, the bank rejected the logon because the computer was not recognized and challenged the user. At 11:01:34, Arizona Time, after entering the one time security code and enrolling the computer, the "Hacker"'s login was authenticated. The "Hacker" accessed Account Summary, Account History and a Check Image.

63.     On May 24, 2008, at 06:00:36 p.m. GMT, IP address 68.199.62.250 accessed the e-mail account andersonsats@gmail.com. This e-mail access was after the logon rejection yet before the successful logon to the Meridian undercover bank account by IP address 68.199.62.250.

64.     Verizon Wireless broadband access card connection records reported the Travis Rupard Account connected to IP address 68.199.62.250 multiple times on May 24, 2008, including connections during 6:00 p.m., 6:01 p.m. and 6:02 p.m. GMT.

I.     Analysis of IP addresses used to file fraudulent tax returns

65.     The IP Addresses logged for the 395 tax returns filed using the undercover bank account located at Meridian Bank were researched on an internet reference directory. A sampling of the IP addresses and ISP information is set forth below:

| IP Address | Internet Service Provider | No. of Returns | Subscriber | City & State |
|---|---|---|---|---|
| 12.216.17.121 | Media Com Communications | 10 | Janet Martin | Des Moines, IA |
| 24.26.218.97 | Time Warner Cable | 21 | Bruce Hicks | Belton, TX |
| 24.17.47.176 | Comcast Cable Communications Inc. | 9 | Gayle Johnston | Willow Springs, IL |
| 67.168.17.7 | Comcast Cable Communications Inc. | 18 | Derek Smith | Federal Way, WA |
| 67.175.211.144 | Comcast Cable Communications Inc. | 2 | Valerie Wachholz | Mundelein, IL |
| 75.209.101.132 | Verizon Wireless | 1 | Travis Rupard | San Jose, CA |

66.     Based on the analysis of the IP Addresses, it appears as if the returns were filed from multiple locations throughout the United States. However, due to the nature of the information contained in the returns, and the manner in which they were filed, it appears the real IP Address, or IP Addresses, were hidden, possibly by use of IP spoofing, IP anonymizer services, or utilizing a botnet to submit the returns. In order to gain additional information regarding these types of activities, your affiant consulted IRS-CI Special Agent Tracy Daun and FBI Special Agent Richard Murray. Special Agent Daun has been a special agent with IRS-CI since February 2001. She has participated in numerous criminal investigations relating to financial crimes, including but not limited to, income tax related crimes, money laundering, wire fraud, telemarketing fraud and mail fraud. Special Agent Daun expanded her expertise to include computer forensics,

and computer crime scene investigations in January 2006, when she received training as a Computer Investigative Specialist (CIS) at the Federal Law Enforcement Training Center. She is trained in the execution of search warrants involving computers and related equipment, electronic data preservation, and the recovery, documentation and authentication of evidence. Special Agent Daun has taken computer related courses covering databases, spreadsheets, word processors, and other specialized software developed to assist with forensic analysis of digital data, digital evidence recovery, password detection, etc.

67.     Special Agent Murray has been an FBI Special Agent since 1999 and has been assigned to the Phoenix FBI Cyber Squad since 2005. SA Murray has participated in investigations relating to computer crime including computer intrusions and fraud committed using computers. SA Murray has received over 350 hours of computer crime training including, but not limited to topics on Internet investigations, networking, computer intrusion investigations, computer security and wireless technology.

68.     Special Agents Daun and Murray have advised your affiant that using a proxy or intermediary computer can allow individuals to mask their true IP address and true identity and appear to be another computer. By using a proxy computer, an attacker makes it appear that his transmittal has come from another machine by sending and receiving communications through the proxy computer.

69.     Special Agents Daun and Murray have advised your affiant that IP anonymizer services are internet based anonymization tools available to hide an individual's real identity. An Internet user may visit an anonymizer tool's website and complete all of their web browsing/actions through the site. Special Agent Daun is aware of multiple free anonymizing websites on the internet including Anonymouse, iphide.com, and Proxify.

70.     Special Agents Daun and Murray have advised your affiant that the term botnet is generally used to refer to a collection of compromised computers (called zombie computers) running programs, under a common command and control infrastructure. A botnet's originator can control the group remotely. A botnet typically runs hidden. While most owners are oblivious to the infection, the networks of botnets are frequently used to launch spam e-mail campaigns, denial-of-service attacks or on-line fraud schemes.

J.    Tax Return Filing Activity by the Travis Rupard Broadband Access Card

71.    The AFDC reported the following fraudulent returns were filed on May 22, 2008, using IP address 24.3.79.57, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 19:38:01 | JESSLYN ACERET | $560.00 |
| 19:41:36 | RICHARD R. AGUILERA | $929.00 |
| 19:48:28 | GINA M. ABAGNARO | $1,538.00 |
| 19:57:27 | MIGUEL A. ALARCON | $1,566.00 |
| 20:00:12 | DONALD M. ADAMS | $1,756.00 |
| 20:11:55 | KATRYNKA N. ADACHI | $912.00 |
| 20:17:58 | CHRISTOPHER B. AKIN | $2,211.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show connections to IP address 24.3.79.57 on May 23, 2008, as early as 12:29:43 a.m. GMT and as late as 7:00:41 p.m. GMT.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

72.    The AFDC reported the following fraudulent returns were filed on May 24, 2008, using IP address 24.47.154.61, with refunds destined for the undercover Bank of America account:

| IP Time (PSDT) | Name | Refund Amount |
|---|---|---|
| 13:28:07 | STEVEN A. ABBOTT | $2,150.00 |
| 13:30:56 | MICHAEL Y. AHN | $1,136.00 |
| 13:31:06 | KEITH T. ALLEN | $1,596.00 |

| 13:33:00 | JOSEPH C. AIREY | $1,006.00 |
|----------|----------------|-----------|
| 13:42:12 | ARTHUR A. ADOLPHSON | $1,159.00 |
| 13:43:00 | MICHAEL L. ADELMAN | $479.00 |
| 13:44:07 | DAVID C. ACKERMAN | $1,303.00 |
| 13:44:55 | ANA C. ALFARO | $1,436.00 |
| 13:53:41 | ELIZABETH ALLEN | $1,857.00 |
| 13:58:03 | CARLOS O. ALVARADO | $507.00 |
| 14:00:25 | RYAN D. ALVARADO | $635.00 |
| 14:03:07 | JAMES P. ACOSTA | $2,179.00 |
| 14:05:51 | CAROL S. AKINS | $2,085.00 |
| 14:08:54 | MIGUEL D. ADAME | $1,034.00 |
| 14:09:52 | MEMORIE P. AGUERRE | $779.00 |
| 14:11:57 | LARRY A. ACEVEZ | $428.00 |
| 14:19:26 | DAVID L. ALCANTAR | $1,152.00 |
| 14:20:14 | JOHN D. ADAMSON | $1,930.00 |
| 14:21:17 | MARIO C. ALONSO | $602.00 |
| 14:25:35 | DANIEL A. ACETO | $953.00 |
| 14:30:45 | DAVID R. ACUNA | $655.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 24.47.154.61 on May 24, 2008, as early as 8:23:51 p.m. GMT and as late as 9:30:59 p.m. GMT. Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

73.     The AFDC reported the following fraudulent returns were filed on May 25, 2008, using IP address 74.73.116.37, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 12:11:53 | DON A. ABELLA | $1,945.00 |
| 12:17:18 | ROGER L. ADAMS | $1,329.00 |
| 12:23:41 | REUBEN ALICEA | $1,036.00 |
| 12:25:26 | LUIS J. ALATRISTE | $1,238.00 |
| 12:27:00 | MICHAEL ACOSTA | $673.00 |
| 12:31:01 | CAROLYN M. ADAMS | $1,120.00 |
| 12:34:12 | MARY R. AKINS | $1,815.00 |
| 12:39:06 | MATTHEW S. ALVAREZ | $1,668.00 |
| 12:45:42 | MARTIN M. AGUAYO | $418.00 |
| 12:51:29 | BRIAN W. ALBOHER | $1,452.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show multiple connections to IP address 74.73.116.37 on May 25, 2008, as early as 7:10:14 p.m. GMT and as late as 7:59:36 p.m. GMT. Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

74.    The AFDC reported the following fraudulent returns were filed on May 26, 2008, using IP address 67.187.132.91, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 20:05:49 | LOREN L. AISENBREY | $1,572.00 |
| 20:07:03 | WALTER F. ALEXANDER | $1,747.00 |
| 20:08:05 | DAVID ALVAREZ | $575.00 |

| 20:09:18 | SHARON M. ADAMS | $1,447.00 |
| 20:15:03 | BART AGUIRRE | $425.00 |
| 20:23:03 | PATRICK ALDERETE | $652.00 |
| 20:24:20 | GLORIA A. AGANZA | $1,939.00 |
| 20:27:57 | EUGENE A. ALCANTER | $1,246.00 |
| 20:29:15 | MANUEL M. ADVIENTO | $1,457.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show multiple connections to IP address 67.187.132.91 on May 27, 2008, as early as 2:54:47 a.m. GMT and as late as 3:58:26 a.m. GMT. Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

75.     The AFDC reported the following fraudulent returns were filed on May 27, 2008, using IP address 67.64.43.108, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 11:21:03 | MICHAEL ALDERSON | $1,436.00 |
| 11:23:20 | ROBERT M. AASE | $1,470.00 |
| 11:27:31 | AHMAD R. ALFRED | $924.00 |
| 11:35:15 | ROBERT J. ADAME | $2,130.00 |
| 11:39:59 | JAMES E. ADAMS | $1,763.00 |
| 11:42:03 | DELAWRENCE L. ADKINS | $1,981.00 |
| 11:47:23 | LEONARD S. ABEYTA | $1,420.00 |
| 11:48:58 | LIZABETH A. AGUILAR | $655.00 |
| 11:50:52 | WAYNE A. ABEL | $725.00 |

| 11:56:09 | DANIEL E. ALBRIGHT | $1,200.00 |
| 11:59:40 | BRENT C. ALLRED | $987.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account connecting with multiple connections to IP address 67.64.43.108 on May 27, 2008, as early as 6:18:31 p.m. GMT and as late as 7:04:01 p.m. GMT. Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

76.     The AFDC reported the following fraudulent returns were filed on May 28, 2008, using IP address 66.42.152.107, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 13:14:46 | MARCIA ADKINS | $1,056.00 |
| 13:16:07 | BETTY A. ABRIL | $981.00 |
| 13:20:02 | DARLENE ALARCON | $1,302.00 |
| 13:21:27 | SERGIO R. AGUILAR | $1,103.00 |
| 13:22:54 | GERALD D. AKERS | $1,188.00 |
| 13:25:47 | BRYAN M. ACOSTA | $1,326.00 |
| 13:27:15 | GARY L. ALDINGER | $1,865.00 |
| 13:28:40 | DANIEL E. ADAMS | $2,045.00 |
| 13:30:04 | MARIO N. AGUIRRE | $593.00 |
| 13:40:18 | MICHAEL G. ALLEN | $1,238.00 |
| 14:09:54 | MARK S. ADLER | $1,166.00 |
| 14:11:48 | JULIA L. AKMAN | $1,413.00 |
| 14:14:40 | RAYMOND ALVAREZ | $2,081.00 |

| 14:17:18 | CHARLES O. ALIANO | $1,079.00 |
|---|---|---|

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 66.42.152.107 on May 28, 2008, as early as 8:13:27 p.m. GMT and as late as 9:17:22 p.m. GMT.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

77.    The AFDC reported the following fraudulent returns were filed on June 1, 2008, using IP address 68.198.200.5, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 11:4348 | THOMAS G. ANDRADE | $1,525.00 |
| 11:50:06 | ARTHUR R. ALVAREZ | $1,651.00 |
| 11:51:28 | GLORIA J. ARMIJO | $1,910.00 |
| 11:53:14 | DALE W. AMBLER | $2,592.00 |
| 11:55:27 | DALE B. ALFORD | $950.00 |
| 12:14:59 | ROBERT G. AMMONS | $2,854.00 |
| 12:38:03 | DAVID A. ALFATHER | $888.00 |
| 12:39:37 | MICHELLE L. ANDREWS | $2,562.00 |
| 12:41:08 | ROBERTO A. ALVAREZ | $1,935.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 68.198.200.5 on June 1, 2008 as early as 6:42:21pm GMT and as late as 7:42:48pm GMT. Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

78.     The AFDC reported the following fraudulent returns were filed on June 3, 2008, using IP address 67.64.43.108, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 13:16:53 | DAVID C. ALBERTSON | $2,443.00 |
| 13:27:16 | JESUS E. ALVARADO | $2,349.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 67.64.43.108 on June 3, 2008, as early as 8:13:09 p.m. GMT and as late as 8:47:38 p.m. GMT.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

79.     The AFDC reported the following fraudulent returns were filed on June 3, 2008, using IP address 76.229.232.193, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 13:50:37 | KIM W. ALLEN | $2,736.00 |
| 13:52:39 | MICHAEL A. AMATUCCI | $2,211.00 |
| 13:55:17 | JENNIFER L. BARNUM | $2,774.00 |
| 14:04:01 | PATRICIA E. ALLEN | $2,842.00 |
| 14:06:49 | JAMES D. ALTUM | $2,741.00 |
| 14:23:29 | MARIA D. BARRAZA | $2,842.00 |
| 14:25:08 | JOSE A. ALVARENGA | $2,481.00 |
| 14:26:36 | AMBER D. BARFIELD | $2,964.00 |

| 14:28:25 | KAREN D. ALEXANDER | $2,335.00 |
| 14:39:03 | JAMES B. ALEXANDER | $2,113.00 |
| 14:40:36 | SCOTT A. ANDERSON | $2,722.00 |
| 14:45:11 | TRISHA L. BARTLETT | $2,353.00 |
| 14:49:01 | LEO L. ALBERT | $2,241.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 76.229.232.193 on June 3, 2008, as early as 8:48:23 p.m. GMT and as late as 10:07:17 p.m. GMT on June 3, 2008.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

80.     The AFDC reported the following fraudulent returns were filed on June 4, 2008, using IP address 67.172.220.94, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
| --- | --- | --- |
| 23:16:11 | RICK I. ALLISON | $984.00 |
| 23:32:26 | DANIEL L. ALLEN | $2,556.00 |
| 23:33:56 | RAYMOND J. ALVAREZ | $1,557.00 |
| 23:37:44 | ROSARIO V. ALTURA | $2,966.00 |
| 23:48:40 | SALLY M. BANDA | $1,549.00 |
| 23:52:18 | JAMES L. ALSUP | $2,260.00 |
| 23:57:18 | MANUEL S. ALLEN | $2,928.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 67.172.220.94, on June 5, 2008 as early as 6:06:42 a.m. GMT and as late as 7:06:36 a.m.

GMT.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

81.    The AFDC reported the following fraudulent returns were filed on June 5, 2008, using IP address 67.187.119.170, with refunds destined for the undercover Bank of America account:

| IP Time (PDST) | Name | Refund Amount |
|---|---|---|
| 00:13:58 | MELVIN G ARNOLD | $1,629.00 |
| 00:16:25 | CHRISTINE A ARENA | $934.00 |
| 00:18:11 | ANDREW L ALLISON | $2,886.00 |
| 00:28:37 | RACHELLE M BARROWS | $1,405.00 |
| 00:32:58 | CORLAINE R ALTO | $1,955.00 |

Verizon Wireless broadband access card connection records for the Travis Rupard account show the Travis Rupard account with multiple connections to IP address 67.187.119.170 on June 5, 2008, as early as 7:08:22 a.m. GMT and as late as 7:40:29 a.m. GMT.  Therefore, your affiant has concluded that the subject wireless broadband access card was used to file each of these fraudulent returns.

K.    Analysis of Bank Accounts

82.    The AFDC has identified refunds destined for the undercover bank accounts and continues to monitor the accounts for additional fraudulent returns.  In addition, the AFDC uses the information from the electronically filed returns to identify any additional fraudulent tax returns, IP addresses and/or accounts being used to facilitate the scheme.  As of June 26, 2008, the following banks have been identified as being linked to this bulk filing scheme:

| Bank | No. of Accounts | No. of Returns |
|---|---|---|
| Meridian Bank (Undercover Account) | 1 | 395 |

| Columbus Bank & Trust | 1 | 73 |
| Centennial Bank | 23 | 200 |
| GE Money Bank | 3 | 134 |
| Bancorp Bank | 9 | 53 |
| MetaBank | 30 | 156 |
| Arkansas State Bank | 3 | 10 |
| Bank of America (Undercover Account) | 1 | 249 |
| International Bank | 2 | 2 |

83.    Centennial Bank has identified the Centennial Bank accounts noted in Paragraph 82 as being related to a debit card program that was issued by Galileo Processing, an intermediary processor as further discussed in Paragraph 88 below.

84.    Bancorp Bank identified the Bancorp accounts noted in Paragraph 82 as being related to prepaid debit cards where the funds are loaded to the card at authorized third party locations, or electronically by direct deposit.  A representative of the bank advised Special Agent Medrano that the tax refunds deposited into the account are listed in the names of people other than the account holder.

85.    A representative of MetaBank has informed Special Agent Medrano that the MetaBank accounts noted in Paragraph 82 were related to debit cards.  The representative further explained that cards with account numbers starting with a 5 were from Account Now, the account numbers starting with a 7 were from NetSpend, and the accounts beginning with 065 were from Galileo Processing Inc.

86.    According to Account Now Inc's website, www.accountnow.net, they are a premier provider of financial solutions for the millions of consumers in the United States who do not have established credit or traditional banking relationships.  Account Now offers prepaid Master Cards.  Account Now states their prepaid Master Cards are issued by MetaBank.  Deposits can be made to the account by paycheck, direct deposit or MoneyGram Express Payment.

87.     According to NetSpend Corporation's website, www.netspend.com, this company offers all-access prepaid Visa and Master Card debit cards.  The company's website states that the cards work like debit cards, without the hassle of a bank account and are accepted at millions of places worldwide.  The website states that a person can obtain a card without a credit check.  Funds are loaded on the card via direct deposit, by visiting a reload center or online with PayPal.  Cards can be purchased at certain reload centers or through the website.  NetSpend states on their website that they are an authorized Independent Sales Organization of Inter National Bank and MetaBank and the cards are issued through these two banks.

88.     According    to    Galileo    Processing,    Inc.'s    website, www.galileoprocessing.com, the company offers partners, clients, and consumers solutions and support for financial payment processing.  According to the company's website, Galileo Processing, Inc., is an advanced processor for credit, debit, and prepaid card programs. The company offers multi-purse technology, a proprietary bill payment service, integrated ACD and IVR, world-class customer service, and real-time connectivity to over 100,000 retail locations that accept cash loads to prepaid cards.

L.     California Death Index Information

89.     The social security numbers listed on the 395 tax returns identified with refunds destined for the IRS controlled undercover bank account at Meridian Bank and the 249 tax returns identified with refunds destined for the IRS controlled undercover account at Bank of America were researched on the California Death Index.  The California Death Index contains millions of records with information for birth years 1940 through 1997.  All 654 corresponding social security numbers were located using this data base.  Research revealed that all of the individuals listed on these returns were deceased well before 2007, and therefore, did not receive taxable income in the form of wages in 2007.

M.     E-Mail Communications between the "Hacker" and CI 2

90.     In the course of the execution of a Search Warrant on April 15, 2008, of a computer used by CI 2, e-mails records were recovered which had been sent on or before April 15, 2008, by the "Hacker".

91.     In an e-mail sent on unknown date prior to April 15, 2008, the "Hacker" advised CI 2 he produces fraudulent identification documents and that he has sold identification documents for many years without any problems.  The "Hacker" stated if

he is raided by law enforcement, he will use his keystroke kill switch to shut down the computer and then physically hold down the power button to turn off the computer in case the kill switch fails. When the computer is shut down, all saved encryption keys are deleted from the computer memory. Moreover, the "Hacker's" entire hard drive is always encrypted.

92.     In an e-mail sent on unknown date prior to April 15, 2008, the "Hacker" advised CI 2 he uses a different IP address for each tax return and has filed returns with many different efilers. The "Hacker" believes filing the returns in this manner would prevent "them," (i.e., the IRS), to link them all. The "Hacker" advised an e-filer "took some heat" from the IRS because of his automated filing scheme. The "Hacker" stated the e-filer tried to stop him by use of a captcha, i.e. a box that appears on a webpage requiring the user to personally view a screen and then enter in a series of characters. The purpose of a captcha is to prevent automated entry of data on a webpage.

93.     In an e-mail sent on unknown date prior to April 15, 2008, the "Hacker" advised CI 2 he knows "everything there is to know about creating new identities in the USA and I know a lot about assumed identities." The "Hacker" advised CI 2 he is an encryption expert and a privacy expert. Further, during a debriefing of CI 2 after April 15, 2008, he/she advised that the "Hacker" had obtained proceeds from the subject bulk filing scheme in the past through the receipt of encrypted electronic information regarding debit cards. CI 2 also stated that he/she has sent related account information to the "Hacker" which he could then use to create his own debit cards using an electronic debit card reader/writer and then withdraw the funds from automatic teller machines. In the course of follow-up investigation with respect to this information, an unknown white male or males, average build, appearing to between the age of 20 and 29, have been observed making withdrawals, or attempting to make withdrawals, with multiple debit cards from automatic teller machines on security camera photos obtained via Grand Jury subpoenas. In each case in March and April of 2008, the subject debit card accounts had previously received fraudulent tax refunds that had been obtained as part of the scheme.

94.     On or about April 23, 2008, the "Hacker" advised CI 2 in an e-mail he had burned his identification document and his birth certificate. The "Hacker" stated to CI 2, "I am probably the single biggest threat to the US government currently living and they don't even know it. I can do things to the government that will make all these terrorist organizations look like sewing circles." In this same e-mail, the "Hacker" claims to have a contact with an individual who was previously a United States Intelligence Agent who assists the "Hacker" primarily with information on identities. The "Hacker" claims he trades computer information with this former Intelligence Agent in exchange for information known to the former Intelligence Agent.   The "Hacker" claims this

29

individual fears being accused of treason even though the former Intelligence Agent has not worked in the government for ten years.

95.     On or about May 12, 2008, the "Hacker" e-mailed CI 2 and stated "I was thinking of starting with robotic aerial assassins that can be controlled from a computer over the internet. It would be essentially a flying handgun that no one would likely see. Perfect for taking out politicians. The controls would be military grade but designed by me. I was also thinking about making 50 mile range missiles without the warheads...I would only want to arm militias planning on standing up against the feds when the winner take all war takes place in the US...I am also trying to convince some old friends to help out with chemical and biological weapons as well. There will be no rules in this war. The government has already set the stage...". The "Hacker" added, "I have always wanted a small automatic weapon with a silencer similar to the one Bruce Willis used in Pulp Fiction to kill the Scientologist..." The "Hacker" advised CI 2, "If you can help me expand my arsenal then I would appreciate it" (The weapon used in the movie appears to be a handheld machine gun with a silencer.)

96.     On or about May 14, 2008, the "Hacker" e-mailed CI 2 a list of numerous weapons to follow up on. In numerous subsequent e-mails, the "Hacker" engaged in discussions regarding purchasing an unregistered MAC-10 with a silencer with CI 2 serving as a broker. On or about June 2, 2008, the "Hacker" e-mailed CI 2 that, "I have a lot of money to spend on guns (100k+) but if this is what it is like to deal with illegal gun dealers then I will stick to making AR15s, AK47s and M4s in my garage." The "Hacker" decided not to purchase the weapon at the present time but advised he will consider purchasing a weapon in the future through CI 2.

97.     On or about May 23, 2008, the "Hacker" sent an e-mail to CI 2 asking for access to the Social Security Administration internal "death master file". The "Hacker" believes this death index contains information on deaths of persons for whom the Social Security Administration has not been able to verify the deaths and therefore cannot treat these persons as deceased for tax purposes. The "Hacker" asked CI 2 for other personal identifying information in database format and access to information in a state death database for persons who died in the year 2008. Your affiant believes the "Hacker" has sought and continues to seek personal identifying information on individuals that he can utilize to file fraudulent tax returns. Since CI 2 successfully provided the "Hacker" with $68,000.00 in cash, the "Hacker's" opinion of CI 2's capabilities as a middleman have been greatly enhanced.

98.     On or about June 10, 2008, the "Hacker" sent an e-mail to CI 2 stating, "I funded other bank accounts at the same time from the same proxies and they all work out..." Your affiant believes the "Hacker" is referencing fraudulent tax returns sent to other accounts in addition to the Bank of America undercover bank account.

99.     On or about June 11, 2008, the "Hacker" sent an e-mail to CI 2 asking for personal identifying information of third parties. The "Hacker" again sought information on the Social Security Administration "internal death master file," the previous Choicepoint data compromise, and personal identifying information on Bank of America customers. The "Hacker" further advised that, "I can and will bring this country into a "Mad Max" state if the government continues down their path. I just hope there are enough people with enough guns spread through out the country to fight off the feds and split the country into new countries...." Your affiant believes that the reference to Mad Max refers to the post-apocalyptic world depicted in the film "Mad Max."

100.     On or about June 26, 2008, the "Hacker" warned CI 2 about the countermeasures he would use to take possession of a bulk currency delivery he is owed after June 30, 2008, representing his percentage of the proceeds derived from fraudulent tax returns. The "Hacker" advised the courier who retrieves the package containing the bulk currency from the mailing center will be armed with a concealed M4 assault rifle. The "Hacker" stated the courier will scan the package for both analog and digital radio signals and with an ultraviolet black light. The "Hacker" advised CI 2 if the package is transmitting a radio frequency signal or the tape on the package has been replaced, the courier will run away and shoot anyone who tries to grab him. According to the "Hacker", a team will be in place to provide cover fire so all members of the pickup team can escape. The "Hacker" advised if anything happens in the FedEx center, "everyone who works there will be dead." The "Hacker" advised if anything happens outside the Fedex store, then anyone the pickup team sees will be dead and any cops will be dead. The "Hacker" stated the pickup team will "make a point" by killing innocent people just to teach law enforcement a lesson. On the chance that CI 2 is a CI, the "Hacker" plans on e-mailing unidentified reporters, in encrypted fashion, the exact details of the package pickup and the countermeasures in place to prove that CI 2 knew beforehand that people would die if law enforcement intervened. If a law enforcement sting ensues at the Fedex store, the "Hacker" will then e-mail the passwords to the encrypted messages previously sent to the reporters so that the news will be, "Law Enforcement and CI knew about murderous rampage but did nothing to prevent it!"

N.     Historical Cell Tower Information and Other Investigative Techniques

101.     Historical cell tower information for the Travis Rupard Broadband Access Card and the records relating to the use of particular IP Addresses used by the card as described above, lead your affiant to conclude that the "Hacker" has used the Travis Rupard Broadband Access Card to commit offenses in violation of the statutes set forth in Paragraph 3 above.

102.   Historical cell tower information and other investigative techniques have led the investigation team to the location of the Travis Rupard Broadband Access Card within the "domicilio" apartment complex; 431 El Camino Real; Apartment 1122; Santa Clara, California, 95050.

103.   On July 17, 2008, a Grand Jury subpoena was issued to domicilio for the file information related to 431 El Camino Real, Apartment 1122, Santa Clara, California, 95050. The subpoena revealed the apartment is currently being rented by an individual claiming to be Steven Travis Brawner. The rental application indicates Brawner is a software engineer.

104.   Brawner provided a California driver's license, license number D6870214. Further investigation revealed the California driver's license number is assigned to a female with a Chino Hills, California address.

105.   In order to rent the apartment, Brawner was required by the rental company to provide a copy of the first page of what he claimed to be this 2006 tax return. The return purports to show an adjusted gross income (AGI) of $110,314. The social security number on the return is 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. Internal records for the Internal Revenue Service were researched and revealed no tax return for 2006 was filed for Steven Travis Brawner. Additionally, Social Security Administration records for social security number 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 indicate that Steven Brawner died in 1997.

106.   On July 21, 2008, Forensic Document Examiner William J. Flynn conducted a handwriting analysis of the original application documents for 431 El Camino Real, Apartment 1122 and the original application documents for the Sacramento Post Office Box. After conducting the analysis of the documents, Mr. Flynn has advised that forensic evidence indicates common authorship among the documents.

<u>LOCATION TO BE SEARCHED</u>

107.   Based on your affiant's training and experience and the above mentioned information, there is probable cause to believe that at the below listed location, there is evidence, fruits and instrumentalities of criminal offenses against the United States as set forth in Paragraph 3 above, and as set forth in Attachment B - Items and Person to be Seized and Attachment C – Computer Search Protocol, hereby incorporated by reference herein.

a.      431 El Camino Real; Apartment 1122; Santa Clara, California, 95050

108.    With respect to the subject residence, the probable cause is based upon the information set forth throughout this affidavit, including the following information:

a.      On March 26, a fraudulent tax return for Kevin Furman was filed with the IRS using IP address 75.209.101.132, claiming a refund amount of $1,282.00 destined for the Meridian undercover bank account.

b.      In response to an Order issued pursuant to 18 U.S.C. § 2703(d), Verizon Wireless reported that IP addresses 75.208.105.186, 75.209.41.104, and 75.209.101.132 were utilized by the Travis Rupard Broadband Access Card.

c.      Historical cell tower information and other investigative techniques have led the investigation team to the location of the Travis Rupard Broadband Access Card within the "domicilio" apartment complex; 431 El Camino Real; Apartment 1122; Santa Clara, California, 95050.

d.      On July 17, 2008, a Grand Jury subpoena was issued to domicilio for the file information related to  431 El Camino Real, Apartment 1122, Santa Clara, California, 95050.  The subpoena revealed the apartment is currently being rented by an individual claiming to be Steven Travis Brawner.

e.      In the course of the subject apartment rental application, Brawner provided a California driver's license bearing number D6870214.  Further investigation revealed the California driver's license number is assigned to a female with a Chino Hills, California, address.

f. In order to rent the apartment, Brawner was required by the rental company to provide a copy of the first page of what he claimed to be this 2006 tax return. The return purports to show an adjusted gross income (AGI) of $110,314.  The social security number on the return is 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.  Internal records for the Internal Revenue Service were researched and revealed no tax return for 2006 was filed for Steven Travis Brawner.  Additionally, Social Security Administration records for social security number 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 indicate that Steven Brawner died in 1997.

g.      CI 2 indicated the "Hacker" previously operated a website (www.fakeid.tv) where the "Hacker" sold fake California driver's licenses.

h.      On July 21, 2008, Forensic Document Examiner William J. Flynn conducted a preliminary handwriting analysis of the original rental application documents for 431 El Camino Real, Apartment 1122 and the original application documents for the Sacramento Post Office Box.  A preliminary review of the documents by Mr. Flynn has indicated it appears that both applications were completed by the same individual.

109.    Based on your affiant's personal training and experience, it is a common business practice for questionable refund scheme promoters to generate and maintain records of scheme participants and addresses, financial records, computer records, copies of tax returns that have been prepared, along with forms, schedules, attachments and other supporting documentation, at their places of business, personal residences, postal and commercial mail boxes, and motor vehicles.

110.    There is probable cause to believe that the "Hacker" will have one or more computers at his residence and information stored on the computers will constitute evidence of the subject offenses.  This is based on the information set forth throughout this affidavit and the fact that the "Hacker" has electronically filed tax returns with refunds destined for the undercover bank accounts, and has used encrypted safe-mail.net e-mail accounts to communicate and coordinate the bulk filing scheme with CI 2.

## COMPUTER EVIDENCE

111.    Based on your affiant's consultation with Special Agents Daun and Murray, and your affiant's personal training and experience, computer hardware, software, documentation, passwords and data security devices may be important to a criminal investigation in four respects: (1) contain contraband, (2) be an instrumentality of an offense, (3) be fruits of a crime, or (4) contain evidence of crime (items that are evidence or may have been used to collect and store information about crimes) created, stored or maintained as electronic or digital data/information.  Rule 41 of the Federal Rules of Criminal Procedure permits the government to search for and seize computer hardware, software, documentation, passwords, and data security devices which are (1) contraband, (2) instrumentalities, (3) fruits, or (4) evidence of crime.  The computer and related media can be one or more of the aforementioned classifications.  In this case, the warrant application requests permission to search and seize evidence of false, fictitious or fraudulent claims, and other evidence, instrumentalities, and fruits of the

offenses set forth in Paragraph 3 above, pursuant to Attachment B – Items and Person to be Seized and Attachment C – Computer Search Protocol, all incorporated by reference herein.  Based on information received, your affiant believes that probable cause exists that computer equipment was used to generate, store, and transmit information used in the bulk filing scheme.  It is also reasonable to believe that any computers located at the search location were used to produce and store the evidence, and that records relating to the "Hacker's" scheme will be stored on these computers.

112.   Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensic tools.  When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, that is, space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache".  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

113.   A proper and thorough search of even a hard disk can easily take many hours, if not days or more, due to the volume of information and the wide variety of systems, programs and file types.  The volume of data stored on many computer systems and storage devices is typically so large it will be highly impractical and intrusive to search for data during the execution of the physical search of the premises.  For example, a single megabyte, which is 1000 kilobytes (KB), of storage space, is the equivalent of 500 double-spaced pages of text.  A single floppy disk contains 1400 KB or 1.4 megabytes of data storage alone.  A single gigabyte (GB) of storage space, or 1,000

35

megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage media containing 10 gigabytes of data drive capacity is equal to 5 million pages of stored text.

114.    Consequently, a non-networked, desktop computer or laptop can easily contain the equivalent of 5 million pages of data, which, if printed out, would completely fill a space 4' x 4' x 1.5' to capacity.  Ten GB of stored data could contain over 21,000,000 copies of Katz v. U.S. 389 U.S. 347, 88 S.Ct. 507 (1967), a 16 page opinion in Word© format or 39,000,000 copies of Katz v. U.S. stored in Adobe© .pdf (Portable Document Format).

115.    Additionally, a 220KB .pst (personal folder file), a Microsoft Outlook© email storage format could easily contain approximately 3000 email messages.  A 40GB hard drive could contain 45000 .pst files of this size, equating to approximately 135,000,000 messages, many of which could include attached files.  A 10GB drive could easily hold up to 200,000 website pages, 66 hours of video or at least 4000 still pictures/graphic files.

116.    It is not uncommon in today's computer environment to find hard disk storage devices with capacities of 120GB or more.  Even a Universal Serial Bus (USB) portable storage device, commonly called a thumb drive or flash drive, can easily be found today to have the capacity of 1GB or more.

117.    Due to the large volume of data, various file, application and system types, it will most likely not be practical to conduct an on site search.  To do such would significantly increase the intrusiveness of the warrant.  Secondly, the imaging time alone can be significant with larger drives and this would need to be completed before any search would even be attempted to avoid potential data changes, corruption or loss. Third due to the various types of file systems, operating systems and programs, it may be necessary to elicit the assistance of specialists experience in searching, and analyzing such.

118.    A trained computer forensic specialist will attempt to image on-site, that is, create a mirror or bit by bit snapshot of the hard disk storage media.  The seized date contained within the "images" will then be searched off-site pursuant to the warrant and the items called for to be seized.  This process will preserve the integrity of the data and minimize the significant intrusiveness a business or individual would be subjected to by the agents remaining on the warrant site for the time necessary to complete the

search of the media for the items called for to be seized. Therefore, it is requested a mirror or "bit by bit" image/snapshot of the data be ordered. This will maintain the integrity of the data, avoid data loss and allow a proper search of all areas in which the items directed to be seized could be located, in a reasonable and minimally intrusive manner.

119.   In some instances, however, it may be necessary to seize some computer equipment and peripherals, for security, technical or environmental reasons, such as power issues. In addition, there are occasions where the time to image the storage media is so great due to the shear volume, that it is more practical and reasonable to seize the item and image it off-site. It is requested that the agents have the authority to seize the necessary computer/storage media and required devices for off-site imaging/processing. Any hardware or media items seized will be returned in a reasonable amount of time once the imaging has been successfully completed, unless such items are otherwise seizable.

120.   It is also normally important for the installed computer software to be seized which was used to create, access, modify or to otherwise interact with the stored files. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. It commonly includes the operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs. It is important to seize the actual operating system and installed programs and data. Many times the image obtained will be restored, that is recreating the seized computers entire operating, application and storage environment. This allows the file or data to be accessed, read and viewed in the exact environment it existed in at the time of seizure.

121.   It is also important to many times seize the computer-related documentation which may consist of written, recorded, printed, or electronically stored material which explains or illustrates how the hardware, software, or other related items are operated, configured or used.

122.   In addition to the computer files and other data, it is also important to obtain a computer hardware system's date and time, operating system, file system, registry information and user's information maintain in the system. This is to provide sufficient documentation, authentication or substantiation of the seized item(s). The

user information may include passwords, searches, websites visited and other items that relate to the referenced violations.

123.   It is also a standard practice for properly searching electronic/digital data to image the entire physical storage medium, including any formatted file systems and unallocated storage area of the media.   The file system is the storage media's area recognized by and used by the operating system for storing and saving data.   By obtaining an image of the entire storage media, it can be properly searched for the items called for to be seized that may remain as deleted files or the data that remains in the unallocated section of the partitions, that is area currently not assigned to a particular file but still is part of the file system.   It can also be properly searched for items that are in an area of the hard drive that has been hidden, by un-allocating it from a partition.

124.   In addition security devices may be utilized.   These devices are designed to restrict access to or hide computer hardware, software or data.   Therefore the seizure of passwords, pass phrases or other items used to access the computer system, operating system, software and data is necessary.   Without such it could be impossible to access for searching the system and/or data protected with such.   This would be analogous to a combination or key being required to open a safe or lock.

<u>NO-KNOCK ENTRY</u>

125.   The Ninth Circuit in <u>United States v. Peterson</u>, 353 F.3d 1045 (9th Cir. 2003) set forth the Supreme Court's standards for no-knock entries detailed in <u>Richards v. Wisconsin</u>, 520 U.S. 385, (1997).   In particular, the Court in Peterson stated:

> In Richards v. Wisconsin, 520 U.S. 385, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997), the Supreme Court instructed that a "no-knock" entry is constitutionally permissible in three situations: when officers "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be [1] dangerous or [2] futile, or that it would [3] inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." Id. at 394, 117 S.Ct. 1416. Richards continues: "This standard-as opposed to a probable-cause requirement-strikes the appropriate balance between the legitimate law enforcement concerns at issue in the execution of search warrants and the individual privacy interests affected by no-knock entries." Id.; see also Wilson v. Arkansas, 514 U.S. 927, 934, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995) ("The

Fourth Amendment's flexible requirement of reasonableness should not be read to mandate a rigid rule of announcement that ignores countervailing law enforcement interests.").

United States v. Peterson, 353 F.3d at 1048,   In this particular case, authorization for a no-knock entry, due to the potential danger to the entering law enforcement officers and the potential for the destruction of evidence, is warranted for the following reasons.

a. As set forth in Paragraph 30 above, the Hacker indicated that the courier sent to pick up the $68,000.00 on May 7, 2008, would be prepared to shoot anyone who attempted to arrest him.

b. As set forth in Paragraph 91 above, in an e-mail sent on an unknown date prior to April 15, 2008, the "Hacker" stated if he is raided by law enforcement, he will use his keystroke kill switch to shut down the computer and then physically hold down the power button to turn off the computer in case the kill switch fails. When the computer is shut down, all saved encryption keys are deleted from the computer memory. Moreover, the "Hacker's" entire hard drive is always encrypted.

c. As set forth in Paragraph 93 above, in an e-mail sent on an unknown date prior to April 15, 2008, the "Hacker" advised CI 2 that he is an encryption expert and a privacy expert.

d. As set forth in Paragraph 94 above, on or about April 23, 2008, the "Hacker" advised CI 2 in an e-mail he had burned his identification document and his birth certificate. The "Hacker" stated to CI 2, "I am probably the single biggest threat to the US government currently living and they don't even know it. I can do things to the government that will make all these terrorist organizations look like sewing circles."

e. As stated in Paragraph 95 above, on or about May 12, 2008, the "Hacker" e-mailed CI 2 and stated "I was thinking of starting with robotic aerial assassins that can be controlled from a computer over the internet. It would be essentially a flying handgun that no one would likely see. Perfect for taking out politicians. The controls would be military grade but designed by me. I was also thinking about making 50 mile range missiles without the warheads...I would only want to arm militias planning on standing up against the feds when the winner take all war takes place in the US...I am also trying to convince some old friends to help out with chemical and biological weapons as well. There will be no rules in this war. The government has already set the stage...". The "Hacker" added, "I have always wanted a small automatic weapon with a silencer similar to the one Bruce Willis used in Pulp

Fiction to kill the Scientologist…"  The "Hacker" advised CI 2, "If you can help me expand my arsenal then I would appreciate it"  (The weapon used in the movie appears to be a handheld machine gun with a silencer.)

f.   As stated in Paragraph 99 above, on or about June 11, 2008, the "Hacker" advised that, "I can and will bring this country into a "Mad Max" state if the government continues down their path.  I just hope there are enough people with enough guns spread through out the country to fight off the feds and split the country into new countries…."

g.   As stated in Paragraph 100 above, on or about June 26, 2008, the "Hacker" warned CI 2 about the countermeasures he would use to take possession of a bulk currency delivery he is owed after June 30, 2008, representing his percentage of the proceeds derived from fraudulent tax returns.   The "Hacker" advised the courier who retrieves the package containing the bulk currency from the mailing center will be armed with a concealed M4 assault rifle.  The "Hacker" stated the courier will scan the package for both analog and digital radio signals and with an ultraviolet black light.  The "Hacker" advised CI 2 if the package is transmitting a radio frequency signal or the tape on the package has been replaced, the courier will run away and shoot anyone who tries to grab him.  According to the "Hacker", a team will be in place to provide cover fire so all members of the pickup team can escape.  The "Hacker" advised if anything happens in the FedEx center, "everyone who works there will be dead."  The "Hacker" advised if anything happens outside the Fedex store, then anyone the pickup team sees will be dead and any cops will be dead.  The "Hacker" stated the pickup team will "make a point" by killing innocent people just to teach law enforcement a lesson.  It should be noted that the white male who picked up the delivery was seen with a small carrying bag and wearing a hooded sweatshirt, both of which could have concealed a firearm or other weapons.  The courier was allowed to leave the scene without incident.  No members of any "team" were observed at the scene.

<u>NIGHT-TIME EXECUTION OF WARRANT</u>

126.   Each fact in paragraph 125 also provides "good cause" for night-time execution pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii).  Since the issuance of the prior warrant (#08-70460 HRL), the investigation has revealed additional facts to provide additional support for night-time execution.  In particular:

a.      The domicilio apartment complex located at 431 El Camino Real, Santa Clara, California 95050 is a gated community, with a unique "fob number"

assigned per individual for key card access.  In response to a Federal Grand Jury subpoena issued to the domicilio apartment complex, it was determined that fob number 58261 is assigned to the individual purporting to be Steven Travis Brawner.  The investigation revealed the gate access system service is provided by Quality Alarm.  In response to a Federal Grand Jury subpoena issued to Quality Alarm regarding fob number 58261, records show that the individual purporting to be Steven Travis Brawner accessed the domicilio apartment complex sixteen separate times between June 4, 2008 and July 23, 2008.  Of the sixteen separate accesses, nine of the accesses were made between the hours of 10:00 pm until 6:00 am.

b.      During the month of July 2008, daytime surveillance and spot check surveillance have not been able to observe any residents at the location.  On July 22, 2008, at approximately 7:20 pm, an FBI Special Agent acting in an undercover capacity knocked on the door using the ruse of a fast food delivery.  No one answered the door.

## CONCLUSION

127.    Based on your affiant's, and his fellow agent's, education, training and experience, and the facts set forth in this affidavit, your affiant believes that there is probable cause to believe that a search of 431 El Camino Real; Apartment 1122; Santa Clara, California, 95050; which are each further described in Attachment A – Location to be Searched, will result in the location and seizure of the items set forth in Attachment B – Items and Person to be Seized and Attachment C – Computer Search Protocol, which are evidence, fruits, and instrumentalities of violations of the statutes set forth in Paragraph 3 above.

Michael P. Fleischmann
Special Agent
Internal Revenue Service
– Criminal Investigation

Sworn to and subscribed
in my presence this _30_ day of July, 2008

Hon. Patricia V. Trumbull
United States Magistrate Judge
Northern District of California

41