# EXHIBIT INDEX

## RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE AND REQUEST FOR AN *EX PARTE* AND *IN CAMERA* HEARING IF NECESSARY

**EXHIBIT 01:** Discovery request letter from Daniel D. Rigmaiden to AUSA Frederick A. Battista, RE: among other matters, (1) request for the security clearance classifications for the claimed privilege evidence; (Letter date: December 3, 2010); (only relevant sections are included in this exhibit);

**EXHIBIT 02:** Letter from AUSA Frederick A. Battista to Daniel D. Rigmaiden, RE: among other matters, (1) no mobile tracking device was used in this case, and (2) the security classifications for the claimed privilege evidence; (Letter date: January 28, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 03:** atis (website), *ATIS - DOCUMENT CENTER* [J-STD-025], <https://www.atis.org/docstore/product.aspx?id=22579> (last accessed Feb. 25, 2011);

**EXHIBIT 04:** Marcia Hofmann, EFF FOIA request to FBI (August 11, 2006), *available at* <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf> (last accessed Mar. 30, 2011);

**EXHIBIT 05:** Defense rough definition of *FBI Digital Collection Program/Digital Collection System*; (Apr. 5, 2011);

**EXHIBIT 06:** Defense rough definition of *DCSNET*; (Apr. 5, 2011);

**EXHIBIT 07:** Defense rough definition of *Lawfully Authorized Electronic Surveillance Protocol (LAESP)*; (Apr. 5, 2011);

**EXHIBIT 08:** Defense rough definition of *Digital Collection System 3000 (DCS-3000)*; (Apr. 5, 2011);

**EXHIBIT 09:** Defense rough definition of *DCS-3000 CDNRS Files*; (Apr. 5, 2011);

**EXHIBIT 10:** Defense rough definition of *Telephone Applications System*; (Apr. 5, 2011);

**EXHIBIT 11:** Defense rough definition of *FBI Cell Site Database*; (Apr. 5, 2011);

**EXHIBIT 12:** Defense rough definition of *FBI Wireless Intercept and Tracking Team (WITT) Van*; (Apr. 5, 2011);

**EXHIBIT 13:** United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay] (registered Sep. 9, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

ATTACHED EXHIBITS
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY
CR08-814-PHX-DGC

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

**EXHIBIT 14:**   United States Patent and Trademark Office, Trademark Reg. No. 3,499,993 [StingRay II] (registered Sep. 9, 2008), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 15:**   United States Patent and Trademark Office, Trademark Reg. No. 2,710,009 [AmberJack] (registered Aug. 22, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 16:**   United States Patent and Trademark Office, Trademark Reg. No. 2,867,227 [KingFish] (registered Jul. 27, 2004), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 17:**   United States Patent and Trademark Office, Trademark Reg. No. 2,534,253 [TriggerFish] (registered Jan. 29, 2002), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 18:**   United States Patent and Trademark Office, Trademark Reg. No. 2,555,909 [LoggerHead] (registered Apr. 2, 2002), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 19:**   Durham, NC, USA - City Council Agenda No. 7503 (Harris Sole Source Vendor Justification letter) (Jan. 3, 2011), *available at* <http://www.durhamnc.gov/agendas/2010/cws20110103/251951_7503_342 363.pdf> (last accessed Mar. 9, 2011);

**EXHIBIT 20:**   Miami, FL, USA – Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor (Apr. 25, 2007), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34761.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 21:**   Miami, FL, USA – Legislative Files, Notice of Public Hearing RE: Harris, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34765.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 22:**   Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter (Nov. 29, 2006), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 23:**   Miami, FL, USA – Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor (Nov. 13, 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 24:**   Miami, FL, USA – Legislative Files, Notice of Public Hearing RE: Harris, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/47997.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 25:**   Miami, FL, USA – Legislative Files, Harris Sole Source Letter [Attachment B] (Aug. 25, 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/40003.pdf> (last accessed Mar. 9, 2011);

**EXHIBIT 26:**   Miami, FL, USA – Legislative Files, Police Legal Advisors Review [Attachment C], *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/48004.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 27:**   Miami, FL, USA – Legislative Files, Harris Product Datasheets, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf> (last accessed Mar. 9, 2011);

**EXHIBIT 28:**   Miami, FL, USA – Legislative Files, Harris Product Datasheets, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf> (last accessed Mar. 9, 2011);

**EXHIBIT 29:**   Miami, FL, USA – Legislative Files, Harris GCSD Price List (Sep. 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf> (last accessed Mar. 9, 2011);

**EXHIBIT 30:**   Maricopa County, FL, USA – Harris Contract, Serial No. 09041-SS (May 27, 2010), *available at* <http://www.maricopa.gov/materials/Awarded_Contracts/PDF/09041-c.pdf> (last accessed Mar. 9, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 31:**   McPherson, Rodney, *et al.* (Palm Bay FL, US), Harris Corp., U.S. Patent No. 7,592,956 [Wireless Transmitter Location Determining System And Related Methods] (Sep. 22, 2009), *available at* <http://www.freepatentsonline.com/7592956.html> (last accessed Feb. 22, 2011);

**EXHIBIT 32:**   Catherine Crump, ACLU FOIA request to USDOJ (November 29, 2007), *available at* <http://www.aclu.org/files/pdfs/freespeech/eousa_foia_20071129.pdf> (last accessed Mar. 30, 2011);

**EXHIBIT 33:**   USDOJ (M.D. La.) Response to ACLU FOIA Request No. 07-4130 (Aug. 12, 2008), *available at* <http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf> (last accessed Jan. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 34:**   FBI Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1 (Aug. 27, 2007), *available at* <http://www.eff.org/files/filenode/061708CKK/082707_dcs01.pdf> (EFF PDF Set 1 of 6) (last accessed Jan. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 35:**   FBI Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1 (Aug. 27, 2007), *available at* <http://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf> (EFF PDF Set 6 of 6) (last accessed Jan. 11, 2011); (only relevant sections are included in this exhibit);

**EXHIBIT 36:**   Coast to Coast AM (website), *Lee Lapin - Guests - Coast to Coast AM*, Lee Lapin Biography, <http://www.coasttocoastam.com/guest/lapin-lee/6469> (last accessed Mar. 11, 2011);

**EXHIBIT 37:**   Excerpt of CDNRS files generated by the government's Pen/Trap device, *i.e.*, the SF-Martinez DCS-3000 server, while it was logging the government's surreptitious pings (*i.e.*, phone calls) made to the aircard;

**EXHIBIT 38:**   USPIS Investigation Details Report Entry, USPIS Inspector James L. Wilson, RE: among other matters, a Stingray was used to locate the aircard; (Entry date: August 7, 2008); (ITEM NO. 5 of July 31, 2009 discovery set);

**EXHIBIT 39:**   Page No. 1 of rough notes prepared by IRS-CI Agent Denise L. Medrano, RE: among other matters, the word "StingRay" in a checklist; (Notes date: July 15, 2008); (ITEM NO. 6 of September 24, 2010 discovery set);

**EXHIBIT 40:**   Paper print-out of email sent from IRS-CI Agent Tracy L. Daun to Jeffrey H. Willert, Re: among other matters, IRS-CI Agent Daun's request to be present and to assist the FBI with triangulating the aircard location; (Email sent date: July 11, 2008 11:16am); (ITEM NO. 3 of September 24, 2010 discovery set);

**EXHIBIT 41:**   Letter from AUSA Frederick Battista to Daniel Rigmaiden, RE: among other matters, use of a mobile tracking device to locate the aircard; (Postmark date: June 18, 2010); (only relevant sections are included in this exhibit);

**EXHIBIT 42:**   Letter from AUSA Frederick Battista to Daniel Rigmaiden, RE: among other matters, the equipment used to locate the aircard is a "pen register trap and trace device" and not a "tracking device"; (Letter date: September 8, 2010); (only relevant sections are included in this exhibit);

**EXHIBIT 43:**   Letter from AUSA Frederick A. Battista to Daniel Rigmaiden, RE: Stingray is a generic term; (Letter date: November 23, 2010);

**EXHIBIT 44:**   Kevin Bankston, EFF, *Surveillance Shocker: Sprint Received 8 MILLION Law Enforcement Requests for GPS Location Data in the Past Year* (Dec. 1, 2009), *available at* <http://www.eff.org/deeplinks/2009/12/surveillance-shocker-sprint-received-8-million-law> (last accessed Feb. 15, 2011);

**<u>EXHIBIT 45:</u>**   Ryan Singel, Wired, *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20, 2007), *available at* <http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell> (last accessed Sep. 22, 2010);

↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓
↓ **EXHIBIT 01** ↓

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Discovery request letter from Daniel D. Rigmaiden to AUSA Frederick A. Battista, RE: among other matters, (1) request for the security clearance classifications for the claimed privilege evidence; (Letter date: December 3, 2010); (only relevant sections are included in this exhibit);

December 3, 2010
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: discovery request: aircard locating mission;
Page # 1 of 30

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Dear Fred:

     I am writing this letter to make additional discovery requests for evidence that I need in order to prepare suppression motions and a trial defense.

December 3, 2010
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: discovery request: aircard locating mission;
Page # 2 of 30

My additional discovery requests are outlined below.  Each heading summarizes the requested evidence and may be followed by a numbered list of more detailed and specific requests under the same category (if needed).  Each section is concluded by detailed articulations as to why the withheld evidence is both material and favorable to the defense.

1.      The defense needs an itemized list of all aircard locating mission discovery currently being withheld based on a claim of "sensitive investigative techniques" with each item designated into the appropriate "security clearance classification" category, e.g., (1) Top Secret, (2) Secret, (3) Confidential, (4) Sensitive, (5) Unclassified, or (6) any other designation. The defense also need to know which government agency is responsible for each "security

December 3, 2010
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: discovery request: aircard locating mission:
Page # 3 of 30

clearance classification."

December 3, 2010
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: discovery request: aircard locating mission;
Page # 30 of 30

Sincerely,

Daniel Rigmaiden



**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**
**↓ EXHIBIT 02 ↓**

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Letter from AUSA Frederick A. Battista to Daniel D. Rigmaiden, RE: among other matters, (1) no mobile tracking device was used in this case, and (2) the security classifications for the claimed privilege evidence; (Letter date: January 28, 2011); (only relevant sections are included in this exhibit);

**U.S. Department of Justice**

United States Attorney
District of Arizona

*Two Renaissance Square*        *Main: (602) 514-7500*
*40 North Central Avenue, Suite 1200*   *Main Fax: (602) 514-7693*
*Phoenix, Arizona 85004-4408*

January 28, 2011

Daniel Rigmaiden
Agency No. 10966111
CCA-CADC
Post Office Box 6300
Florence, Arizona 85132

      Re:    <u>United States v. Daniel David Rigmaiden</u>
             CR-08-814-PHX-DGC

Dear Mr. Rigmaiden:

      This is in response to your 30 page discovery letter, dated December 3, 2010, which also contained approximately 70 pages of attachments. In the interest of clarity, our response follows the format of your request. Attached to this response is some additional discovery per your request; including the raw data you have requested.

. Since this issue has been raised, please be advised that no tracking device, such as the types that may be covertly attached to motor vehicle or enclosed in a package, was used in this case. The prosecution never intended you to believe that one was ever used as it redacted matters related to the equipment used to locate the subject aircard.

      **Section I    Qualifications of Prosecutors Assigned to Case - Page 2 of 30**

      ¶ 1.    All information that has been withheld regarding equipment used to locate the subject aircard is considered law enforcement sensitive by the FBI. The notations regarding this equipment are set forth throughout the discovery. The government does not intend to prepare more detailed indexes regarding the discovery with respect to this equipment. It is the position of the government that materials that have been requested such as the make of the actual equipment, operation manuals, etc., are all law enforcement sensitive, not subject to disclosure and will not be itemized by the government.

Letter to Daniel David Rigmaiden
Re: United States v. Daniel David Rigmaiden
Page 10

Sincerely yours,

DENNIS K BURKE
United States Attorney
District of Arizona

FREDERICK A. BATTISTA
Assistant United States Attorney

Enclosures

cc:     Philip Seplow
        Shadow Counsel for Defendant Daniel David Rigmaiden

        Taylor Fox
        Counsel for Defendant Ransom Carter — Including incoming
                                                discovery request on disc.

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

↓ **EXHIBIT 03** ↓

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

atis (website), *ATIS - DOCUMENT CENTER* [J-STD-025], <https://www.atis.org/docstore/product.aspx?id=22579> (last accessed Feb. 25, 2011);



## ATIS Document Center

<< Back to Search

**Login**

Email:

Password:

[Login]

New User?
Forgot Password?

**Links**

Document Center
Home

Document Search

Checkout

FAQs

Contact

**Shopping Cart**

View
item(s): 0
$0.00

Discount not reflected
in total shown.

**Document Detail**

| | |
|---|---|
| Document Name: | Lawfully Authorized Electronic Surveillance |
| Document Date: | July, 2006 |
| Document Number: | J-STD-025-B-2006 |
| Document Version: | J-STD-025-B |
| Committee: | WTSC |
| Document Type: | ATIS/TIA Joint Standard |
| Abstract: | This Standard defines the interfaces between a telecommunication service provider (TSP) and a Law Enforcement Agency (LEA) to assist the LEA in conducting lawfully authorized electronic surveillance. |
| Formats Available: | Paper Copy: $348.00 - Add to Cart |
| | Electronic Download: $333.00 - Add to Cart |
| | CD-Rom: $348.00 - Add to Cart |
| File Size: | |
| Number of Pages: | 268 |

Preview Sample Pages |



**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**
**↓ EXHIBIT 04 ↓**

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Marcia Hofmann, EFF FOIA request to FBI (August 11, 2006), *available at* <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf> (last accessed Mar. 30, 2011);



**Electronic Frontier Foundation**
Protecting Rights and Promoting Freedom on the Electronic Frontier

1875 Connecticut Avenue, NW • Suite 650 • Washington, DC 20009 USA
202.797.9009 (v) • 202.797.9066 (f) • www.eff.org • information@eff.org

August 11, 2006

**BY FACSIMILE — (202) 324-3752**

David M. Hardy, Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Department of Justice
935 Pennsylvania Avenue NW
Washington, DC 20535-0001

      RE:   Freedom of Information Act Request

Dear Mr. Hardy:

This letter constitutes a request under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and is submitted to the Federal Bureau of Investigation ("FBI") on behalf of the Electronic Frontier Foundation ("EFF"). We make this request as part of EFF's FOIA Litigation for Accountable Government ("FLAG") Project, which works to obtain government documents and make them widely available to the public.

We are seeking all agency records (including, but not limited to, electronic records) concerning electronic surveillance systems known as DCS-3000 and Red Hook. Please interpret this request to include any reports made by the FBI to Congress on the Bureau's use of these technologies.

According to a report published earlier this year by the Department of Justice Inspector General:

> System DCS-3000. The FBI has spent nearly $10 million on this system. The FBI developed the system as an interim solution to intercept personal communications services delivered via emerging digital technologies used by wireless carriers in advance of any CALEA solutions being deployed. Law enforcement continues to utilize this technology as carriers continue to introduce new features and services.
>
>           *        *        *
>
> Red Hook. The FBI has spent over $1.5 million to develop a system to collect voice and data calls and then process and display the intercepted information in the absence of a CALEA solution.[1]

---

[1] Dep't of Justice, Office of the Inspector General, Audit Division, Audit Report No. 06-13, *The Implementation of the Communications Assistance for Law Enforcement Act* 107 (March 2006), *available at* http://www.usdoj.gov/oig/reports/FBI/a0613/final.pdf.

EFF FOIA Request [as an exhibit to a court filing] [Aug. 11, 2006]; Page # 2 of 12;
Download at <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf>
[last accessed Mar. 30, 2011];

                                         .Ex. Bates No. 000001

**Request for News Media Fee Status**

EFF asks that it not be charged search or review fees for this request because EFF qualifies as a representative of the news media pursuant to the FOIA and 28 C.F.R. § 16.11(b)(6).

EFF is a non-profit public interest organization that works "to protect and enhance our core civil liberties in the digital age."[2] One of EFF's primary objectives is "to educate the press, policymakers and the general public about online civil liberties."[3] To accomplish this goal, EFF routinely and systematically disseminates information in several ways.

First, EFF maintains a frequently visited web site, http://www.eff.org, which received 38,858,298 hits in July 2006 — an average of 52,228 per hour. The web site reports the latest developments and contains in-depth information about a variety of civil liberties and intellectual property issues.

EFF has regularly published an online newsletter, the EFFector, since 1990. The EFFector currently has more than 77,000 subscribers. A complete archive of past EFFectors is available at http://www.eff.org/effector/.

Furthermore, EFF publishes two blogs that highlight the latest news from around the Internet. DeepLinks (http://www.eff.org/deeplinks/) reports and analyzes newsworthy developments in technology, while miniLinks (http://www.eff.org/minilinks/) directs readers to other news articles and commentary on these issues. DeepLinks had 817,993 hits in July 2006; miniLinks received 436,043 hits during the same period.[4]

In addition to reporting hi-tech developments, EFF staff members have presented research and in-depth analysis on technology issues in no fewer than eighteen white papers published since 2002. These papers, available at http://www.eff.org/wp/, provide information and commentary on such diverse issues as electronic voting, free speech, privacy and intellectual property.

EFF has also published several books to educate the public about technology and civil liberties issues. *Everybody's Guide to the Internet* (MIT Press 1994), first published electronically as *The Big Dummy's Guide to the Internet* in 1993, was translated into several languages, and is still sold by Powell's Books (http://www.powells.com). EFF also produced *Protecting Yourself Online: The Definitive Resource on Safety, Freedom & Privacy in Cyberspace* (HarperEdge 1998), a "comprehensive guide to self-protection in the electronic frontier," which can be purchased via Amazon.com (http://www.amazon.com). Finally, *Cracking DES: Secrets of Encryption Research, Wiretap Politics & Chip Design* (O'Reilly 1998) revealed technical details on encryption security to the public. The book is available online at http://cryptome.org/cracking-des.htm and for sale at Amazon.com.

---

[2] Guidestar Basic Report, Electronic Frontier Foundation, http://www.guidestar.org/pqShowGsReport.do?npoId=561625 (last visited Aug. 9, 2006).

[3] *Id.*

[4] These figures include hits from RSS feeds through which subscribers can easily track updates to DeepLinks and miniLinks.

2

EFF FOIA Request [as an exhibit to a court filing] [Aug. 11, 2006]; Page # 3 of 12;
Download at <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf>
[last accessed Mar. 30, 2011];                                        Ex. Bates No. 000002

Most recently, EFF has begun broadcasting podcasts of interviews with EFF staff and outside experts. *Line Noise* is a five-minute audio broadcast on EFF's current work, pending legislation, and technology-related issues. A listing of *Line Noise* podcasts is available at feed://www.eff.org/rss/linenoisemp3.xml and feed://www.eff.org/rss/linenoiseogg.xml. These podcasts were downloaded about 5,000 times from EFF's web site last month.

### Request for a Public Interest Fee Waiver

EFF is entitled to a waiver of duplication fees because disclosure of the requested information is in the public interest within the meaning of 5 U.S.C. § 552(a)(4)(a)(iii) and 28 C.F.R. § 16.11(k). To determine whether a request meets this standard, the FBI determines whether "[d]isclosure of the requested information is likely to contribute significantly to public understanding of the operations or activities of the government," and whether such disclosure "is not primarily in the commercial interest of the requester." 28 C.F.R. §§ 16.11(k)(i), (ii). This request clearly satisfies these criteria.

First, the FBI's development and use of Internet surveillance technology concerns "the operations or activities of the government." 28 C.F.R. § 16.11(k)(2)(i). The Bureau is a government agency. Therefore, its surveillance of communications unquestionably constitutes government operations or activities.

Second, disclosure of the requested information will "contribute to an understanding of government operations or activities." 28 C.F.R. § 16.11(k)(2)(ii) (internal quotation marks omitted). EFF has requested information that will shed light on the FBI's development of electronic surveillance technology, as well as its functionality and the extent of its use.

Third, the requested material will "contribute to public understanding" of the extent to which the FBI uses DCS-3000 and Red Hook. 28 C.F.R. § 16.12(k)(2)(iii) (internal quotation marks omitted). This information will contribute not only to EFF's understanding of the FBI's surveillance activity, but to the understanding of a reasonably broad audience of persons interested in the subject. EFF will make the information it obtains under the FOIA available to the public and the media through its web site and newsletter, which highlight developments concerning privacy and civil liberties issues, and/or other channels discussed more fully above.

Fourth, the disclosure will "contribute significantly" to the public's knowledge and understanding of the FBI's development and use of DCS-3000 and Red Hook. 28 C.F.R. § 16.11(k)(2)(iv) (internal quotation marks omitted). Little is publicly known about these technologies and how the Bureau uses them, so disclosure of this information will help inform the public about DCS-3000 and Red Hook, as well as contribute to the public debate about the FBI's electronic surveillance activities.

Furthermore, a fee waiver is appropriate here because EFF has no commercial interest in the disclosure of the requested records. 28 C.F.R. § 16.11(k)(3). EFF is a 501(c)(3) nonprofit organization, and will derive no commercial benefit from the information at issue here.

EFF FOIA Request [as an exhibit to a court filing] [Aug. 11, 2006]; Page # 4 of 12;
Download at <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf>
[last accessed Mar. 30, 2011];                                    Ex. Bates No. 000003

Thank you for your consideration of this request. If you have any questions or concerns, please do not hesitate to contact me at (202) 797-9009 x. 12. As the FOIA provides, I will anticipate a determination on this request from your office within 20 working days.

Sincerely,

Marcia Hofmann
Staff Attorney

4

EFF FOIA Request [as an exhibit to a court filing] [Aug. 11, 2006]; Page # 5 of 12;
Download at <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf>
[last accessed Mar. 30, 2011];
                                                                    Ex. Bates No. 000004

ATTACHED EXHIBITS
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY
CR08-814-PHX-DGC

↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓
↓ **EXHIBIT 05** ↓

Defense rough definition of *FBI Digital Collection Program/Digital Collection System*; (Apr. 5, 2011);

**FBI Digital Collection Program/Digital Collection Systems**

The Digital Collection Program provides the FBI with the means to collect evidence and intelligence through the acquisition, deployment, and support of communications interception techniques and systems which facilitate and support national security, domestic counterterrorism, and criminal investigation efforts. Digital collection systems provided through this program are computer based systems comprised primarily of commercial-off-the-shelf hardware and software with limited proprietary application software. Digital collection systems are procured in three basic configurations: portable, transportable, and fixed. Portable systems are moveable by two persons and designed for use in temporary situations; they do not require special power considerations. Transportable systems are more robust than portable systems and will be used at sites that anticipate ongoing or recurring operations that do not require a large number of inputs. Fixed systems will be installed at sites with known long term requirements such as foreign Translations Centers, collection "hubs," or as required by operational needs. Digital Collection Systems intercept multi-source digital (and analog) communications information for intelligence gathering for foreign counterintelligence activities and investigative purposes for providing evidence of criminal activity for trial. The electronic information collected includes Pen/Trap data (*i.e.*, call-identifying information), analog and digital call content, facsimile transmissions, modem transmissions, and microphone audio. Digital Collection Systems process and evaluate the collected electronic information for migration to a separate information technology system where the collected data is analyzed, managed and archived as case related information. Processing of electronic information collected through Digital Collection Systems involve monitoring information, recording it onto digital media, and playback/transcription into a readable document. Digital Collection Systems are used primarily by FBI field offices and resident agencies in support of active foreign intelligence and criminal cases. Support is also provided to other federal, state, local, and tribal agencies as required.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇
⬇ **EXHIBIT 06** ⬇

Defense rough definition of *DCSNET*; (Apr. 5, 2011);

## DCSNET

The Digital Collection Systems Network (DCSNET) is the communications medium used by the FBI's Digital Collection Program.  DCSNET is a peerless and private encrypted IP network layered over the FBI Trilogy network backbone--an enterprise wide area digital communications network deployed to link all FBI field offices and resident agencies. DCSNET has nodes in all 56 FBI field offices and in 29 resident agencies for a total of 85 nodes.  DCSNET is fully meshed allowing for each node to communicate with every other node directly, without transversing any other node of the network.  DCSNET is monitored and maintained by FBI staff from the Engineering Research Facility (ERF) Operational Technology Division (OTD) Telecommunications Intercept and Collection Technology Unit (TICTU) Switch-Based Intercept Team (SBIT).  DCSNET supports the transport and delivery of CALEA call-identifying information and call content from Telecommunications Service Providers (TSP) to FBI Central Monitoring Plants (CMP) located at each of the 85 DCSNET nodes.  A Central Monitoring Plant is a physical area set aside within a building to house DCS server computers (*e.g.*, the DCS-3000), networking equipment, client PCs, and furniture.  The FBI is in a continual relationship with all major telecommunications service providers and has allowed them limited access to DCSNET for the purpose of providing the FBI with call-identifying information and call content associated with the communications of intercept targets.  Telecommunications Service Providers deliver this information via Call Data Channels (CDC) and Call Content Channels (CCC) logically linked from FBI DCSNET gateways to Intercept Access Points (IAP) located within telecommunications network infrastructure.  An Intercept Access Point is a point within a telecommunications system where some of the communications or call-identifying information of an intercept target's equipment, facilities and services are accessed.  An Intercept Access Point typically consists of a telecommunications network switch connected to a Packet Assembler-Disassembler (PAD) which is in turn connected to a modem with a direct link to a DCSNET gateway.  Once CDC and CCC information is received at a DCSNET gateway, SBIT distributes the data in real time to network switches located in Central Monitoring Plants at the appropriate FBI field offices where it is collected per court orders and/or warrants.  Wireless carriers (*e.g.*, Verizon Wireless) utilize DCSNET to send Pen/Trap data (*i.e.*, call-identifying information) from Intercept Access Points to FBI Central Monitoring Plants.

///
///
///
///
///
///
///
///
///
///
///
///
///

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

**↓ EXHIBIT 07 ↓**

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Defense rough definition of *Lawfully Authorized Electronic Surveillance Protocol (LAESP)*; (Apr. 5, 2011);

**Lawfully Authorized Electronic Surveillance Protocol (LAESP)**

Under the CALEA, delivery of Pen/Trap data from a wireless carrier is made over a Call Data Channel using the Lawfully Authorized Electronic Surveillance Protocol (LAESP)--an Open System Interconnection (OSI) Layer 7 or Application Layer Protocol.  LAESP messages are binary encoded and compatible with the X.208 Abstract Syntax Notation One (ASN.1) and the X.209 Basic Encoding Rules (BER).  LAESP messages received by an FBI Central Monitoring Plant are considered the raw and unaltered Pen/Trap data as collected and encoded by an Intercept Access Point belonging to a Telecommunications Service Provider.  LAESP messages are delivered over Call Data Channels to Central Monitoring Plants using a variety of OSI Layer 2-4 communications protocols including, but not limited to, Transmission Control/Internet Protocol (TCP/IP), Point-to-Point protocol (PPP), Serial Link Internet Protocol (SLIP), Link Access Protocol--Balanced (LAPB), and Link Access Protocol—D-Channel (LAPD).

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇
⬇ **EXHIBIT 08** ⬇

Defense rough definition of *Digital Collection System 3000 (DCS-3000)*; (Apr. 5, 2011);

**Digital Collection System 3000 (DCS-3000).**

The Digital Collection System 3000 (DCS-3000) is the FBI's primary CALEA Pen/Trap collection system. The DCS-3000 is responsible for processing LAESP messages (containing call-identifying information) received from telecommunications service providers as they arrive at FBI Central Monitoring Plants over DCSNET. The DCS-3000 is a Microsoft Windows based server platform comprised of commercial-off-the-shelf hardware and loaded with a custom application suite developed by Booz Allen & Hamilton (BAH) while under the direction of TICTU. Between January 1997 and July 1998, BAH successfully developed an early version of the DCS-3000 and, at the time, it provided for the collection and recording of both call-identifying information and call content for three wireless carrier switches. By March 1999, the FBI had installed DCS-3000 servers in more than 34 FBI field offices and equipped 61 wireless carrier switches to be Intercept Access Points compatible with the DCS-3000. Today, BAH continues to support TICTU activities and is involved with the development of the current DCS-3000 collection system. Currently, the DCS-3000 has been deployed to Central Monitoring Plants in all 56 FBI field offices and in 29 resident agencies. Central Monitoring plants are designed using the DCS client/server architecture and contain Microsoft Windows based client computer workstations that are used to access information on the DCS-3000 server. All major Telecommunications Service Providers have network switches configured to be Intercept Access Points capable of communicating with DCS-3000 servers over DCSNET. All DCS-3000 servers are also interconnected via DCSNET allowing for, (1) Central Monitoring Plants to share information, (2) FBI OTD to provide technical support to field offices, and (3) FBI OTD to collect specific performance metrics from each DCS-3000 server. The DCS-3000 server software suite consists of the following: (1) Server application (used to collect CDC information pursuant to CALEA); (2) Viking application (used to decode audio communications); (4) Enhanced Codec Decoder application (used to decode audio communications); (5) Multivanguard application (used to (a) route FISA CDC and CCC information to the DCS-5000 (FISA platform), (b) route Title III (wiretap) CCC information to the DCS-6000 (criminal platform), and (c) route CALEA CDC information to the DCS-3000 Multiserver application); (6) Multiserver application (used to send collected CALEA CDC information to DCS-3000 client computer workstations located in the same Central Monitoring Plant as the DCS-3000 server); (7) Tracker application (used to geographically display cell site position based off of CALEA CDC information associated with the communications of an intercept target); and (8) Backtrack application (used to geographically display cell site position based off of historical cell site location information associated with the communications of an intercept target). The DCS-3000 client software suite is used to access the DCS-3000 server and consists of various component applications residing on one more workstations within the Central Monitoring Plant.

///
///
///
///
///
///
///

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇
⬇ **EXHIBIT 09** ⬇

Defense rough definition of *DCS-3000 CDNRS Files*; (Apr. 5, 2011);

## DCS-3000 CDNRS Files.

Once the raw and unaltered LAESP messages are received by an FBI Central Monitoring Plant, they are processed and altered by the DCS-3000 into "human readable" text formatted archive files using the "CDNRS" file format.  While processing the raw and unaltered LAESP messages, the DCS-3000 attempts to extract and format relevant Pen/Trap data before  saving it into archive files having .cdnrs file extensions.  This post-processed (altered) Pen/Trap data is processed by the DCS-3000 a second time after an agent instructs the DCS-3000 to save the data into the CDNRS upload file format.  In response to an agent requesting such a save, the DCS-3000 reformats the Pen/Trap data contained in the .cdnrs files and saves the reformatted data in "summary" and "log" files having .sum and .log file extensions.  The DCS-3000 then automatically places the .sum and .log files into folders named "sum" and "log" respectively and places those folders into a folder named "CDNRS" nested in a parent folder taking the name of the target phone number (*e.g.*, H:\5551234567\Cdnrs\Log\000000.000.log).  The CDNRS .sum and .log files are typically used to upload the post-processed Pen/Trap data to the Telephone Applications (TA) database at FBI Headquarters.  Although the DCS-3000 converts the raw and unaltered Pen/Trap data (*i.e.*, LAESP messages) into "human readable" CDNRS form, technical agents at FBI OTD have the ability to login to any DCS-3000 server on DCSNET and download the original unaltered LAESP messages.  The OTD technical agents also have the skill to read and understand the unaltered LAESP messages for the purpose of providing technical support to field offices.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

⬇ **EXHIBIT 10** ⬇

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Defense rough definition of *Telephone Applications System*; (Apr. 5, 2011);

**Telephone Applications System**

The Telephone Applications System, maintain by the FBI's Information Technology Operations Division (ITOD), consists of a database of Pen/Trap data and various software applications remotely used by FBI field offices to search and analyze the data contained in the database.  Most FBI field offices use the DCS-3000 as a front end collection system for Pen/Trap data.  Once the Pen/Trap data is collected, it is converted into the CDNRS upload file format and then uploaded to the Telephone Applications database located at FBI Headquarters. The task of uploading the CDNRS files to the Telephone Applications database may be done either manually by an agent or automatically by the DCS-3000.  The Telephone Applications database maintains a record of all Pen/Trap data collected by the FBI since the time the database was created.  The Telephone Applications software allow investigators to conduct cross reference and dataminig investigations using the database in order to generate leads and display Pen/Trap data in a user friendly form.  Agents may use either Trilogy desktop computers or DCS-3000 client computers to access the Telephone Applications database via search and analysis application software.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓
↓ **EXHIBIT 11** ↓

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Defense rough definition of *FBI Cell Site Database*; (Apr. 5, 2011);

**FBI Cell Site Database**

The The FBI TICTU/SBIT maintains a large central database containing cell site position information for all major wireless carriers.  The cell site database may be queried by agents to provide the geographic location of a particular target's location based off of either real time Pen/Trap data contained in LAESP messages or historical data obtained directly from wireless carrier personnel.  The cell site database contains up to date records on the longitude and latitude coordinates of each wireless carrier cell site and the general cell site sector positioning convention used by each respective wireless carrier, *i.e.,* beamrange and a standard beamwidth for each sector.  For some wireless carriers, the cell site database also contains up to date records on the specific antenna azimuth and beamwidth of each cell site sector covering the wireless network.  The azimuth, having its value in degrees, corresponds to the point at which the cell site sector is centered measured clockwise in degrees beginning from the North point valued at 0° (degrees) and ending at the point represented by the azimuth degree value. The beamwidth corresponds to the total width in degrees of the sector antenna coverage area with 50% of the beamwidth falling on either side of the azimuth.  In real world applications, the total combined beamwidth of all sectors for a single cell site will never equal 360° (degrees) considering the edges of sector antenna beams always overlap.  There are numerous ways that agents may access the cell site database for the purpose of locating mobile telecommunications devices.  Agents may use the DCS-3000 server to query the cell site database and have the FBI Engineering Research Facility (ERF) send screen shots of cell site position maps over DCSNET to the DCS-3000 client computers.  This is accomplished by using the DCS-3000 Tracker application for real time cell site/sector information obtained via a Pen/Trap order or by using the DCS-3000 Backtrack application for historical cell site/sector information obtained via a Stored Communications Act 18 U.S.C. § 2703(d) order.  Agents may also use a Trilogy desktop computer to access a TICTU/SBIT website that allows for searching the cell site database and downloading records for use in mapping software.  The DCS-3000 also has a "software hook" that can be used to automatically send cell site position records from the cell site database to various locally installed mapping programs such as Wintrack by Integrated Systems Research (ISR) and Microsoft Streets and Trips.  The "software hook" also allows for sending cell site position records from the cell site database to other DCS server platforms such as the DCS-1020 used in the FBI "WITT Van" integration project.

///
///
///
///
///
///
///
///
///
///
///
///
///

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

**⬇ EXHIBIT 12 ⬇**

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

Defense rough definition of *FBI Wireless Intercept and Tracking Team (WITT) Van*; (Apr. 5, 2011);

**FBI Wireless Intercept and Tracking Team (WITT) Van.**

Once cell site location information (either historical or real time ) is used to locate a mobile device to an area covered by a single cell site sector, local FBI Wireless Intercept and Tracking Team (WITT) agents will attempt to pinpoint the location of the device by deploying a "WITT Van" equipped with specialized mobile electronic surveillance equipment.  The WITT agents will attempt to pinpoint the location of the mobile device by using the electronic surveillance equipment while driving the WITT Van around the area covered by the serving cell site sector.  If a Pen/Trap order is in effect, the local Central Monitoring Plant will send the WITT Van the target's cell site sector location/position information in real time.  The local Central Monitoring Plant completes this task through the following chain of events: (1) the DCS-3000 server receives cell site location information for a target via LAESP messages sent from a wireless carrier Intercept Access Point, (2) the DCS-3000 server processes and alters the LAESP messages into the CDNRS file format, (3) the DCS-3000 server queries the cell site database at the FBI ERF over DCSNET for longitude, latitude, azimuth, beamwidth, and beamrange of the serving cell site/sector listed in the CDNRS files, (4) once receiving the requested cell site position information, the DCS-3000 server sends the data to a DCS-1020 gateway server located at the same Central Monitoring Plant as the DCS-3000, and (5) the DCS-1020 server sends the cell site/sector location/position information over the internet via a Virtual Private Network (VPN), to a wireless cellular modem paired with a laptop computer located inside the WITT Van.  The WITT members are kept informed of the target's real time cell site/sector location/position information by the laptop inside the WITT Van.  If the Pen/Trap real time cell site location information is unavailable, and the WITT agents are using only historical cell site location information, then the VPN connection between the WITT Van laptop and the DCS-1020 at the local Central Monitoring Plant may not be utilized.  Once the WITT Van is in the area of the target's serving cell site/sector, the WITT agents will begin using specialized mobile electronic surveillance equipment to pinpoint the exact location of the mobile device to an area the size of a single room.  These specialized mobile electronic surveillance devices operate independent of the Central Monitoring Plant and are usually capable of pinpointing the exact location of a mobile device without assistance from the wireless carrier.  Vehicle portable devices are first used to narrow the search before man portable devices are deployed (if needed) to pinpoint the precise location of a mobile device within a hotel, office building, or similar structure.
///
///
///
///
///
///
///
///
///
///
///
///

⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇
⬇ **EXHIBIT 13** ⬇

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay] (registered Sep. 9, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

Reg. No. 2,762,468

## United States Patent and Trademark Office

Registered Sep. 9, 2003

### TRADEMARK
### PRINCIPAL REGISTER

# STINGRAY

HARRIS CORPORATION (DELAWARE COR-
    PORATION)
1025 WEST NASA BOULEVARD
MELBOURNE, FL 32919

FOR: MULTI-CHANNEL, SOFTWARE-DEFINED,
TWO-WAY ELECTRONIC SURVEILLANCE
RADIOS FOR AUTHORIZED LAW ENFORCE-
MENT AND GOVERNMENT AGENCIES FOR IN-
TERROGATING, LOCATING, TRACKING AND

GATHERING INFORMATION FROM CELLULAR
TELEPHONES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36
AND 38).

FIRST USE 3-2-2003; IN COMMERCE 3-2-2003.

SN 76-303,503, FILED 8-21-2001.

MELVIN AXILBUND, EXAMINING ATTORNEY

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 10 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];



USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 9 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];
Ex. Bates No. 000002

## SPECIMEN

**Internet Transmission Date:**
06/05/2003

**Serial Number:**
76303503

**International Class:**
009





USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 15 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];          Ex. Bates No. 000003

EL626297106US

*TRADEMARK*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Mark:  STINGRAY

International Class: 009

To the Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA  22202-3513

Sir:

Harris Corporation (Applicant"), a Delaware corporation, located and doing business at 1025 West NASA Boulevard, Melbourne, Florida 32919.

Applicant requests registration of the above-identified mark shown in the accompanying drawing in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. 1051 et seq., as amended) for electronic surveillance transceivers for tracking, locating and gathering information from cellular telephones in International Class 009.

Applicant has a bona fide intention to use the mark in commerce on or in connection with the above-identified goods, pursuant to 15 U.S.C. §1051(b) as amended, by applying the mark to the goods and/or on the packaging for the goods.

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he is properly authorized to execute this application on behalf of the Applicant; he believes the Applicant to be the owner of the mark sought to be registered, or, if

the application is being filed under 15 U.S.C. 1051(b), he believes Applicant to be entitled to use such mark in commerce; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the above-identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his own knowledge are true and that all statements made on information and belief are believed to be true.

The undersigned hereby appoints Donald S. Showalter (R. No. 33,033); Thomas L. Kautz (R. No. 28,726); Leslie J. Hart (R. No. 26,462); Harry M. Fleck (R. No. 24,704) and Michael S. Yatsko (R. No. 28,135), its attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the United States Patent and Trademark office connected therewith.  Please direct all telephone calls and correspondence to:

> Donald S. Showalter, Esquire
> Holland & Knight LLP
> One East Broward Boulevard, Suite 1300
> Fort  Lauderdale, Florida  33301
> Phone (954) 468-7879
> Fax:  (954) 463-2030
> E-mail:  dshowalt@hklaw.com

HARRIS CORPORATION

By _Michael S. Yatsko_____
Michael S. Yatsko, Esquire
Sr. Intellectual Property Counsel

Date __8/14/01_____

FTL1 #554328 v2

2

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 80 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];     Ex. Bates No. 000005

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

I hereby certify that this paper or fee has been transmitted via facsimile to the
Assistant Commissioner for Trademarks, 2900 Crystal Drive, Arlington VA 22202-3513
on July 18, 2002 via facsimile number (703) 746-8113.

*Karen J. Harvey*                    7/18/02.
Karen J. Harvey                      Date

Serial No.:       76/303,503
Applicant:        Harris Corporation
Filed:            August 21, 2001
Examiner:         Melvin T. Axilbund
Law Office:       113
Mark:             STINGRAY

Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington VA 22202-3513

Sir:

### RESPONSE TO OFFICE ACTION

This responds to the Office Action mailed January 18, 2002.

### Identification of Goods

Please amend the identification of goods to read:

"multi-channel, software-defined, two-way electronic
surveillance radios for interrogating, locating, tracking
and gathering information from cellular telephones".

### Remarks

Registration has initially been refused over the cited registration in view of

its recitation of "transmitters and receivers for computer networks" and

"transceivers". Applicant acknowledges that likelihood of confusion must be

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 36 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];     Ex. Bates No. 000006

assessed based on the goods as described in the cited registration and not based on comparison of the respective actual goods of Registrant and Applicant. Applicant further acknowledges that the present refusal cannot be overcome merely by limiting the identification of goods so as to describe a subset of Registrant's goods. However, provided the scope of the original recitation of goods is not expanded, it is appropriate to amend the identification of goods to distinguish those of a cited registration. Moreover, evidence may properly be considered under circumstances where the cited registration is vague as to the nature of the goods it lists. In re Trackmobile, 15 U.S.P.Q.2d (1152 TTAB 1990). Applicant respectfully submits such circumstances are present here.

The description of goods in the cited registration is unquestionably vague. It provides no insight as to the nature of the goods it purports to describe. "Transmitters and receivers for computer networks" says nothing about what is being transmitted or received, for what purpose, or how. Are these transmitters and receivers wireless or hardwired? That information cannot be ascertained from the recitation of goods.

"Transceivers" is even more vague. That term can be used to describe products ranging from toy "walkie-talkies" sold to ordinary consumers for use by children to highly sophisticated secure communications gear purchased by aerospace companies for use in the next generation of jet fighter aircraft. Again, it also cannot be determined from the face of the cited registration whether these

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 37 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];     Ex. Bates No. 000007

"transceivers" are wireless or hardwired or what they might be used for. The answers were revealed only by a search of the Registrant's web site.

That search revealed only one product sold by the Registrant called "STINGRAY". While the terms "transceiver" or "transmitter and receiver for computer networks" can be used to describe the product, a much clearer understanding can be gleaned from a brochure and a white paper published by Registrant on its web site. Copies of same are enclosed as Exhibits A and B respectively to this Response.

As Exhibits A and B reflect, Registrant's "STINGRAY" has nothing whatsoever to do with carrying out surveillance of cellular telephones. The product is a file transfer server that allows exchange of electronic documents regardless of platform, protocol or communication method. As Exhibit A expressly indicates at pg. 3, the product is targeted to "large or small companies" such as "ad agencies, publishers, newspapers, graphic designers, printers, repro houses, solicitous offices and many more". Because the product transmits and receives files, it is capable of being described as a "transmitter", a "receiver" or a "transceiver". Those terms, however, are hardly enlightening as to the true nature of the goods.

By way of contrast, Applicant's goods are not targeted to business customers. They are described in Exhibit C. As can be seen, Applicant's goods are a software-defined radio that enables simultaneous monitoring of multiple cellular channels for carrying out surveillance of cellular telephones and more particularly, for

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 38 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];          Ex. Bates No. 000008

interrogating, locating, tracking and gathering information from cellular telephones. Importantly, as the second pages of Exhibit C reflects, "[T]his product is a restricted item and can be sold only to authorized law enforcement and government agencies". Such customers are highly sophisticated and not readily confused. Consistent with the "Distribution Warning" which appears on that same page, Exhibit C has been redacted to delete information which might be misused by some who might seek to circumvent the product.

It is to be noted that Exhibit C does not even use the word "transceiver" to describe Applicant's goods. Accordingly, the identification of goods has been amended. The amended description not only conforms more closely to the terminology being used by Applicant to describe the product in the marketplace, but also more clearly distinguishes Applicant's goods from those of the cited registration.

In view of the ambiguity present in the cited registration, In re Trackmobile, supra, is instructive. In that case, the facial similarity of the two marks in question was not in dispute. The sole issue was whether the goods were related. Comparing only the wording of the cited registration to the goods recited by the applicant in that case, it could certainly be argued the goods at issue were closely related.

Applicant's goods were for "mobile railcar movers". The cited registration covered, in pertinent part, "runways and monorails with manual, mechanical, hydraulic, pneumatic, electric and electronic control vehicles - namely, light railway

4

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 39 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];   Ex. Bates No. 000009

motor tractors". The Examiner had contended that the respective goods as so described were "identical or nearly identical". However, his refusal to register was reversed by the Board.

After noting that the goods of both parties were not sold to ordinary consumers, the Board pointed out that the Applicant had presented extrinsic evidence that showed that the actual goods of the parties were really quite different. The evidence showed that the registrant's goods were relatively small unmanned devices used to carry boxes, parts and other loads from point to point in a factory. In contrast, Applicant's mover was a $350,000.00 piece of equipment capable of moving up to ten, 100 Ton railway cars.

The Board stated:

[W]e could as did the Examining Attorney, interpret the individual words in those two terms so as to come up with meanings for the terms which are quite similar. For example, a "tractor" can be described as a "mover" and a "railcar" can be said to run on a "railway".

It concluded that it would be improper to do so, however.

[W]hen the description of goods for a cited registration is somewhat unclear, as is the case herein, it is *improper* to simply consider that information in a vacuum and attach all possible interpretations to it when the applicant has presented evidence showing that the description of goods has a specific meaning to members of the trade. In re Trackmobile, supra, at 1154. (emphasis added).

The Trackmobile Board quoted with approval In re Protection Controls, Inc., 185 U.S.P.Q. 692, 694 (TTAB 1975):

5

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 40 of 88;
Download at <http://tmportal.uspto.gov/external_portal/tow> [last accessed Mar. 11, 2011];    Ex. Bates No. 000010

"[T]he identification of goods in the [cited] registration as 'monitoring instrument', per se, is so indefinite and so all inclusive as to be meaningless in attempting to ascertain whether the respective monitoring apparatus [of applicant and registrant] relate to the same or disparate fields... [T]he better approach in this particular situation... is to authorize publication of the mark for opposition..." (emphasis added).

Applicant submits that is the better approach here also.

Upon considering the evidence made of record here of the true nature of Applicant's goods as compared to those of the cited registration, it is apparent that the two are quite unrelated. For that reason, as In re Trackmobile, supra, teaches, attempts to build artificial semantic bridges between them should be resisted. As Exhibits A & B clearly reflect, the Registrant's goods are computer networking products for use by small and large businesses to facilitate transfer of documents. As Exhibit C shows, Applicant's goods are nothing of that sort. They are instead, highly specialized software-defined radios for carrying out electronic surveillance of cellular telephones. As Exhibit C expressly indicates, Applicant's goods are targeted specifically to law enforcement and government agencies for official use. Indeed, Applicant's products are subject to legal/regulatory restrictions which preclude their sale to the ordinary small or large business customers of the type who according to Exhibits A & B might buy Registrant's product.

The respective target customer groups in either case do not include ordinary consumers. Registrant's business customers can be assumed to be relatively sophisticated and discriminating since purchase of computer hardware and the like

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

6

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 41 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];  Ex. Bates No. 000011

by businesses is not undertaken lightly and is typically the responsibility of persons with significant skill and technical expertise. Applicant's customers are unquestionably highly skilled and discriminating. The purchase of sophisticated electronic surveillance gear is generally within the purview of experts who are not at all likely to be confused as to the source, origin, sponsorship or approval of such products.

## Conclusion

In view of the foregoing, reconsideration and withdrawal of the outstanding refusal under Section 2(d) is solicited. The identification of goods has been amended to more clearly distinguish the terms used in the cited registration. Even more importantly, evidence made of record here reveals the cited registration is vague and that the goods it covers are quite unrelated to the goods recited in the present application.

While it is believed the Application is now in condition for publication, the Examiner is encouraged to contact the undersigned by telephone should any issues remain to be resolved.

Respectfully submitted,

HOLLAND & KNIGHT LLP

By _____

Donald S. Showalter
Reg. No. 33,033

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 42 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];      Ex. Bates No. 000012

One East Broward Boulevard
P.O. Box 14070
Fort Lauderdale, FL 33302-4070
954-525-1000 (phone)
954-468-7879 (direct dial)
954-463-2030 (fax)
dshowalt@hklaw.com (e-mail)

Enclosures:  Exhibits A, B & C

FTL1 #596774 v1

8

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 43 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];      Ex. Bates No. 000013

EXHIBIT C
(2 pgs. to follow)

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 59 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];    Ex. Bates No. 000014

# HARRIS

## StingRay™

*Transportable CDMA Interrogation, Tracking and Location, and Signal Information Collection System*

# WIRELESS
## products group

### Product Description

StingRay™ is Harris' latest offering in a long line of advanced wireless surveillance products. StingRay is a multichannel software defined radio that performs network base station surveys, Dialed Number and registration collection, mobile interrogation, and target tracking and location with Harris' Amber-Jack™ Direction-Finding Antenna. This low-power transportable surveillance system is designed with the future in mind—its reconfigurable architecture lends itself to upgrades of new capabilities and wireless standards, while preserving the initial investment in hardware.

### Features

- Software Defined Radio (SDR) enables simultaneous monitoring of up to ████ channel pairs

- Active interrogation capability emulates base station to collect MINs and ESNs through forced registration; external ████ output available for ████ requirements

- Interfaces with AmberJack antenna to form a complete target tracking and location solution using active ████ and ████ techniques ████ the target phone

- Optional ████

- ████ RF front-end provides ████ operation in the U.S. cellular ████ bands and is reconfigured to support ████ bands

- PC-based controller running ████ provides an intuitive Graphical User Interface (GUI)

- Industry-standard USB interface enables ████

- Supports ████

████ designed for ████ operations



*next level solutions*

EXHIBIT C

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 60 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];    Ex. Bates No. 000015

 **Wireless Products Group**

### Standards Currently Supported

■ ▉▉▉

### Future Standards Supported

■ Software reconfigurable architecture will allow for future software upgrades to support other wireless standards and capabilities

### Operating Bands



### Transmit Capabilities

*(For Interrogation and Active Tracking and Location)*

■ Up to ▉ dBm output

■ Interfaces with an ▉▉▉▉▉▉▉

### Compatible Accessories



■ ▉▉▉▉▉▉
■ ▉▉▉▉▉▉
■ ▉▉▉▉▉▉
■ ▉▉▉▉▉▉

### Interfaces



■ Power

### Physical Characteristics

■ Housing: Standard aluminum case
■ Wheeled transit case
  – Stows ▉▉▉▉▉
  – Conforms to airline carry-on weight and size limits

### PC Controller Characteristics

■ ▉▉▉▉▉▉▉ operating system
■ GUI is easily configured by user for mission scenarios
■ Enables field upgrade of system firmware
■ Integrated ▉▉▉▉▉▉▉ GUI with optional ▉▉▉

1. Hardware is preconfigured to work in these bands. Future software upgrades will provide operation in these bands—consult Harris Wireless Products Group for availability.

Specifications are subject to change without notice.

StingRay and AmberJack are trademarks of Harris Corporation.

Windows XP is a registered trademark of Microsoft Corporation.

This product is a restricted use item and can be sold only to authorized law enforcement and government agencies. Its use shall comply with all local, state and federal statutes associated with the intercept and monitoring of oral communications. Harris Corporation assumes no liability for any misuse or improper use of the product and makes no representation as to its suitability for any specific application.

**DISTRIBUTION WARNING**

This brochure may be provided only to persons eligible under 18 USC 2512 (Government law enforcement agencies or communications service providers).

This brochure may only be given to U.S. citizens, permanent residents of the U.S. (green card holders), or Canadians eligible under 22 CFR 126.5.

**HARRIS**

*next level solutions*

Government Communications Systems Division | P.O. Box 37 | Melbourne, FL USA 32902-0037
1-800-358-5297 or wpg@harris.com | www.harris.com

Copyright © 2002 Harris Corporation
Printed in USA on Recyclable Paper 07/02 VPS-506590-9 d0106

Received from < > at 7/18/02 11:31:01 AM [Eastern Daylight Time]

TOTAL P.27

USPTO StingRay Trademark [all docs.]; Reg. No. 2,762,468 [Sep. 9, 2003]; Page # 61 of 88;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];    Ex. Bates No. 000016



**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

**EXHIBIT 14**

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

United States Patent and Trademark Office, Trademark Reg. No. 3,499,993 [StingRay II] (registered Sep. 9, 2008), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

**United States Patent and Trademark Office**

Reg. No. 3,499,993

Registered Sep. 9, 2008

# TRADEMARK
## PRINCIPAL REGISTER



HARRIS CORPORATION (DELAWARE COR-PORATION)
1025 WEST NASA BOULEVARD
MELBOURNE, FL 32919

FOR: MULTI-CHANNEL, SOFTWARE-DEFINED, TWO-WAY ELECTRONIC SURVEILLANCE RADIOS FOR AUTHORIZED LAW ENFORCE-MENT AND GOVERNMENT AGENCIES FOR IN-TERROGATING, LOCATING, TRACKING AND GATHERING INFORMATION FROM CELLULAR PHONES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 7-17-2008; IN COMMERCE 7-17-2008.

OWNER OF U.S. REG. NO. 2,762,468.

THE MARK CONSISTS OF THE WORD "STIN-GRAY" FOLLOWED BY THE ROMAN NUMERAL "II" AND A DESIGN OF A "STINGRAY".

SN 77-316,689, FILED 10-30-2007.

ANDREA K. NADELMAN, EXAMINING ATTOR-NEY

USPTO StingRay II Trademark [all docs.]; Reg. No. 3,499,993 [Sep. 9, 2008]; Page # 1 of 41;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];
Ex. Bates No. 000001



USPTO StingRay II Trademark [all docs.]; Reg. No. 3,499,993 [Sep. 9, 2008]; Page # 15 of 41;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];   Ex. Bates No. 000002

| | |
|---|---|
| **NUMBER OF CLASSES** | 1 |
| **SUBTOTAL AMOUNT** | 100 |
| **TOTAL AMOUNT** | 100 |
| **SIGNATURE SECTION** | |
| **SIGNATURE** | /Ronald S. Blum II/ |
| **SIGNATORY'S NAME** | Ronald S. Blum II |
| **SIGNATORY'S POSITION** | Counsel, Intellectual Property |
| **DATE SIGNED** | 07/18/2008 |
| **FILING INFORMATION** | |
| **SUBMIT DATE** | Fri Jul 18 11:18:08 EDT 2008 |
| **TEAS STAMP** | USPTO/SOU-209.36.59.1-200 80718111808024433-7731668 9-40090e2ad863d44a4ce7c98 ae866f319b73-DA-6835-2008 0718105257734859 |

PTO Form 1553 (Rev 9/2005)
OMB No. 0651-0054 (Exp. 09/30/2011)

# Trademark/Service Mark Statement of Use
## (15 U.S.C. Section 1051(d))

To the Commissioner for Trademarks:

MARK: STINGRAY II (stylized and/or with design)
**SERIAL NUMBER:** 77316689

This Allegation of Use is being filed after a Notice of Allowance has issued.

The applicant, Harris Corporation, having an address of 1025 West NASA Boulevard, Melbourne, Florida United States 32919, is using or is using through a related company or licensee the mark in commerce on or in connection with the goods and/or services as follows:

For International Class 009:
Current identification: Multi-channel, software-defined, two-way electronic surveillance radios for authorized law enforcement and government agencies for interrogating, locating, tracking and gathering

USPTO StingRay II Trademark [all docs.]; Reg. No. 3,499,993 [Sep. 9, 2008]; Page # 17 of 41;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];     Ex. Bates No. 000003

information from cellular phones

The applicant, or the applicant's related company or licensee, is using the mark in commerce on or in connection with all goods and/or services listed in the application or Notice of Allowance or as subsequently modified.

The mark was first used by the applicant, or the applicant's related company, licensee, or predecessor in interest at least as early as 07/17/2008, and first used in commerce at least as early as 07/17/2008, and is now in use in such commerce. The applicant is submitting one specimen for the class showing the mark as used in commerce on or in connection with any item in the class, consisting of a(n) digital image showing the mark as used on the goods.
Specimen File1

The applicant hereby appoints Donald S. Showalter of GRAYROBINSON, PA, PO BOX 2328, FORT LAUDERDALE, Florida United States 33303-2328 to submit this Trademark/Service Mark Statement of Use on behalf of the applicant. The attorney docket/reference number is 621020.1728.

A fee payment in the amount of $100 will be submitted with the form, representing payment for 1 class.


## Declaration

Applicant requests registration of the above-identified trademark/service mark in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. Section 1051 et seq., as amended). Applicant is the owner of the mark sought to be registered, and is using the mark in commerce on or in connection with the goods/services identified above, as evidenced by the attached specimen(s) showing the mark as used in commerce.

The undersigned being hereby warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements and the like may jeopardize the validity of this document, declares that he/she is properly authorized to execute this document on behalf of the Owner; and all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true.


Signature: /Ronald S. Blum II/     Date Signed: 07/18/2008
Signatory's Name: Ronald S. Blum II
Signatory's Position: Counsel, Intellectual Property

Mailing Address:
   GRAYROBINSON, PA

   PO BOX 2328
   FORT LAUDERDALE, Florida 33303-2328

RAM Sale Number: 6835
RAM Accounting Date: 07/18/2008

Serial Number: 77316689
Internet Transmission Date: Fri Jul 18 11:18:08 EDT 2008
TEAS Stamp: USPTO/SOU-209.36.59.1-200807181118080244
33-77316689-40090e2ad863d44a4ce7c98ae866
f319b73-DA-6835-20080718105257734859

USPTO StingRay II Trademark [all docs.]; Reg. No. 3,499,993 [Sep. 9, 2008]; Page # 19 of 41;
Download at <http://tmportal.uspto.gov/external/portal/tow> [last accessed Mar. 11, 2011];                    Ex. Bates No. 000005

↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓
↓ **EXHIBIT 15** ↓

*ATTACHED EXHIBITS*
*RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE*
*AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY*
*CR08-814-PHX-DGC*

United States Patent and Trademark Office, Trademark Reg. No. 2,710,009 [AmberJack] (registered Aug. 22, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011); (only relevant sections are included in this exhibit);

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

Reg. No. 2,710,009

## United States Patent and Trademark Office

Registered Apr. 22, 2003

## TRADEMARK
### PRINCIPAL REGISTER

## AMBERJACK

HARRIS CORPORATION (DELAWARE COR-
  PORATION)
1025 WEST NASA BOULEVARD
MELBOURNE, FL 32919

  FOR: DIRECTION FINDING ANTENNAS FOR
USE IN LOCATING AND TRACKING MOBILE
TELEPHONES, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36
AND 38).

FIRST USE 10-28-2002; IN COMMERCE 10-28-2002.

SN 76-303,502, FILED 8-21-2001.

MELVIN AXILBUND, EXAMINING ATTORNEY



FRONT
PLEASE READ THIS IMPORTANT INFORMATION
Direction Finding System has been designed to mount magnetically
While the magnetic fastening system has been designed to
at normal highway speeds, there is no assurance that it will
and fixed in a crash at any speed.
recommended that users who anticipate attaching the system to
may be driven at highway speeds, make use of the tie-down kit
the antenna. The tie-down kit includes swivel eyebolts and a
around the vehicle's roof. Care should be taken to follow all
safety and installation instructions when installing and using the
TO FOLLOW ALL MANUFACTURERS' INSTRUCTIONS MAY CAUSE
OF THE TIE-DOWN KIT TO PROPERLY SECURE THE ANTENNA
RESULTING IN POTENTIAL DAMAGE TO THE ANTENNA SYSTEM,
VEHICLE AND POSSIBLE SEPARATION OF THE ANTENNA SYSTEM
THE VEHICLE.
AmberJack-X
PN: 3123332-101 S/N: 0442

EL626297083US

*TRADEMARK*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Mark:  AMBERJACK

International Class: 009

To the Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA  22202-3513

Sir:

Harris Corporation (Applicant"), a Delaware corporation, located and doing business at 1025 West NASA Boulevard, Melbourne, Florida  32919.

Applicant requests registration of the above-identified mark shown in the accompanying drawing in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. 1051 et seq., as amended) for direction finding antennas for use in locating and tracking mobile telephones in International Class 009.

Applicant has a bona fide intention to use the mark in commerce on or in connection with the above-identified goods, pursuant to 15 U.S.C. §1051(b) as amended, by applying the mark to the goods and/or on the packaging for the goods.

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he is properly authorized to execute this application on behalf of the Applicant; he believes the Applicant to be the owner of the mark sought to be registered, or, if the application is being filed under 15 U.S.C. 1051(b), he believes Applicant to

be entitled to use such mark in commerce; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the above-identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive; and that all statements made of his own knowledge are true and that all statements made on information and belief are believed to be true.

The undersigned hereby appoints Donald S. Showalter (R. No. 33,033); Thomas L. Kautz (R. No. 28,726); Leslie J. Hart (R. No. 26,462); Harry M. Fleck (R. No. 24,704) and Michael S. Yatsko (R. No. 28,135), its attorneys with full power of substitution and revocation, to prosecute this application and to transact all business in the United States Patent and Trademark office connected therewith.  Please direct all telephone calls and correspondence to:

Donald S. Showalter, Esquire
Holland & Knight LLP
One East Broward Boulevard, Suite 1300
Fort  Lauderdale, Florida  33301
Phone (954) 468-7879
Fax:  (954) 463-2030
E-mail:  dshowalt@hklaw.com

HARRIS CORPORATION

By_____
Michael S. Yatsko, Esquire
Sr. Intellectual Property Counsel

Date_____

FTL1 #554328 v3

2