**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**
**⬇ EXHIBIT 01 ⬇**

*REQUEST FOR JUDICIAL NOTICE OF FACTS RELEVANT TO THE ISSUE OF GOVERNMENTAL PRIVILEGES*
*ATTACHED EXHIBITS*
*CR08-814-PHX-DGC*

February 24, 2009 *Daubert* hearing transcripts for United States v. Allums, No. 2:08-CR-30 TS, District of Utah (Dkt. #128);

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                       DISTRICT OF UTAH

 3                       CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,       )

 6             Plaintiff,            )

 7   vs.                             )   CASE NO.  2:08-CR-30TS

 8   JAMES EDWARD ALLUMS,            )

 9             Defendant.            )

10   _____)

11

12              BEFORE THE HONORABLE TED STEWART

13              --------------------------------

14                     February 24, 2009

15                       Daubert Hearing

16

17

18

19

20

21

22

23

24   REPORTED BY:  Patti Walker

25   350 South Main Street, #146, Salt Lake City, Utah  84101
```

```
 1                    A P P E A R A N C E S

 2

 3

 4    For Plaintiff:               Cy Castle, AUSA
                                   William Kendall, AUSA
 5                                 185 South State Street, #300
                                   Salt Lake City, Utah  84111
 6

 7    For Defendant:               Kristen Angelos
                                   Vanessa Ramos
 8                                 UTAH FEDERAL DEFENDER OFFICE
                                   46 West Broadway, #110
 9                                 Salt Lake City, Utah  84101

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                          I N D E X

 2     Witness              Examination By              PAGE

 3     William Shute        Mr. Castle  (Direct)            7

 4                          Ms. Angelos  (Cross)           49

 5                          Mr. Castle  (Redirect)         90

 6

 7

 8

 9

10     PLAINTIFF'S EXHIBITS RECEIVED INTO EVIDENCE:

11     1                                                  27

12     4                                                  28

13     5                                                  36

14     6 and 14                                           47

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   SALT LAKE CITY, UTAH; TUESDAY, FEBRUARY 24, 2009; 2:30 P.M.
 2                        PROCEEDINGS
 3        THE COURT:  We are here in the case of United
 4   States of America vs. James Edward Allums, case 08-CR-30.
 5   Representing the United States is Mr. Cy Castle and Mr. Bill
 6   Kendall, and on behalf of the defendant Ms. Vanessa Ramos
 7   and Kris Angelos.  The purpose of this hearing is to hear
 8   testimony on a motion to exclude the testimony of expert
 9   witness William Shute.
10        Mr. Castle, I am going to presume that you want to
11   proceed first.  Is that logical?
12        MR. CASTLE:  Yes, Your Honor, I do, with some
13   questions.
14        THE COURT:  Go ahead and ask the questions.
15        MR. CASTLE:  Just so we -- I've already talked to
16   defense counsel about this concept, Your Honor.  I want to
17   just make sure we have it on the record.  The question that
18   I had for them was are we here today to talk about the
19   qualifications of Special Agent Shute to testify about his
20   area of expertise or at least his alleged area of expertise
21   of the cell site historical analysis or whether we're also
22   here to deal with the opinion that he would be rendering as
23   a result of the historical analysis that he has done in this
24   particular case.
25        If we are going to do both, then at least it's the
```

```
 1    government's hope that should the Court believe that he is
 2    an expert and that what he has to say will assist the trier
 3    of fact in determining the guilt or innocence of Mr. Allums,
 4    that we don't have to repeat this process in front of the
 5    jury, that Mr. Shute be considered designated in front of
 6    the jury as being an expert witness, qualified to render the
 7    opinion that he will render, and that the defense would have
 8    their opportunity to cross-examine and to create a
 9    reasonable doubt related to his opinion either -- I
10    shouldn't say through cross-examination, but should they
11    bring an expert in to provide some contrary testimony.  I
12    just want to make sure that we're on the same page in terms
13    of the direction that we conduct this hearing.  The
14    government is prepared to go forward on both elements.
15             THE COURT:  Did you ask these questions of Ms.
16    Ramos?
17             MR. CASTLE:  Right.
18             THE COURT:  What did she say?
19             MR. CASTLE:  She said she wanted to do both.
20             THE COURT:  Let me see if I understand.  There are
21    two issues before this Court in determining the
22    admissibility of any expert testimony.  First is the
23    relevance of the testimony.  Second is the reliability of
24    the witness.  I am reading the motion to exclude testimony
25    of -- all I can see is evidence that -- the indication that
```

```
 1    they are challenging the reliability of the testimony, not
 2    the relevance.  And that is what I'm going to presume
 3    because that is what is in writing before the Court.
 4              MR. CASTLE:  I'm sorry, Your Honor.  I didn't hear
 5    that last part.
 6              THE COURT:  That is what is in writing and I can't
 7    read their motion any other way then to say that they are
 8    challenging not the relevance of testimony but the
 9    reliability of the expert witness.  And it would be the
10    Court's presumption that it will make a ruling as to whether
11    or not the testimony is reliable, whether the expert will be
12    allowed to testify.  And if that's the case, then I will, as
13    I always do, require that at the trial you put on ten to 15
14    minutes of questioning about his qualifications, and then I
15    will have him designated as an expert, with his vitae going
16    to the jury for them to determine what they want to from
17    that information.  It would not be my intention to go
18    through this again.  Okay.
19              Ms. Angelos, do you want to respond to that?  You
20    seem to be the one.  Ms. Ramos.
21              MS. ANGELOS:  Your Honor, that is correct.  So the
22    two things that I understand that we would be doing under
23    the reliability factor is, first, is he qualified, and then
24    is his methodology sound.  Those would be the two things we
25    would be dealing with today, Your Honor.
```

```
 1              THE COURT:  That's helpful very much.  Thank you.
 2              That being the case, Mr. Castle, are you prepared
 3    to put the witness on?
 4              MR. CASTLE:  Your Honor, the government is
 5    prepared.  And in light of that, we would call Special Agent
 6    William Shute to the stand.
 7              THE COURT:  Okay.
 8                    WILLIAM D. SHUTE,
 9             Having been duly sworn, was examined
10                  and testified as follows:
11              THE CLERK:  If you would please state and spell
12    your name for the Court.
13              THE WITNESS:  Yes.  William D. Shute.  S-h-u-t-e.
14                   DIRECT EXAMINATION
15    BY MR. CASTLE:
16    Q    What is your occupation?
17    A    Yes, I'm a special agent with the FBI.
18    Q    How long have you been a special agent?
19    A    I have been a special agent for about nine years.
20    Q    Where are you currently assigned?
21    A    In the Philadelphia division.  I work on the violent
22    crimes fugitive task force.
23    Q    On that task force, do you have a special assignment
24    for something that you do in addition to the normal duties
25    an agent would do on that type of a task force?
```

```
 1    A    I have a particular expertise in cell phone technology,

 2    plotting cell towers, tracking movements people are making

 3    when they are making phone calls.

 4    Q    Tell us what education you have gone through to develop

 5    those qualifications.

 6    A    Sure.  The FBI has provided myself and other agents in

 7    the FBI with training as to how cellular telephone

 8    technology works, how cellular telephone network is set up,

 9    how it operates.  We've done that training regarding all the

10    various technologies, GSM, which stands for global standard

11    for mobile communications, IDEN, which stands for integrated

12    digital enhanced network, which is basically Nextel, GSM

13    being T-Mobile, AT&T, and also CDMA, and CDMA stands for

14    code division multiple access, which would be representative

15    of Cricket's network, Sprint, Verizon Wireless, companies

16    like that.  So I've had a lot of training in how those

17    networks operate and how the technology works.

18              I've also had training from an independent private

19    company, ETS.  ETS stands for E.mergent technology support.

20    And that company is comprised of mainly ex-military and

21    ex-government workers ranging from various government

22    entities.  What they do is they provide training in radio

23    frequency theory, radio frequency cell phone analysis,

24    tracking, all those types of things, and they provide that

25    back to specific government entities.  And they are probably
```

```
 1    the best in the world at that training.

 2              I've also had training from the Harris Corporation

 3    in Melbourne, Florida, which is a company that produces

 4    various products for analyzing cellular telephones,

 5    measuring radio frequency.  It's basically an engineering

 6    development company.

 7              And beyond that, I have also had routine daily

 8    interaction with cell phones providers, all the major

 9    providers in the company -- I mean, rather, in the country.

10    And also I'm currently enrolled at Penn State University

11    pursuing my master's degree in what is called geospatial

12    intelligence, basically utilizing mapping programs,

13    sophisticated or non, to locate places on the earth and

14    those reference points that matter to a particular

15    situation.

16    Q    Over what period of time have you been involved in the

17    study of cellular technology?

18    A    In one aspect or another the last nine years,

19    predominantly my entire time as an agent.

20    Q    These FBI courses that you've referenced, how many

21    courses are we talking about?

22    A    I have had two from the FBI, numerous -- probably about

23    four from ETS, and one from the Harris Corporation.  Then I

24    will be going back there in April for additional training.

25    Q    If you could for us just go through the subject matter
```

```
 1   of each one of those training courses.  What is it you have
 2   learned from each one of those courses?
 3   A    I've kind of covered that already in terms of radio
 4   frequency of how the cell phones operate, how they interact
 5   with the tower to how the network is built, how the phones
 6   interact and utilize cell phone towers for service, various
 7   aspects of that type of technology.
 8   Q    Have you had training that involves locating cell phone
 9   devices in real time?
10   A    In real time?
11   Q    Yes.
12   A    Yes.
13   Q    What kind of training have you had in that regard?
14   A    Just a lot of the same.  I mean essentially when a
15   phone call is made, the moment the phone call is made, it's
16   originated and then terminated, it becomes a record on the
17   cell phone network.  So my training is to take the record,
18   you know, that originating cell site, the terminating cell
19   site, and being able to plot that into a geographic area and
20   to be able to determine approximately the range of that
21   tower in relation to that phone call at that moment, so you
22   can make a determination of the geographic location from
23   which that phone made the call.
24   Q    What about training in historical cell phone data?
25   A    Well, again, it's the same exact thing.  The moment a
```

```
 1    phone call is made it's historical in nature.  So as soon as
 2    you receive the information, then that information becomes
 3    historical.  The process by which we use to actively locate
 4    someone right now or by which we plot a historical cell site
 5    analysis is exactly the same.  It's taking the data, it's
 6    analyzing it, breaking it down, figuring out the cell site,
 7    the orientation of that cell tower, the potential range of
 8    it, where that translates into a geographical area, and then
 9    plot it.  It's the same exact -- it's the same exact
10    process.
11    Q    You mentioned you had training in GMS?
12    A    GSM, yes
13    Q    Tell us what that stands for.
14    A    As I said earlier, it stands for global standard for
15    mobile communications.  That is one particular technology
16    that seems to be across the -- internationally and globally,
17    it seems to be the main -- the most preferred technology.
18    But CDMA is a more efficient technology and it is actually
19    growing all across the world as well.
20    Q    Here in the United States which technology is used
21    most?
22    A    It's a combination between CDMA and GSM.  Verizon
23    Wireless is currently the largest cellular telephone
24    provider, and AT&T is just below them in terms of
25    subscribers.  I just read it recently.  So you have pretty
```

1    such GSM and CDMA being very close.  I wouldn't know the

2    exact numbers.  But I know in terms of the amount of users

3    in this country, you know, it could even have CDMA being a

4    little bit more used.

5    Q    So what is the difference in the two technologies?

6    A    The main difference is the way they operate.  I mean

7    GSM utilizes a technology known as TDMA.  That stands for

8    time division multiple access.  Whereas CDMA uses code

9    division multiple access.  Two different technologies

10   operating similarly but different.

11   Q    And in the course of your career of nine years, have

12   you had an opportunity to work with both of these networks?

13   A    Oh, yes, yes, and it's important to note that CDMA and

14   GSM, there are international standards by which these

15   companies are built.  Although a label of a company may look

16   different, such as Cricket or Sprint, the technology on

17   which they are based, how the phones are used, is based on a

18   scientific standard.  It's a published standard that they

19   use and that they correspond to build their network.

20   Q    What is that standard, for example, with CDMA?

21   A    Well, I mean the standard being the way the phone

22   operates, the way the technology operates, the way the

23   signals are emitted, the way the signals are transmitted and

24   then received back on the other end.

25            For example, a smaller network like Cricket

1    doesn't have towers yet in the Philadelphia market.  So if

2    somebody was to take their Cricket cell phone from here, go

3    to Philadelphia, where I'm primarily based out of, you would

4    have a situation where that phone would have to roam on

5    another network.  In Philadelphia, it would have to roam on

6    either Sprint or Verizon Wireless because they are the two

7    CDMA carriers there in Philadelphia.  So the standard has to

8    be the same by which they are used.  If they are not, then

9    the phone won't be able to function on the network.

10   Q    So when it comes to these two networks, then, whoever

11   is using them, whether it's Sprint, for example, or Verizon,

12   they are all using the same scientific standards?

13   A    Yes.

14   Q    They do that so that, for example, if I had a Verizon

15   phone here in Salt Lake, I could go to Philadelphia and use

16   my phone?

17   A    That's correct.

18   Q    You also mentioned -- perhaps you didn't, but let me

19   ask you -- radio frequency theory.  Have you had training in

20   that area?

21   A    Yes.

22   Q    Tell us what that training consisted of.

23   A    Pertaining to actual radios or cell phones?

24   Q    Cell phones.  Okay.  Well, basically, we examine how

25   the cell phone network operates, how the cell phone network

```
1    provides the phone service.  So you have your cell phone
2    network that is comprised of towers.  And the phone utilizes
3    these towers, the frequency emitted from the tower.  So in
4    this case each individual cell phone tower has what is
5    called a channel and they are all on the same frequency
6    channel, but they are coded differently, hence the name code
7    division multiple access.  So you have a cell site sector,
8    you have a cell site sector which is represented by
9    something known as PN offset, which stands for pseudo noise.
10           THE COURT:  Mr. Shute, you use a lot of technical
11   terms.  Would you keep in mind that, number one, the court
12   reporter has got to get everything you say.  And, further,
13   it would be helpful if you use any acronyms to automatically
14   give us what the acronym stands for.
15           THE WITNESS:  Sure.  You got it.
16           So PN stands for pseudo noise.  It's basically a
17   coded signal emitted from the tower that would be
18   representative of that tower and that tower sector.  And so
19   the phone then utilizes that frequency channel, that code,
20   to place it into the right slot to make the phone call.
21           So it's important to note that that PN -- there is
22   one PN per sector, PN offset per sector.  So it would go
23   through all that and how it works and how it operates, how
24   that translates back into call detail records.  Those are
25   the types of things that we go over.
```

```
 1   BY MR. CASTLE:

 2   Q    You mentioned you have regular contact with cell phone

 3   providers.  Why do you do that?

 4   A    Well, because, you know, they have their world as being

 5   a cellular telephone provider and we have our world as law

 6   enforcement.  The more you interact with them, the more you

 7   speak with them about the products they put out, their

 8   records and how they handle it and do business, the better

 9   you are going to be at understanding what you are dealing

10   with and what you get.  My goal is to be able to move very

11   quickly when it comes to a case, be it a fugitive case, a

12   murder case, a victim of child kidnapping, any of these

13   types of things, all of which are examples of cases that

14   I've worked on, to move very fast.  So there is no room for

15   delay in that.  So you have to really understand what is

16   going on and the little idiosyncrasies with each company.

17   Q    Are you also an instructor for the FBI?

18   A    I am, yes, sir.

19   Q    What kind of instructor?

20   A    Well, they have an instructor course known as an

21   instructor development course to make you a certified

22   instructor.  Typically what I do is I instruct other agents,

23   task force officers, detectives in the area of cell phone

24   technology and historical cell site analysis and tracking,

25   things like that.
```

1              The FBI asked me -- or our criminal investigative

2     division asked me if you would create a curriculum, to teach

3     a course, which I've done, and we've taught it about five

4     times and are slotted to teach it another five times this

5     year.  Basically we're teaching, you know, how to take the

6     records, break them down, a three-day course, to criminal

7     agents, how to plot that and how to show where a person was

8     when they made the call.

9     Q    The training that you have received and discussed here

10    with the Court, how many times have you had the opportunity

11    to apply this training?

12    A    Over the last nine years, but predominantly more so in

13    the last three, I personally have used this over 300 times.

14    And now the people that I've trained over the last couple of

15    years, I just checked with FBI headquarters this morning,

16    and they informed me that at least the statistical

17    accomplishments claimed by the people I've trained is over

18    500.  Then there are any number of county detective schools

19    where I instruct at where there is no way of knowing the

20    amount because we don't track that.

21    Q    In terms of the number of times you've applied your

22    training, do you make a distinction in your numbers between

23    real-time cell phone locations versus the historical cell

24    phone analysis?

25    A    They are all historical.  Like I said, from the moment

```
 1    that the phone call is made, that becomes our record in
 2    nature, and then that is -- it's historical the moment that
 3    the phone call is made.
 4    Q    Now across the country have you been requested by
 5    various prosecuting agencies to come in and provide
 6    testimony about cell site historical analysis?
 7    A    Yes.
 8    Q    How many cases would you say you have been involved in
 9    in that capacity?
10    A    Where I provided cell site analysis?
11    Q    Right.
12    A    Probably close to 35.
13    Q    Of those cases, how many have you testified in?
14    A    Yeah, in only a portion of those, mainly because many
15    of them plead guilty or something happened where the
16    testimony is not actually needed.
17    Q    So I have two questions.  Tell us how the cell phone
18    works that enables a person with the kind of training that
19    you have had to identify where not necessarily the person is
20    but the handset was located.  Walk us through that process.
21    A    Okay.  So it would be a basic description of how a cell
22    phone network operates.  You have your phone, which utilizes
23    cell phone towers for service, also known as base stations.
24    And those base stations or cell towers, they are
25    synonymous -- I always get that confused myself -- they are
```

1    utilizing -- see, a lot of people like the word bounce, it

2    bounces off, or hits.  I don't like that.  I prefer to use

3    the phrase utilize because that is what it's doing.

4    Q    What about the word ping?

5    A    I don't like to use that word either.

6    Q    Does it all mean the same thing?

7    A    Yeah.  It all depends on what they are saying, who is

8    saying it.  But to be fair and the way it actually works is

9    that the phone is actually utilizing that cell site and cell

10   site sector for service.  So that is where I -- there are

11   resources being allocated from the tower and then that phone

12   is utilizing those resources to go up on a call.  So, as I

13   say, you have phones and you have cell phone towers.

14          Now within the CDMA network, such as this, you

15   have like a registration zone.  In GSM that would be called

16   a LAC.  So there is a registration zone, which would be a

17   group of towers, and within that area all the towers in that

18   area would report to what is called a switch.  Okay.

19          So the phone call -- the phone is sitting there

20   idle just waiting for a phone call to come in, or waiting to

21   make a phone call.  What happens is the phone is kind of

22   going through these certain measurements.  It's measuring

23   something known as EC over IO.  Basically it stands for

24   energy per chip over -- I believe it's interference.  It's

25   basically a measured -- the EC over IO is a unit of

1   measurement that is determining the quality of the call

2   signal.  So it's doing this, it's measuring.

3           What it does is is the phone is camped on the cell

4   site that it sees best, not just the cell site, but the cell

5   site and cell site sector that it sees best.

6           Now the phone call comes in.  That is the cell

7   site sector where the phone has place the call.  And then

8   from there the network takes over.  When the network takes

9   over, that call could be carried on any number of different

10  cell phone towers along the way in order to provide it with

11  the best possible call quality.  So they record at the

12  switch the originating cell site, where the phone was at the

13  moment that the call was made, or received, initiated, in

14  those terms.

15          Secondly, the phone is then recorded as to where

16  it is when the phone call is terminated.  It does this in

17  the network.  However, Cricket doesn't see fit to provide

18  those records to law enforcement.  It is in fact in their --

19  the matrix of their world, but they don't provide that to

20  law enforcement.  So what we have here in the call detail

21  record in this case is a representation of the cell site

22  sector where the phone was originated.

23  Q    Of the times that you have been requested to testify in

24  court regarding cell site historical analysis, how many

25  times have you qualified as an expert witness?

```
 1    A    Eight times, eight out of nine, and the only reason was
 2    on the very first time it wasn't requested.  There was a
 3    proffer between the defense attorney and the prosecutor and
 4    they just determined that it was best just to handle it as
 5    is.
 6    Q    Has that occurred both in federal and state court?
 7    A    Yes.  I've testified in the district of -- federal
 8    district of New Jersey.
 9              THE COURT:  Mr. Shute, that's okay, that's not
10    been requested of you, that answer.  I want us to move this
11    on as quickly as we can.
12              THE WITNESS:  Five different courts is that
13    answer.
14    BY MR. CASTLE:
15    Q    The procedure that you talked about, that you apply
16    when you are doing a cell site historical analysis, did you
17    apply that procedure here to the case involving Mr. James
18    Allums?
19    A    Yes, I did.
20    Q    As part of that procedure, were you given certain
21    information regarding his cell number?
22    A    Yes, his cell phone number as well as his call detail
23    records with cell site information.
24              MR. CASTLE:  Your Honor, I have books of exhibits,
25    one for the Court, one for the witness.  I would like to go
```

 1    through those right now, if I could.

 2              THE COURT:  Frankly, I don't want them at all.

 3              I'm just kidding.  Thank you.  When you are

 4    talking about books, you can imagine that is quite

 5    intimidating.

 6              I trust defense counsel have copies of this?

 7              MR. CASTLE:  That's correct, Your Honor.

 8    BY MR. CASTLE:

 9    Q    Special Agent Shute, let me just ask you two questions

10    before we get into this.  Tell us what a cell site is.

11    A    A cell site -- a cell site is basically the cellular

12    telephone tower or the device that you would know that

13    provides service.  Sometimes it's not physically on a tower.

14    Sometimes, as in this case, I believe cell site 50 was on

15    top of a building.  It doesn't have to be a physical

16    structure, but it represents the device by which the cell

17    phone company provides service.  That generally is a

18    three-sector tower.  Not always, but generally.

19    Q    How are the sectors designated?

20    A    How are they designated?

21    Q    Yeah, in the sense -- well, how are they designated?

22    A    Sure.  Each company does it different, but what Cricket

23    does is they have what they call an engineer's list.  They

24    provide a list.  They give it a number.  That number

25    corresponds to a location.  They generally have an address

1    for it as well as a latitude and longitude so they know

2    exactly where that is in relation to any other tower out

3    there.

4              On the network, each cell site, meaning each cell

5    site sector has its own what is called a base station ID,

6    meaning cell phone tower identifier.  And each one has their

7    own what is called PN, PN offset basically, the pseudo

8    noise, that kind of code that gets sent from the tower

9    sector to the phone.  So that is how they are designated.

10   But what happens is Cricket then translates that, say, for

11   example, in cell site 50, it may have a different base

12   station ID at the actual location because that is just the

13   way Cricket builds their network, but that base station ID

14   actually corresponds to one of their cell phone towers and

15   it's recorded as such.

16   Q    Do cell phone companies typically have physical

17   addresses for their cell sites?

18   A    Yeah.  Every company I've ever seen, all the major ones

19   and even smaller ones, they have a tower number.  If they

20   don't have the address and latitude and longitude, they at

21   least have a latitude and longitude.  Keep in mind, if a

22   cell phone tower goes down in a general geographic area,

23   there could be a loss of calls and thereby not providing the

24   best call quality or service to their customers.  So it's

25   imperative for them to know exactly where that tower is

1    should there be a problem.

2    Q    Now you've talked about sectors.  What is the

3    association of a sector with a cell site?

4    A    Well, each cell phone tower, at least all the ones in

5    this particular case, have three sectors.  Each sector has

6    its own PN, has its own pseudo noise offset, and it has its

7    own number -- number and sector designation.  Say, for

8    example, in the call detail records here, you will see a

9    cell site, but you also see a sector designation with that.

10   Q    Do the sector designations all have the same

11   geographical designation?

12   A    No.  Meaning are they all omnidirectional?  No, they

13   are not.

14   Q    Are they all the same size geographically?

15   A    Geographically speaking, generally they are all about

16   120 degrees.  But that having been said, on one of the

17   examples, I believe it was cell site 50, it was a little

18   less than that because it's up against the mountain so there

19   is no reason for them to shoot too much signal towards the

20   mountain because there is nobody living there.  Generally

21   speaking, you will have an orientation of three different

22   sectors, each representing close to 120 degrees.

23   Q    Does the measurement begin starting north or starting

24   in some other direction?  If it's 0 to 120 degrees, in

25   relationship to what I guess is my questions.

1    A    It's really in relationship to how the network -- how

2    they decide to lay out their network.  They have to do what

3    is best for them for best call quality.  That's why often in

4    these cases it's hard to make a determination.  Like in

5    Philadelphia, I've worked so much in that area, I know the

6    way all the towers are oriented.  Many of them I've done

7    training off of or I've had cases where I testified or I did

8    an analysis for.

9            But when I come here to Salt Lake City, an area or

10   market that I'm not familiar with, I think it's imperative

11   to go to the tower, verify its existence, then verify both

12   by sketching it out as well as taking certain gear to test

13   it to be able no measure the exact orientation of that

14   tower, which is what I did in this case.

15           THE COURT:  When you are talking about a

16   120-degree angle, are you talking about the angle from the

17   top of the tower based from the base of the tower outward

18   and up?  For example, that thunderbolt line there, would

19   that be an example of 120 degrees?

20           THE WITNESS:  Right.  Like this, Your Honor,

21   basically 120 degrees.  If you had a circle -- if you are

22   looking down on it and had a circular area, it would be kind

23   of at 120 degrees.

24           THE COURT:  You are looking down at a 120-degree

25   coverage?

```
 1              THE WITNESS:  Correct, generally speaking.

 2              THE COURT:  Thank you.

 3    BY MR. CASTLE:

 4    Q     Your experience, at least out here with the towers that

 5    you tested, indicated that they had three sectors?

 6    A     Oh, yes, they did.

 7    Q     Are these sectors designated by alpha, beta, gamma?

 8    A     That is the way we view them as, yes.  They have

 9    separate, like I said, base station IDs, separate codes off

10    of each one.  That's the way they are.  But each company

11    does it differently.  I believe, having interactions with

12    the gentleman from Verisign that indicated that, yes, they

13    do take a binary code, meaning their alpha designator, their

14    beta designator, their gamma designator, and then that

15    translates into a sector number, and in this case two, three

16    or four.

17    Q     Why not one, two, three?

18    A     Why not?

19    Q     Yeah.

20    A     Because in this market here, this market -- Cricket's

21    market here was put up by Lucent.  The company Lucent built

22    all their towers.  As a result, it's just the way Lucent

23    does business.  Lucent records their data as a two

24    designation for the alpha, a three designation for the beta,

25    and a four designation for the gamma.
```

1    Q   Do you understand how it is that the information

2    generated from a cell phone is stored, translated and then

3    placed into -- you've mentioned record, a call detail

4    record?

5    A   Yeah.  Every company does it differently.  Most

6    companies handle their call detail reports themselves.  I

7    believe Cricket chooses to outsource it to a company known

8    as Verisign, which is now I believe Convergys.  They just

9    got bought out.  And, you know, they take the data -- all

10    the data recorded at the switch, again, cell phone towers

11    through that zone recorded at the switch, they take that

12    data and that is what Verisign has then taken from them and

13    translating into basically what you see as an Excel

14    spreadsheet, each call -- detailing each call, the call

15    made, the call time, the duration, the cell site used.

16    Q   Can I have you turn to Exhibit 1 of the notebook that

17    you have been handed?

18    A   Yes.

19    Q   Can you tell us what Exhibit 1 is?

20    A   This is I guess my CV that I provided to you guys a

21    while ago.

22    Q   Is it current?

23    A   Yeah, fairly current.  I testified last week in a case,

24    so a lot of times I'll put them down.  But I testified as an

25    expert witness in the Eastern District of Pennsylvania last

```
 1   week.

 2          MR. CASTLE:  Your Honor, we would move to admit

 3   Exhibit No. 1.

 4          MS. ANGELOS:  No objection, Your Honor.

 5          THE COURT:  It will be admitted.

 6          (Plaintiff's Exhibit 1 was received into

 7   evidence.)

 8          MR. CASTLE:  Your Honor, we would at this point

 9   request that Special Agent Shute be designated as an expert

10   witness in the field of cell site historical analysis.

11          THE COURT:  My assumption is that's what this case

12   is all about, so I think it's premature for you to do that.

13   BY MR. CASTLE:

14   Q    Let's go back then, Special Agent Shute, to your

15   involvement in this case.  Let me have you turn to

16   Government's Exhibit No. 4, if you would.

17          Do you recognize that exhibit?

18   A    It's the Salt Lake City cell sites for Cricket.

19   Q    Is this a document that you relied upon for your

20   analysis to determine historical cell site data?

21   A    It was -- there were two actual cell site lists which

22   did match up.  It's just one had more information than the

23   other.  I don't remember which one I used, but I do recall

24   making sure they were the same, meaning that, you know, cell

25   site 71 had the same information.  I believe this one has a
```

```
 1    little bit more information than another one.

 2              MR. CASTLE:  Your Honor, I would move to admit

 3    Government Exhibit No. 4.

 4              MS. ANGELOS:  Your Honor, the only objection I

 5    would have is if he can say this is the one that I used in

 6    my analysis.

 7              THE COURT:  Well, has this witness prepared an

 8    expert witness's report?

 9              MS. ANGELOS:  Your Honor, the only report that we

10    have is this Pin Point.  He doesn't have any methodology

11    behind that with the report -- with the Pin Point

12    presentation.

13              THE COURT:  All right.  Well, again, the question

14    to you, Special Agent, is this Exhibit 4 what you relied

15    upon in preparing your expert report?

16              THE WITNESS:  I would say yes.

17              THE COURT:  All right.  Being answered yes, are

18    you going to object to its admission?

19              MS. ANGELOS:  No, Your Honor.

20              THE COURT:  It will be admitted.

21              (Plaintiff's Exhibit 4 was received into

22    evidence.)

23    BY MR. CASTLE:

24    Q    Now I would have you turn to Government's Exhibit 5.

25    Do you recognize this exhibit?
```

1   A   Yes, these are the call detail records that were used

2   in this analysis.

3   Q   Was this the call detail record you used for the number

4   assigned to Mr. Allums, that number being 801-654-0247?

5   A   Yes.

6   Q   In addition to Exhibits 4 and 5, will you also -- what

7   other information did you rely on or use to create your

8   report?

9   A   Well, like I said, because the only way I think you

10  could truly make a determination of a particular range of a

11  tower in relation to a phone call at any given moment is to

12  take into consideration the cell phone network.  So what I

13  did was I came out here in early November of last year and I

14  took a cell phone that would mirror the same type of phone,

15  most phones are generally the same, and used a handset to --

16  basically I pushed it into engineering mode and watched the

17  actual cell tower that it was utilizing, and also the sector

18  PN.

19       And what we did was we actually used the phone as

20  well as radio frequency measuring gear to see the best

21  possible signal.  Then what we did was drove in various

22  areas, directions, also the locations of the actual crimes

23  themselves, and was observing the phone tower that that

24  particular phone would be camped on at that given moment.

25       So, you know, doing it, it was basically

1    conducting what we call drive test data basically showing

2    the geographic breadth of that particular cell site and cell

3    site sector.

4    Q   Using a cell phone the way you've described it, is that

5    generally accepted in the industry in terms of locating cell

6    towers?

7    A   I'm sorry.  Could you say that again?

8    Q   The way in which you used the cell phone, you indicated

9    that you came out to Salt Lake and you bought a cell phone?

10    A   Yes.

11    Q   You signed up for the Cricket cell service?

12    A   Yes, the FBI here in Salt Lake City did.

13    Q   On your behalf?

14    A   Correct.

15    Q   Then you converted it into, as you mentioned, an

16    engineering mode?

17    A   Yes.

18    Q   And the purpose of doing that was what?

19    A   So that -- well, because what is happening is your

20    phone is doing all these things I explained earlier,

21    measuring its best signal.  When in engineering mode, you

22    can actually see what it's doing, when you have your nice

23    little screen saver on there, picture of your kids, inside

24    the phone it's going through these measurements, it's kind

25    of remeasuring the actual best cell site and cell site

```
 1   sector, you know, to provide service.  So when you push the

 2   phone into engineering mode, just about every phone will do

 3   it, you just have to find the right code to push on the

 4   buttons, you can actually visually see what is happening

 5   about what I'm describing.

 6   Q    So your explanation is in using a phone like that, is

 7   it generally accepted practice in the industry to use a

 8   phone, convert it to its engineering mode to determine the

 9   strength, location of a cell tower signal?

10   A    Oh, yes.  In fact, you know, if you ever see the

11   Verizon Wireless commercial, can you hear me now, it's based

12   on jest, but it's actually based on reality, cell phone

13   networks actually do this for data testing to determine, you

14   know, the range of a tower to make sure that they have

15   coverage in an area, that there are proper overlaps so that

16   they can provide you with the best possible call quality.

17   Q    Then you mentioned you brought some other gear with

18   you.  Could you explain what that other gear was?

19   A    Yes.  Radio frequency measuring gear, measures the

20   radio frequency of the cell phone tower, the measurements of

21   which I talked about, that EC over IO, to measure the best

22   signals in the area.  It also will record the base station

23   ID, the latitude, longitude.

24        So what we did is I took the -- in one particular

25   column, I matched that latitude and longitude up with each
```

```
 1    corresponding cell site.  So in this case, say it was cell
 2    site 50, I made sure that the latitude and longitude on the
 3    cell site that was being emitted from the tower was the same
 4    as what Cricket had on their tower list.
 5    Q    What is the name of this equipment?
 6    A    The equipment that I used was from the Harris
 7    Corporation called the Sting Ray.
 8    Q    Is that particular piece of equipment commonly used in
 9    the cell phone industry to verify the information you have
10    talked about?
11    A    Yes.  I mean various companies produce varies pieces of
12    equipment all doing the same thing.
13    Q    You used two pieces of equipment when you came out to
14    Salt Lake?
15    A    I used the device known as the Sting Ray as well as the
16    engineering cell phone.
17    Q    Why did you use both of them and not one or the other?
18    A    Well, you know why, because the Sting Ray actually has
19    better antenna systems in it.  So in order to get a more
20    real depiction of what a phone would have seen at that time,
21    you have to base it on what the phone is seeing.  The device
22    will tell you certain numbers like the latitude and
23    longitude, and some of the numbers that you need to make the
24    correspondence.  However, the phone is actually the more
25    real depiction of what a phone would have seen in that
```

```
1    particular cell site sector.

2    Q    When you came out here to Salt Lake, were you provided

3    information about when the robberies occurred for which

4    Mr. Allums is accused?

5    A    Yes.

6    Q    Were you provided the dates and times?

7    A    Yes, I was.

8    Q    Were you provided the location of the businesses

9    robbed?

10   A    Yes, I was.

11   Q    With that information in mind, tell me what procedure

12   you then followed to verify that the towers nearest those

13   businesses were properly working.

14   A    Well, what we did is came and went to the actual --

15        MS. ANGELOS:  Your Honor, could I clarify we.

16        THE WITNESS:  I'm sorry.  There was another agent

17   from the Phoenix division who drove me because I have to use

18   the gear in the back of a van, so another agent drove.  I'm

19   sorry, I say we because there were two of us.  I was doing

20   all the gear operating, but he was driving.

21        Okay.  So we were driving around and we would go

22   to each location.  I believe what we tried to do was go to

23   each location close to the approximate time of each robbery,

24   at least we tried to the best we could.  I can't remember

25   exactly right now, mainly because the cell phone tower, the
```

1    range could be different at any given time a day.  Usually

2    later in the evening when it's cooler or wet atmosphere

3    conditions, the cell phone -- the cell phone tower could

4    breathe a little bit more than it would in a warm

5    environment.  So I tried to go at the same exact time of

6    day, keeping the understanding that I forget the exact dates

7    of the actual robberies.  I could only come that week of

8    November when I came.

9    Q    So during the time you were here, did you go to Kmart,

10   for example?

11   A    Yes, I went to all the locations, the Kmart, the Home

12   Savings Bank, I believe there was another bank.  We went to

13   all locations and tried to take measurements and using that

14   engineering cell phone at each location to determine the

15   cell site sector that the phone was camped on at that moment

16   just to see if it was possible that the suspect could have

17   been in that range at that location at the time that they

18   made the call.

19           I also then went and was checking the range of the

20   towers, again, in relation to a phone.  I mean a cell phone

21   tower could technically emit signals, you know, much further

22   than what we have, but you have to take into consideration

23   the phone and the phone network plays a vital role in this.

24   So what I was doing was trying to see when it was that the

25   cell phone network would actually hand off the phone to

1    another tower in that general direction.

2           So what I did was I created a tower range based

3    upon -- based on an actual phone, what an actual phone saw

4    in that area.

5    Q    Before going to the Kmart -- do you recall the address

6    of the Kmart?

7    A    I don't.  It's on the slides here.

8    Q    Okay.  The cell detail records that you were provided,

9    what kind of information was provided in the call detail

10   records?

11   A    Well, it's the phone number, the number in question,

12   the number that made the phone call, generally the duration

13   of the call.  They give you the originating cell site

14   sector.  I believe Cricket does a thing where they will tell

15   you if it's ML or LM, mobile to land, land to mobile.

16   Typically if you see an ML, mobile to land, it's an outgoing

17   call.  If it's an LM, it's usually an incoming call, things

18   like that.  It gives you various different columns which are

19   displayed in this report as well as one of the government

20   exhibits here.  I believe it's 5 -- 4 or 5.

21   Q    Now with respect to 5, you were aware that the Kmart

22   robbery occurred on October 23rd of 2007 at approximately

23   9:00 p.m.?

24   A    Yes.

25   Q    Did you --

```
 1              THE COURT:  Excuse me, Mr. Castle.  I need to
 2    interrupt.  First of all, are you going to offer the
 3    admission of Exhibit 5?
 4              MR. CASTLE:  Yes, Your Honor, I do.
 5              THE COURT:  Any objection?
 6              MS. ANGELOS:  No, Your Honor.
 7              THE COURT:  It will be admitted.
 8              (Plaintiff's Exhibit 5 was received into
 9    evidence.)
10              THE COURT: Mr. Castle and counsel for the
11    defendant, you need to know that I have to leave here by
12    about ten minutes to five.  I hope you will keep that in
13    mind as you question these witnesses.  Okay.
14    BY MR. CASTLE:
15    Q    Did you have an opportunity to look at Government's
16    Exhibit No. 5 relating to the date of 10-23-07 around the
17    time of nine o'clock?
18    A    Yes, I did.
19    Q    What were you able to at least see from Exhibit 5
20    related to this cell number that is depicted in Exhibit No.
21    5 related to the date and time of the robbery at Kmart?
22    A    Are we going to go through the slides?
23    Q    Sure.
24              This is testimony you have already provided,
25    correct, regarding towers and --
```

1  A    Yes.

2              MR. CASTLE:  Sorry, Your Honor, we didn't know how

3  to convert it, so it just went from page to page.

4  BY MR. CASTLE:

5  Q    Tell us what this page is right here, Special Agent

6  Shute.

7  A    So this is basically the call detail records, just

8  copied and pasted onto the slide.

9              THE COURT:  Part of Exhibit 5?

10             THE WITNESS:  Yes, part of Exhibit 5.

11             And what I have there highlighted in red are the

12 calls that I am about to display.  It shows the date and it

13 shows the time of the call.  And then if you look off to the

14 right where it says cell, that is the cell site.

15             Now there was a lot of contention regarding a cell

16 site on Cricket's part of whether or not they could

17 determine a cell site sector.  And my experience with all

18 the various companies is because each cell site sector emits

19 its own signal, its own PN and, then, of course, there would

20 be its own cell site sector.

21             What you see here is this five-digit designation

22 in the cell column.  You see first the S, and the S is

23 representative of the way Cricket Communications codes, and

24 then Verisign, the company that does the translation of the

25 records, translates it.  S means the Salt Lake City market.

1   So you know you are in the Salt Lake City market.

2           The next digit is representative of the tower

3   sector.  So what you have here is a tower sector and you are

4   going to see either a two, a three or a four because this

5   market here is Lucent, meaning the Lucent Company built the

6   tower system here.  So the two, the three and the four is

7   the tower sector designation.

8           Then the last three digits would be representative

9   of the actual cell phone tower, the physical location of

10  that particular cell site.

11          So that is what we have here.  This would be

12  representative of where the defendant's phone was

13  approximately an hour to 15 minutes prior to the robbery of

14  the Kmart.

15  BY MR. CASTLE:

16  Q   And in terms of locating cell tower locations, you

17  relied on Exhibit 4 for that?

18  A   Yes.

19  Q   Tell us what this exhibit is.

20  A   Well, what this is is this is an exhibit that shows the

21  cell site sectors, their locations, as well as the location

22  of the Kmart.  It is basically a geographical representation

23  of the last slide that we just showed.  This is just showing

24  the range of that tower, omnidirectionally because at one

25  point during the various conversations that we had in

```
 1    preparing evidence at the trial was that Cricket was not
 2    able to determine a cell site sector.  That has since been
 3    proven to be incorrect, at least through our conversations
 4    with both Cricket and Verisign, that they do in fact have
 5    sector designations, which is what I found when I was here.
 6    But this is the range of that tower in relation to a phone,
 7    the test phone that I used, and it's just showing where the
 8    phone was first at about eight o'clock and then again at
 9    about 8:11.
10    Q    In terms of historical data?
11    A    Historical, yes.
12    Q    What you attempted to do with this particular slide is
13    plot where Mr. Allums' handset was either before or after
14    the robbery at Kmart?
15    A    Yeah.  Typically I'll take a significant amount of time
16    prior to the crime and look to see where the phone was.
17    This is where the phone was in that general geographical
18    area there.
19    Q    How did you determine that general geographic area?
20    A    Again, using the gear that I used, the cell phone, and
21    measuring when the phone would switch and hand off to the
22    next tower in that area.  So the first call would have been
23    46 and the second call would have been down there on cell
24    site 50.
25    Q    The 46 that we see on this particular exhibit, that is
```

1    the tower number?

2    A    Yes, that's correct.

3    Q    And then the next round circle, what tower number are

4    we dealing with?

5    A    Fifty.

6    Q    And then did you with respect to this location do some

7    other testing?

8    A    In relation to this one here?

9    Q    Right.

10   A    I don't know if it's coming up next, but I did do a --

11   it's going to go through where the phone was in the next

12   couple calls.  You are probably getting to the drive test --

13   the drive that's coming up.

14   Q    Tell us what this exhibit is.

15   A    So these are the phone calls -- the next two phone

16   calls that he made at the seven -- what is 1914, so that's

17   7:14, and also at 2007, which would be 8:07.  And it's just,

18   again, showing the phone was moving around throughout that

19   time frame.

20   Q    Then our next exhibit?

21   A    Yeah, that is showing where the first two towers were

22   where calls were made and then the next two if you were to

23   hit the advance button.

24   Q    So what you have done is you have included towers 54

25   and towers 52?

```
 1   A    Yeah, because they were the next two cell sites used.

 2   Q    Based on what information?

 3   A    Based on the call detail report recorded by Cricket's

 4   network.

 5            THE COURT:  Mr. Castle, is it really necessary for

 6   you to go through each of these?  I think the emphasis here

 7   ought to be in the special agent's methodology and the

 8   reliability of that methodology.  I don't think it's

 9   necessary for the Court to see all the testimony that he

10   intends to present if it is all based on the same

11   methodology.

12            MR. CASTLE:  Well, Your Honor, we could speed this

13   up by asking that question.

14   BY MR. CASTLE:

15   Q    The methodology that you have been talking about, is it

16   the same methodology that you used involving the Kmart

17   robbery, the Salt Lake City Credit Union robbery, and the

18   Home Savings Bank robbery?

19   A    Yes.

20   Q    And based on that methodology, is that a methodology

21   that is generally accepted in the industry for identifying

22   the location of handset devices in a CDMA network?

23   A    Yes.  We also use test phones to mirror what the target

24   phone is going to be doing and what the target phone would

25   be seeing.
```

1    Q    Have you had an opportunity to talk with Cricket about

2    their call detail records?

3    A    Numerous times.

4    Q    And there was some question in talking with them about

5    whether they would provide sector information?

6    A    Initially there was, yes.

7    Q    What additional information have you learned regarding

8    their ability to provide sector information?

9    A    Well, you see, Cricket, when you call their law

10   enforcement relations number, typically you have people that

11   are -- you know, people that are processing records, trying

12   to field calls.  But there are usually two groups.  There is

13   the subpoena compliance side and then there is the

14   engineering side.  What I've come to realize is that rarely

15   do the two speak.  They don't interact as much as we would

16   probably like them to.

17          What we've been able to find out is that in fact

18   not only are there clearly on all of these towers three

19   clear sectors, but that in fact that data is recorded into

20   their network at their switch, and that Verisign, the

21   company, does have a way to take that binary code and crunch

22   it down and decipher that that actually corresponds to a

23   cell site sector.

24   Q    Are there factors that can come into play to reflect

25   whether a cell phone even hits a particular tower or not?

1    A     Sure.  There could be any number of different things

2    ranging from atmosphere conditions to structures blocking

3    it.  You know, you get into a certain thing -- keep in mind,

4    we're dealing with a radio frequency, so line of sight is a

5    big thing, reflection, radio frequency signals bouncing off

6    objects, refraction, when one hits the location where it

7    goes, the direction it goes in and how it's propagated from

8    there.  There are various things to consider, which is why

9    the best way to do this sort of thing -- and it's the same

10   method by which we used to find, myself personally, 300

11   people, the rest of the guys that I work with another 500

12   people.  I know it's done by us, other agencies, U.S.

13   Marshals, Secret Service, any different number of agencies

14   all over the country every day.

15           Keep in mind, just this morning I had interactions

16   with another cell phone provider that said they get ten

17   requests a day on exigent circumstances to know the sector

18   of where a person is right now so law enforcement can take

19   some sort of action.  This is done every single day all

20   across the country, you know, with all various cell phone

21   providers.

22   Q   When it comes to Mr. Allums' call detail records, how

23   do we know that some of these other factors weren't in play

24   and, in fact, the sector and tower numbers identified in his

25   call detail records aren't incorrect?

1    A    Well, because you have to understand that the cell

2    phone network has allocated certain resources.  That tower

3    and that tower sector is representative of a geographical

4    area.  Cricket will tell you that they want to try to narrow

5    it down to that area to provide service.

6         So when a person is making that call -- so as long

7    as you've done drive test data to determine the scope of

8    that tower range and you know when the phone would then

9    switch to the next sector or the next tower, then you can

10   accurately depict where that range is and what that

11   translates to geographically.

12   Q    It's the cell company's objective to construct towers

13   so that they -- so that cell phones, when they are used, are

14   hitting the closest tower?  Is that their objective?

15   A    That's their objective, but it's not always the case.

16   In certain circumstances a tower could be up on a mountain

17   utilizing that because it has the best line of sight.

18        But in this case here, you know, I didn't find

19   that to be the case.  In this case here, we were trying to

20   measure out the cell site and when that phone would actually

21   hand off to the next tower, when it would be camped on

22   another tower.  So what you have here are the approximate

23   ranges of those cell phone towers in relation to an actual

24   handset, not in relation to how far a tower actually blasts

25   its energy out.  This is in relation to an actual phone.

```
 1    Q    You came out a year later?

 2    A    Correct.

 3    Q    So how do you know that the information contained in

 4    Mr. Allums' call detail records is reliable information if

 5    you came out a year later to do all this testing that you've

 6    talked about?

 7    A    Right.  I wouldn't know specifically, I would have to

 8    ask, and I have done that before in a case in Tennessee.  I

 9    had to go ask the site engineer, sir, has there been any

10    changes in the tower, the tower structure, anything in the

11    notes, because, you know, the site engineer keeps record of

12    all that.

13              THE COURT:  Have you done that in this case?

14              THE WITNESS:  I did.  I requested that of Cricket

15    and they were not able to say that there were any changes or

16    anomalies or problems with the network.

17    BY MR. CASTLE:

18    Q    Your request was to provide copies of any work orders

19    that might have been issued to repair the cell towers that

20    were the subject of your study?

21    A    I believe we asked for that and I think through legal

22    process you may have asked for that.  Nothing was ever

23    provided saying there were any problems or work orders or

24    changes in the tower.  Typically, if it's working, then they

25    are not going to change that.  If I take various networks --
```

```
 1          THE COURT:  Mr. Shute, I'm sorry.  I've just got
 2    to ask you to make your answers very brief.  He's only got
 3    five minutes more.
 4          THE WITNESS:  Okay.
 5          MR. CASTLE:  Your Honor, then we would, as part of
 6    our presentation, move to admit Exhibit No. 6.
 7          THE WITNESS:  Mr. Castle, based on the outcome of
 8    this hearing, keep in mind, you know, we'll have to, you
 9    know, upon the new information learned from Cricket -- which
10    is not new to me, I have known this all along -- we would
11    have to redraw the sector designations in this report here.
12    This is just omnidirectional.
13    BY MR. CASTLE:
14    Q    I'm going to have you look at Government's Exhibit 14.
15    Tell us what that is.
16    A    These are call detail reports of the phone that I
17    utilized while I was here.
18    Q    Were you able to verify reliability information
19    contained in Exhibit 14?
20    A    Yes.
21    Q    How did you go about doing that?
22    A    These are the phone calls that I made when I was at
23    these various locations.  I was basically trying to test the
24    tower to see where the phone that I had was -- you know,
25    where it was using for a serving cell site when it made the
```

```
 1    phone calls.  So some of these calls represent where I was
 2    at different points in time.
 3    Q    And do they correlate to the sectors and cell site
 4    towers you were at?
 5    A    Yes, they do actually.
 6              MR. CASTLE:  Your Honor, I would move for the
 7    admission of Government's Exhibit 14.
 8              THE COURT:  Six and 14?
 9              MS. ANGELOS:  I have no objection, Your Honor.
10              THE COURT:  Exhibit 6 and 14 will be admitted.
11              (Plaintiff's Exhibits 6 and 14 were received into
12    evidence.)
13              MR. CASTLE:  Yes, Your Honor.
14              If I could just have a second, Your Honor?
15              THE COURT:  Go ahead.
16    BY MR. CASTLE:
17    Q    Special Agent Shute, you mentioned this issue that you
18    were having with Cricket regarding sector designations?
19    A    Yes.
20    Q    How was it you were able to clarify, at least in your
21    mind, that Cricket in fact does have sectors within their
22    towers?
23    A    Well, first of all, just by a general understanding of
24    the CDMA technology, I knew that there were different
25    sectors.  When I came out here and tested it and basically
```

```
 1   drove around the towers, spent significant time, over three

 2   days at each tower, I can see there are three clear base

 3   station IDs, three clear PNs coming off of each tower.  You

 4   know, you were able to sketch it out and then modify that

 5   based on where the phone would switch as I drove across

 6   those boundaries lines.  And so -- I'm sorry.

 7           THE COURT:  I think you've answered the question.

 8   BY MR. CASTLE:

 9   Q    Did you have an opportunity to speak to a Michael

10   Vlassis?

11   A    Yes.

12   Q    Who is he with?

13   A    He is with Verisign, now Convergys.

14   Q    What function does Verisign provide to Cricket or

15   Convergys.

16   A    They take the data that is recorded at the switch for

17   Cricket Communications and other cell phone companies, and

18   they translate that into a call detail report.  Basically

19   what you seen on the previous slide where it says the phone

20   call, the date, the time, the cell site, they take that, and

21   particularly the most important part, they take that binary

22   code that is generated from that cell site sector and they

23   translate that into a numeric designation, as you see here,

24   two, three or four because it follows the Lucent technology

25   standard format for that type of thing.
```

```
 1    Q    When you were visiting with Mr. Vlassis, was he able to

 2    verify the reliability of the cell numbers and sector

 3    numbers in Exhibit 14?

 4    A    Yes.

 5    Q    How was he able to do that?

 6    A    Well, I believe he is the director --

 7              MS. ANGELOS:  Your Honor, I'm going to object to

 8    that question.  I think Mr. Vlassis can actually answer

 9    those questions.

10              THE COURT:  I would agree.

11              MR. CASTLE:  That's all I have, Your Honor.

12              THE COURT:  Thank you, Mr. Castle.

13              Special Agent, I would again ask you to please

14    specifically try to be as brief and precise in your answer

15    as possible.

16              THE WITNESS:  Yes, Your Honor.

17                         CROSS-EXAMINATION

18    BY MS. ANGELOS:

19    Q    Hello, Mr. Shute.

20    A    Hello.

21    Q    You indicate in your resume that you've taken an FBI

22    cellular technology course, and I think you told us today

23    you've done it two times; is that correct?

24    A    Recently, between the time I sent you the CV, there was

25    an online course that the FBI offers through a Web-based
```

1    training and I took that as well.

2    Q    So two times total?

3    A    Yeah, two different courses.

4    Q    How long was the course?

5    A    Which course?

6    Q    The first one.  How long was the first course?

7    A    A week long.

8    Q    How long was the second course?

9    A    The second one was a Web-based course that took

10   somewhere around four hours to complete.

11   Q    Was there a manual used in either one of them?

12   A    A manual?  I mean the FBI has a, you know, lesson plan

13   they utilize for that.  I don't know what it is.

14   Q    Were there any specific books that you were required to

15   read?

16   A    Online courses, no.

17   Q    For those courses?

18   A    No.

19   Q    Did you have to take a test afterward to show

20   successful completion of the course?

21   A    Yes.  In the Web-based course, yes.  And then the

22   week-long course, it was more of a practical exercise in

23   practicality.

24   Q    And then you also indicate that you have received

25   training in the cellular technology from a private company

1    known as ETS.  I think you testified today that was five

2    times; is that correct?

3    A    Yes, and the people there, I interact with them

4    frequently.

5    Q    How long was that training each time?

6    A    The first one was two weeks long, the second one was a

7    week long, and then after that each of the other three were

8    a week long.

9    Q    And was there any manual that was used in that type of

10   training?

11   A    There was -- again, the ETS is a private company, they

12   have their own proprietary information that they utilize to

13   train people.  Yes, they have their manuals and guides.

14   Q    Were there any specific books you were required to read

15   outside their manual?

16   A    They provided us with certain books, a GSM book, a CDMA

17   technology book where we just look at excerpts from the

18   book.

19   Q    Do you know the names of those books?

20   A    I don't know, but one was something to the effect of

21   GSM made simple.  I don't remember it now.  It was a couple

22   years ago.

23   Q    Did you have to take a test afterward to show

24   successful completion of these courses?

25   A    Yes.  We have quizzes and then I believe we also had a

1    practical exercise to make sure you understood the concepts

2    of being able to locate phones in certain areas.

3    Q    Where did you go to college?

4    A    Rutgers University.

5    Q    What was your degree in?

6    A    Psychology.

7    Q    So you don't have a degree in mathematics?

8    A    No.

9    Q    You don't have a degree in engineering?

10   A    No.

11   Q    Have you ever worked for a cell phone company?

12   A    No, ma'am.

13   Q    What type of training do you have specifically in

14   regard to the collection of these type of records, the

15   historical records?

16   A    The collection is the duty of the actual cell phone

17   provider.  They do the collecting of it.  Where we come in

18   is we take the data that they have collected and then we

19   analyze it, break it down, translate that into a

20   geographical area.

21   Q    Do you have any training with regards to the collection

22   of those records?  Have you ever done any type of training?

23   A    There would be no type of training done.

24   Q    What type of training do you have with regard to the

25   interpretation and analysis of these types of records?

```
 1    A    Okay.  That would be all these various courses that
 2    we've talked about where we take the records, we break them
 3    down, figure out the geographical scope of a particular cell
 4    phone tower, and then go and look for that handset in that
 5    given area.
 6    Q    Do you have any type of certification or accreditation
 7    with respect to cellular data analysis?
 8    A    Cellular data analysis?
 9    Q    Cellular tower data analysis.
10    A    Accredited -- to my knowledge there exists no
11    accreditation of it.  It's just, as we would call it, the
12    school of hard knocks, doing it every day, you know,
13    practical use.
14    Q    Do you have any certification or accreditations in
15    radio frequency engineering principles?
16    A    No.
17    Q    In your resume, and I think today you also testified
18    that you have indicated that you successfully used project
19    Pin Point, the survey mapping process -- in your resume it
20    says 250 times, but I think you said 300 times today.
21    That's using cellular telephone historical records; is that
22    correct?
23    A    Yes.
24    Q    But you are not really using the same type of analysis
25    on fugitive cases that you would be using in this type of
```

1    case, are you?

2    A    Yes, I am.

3    Q    Let's walk through a fugitive case.  On a fugitive

4    case, do you acquire historical records in that case?

5    A    Yes.

6    Q    What period of days -- how many days would you make --

7    how many -- how many days would you make a request on?

8    Would you want 30 days of historical records in a certain

9    period, 60 days?

10   A    It's case specific.  I generally go with 30 days, but

11   you have to take into consideration the -- well, you have to

12   take into consideration what has happened with this

13   particular suspect.  Did he just shoot somebody three days

14   ago and now is on the run?  Did a law enforcement agency

15   carrying that warrant just serve a warrant at his home

16   residence?  You know, it really depends, but I generally ask

17   for 30 days so that I'm looking for patterns.

18   Q    Exactly, you're looking for patterns.

19        So is it true that you would use the mapping and

20   you would map the towers that he's hitting on any given

21   date?  Right?

22   A    Yes.

23   Q    In that 30-day period.

24        So he's hitting this tower one day, he's hitting

25   this tower one day, he's hitting this tower another day,

1    he's hitting this tower another day, and you would plot all

2    of those where he's hitting on those towers during that

3    30-day period, correct?

4    A     Yes, plot the tower and the sector.

5    Q     Now if only one -- is it fair to say if one of the

6    towers, there is a possibility that it's only hit one time

7    during that 30-day period?

8    A     Yes, sure.

9    Q     You are looking for a pattern of how many times a

10   certain tower is being hit, aren't you?

11   A     In some circumstances, yes.

12   Q     How many circumstances?  Of those 300 cases, how many

13   are you using this type of looking at patterns?

14   A     In all 300 cases, I always look at that.  However,

15   there is another aspect to it, which is where the phone is

16   right now.  Because if I'm trying to locate somebody, I want

17   to know where the phone is now, what was the last call that

18   was just made two minutes ago.

19   Q     Let's ignore right now for a second.  So on that 30-day

20   call record, after you have plotted them all out, what you

21   are looking at is where the tower he hit upon the most is,

22   correct?

23   A     Well, somewhat.  We're looking for a number of

24   different things.  I'm looking for the most frequently hit

25   calls, the most frequently hit towers, the most frequently

1    hit at specific times a day.

2    Q    To determine his location, though, right?

3    A    Sure, I'm trying to look at the first --

4         THE COURT:  Special Agent, I think it's going to

5    be best if you let her ask the question, you answer it

6    directly, concisely, then if she wants to ask you more

7    questions, she may.  Keep in mind this is cross-examination.

8    She has the right to have you -- she can ask the question

9    and you are to answer the question she asks and nothing

10   more.

11   BY MS. ANGELOS:

12   Q    The reason that you are looking at patterns is because

13   the more the tower is hit, the most likely that is the

14   location he's going to be in, correct?  Like a home?

15   A    Sure.  I'm looking for -- I'm looking for patterns in

16   certain cases, yes.

17   Q    In 300 cases of fugitives, correct?

18   A    Sure.

19   Q    Now in this type of case that we're dealing with today,

20   you are looking at one day, correct?  Say the day of the

21   Kmart robbery.  You're looking at one day, and you are

22   looking at possibly a three-hour period, correct?

23   A    Sure.

24   Q    And you are looking at one tower, correct?

25   A    Yes, one tower.  Each call is one tower.  Sure.

1    Q    You are saying that that tower was hit at a certain

2    time, one hit, correct?

3    A    Yes.

4    Q    There is no pattern there, is there?

5    A    No.  I mean not at that given moment.

6    Q    So it's a different analysis in the 300 fugitive cases

7    that you have looked at --

8    A    No.

9    Q    Explain that then.

10   A    Okay.  I was trying to, but I was told to explain --

11   you know, answer your one question.  I look for the pattern,

12   that is if a person is making a call.  I do that and then I

13   put that aside because I am hoping that the next call that

14   the person makes matches that pattern.  However, many times

15   it doesn't match that pattern.

16        In fact, in many cases, victims of carjackings,

17   kidnappings where you have to look at the call and the call

18   that was just made and you have to analyze that and

19   translate that into a geographical area.  Just because there

20   isn't a consistent pattern over and over and over does not

21   mean that the range of the tower is any less correct.

22   Q    But in looking at fugitive cases when you talk about

23   looking in three minutes before he made the call, you don't

24   have that in this case, do you?  You are looking at

25   historical call records from a period of long ago, correct?

```
 1    A    Sure.

 2    Q    So we don't even have the added addition of looking at

 3    the last three minutes where his cell phone tower hit,

 4    correct?

 5    A    Correct, but you are assuming one thing.

 6    Q    Hold on.  All right.

 7    A    You are assuming that every time I had a fugitive case

 8    that the person is there in the pattern and most of the

 9    times they are not.

10    Q    That's fine.  So there is an error of probability in

11    this; is that correct?

12    A    Not in the technology in where a person could be, sure,

13    you don't know where the person is going to be.

14    Q    But in usual circumstances, if you are having a

15    pattern, those are the two places you are going to be most

16    likely to look as far as his location, correct?

17    A    Yes.

18    Q    And you know whether or not you'll find him there?

19    A    I know whether or not I find him there because before I

20    go out into the street to find him, I see what the last cell

21    site was that was used.  If it matches that pattern, then

22    that helps me --

23    Q    When you get there, if you find a fugitive, you know

24    you are correct?

25    A    Correct, sure.
```

1    Q    So if in 300 cases you go out and on 150 of those cases

2    you find him where the pattern is, you know that you have

3    got 50 percent of the time this analysis is correct,

4    correct?

5    A    If you say so.  I mean --

6    Q    Answer me.

7    A    You are comparing apples and oranges, so I don't

8    understand how to answer you.

9    Q    Let me ask it this way.  In the case that we have where

10   there is one day that you are looking at, one hour that you

11   are looking at, one call that you are looking at and one

12   tower, how do you determine the error rate -- because you

13   are basically saying if it's hit this tower, the cell phone

14   is in this tower's range, correct?

15   A    Uh-huh.  (Affirmative)

16   Q    Which basically says the individual is right in that

17   range, too?

18   A    Well, the person who has the phone in their hands.

19   Q    How do you determine an error rate on that?

20   A    Well, again, by doing drive test data.  You go out

21   there and utilize this gear, you determine the geographical

22   breadth of that particular cell site and that cell site

23   sector and that is how you determine it.

24   Q    But the only real way you would be able to determine if

25   your analysis was correct was I guess in a jury trial

1    setting where they convict the individual, correct?

2    A    In that respect, sure.  The problem here is that I

3    think what maybe you are not understanding is that the

4    process is the same whether I'm looking for a person right

5    now because regardless of that cell site analysis that you

6    are talking about, I am looking at the last call, what was

7    the call that was just made, and that is where I go look.

8    That is incidental.

9    Q    You are saying that the analysis is different?

10             MR. CASTLE:  Your Honor, he was trying to explain

11    the answer and she's asking a question right in the middle

12    of his testimony.

13             MS. ANGELOS:  Your Honor, I just want a simple

14    answer.

15             THE WITNESS:  You want your answer.

16             THE COURT:  Again, you will have an opportunity on

17    redirect, Mr. Castle, to explain further if you think it's

18    necessary.  But I do want you to make maximum use of your

19    time, Ms. Angelos.

20             MS. ANGELOS:  Thank you, Your Honor.

21    BY MS. ANGELOS:

22    Q    Your resume -- and I think you testified today that you

23    would have weekly contact with all major cellular telephone

24    company providers for the last five years; is that correct?

25    A    Yes.

1    Q    You've met with Sprint daily for the last five years?

2            MR. CASTLE:  Objection, Your Honor, that's a

3    mischaracterization of his testimony.  He didn't meet daily

4    with these cell phone providers.  He said he met weekly with

5    them.

6            MS. ANGELOS:  I actually think it's in his resume,

7    Cy.

8            THE WITNESS:  Weekly contact.

9    BY MS. ANGELOS:

10   Q    Weekly contact with Sprint?

11   A    Sure.  Again, contact is telephonic.  It doesn't mean

12   face-to-face.

13   Q    That's fine.

14           You've met with Verizon daily -- weekly within the

15   last five years?

16   A    Telephonically, sure.  We speak to them all the time.

17   Q    T-Mobile?

18   A    T-Mobile a lot, yeah.

19   Q    Nextel?

20   A    Nextel, yes.

21   Q    Cingular daily?

22   A    Cingular now is AT&T.

23   Q    Although you've met with all of these telephone

24   providers in a weekly setting for the last five years, this

25   is the first case you've ever had with Cricket; is that

62

 1    correct?

 2    A    This is the first case I have had with Cricket.  I have

 3    assisted some agents from other divisions who were trying to

 4    interpret Cricket records.

 5    Q    Prior to this case, have you had weekly contact with

 6    Cricket?

 7    A    Weekly contact with Cricket, no.

 8    Q    You are primarily based out of Philadelphia,

 9    Pennsylvania; is that correct?

10    A    Yes, ma'am.

11    Q    Cricket doesn't have operations there?

12    A    Not yet.  They are coming in the next month or two.

13    Q    So when you indicate that you have weekly conversations

14    with all the major telephone carriers, that excludes

15    Cricket?

16    A    Correct.  Cricket is, like I said, not --

17             THE COURT:  Special Agent, you could have answered

18    that yes.  That's how I want you to answer the question.

19    All right.

20    BY MS. ANGELOS:

21    Q    Is it true that the major carriers, and those are the

22    ones I just discussed, besides Cricket, provide the

23    following information in their historical call records, the

24    originating cellular telephone tower where the cell call

25    originated?

```
 1    A    Yes.

 2    Q    They also provide the terminating cell tower; is that

 3    correct?

 4    A    Many of them do, yes.

 5         MS. ANGELOS:  Your Honor, if it's all right, it

 6    helps me to walk him through this, if I can just continue to

 7    use this.

 8    BY MS. ANGELOS:

 9    Q    So it provides the originating cell tower and the

10    terminating cell tower, correct?

11    A    Yes, many of them do.

12    Q    Then do all of them also provide if a tower -- there is

13    a handoff to another tower during the cell phone call?

14    A    During the call, no.  The only thing they are recording

15    is the originating cell site where the phone was at the time

16    that it initiated the call or the call was originated, and

17    the location of the terminating cell site where the phone

18    call was terminated.

19    Q    Is it accurate that Cricket does not provide any

20    information with where the call terminated?

21    A    They do not provide it, no.  They have it, but they

22    don't provide it.

23    Q    So the only thing that you received in those historical

24    call records of Cricket is the originating cell phone tower?

25    A    Yes.
```

1    Q    Now I think you described -- you have got a tower that

2    reports to -- and is it an LAC that you --

3    A    A LAC would be, yes, in GSM terms.  In this case, this

4    is a CDMA network, so it reports to a zone and it records at

5    a switch.

6    Q    So it reports to a zone but then records at a switch;

7    is that accurate?

8    A    Yes, the zone.  The switch covers that zone.  They are

9    synonomous.

10   Q    How many towers would be covered with a switch?

11   A    A switch could be -- it depends on the network and the

12   area, but it could be anywhere from say 25 to 100.

13   Q    Twenty-five to 100 towers?

14   A    Could be, yeah.

15   Q    Generally how many calls is a tower able to handle?

16   A    Oh, what time frame?

17   Q    I mean even just in five minutes?

18   A    In five minutes, one individual tower could, depending

19   upon how frequent the bouncing, hundreds, maybe even close

20   to a thousand.  Probably hundreds.

21   Q    So at any given time the switch that is recording

22   information from all of these towers could be making

23   recordings involving a thousand calls; is that correct?

24   A    Yeah.

25   Q    You are aware that the switch most often only stores

1    volatile information for a period of 36 hours; is that

2    correct?

3    A    Yes, volatile data is -- yes.

4    Q    You are aware that a switch, if busy, may not record

5    all of the information of the towers' calls, correct?

6    A    Well, it's going to record the originating cell site.

7    It's going to record that, yes, it is.

8    Q    Will it skip information if it gets busy?

9    A    If the tower gets busy?  If the tower gets busy --

10   Q    If the switch gets busy?

11   A    If the switch gets busy.  I've never seen a situation

12   where the switch did not record the data.

13   Q    Your assumptions and conclusions are based on the

14   belief that the data that you received is entirely accurate,

15   correct?

16   A    Sure, the data is -- yes.

17   Q    Is it true that in a switch data there would be

18   recorded information regarding tower troubles?

19   A    If there was a trouble with the tower, the network,

20   yes, and Cricket would know that.

21   Q    But you don't get any information in that with

22   historical call detail records, do you?

23   A    No, because it's not needed.  All we need is where the

24   phone was originated.

25   Q    Yes or no, you don't get any information with regards

1    to the tower trouble?

2    A    No.

3    Q    That switch data would also initially record the amount

4    of traffic on all of the towers, correct?

5    A    For a finite period of time, then that data has to be

6    dropped because it's just so much.

7    Q    Correct.  So that information wouldn't be in the

8    historical call detail records either, right?

9    A    No.

10    Q    You have no idea on the days in question whether there

11    was any troubles with the towers in the areas in question,

12    correct?

13    A    Correct.  I assume not because we asked Cricket.

14    Q    You have no information yourself, correct?

15    A    I have none.

16    Q    And you have no idea on the days in question what the

17    call volume was during the time of the incident on all those

18    towers, correct?

19    A    Call value?

20    Q    The volume.

21    A    Volume, no.

22    Q    Do you know what the weather was like on the particular

23    days in question?

24    A    I do not.

25    Q    You have no knowledge of whether there was any cloud or

1    ceiling coverage issues, raining, snowing, anything like

2    that?

3    A    On the days that the phone calls were recorded, no.

4    Q    Is it true that the weather does have a tendency to

5    affect cell phone tower coverage?

6    A    Yes.  I said that earlier.

7    Q    Is it also true that buildings or other obstructions

8    can affect which cell phone tower is chosen during a call?

9    A    Yes.

10   Q    Is it your opinion that the only place that a target

11   device or cell phone can be located within a call -- during

12   a specific call is within the shaded area?

13   A    In the shaded area that I drew?

14   Q    Yes.

15   A    Yes, and I could offer a reason, if you would like.

16   Q    Well, is it possible, taking everything that we've just

17   discussed above with building obstructions, weather being a

18   possible thing, traffic being a possible thing, that the

19   cell phone could have actually been in an area that hasn't

20   been shaded?

21   A    No.  Could I explain?

22   Q    Sure.

23   A    Because had I not done the data testing that I did, I

24   would agree with you.  But in this example, what I did was I

25   came out here just at the very beginning of November, so

```
 1    it's almost the exact time frame.  I went to the towers
 2    close to the exact time -- time of the year and the time
 3    that these calls were made.  And what I was doing was using
 4    the engineering phones and trying to measure the distance,
 5    which, keep in mind, that phone that I'm using to test with
 6    is taking all that into consideration.  It's taking into
 7    consideration building reflection, refraction, height of the
 8    tower, all of that stuff.  The phone doesn't lie.
 9    Q    It's not taking into consideration the traffic on the
10    tower at a year before?
11    A    Oh, yeah, sure.
12    Q    Is it?
13    A    It couldn't because --
14    Q    It couldn't, correct?
15         And it doesn't take into account how the weather
16    was the year before, correct?
17    A    Sure.
18    Q    None of the information, geographic, weather, traffic
19    on the tower, or even antenna placement appear on the
20    historical call records you used, correct?
21    A    Run that one again, please.
22    Q    I'll just ask individually.  The geography doesn't
23    appear on -- the weather, traffic on the tower doesn't
24    appear on the historical call records?
25    A    No.
```

1    Q    Whether or not buildings obstructed doesn't appear on

2    the historical call records?

3    A    No.  It's impossible.

4    Q    Antenna placement doesn't appear on the historical call

5    records?

6    A    Well, you know, technically it does because they

7    provide you with the engineering tower list.  And so if it

8    hasn't changed, that would still be the same.

9    Q    Is it also true that if a cell phone is hitting a

10   particular segment of a tower, you certainly cannot say with

11   any specificity how close it is to that tower, correct?

12   A    You couldn't say, no.  You would have to be within that

13   range.

14   Q    The most that you can say is that this is the strongest

15   cell tower, correct?

16   A    What I can say is that is the geographical area of that

17   tower in relation to a phone.

18   Q    Let me ask you this:  Is the tower which carries -- a

19   tower which carries a particular call is not always the

20   closest tower to the phone call, it's the strongest?

21   A    That's correct.

22   Q    So you would agree that a cell phone doesn't

23   necessarily hit the closest tower, but it hits the tower

24   with the strongest signal?

25   A    Strongest signal, correct.  It's typically the one

1   that's closest to it.

2   Q    But not always?

3   A    Not always, yes.

4   Q    But your conclusions rest on the fact that you are

5   assuming that the cell phone is hitting the closest tower?

6   A    There is no assumption there.  That is based on an

7   actual phone in relation to towers in the area.

8   Q    You are talking about the phone you purchased?

9   A    Yeah.

10   Q    I will get to that.

11   A    Sure.

12   Q    Are there any scientific tests supporting this theory

13   or testing of it, strongest versus closest?

14   A    Well, the scientific testing which you talk about is

15   based on how a cell phone company operates.  This testing is

16   done all the time by various cell phone networks.

17   Q    Are there any scientific tests that you've been able to

18   read to find errors, accuracies, probabilities?

19   A    No, just practicality, using the techniques to locate

20   people.

21   Q    Are there any scientific tests documenting things that

22   could interfere with the signal?

23   A    Not that I am aware of.

24   Q    Are there any scientific tests to determine the limit

25   or range of a radio wave?

1    A    Well, yeah, cell phone companies do testing to see how

2    far a cell phone tower can -- radio frequency can propagate.

3    Typically, let's say, for example, in a GSM network, it can

4    go 35 kilometers, the signal, but keep in mind the phone

5    plays a huge role in that.

6    Q    Are you aware of any specific written memorandum

7    regarding those tests?

8    A    No.

9    Q    You don't have any personal knowledge with regard to

10    those tests?

11    A    No.

12    Q    Are there any scientific tests out there which show the

13    instance of radio waves hitting unexpected towers at

14    substantial distances?

15    A    Tests, ma'am?

16    Q    Uh-huh.  (Affirmative)

17    A    No.

18    Q    But you are aware of that happening, correct?

19    A    I'm aware of that happening because of my practical

20    use, sure.

21    Q    So you are aware that a cell phone tower can hit an

22    unexpected tower at a substantial distance?

23    A    Yes.  If it can see the signal as the clearer signal at

24    that moment, yes.

25    Q    Are there any scientific tests indicating frequencies

```
 1    that cell signals are redirected or passed on to other

 2    towers?

 3    A    I believe the cell phone networks do their testing for

 4    that, but not that I'm aware of.

 5    Q    You are not specifically aware of any?

 6    A    No.

 7    Q    You didn't rely on any of those because you are not

 8    aware --

 9              THE COURT:  Ms. Angelos, it's pretty evident,

10    isn't it?

11              MS. ANGELOS:  Thank you.

12    BY MS. ANGELOS:

13    Q    You would agree with me that radio waves is a

14    scientific principle, correct?

15    A    Yes.

16    Q    And you are not a scientist, correct?

17    A    Nope.

18    Q    You have not conducted any research with regards to any

19    of this, correct?

20              MR. CASTLE:  Your Honor, that's a vague question.

21              THE COURT:  Sustained.

22    BY MS. ANGELOS:

23    Q    You yourself have not made any type of determination

24    with regards to error rates on the type of analysis you are

25    doing in this particular case, have you?
```

```
 1    A     In this particular case, no.  I mean just that I've
 2    used it hundreds of times to locate where the handset is.
 3    Q     Is hundreds of times in those 300 fugitive cases,
 4    correct?
 5    A     You keep saying fugitive cases.  I didn't say that.
 6    Some of them were fugitive cases, some of them were
 7    kidnappings, some of them were witnesses, some carjackings.
 8    It could have been any number of different cases.
 9    Q     Are the fugitive cases similar to child kidnappings,
10    carjackings, you are taking 30 days' worth of historical
11    data?
12    A     No, not always.  I take the records and, again, I look
13    for a pattern.  But what I'm always looking for at the
14    moment I'm looking for the phone is I'm looking for the last
15    call regardless if it matches that pattern or not.
16    Q     You can't do that in this case, can you?
17    A     No, but I did look at the last phone call, where that
18    phone call was and translated that into a geographical area.
19    Q     Your conclusions and analysis assume that the signal
20    was not interfered with, correct?
21    A     If the signal was interfered with, then it wouldn't
22    have been recording that data at that cell site.  The call
23    wouldn't have gone through.
24    Q     What I mean is your assumptions assume that a call -- a
25    cell phone made a call and there was no interference
```

1   because -- does that make sense?

2   A    Well, there was no interference because it's recorded

3   as being a phone call on that cell site and cell site

4   sector.

5   Q    Let me ask it in a different way.  Your conclusions and

6   analysis assume that the radio waves on the cell phones do

7   not hit an unexpected tower a substantial distance away?

8   A    Correct.  I'm just saying the tower that it did hit and

9   utilized.

10  Q    Your conclusions and analysis assume that the cell

11  signal was not passed or redirected to another tower because

12  of weather?

13  A    I'm sorry?

14  Q    Your conclusions and analysis assume that the cell

15  signal was not passed or redirected to another tower because

16  of weather?

17  A    Sure.

18  Q    Or because of traffic?

19  A    Sure.

20  Q    Or because of interference by buildings or other

21  geographical blocks that would interfere with the signal?

22  A    Yeah, but that has nothing to do with the recording

23  cell site, but, yes, I guess.

24  Q    Your conclusions and analysis also assume that the

25  signal was not passed or redirected to another tower because

1    of maintenance problems on a certain tower?

2    A    Correct.  I was not aware of any maintenance problems.

3    We asked, but didn't get any.

4    Q    Your conclusions and analysis assume that the

5    historical cell phone records are entirely accurate?

6    A    Yes.

7    Q    Your conclusions and analysis assume that the switch

8    downloaded and recorded entirely accurate information?

9    A    Yes.  You keep using the word assume and, you know --

10            THE COURT:  That's all right, Special Agent.

11   BY MS. ANGELOS:

12   Q    Would you concede that line of sight is important in

13   determining what cell tower a cell phone will hit?

14   A    A line of sight could be important, yes.

15   Q    Is it possible that a cell phone will hit on a cell

16   tower a half mile away versus 40 feet away if the closest

17   tower obstructs the radio waves from getting through?

18   A    It is possible.  I mean you have to take a case-by-case

19   basis.

20   Q    In the present instance you didn't have Mr. Allums'

21   cell phone to test your analysis with, did you?

22   A    No, I took another phone.

23   Q    Do you know what type of phone he had?

24   A    I believe I requested that, but I never got that.

25   Q    Do you know what type of phone he had?

1   A    No.

2   Q    Do you know what type of features he had on his phone?

3   A    No.

4   Q    What --

5          THE COURT:  Would it be relevant if he had

6  different types of features?

7          THE WITNESS:  Again, I am confused as to where

8  she's going with this.

9          THE COURT:  That's why I'm asking the question.

10  Would it matter, would it be relevant to your analysis if he

11  had different types of features on his phone?  Would it

12  affect any of your analysis as to where the phone was at a

13  given time?

14          THE WITNESS:  The features, like what, sir, like

15  the games?

16          THE COURT:  That's all I can say.  Call waiting,

17  call forwarding.

18          THE WITNESS:  The features are not the same.  The

19  cell phone network and cell phone are still operating the

20  same.

21          THE COURT:  So the answer to my question would be

22  what features he had would not be relevant to your analysis?

23          THE WITNESS:  I believe not, sir.

24  BY MS. ANGELOS:

25   Q    What type of phone did you use for your analysis?

1    A    I believe it was a Razor, bought at a Cricket store,

2    the Razor.

3    Q    Is it true that you've never viewed Allums' phone and

4    have no idea what model it is?

5             MR. CASTLE:  Asked and answered, Your Honor.

6             THE COURT:  Sustained.

7    BY MS. ANGELOS:

8    Q    Are there certain types of phones that cannot operate

9    in engineering mode?

10   A    I am not sure.  The ones that I used did.  Most of them

11   can, though.

12   Q    Would you concede that even similar types of cell

13   phones could react differently?

14            MR. CASTLE:  Objection, vague.  Differently to

15   what?

16   BY MS. ANGELOS:

17   Q    Differently to a cell tower.  For example, if two

18   individuals are sitting in the same car with the same type

19   of cell phone, both make a call at the same time, is it

20   possible that these two types of phones could actually go to

21   different towers?

22   A    It would depend on the location of where they are at

23   that time.

24   Q    Is it possible?

25   A    If they are in the middle of two towers, in the

```
1    overlap, the two towers, it's possible, sure.
2    Q    Is it also true that there could be two individuals in
3    the same home with the same phone, in different rooms, where
4    one gets a signal and the other does not?
5    A    Again, that's a case-by-case basis.
6    Q    Is it possible?
7    A    It's possible.
8    Q    Would you also concede that the condition of a phone
9    may affect how it reacts to a cell tower?
10   A    A condition of a phone?
11   Q    Uh-huh.  (Affirmative)
12   A    I mean it could -- it could, but not in the technology.
13   The technology is the same.
14   Q    Let me ask you this:  If Mr. Allums' phone was
15   significantly damaged, would it react differently than your
16   newly purchased phone?
17           MR. CASTLE:  Objection, Your Honor.  That is a
18   vague question.  There are no facts in evidence that even
19   existed.
20           THE COURT:  Overruled.
21           THE WITNESS:  So the question is --
22   BY MS. ANGELOS:
23   Q    If Mr. Allums' phone was significantly damaged, would
24   it react differently with regards to a cell tower than a
25   newly acquired, spanking new phone?
```

1    A    If Mr. Allums' phone was significantly damaged, it

2    would react differently.  It wouldn't even make a call.  It

3    wouldn't record a call.

4    Q    Assuming it's not significantly damaged enough not to

5    make a call?

6    A    Well, then I wouldn't consider that significantly

7    damaged. If a phone call can go through, then what is the

8    point?

9            THE COURT:  If a phone is old and has some damage,

10    it is possible that it might go to a different tower than a

11    brand new phone in the same location?

12            THE WITNESS:  No, the technology operates the

13    same.

14            THE COURT:  That's all you needed to say was no.

15    Thank you.

16    BY MS. ANGELOS:

17    Q    You didn't do any testing back in October and November

18    of 2000, correct?

19    A    Of 2000?

20    Q    When the robberies occurred.

21    A    The robberies happened in 2007.

22    Q    Sorry.  2007, October and November of 2007.

23    A    No.

24    Q    You didn't do any testing until November of 2008, a

25    full year later, correct?

 1   A    Yes, after I was asked.

 2   Q    That was the first time you had ever been to Salt Lake

 3   City, Utah; is that correct?

 4   A    I had been to Salt Lake City before, but never for that

 5   purpose.

 6   Q    I guess I would want to know how many times you have

 7   been to Salt Lake City.

 8            MR. CASTLE:  Objection, Your Honor, relevancy.

 9            THE COURT:  Sustained.

10            MS. ANGELOS:  Your Honor, there are certain things

11   on his analysis indicating that he drove a period of a road,

12   timed it at eight minutes and said this is the only route

13   that someone could take, and I think that is my question.

14            THE COURT:  That may go to relevance of testimony

15   at trial, but it has nothing to do with the issues before

16   the Court here today, Ms. Angelos.

17            MS. ANGELOS:  Thank you, Your Honor.

18   BY MS. ANGELOS:

19   Q    Yes or no, isn't it true that a cell phone tower can

20   actually reject at 35 kilometers?

21   A    Yes.

22   Q    Which would be about 22 miles?

23   A    Yes.

24   Q    In your analysis of cell phone historical -- or

25   analysis of historical -- let me ask it a different way.

1          In your analysis of cell data, have you ever made

2     a mistake?

3     A     Have I ever made a mistake?  I would say no based on

4     the fact that every time we've done this, we've gone and

5     located a person within that cell site sector.

6     Q     So you have gone to find your fugitive and you've

7     actually located a person?

8     A     Yes, or victim, or any number of things.

9     Q     Or a victim.

10          How do you test your error rate with this type of

11    analysis when you don't have a body to find, a fugitive to

12    find?

13    A     Because, as I said earlier, the analysis is the same.

14    It's exactly the same.  The moment a phone call is made, it

15    is a record of the system.  We take that, we plot it, so if

16    I'm looking for a person right now and the phone call was

17    just made, I have to take that, interpret that.  So the

18    analysis is exactly the same.  The survey process is exactly

19    the same, whether that data is a year old or the data is,

20    you know, three minutes old.

21    Q     Has all of your work in this field been done with

22    respect to law enforcement and litigation?

23    A     Yes.

24    Q     Have you ever provided any of your analysis or

25    conclusions in other matters or this matter to anyone in the

1    scientific community?

2    A    No.

3    Q    Agent Shute, does part of your analysis involve looking

4    at the cell tower in person?

5    A    Yes.

6    Q    In order to make assumptions and conclusions, must you

7    actually look at the physical orientation of the tower?

8    A    I believe you do.

9    Q    And your analysis involves taking actual readings from

10   the specific tower in person, correct?

11   A    In this case, yes.

12   Q    Would you agree that you can't take a reading from a

13   tower that is no longer there?

14   A    Oh, sure, you can't do that.

15   Q    So is it true that with regards to tower 52, which is

16   no longer there, you can make no analysis with regards to --

17   or conclusion with regards to physical location?

18   A    I'm sorry?  Say again.

19   Q    Because part of your assumptions and conclusions rely

20   on looking at the specific tower in question, you can make

21   no conclusions as to whether Mr. Allums' phone was in the

22   geographic area of cell phone 52?

23   A    No, I believe you can.  I will explain, if it's okay.

24   Many times in many cases, I never even go through this much

25   detail and work as I did for this particular case.  I did it

 1   here because of the fact that the Salt Lake City market, I'm

 2   not as familiar with that.  So here in this example, that

 3   range is very generous to where -- generous towards the

 4   defendant in that in my experience and knowledge of how this

 5   cell phone network works, by the time he would have gotten

 6   to the outskirts of that area in tower 52, he most certainly

 7   would have re-selected to another tower.

 8          MS. ANGELOS:  Your Honor, may I approach the

 9   witness?

10          THE COURT:  You may.

11   BY MS. ANGELOS:

12   Q    Did you testify in a case, United States v. Marvin

13   Nicholson?

14   A    Yes, in Tennessee.

15   Q    I am handing you the Marvin Nicholson transcript.  Let

16   me just find the page.

17          THE COURT:  Ms. Angelos, are you going to wrap

18   this up in ten minutes?

19          MS. ANGELOS:  We are, Your Honor.

20          THE WITNESS:  Just so I know, is this from the

21   trial or from the McDaniel hearing?

22          MS. ANGELOS:  It's from the trial.

23          MR. CASTLE:  Your Honor, if I could just make one

24   comment.  I know that we had reserved three hours with the

25   Court, but we're not going to be able to complete --

```
 1            THE COURT:  Yes, you are.

 2            MR. CASTLE:  -- this process today.  We have

 3    several other witnesses.

 4            THE COURT:  You have other witnesses on this

 5    expert --

 6            MR. CASTLE:  We have a witness from Verisign, Your

 7    Honor, regarding the collection of the data.

 8            THE COURT:  That doesn't go to the issue before

 9    this Court as to this witness's reliability of his

10    testimony, Mr. Castle.  I'm sorry.  It may be something that

11    would be very relevant at trial, but it's not relevant to

12    this witness.

13    BY MS. ANGELOS:

14    Q    I'm handing you the transcript in United States v.

15    Marvin Nicholson and I'm asking you to look at page 16.  If

16    you could read lines two through nine to the Court.

17    A    Yes.  It says -- I guess it's my answer.  It says, it's

18    only part of the data and that I had the data of the cell

19    phone towers that were utilized for each call.  Then, again,

20    to be accurate and to be fair also to the defendant, you

21    have to go to the tower and verify its existence.  You know,

22    I can't see it any other way of being able to be a

23    legitimate person who would testify to this unless you did

24    the things that I did.

25    Q    Thank you.
```

```
 1    A    Which is what I did in this case.

 2    Q    You didn't -- you weren't able to go out and verify the

 3    tower 52, correct, because it's no longer in existence?

 4    A    True, but, keep in mind, I don't do this when I'm

 5    routinely looking for people based on the call detail

 6    records.  This is just --

 7              THE COURT:  The question is is the tower that is

 8    designated as 52, does it still exist?

 9              THE WITNESS:  No, it does not.

10              THE COURT:  Did it exist when you were here last

11    fall to do your --

12              THE WITNESS:  No, it was taken down three weeks

13    before I got here.

14              THE COURT:  Go ahead, Ms. Angelos.

15              MS. ANGELOS:  Your Honor, if I can have him turn

16    to page 18.

17    BY MS. ANGELOS:

18    Q    If you could read lines 18 through 24.

19              Do you want me to help you?

20    A    Yes.  I'm sorry.

21    Q    It was probably two pages after.

22              If you could read lines 18 through 24.

23              THE COURT:  Is this from the same proceeding?

24              MS. ANGELOS:  It is, Your Honor.

25              MR. CASTLE:  What page are we referring to?
```

1          MS. ANGELOS:  Your Honor, I think it's 17 -- or

2    page 18, lines 18 through 24.

3    BY MS. ANGELOS:

4    Q    If you could read that in open court, please.

5    A    18 through 24?

6    Q    Yes.  And this is your answer, correct?

7    A    No, this is a question from Mr. Houston.

8    Q    I think your answer follows.

9    A    So it says, but you communicated to the state two

10   months ago, did you not, that the validity of your findings

11   were premised upon the orientation of these towers.  My

12   answer is, I told them that I needed to come here and verify

13   the tower existence and the cell site sectors or else I

14   wouldn't feel comfortable in testifying to it in court.

15   Q    Thank you.

16          The analysis and conclusions you are making are

17   not based on GPS or cell phone triangulation; is that

18   correct?

19   A    No.

20   Q    GPS is the use of satellites to pinpoint a person's

21   location, correct?

22   A    Yes.

23   Q    And this is done in real time?

24   A    GPS can be done in real time, yes.

25   Q    In that method, three satellites are used to determine

1    a person's location, correct?

2    A    That's more of triangulation.

3    Q    How many triangulations does GPS use?

4    A    Multiple.  It could use eight, nine.  The more

5    satellites, the better the triangle of where it's at.

6    Q    Cell triangulation is the use of cell towers to

7    pinpoint a person's certain location also, isn't it?

8    A    Triangulation takes into account at least three or

9    potentially six towers.

10   Q    This is also done in real time?

11   A    Yes.

12   Q    So both GPS and cell triangulation use at least three

13   points of reference to determine location, correct?

14   A    Yes.  They are what is called location based services.

15   Q    In your analysis with your historical data, you only

16   used one, correct?

17   A    Yes.

18   Q    Were you asked by the prosecution to analyze the cell

19   phone records of any other individual?

20   A    No.

21        MS. ANGELOS:  Your Honor, the only other questions

22   that I have are with regards to certain slides.  Like I

23   indicated, all that we got was this report, no methodology.

24   These do not have specific ranges on them.  The range --

25        THE COURT:  Are you all right, Mr. Castle?

1              MR. CASTLE:  Oh, yes.  I'm sorry.  I have a bad

2    back, Your Honor, and sometimes it just fails me.

3              THE COURT:  Before you fell, were you going to say

4    something, Mr. Castle?

5              MR. CASTLE:  Well, what I wanted to say is that

6    defense counsel had an opportunity to interview Mr. Shute

7    for about an hour.  So while it's true a formal report was

8    not provided, they were given the opportunity to --

9              THE COURT:  Let her finish her point here, please.

10             MS. ANGELOS:  Your Honor, if I may, with regards

11   to that one-hour phone conversation, Mr. Shute was not

12   forthcoming as far as certain questions with regards to a

13   methodology.  If the Court has concerns about me going

14   forward, I would be happy to enter that recorded phone

15   information.

16             THE COURT:  No.

17             MS. ANGELOS:  Do we have time that I can --

18             THE COURT:  What do you want to do?

19             MS. ANGELOS:  That's what I want to do.

20             THE COURT:  What do you want to do?

21             MS. ANGELOS:  I would like to question him with

22   regards to the specific ranges on each tower because I think

23   that is important to his analysis.

24             THE COURT:  Go ahead.

25   //

1    BY MS. ANGELOS:

2    Q    In slide number two, you indicate that you can tell

3    where the phone of Mr. Allums originated and terminated.  Is

4    that inaccurate as far as termination?

5    A    Where does it say that?

6          Yeah, when I created that, I just must have left

7    terminated in.

8    Q    Slide four.

9          THE COURT:  Ms. Angelos, please tell me, is this

10   really necessary for the purposes of this hearing in

11   contrast to what may happen at trial?

12         MS. ANGELOS:  The only thing I'm concerned about,

13   Your Honor, is he's going to be saying that a cell phone

14   reaches a specific range and based on that range a person

15   has to be inside that range.

16         THE COURT:  You may challenge the accuracy of

17   that, but for purposes of methodology, does it have anything

18   to do methodology?

19         MS. ANGELOS:  As long as he took ranges on each of

20   them, Your Honor.

21         THE COURT:  Ask him that.

22   BY MS. ANGELOS:

23   Q    Did you take ranges on each one of them?

24   A    On each one of the towers in question?  Yes, I did.

25   Q    Did you go around each sector to take the ranges?

```
 1   A    I did.

 2             MS. ANGELOS:  Your Honor, if I may just have a

 3   moment?

 4             THE COURT:  Go ahead.

 5             Mr. Castle, be organizing your redirect very

 6   carefully, would you, please?

 7             MR. CASTLE:  I am, Your Honor.  Thank you.

 8             MS. ANGELOS:  Your Honor, I don't think I have any

 9   other questions.  Thank you.

10             THE COURT:  Thank you.

11                        REDIRECT EXAMINATION

12   BY MR. CASTLE:

13   Q    Special Agent Shute, you were asked the question about

14   never having dealt with Cricket until now, correct?

15   A    Yes.

16   Q    Does it make a difference whether you've dealt with

17   Cricket before or not?

18   A    No.

19   Q    Why is that?

20   A    Because the standard of CDMA technology is the same, be

21   it Cricket --

22             THE COURT:  Officer -- Special Agent, excuse me.

23   Remember, she's trying to get everything you are saying.

24             THE WITNESS:  It's the same, so it's just their

25   procedures, which we interacted with them numerous times.
```

```
 1    BY MR. CASTLE:

 2    Q     But they use the same type of network system?

 3    A     Yes.

 4    Q     That's why it works?

 5    A     Yes.

 6    Q     That's why --

 7                THE COURT:  Same kind of recording of data?

 8                THE WITNESS:  That all the other companies I

 9    mentioned, they all use the same thing.

10    BY MR. CASTLE:

11    Q     Now there were conversations about cell phones hitting

12    other towers potentially because of weather, volume of

13    calls, buildings.  If that happened, would the cell phone

14    then be -- or would the call data record be recording the

15    fact that the cell phone hit another tower because that was

16    the tower whose signal it hit?

17    A     Yes.  And it's not recording all these things like

18    weather, but it would record the cell site it was on,

19    correct.

20    Q     Even if it was one across town from where they actually

21    were?

22    A     Correct.  It's recording the cell site it was on.

23    Q     So you would go to the cell tower -- the CDR and it

24    would demonstrate that?

25    A     Yes.
```

1    Q   Did you find that with any of the call records that you

2    looked at regarding Mr. Allums' phone number?

3    A   No.

4    Q   Now there was this question -- or your response about

5    apples and oranges, because Ms. Angelos was up here talking

6    about what she defined as fugitives and what you are doing

7    here, your response was, well, you are talking about apples

8    and oranges.  Could you explain to the Court what you meant

9    by that?

10    A   Well, yeah.  She was fixated on this concept that a

11    fugitive case is anything different.  It's true I do do an

12    analysis to see historically over 30 days where the person

13    is, if I am looking for the person now, but I am only

14    concerned -- I take that into consideration, but I'm only

15    looking for where they are now.  So in many cases the

16    historical analysis -- say, for example, in a case where a

17    person just shot somebody yesterday and I get 30 days' worth

18    of call detail records, all of a sudden he changes his

19    behaviors and patterns.  So the 30 days' worth of analysis,

20    even though I do it and I do it very quickly, I can do it in

21    five to ten minutes, I do not always take that into

22    consideration.  What I do take into consideration is where I

23    believe the phone is right now.

24           And so when I'm talking about apples and oranges,

25    it is two different things.  On all the cases I do the

1    apples, but I also do the oranges, if that makes sense to

2    you.

3    Q    So the analysis that you did in this case is an

4    analysis you have done on every other case?

5    A    Yes, especially when I'm trying to locate the handset.

6    Q    Here in the Salt Lake valley when you were out doing

7    your testing, did you find any Cricket towers that had a

8    range of 35 miles -- or 35 kilometers?

9    A    No.  But, then again, I wasn't testing for that.  Keep

10   in mind, and this is very important to understand, I am

11   testing the tower in relation to a phone.  Is it true that a

12   tower can blast out that far?  Absolutely.  But what you

13   have to take into consideration when you are doing this

14   analysis is the fact that the phone plays a vital role in

15   it.  And, you know, the phone can only see so much, it can

16   only see so many towers out there.  So it's not going to see

17   35 kilometers away, especially in a setting like Salt Lake

18   City where there are numerous towers in the area.  So you to

19   take that into consideration.

20   Q    Your understanding is that the objective of a cell

21   phone provider, like Cricket, is to provide a cell tower

22   closest to where someone would use a cell phone?

23   A    That's the objective.

24   Q    Part of reason for that is the cell phone tower

25   projects a signal, correct?

```
 1   A    Yes.

 2   Q    The closer you are to a cell tower, the better the

 3   signal?

 4   A    Yes, particularly with CDMA because CDMA is all about

 5   power, it's all about the strength of the power of the

 6   signal.  So typically with CDMA --

 7             THE COURT:  Thank you, Special Agent.  You have

 8   answered the question.

 9   BY MR. CASTLE:

10   Q    With respect to cell phones and the power of cell

11   phones, what has changed historically about cell phones

12   today?

13   A    I'm sorry?

14   Q    In the old days, you remember --

15             THE COURT:  We don't know need to know about the

16   old days, Mr. Castle.

17   BY MR. CASTLE:

18   Q    Remember when we had brick phones?

19             THE COURT:  Mr. Castle, we don't need to know

20   about brick phones.

21   BY MR. CASTLE:

22   Q    What about the wattage on cell phones today?

23   A    I'm not sure what you are asking.

24   Q    I'm wondering what the wattage is and if it's changed

25   over time.
```

```
 1    A     It could be less than a watt, one watt.

 2    Q     So does it make it imperative that the cell phone, when

 3    used, be closest to the closest tower because the wattage of

 4    the cell phone is different than what it used to be?

 5    A     Yeah, it's typically the one that's closest.  But, keep

 6    in mind, it's the best signal is what it's looking for.

 7              MR. CASTLE:  That's all I have, Your Honor.

 8              THE COURT:  Thank you, Mr. Castle.

 9              Ms. Angelos, do you have any questions?

10              MS. ANGELOS:  No, Your Honor.

11              THE COURT:  May I assume you will want a

12    transcript in order to do your briefing?

13              MR. CASTLE:  Yes.

14              THE COURT:  Ms. Angelos, if you have a transcript

15    by Friday, March 6th, how long will it take you to do your

16    memorandum?

17              MS. ANGELOS:  Could I have until the end of the

18    week, Your Honor?  I'm not sure what day March 6th is.

19              THE COURT:  March 6th is a Friday.

20              MS. ANGELOS:  The following Friday, if I could

21    have it.

22              THE COURT:  I will give you until the 16th.  I'll

23    give you over the weekend, okay.

24              Mr. Castle, can you then have yours by the

25    following -- the 23rd of March?
```

```
 1              MR. CASTLE:  Sure, Your Honor.

 2              THE COURT:  Do you think you will want a reply?

 3              MS. ANGELOS:  Your Honor, the trial --

 4              THE COURT:  The trial is not going to go, guys.

 5    It's not going to go on schedule, not with this briefing.

 6              MS. ANGELOS:  Your Honor, I think I will want a

 7    reply.

 8              THE COURT:  Is it more important to keep the trial

 9    date?  How important is it to keep the trial date?

10              MS. ANGELOS:  I think it's pretty important.  I

11    can work that weekend and get it done if you could give me

12    until Wednesday.

13              THE COURT:  If you have the transcript by March

14    4th, can you have your memorandum to the Court by the 9th,

15    Ms. Angelos?

16              MS. ANGELOS:  What?

17              THE COURT:  If you have the transcript by the 4th,

18    which is a week from tomorrow, can you have your memorandum

19    by the 9th, which is the following Monday?

20              MS. ANGELOS:  Yes, Your Honor.

21              THE COURT:  Mr. Castle, would you be able to have

22    yours by the 13th?

23              MR. CASTLE:  Sure, Your Honor.

24              THE COURT:  Are you sure?

25              MR. CASTLE:  I'll do whatever the Court needs us
```

1    to do.

2              THE COURT:  Then, Ms. Angelos, I will give you

3    until the 17th for the reply.  Okay.

4              Those dates, will they work for you, counsel?  Are

5    they realistic?

6              MR. CASTLE:  Well, we'll make it work, Your Honor.

7              THE COURT:  Okay.  The trial is scheduled, as I

8    recall, for the 23rd of March; isn't that right?

9              MR. CASTLE:  Twenty-fourth.

10             THE COURT:  All right.  We'll try to keep the

11   trial date then.

12             Is there anything else, counsel, today?

13             MR. CASTLE:  No, Your Honor.

14             MS. ANGELOS:  No, Your Honor.

15             THE COURT:  Special Agent, thank you very much.

16   Appreciate it.

17             We'll be in recess.

18             (Whereupon, the proceeding was concluded.)

19

20

21

22

23

24

25

1

```
 1                    C E R T I F I C A T E

 2

 3

 4            I hereby certify that the foregoing matter is

 5    transcribed from the stenographic notes taken by me and is a

 6    true and accurate transcription of the same.

 7

 8

 9

10

11

12

13

14

15

16    PATTI WALKER, CSR-RPR-CP      DATED:
      Official Court Reporter
17    350 South Main Street, #146
      Salt Lake City, Utah  84101
18    801-364-5440

19

20

21

22

23

24

25
```