## MEMORANDUM OF POINTS AND AUTHORITIES

### RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE AND REQUEST FOR AN *EX PARTE* AND *IN CAMERA* HEARING IF NECESSARY

## I.  INTRODUCTION

Prior to the Court addressing a claim of privilege, the government is required to lodge a formal written claim detailing (1) the precise privilege being invoked, (2) the specific evidence being withheld, and (3) specific reasons as to why the evidence is privileged, *e.g.*, reasons why disclosure would be detrimental to law enforcement or detrimental to national security.  The government has not done this and instead jumps directly to requesting an *ex parte*, *in camera* hearing based on an informal blanket claim of law enforcement sensitivity and national security concerns.  This practice has been rejected by numerous courts addressing the same issue.  *See* Section III(A)(1), *infra*.  The required formal written claim of privilege must follow specific guidelines relating to the specific type of privilege being invoked, *e.g.*, law enforcement privilege, state secrets privilege, or CIPA claim.  *See id.*

In order for the government to formally lodge a claim of privilege, the defendant first needs to advise the Court and the government in a written filing on the exact withheld evidence the defense still needs in order for the defendant to establish his Fourth Amendment arguments.  Otherwise, the government will be afforded an opportunity to manipulate the proceedings by unilaterally deciding what evidence will be addressed by the Court during *ex parte*, *in camera* proceedings.  Furthermore, prior to the Court deciding whether evidence is privileged and whether *ex parte*, *in camera* proceedings are necessary, the defendant first needs to place on the record all the evidence currently in his possession pertaining to his motion to suppress and the reasons why the withheld evidence is relevant and helpful to his defense.  Only then can the Court adequately decide the issue of privilege and determine if *ex parte*, *in camera* proceedings are necessary.  This is the practice followed by previous courts as indicated in the cases cited in this memorandum.

Considering the required prerequisites have not been met, the government's request for an *ex parte*, *in camera* hearing is premature.  Even so, if the Court were to ignore all

relevant case law and entertain the government's request now, the evidence the defendant seeks does not meet the legal definition of privileged, secret, or classified and the government's argument fails on this point alone.  With like failure, if the Court entertains the government's request in the future, after the required prerequisites are met, the government will inevitably be required to provide the requested evidence anyways considering the defendant will show a strong need for what is being withheld.

In this response, the defendant will address the Court's three primary legal questions that were posed at the February 10, 2011 status conference and explain why the government is not entitled to the requested *ex parte*, *in camera* hearing either now or in the future.  In doing so, the defendant will analyze three different doctrines upon which the government's request for a secret hearing may be addressed and discuss case law that supports the conclusions contained in this introductory section.

## II.   FACTS

The defendant has grounds to argue for suppression of vital evidence in the prosecution's case based on Fourth Amendment violations[1] stemming from the government's efforts to search for and locate a "UTStarcom PC5740 Broadband Connection Card" (hereafter "aircard") associated with a Verizon Wireless account opened under the name of Travis Rupard.  The aircard is a CDMA based wireless device that provides Internet access to a host computer via wireless links to compatible Verizon Wireless cell sites.  The prosecution's case indicates that agents identified the aircard as being linked to the alleged IRS tax return bulk e-filing scheme.  Once the aircard was identified, the government began a locating mission in order to pinpoint the exact location of the aircard.  The government's aircard locating mission began at least as early as June 6, 2008 and ended approximately July 16, 2008 with the government obtaining the precise location of the aircard, *i.e.*, apartment No. 1122 within an apartment complex in Santa Clara, CA. (hereafter "apartment No. 1122").  After obtaining the precise location of the aircard, the government obtained various

1.    Basic explanations of what will be the defendant's extensive and detailed Fourth Amendment arguments will be outlined in his motion for disclosure of all relevant and helpful evidence currently being withheld based on a claim of privilege.

search warrants based upon probable cause statements largely dependent on, and/or a result of, the aircard location evidence.  The defendant's planned defense involves obtaining all evidence relevant and helpful to challenging the government's mission to search for and locate the aircard as being in violation of the Fourth Amendment.

**A.      Government claims regarding sensitive investigative techniques, the law enforcement privilege, and national security concerns.**

Via a December 3, 2010 discovery request letter, the defendant requested that the government provide the following information:

> The defense needs an itemized list of all aircard locating mission discovery currently being withheld based on a claim of "sensitive investigative techniques" with each item designated into the appropriate "security clearance classification" category, *e.g.*, (1) Top Secret, (2) Secret, (3) Confidential, (4) Sensitive, (5) Unclassified, or (6) any other designation.  The defense also need[s] to know which government agency is responsible for each "security clearance classification."

*Id*, p. 2-3 (UNDERLINE EXHIBIT 01).

Via a January 28, 2011 letter response to the above, the government answered the defendant with the following:

> All information that has been withheld regarding equipment used to locate the subject aircard is considered law enforcement sensitive by the FBI.... The government does not intend to prepare more detailed indexes regarding the discovery with respect to this equipment.  It is the position of the government that the materials that have been requested such as the make of the actual equipment, operation manuals, etc., are all law enforcement sensitive, not subject to disclosure and will not be itemized by the government.

*Id.*, p. 1  (UNDERLINE EXHIBIT 02).

The government also previously stated that the "information that defendant seeks as it relates to sensitive investigative techniques is privileged."  *Government's Response To Defendant's Motion To Compel The Government To Disclose All Discovery That May Be Relevant And Material To Defendant's Motion To Suppress The Aircard Location Evidence*, p. 9 (April 16, 2010) (Dkt. #300).[2]  More recently, the government claimed a "law enforcement privilege"

---

2.      The defendant's original discovery motions (Dkt. #251 and #252) were denied in part as moot and otherwise without prejudice (*see* Dkt. #335) upon the defendant's request for a reserved ruling (*see* Dkt. #320) thus allowing the defendant to file a motion at a later date to compel disclosure of the evidence being withheld based on a claim of privilege.  In a later order (Dkt. #402), the Court indicated that the defendant should have been able to file his

and stated that the "FBI has always asserted that its electronic surveillance and cell-site tracking capabilities and equipment are law enforcement sensitive." *Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 13 (March 11, 2011) ("Government Memo") (Dkt. #465).

During the February 10, 2011 status conference, the government made the following state secrets claim:

> "And the sensitive nature of the equipment goes beyond issues of law enforcement to matters of national security in terms of obviously some of this equipment is not only used in the law enforcement realm, it's used in the national security realm." *February 10, 2011 Status Conference, Partial Transcript of Proceedings*, [MR. BATTISTA] at 15:24:17 – 15:24:32.

During the February 10, 2011 status conference, the government also indicated that it intends to have the FBI educate the Court *in camera* regarding the technical operations of devices used to search for and locate the aircard:

> "I'm asking on behalf of the FBI that they are requesting the opportunity to address this matter in camera so the Court can be educated with respect to what the issues are with respect to the operation of this equipment." *Id*, [MR. BATTISTA] at 16:26:38 – 16:27:15.

**B.**   **Government claim regarding having no case against the defendant if it loses the evidence gained from the mission to search for and locate the aircard.**

During the September 8, 2010 status conference, the government made the following comment regarding the result of litigating a motion to suppress:

> "[O]bviously, if the government loses the information that we gained by gaining access to the location of the air card, we don't have a case against the defendant. But if we win that, the evidence is quite extensive and direct." *September 8, 2010 Status Conference, Partial Transcript of Proceedings*, [MR. BATTISTA] at 16:33:34 – 16:34:14.

---

motion by December 14, 2010. In light of looming prejudice to the defense due to the defendant being rushed through a complex litigation involving specialized technology and novel issues of law, the defendant briefed the issue and explained how the government's belated discovery and falsifying of facts relating to the aircard locating mission (Dkt. #424) resulted in unavoidable delays. The defendant is still yet to file his motion for disclosure of the so-called privileged evidence considering (1) the government continues to provide relevant discovery (most recently on January 28, 2011), (2) there are still unanswered March 9, 2011 discovery requests stemming from the January 28, 2011 discovery set, (3) the defendant has been experiencing other unavoidable delays of which are fully documented on both the public and *ex parte* records, and (4) due to the recent disclosures, the motion is now much more extensive than previously anticipated (*see also* Dkt. #424).

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

**C.    The Court's three primary legal questions regarding the government's withholding of evidence, *ex parte* and *in camera* proceedings, and balancing government privilege against the defendant's Fourth Amendment rights.**

During the February 10, 2011 status conference, the government asserted that the Court must balance law enforcement sensitivity against the defendant's Fourth Amendment rights and that the government should be afforded an *ex parte*, *in camera* hearing to explain why certain evidence should be kept confidential.  *See February 10, 2011 Status Conference, Partial Transcript of Proceedings*, [THE COURT and MR. BATTISTA] at 16:21:43 – 16:22:48.  The Court then posed the following two legal questions to be addressed by the parties via a briefing:

> "[Question number one] is why it's appropriate to [][discuss withholding evidence] ex parte, and, number two, where does the ex parte hearing lead to? Does it lead to me saying [][that] this is really important law enforcement information and therefore [][Mr. Rigmaiden] loses some of his Fourth Amendment argument?  Is that the balance that I'm to strike?  And does the case law say that that balance can be struck?"  *Id.*, [THE COURT] at 16:29:46 – 16:30:25.

The Court also posed a third legal question to be contemplated by the parties in preparation of the briefing:

> "[I]f I were to agree with the government and say this is law enforcement sensitive, Mr. Rigmaiden doesn't get it, and if he was then to file a Fourth Amendment motion with... an expert affidavit attached, or bring somebody in to testify [to Mr. Rigmaiden's version of the facts]... [how does the government] rebut it without putting on the record the very stuff you're trying to keep confidential?"  *Id.*, [THE COURT] at 16:40:09 – 16:42:43.

**D.    Public sources of information regarding the FBI's Digital Collection Program, the Harris StingRay, and other wireless device locators.**

During the February 10, 2011 status conference, the Court asked the government what "is publicly known about this equipment?"  *February 10, 2011 Status Conference, Partial Transcript of Proceedings*, [THE COURT] at 15:07:53 – 15:08:09.  In response, the government stated the following:

> "Well, Your Honor, it's kind of an interesting issue in terms of what's publicly known because the government is under... a constant barrage of requests of information from numerous sources.  So there is Freedom of information Act requests, there's people within the government who are not aware of the sensitivity of this equipment.  So on occasion information possibly is released

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1  in error or without detailed consideration.  So in terms of this day and age with
   the Internet, in terms of what's possibly publicly out there in some format, it's
2  hard for me to say." *Id.*, [MR. BATTISTA] at 15:08:09 – 15:08:58.

3      The equipment and software at issue relates specifically to the FBI's Digital

4  Collection Program and the wireless device locators (*e.g.*, the StingRay) manufactured and

5  sold by Harris Wireless Products Group (hereafter "Harris" or "Harris Corporation") and

6  possibly other companies.  In this section, the defendant will outline only some of the

7  publicly available information regarding the above noted equipment and software.

8

9      **1.   Official public government disclosures regarding the FBI's
            Digital Collection Program.**

10      In a lawsuit filed by telecommunications industry associations and privacy rights

11  organizations, challenges were made to an FCC order requiring wireless carriers to make

12  available to law enforcement agencies the location of antenna towers used in wireless

13  telephone calls.  *See* U.S. Telecom Ass'n v. F.C.C., 227 F.3d 450 (D.C. Cir. 2000).  The *U.S.*

14  *Telecom Ass'n* opinion identifies and discusses the technical standards adopted by the

15  government and wireless carriers to facilitate compliance with the FCC order, *i.e.*, the

16  Telecommunications Industry Association ("TIA") J-STD-025 standard (referred to in the

17  *U.S. Telecom Ass'n* opinion as the "J-Standard").  J-STD-025 is publicly available to anyone

18  willing to pay the TIA price of $348.00.  *See* atis (website), *ATIS - DOCUMENT CENTER* [J-

19  STD-025], <https://www.atis.org/docstore/product.aspx?id=22579> (last accessed Feb. 25,

20  2011) (print-out attached as EXHIBIT 03).  The FBI's Digital Collection Program and DCS-

21  3000 hardware implement the technical standards outlined in J-STD-025.

22      Via an August 11, 2006 request for information under the Freedom of Information Act

23  ("FOIA"), 5 U.S.C. § 552 *et seq.*, the Electronic Frontier Foundation ("EFF") asked the FBI

24  to produce documents concerning electronic surveillance systems known as DCS-3000 and

25  Red Hook.  *See* Marcia Hofmann, EFF FOIA request to FBI (August 11, 2006), *available at*

26  <http://www.eff.org/files/filenode/061708CKK/020907_exhibita.pdf> (last accessed Mar.

27  30, 2011) (relevant sections attached as EXHIBIT 04);  *see also* the resulting litigation at

28  Electronic Frontier Foundation v. Dep't of Justice, 517 F.Supp.2d 111 (D.D.C. 2007).

Between June 4, 2007 and February 11, 2008,  the government disclosed to the public 5,278 pages of documents in response to the EFF FOIA request.  All of these documents are available for download at <http://www.eff.org/fn/directory/3673/228> (last accessed Oct. 25, 2010).

After reading the D.C. Circuit opinion in *U.S. Telecom Ass'n*, the TIA technical standard J-STD-025, and a mere 2,000 of the 5,278 pages of the EFF FOIA request response, the defense was able to draft rough definitions of the following terms relating to government investigative techniques used to collect Pen/Trap data and to locate wireless devices:

**(1)** FBI Digital Collection Program/Digital Collection Systems (<u>EXHIBIT 05</u>);

**(2)** DCSNET (<u>EXHIBIT 06</u>);

**(3)** Lawfully Authorized Electronic Surveillance Protocol (LAESP) (<u>EXHIBIT 07</u>);

**(4)** Digital Collection System 3000 (DCS-3000) (<u>EXHIBIT 08</u>);

**(5)** DCS-3000 CDNRS Files (<u>EXHIBIT 09</u>);

**(6)** Telephone Applications System (<u>EXHIBIT 10</u>);

**(7)** FBI Cell Site Database (<u>EXHIBIT 11</u>);

**(8)** FBI Wireless Intercept and Tracking Team (WITT) Van (<u>EXHIBIT 12</u>);

As noted above, all of the listed definitions are attached to the accompanying motion as exhibits.

### 2. Publicly available trademark documents containing disclosures by Harris Corporation regarding its wireless device locators.

This section lists only a fraction of the trademarks registered to Harris Corporation used for its wireless device locators and software.  The United States Patent and Trademark Office makes available to the public all documents relating to the trademarks listed below.

### a. StingRay ™

The trademark name "StingRay" is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay] (registered Sep. 9, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011) (various

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

excerpts attached as EXHIBIT 13).  In a public declaration signed August 14, 2001, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, stated that the mark is for "electronic surveillance transceivers for tracking, locating and gathering information from cellular telephones," *see id.* (Bates Nos. 4-5 of EXHIBIT 13), and in a later "Response To Official Action," attorney Donald S. Showalter, on behalf of Harris, asked to amend the identification of goods to read "multi-channel, software-defined, two-way electronic surveillance radios for interrogating, locating, tracking and gathering information from cellular telephones." *Id.* (Bates No. 6 of EXHIBIT 13).  In support of his request to amend, Mr. Showalter included a Harris Corporation datasheet explaining the features of the StingRay.  *See id.* (Bates Nos. 15-16 of EXHIBIT 13).  Among other information,[3] the StingRay datasheet contains a heading reading "Transmit Capabilities" with "For Interrogation and Active Tracking and Location" under the heading.  *See id.*  The trademark documents indicate that the mark was first used in connection with the goods on March 2, 2003 and was first used in commerce on March 2, 2003.  *See id.* (Bates No. 1 of EXHIBIT 13).  Also available in the public record are pictures of the StingRay mark attached to goods as used in interstate commerce.  *See id.* (Bates Nos. 2-3 of EXHIBIT 13).[4]  In one picture, the StingRay shows the following labeled connection ports: (1) MAIN ANTENNA, (2) EXT PA, (3) DF [(Direction Finding)] ANTENNA, (4) DC INPUT, (5) AUX, and (6) USB.  *See id.*

### b.  StingRay II ™

The trademark name "StingRay II" is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No. 3,499,993 [StingRay II] (registered Sep. 9, 2008), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011) (various excerpts attached as EXHIBIT 14).  In a public declaration signed July 18, 2008,

---

3.      The StingRay datasheet is also publicly available in Miami, FL, City Commission Legislative Files and is discussed in detail in Section II(D)(3)(b), *infra*.

4.      The pictures of the Harris StingRay, StingRay II, AmberJack, and KingFish that are attached to the accompanying motion are the same pictures that were provided to the government by the defendant during the February 10, 2011 status conference.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

Harris Intellectual Property Dept. attorney, Ronald S. Blum II, stated that the mark is for "[m]ulti-channel, software-defined, two-way electronic surve[i]llance radios for authorized law enforcement and government agencies for interrogating, locating, tracking and gathering information from cellular phones" and that it "was first used... at least as early as 7/17/2008, and first used in commerce at least as early as 7/17/2008, and is now in use in such commerce." *Id.* (Bates Nos. 3-4 of EXHIBIT 14).  Also available in the public record is a picture of the StingRay II mark attached to goods as used in interstate commerce.  *See id.* (Bates No. 2 of EXHIBIT 14).[4]  In the picture, the StingRay II shows the following labeled connection ports: (1) TX1 [(Transmission Antenna No. 1)]; (2) TX2 [(Transmission Antenna No. 2)]; (3) TX3 [(Transmission Antenna No. 3)]; (4) TX4 [(Transmission Antenna No. 4)]; (5) ANT 1 [(Direction Finding Antenna No. 1)]; (6) ANT 2 [(Direction Finding Antenna No. 2)]; (7) CNTRL 1; (8) CNTRL 2; (9) GPS ANTENNA; (10) 10 MHZ REF OUT; (11) PC INPUT; (12) AUX1; (13) AUX2; (14) RX1 [(Receive Antenna No. 1)]; (15) RX2 [(Receive Antenna No. 2)]; (16) RX3 [(Receive Antenna No. 3)]; (17) RS232; (18) 10/100 [(Ethernet)]; (19) USB [(x2)] ; and (20) DC INPUT 12VDC.  *See id.*

### c.  AmberJack ™

The trademark name "AmberJack" is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,710,009 [AmberJack] (registered Aug. 22, 2003), *all associated documents available via search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011) (various excerpts attached as EXHIBIT 15).  In a public declaration signed August 14, 2001, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, stated that the mark is for "direction finding antennas for use in locating and tracking mobile telephones." *Id.* (Bates Nos. 3-4 of EXHIBIT 15).  The trademark documents indicate that the mark was first used in connection with the goods on October 28, 2002 and was first used in commerce on October 28, 2002.  *See id.* (Bates No. 1 of EXHIBIT 15).  Also available in the public record is a picture of the AmberJack mark attached to goods as used in interstate commerce.  *See id.* (Bates No. 2 of EXHIBIT 15).[4]  In the picture, a warning sticker attached to the

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1   AmberJack reads "Direction Finding System has been designed to mount magnetically" and/

2   or with a "tie-down kit" and used at "normal highway speeds" (indicating road vehicle

3   deployment).  *See id.*

### d.  KingFish ™

5        The trademark name "KingFish" is registered to Harris Corporation out of Melbourne,

6   FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,867,227

7   [KingFish] (registered Jul. 27, 2004), *all associated documents available via search at*

8   <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011) (various

9   excerpts attached as <u>EXHIBIT 16</u>).  In a public declaration signed August 16, 2001, Harris

10  Intellectual Property Dept. attorney, Michael S. Yatsko, stated that the mark is for "electronic

11  surveillance transceivers for tracking, locating and gathering information from cellular

12  telephones."  *Id.* (Bates Nos. 3-4 of <u>EXHIBIT 16</u>).  The trademark documents indicate that

13  the mark was first used in connection with the goods on December 10, 2003 and was first

14  used in commerce on December 10, 2003.  *See id.* (Bates No. 1 of <u>EXHIBIT 16</u>).  Also

15  available in the public record is a picture of the KingFish mark attached to goods as used in

16  interstate commerce.  *See id.* (Bates No. 2 of <u>EXHIBIT 16</u>).[4]  In the picture, the KingFish

17  shows the following labeled connection ports: (1) REMOTE ANTENNA, (2) USB, (3) DF

18  [(Direction Finding)] ANTENNA, (4) EXT PA, (5) DC INPUT, and (6) MAIN ANTENNA.

19  *See id.*

### e.  TriggerFish ™

21       The trademark name "TriggerFish" is registered to Harris Corporation out of

22  Melbourne, FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No.

23  2,534,253 [TriggerFish] (registered Jan. 29, 2002), *all associated documents available via*

24  *search at* <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011)

25  (various excerpts attached as <u>EXHIBIT 17</u>).  In a public declaration signed July 9, 2001,

26  Harris Intellectual Property Dept. attorney, Michael S. Yatsko, stated that the mark is for

27  "electronic receivers for intercepting and monitoring cellular network communications" and

28  that it "was first used in connection with the goods at least as early as November 26, 1997,

was first used in interstate commerce at least as early as November 26, 1997, and is now in use in such commerce." *Id.* (Bates Nos. 3-4 of <u>EXHIBIT 17</u>).  Also available in the public record is a picture of the TriggerFish mark attached to goods as used in interstate commerce. *See id.* (Bates No. 2 of <u>EXHIBIT 17</u>).

### f.   LoggerHead ™

The trademark name "LoggerHead" is registered to Harris Corporation out of Melbourne, FL, USA.  *See* United States Patent and Trademark Office, Trademark Reg. No. 2,555,909 [LoggerHead] (registered Apr. 2, 2002), all associated documents available via search at <http://tmportal.uspto.gov/external/portal/tow> (last accessed Mar. 11, 2011) (various excerpts attached as <u>EXHIBIT 18</u>).  In a public declaration signed July 9, 2001, Harris Intellectual Property Dept. attorney, Michael S. Yatsko, stated that the mark is for "electronic surveillance transceivers for intercepting, monitoring and gathering information concerning cellular network communications" and that it "was first used in connection with the goods at least as early as August 25, 1999, was first used in interstate commerce at least as early as August 25, 1999, and is now in use in such commerce." *Id.* (Bates Nos. 3-4 of <u>EXHIBIT 18</u>).  Also available in the public record is a picture of the LoggerHead mark attached to goods as used in interstate commerce.  *See id.* (Bates No. 2 of <u>EXHIBIT 18</u>).

### 3.   Officially released and publicly available city and/or county government documents containing disclosures by local government officials and Harris Corporation employees regarding its wireless device locators.

#### a.   Documents released by the local government of the city of Durham, NC, USA.

The publicly disclosed Durham, NC, City Council Agenda No. 7503 contains a Sole Source Vendor Justification letter by Michael E. Dillon, of Harris Corporation, revealing the following information regarding the Harris RayFish product line:

> The Harris RayFish ® product line includes the StingRay II, StingRay, and KingFish systems, which are compatible with the CDMA2000, GSM, and iDEN (Nextel) protocols.  <u>The Harris StingRay and KingFish systems are the only cooperative portable/man-portable standard +12VDC powered/battery powered multiprotocol surveillance systems currently available.</u>  When

interfaced with the optional Harris AmberJack DF antenna, supported mapping software, laptop PC controller, and the Harris 25-Watt power amplifier kit, the StingRay can perform vehicular-based operations.  The transportability and standard +12VDC vehicular power features of the Harris StingRay and AmberJack, and the battery-powered features of the KingFish are unique for tactical mission needs.

Durham, NC, USA - City Council Agenda No. 7503 (Harris Sole Source Vendor Justification letter), p. 1 (Jan. 3, 2011), *available at* <http://www.durhamnc.gov/agendas/2010/cws20110103/251951_7503_34236 3.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 19).

**b.  Documents released by the local government of the city of Miami, FL, USA.**

The publicly disclosed Miami, FL, City Commission Legislative Files contain numerous documents revealing information on Miami's purchase of various Harris wireless device locators and related products.  Some of these documents are quoted below:

[T]he Florida Department of Law Enforcement and Miami-Dade County have both determined the Harris Wireless Products Group is the only source for the StingRay, KingFish, StingRay/KingFish GSM and software upgrade.

Miami, FL, USA – Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor, p. 1 (Apr. 25, 2007), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34761.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 20).

———

A public hearing will be held by the City Commission of the City of Miami, Florida... for the purpose of waiving the requirements of obtaining sealed bids for the sole source purchase of electronic software (including training) to operate the Cellular Tracking Surveillance Equipment equipped with two electronic devices known as the Sting-Ray 4-CH and Kingfish 1-CH, from Harris GCSD Wireless Products Group, for the Department of Police, at an amount not to exceed $75,800.

Miami, FL, USA – Legislative Files, Notice of Public Hearing RE: Harris, p. 1, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34765.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 21).

———

The KingFish system is the only man-portable battery powered CDMA & GSM Interrogation, Active Location, and Signal Information Collection system currently available.  KingFish is compatible with CDMA commercial standards IS-95A, IS-95-B, TSB74, and J-STD-008 in the U.S. 800 and 1900 MHz bands.  A GSM S/W upgrade package (for the KingFish and its Pocket PC) is available for purchase that will allow operation against the GSM standard in the U.S. 800 and 1900 MHz bands (as well as the overseas 900 MHz E-GSM and DCS 1800 MHz bands).  KingFish can also be powered via standard automotive + 12V DC or standard 110 VAC.  The man-portability and battery power features of the Harris KingFish product are unique for tactical mission

RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
MEMORANDUM OF POINTS AND AUTHORITIES
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

needs, allowing the user to perform passive collection, active interrogation and active location while on foot (i.e., inside a multi-story building, or outside in rough terrain).

Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 22).

———

The Police Department will be purchasing a Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the StingRay 4-CH and KingFish 1-CH, from Harris GCSD...

The upgrade is necessary to operate both the StingRay 4-CH and the KingFish 1-CH given the continuous change in technology. The amplifier will allow an increase in wattage that will greatly heighten the ability of tracking phones from an increased distance and reducing the time utilized; the converter is a high performance converter that enables the StingRay and the KingFish to operate in the 2100 MHz band, which is the new cellular phone technology being introduced to the Miami market and already being utilized around the country; the Amberjack Wideband will enable the StingRay to use its added capabilities with the current iDEN software to pinpoint push-to-talk cellular phones more effectively, a feature that the current equipment does not have. This will enable the investigators to carry out their duties and responsibilities in a more effective and efficient manner.

Miami, FL, USA – Legislative Files, Inter-Office Memo RE: Harris Sole Source Vendor, p. 1 (Nov. 13, 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/47993.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 23).

———

A public hearing will be held by the City Commission of the City of Miami, Florida... for the purpose of waiving the requirements of obtaining sealed bids for the sole source purchase of Dual Band High Powered 30W Filtered Amplifier, a 2100 MHz Converter and an Amberjack Wideband Direction Finder to upgrade the current cellular tracking surveillance equipment, known as the Sting-Ray 4-CH and KingFish 1-CH, from Harris GCSD Wireless Products Group, for the department of police, at an amount not to exceed $51,500.

Miami, FL, USA – Legislative Files, Notice of Public Hearing RE: Harris, p. 1, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/47997.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 24).

———

The Harris StingRay and KingFish systems are compatible with the CDMA standard in the 800 MHz and 1900 MHz frequency bands, the GSM standard in the 800 MHz, 900 MHz, 1800 MHz, and 1900 MHz frequency bands, the iDEN (Nextel) standard in the 800 MHz and 850 MHz frequency bands, the UMTS standard in the 800 MHz and 1900 MHz frequency bands, and, with

optional converter equipment, the UMTS standard in the 2100 MHz frequency band.

The Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection system currently available.  When interfaced with the optional Harris AmberJack direction-finding (DF) antenna(s) (or handheld DF antenna for iDEN and UMTS), Tarpon software, laptop PC controller, and Harpoon amplifier kits, the StingRay can perform vehicular-based DF operations on the CDMA, GSM, UMTS, and iDEN cellular formats.  The transportability and standard +12VDC vehicular power features of the Harris StingRay and KingFish products are unique for tactical mission needs.

The StingRay and KingFish are quoted with software and accessories that are required in order to perform missions on the CDMA, GSM, UMTS, and iDEN cellular formats.  These include the cable assemblies, power supplies, antennas, laptop PC controller, power amplifiers, handheld DF antenna, AmberJack DF antenna, and cellular format software (CDMA, GSM, UMTS, and iDEN).

Harris also sells training on the use of the StingRay, KingFish and its accessories.  Standard training sessions are 2 days per class with a maximum class size of 4 students....

Miami, FL, USA – Legislative Files, Harris Sole Source Letter [Attachment B], p. 2 (Aug. 25, 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/ Attachments/40003.pdf> (last accessed Mar. 9, 2011) (Bates No. 2 of EXHIBIT 25).

———

CELLULAR TRACKING SYSTEM-UPGRADE
The Technical Assistance Support Detail is requesting Law Enforcement Trust Funds to upgrade the department's cellular tracking system.  This Equipment has become an integral part of investigation in the relatively short time the department has had it.  To date it has been successfully utilized to track 24 cellular phones successfully capturing nine phones.  The rapid changes in technology require a continuous upgrade to ensure it does not become obsolete.

Miami, FL, USA – Legislative Files, Police Legal Advisors Review [Attachment C], p. 2, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/48004.pdf> (last accessed Mar. 9, 2011) (Bates No. 2 of EXHIBIT 26).

———

The publicly disclosed Miami, FL, City Commission Legislative Files also contain

Harris product datasheets revealing information on the features of Harris line of wireless

device locators.  Some of these Harris datasheets are quoted below:

**StingRay ™** Transportable CDMA Interrogation, Tracking and Location, and Signal Information Collection System

***Product Description***

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

StingRay ™ is Harris' latest offering in a long line of advanced wireless surveillance products.  StingRay is a multichannel software defined radio that performs network base station surveys, Dialed Number and registration collection, mobile interrogation, and target tracking and location with Harris' AmberJack ™ Direction-Finding Antenna.  This low-power transportable surveillance system is designed with the future in mind—its reconfigurable architecture lends itself to upgrades of new capabilities and wireless standards, while preserving the initial investment in hardware.

### Features

- Software Defined Radio (SDR) enables Simultaneous monitoring of up to eight CDMA Paging/Access channel pairs

- Active interrogation capability emulates base station to collect MINs and ESNs through forced registration; external PA output available for higher power requirements

- Interfaces with AmberJack antenna to form a complete target tracking and location solution using active direction-finding and ranging techniques (active approach does not require the target phone to be engaged in a call)

- Optional geolocation software overlays target tracks and tracking vehicle location on a digital map

- Wideband RF front-end provides simultaneous operation in the U.S. cellular 800 and PCS 1900 MHz bands and is preconfigured to support iDEN (low band), GSM 900, and DCS 1800 bands

- PC-based controller running Windows® XP provides an Intuitive Graphical User Interface (GUI)

- Industry-standard USB interface enables plug-n-play networking of multiple StingRay surveillance systems if the user requires more channel capacity

- Supports targeting and real-time searching of mobile identification numbers (MIN), dialed numbers, and electronic serial numbers (ESN)

- Low-power system designed for vehicular operations

Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf> (last accessed Mar. 9, 2011) (Bates No. 01 of <u>EXHIBIT 27</u>).

———

**AmberJack ™** Dual-Band Direction Finding System

### Product Description

AmberJack ™ is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users.  The DF antenna array is designed to operate with Harris' LoggerHead ™ and StingRay ™ products enabling tracking and location of AMPS, TDMA and CDMA phones.  AmberJack operates in both the cellular and PCS bands.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE, AND IN CAMERA HEARING IF NECESSARY

AmberJack combines Harris' expertise in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction finding system.  Beam forming technology offers a universal DF antenna for existing as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface.  Once a targeted phone is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Features

• Determines direction of arrival and received signal strength of phone's transmission

• Provides real-time display of direction to the target

• Low power, small size

• User-friendly graphical user interface for the PC or Pocket PC (optional)

Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf> (last accessed Mar. 9, 2011) (Bates No. 02 of <u>EXHIBIT 27</u>).

———

**AmberJack** ® Direction-Finding System

### Product Description

AmberJack ® is a phased array direction-finding (DF) antenna system capable of tracking and locating mobile phone users and base stations. The DF antenna array is designed to operate with Harris' Gossamer ®, KingFish ®, StingRay ®, and StingRay II ® products, enabling tracking and location of targeted mobile phones, as well as base stations. AmberJack-X operates in the U.S. cellular 850 and PCS 1900 bands, and AmberJack-G operates in the EGSM 900 and DCS 1800 bands.  AmberJack-W operates in all the bands above as well as IDEN ™ and UMTS bands I and IV.

AmberJack combines Harris' experience in phased array antenna technology and tracking and locating systems to offer a state-of-the-art direction-finding system.  Phased array technology offers a universal DF antenna for existing, as well as future cellular standards.

The DF antenna array incorporates magnetic mounts for ease of installation on the roof of a tracking vehicle and offers a low profile for reduced visibility. User-friendly software, developed for the Windows® operating system, enables intuitive control of the AmberJack system and its companion receiver from a single interface. Once a target is engaged, information on the direction to the target is dynamically updated for display on the PC.

### Operations Supported

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

- Locating mobile phones and base stations

- Tracking mobile phones

**Features**

- Determines direction of arrival and received signal strength of a targeted mobile phone's transmissions

- Determines direction of arrival and received signal strength of a targeted base station's transmission

- Provides real-time display of direction to the target

- Low power and portable

- User-friendly Graphical User Interface (GUI) for the PC

…

**External Control**

- Laptop PC (Windows® XP Professional)

**Power Source**

- 12 Vdc at 0.5 A

**Physical Characteristics**

- Size: D = 17" H = 4.2"

- Weight: <14 lbs

**Required Accessories** *(sold separately)*

Gossamer with PC Controller, StingRay system, StingRay II, or KingFish with PC Controller

**Optional Accessories**

- Harpoon ™ for DF range extension

…

Miami, FL, USA – Legislative Files, Harris Sole Source Letter [Attachment B], p. 6-7 (Aug. 25, 2008), *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/40003.pdf> (last accessed Mar. 9, 2011) (Bates Nos. 6-7 of EXHIBIT 25).

———

**Geolocation (Preliminary)** PC-Based Intelligent AMPS/TDMA and CDMA Tracking and Location

**Product Description**

Geolocation is a PC-based software application that allows the user to

intelligently track and locate targeted AMPS/TDMA or CDMA cellular phones...  Geolocation consists of software and an external GPS receiver. Geolocation will be offered in two options: an AMPS/TDMA Option to be used in conjunction with the Harris LoggerHead ™ Interrogator plus the PC Controller ™ and the AmberJack ™ DF Antenna; and a CDMA Option to be used in conjunction with the Harris StingRay ™ system plus the AmberJack ™ DF Antenna.

Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone.

Providing a visual screen of an accurate local map, the exact location of the tracking vehicle, and the approximate location of the targeted phone, allows for a much more intelligent and expedient method for tracking and location.

### Features

- User-friendly application running on Windows® 98/2000/XP provides an intuitive Graphical User Interface (GUI)

- AMPS/TDMA: Interfaces with the LoggerHead ™ Handheld Interrogator plus the PC Controller ™ and the AmberJack ™ Direction-Finding (DF) Antenna

- CDMA: Interfaces with the StrngRay ™ plus the AmberJack ™ Directicn-Finding (DF) Antenna

- Provided GPS receiver integrates with PC running the application

- Real-time viewing of tracking vehicle location

- Real-time viewing of approximate targeted cellular phone location

- Tracking missions can be stored for post-mission analysis

- Migration path to GSM and future cellular standards

Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf> (last accessed Mar. 9, 2011) (Bates No. 01 of <u>EXHIBIT 28</u>).
_____

**KingFish ™ (Preliminary)** Portable CDMA Interrogation, Direction-Finding, and Collection System

### Product Description

KingFish ™ provides investigators with a tool that extracts the telephone number (MIN) and Electronic Serial Number (ESN) from a CDMA mobile telephone.  The Active Direction-Finding (DF) capability enables location of a powered-on phone without depending on the suspect to be involved on a call. Additionally, KingFish provides passive Dialed Number Recorder (DNR) and Registration Collection capabilities.  Passive operations identify calling patterns and provide information on the suspect's area of operation.

KingFish is based on a Software Defined Radio (SDR) architecture, which enables upgrades to future cellular standards, while preserving the initial investment in hardware. As initially offered, KingFish provides CDMA operation in both the Cellular and PCS bands.

**Features**

**Covert Packaging**

- Concealed radio, antennas, and battery power supply

- Wireless remote control from commercially available Pocket PC

**Intuitive Application Software**

- Windows® interface

- Identifies active CDMA channels and catalogs base station parameters

- Provides real-time display of Interrogation and Passive Collection results

- Dynamically updates received signal strength to enable precise location of a target phone

Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf> (last accessed Mar. 9, 2011) (Bates No. 02 of EXHIBIT 28).

———

Publicly disclosed Miami, FL, City Commission Legislative Files also contain a Harris GCSD Price List with numerous wireless device locators and accessories listed. *See* Miami, FL, USA – Legislative Files, Harris GCSD Price List (Sep. 2008), p. 1-8, *available at* <http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf> (last accessed Mar. 9, 2011) (EXHIBIT 29). The price list has a StingRay accessory named "Airborne DF Kit CONUS" ($9,000), indicating that the StingRay may be used via airborne vehicle deployment. *See* Bates No. 04 of EXHIBIT 29.

**c.   Documents released by the local government of Maricopa County, AZ, USA.**

Publicly disclosed Maricopa County, AZ, government documents contain an award contract between Harris Corporation and Maricopa County for the purchase of the Harris KingFish wireless device locator and related accessories. *See* Maricopa County, FL, USA – Harris Contract, Serial No. 09041-SS (May 27, 2010), *available at*

<http://www.maricopa.gov/materials/Awarded_Contracts/PDF/09041-c.pdf> (last accessed

Mar. 9, 2011) (<u>EXHIBIT 30</u>).  The contract indicates that Maricopa County paid $89,300 for

the KingFish and related accessories with a KingFish description reading "Interrogation,

Direction Finding, Denial of Service & Passive Collection."  *See* Bates No. 03 of <u>EXHIBIT</u>

<u>30</u>.  The contract also contains a Harris WPG Product Pricing list with numerous wireless

device locators and accessories listed.  *See* Bates Nos. 04-08 of <u>EXHIBIT 30</u>.

### 4.   Publicly available patent documents containing official disclosures by Harris Corporation regarding its wireless device locator technology.

In U.S. Patent No. 7,592,956, McPherson, *et al.*, Explains a "Wireless Transmitter

Location Determining System And Related Methods."  *See* McPherson, Rodney, *et al.* (Palm

Bay FL, US), Harris Corp., U.S. Patent No. 7,592,956 (Sep. 22, 2009), *available at*

<http://www.freepatentsonline.com/7592956.html> (last accessed Feb. 22, 2011) (<u>EXHIBIT</u>

<u>31</u>).  This patent, with Harris as the assignee, explains specific proprietary technology that

can be directly linked to the features of the Harris StingRay as listed on the Harris datasheet

attached as Bates Nos. 15-16 of <u>EXHIBIT 13</u> and Bates No. 01 of <u>EXHIBIT 27</u>.  For

example, *see* U.S. Patent No. 7,592,956, p. 4, ln. 42-45 (referring to *Interrogation*: "the

signal may comprise a signal that would routinely prompt a transmission reply from the

wireless transmitter under the applicable communication standard" (claim note omitted));  p.

4, ln. 7-11 (referring to *Ranging Techniques*: "the range measurements may comprise time of

flight measurements, i.e. the time elapsed for a transmission signal to traverse the distance

between the platform and the wireless transmitter" (claim notes omitted));  p. 6 ln. 13-17

(referring to *Active Approach*: "As the platform moves relative to the wireless transmitter, the

accuracy of the location estimate improves if the trajectory of the platform: breaks symmetry

with regards to the wireless transmitter, reduces ambiguity resolution, and minimizes

geometric dilution of precision (GDOP)." (claim notes omitted)).  McPherson, *et al.*, also

teaches that the geolocation equations used by wireless device locators are accurate enough

to pinpoint the location of a wireless device to a precise floor inside a multi-story building.

*See id.*, p. 7 ln. 45-47 ("The equations below are derived from the general case where the

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

target is located in a 3D space which may be useful if the target (wireless transmitter) is in a high-rise building...").  The above is only a small sample of the wireless device locator technology patented by Harris Corporation.  The defense has isolated over 100 relevant patents with Harris as the assignee—all of these patents are made available to the public through the United States Patent and Trademark Office.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

### 5.   Official public government disclosures regarding its use of wireless device locators in law enforcement and the underlying technology.

Via a November 29, 2007 request for information under the FOIA, 5 U.S.C. § 552 *et seq.*, the American Civil Liberties Union and the American Civil Liberties Union Foundation ("ACLU") asked the U.S. Department of Justice, Executive Office for United States Attorneys ("USDOJ"), to produce documents pertaining to the use of cell phone tracking and locating in criminal investigations.  *See* Catherine Crump, ACLU FOIA request to USDOJ (November 29, 2007), *available at* <http://www.aclu.org/files/pdfs/freespeech/eousa_foia_20071129.pdf> (last accessed Mar. 30, 2011) (relevant sections attached as <u>EXHIBIT 32</u>);  s*ee also* the resulting litigation at <u>American Civil Liberties Union v. Department of Justice</u>, U.S. Dist. LEXIS 29040, No. 08-1157 (JR) (D.D.C., Mar. 26, 2010).  In an August 12, 2008 response to the above noted FOIA request, the USDOJ made official public disclosures of various sections from its Electronic Surveillance Manual.  *See* USDOJ (M.D. La.) Response to ACLU FOIA Request No. 07-4130 (Aug. 12, 2008), *available at* <http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf> (last accessed Jan. 11, 2011) (relevant sections attached as <u>EXHIBIT 33</u>).  In the manual, under a heading labeled "Collection of Cell Phone Location Information Directly by Law Enforcement," the government informed the public of the following investigative techniques involving cell phone triangulation through use of a single wireless device locator in multiple positions:

Law enforcement possesses electronic devices that allow agents to

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1
2
3
4
5

determine the location of certain cellular phones by the electronic signals that they broadcast.  This equipment includes an antenna, an electronic device that processes the signals transmitted on cell phone frequencies, and a laptop computer that analyzes the signals and allows the agent to configure the collection of information.  Working together, these devices allow the agent to identify the direction (on a 360 degree display) and signal strength of a particular cellular phone while the user is making a call.  **By shifting the location of the device, the operator can determine the phone's location more precisely using triangulation**.

6
7
8
9
10
11

In order to use such a device the investigator generally must know the target phone's telephone number (also known as a Mobile Identification Number or MIN).  After the operator enters this information into the tracking device, it scans the surrounding airwaves.  When the user of that phone places or receives a call, the phone transmits its unique identifying information to the provider's local cell tower.  The provider's system then automatically assigns the phone a particular frequency and transmits other information that will allow the phone properly to transmit the user's voice to the cell tower.  By gathering this information, the tracking device determines which call (out of the potentially thousands of nearby users) on which to home in.  While the user remains on the phone, the tracking device can then register the direction and signal strength (and therefore the approximate distance) of the target phone.

12

*Id.*, p. 9-10 (emphasis added) (Bates Nos. 03-04 of <u>EXHIBIT 33</u>).

13

Other documents in the FOIA response reveal additional investigative techniques and

14

provide the exact make of specific wireless device locators (*i.e.*, the Harris TriggerFish and

15

the Smith Myers Swamp Box):

16
17
18

A "triggerfish" can also be used to determine the cell site being used by a particular cellular telephone.  In addition, the cellular telephone company should be able to provide cell site information.  Once a cell site is determined, law enforcement agents can conduct surveillance in a more specific area in an effort to identify the user of the cellular telephone.

19

*Id.*, p. 16 (Bates No. 07 of <u>EXHIBIT 33</u>).

20
21
22
23

A cell site simulator (sometimes called a digital analyzer, cell site locator, triggerfish, ESN reader, or swamp box) is a mobile device that can electronically force a cell phone to register its telephone number (MIN), electronic serial number (ESN), and information about its location, when the phone is turned on.  This can be done without the user knowing about it, and without involving the cell phone provider.

24

*Id.*, p. 18 (Bates No. 06 of <u>EXHIBIT 33</u>).

25

In a response to the EFF FOIA request noted in Section II(D)(1), *supra*, the FBI

26

officially disclosed to the public various FBI emails and other documents relating to its

27

efforts to surreptitiously locate cellular phones.  In the FOIA response, the FBI publicly

28

disclosed an email sent by an agent wherein he/she advised a list of email recipients of the

1   FBI's ability to pinpoint the location of cell phones in office buildings and in hotels:

2       The **[REDACTED BY FBI]** is a new product from **[REDACTED BY FBI]**
        that allows portable tracking of **[REDACTED BY FBI]** phones.  It has one

3       receiver, compared to the **[REDACTED BY FBI]** in the **[REDACTED BY
        FBI]** and looks like it will be a useful tool when we need to enter a building to

4       pinpoint the exact location of a phone.  We were able to find phones hidden in
        an office building and a hotel using the **[REDACTED BY FBI]** during several

5       different tests.
        …

6
        An upcoming update to the **[REDACTED BY FBI]** will allow it to be

7       connected to the **[REDACTED BY FBI]** direction finding antenna array so
        that a bearing to the target can be obtained.  It is unknown if we will need this

8       capability if the **[REDACTED BY FBI]** is updated to track **[REDACTED BY
        FBI]** phones.

9
        FBI Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1, p. 41

10      (Aug. 27, 2007), *available at*
        <http://www.eff.org/files/filenode/061708CKK/082707_dcs01.pdf> (EFF PDF

11      Set 1 of 6) (last accessed Jan. 11, 2011) (Bates No. 06 of <u>EXHIBIT 34</u>).

12  In another publicly disclosed email, an FBI Office of Technology Division (OTD) agent

13  provided assistance to other agents while they troubleshooted their inability to operate

14  wireless device locating equipment to locate a cell phone:

15      ...sometimes in the 'heat of battle' **[REDACTED BY GOVERNMENT]**
        cables are connected improperly - that is, the IN gets connected to the OUT

16      and vise versa...always verify that the hardware is properly installed whenever
        you feel things aren't working properly.  One last thing to validate is whether or

17      not the AMP was enabled on the software...

18      *Id.*, p. 14-16 (Bates Nos. 03-05 of <u>EXHIBIT 34</u>).

19  In another publicly disclosed email, an individual spoke of how agents connected a flat panel

20  antenna to the Harris LoggerHead in order do locations but are still dependent on Harris to

21  update its LoggerHead software:

22      I was working with some agency guys yesterday.  They are putting together a
        system with a flat panel ant[enna] and a loggerhead and doing locations based

23      on registrations.  It works.  They have a later software version on their
        loggerheads (I think).  It will really help when we can use your software for

24      real time display of the loggerhead activity.  As it is, you have to make a pass
        in the area, move somewhere else, look at the log, etc.  Any word on when

25      Harris can make the change to the loggerhead?

26      FBI Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1, p. 142
        (Aug. 27, 2007), *available at*

27      <http://www.eff.org/files/filenode/061708CKK/082707_dcs06.pdf> (EFF PDF
        Set 6 of 6) (last accessed Jan. 11, 2011) (<u>EXHIBIT 35</u>).

28

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

**6.    Publicly released book by Lee Lapin, former government advisor, containing information on the Harris line of wireless device locators and others.**

Lee Lapin, former government advisor and author of the publicly released book, *How To Get Anything On Anybody – Book 3*, has been described as follows:

> Lee has worked with several agencies, both public and private, helping to develop surveillance and tracking equipment and techniques.  His works ("letters on file") are employed as textbooks by many of the world's major intelligence agencies including the CIA, KGB and MOSSAD, the Justice Department, IRS, ATF, even the FBI.  In addition, Lee has appeared on several national talk shows and has been featured on the front page of the NY Times, in People Magazine, Associated Press, and in many other magazines and newspapers.

Coast to Coast AM (website), *Lee Lapin - Guests - Coast to Coast AM*, Lee Lapin Biography, <http://www.coasttocoastam.com/guest/lapin-lee/6469> (last accessed Mar. 11, 2011) (print-out attached as <u>EXHIBIT 36</u>).

In his book, Lee Lapin explains the functionality of various wireless device locators manufactured by Harris Corporation (*i.e.*, LoggerHead 4000, DF Antenna Array, SeaHorse, StarFish, and TriggerFish) and the CSS2001 "Swamp Box" manufactured by Smith Myers:

> The LoggerHead 4000 is a handheld device that enables survey, intercept, and interrogation of analog and digital cellular networks.  This multipurpose tool provides investigators with a means of passively monitoring forward and reverse voice traffic, locating targeted cellular telephone users, actively intercepting calls, and interrogating cellular telephones for identifying information.  LoggerHead 4000 operates in the cellular and PCS bands.
>
> **Base Station Survey**
> ●    Identifies analog and digital control channels with related received signal strength
> ●    Captures network information including System ID (SID) and service provider features
> ●    Time tags and stores survey results
>
> **Passive Mobile Survey**
> ●    Intercepts forward and reverse audio using operator-defined mobile target parameters
> ●    Captures call related information including Mobile Identification Number (MIN), Electronic Serial Number (ESN), Dialed Number, Caller ID. and Received Signal Strength
> ●    Collects occurrences of mobile registrations with the network
> ●    Scans voice traffic channels for call activity
>
> **Active Mobile Survey**
> ●    Emulates Base Station Control Channel to "capture" mobile phones in close proximity
> ●    Collects MINs and ESNs through forced registration

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

●     Actively intercepts or denies calls originating from captured mobile phones

**Direction Finding**
●     Interfaces with available direction-finding equipment

Lapin, Lee (Mt. Shasta, CA, US), *How To Get Anything On Anybody – Book 3*, Intelligence Here, p. 122 (January 15, 2003).
_____

SeaHorse is an Interrogation and Direction Finding (DF) system, which is capable of identifying, tracking, and locating an IS-95 (CDMA) mobile phone. SeaHorse may be deployed with a tracking vehicle or in a man-portable configuration. The interrogation function is used to extract the identity (IMSI and ESN) of a suspect's mobile phone, if this information is not already known to the investigator. The DF function is used to track and locate a targeted suspect.

SeaHorse is capable of operating in both the Cellular and PCS bands. User friendly software, developed for Windows operating systems, enables control of the SeaHorse system from a laptop or pocket PC.

The DF Antenna Array incorporates magnetic mounts for ease of installation to the roof of a tracking vehicle. Once a targeted phone is engaged, information on the directions to the target is dynamically updated for display on the PC. The DF Antenna Array is designed to operate with Harris' entire line of interrogators and intercept receivers, enabling tracking and location of AMPS, TDMA, GSM, as well as CDMA phones.

When detached from the laptop PC and Antenna Array, the interrogator unit can be easily concealed for tactical interrogation and location operations.

**Features**
      Base Station Survey Capability
●     Identifies active CDMA channels
●     Measures and records pilot signal strengths
●     Captures network information required for interrogation operation
●     Time tags and stores survey results

**Interrogation**
●     Emulates Base Station to "capture" IS-95 phones in close proximity
●     Collects and stores phone identities (IMSI and ESN)

**Direction Finding**
●     Engages targeted mobile phone
●     Determines direction of arrival and received signal strength of phone's transmissions
●     Provides real-time display of direction to the target

*Id.*, p. 123.
_____

RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

MEMORANDUM OF POINTS AND AUTHORITIES

StarFish integrates the Harris TriggerFish ™ and LoggerHead ™ surveillance products into a single pinpoint cellular location product. StarFish combines the multichannel monitoring capability of the TriggerFish with the mobility of the handheld LoggerHead to track a cellular user to an area the size of a hotel room. The StarFish system is comprised of a LoggerHead segment and a TriggerFish segment. The LoggerHead segment consists of a LoggerHead, directional antenna, a pocket PC (PPC) and communications equipment that is man-portable and concealed within a common backpack or shoulder bag. The TriggerFish segment consists of a TriggerFish and wireless communications equipment.

In StarFish mode, the LoggerHead receives its channel assignment remotely from the TriggerFish segment and graphically represents signal strength indications from the directional antenna to the PPC enabling the operator to locate the cellular target. The TriggerFish segment serves as the command and control element for StarFish. It monitors for a selected cellular target and sends channel assignments and short text messages to a maximum of six LoggerHead segments in the field.

Feedback to the TriggerFish operator of LoggerHead receiver signal strength and channel information allows an operator to direct and coordinate the search while somewhat removed from the hostile environment.

**Features**
●    Ability to intercept and locate an AMPS/TDMA phone operating in the U.S. cellular or PCS bands
●    Ability of the TriggerFish to remotely control and status up to six LoggerHeads at a range of up to 2,000 feet
●    Remote control and status of LoggerHead mobile tracking functions via the PPC
●    Concealment of the LoggerHead segment in an ordinary backpack or shoulder bag

*Id.*, p. 123-24.

_____

Produced by Smith Myers, the CSS2001 not only blocks our local cell phones, it seizes control of all nearby cell phones. By utilizing a full 4 watts of output the "swamp box" is able to perform electronic magic including:

●    Seizes control of nearby cellular phones
●    Registers all cell phones in the area
●    Operates on 12v or internal battery
●    Output power adjustable up to 4 watts
●    Weighs less than 5 pounds
●    Two internal logs
●    Downloads logs to PC or printer
●    Compares logs to isolate target phones
●    User friendly, totally self-contained

The CSS2001 "Swamp Box" is a portable unit that transmits signals identical to those of a base station (cell site). Any targeted phone will obey the commands given it by the CSS2001. Target phones in range can be forced to give up their ESN, MIN, and SCM. This data is stored in one of two internal

logs.  The unit can compare the two logs for cross-reference identification of targets.  Logs can also download to a PC or printer.  The CSS2001 performs the following functions on targeted phones using simulated local command signals: extraction of RF electronic information, jamming to deny network access and forced continuous RF transmission for direct[ion] finding.  Specific commands include: System Busy, Line busy, Directed Retry, Land Release, Bad Number and others.  It is also possible to communicate with the target phone directly using LPI/LPD signaling techniques.

*Id.*, p. 140-41.

———

Lee Lapin's book, quoted above, is available FREE to any member of the public who has access to the Internet.  *See* Google Books (website), *How To Get Anything On Anybody – Book 3*, <http://www.google.com/search?tbo=p&tbm=bks&q=isbn:1-880231-13-1&num=10> (last accessed Feb. 22, 2011).

**7.    Information disclosed in public court records.**

The *Allums* court opinion, published as <u>United States v. Allums</u>, 2009 U.S. Dist. LEXIS 24224, No. 2:08-CR-30 TS (D. Utah, Mar. 24, 2009), paraphrases sworn testimony given by a purported government expert, William Shute, on an investigative technique involving base station surveys performed on cell towers using a StingRay in order to determine the past call locations of a cell phone:[5]

At the February 24, 2009 *Daubert* hearing, "[William] Shute testified that he identified the originating cell tower for each of the calls in question.  Shute testified that he purchased a cell phone from the same service provider as the Defendant and placed the phone into 'engineering mode,' where the phone display showed the cell tower to which it was currently connected.  Using that phone and another device called a Stingray, which also tracked which cell tower was the strongest at any geographical position, Shute drove for some time around the neighborhoods surrounding the cell towers in question and determined an approximate range for each cell tower.  Specifically, Shute testified that he was able to determine the approximate distance from the originating cell tower where the cell phone and Stingray switched from the originating cell tower to another cell tower.  Shute testified that this method allows him to determine, with a reasonable degree of certainty, a fairly narrow geographical location where an individual is located while a cell call is being placed." *Id.*

———

5.    Performing base station surveys is only one of the investigative techniques that can be conducted using a StingRay.  *See* the datasheet for the StingRay attached as Bates No. 01 of <u>EXHIBIT 27</u>.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE, IN CAMERA HEARING IF NECESSARY

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

**E.    Information provided directly to the defendant by the government regarding the Harris StingRay and the FBI's Digital Collection Program.**

During the February 10, 2011 status conference, the Court asked the government "what, if anything, have you disclosed to Mr. Rigmaiden about the equipment?" *February 10, 2011 Status Conference, Partial Transcript of Proceedings*, [THE COURT] at 15:09:18 – 15:09:37.  In response, the government stated the following:

> "What we've disclosed, Your Honor, is that we obtained the two court orders in California to authorize us to use this equipment; that the equipment was used to assist the investigation, the prosecution team." *Id.*, [MR. BATTISTA] at 15:09:37 – 15:10:00.

The two court orders referred to above are (1) the N.D.Cal. 08-90330MISC-RS order (use and monitor a mobile tracking device), and (2) the N.D.Cal. 08-90331MISC-RS order (install and continually use a pen register and trap and trace device)[6]—both of which were placed on the record by the government under seal at Dkt. #463 (lodged).  In addition to the two court orders, the government has also revealed further information regarding the FBI's Digital Collection Program and the wireless device locators used to search for and locate the aircard.  This additional information is outlined below.

**1.    The FBI's Digital Collection Program.**

**a.    According to the evidence.**

Via the discovery process, the government provided the defendant with the CDNRS files[7] generated by the government's Pen/Trap device, *i.e.*, the SF-Martinez DCS-3000[8]

---

6.    Neither of the orders are warrants and neither complies with Rule 41 of the Federal Rules of Criminal Procedure.  Additionally, the only probable cause finding contained in the orders was for the use and monitoring of a mobile tracking device.  The prosecution admits that no mobile tracking device was used in this case.  *See* Section II(E)(2)(b), *infra*.  All other judicial findings contained in the orders in support of investigative techniques and seizing evidence are based on a mere relevance standard.

7.    *See* the defendant's definition of *DCS-3000 CDNRS Files* attached as <u>EXHIBIT 09</u>.

8.    *See* the defendant's definition of the *Digital Collection System 3000 (DCS-3000)* attached as <u>EXHIBIT 08.</u>

[9] server, while it was logging the government's surreptitious pings (*i.e.*, phone calls) made to the aircard.  An excerpt of the CDNRS file is attached as <u>EXHIBIT 37</u>.  The government also eventually provided the defendant with the original native form digital data used to create the CDNRS files, *i.e.*, the LAESP messages,[10] received from Verizon Wireless in response to the government's pings sent to the aircard.[11]

## 2.  The Harris StingRay.

### a.  According to the evidence.

USPIS Inspector James L. Wilson ("USPIS Inspector Wilson") indicated in a report that FBI technical agents used a StingRay to pinpoint the location of the aircard:

> During the course of this investigation and conferring with TSD agents with the FBI and USPIS, we determined that doing a normal "Trap and Trace" on the aircard would suffice **[REDACTED BY GOVERNMENT]**.  Essentially we would ping the number associated to the card instead of collecting data from the aircard's connection.  On 7/10/08, an order was signed for a Trap and Trace on the suspect's aircard.  On 7/14/08, Verizon provided historical tower data (the data was provided in compliance with a "2703D Order").  Tower data indicated that the suspect's aircard was hitting on four specific towers within the Santa Clara/San Jose area.  Based on this information, on 7/15/08, Agent Murray (FBI), Agent Medrano (IRS), Agent Fleischmann (IRS), Agent Daun (IRS) and I flew to Santa Clara/San Jose to start triangulating the suspect's position.  Upon our arrival, we met with Agent William Ng at the San Jose FBI Office.  While at the San Jose Office, we met with several FBI agents with their Technical Service Division assigned to help us[] track the suspect's aircard.  According to the TSD Agents, Verizon had a set-up problem with "Provisions" for the PEN data.  Therefore, we were not able to get a signal on 7/15/08.  On 7/16/08, we were informed that they were able to track a signal and were **using a "Stingray" to pinpoint the location of the aircard**.  After numerous of hours on surveillance, we were able to get a positive signal at an apartment complex in Santa Clara....  We were able to narrow down the signal to three possible apartments: #1120, #1122 and #1124.

USPIS Investigation Details Report Entry, USPIS Inspector James L. Wilson,

---

9.  Although DCS-3000 servers obtain location information via Pen/Trap data sent from wireless carriers (*e.g.*, Verizon Wireless), the server hardware itself operates completely separate from mobile wireless device locator hardware such as the StingRay.

10.  *See* the defendant's definition of the *Lawfully Authorized Electronic Surveillance Protocol (LAESP)* attached as <u>EXHIBIT 07</u>.

11.  The relevancy of the noted evidence and why the defendant needs further details regarding the FBI's Digital Collection Program will be explained in the defendant's motion for disclosure of the relevant and helpful evidence currently being withheld based on a claim of privilege.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1   (August 7, 2008) (ITEM NO. 5 of July 31, 2009 discovery set) ("Wilson Report") (emphasis added) (<u>EXHIBIT 38</u>).

2   In her rough notes taken on June 15, 2008, one day prior to the aircard being located, IRS-CI

3   Agent Denise L. Medrano used the term "StingRay" in a checklist.  *See* <u>EXHIBIT 39</u>.  In a

4   July 11, 2008 email, IRS-CI Agent Tracy L. Daun ("IRS-CI Agent Daun") asked IRS-CI

5   Jeffrey H. Willert if she could assist the FBI with triangulating down on the aircard location.

6   *See* <u>EXHIBIT 40</u>.  In the government's January 28, 2011 discovery response letter, AUSA

7   Frederick A. Battista ("AUSA Battista") clarified the above email by indicating that IRS-CI

8   Agent Daun "was permitted to observe the operation of the equipment used to locate the

9   subject aircard..."  *Id.*, p. 5 (<u>EXHIBIT 02</u>).  Taking the Wilson Report and IRS-CI Agent

10  Daun's presence in tandem, it is logical to conclude that IRS-CI Agent Daun was in the

11  vicinity of the StingRay, while FBI Technical Agents used it to search for and locate the

12  aircard.

13                          **b.   According to the prosecution.**

14         Initially, the prosecution categorized the device used to search for and locate the

15  aircard as a "tracking device" or "mobile tracking device."  *See*, *e.g.*, Letter from AUSA

16  Frederick Battista to Daniel Rigmaiden, RE: among other matters, use of a mobile tracking

17  device to locate the aircard, p. 4 (Postmark date: June 18, 2010) ("...with respect to the use of

18  any **mobile tracking device**, no triangulation was done through the use of multiple devices."

19  (emphasis added)) (<u>EXHIBIT 41</u>); *May 28, 2010 Status Conference, Partial Transcript of*

20  *Proceedings*, [MR. BATTISTA] at 14:29:10 – 14:29:49 (Dkt. #359) ("the defendant is

21  seeking discovery regarding the operation and use of the **tracking device** which led to the

22  location of his apartment." (emphasis added)).  Eventually, the prosecution abandoned

23  "mobile tracking device" and settled on "pen register trap and trace device" as the legal

24  definition of the equipment used to search for and locate the aircard.  *See*, *e.g.*, Letter from

25  AUSA Frederick Battista to Daniel Rigmaiden, RE: among other matters, the equipment

26  used to locate the aircard is a "pen register trap and trace device" and not a "tracking

27  device," p. 1 (September 8, 2010) ("at this point, the government is only willing to advise

28  you that a 'pen register trap and trace device' (what we have been previously been referring

to as the 'tracking device') was used to locate the subject aircard.") (EXHIBIT 42); Letter from AUSA Frederick Battista to Daniel Rigmaiden, RE: among other matters, (1) no mobile tracking device was used in this case, and (2) the security classifications for the claimed privilege evidence, p. 1 (January 28, 2011) ("no tracking device, such as the type that may be covertly attached to motor vehicle or enclosed in a package, was used in this case.") (EXHIBIT 02).

The prosecution claims that the StingRay is a generic term that does not refer to the specific equipment used to search for and locate the aircard.  Via a letter dated October 18, 2010, the defendant inquired with the government as to whether a StingRay is an actual device used to locate cellular devices or simply a law enforcement buzz word not referring to any specific electronic surveillance equipment.  After a letter based discussion lasting until November 23, 2010, AUSA Battista stated the following:

> "For purposes of this case as of this date, please be advised that whenever the term 'stingray' appears in the discovery, the case agents, including IRS-C1 Special Agents Denise Medrano, Michael Fleischmann and Tracy Daun, FBI Special Agent Richard Murray and Postal Inspector James Wilson, as well as any of their immediate supervisors, were simply using the term in a generic sense and were not specifically referring to any particular piece of equipment that may have actually been used to locate the subject aircard."  Letter from AUSA Frederick A. Battista to Daniel Rigmaiden, RE: Stingray is a generic term, p. 1 (November 23, 2010) (EXHIBIT 43).

### III.   ARGUMENT

#### A.   The defendant's answers to the court's three primary legal questions.

##### 1.   When is it appropriate for the Court to hold an *ex parte*, *in camera* hearing to address the government's desire to withhold evidence based on a claim of privilege?

Case law dictates that specific steps must be followed and prerequisites met prior to a court even considering whether the government should be granted an *ex parte*, *in camera* hearing to address a claim of privilege.  In answering the above question, the defendant analyzes three separate but related doctrines upon which the government may invoke a claim

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

of privilege to withhold evidence.  The introductory section of this memorandum is also a brief answer to the above question and draws upon the three part analysis outlined below.

### a.   State Secrets Privilege.

"The state secrets privilege is a common law evidentiary privilege that permits the government to bar the disclosure of information if there is a reasonable danger that disclosure will expose military matters which, in the interest of national security, should not be divulged." Al-Haramain Islamic Found., Inc. v. Bush, 507 F.3d 1190, 1196 (9th Cir 2007) (internal quotation marks omitted) (citing United States v. Reynolds, 345 U.S. 1, 10 (1953)). Although the state secrets privilege is typically applied in the context of civil cases with the government as defendant or intervenor, its general principals are also applied in criminal cases involving other claims of executive privilege such as CIPA claims and the law enforcement privilege.[12]  The state secrets privilege "is not to be lightly invoked," and "[t]here must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by the officer." Kasza v. Browner, 133 F.3d 1159, 1165 (9th Cir. 1998) (quoting Reynolds, 345 U.S. at 7-8).  For this requirement, courts have accepted, e.g., "public and classified versions of declarations from John Negroponte, then-Director of National Intelligence, and Keith Alexander, then-Director of the NSA," Al-Haramain Islamic Found., Inc., 507 F.3d at 1195, and "a twenty-eight page, classified affidavit by James H. Geer, the assistant director of the FBI's Intelligence Division," In re United States, 872 F.2d 472, 474 (D.C. Cir. 1989).  Once certain prerequisites are met (see below), and if a court finds that further fact finding is necessary, it may also permit the government to proffer ex parte, in camera testimony as to the secrecy of the information or evidence at issue.  For example, in Halkin I the government invoked the state secrets privilege and "the District Court reviewed the In camera affidavits and heard Ex parte, in camera testimony of the [NSA] Deputy Director." Halkin v. Helms, 598 F.2d 1, 6

---

12.   See, e.g., United States v. Klimavicius-Viloria, 144 F.3d 1249, 1261 (9th Cir. 1998) (For a CIPA claim, "[i]n order to show that material is classified, the government must make a formal claim of state secret privilege.") (citation omitted));  Section III(A)(1)(c), infra (explaining how courts draw upon some of the procedural guidelines in state secrets cases while addressing any claim of executive privilege).

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1    (D.C. Cir. 1978) (*Halkin I*) (cited with approval in the Ninth Circuit's <u>Kasza v. Browner</u>, 133

2    F.3d at 1169).

3       When addressing a claim of state secrets privilege, a court "cannot resolve whether

4    the *Reynolds* evidentiary privilege applies without (1) an actual request for specific evidence,

5    (2) an explanation from [][the requesting party] of [][its] need for the evidence, and (3) a

6    formal invocation of the privilege by the government with respect to that evidence,

7    explaining why it must remain confidential." <u>Mohamed v. Jeppesen Dataplan, Inc.</u>, 579 F.3d

8    943, 961 (9th Cir 2009). Nor can a court "determine whether the parties will be able establish

9    their cases without use of the privileged evidence without also knowing what *non-privileged*

10    evidence they will marshal." *Id.* (citing <u>Crater Corp. v. Lucent Techs., Inc.</u>, 423 F.3d 1260,

11    1267-68 (Fed. Cir. 2005) ("deciding the impact of the government's assertion of the state

12    secrets privilege" before the record is "adequately developed" puts "the cart before the

13    horse")). Furthermore, "the greater the party's need for the evidence, the more deeply a court

14    must probe to see whether state secrets are in fact at risk." <u>Doe v. Tenet</u>, 329 F.3d 1135,

15    1152 (9th Cir. 2003).

16       After a party to an action makes a request and shows a need for certain evidence, and

17    after the government properly invokes the state secrets privilege, a court must then determine

18    whether the evidence at issue meets the legal definition of "secret" under the doctrine. *See*,

19    *e.g.*, <u>Hepting v. AT&T Corp.</u>, 439 F.Supp.2d 974, 986 (N.D. Cal. 2006). In *Hepting*, the

20    government invoked the state secrets privilege upon plaintiffs filing suit against AT&T for

21    contracting its facilities to the NSA for the purpose of conducting warrantless surveillance.

22    *See id.* While addressing the issue, the *Hepting* court indicated that "what is or is not secret

23    depends on what the government and its alleged operative AT&T and other

24    telecommunications providers have either admitted or denied or is beyond reasonable

25    dispute." *Id.* at 990-91. The *Hepting* court indicated that it will only consider "public

26    admissions or denials by the government, AT&T and other telecommunications companies,

27    which are the parties indisputably situated to disclose whether and to what extent the alleged

28    programs exist." *Id.* at 990. *See also* <u>Al-Haramain Islamic Found., Inc.</u>, 507 F.3d at 1198

(The court looked to "[t]wo discrete sets of unclassified facts" to support its determination that an alleged warrantless government surveillance program was not protected by the state secrets privilege). Furthermore, unlike claims of privilege made under CIPA, "*Reynolds* makes clear that 'classified' cannot be equated with 'secret' within the meaning of the doctrine. If the simple fact that information is classified were enough to bring evidence containing that information within scope of the privilege, then the entire state secrets inquiry —from determining which matters are secret to which disclosures pose a threat to national security—would fall exclusively to the Executive Branch, in plain contradiction of the Supreme Court's admonition that judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers without leading to intolerable abuses." Mohamed, 579 F.3d at 958-59 (internal quotation marks and brackets omitted) (citing Reynolds, 345 U.S. at 8-10).

"Once the privilege is properly invoked and the court is satisfied as to the danger of divulging state secrets,... the evidence is completely removed from the case." Kasza, 133 F.3d at 1166. "If, after further proceedings, the plaintiff cannot prove the *prima facie* elements of her claim with nonprivileged evidence, then the court may dismiss her claim as it would with any plaintiff who cannot prove her case." *Id.* "Alternatively, if the privilege deprives the *defendant* of information that would otherwise give the defendant a valid defense to the claim, then the court may grant summary judgment to the defendant." *Id.* (internal quotation marks and citation omitted). Finding dismissal appropriate from either angle, the *Kasza* court further noted that "[w]hile dismissal of an action based on the state secrets doctrine is harsh, the results are harsh in either direction and the state secrets doctrine finds greater public good – ultimately the less harsh remedy – to be dismissal." *Id.* (internal quotation marks and citation omitted).

## b. Classified Information Procedures Act ("CIPA").

The Classified Information Procedures Act ("CIPA"), codified at 18 U.S.C. app. III § *et seq.*, was enacted to provide statutory guidelines for courts to follow when dealing with classified evidence that may be discoverable in a criminal proceeding. *See id.* CIPA has its

1  roots in the common-law state secrets privilege.  *See*, *e.g.*, United States v. Aref, 533 F.3d 72,

2  78-79 (2nd Cir. 2008) ("The most likely source of the protection of classified information lies

3  in the common-law privilege against disclosure of state secrets....  It would appear that

4  classified information at issue in CIPA cases fits comfortably within the state-secrets

5  privilege.").  *See also* fn. 12, *supra*.  "The court, upon a sufficient showing, may authorize

6  the United States to delete specified items of classified information from documents to be

7  made available to the defendant through discovery under the Federal Rules of Criminal

8  Procedure, to substitute a summary of the information for such classified documents, or to

9  substitute a statement admitting relevant facts that the classified information would tend to

10  prove.  The court may permit the United States to make a request for such authorization in

11  the form of a written statement to be inspected by the court alone."  *Id.* § 4.  The court may

12  also permit a defendant to "submit *in camera ex parte* an affidavit setting out in detail why

13  the requested information [][is] material to the preparation of the defense."  United States v.

14  Clegg, 740 F.2d 16, 17 (9th Cir. 1984).  Once certain prerequisites are met (*see* below), the

15  government may also "request the court to conduct a hearing" regarding the classified

16  information and it "shall be held in camera if the Attorney General certifies to the court in

17  such petition that a public proceeding may result in the disclosure of classified information."

18  18 U.S.C. app. III § 6(a).  "Such a hearing is appropriate if the court has questions about the

19  confidential nature of the information or its relevancy."  Klimavicius-Viloria, 144 F.3d at

20  1261.

21       Unless the claimed classified evidence or information is relevant and helpful to the

22  defense, *ex parte*, *in camera* proceedings become a moot point.  *See*, *e.g.*, United States v.

23  Gurolla, 333 F.3d 944, 951 (9th Cir. 2003) ("[T]he classified items would not have been

24  relevant and helpful to the defense... they were not material, and the government had no

25  obligation to disclose them." (internal quotation marks and citation omitted)).  A defendant

26  must first be afforded an opportunity to petition the court for the withheld evidence.  *See*

27  Clegg, 740 F.2d at 17 (the defendant first filed a motion for discovery, the court granted the

28  motion, and the government then invoked the provisions of CIPA); *see also* Pennsylvania v.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1   Ritchie, 480 U.S. 39, 59 (1987) ("If a defendant is aware of specific information contained in

2   the [][protected evidence], he is free to request it directly from the court, and argue in favor

3   of its materiality.").  When determining relevancy,  "[classified] information meets the

4   standard for disclosure only if there is a reasonable probability that, had the evidence been

5   disclosed to the defense, the result of the proceeding would have been different."

6   Klimavicius-Viloria, 144 F.3d at 1261 (internal quotation marks omitted) (citing United

7   States v. Bagley, 473 U.S. 667, 682 (1985)).

8         If the defendant has a need for certain evidence, and the government is withholding

9   that evidence pursuant to CIPA, then the court must next determine if the evidence meets the

10  definition of "classified" under the Act.  CIPA defines "classified information" as "any

11  information or material that has been determined by the United States Government pursuant

12  to an Executive order, statute, or regulation, to require protection against unauthorized

13  disclosure for reasons of national security..."  Id. § 1(a).  CIPA defines "national security" as

14  "the national defense and foreign relations of the United States."  Id. § 1(b).  However, if

15  information has been officially disclosed to the public, it cannot be withheld under CIPA.

16  See Horn v. Huddle, 636 F.Supp.2d 10, 17 and fn. 9 (D.D.C. 2009) (Applying CIPA to a civil

17  case, the court agreed that "the government has asserted the state secrets privilege too

18  broadly[,]" in part because "the plaintiff makes a credible argument not only that the device

19  is publicly known, but that the fact that the government uses this type of device is publicly

20  available...").  See also United States v. Thruong Dinh Hung, 629 F.2d 908, 918 n. 9 (4th Cir.

21  1980) (The district court correctly told the jury "that the defendants would not be guilty of

22  transmitting national security information if the information were available in the public

23  domain.");  Snepp v. United States, 444 U.S. 507, 513 fn. 8 (1980) (dictum) ("If in fact

24  information is unclassified or in the public domain, neither the CIA nor foreign agencies

25  would be concerned.").

26        If the court finds that the information at issue is classified under CIPA, but also

27  relevant and helpful to the defense, the government may request in a motion that, in lieu of

28  ordering disclosure, the court order the following:

1

(A) the substitution for such classified information of a statement admitting
relevant facts that the specific classified information would tend to prove; or

2

3

(B) the substitution for such classified information of a summary of the
specific classified information.

4

18 U.S.C. app. III § 6(c)(1).

5

"The court shall grant such a motion of the United States if it finds that the statement or

6

summary will provide the defendant with substantially the same ability to make his defense

7

as would disclosure of the specific classified information." *Id.* "The plain language of the

8

provision [(18 U.S.C. app. III § 6(c))] indicates that it is not applicable unless and until the

9

court first rules that the classified information is admissible." United States v. Miller, 874

10

F.2d 1255, 1277 (9th Cir. 1989). "Thus, to assess whether the government's proposed

11

substitutions provide the defendant with substantially the same ability to present his defense,

12

the Court must first examine the nature of the defendant's defense and then analyze whether

13

the defendant will have the same ability to present that defense... with the substitutions and

14

any other evidence he has available to him." United States v. Libby, 467 F.Supp.2d 20, 28

15

(D.D.C. 2006). If the court finds that the substitutions are deficient and unacceptable then

16

the defendant is entitled to the classified evidence. *See*, *e.g.*, Clegg, 740 F.2d at 17 ("The

17

district court, after an *in camera ex parte* review of the documents and a review of the

18

alternative substitution with deletions, ruled that the classified documents were material and

19

discoverable under Rule 16, and that the proposed alternative substitution with deletions was

20

deficient and not acceptable."). Under this scenario, if the "United States files with the court

21

an affidavit of the Attorney General objecting to disclosure of the classified information at

22

issue, the court shall order that the defendant not disclose or cause the disclosure of such

23

information," 18 U.S.C. app. III § 6(e)(1), and "the court shall dismiss the indictment or

24

information; except that, when the court determines that the interests of justice would not be

25

served by dismissal of the indictment or information, the court shall order such other action...

26

as the court determines is appropriate." *Id.* § 6(e)(2).

27

### c.   The Catch-all Executive Privilege.

28

"The law enforcement privilege, state secrets privilege, official files privilege,

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

deliberative process privilege, and other general privileges asserted by the [][government] protecting confidential information fall under the broad rubric of 'executive privileges.'" Al-Kidd v. Gonzales, 2007 U.S. Dist. LEXIS 90548, No. CV 05-093-EJL-MHW (D. Idaho, Dec. 10, 2007). "Many of the courts that have developed doctrine about the executive or governmental privilege have drawn on cases involving the 'state secrets' privilege for procedural guidance." Kelly v. San Jose, 114 F.R.D. 653, 668 (N.D. Cal. 1987) (citing Kerr v. U.S.D.C., 511 F.2d 192, 198 (9th Cir. 1975), aff'd 426 U.S. 394 (1977)). In Kerr, the Ninth Circuit applied the procedures for invoking the state secrets privilege set out in United States v. Reynolds, 345 U.S. 1 (1953) to a case involving prison staff personnel files and a claim of general governmental privilege. See Kerr, 511 F.2d at 198. The law enforcement privilege or law enforcement sensitive privilege are labels most often applied to criminal cases involving the evaluation of unclassified evidence under the general executive privilege doctrine. See, e.g., United States v. Budziak, 2009 U.S. Dist. LEXIS 56199, No. CR08-00284 RMW (HRL) (N.D. Cal., May 14, 2009) (applying a law enforcement privilege to a defendant's request for unclassified FBI software used in a criminal investigation); In re Guantanamo Bay Detainee Litigation, 630 F.Supp.2d 1, 3-6 (D.D.C. 2009) (Although ultimately denying the government's request without prejudice, the court analyzed a claim of law enforcement sensitive privilege applied to non-public unclassified information of which the government claimed may "pose a threat to the security of the United States" if released to the public.). The purpose of the law enforcement privilege is "to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation and otherwise to prevent interference with an investigation." Doe v. City of Phoenix, 2009 U.S. Dist. LEXIS 8078, CV-07-1901-PHX-GMS (D. Ariz., Jan. 26, 2009) (quoting In re Dep't of Investigation of City of New York, 856 F.2d 481, 484 (2nd Cir. 1988)).

In Kerr, the Ninth Circuit addressed the government invoking an executive privilege and ruled that the "privilege must be formally asserted and delineated in order to be raised properly." Kerr, 511 F.2d at 198 (citing Reynolds, 345 U.S. at 7-8). The Kerr decision

1   requires that *Reynolds* be followed when invoking executive privileges and that the official

2   claiming the privilege "state with specificity the rationale of the claimed privilege." *Id.*  In

3   *Guantanamo Bay Detainee Litigation*, the court rejected a blanket government claim that the

4   evidence could "pose a threat to the security of the United States" as a "spare, generic

5   assertion" of the law enforcement sensitive privilege and required that the government show

6   rationale by "fil[ing] under seal with petitioner's counsel and the appropriate Merits Judge an

7   unclassified factual return highlighting with a colored marker the exact words or lines the

8   government seeks to be deemed protected as well as a memorandum explaining why each

9   word or line should be protected." *Id.*, 630 F.Supp.2d at 6-8.  If a court finds that further fact

10  finding is necessary, it may also conduct an *ex parte*, *in camera* proceeding involving further

11  government submissions.  *See, e.g.*, <u>United States v. Green</u>, 670 F.2d 1148, 1156 (D.C. Cir.

12  1981) (In recognizing a specific "surveillance location privilege," the court noted a prior

13  court's assertion that "if the surveillance location is relevant..., the trial court may exercise its

14  discretion to conduct an in camera proceeding in which the Government informs the court of

15  the secret location." (citation omitted)).  A court may also hold hearings with the defendant

16  regarding the relevancy of the evidence.  *See* <u>United States v. Van Horn</u>, 789 F.2d 1492, 1508

17  (11th Cir. 1986) (The district court "held a hearing on the appellants' claim of necessity.").

18          Unless the evidence claimed to be privileged is relevant and helpful to the defense, *ex*

19  *parte*, *in camera* proceedings become a moot point.  For example, in *Crumly* no *ex parte*

20  proceedings were held after the government withheld the location of a secret tracking sheet

21  hidden in a vehicle that allowed law enforcement to identify it as stolen.  *See* <u>United States v.</u>

22  <u>Crumly</u>, 565 F.2d 945, 950 (5th Cir. 1978).  The *Crumly* court recognized that "secret

23  identification numbers and track sheets... are valuable tools used by law enforcement officers

24  in discovering and solving motor vehicle theft," *id.*, however, it did not even reach the issue

25  of weighing government privilege against the defendant's right for disclosure considering

26  "Crumly has not shown in what manner the revelation of the track sheet's location would be

27  material to his case." *Id.*  Likewise, in *Green* the district court denied the defendant's request

28  for evidence that the government claimed was privileged after conducting only a basic

relevance test with no *ex parte*, *in camera* submissions or proceedings.  *See* <u>Green</u>, 670 F.2d

at 1156 ("[T]here was no disclosure of the Police Department's surveillance location either in

the District Court or to the defendant's counsel.").  The Green court upheld the district court's

decision to withhold the surveillance location considering the defendant "succeeded in

establishing the limits of the police officers' observations without learning the exact location

of their observation post."  *Id.* at 1157.  The above cases make clear that, prior to a court

addressing a government claim of privilege, due process requires that a defendant file a

motion explaining (1) the evidence currently in his possession pertaining his defense, and (2)

why the withheld evidence is relevant and helpful to his defense.

After a party to an action shows a need for certain evidence, and after the government

properly invokes an executive privilege, the court must next determine whether the evidence

at issued meets the legal definition of "privileged" or "protected" under the doctrine.  "At a

minimum, the specificity required by the D.C. Circuit precludes the government from

seeking to designate as protected information that is already in the public domain."  <u>In re</u>

<u>Guantanamo Bay Detainee Litigation</u>, 630 F.Supp.2d at 6 (citing <u>Parhat v. Gates</u>, 532 F.3d

834, 853 (D.C. Cir. 2008)).  *See also* <u>United States v. Roviaro</u>, 353 U.S. 53, 60 (1957)

(Addressing an informer's privilege: "once the identity of the informer has been disclosed to

those who would have cause to resent the communication, the privilege is no longer

applicable.").  In determining what may be protected under the asserted executive privilege,

courts may also look for procedural guidance in cases that address strict state secrets claims

such as <u>Hepting v. AT&T Corp.</u>, 439 F.Supp.2d 974 (N.D.Cal. 2006) and <u>Mohamed v.</u>

<u>Jeppesen Dataplan, Inc.</u>, 579 F.3d 943, 961 (9th Cir 2009).  *See* <u>Al-Kidd</u>, 2007 U.S. Dist.

LEXIS 90548 ("These privileges have been treated the same by the various courts that have

considered them.").

If the government properly invokes an executive privilege after the defendant shows

that certain evidence is relevant and helpful, and the court is thereafter satisfied that the

evidence at issue is privileged or protected, the court must then determine what evidence or

alternative submissions the government will be required to provide the defendant and under

what conditions.  In *Liebert*, the Third Circuit addressed a confrontation clause challenge and agreed that in place of providing the defendant with tax return "nonfiling lists" that were deemed privileged, the government's alternative evidence was adequate which included "(a) all the relevant IRS handbooks documenting the procedures, machine operations, and other relevant information pertaining to its electronic data processing system; (b) statistical analyses relating to the Service's ability to discover and report accurately failures to file returns; (c) an expert familiar with all aspects of the nonfiling lists; (d) an expert familiar with all aspects of the processing of work through the Mid-Atlantic Service Center; and (e) an expert who has made studies on the reliability of the Service's data processing systems." United States v. Liebert, 519 F.2d 542, 550 (3rd Cir. 1975) (footnote omitted).  In *Bismullah*, the D.C. Circuit applied conditions by adopting a protective order allowing law enforcement sensitive material to be viewed by petitioners but not by the public.  *See* Bismullah v. Gates, 501 F.3d 178, 201 (D.C. Cir. 2007).  If the government refuses or fails to either provide adequate evidence or comply with an alternative solution then the court may exercise its discretion and tailor an appropriate remedy such as excluding evidence from the government's case or dismissing the indictment.  *See, e.g.*, United States v. Talbot, 51 F.3d 183, 187 (9th Cir. 1995) (When using its inherent authority, "a district court can exclude otherwise admissible government evidence only when a violation of any constitutional provision, federal statute, specific discovery order, or any other recognized right has been shown." (internal quotation marks and citation omitted));  United States v. Grace, 526 F.3d 499, 516 (9th Cir. 2008) ("The district court had the authority under Rule 16(d)(2) to... enforce the discovery requirements mandated by the rule; it did not need to resort to its inherent authority.");  Rovario, 353 U.S. at 61 (When addressing an informer's privilege, "the trial court may require disclosure [of the identity of an informant] and, if the Government withholds the information, dismiss the action." (footnote omitted)).

**2.   If the Court finds that the withheld evidence is privileged then how does the Court balance the government's need for confidentiality against the defendant's need for disclosure?**

If the Court finds that the withheld evidence is privileged and also relevant and helpful to the defense, the privilege must give way unless the government either provides equivalent non-privileged evidence, stipulates to facts that the privileged evidence would otherwise prove, or simply concedes to the defendant's arguments.  The defendant found no case law indicating that the Court is permitted to balance the defendant's Fourth Amendment rights against the government's need for confidentiality.  If the defendant has valid Fourth Amendment arguments that require the privileged evidence then he is Constitutionally entitled to what is being withheld.  The only balancing concept that applies during the materiality stage of assessing a claim of privilege involves the differences between merely discoverable evidence and evidence that is relevant and helpful to the defense of an accused. If evidence is found to be relevant and helpful then a second balancing concept may apply that involves permitting the government to provide equivalent alternative evidence, or to stipulate to facts, in lieu of providing the privileged evidence.

The first balancing concept is explained in *Roviaro* and addresses an informer's privilege.  *See* United States v. Roviaro, 353 U.S. 53 (1957).  *See also* Klimavicius-Viloria, 144 F.3d at 1261 (CIPA case citing *Roviaro* and noting that the court can engage in balancing).  In *Roviaro*, the Supreme Court stated that "no fixed rule with respect to disclosure is justifiable.  The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." *Id.* at 62.  However, that statement is presupposed by the court's previous finding that "[w]here the disclosure of an informer's identity, or the contents of his communication, is **relevant and helpful** to the defense of an accused, or is essential to a fair determination of a cause, the privilege **must give way**." Roviaro, 353 U.S. at 61 (emphasis added) (footnote omitted). In order to avoid a contradiction, it is reasonable to read *Roviaro* to mean that the elements of balancing only come into play when the evidence is merely discoverable and not necessarily relevant and helpful to the defense of an accused.  The Second Circuit noted this

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

distinction in *Aref* while establishing guidelines to follow for addressing government claims of privilege under CIPA.  *See* <u>Aref</u>, 533 F.3d at 79 ("If the evidence is discoverable but the information is privileged, the court must next decide whether the information is helpful or material to the defense...").  Conducting a balancing test within the spectrum covering merely discoverable evidence through relevant and helpful evidence falls in line with the basic concept that there "is no general constitutional right to discovery in a criminal case..." <u>Weatherford v. Bursey</u>, 429 U.S. 545, 559 (1977) (internal quotation marks and citation omitted).  Despite the above interpretation of *Roviaro's* balancing instruction, criminal courts seem to ignore the noted balancing concept and instead conduct an "either/or balancing" consisting of either finding for disclosure of the privileged evidence if it is necessarily relevant and helpful to the defense of an accused, or not finding for disclosure if the privileged evidence is merely discoverable and more than likely not relevant and helpful to the defense of an accused.  *See, e.g.*, all criminal cases cited *supra*.

The second balancing concept involves rendering privileged evidence no longer relevant and helpful by allowing the government to produce an alternative equivalent.  This concept is applied in various CIPA and executive privilege cases involving criminal defendants.  These alternative submissions, such as non-privileged evidence tending to prove the same facts as the privileged evidence, are intended to extinguish the defendant's need to access what the court finds to be privileged.  For example, in *Ressam*, "[f]ollowing each of the United States' three submissions of classified information, the Court issued protective orders making the required findings and authorizing the Government to satisfy its discovery obligations by producing an unclassified summary for the defendant."  <u>United States v. Ressam</u>, 221 F.Supp.2d 1252, 1262 (W.D. Wash 2002).  In *Leibert*, the Third Circuit agreed that in place of providing the defendant with privileged tax return "nonfiling lists," the government's alternative evidence was adequate which included virtually every last detail of the technology used to create the lists.  *See* <u>Liebert</u>, 519 F.2d at 550.  *See also* Section III(A)(1)(c), *supra*.

### 3. If the defendant's arguments involve facts relating to the privileged evidence then how does the government rebut those arguments without placing the privileged evidence on the record?

The government cannot refuse to address facts alleged by the defendant, and backed by evidence and information already known to the defense, unless the government is willing to concede to the defendant's version of the facts. The government cannot invoke a claim of privilege to the truth or falsity of allegations, facts, or information if it comes at the defendant's detriment. Such claims of privilege, whether successful or not, only apply to undisclosed non-public evidence in the government's possession.

Unless the very subject matter of the case is a state secret,[13] the privilege has "never applied to prevent parties from litigating the truth or falsity of allegations, or facts, or information simply because the government regards the truth or falsity of the allegations to be secret." Mohamed, 579 F.3d 943, 957 (9th Cir. 2009). "[T]he privilege applies to prevent discovery of the evidence itself and not litigation of the truth or falsity of the information that might be contained within it." Id. See also United States v. Nixon, 418 U.S. 683, 709 (1974) ("The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence."). Similarly, in Horn the District of Columbia disapproved of the government's failure "to address the plaintiff's arguments about the basic capabilities [of an eavesdropping device] being in the public domain" and the rehashing of "its unsupported assertion that any mention of the U.S. Government owning surveillance equipment is a state secret." Horn, 636 F.Supp.2d at 17-18.

Primary case agent USPIS Inspector Wilson wrote in a report of investigation that a StingRay was used by FBI Technical Agents to locate the aircard. See Section II(E)(2)(a), supra. Primary case agent IRS-CI Agent Daun witnessed FBI Technical Agents operate the

---

13. As noted in Section III(A)(1)(b) and III(A)(1)(c), supra, the Ninth Circuit draws from cases involving the state secrets privilege when addressing CIPA claims and claims of other executive privileges. See United States v. Klimavicius-Viloria, 144 F.3d 1249 (9th Cir 1998) (applying some state secrets privilege doctrine to a CIPA claim); Kerr v. U.S.D.C., 511 F.2d 192 (9th Cir. 1975) (applying some state secrets privilege doctrine to a general governmental privilege).

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE, IN CAMERA HEARING IF NECESSARY

equipment used to locate the aircard.  *See id.*  The defendant will be arguing that the government used a StingRay and other equipment and software to locate the aircard in an unconstitutional manner.  The defendant found no case law indicating that he should be prohibited from arguing the unconstitutional use of the StinRay and other techniques simply because the prosecution is now attempting to hide the government's prior admission.[14]  If the government wishes to remain silent during the litigation of the defendant's motion to suppress then the Court should construe that silence as the government conceding to the defendant's version of the facts.  This would be similar to when a party "fails to appear at the time and place assigned for oral argument" on a motion and the court taking such non-compliance as "a consent to the... granting of the motion..."  LRCiv 7.2(i), *when referenced through* LRCrim 12.1.  *See also* Gwaduri v. INS, 362 F.3d 1144, 1146 (9th Cir. 2004) (Addressing a motion for attorneys fees, "the court may treat the government's non-opposition as constituting a failure to offer a basis for a finding of substantial justification and, thus, a failure to carry its burden of proof."); Federal Deposit Ins. Corp. v. New Hampshire Ins. Co., 953 F.2d 478, 484 (9th Cir. 1991) (In the context of a civil claim, "[d]effects in evidence submitted in opposition to a motion for a summary judgment are waived absent a motion to strike or other objection." (internal quotation marks and citation omitted)).

   **B.**   **The government's request for an *ex parte*, *in camera* hearing is premature and ultimately unnecessary.**

   **1.**   **What little evidence the defendant still needs does not meet the legal definition of privileged, secret, or classified.**

   **a.**   **The extent of the government's public disclosures negates any claim of privilege.**

   All three doctrines discussed in Section III(A)(1), *supra*, indicate that the government cannot invoke a claim of privilege upon information already in the public domain.  In

---

14.   The prosecution refuses to address the defendant's StingRay claims and instead asserts that "StingRay" is a generic term not referring to any particular type of electronic surveillance equipment.  *See* Section II(E)(2)(b), *supra*.

*Hepting*, the court looked to public disclosures by the government and the government's operatives in order to determine if the information at issue was privileged.  *See* <u>Hepting</u>, 439 F.Supp.2d at 990-91.  *See also* Section III(A)(1)(a), *supra*.  In the present case, Harris Corporation and the government have officially released to the public a significant amount of information regarding the Harris line of wireless device locators.  *See* Section II(D), *supra*. The government cannot seriously claim that this publicly available information, and the related evidence currently being withheld from the defendant, are protected by any claim of privilege.  "Common sense confirms this conclusion.  The government could not seriously argue, for example, that the Pentagon Papers remained 'secret' and therefore subject to the state secrets privilege even after having been published in *The New York Times*, simply because the government itself refuses to declassify or otherwise 'officially disclose' the content of the papers."  <u>Mohamed</u>, 579 F.3d at 959-60 (referring to <u>New York Times Co. v. United States</u>, 403 U.S. 713 (1971)).  In the present case, the government has even less grounds to argue against this point considering the federal government officially disclosed the majority of the publicly available information.  This information was disclosed through FOIA request responses, a district court opinion paraphrasing sworn testimony, and numerous United States Patent and Trademark Office documents published at the request of Harris Corporation.

With respect to the prosecution's claim of national security concerns (*see* Section II(A), *supra*), the government issued no secrecy order on Harris Patent No. 7,592,956[15] pursuant to the Invention Secrecy Act (ISA), 35 U.S.C. §§ 181-88.  In *Halpern*, the Second Circuit addressed a claim for damages filed against the United States by an inventor who was prevented from patenting his invention after "the Commissioner or Patents found that the disclosure of the contents of the patent application would be detrimental to the public safety and defense and entered a secrecy order pursuant to former 35 U.S.C. § 42 (1942 ed.)."  <u>Halpern v. United States</u>, 258 F.2d 36, 37 (2nd Cir. 1958).  For the Harris patent, if the

---

15.    In the patent, McPherson, *et al.*, teaches technology upon which the StingRay is based (*see* <u>EXHIBIT 31</u>).

government sincerely thought disclosure of the technology would be detrimental to national security then it would have prevented Harris from publishing the patent pursuant to 35 U.S.C. § 181 providing as follows:

> If, in the opinion of the Atomic Energy Commission, the Secretary of a Defense Department, or the chief officer of another department or agency so designated, the publication or disclosure of the invention by the publication of an application or by the granting of a patent therefor would be detrimental to the national security,... the Commissioner of Patents shall order that the invention be kept secret and shall withhold the publication of the application or the grant of a patent for such period as the national interest requires, and notify the applicant thereof.

> *Id.*

In addition to the published Harris patent noted above, there are literally thousands of other published patents covering similar technologies and none of these patents have been placed under secrecy orders pursuant to ISA.

### b.   The District of Columbia FOIA case law relied upon by the government to conceal evidence holds little weight and contradicts Ninth Circuit FOIA case law.

The government cites two District of Columbia FOIA cases in support of its argument that the "mere fact that some of the information related to the technology is publicly available does not mean that defendant is entitled to detailed information about who used the device in this case, and how it was used." *Government Memo* (Dkt. #465).  The District of Columbia FOIA cases cited by the government are (1) Barnard v. Dep't of Homeland Security, 598 F.Supp.2d 1 (D.D.C. 2009), and (2) Piper v. Dep't of Justice, 294 F.Supp.2d 16 (D.D.C. 2003).  Cases addressing FOIA requests should be given very little weight in the context of a criminal defendant's Constitutional right to present a meaningful defense.  The Ninth Circuit reached a similar conclusion while addressing a government argument involving provisions of FOIA in support of a claim of state secrets privilege in a civil case. *See* Mohamed, 579 F.3d at 960.  The *Mohamed* court noted that there are "substantial differences in the balance of interests involved in the two types of cases."  *Id.*  The court further explained that "[t]he state secrets doctrine empowers the government to refuse disclosure of secret evidence during the course of a lawsuit that necessarily has an

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

independent purpose apart from disclosure[]" and by contrast the "FOIA entails litigation for the sole and independent purpose of obtaining disclosure of classified information." *Id.* Just like a litigant in a non-FOIA civil action, the defendant has an independent purpose for evidence apart from mere disclosure, *i.e.*, his Constitutional right to present a meaningful defense.

Nevertheless, the District of Columbia FOIA cases cited by the government contradict Ninth Circuit FOIA case law. For example, in *Piper* the District of Columbia found that the FBI properly withheld information about sensitive electronic monitoring devices under FOIA despite public knowledge of the devices because "[g]eneral, non-specific knowledge that the FBI possesses capabilities to electronically monitor the movement of automobiles, for example, or other moving objects is not the same as identifying the actual device, its functions, and its capabilities." Piper, 294 F.Supp.2d at 31. However, in *Rosenfeld* the Ninth Circuit found just the opposite while addressing the same government argument:

> "It would not serve the purposes of FOIA to allow the government to withhold information to keep secret a[n] investigative technique that is routine and generally known.... We are not persuaded by the government's argument that the technique at issue is more precise [than what is already publicly known]... If we were to follow such reasoning, the government could withhold information under Exemption 7(E) under any circumstances, no matter how obvious the investigative practice at issue, simply by saying that the 'investigative technique' at issue is not the practice but the application of the practice to the particular facts underlying the FOIA request." Rosenfeld v. United States Dep't of justice, 57 F.3d 803, 815 (9th Cir. 1995).

A simple Internet search reveals that locating cellular phones and other wireless devices is a government investigative technique that is routine and generally known. *See*, *e.g.*, Kevin Bankston, EFF, *Surveillance Shocker: Sprint Received 8 MILLION Law Enforcement Requests for GPS Location Data in the Past Year* (Dec. 1, 2009), *available at* <http://www.eff.org/deeplinks/2009/12/surveillance-shocker-sprint-received-8-million-law> (last accessed Feb. 15, 2011) ("Now that the fact is out that law enforcement is rooting through such vast amounts of location data, it raises profoundly important questions that law enforcement and the telcos must answer...") (print-out attached as EXHIBIT 44);  Ryan Singel, Wired, *FBI E-Mail Shows Rift Over Warrantless Phone Record Grabs* (Dec. 20,

2007), *available at*

<http://www.wired.com/print/politics/onlinerights/news/2007/12/fbi_cell> (last accessed

Sep. 22, 2010) ("The new documents detail how a little-known FBI telephone intercept unit

has developed a powerful cellphone tracking technology that agents use to monitor the

physical movements of surveillance targets, even on phones that are not GPS equipped.")

(print-out attached as EXHIBIT 45).  Furthermore, in Section II(D), *supra*, the defendant has

outlined very specific knowledge (based on information in the public domain) regarding the

StingRay and other wireless device locators.  Under Ninth Circuit FOIA case law, the

defendant is entitled to what little evidence he still needs in order to present his valid Fourth

Amendment arguments.

> **2.  Prior to addressing a claim of privilege, the defendant must first be afforded an opportunity to address the Court through a motion regarding why the withheld evidence is relevant and helpful to his defense.**

The government's request for an *ex parte*, *in camera* hearing is premature considering

the defendant has not been afforded an opportunity to file a motion explaining why the

withheld evidence is relevant and helpful to his defense.  *See* fn. 1 and 2, *supra*.  This is a

necessary step if the Court is to conduct an adequate assessment of the government's claim of

privilege.  Likewise, if the defendant is ultimately refused the withheld evidence by the

Court and the case later goes to appeal, the record will be inadequately developed for a

proper appellate review.  Every appellate ruling involving a loss for a defendant on the issue

of withholding evidence based on a claim of privilege is justified by a finding that the

evidence was not relevant and helpful to the defense.  *See, e.g.,* United States v. Fernandez,

797 F.2d 943, 952 (11th Cir. 1986) ("We need not determine whether the information sought

was privileged because we hold that in any event necessity has not been demonstrated....  We

also need not determine whether such information was properly the subject of national

security concerns[] [b]ecause the information the defendants sought was not relevant to their

defense...").  Considering the defendant has not briefed the issue of relevancy, the Court is

unaware of the full scope of the withheld evidence and why it is relevant and helpful to the

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

defense.  If the Court grants the government's pending request now, or even just allows the government to formally invoke a claim of privilege, the government will have an opportunity to manipulate *ex parte*, *in camera* proceedings by unilaterally deciding what evidence will be addressed by the Court and what reasons the defendant has for requesting it.[16]

The defendant also needs to place on the record all of the evidence currently in his possession that he plans to use in support of his motion to suppress so that the Court can determine if disclosure of the withheld evidence is necessary.  *See, e.g.*, Mohamed, 579 F.3d at 961 (A court will be unable to "determine whether the parties will be able establish their cases without use of the privileged evidence without also knowing what *non-privileged* evidence they will marshal." (internal citation omitted)).  This task serves a second purpose considering in order for the defendant to prove that the withheld evidence is necessary, the Court needs to fully understand the underlying technology upon which the defendant's need for disclosure is based.  If the record is not adequately developed with respect to the underlying technology, and this goes much further than simply reviewing evidence, then the Court will be unable to establish an adequate knowledge base to assess the issue.  Senior Ninth Circuit Judge Tashima came to a similar conclusion in a concurring precedent-setting opinion addressing only one of the Fourth Amendment issues the defendant will raise in his motion to suppress.  *See* In The Matter Of The Application Of The United States Of America For An Order Directing A Provider Of Electronic Communication Service To Disclose Records To The Government, 620 F.3d 304, 320 fn. 11 (3rd Cir. 2010) (Judge Tashima noted the findings of other courts that this is a "fast-changing technological era" requiring "a fact-intensive inquiry" and explained that he was "troubled by the majority's assumption, **without any support in the record**, that a cell phone customer has not 'voluntarily' shared his location information with a cellular provider in any meaningful way." (some internal quotation marks and brackets omitted) (emphasis added)).  The technology relevant to the

---

16.    The government is already trying to manipulate the proceedings with its conclusion in its memorandum reading, "[a]ccordingly, defendant's request for the subject information should be denied[,]" while the defendant is yet to make a motion to the Court for disclosure of the evidence at issue.  *See Government Memo*, Section III, p. 26.

defendant's suppression arguments involves aspects of the CDMA cellular protocol, how wireless device locators hack and exploit said protocol, the use of 3D geolocation techniques, and employment of radio wave collection methods.[17]  Filing a detailed and thorough motion explaining the underlying technology and how it relates to the defendant's need for the withheld evidence is absolutely necessary if the defendant is to succeed at showing that the withheld evidence is relevant and helpful to his defense.

### 3. The government has not satisfied the procedural prerequisites for making any claim of privilege.

The government's request for an *ex parte*, *in camera* hearing should be denied considering the only claim of privilege made was by AUSA Battista through generic assertions in a memorandum and blanket claims made during various court hearings.  Prior to the Court addressing a claim of privilege, let alone a request for an *ex parte*, *in camera* hearing, the government is required to lodge a formal written claim while following the procedural guidelines relating to the specific privilege being invoked.  *See*, *e.g.*, Reynolds, 345 U.S. 1, 10 (1953) ("[T]he trial judge was in no position to decide that the report was privileged until there had been a formal claim of privilege.").  The government failed to invoke a proper formal claim of privilege in this case and instead makes a vain attempt to sidestep well established common-law addressing governmental privileges.

"Simply saying 'military secret,' 'national security,' or 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient to support the privilege." Al-Haramain Islamic Found., Inc., 507 F.3d at 1203.  The District of Columbia required that the government highlight with a colored marker the exact words or lines sought to be deemed protected and explain why each word or line should be protected.  *See* Guantanamo Bay Detainee Litigation, 630 F.Supp.2d at 6-8.  When invoking the state secrets privilege, the formal claim must be invoked by the head of the department which has control over the privileged material.  *See* Reynolds, 345 U.S. at 7-8.  When invoking a general executive

---

17.    For a review of only some of the relevant technology, *see* Harris Patent No. 7,592,956 attached as EXHIBIT 00.

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

privilege, such as the law enforcement privilege, it has been suggested that the *Reynolds* requirement be relaxed and that the privilege be invoked via "a declaration or affidavit, under oath and penalty of perjury, from... a person with some relevant supervisorial or policy making role[]" but not from "the lawyer representing the agency or officers in the litigation..." Kelly, 114 F.R.D. at 669.

In this case, an officer involved in the litigation is informally invoking two separate types of privilege via a generic blanket claim of (1) an executive privilege (interchangeably referred to by the prosecution as "law enforcement privilege," "sensitive investigative techniques," and "law enforcement sensitive"), and (2) a state secrets privilege (referred to by the prosecution as "national security concerns").  *See* Section II(A), *supra*.  Not only did the government fail at having the correct officials invoke the claims of privilege, it also ignored the generally accepted doctrine that a formal written claim be submitted detailing (1) the precise privilege being invoked, (2) the specific evidence being withheld, and (3) specific reasons as to why the evidence is privileged.  *See* Section III(A)(1), *supra*;  *see also* Kelly, 114 F.R.D. at 669 ("[A] court that cannot conduct a meaningful balancing analysis because the government has not provided the necessary information would have no choice but to order disclosure.").  If the government invokes a formal claim of privilege in the future, and the Court relaxes any of the strict *Reynolds* requirements based on the government only invoking a law enforcement privilege,[18] then the government should be prohibited from raising any claim that disclosure of the evidence would raise national security concerns.[19] In other words, the government should be prohibited from riding in a "national security" claim on the coattails of a "law enforcement privilege" claim.

---

18.     *See* Alexander v. FBI, 186 F.R.D. 154, 166 (D.D.C. 1999) (implying that declarations by the Department of Defense's Inspector General and General Counsel would have been sufficient if they had provided enough information to assess whether the law enforcement privilege applied).

19.     *See* Landry v. FDIC, 204 F.3d 1125, 1136 (D.C. Cir. 2000) ("We note that decisions involving the more sensitive and absolute privilege for state and military secrets have been more insistent on assertion at the highest level." (listing cases)).

**C.**  **The government is using its memorandum and the issue of an *ex parte*, *in camera* hearing as a forum to prejudice the Court against the defendant by arguing Fourth Amendment issues that the defendant cannot currently respond to.**

Via Sections II(D), p. 14, ln. 10-23; II(D)(1); II(D)(1)(a); II(D)(1)(b); II(D)(1)(c); II(D)(1)(d); II(D)(2); II(D)(3), and III of its memorandum at Dkt. #465, the government is attempting to sidestep addressing a motion for discovery and a motion to suppress by using the defendant's ignorance of the contents of the withheld evidence as leverage against his planned defense.  The Ninth Circuit rejected a similar government tactic in United States v. Streit, 962 F.2d 894 (9th Cir. 1992).  In *Streit*, the government argued that the defendant was "not entitled to appellate review because he cannot demonstrate that the reports in question contained exculpatory material and because [][he] has not alleged any error in the *in camera* procedure."  *Id.* at 900.  The Ninth Circuit found that the "government's position is untenable because it seeks to use Streit's ignorance of the contents of the sealed reports as leverage against his request for review."  *Id.*  In the present case, the government is using the defendant's ignorance of the contents of the withheld evidence as a means to marginalize his yet to be filed motion to suppress.  In doing so, the government raises a number of Fourth Amendment issues in its memorandum that are completely irrelevant to the Court's intended purpose of having the parties brief the issue of governmental privileges.  The defendant cannot currently address these Fourth Amendment issues without gaining access to the withheld evidence and without filing a motion to suppress.

By prematurely arguing Fourth Amendments issues that the defendant cannot respond to, the government is gaining a tactical advantage and prejudicing the Court against the defendant's planned defense.  Most revealing of this government tactic is the prosecution's argument that "the FBI personnel tracked the defendant's aircard transmissions made over public airwaves, using equipment tuned to the same frequency as the aircard.  Therefore, defendant could not have had a reasonable expectation of privacy over the radio emanations from his aircard."  *Government Memo*, p. 18 (Dkt. #465).  The prosecution further contends that the "defendant actively and intentionally broadcast radio waves from inside of his apartment to the outside... [and] interception of these radio waves did not reveal any

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1  information concerning the inside of defendant's individual apartment..." *Id.*, p. 19 fn. 2.

2  Contrary to the government's factual claims, the second page of the Harris StingRay

3  datasheet, publicly available via the United States Patent and Trademark Office website,

4  contains a heading reading "Transmit Capabilities" (meaning the StingRay's transmit

5  capabilities) with "For Interrogation and Active Tracking and Location" under the heading.

6  *See* Bates No. 16 of EXHIBIT 13.  If the FBI's equipment located the aircard by transmitting

7  an interrogation signal to the aircard's receive antenna, through the walls of a Fourth

8  Amendment protected space, then the government's argument quickly fails.  The defendant

9  will be unable to adequately present this Fourth Amendment argument, and numerous others,

10  if the government does not (1) identify all equipment and software used to search for and

11  locate the aircard, (2) disclose full technical details for said equipment/software, and (3)

12  provide the logged aircard location data that was destroyed by the FBI.[20]

13  Also revealing of the above noted government tactic, is the prosecution's contention in

14  its memorandum that the defendant lacks "standing" to raise Fourth Amendment arguments.

15  *See Government Memo*, Section II(D)(1)(c), p. 20.  The defendant cannot respond

16  considering it is questionable whether the principles explained in *Simmons*[21] can be

17  carried over to the present situation involving a *pro se* pseudo reply to a government pseudo

18  response to a nonexistent motion to suppress of which the *pro se* defendant is yet to file.  *See*

19  McGautha v. California, 402 U.S. 183, 211 (1971) ("[N]ot everything said in [][*Simmons*]

20  can be carried over to [other situations] without circumspection.").  The defendant will

21  address "standing" during litigation of the suppression issue.

22  ///

23  ///

24

25  20.    This broad explanation of the withheld evidence in no way explains the specific detailed evidence the defendant is requesting from the government.

26  21.    *See* Simmons v. United States, 390 U.S. 377, 394 (1968) (Holding that "when a
27  defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of
28  guilt unless he makes no objection.").

**D.      The FBI agents the prosecution intends to present to the Court are unqualified to advise on the technology at issue.**

Considering the evidence the defendant is requesting is very specific and specialized, anyone providing technical information or explanations to the Court needs to be an expert on proprietary Harris Corporation technology[22] pursuant to Fed. R. Evid 702[23] and <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993).[24]  If the Court grants the government an *ex parte*, *in camera* hearing, or even just considers a formal written claim of privilege, then the defendant objects if government agents or officials testify or provide sworn statements regarding any matter other than whether disclosure of specific evidence will harm law enforcement efforts or jeopardize national security.  The defendant objects on the basis that the agents/officials proffered by the government will not be qualified experts pursuant to Fed. R. Evid. 702 and the Supreme Court opinion in *Daubert*.  Unless the agents/officials the prosecution intends to present are electrical and radio engineers who work for Harris Corporation, and are the individuals who designed the StingRay and other Harris equipment, then those individuals will be unqualified to make any factual claims regarding the technology at issue.

The prosecution wants the FBI to advise the Court on the technical operations of the equipment used to search for and locate the aircard.  *See February 10, 2011 Status Conference, Partial Transcript of Proceedings*, [MR. BATTISTA] at 16:26:38 – 16:27:15, quoted in Section II(A), *supra*.  An email contained in the FBI's response to the EFF FOIA request (*see* Section II(D)(1) and (5), *supra*) indicates that FBI agents who operate Harris

---

22.      For example, *see* Harris Patent No. 7,592,956, "Wireless Transmitter Location Determining System And Related Methods", wherein McPherson, *et al.*, teaches technology upon which the StingRay is based (*see also* <u>EXHIBIT 31</u>).

23.      Fed. R. Evid. 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

24.      A court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  <u>Daubert</u>, 509 U.S. at 592-93 (setting out a checklist of factors).

MEMORANDUM OF POINTS AND AUTHORITIES
RESPONSE TO GOVERNMENT'S MEMORANDUM REGARDING LAW ENFORCEMENT PRIVILEGE
AND REQUEST FOR AN EX PARTE AND IN CAMERA HEARING IF NECESSARY

1  wireless device locators have hardware experience ending at plugging antenna cables into

2  antenna jacks.  *See* <u>EXHIBIT 35</u> (agents connected a flat panel antenna to a Harris

3  LoggerHead but depend on Harris engineers when it comes to upgrading the LoggerHead

4  equipment with new software).  Another email contained in the same FOIA response

5  indicates that sometimes FBI agents cannot even get right the simple task of plugging in a

6  cable.  *See* Bates Nos. 03-05 of <u>EXHIBIT 34</u> (while addressing equipment failure, an FBI

7  OTD agent warned other agents about not plugging in antenna amplifier cables backwards).

8  The government's witnesses should not be advising the Court on technical matters unless

9  they can explain every last detail of the specific equipment used to search for and locate the

10  aircard including explanation of (1) the low level schematic drawings and flow charts

11  explaining the internal hardware operations of said equipment, and (2) the actual source code

12  of the software used to control the hardware of said equipment.  The record will be better

13  suited by the defendant subpoenaing Harris engineers and subjecting them to a barrage of

14  questioning regarding the technology at issue while under oath and on the witness stand.

15      **IV.    <u>CONCLUSION</u>**

16          The defendant respectfully requests that the Court deny the government's request for

17  an *ex parte* and *in camera* hearing considering the request is premature, the claim of

18  privilege was improperly invoked, and the evidence at issue is not privileged thus rendering

19  such a hearing unnecessary.  Instead, the defendant requests that the Court establish a

20  procedural plan of action for addressing the government's claims of privilege while

21  following well established common-law as discussed in the cases cited in this memorandum.

22  Specifically, the defendant requests that the following proposed plan be implemented by the

23  Court:

24          1.    Once the government responds to the defendant's March 9, 2011 discovery

25  request letter, the defendant will begin completion of his motion requesting disclosure of the

26  relevant and helpful evidence currently being withheld based on a claim of privilege.  In this

27  filing,[25]  the defendant will outline the following: (1) the specific withheld evidence the

28  ─────────────────────

25.    As previously indicated, it will take the defendant 1170 hours over three months to

defense still needs (*see* LRCiv 37.1) in order for the defendant to establish his Fourth Amendment arguments, (2) the reasons why the defendant needs the withheld evidence by giving a basic explanation of his Fourth Amendment arguments requiring disclosure, and (3) a complete listing and explanation of all the evidence already in the defendant's possession that he plans to use in support of his motion to suppress.  With respect to part three, this evidence will be integrated into a detailed and specific factual statement that will include technical explanations with citations from academic resources, published patents, expert opinion, subpoenaed material/testimony from Harris Corporation engineers, and other creditable sources.

2.    The defendant's motion requesting disclosure of the relevant and helpful evidence will be filed unsealed and served upon the government except for part three (the factual statement) which will be filed sealed *ex parte*.  Part three will be filed sealed *ex parte* considering the technical explanations the defendant will provide the Court are well beyond the government's current understanding and if the defense is forced to educate the FBI and the prosecution prior to a motion to suppress then the government will gain a substantial tactical advantage while litigating the issue of privilege and possibly other issues.

3.    If the Court finds that some or all of the withheld evidence is relevant and helpful to the defense, the government should invoke a proper and formal written claim of privilege with respect to that evidence.  Once the claim is properly invoked, the issue of privilege will be litigated in accordance with common-law (and possibly CIPA) as discussed in the cases cited in this memorandum.

* * * * *

The defendant is appearing *pro se* and has never attended law school.  The defendant's filings, however inartfully pleaded, must be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers.  *See* <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).

complete this filing (*see* Dkt. #424, p. 32 and fn. 34).