↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓
↓ ATTACHMENT 03 ↓

*ATTACHED ATTACHMENTS*
*SUBMISSION OF DOCUMENTS RELATED TO DISTRICT OF ARIZONA COURT ORDERS*
*08-3286MB-LOA, 08-3298MB-LOA, AND 08-7273MB-ECV OBTAINED TO FACILITATE LOCATING THE AIRCARD*
*CR08-814-PHX-DGC*

District of Arizona 08-3298MB-LOA order application: "Ex Parte Order Application Of The United States For A Order Pursuant To 18 U.S.C. § 2703(d)"; Note: application for historical cell site information order; (Applicant: AUSA Frederick A. Battista; Signature Date: July 10, 2008); (ITEM No. 2 of April 14, 2009 discovery set);

[White square with black border redactions added by defendant pursuant to Fed. R. Crim. P. 49.1(a).]

□ COPY

1   DIANE J. HUMETEWA
    United States Attorney
2   District of Arizona

3   FREDERICK A. BATTISTA
    Assistant United States Attorney
    Maryland State Bar Member
    Two Renaissance Square
4   40 North Central Avenue, Suite 1200
    Phoenix, Arizona 85004
5   Telephone (602) 514-7500
    Fred.Battista@usdoj.gov

6

7                   UNITED STATES DISTRICT COURT

8                        DISTRICT OF ARIZONA

9
    IN RE APPLICATION OF THE              Misc. No.  O8 - 3298MB
10  UNITED STATES OF AMERICA FOR
    AN ORDER PURSUANT TO
11  18 U.S.C. § 2703(d)                   EX PARTE APPLICATION OF THE
                                          UNITED STATES FOR A ORDER
12                                        PURSUANT TO 18 U.S.C. § 2703(d)

13                                        (Filed Under Seal)

14

15

16        The United States of America, moving by and through its undersigned counsel, respectfully

17   submits under seal this ex parte application for an Order pursuant to 18 U.S.C. § 2703(d) to require

18   and authorize Cellco Partnership, D.B.A. Verizon Wireless, an Internet service provider, located in

19   Bedminster, New Jersey, which functions as an electronic communications service provider and/or

20   a remote computing service, to provide certain records and other information pertaining to the

21   subscriber who has opened an account under the name Travis Rupard, Social Security Number ☐

22   ☐7884. The records and other information requested are set forth as an Attachment to the proposed

23   Order. In support of this application, the United States asserts:

24

25   I.    LEGAL AND FACTUAL BACKGROUND

26   1.    The United States is investigating an unidentified individual (investigation moniker "the

27   Hacker") presumably located within Northern California, who has assumed the identity of Travis

28   Rupard, a resident of the State of Texas, for possible violations for the following criminal statutes:

a.    18 U.S.C. § 286 – Conspiracy to Defraud the Government;

b.    18 U.S.C. § 287 – False, Fictitious or Fraudulent Claims;

c.    18 U.S.C. § 371 – Conspiracy;

d.    18 U.S.C. § 1028 – Fraud Related to Identity Information;

e.    18 U.S.C. § 1028A – Aggravated Identify Theft;

f.    18 U.S.C. § 1029 – Fraud with Access Devices;

g.    18 U.S.C. § 1030 – Unauthorized Computer Access;

h.    18 U.S.C. § 1341 – Mail Fraud; and

I.    18 U.S.C. § 1343 – Wire Fraud.

As of this date, the investigating agencies have determined that the Hacker prepares and electronically files fraudulent claims with the United States in the form of fraudulent income tax returns filed with the United States Internal Revenue Service (IRS) and conspires with other unidentified individuals who later seek to obtain income tax refunds generated from the fraudulent claims and returns through numerous means including pre-paid debit cards and withdrawals from bank accounts opened in the names of shell accounting and tax preparation entities.

2.     The investigation of these incidents provides reasonable grounds to believe that Verizon Wireless has records and other information pertaining to one of its subscribers that are relevant and material to an ongoing criminal investigation. Because Verizon Wireless functions as an electronic communications service provider (provides its subscribers access to electronic communication services, including e-mail and the Internet) and/or a remote computing service (provides computer facilities for the storage and processing of electronic communications), 18 U.S.C. § 2703 sets out particular requirements that the government must meet in order to obtain access to the records and other information it is seeking.

3.     Here, the government seeks to obtain the following additional information with respect to the subject account, via Court Order, in order to supplement the information ordered to be produced pursuant to sealed Order No. 08-3268MB, signed on July 9, 2008.  In particular, the additional information with respect to the subject account is cell site information and sector/distance information to determine the cellular/data network's registration of the target broadband access card associated with data

1  transmissions or connections for the past 30 days; the information is requested in electronic format.

2  4.      A subpoena allows the government to obtain subscriber name, address, length and type of

3  service, connection and session records, telephone or instrument number including any temporarily

4  assigned network address, and means and source of payment information. 18 U.S.C. § 2703(c)(2).

5  This information, as it relates to the subject account, has already been requested and received from

6  Verizon Wireless for the period of time of March 1, 2008 into June 18, 2008, via Grand Jury

7  subpoenas served on June 6 and 16, 2008.  The government may also compel such information

8  through an order issued pursuant to 18 U.S.C. § 2703(d). 18 U.S.C. § 2703(c)(1)(B), (c)(2).

9  5.      To obtain records and other information pertaining to subscribers of an electronic

10  communications service provider or remote computing service, the government must comply with

11  18 U.S.C. section 2703(c)(1), which provides, in pertinent part:

12      A governmental entity may require a provider of electronic communication service
        or remote computing service to disclose a record or other information pertaining to
13      a subscriber to or customer of such service (not including the contents of
        communications) only when the governmental entity –

14

15      . . .

        (B) obtains a court order for such disclosure under subsection (d) of this section.
16

17  6.      Section 2703(d), in turn, provides in pertinent part:

18      A court order for disclosure under subsection (b) or (c) may be issued by any court
        that is a court of competent jurisdiction [1/]  and shall issue only if the governmental
19      entity offers specific and articulable facts showing that there are reasonable grounds
        to believe that the contents of a wire or electronic communication, or the records or
20      other information sought, are relevant and material to an ongoing criminal
        investigation . . . . court issuing an order pursuant to this section, on a motion made
21      promptly by the service provider, may quash or modify such order, if the information
        or records requested are unusually voluminous in nature or compliance with such
        order otherwise would cause an undue burden on such provider.
22

23  Accordingly, this application sets forth specific and articulable facts showing that there are

24  reasonable grounds to believe that the materials sought are relevant and material to an ongoing

25  [1/]
    18 U.S.C. § 2711(3) states that "the term 'court of competent jurisdiction' has the meaning assigned by
26  section 3127, and includes any Federal court within that definition, without geographic limitation." Section
    3127 defines the term "court of competent jurisdiction" as "any district court of the United States (including
27  a magistrate judge of such a court) or any United States court of appeals having jurisdiction over the offense
    being investigated." 18 U.S.C. § 3127(2)(A).
28

3

1  criminal investigation.

2

3  II.    THE RELEVANT FACTS

4  7.     The investigation in this matter is a joint investigation involving the Internal Revenue

5  Service-Criminal Investigation (IRS–CI), Federal Bureau of Investigation (FBI), and the United States Postal

6  Inspection Service (USPIS).  The investigation to date has revealed the existence of a sophisticated scheme

7  to fraudulently obtain tax proceeds filed in the name of innocent third parties and deceased individuals, and

8  illegally obtain the proceeds from these tax returns.  The primary subject of this investigation, who operates

9  in the United States, is involved in acquiring identity information of deceased and living individuals

10  including their social security numbers, and using that information to conduct a bulk tax filing scheme

11  through the use of identities of innocent third parties and deceased individuals, and directing the deposit of

12  the proceeds of those fraudulent tax returns to bank accounts and debit cards where the funds can be

13  accessed by the Subject and co-conspirators.

14        A.    Electronic Filing of Income Tax Returns

15  8.     The Internal Revenue Service (IRS) encourages taxpayers to prepare and electronically file (e-file)

16  their Federal income tax returns.  Taxpayers can submit their returns via e-file through authorized IRS e-file

17  providers.  Each authorized IRS e-file provider is assigned one or more Electronic Filing Identification

18  Numbers (EFIN), which the IRS uses to identify and monitor e-file provider activity.  The IRS Electronic

19  Tax Administration (ETA) administers the e-file program.

20  9.     The Free File program is a free federal tax preparation and electronic filing program for eligible

21  taxpayers developed through a partnership between the IRS and the Free File Alliance LLC, a group of

22  private sector tax software companies.  Since Free File's debut in 2003, more than 15.4 million returns have

23  been prepared and e-filed through the program.  Free File allowed taxpayers with an Adjusted Gross Income

24  (AGI) of $52,000.00 or less in 2006, and $54,000.00 or less in 2007, to e-file their federal tax returns for

25  free.  Approximately 70 percent of all taxpayers (95 million taxpayers) are eligible to electronically file their

26  income tax returns under the Free File program.

27  10.    Many e-file providers offer home use web-based tax preparation software applications.  The

28  application allows the end-user to self-prepare a tax return on their home computer and electronically

4

1  transmit the tax return via the Internet by means of a personal computer and modem. After the e-file

2  provider receives the information from the end-user, the e-file provider electronically files the tax return with

3  the IRS, thereby completing the electronic filing process. In order for the end-user to connect and transmit

4  an e-filed return over the Internet, the end-user must have access to the Internet via an Internet Service

5  Provider (ISP).

6  11.    Once the customer obtains an IP address and logs onto the Internet, each customer can utilize the

7  web-based application offered by e-file providers to transmit their tax return information. When the e-file

8  provider transmits a tax return to the IRS, they are required to include the IP information of the customer,

9  consisting of the IP address, IP Date, IP Time and IP Time Zone. The IP information can normally be used

10  to trace back to the individual filing the return.

11        B.    Carter Tax and Accounting, LLC

12  12.    In May 2007, IRS-Ci became aware of questionable activity involving an account at Compass Bank,

13  in the name of CARTER TAX & ACCOUNTING, LLC. Ransom Marion Carter was the authorized signer

14  for the account. Between May 22 and May 25, 2007, 75 U. S. Treasury electronic credits, totaling

15  approximately $129,364.00, and labeled "tax refund" were posted to the account. On May 26, 2007,

16  Ransom Carter withdrew $24,500.00 from the account and purchased two cashier's checks with the funds.

17  13.    On June 5, 2007, EFile Tax Returns, Inc., an authorized IRS e-file provider and member of the Free

18  File Alliance LLC, contacted the ETA, regarding a large volume of returns filed through its website using

19  what appeared to be an automated process. EFile Tax Returns, Inc., identified approximately 200 returns

20  for tax year 2006 and 400 for tax year 2005, which appeared to be related to this automated scheme.

21  14.    The IRS Fraud Detection Center in Austin, Texas (AFDC), researched the returns identified by EFile

22  Tax Returns, Inc., and identified Ransom Carter's Compass Bank account as one of the accounts destined

23  to receive refunds claimed on those returns. A search was conducted for all electronically filed returns with

24  refunds destined for the above referenced Compass Bank account. Approximately 209 returns, claiming

25  over $339,000.00 in refunds, were identified bearing this particular bank account number and routing

26  number.

27  15.    Analysis of the subject returns revealed multiple fraudulent returns filed from single IP addresses

28  within short time periods, indicating the use of some type of computerized bulk filing system. Based on

1  analysis of the IP addresses, it appeared the returns were filed from multiple locations around the United

2  States.   However, the real IP address was apparently hidden, possibly by utilizing illicit proxies or

3  intermediary computers to submit the returns and prevent the identification of the individual filing the

4  returns.

5  16.      For tax year 2006, refunds totaling approximately $1,112,040.00 were falsely claimed via these

6  electronically filed returns.  Based on the significant similarities associated with the IP addresses, return

7  format, and e-mail addresses, the AFDC identified approximately 1,272 returns, 175 IP addresses, and 73

8  bank accounts that are believed to be linked to this scheme for tax year 2007.  As of June 26, 2008, refunds

9  totaling approximately $2,133,824.00 have been falsely claimed via these electronically filed returns for the

10 2007 tax year.

11         C.   CI 1 and CI 2

12 17.      In January 2008, an individual pending unrelated felony fraud charges, in the Superior Court of

13 Arizona, agreed to provide information to IRS-CI and USPIS in order to potentially gain consideration with

14 respect to his/her pending state charges.  This individual will hereinafter be referred to as CI 1.  To date,

15 based on information provided by IRS-CI, the investigation team has found CI 1 to be credible and his/her

16 information has been corroborated and documented through independent investigation, recorded telephone

17 calls, and recorded e-mails.  In a debriefing, CI 1 advised that an individual he/she knew only as "JP" and

18 another unknown individual CI 1 referred to as "The Hacker," hereinafter referred to as the "Target Subject,"

19 had been operating an automated system to file fraudulent tax returns using the names and Social Security

20 Numbers of deceased individuals.  CI 1 also advised that Ransom Carter had worked with CI 1 and JP in

21 the past in order to promote various fraudulent schemes.

22 18.      CI 1 further stated Ransom Carter's receipt of refunds through the Compass Bank account Carter

23 established in 2006, in the name of CARTER'S TAX & ACCOUNTING LLC, represented a successful test

24 run of the scheme.  CI 1 said "JP" and his associates intended to pursue the same scheme for the 2008 filing

25 season (for income earned in 2007).  CI 1 also stated he/she believed that during prior years, going back as

26 far as 2005, the fraudulent tax returns had directed refunds be credited to pre-paid debit cards.

27 19.      Based on the information provided by CI 1 and CI 1's agreement to work as a confidential informant

28 on behalf of law enforcement, an undercover operation was initiated by IRS-CI and USPIS to determine the

true identity of "JP," the Target Subject and their associates, and gather evidence concerning the nature and extent of the bulk filing scheme. Per "JP's" instructions to CI 1, IRS-CI and USPIS, with the assistance of CI 1, established an undercover shell business and a related undercover bank account at Meridian Bank ( the "Meridian undercover bank account").

20.     In the course of the scheme, "JP" asked CI 1 to open a safe-mail.net e-mail account. Safe-mail holds itself out as a highly secure communication, storage, sharing and distribution system for the internet and offers a variety of services including secure e-mail. The purported purpose of using this e-mail service was to avoid detection. In February 2008, CI 1 e-mailed the account number and routing numbers for the Meridian undercover bank account to "JP." "JP" subsequently advised CI 1 that the Target Subject would begin to e-file fraudulent returns which directed refunds to be sent to the Meridian undercover bank account. Per CI 1, "JP" generally acted as the middleman between street-level individuals such as himself/herself and the Target Subject.

21.     Throughout the initial stages of the undercover operation, CI 1 communicated with "JP" via telephone and his safe-mail.net account.   Incoming e-mails from "JP" revealed his IP address as 76.27.37.158.  Investigation of this IP address ultimately determined that IP address 76.27.37.158 was owned by Comcast Cable Communications, Inc. In late February 2008, in response to a subpoena, Comcast reported that IP address 76.27.37.158 was leased by "JP" at "JP's" residential address.  It was determined that "JP" was, in fact, the subscriber.

22.     In early March 2008, the AFDC identified 72 electronically filed tax returns with refunds, totaling approximately $117,496.00, destined for the controlled undercover  Meridian bank account.   Over $62,000.00 was deposited by the government into the Meridian undercover bank account in mid-March 2008.

23.     After the aforementioned deposits, CI 1 contacted "JP" and informed him that money had been deposited into the account. CI 1 told "JP" he/she would withdraw $9,000.00 in mid-March 2008 and ship it to "JP" on March 18, 2008, via FedEx. CI 1 further advised that he/she would withdraw money from the account every week and ship $9,000.00 to "JP" every other week.  The withdrawn money that was not "shipped" was purported to be CI 1's cut. "JP" provided CI 1 with the name and address where the money was to be shipped. "JP" also told CI 1 to provide the tracking number so he/she could monitor the shipment

1   of the package.

2   24.    In late March 2008, an IRS-CI agent withdrew $9,000.00 in currency from the Meridian undercover

3   bank account and on April 1, 2008, the $9,000.00 was shipped overnight priority mail to "JP." On April 14,

4   2008, a third shipment in the amount of $9,000 currency was sent overnight priority mail to "JP." On April

5   15, 2008, "JP" was arrested when leaving the destination location carrying the third and final delivery of

6   $9,000 currency.  The second and third shipments were in violation of 18 U.S.C. § 1341.

7   25.    After his/her arrest on related federal charges, "JP" agreed to act as a confidential informant and

8   assist law enforcement in identifying and apprehending the Target Subject and will be hereinafter referred

9   to as CI 2.  CI 2 has advised he/she has never met the Target Subject in person and has never spoken to the

10  Target Subject telephonically or via Voice Over Internet Protocol (VOIP).  CI 2 maintains ongoing contact

11  with the Target Subject via encrypted e-mail using a safe-mail.net e-mail account.  Safe-Mail is owned and

12  operated by Secure Information Technologies Limited, which is a privately owned company,

13  registered in Israel, and with offices in Israel, the United Kingdom and Japan.

14          D.    Controlled Delivery of $68,000

15  26.    The Target Subject has been led to believe that CI 2 has an associate, "Daniel," who works in the

16  banking industry and is willing to assist CI 2 in moving the Target Subject's fraudulent tax return proceeds

17  from the Meridian undercover bank account quickly and without detection.

18  27.    On April 17, 2008, CI 2 sent an encrypted e-mail to the Target Subject explaining that he/she had

19  received an additional $9,000 in currency from the Meridian undercover bank account, and was expecting

20  to receive an additional $75,000 by April 22, 2008.  CI 2 inquired how the Target Subject wanted his cut

21  ($68,000) of the money.  The Target Subject provided CI 2 detailed instructions regarding how to physically

22  wash $68,000 in currency in lantern fuel to remove any drug or explosive residues which might cause a

23  detection dog to alert on the package.  CI 2 was further instructed to double vacuum seal the currency, to

24  place the sealed currency in the cavity of a toy, gift wrap the toy so it appeared to be a present, attach a

25  birthday card for a dying child, package it for overnight FedEx delivery, and have the package held for

26  pickup at the destination location.

27  28.    Additionally, the Target Subject informed CI 2 he would send a courier, armed with an AR-15 in a

28  duffle bag, to pick up the package.  The Target Subject added the courier would be prepared to shoot anyone

8

1   who attempted to arrest him while he was in possession of the package.  The Target Subject informed CI

2   2 that he would send details of the operation in an encrypted format to the media before the pickup date.

3   If law enforcement conducted a sting on the pickup, the Target Subject would then provide information to

4   the media to decrypt his prior message.  The Target Subject advised that this would make law enforcement

5   look bad by proving that law enforcement knew the potential for violence at a public place before conducting

6   the sting.

7   29.      On May 5, 2008, the Target Subject sent CI 2 an encrypted e-mail with directions to send a package

8   containing $68,000 in currency to Patrick Stout, using an address of 249 South California Avenue, Palo Alto,

9   California, to arrive on the morning of May 6, 2008. This location was determined to be a FedEx/Kinko's

10  retail store open 24 hours a day.  Prior to the shipment, CI 2 provided the Target Subject with the undercover

11  package's tracking number via another encrypted e-mail.

12  30.      The package containing $68,000 in currency was delivered to the FedEx/Kinko's store on May 6,

13  2008.  On May 7, 2008, at approximately 5:00 am, an unknown male, wearing a dark jacket with a hood,

14  was observed entering the back entrance of the Fed Ex/Kinko's on foot and retrieving the package.  The

15  male carried the box to a nearby corner where he ripped open the box, removed the contents containing the

16  currency and discarded the packaging in a nearby dumpster.  The unknown male proceeded toward a nearby

17  train station.  Agents conducting surveillance on foot were unsuccessful in efforts to identify the unknown

18  male or follow the unknown male to his final destination due to the fact that the area was practically deserted

19  at that early hour.

20  31.      On or about May 8, 2008, the Target Subject e-mailed CI 2 and confirmed receipt of the money.  The

21  Target Subject indicated in his e-mail that the money was picked up by a third party.  The Target Subject

22  advised CI 2 that the courier who retrieved the package believed that he was being followed by police.

23  According to the Target Subject, the courier advised that he noticed a "car circling around the area after he

24  left with the driver acting like he was looking for someone.  There were also some suspect characters

25  walking around on foot 'trying to follow him' so he said he did a 180 and 'came right at them' but they did

26  not do anything about it. He said they looked like UK (United Kingdom) government agents by the way they

27  were dressed."  The Target Subject then advised that the courier was "likely just really paranoid."

28  32.      CI 2 and the Target Subject soon thereafter agreed "Daniel" would withdraw all of the money from

9

1  the Meridian undercover bank account and deposit the money in an account controlled by "Daniel." CI 2

2  informed the Target Subject, "Daniel" is able to make very large one-time withdrawals only at the end of

3  each quarter, the next quarter ending June 30, 2008.

4      33.    On May 16, 2008, CI 2 informed the Target Subject that "Daniel" had moved $364,260 (the

5  remaining cut for CI 2 and the Subject) from the Meridian undercover bank account into another bank

6  account believed to be controlled by "Daniel." CI 2 provided a Bank of America routing number and

7  undercover account number to the Target Subject where future tax refunds could be deposited. Per the

8  Target Subject's request, the funds in the Bank of America account would be swept weekly into another

9  account controlled by "Daniel."

10      34.    On May, 27, 2008, the Target Subject informed CI 2 that he had filed approximately 200 additional

11  fraudulent tax returns seeking refunds destined for the new undercover account located at Bank of America.

12  As of June 26, 2008, the AFDC identified 249 fraudulent tax returns claiming approximately $404,382

13  destined for this account. The returns were filed from multiple IP addresses.

14      E.    Travis Rupard

15      35.    On March 1, 2008, a fraudulent tax return for James Johnson was filed with the IRS using IP address

16  75.208.105.186, claiming a refund amount of $2,099.00 and also a fraudulent tax return for Michael

17  Deshields claiming a refund amount of $1,988.00. Both refunds were destined for debit card accounts at

18  MetaBank. The debit card accounts were linked by the investigation team to the Meridian undercover bank

19  account through connected IP addresses and bank accounts.

20      36.    On March 5, 2008, a tax return for Robert Galletly was filed with the IRS using IP address

21  75.209.41.104, with a refund amount of $1,093.00 destined for a debit card account at MetaBank. This debit

22  card account was linked by the investigation team to the Meridian undercover bank account through analysis

23  of connected IP addresses and bank accounts.

24      37.    On March 26, 2008, a fraudulent tax return for Kevin Furman was filed with the IRS using IP address

25  75.209.101.132, claiming a refund amount of $1,282.00 destined for the Meridian undercover bank account.

26      38.    Investigation revealed the IP addresses associated with the James Johnson return, Robert Galletly

27  return, Michael Deshields return and the Kevin Furman return, are registered to Verizon Wireless. In

28  response to a Federal Grand Jury subpoena, Verizon Wireless reported that IP addresses 75.208.105.186,

1  75.209.41.104, and 75.209.101.132 were utilized by an account in the name of Travis Rupard, customer

2  account ID 270691733, MDN (415) 264-9596, subscriber SSN ☐7884, contact address Post Office

3  Box 730031 in San Jose, California, telephone number (206) 666-3620.

4      39.    USPIS conducted an investigation of Post Office Box 730031 in San Jose, California and determined

5  that this PO Box was opened on March 31, 2006 and was closed on August 31, 2006. The application

6  indicated that an individual purporting to be Travis Rupard presented a California Driver's License, number

7  D2740168 and a Student ID Card, and provided a physical address of 1780 Oakland Road, #17, San Jose,

8  California, 95131. Further investigation showed that the California Driver's License number is assigned

9  to a female with a Bakersfield, California address. Based on information provided by the San Jose,

10 California, Post Office, the address 1780 Oakland Road is a physical street address for the Leasing Offices

11 of an apartment complex in San Jose. There are no apartment numbers or suite numbers associated with

12 1780 Oakland Road, San Jose, California.

13     40.    Further investigation has revealed a PayPal account in the name of Travis Rupard, San Jose,

14 California, to possibly be involved with identity theft. The Travis Rupard account had multiple bank

15 accounts on the corresponding PayPal account from which funds were received and then either sent for an

16 attempted purchase of gold coins or withdrawn into a secondary bank account. The original source of the

17 funds was identified as being fraudulent tax returns. PayPal attempted to contact Travis Rupard but found

18 the provided telephone number was not correct. The money funding the Travis Rupard PayPal account was

19 from US Bank Account xxxxxx6706. The Travis Rupard account listed the following: Post Office Box

20 730031, San Jose, California, telephone number (408) 368-3479, e-mail Travis Rupard@safe-mail.net.

21 Travis Rupard's related bank accounts included accounts at US Bank, Centennial Bank and a Visa Credit

22 Card.

23     41.    CI 2 has advised that he/she has been involved with the Target Subject in a number of fraudulent

24 schemes over a period of several years and in the past he/she had sent money to the Target Subject by

25 sending it to e-gold account 3501337. A Federal Grand Jury subpoena was issued for documents related to

26 this account. Records show that this account was created on August 16, 2006, in the names of Sam Blat and

27 Benjamin Cohan. Records corroborate that CI 2 sent the Target Subject $7,640.00 on August 17, 2006.

28 Records further indicate that the Sam Blat account sent money to an account in the name of Aaron Johnson

1  on five occasions beginning on November 19, 2006 through December 22, 2006.  On July 31, 2006, an

2  account in the name of Travis Rupard, 6447 Ivy Lane, San Jose, California, 95129, e-mail address

3  travisrupard@safe-mail.net, telephone number (408) 252-1678, sent $9.50 to the Aaron Johnson account.

4  The name Aaron Johnson is listed as the account holder of a Southwest Bank Account used to receive

5  additional fraudulent tax refunds related to the overall scheme.  The Target Subject recently asked CI 2 to

6  inquire about the Southwest Bank Account with "Daniel" to determine if the Target Subject could obtain

7  proceeds in the account.  The Target Subject has advised CI 2 that he has been unable to withdraw the

8  proceeds from the scheme out of this account.

9          J.      E-Mail Communications Between the Target Subject and CI 2

10  42.      In an e-mail sent on unknown date and recently recovered from CI 2's records, the Target Subject

11  advised CI 2 that he uses a different IP address for each tax return and has filed returns with many different

12  efilers.  The Target Subject believes that filing the returns in this manner would prevent "them," (i.e., the

13  IRS), to link them all.  The Target Subject advised that an e-filer "took some heat" from the IRS because

14  of his automated filing scheme.  The Target Subject stated that the e-filer tried to stop him by use of a

15  captcha, i.e. a box that appears on a webpage requiring the user to personally view a screen and then enter

16  in a series of characters.  The purpose of a captcha is to prevent automated entry of data on a webpage.

17  43.      On or about May 12, 2008, the Target Subject asked CI 2 if CI 2 knew of any socks proxy botnet

18  services.  The Target Subject advised that his main proxy service went down.  (A socks proxy botnet would

19  enable the Target Subject to continue to communicate with others and further the bulk filing scheme while

20  seeking to avoid detection.)

21  44.      On or about May 14, 2008, the Target sent an e-mail to CI 2 stating that he needed a web based

22  account which had a list of proxies that the Target could search by geographic location and then utilize the

23  proxy IP address and port number of his choice.  The Target explained that these proxies could come from

24  home personal computers that have proxy Trojans, (i.e., a malicious program which allows unauthorized

25  activity unbeknownst to the computer's lawful owner/user) or from scanning computers which results in

26  identifying open proxies.  The Target advised CI 2 that CI 2 should be willing to pay any amount to identify

27  proxies in order to continue funding accounts.  The Target Subject stated that he could scan for his own

28  proxies but that he would need to use a T1 line (a dedicated high speed Internet line) to obtain the needed

1  bandwidth and sit all day while the computer conducted the vulnerability scanning.

2  45.    On or about June 10, 2008, the Target Subject sent an e-mail to CI 2 stating that "I funded other bank
3  accounts at the same time from the same proxies and they all work out..." The investigation team believes
4  that the Target Subject is referencing fraudulent tax returns sent to other accounts in addition to the Bank
5  of America undercover bank account.

6  46.    On or about June 11, 2008, the Target Subject sent an e-mail to CI 2 asking for personal identifying
7  information of third parties.   The Target Subject again sought information on the Social Security
8  Administration "internal death master file," the previous Choicepoint data compromise, and personal
9  identifying information on Bank of America customers. The Target Subject further advised that, "I can and
10  will bring this country into a into a "Mad Max" state if the government continues down their path. I just
11  hope there are enough people with enough guns spread through out the country to fight off the feds and split
12  the country into new countries...." The investigation team believes that the reference to Mad Max refers
13  to the post-apocalyptic world depicted in the film.

14  47.    The conduct described above provides reasonable grounds to believe that a number of federal statutes
15  may have been violated, as listed in paragraph (1) above.

16  48.    The following records relating to the subject account that are available from Verizon Wireless will
17  help government investigators to identify the individual(s) who are responsible for the events described
18  above and to determine the nature and scope of their activities. Accordingly, the government requests that
19  Verizon Wireless be directed to produce all records described in Attachment A to the proposed Order. In
20  particular, the records concern the Verizon Wireless account with Customer Account ID 270691733,
21  Subscriber Travis Rupard, Subscriber SSN [        ]7884, and MDN (415) 264-9596, and are cell site
22  information and sector/distance information to determine the cellular/data network's registration of the
23  assigned broadband access card associated with data transmissions or connections for 30 days prior to the
24  date of the Order;  the information is requested in electronic format.

25  49.    The information requested should be readily accessible to Verizon Wireless by computer
26  search, and its production should not prove to be burdensome.

27  50.    The United States requests that this application and Order be sealed by the Court until such
28  time as the Court directs otherwise.

51.     The United States requests that pursuant to the preclusion of notice provisions of 18 U.S.C. section 2705(b), Verizon Wireless be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this Order for such period as the Court deems appropriate. The United States submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation. Such a disclosure would give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue his flight from prosecution.

IV.     CONCLUSION

        WHEREFORE, it is respectfully requested that the Court grant the attached Order, effective June 6, 2008, (1) directing Verizon Wireless to provide the United States with the records and information described in Attachment A; (2) directing that the application and Order be sealed; (3) directing Verizon Wireless not to disclose the existence or content of the Order, except to the extent necessary to carry out the Order; and (4) directing that three certified copies of this application and Order be provided by the Clerk of this Court to the United States Attorney's Office.

        Executed on July 10, 2008.

                                    DIANE J. HUMETEWA
                                    United States Attorney
                                    District of Arizona


                                    FREDERICK A. BATTISTA
                                    Assistant United States Attorney

14