MEMORANDUM OF POINTS AND AUTHORITIES

MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE

*****

## Table of Contents

I. INTRODUCTION....1

II. INCORPORATIONS....3

A. External document incorporations....3

B. Accompanying attachment incorporations....4

III. CERTIFICATION PURSUANT TO LRCiv 7.2(j)....4

IV. PROCEDURAL HISTORY....4

A. D.Ariz. Grand Jury subpoenas 07-03-609 and 07-03-615....4

B. D.Ariz. order No. 08-3286MB-LOA, i.e., the retroactive order....5

C. D.Ariz. order No. 08-3298MB-LOA, i.e., historical cell site information order....7

D. D.Ariz. order No. 08-7273MB-ECV, i.e., historical cell site information order....8

E. N.D.Cal. order No. 08-90330MISC-RS, i.e., use and monitor a mobile tracking device order....9

F. N.D.Cal. order No. 08-90331MISC-RS, i.e., pen register and trap and trace order....12

G. N.D.Cal. warrant No. 08-70460-HRL (the original unexecuted and amended versions)....14

V. FACTS....16

A. Details of the aircard and its laptop host computer....17

1. Technical information....17

B. Identification of the aircard and use of the illegally obtained destination IP addresses....19

C. Obtaining aircard historical cell site location information and creating the cell tower range chart/map....20

D. Triangulating the precise aircard location using Over-The-Air Service Provisioning, surreptitious phone calls, real-time cell site location information, and a portable/transportable wireless device locator (e.g., the Harris StingRay)....23

E. The precision of the government's aircard locating mission remains a debatable issue. ....................27

F. After the FBI technical agents/personnel located the aircard, they handed off the aircard location evidence to the primary case agents so that they could attempt to establish "independent probable cause" to search apartment No. 1122....................30

G. The FBI technical agents/personnel electronically verified the aircard location on dates after it had been initially located....................31

H. The government seized evidence from apartment No. 1122 by executing the reissued version of the previously returned N.D.Cal. 08-70460-HRL search warrant....................32

VI. ARGUMENT....................33

A. All evidence relating to the identities and roles of the witnesses to the mission to search for and locate the aircard. [Section I(A) of Submission Pursuant To LRCiv 37.1]. 35

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: identification of witnesses]....................35

a. The government used a helicopter and/or a man-on-foot as a moveable platform for the portable/transportable wireless device locator(s). [Stipulation No. 14] [Stipulation Nos. 1-2, and 4 integrated]....................35

b. The government destroyed the real-time aircard location data and other additional data after the date of Daniel Rigmaiden's arrest. [Stipulation No. 15] [Stipulation Nos. 2, 4, and 23-25 integrated]....................37

2. How the government's agreement to the waivers in the relative proposed stipulations will alleviate the defendant's need for disclosure. [RE: identification of witnesses]....................37

a. Waiver of claims of good faith searches and seizures on the part of the unidentified FBI technical agents/personnel. [Stipulation Nos. 11-13][Stipulation Nos. 2 and 4 integrated]....................37

b. Waiver of claims of good faith destruction of real-time aircard location data and other additional data by the unidentified FBI technical agents/personnel. [Stipulation Nos. 16-19][Stipulation Nos. 2, 4, and 23-25 integrated]....................37

3. Why the requested evidence is relevant and helpful to the defense. [RE: identification of witnesses]....................38

a. Relevancy of the requested evidence with respect to proving that the government used a helicopter and/or a man-on-foot as a moveable platform for the portable/transportable wireless device locator(s). [RE: identification of witnesses]. 38

i. Use of a helicopter as a Fourth Amendment violation. [RE: identification of witnesses]....................38

ii. Use of a man-on-foot inside the Domicilio apartment complex as a Fourth Amendment violation. [RE: identification of witnesses]....................39

b. Relevancy of the requested evidence with respect to determining a destruction

- ii -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

date/time for the real-time aircard location data and other additional data. [RE: identification of witnesses]....................40

c. Relevancy of the requested evidence with respect to challenging government claims of good faith in executing illegal searches and seizures. [RE: identification of witnesses]....................40

d. Relevancy of the requested evidence with respect to challenging government claims of good faith in destroying evidence. [RE: identification of witnesses].........41

4. Why the government is obligated to provide the evidence being requested. [RE: identification of witnesses]....................42

B. Unredacted order applications and attachments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders obtained to facilitate locating the aircard. [Section I(B) of Submission Pursuant To LRCiv 37.1]....................44

1. How the government's agreement to the waivers in the relative proposed stipulations will alleviate the defendant's need for disclosure. [RE: unredacted order applications and attachments]....................44

a. Waiver of use of the relevant order applications and attachments. [Stipulation No. 20][Stipulation Nos. 1-4 integrated]....................44

2. Why the requested evidence is relevant and helpful to the defense. [RE: unredacted order applications and attachments]....................44

3. Why the government is obligated to provide the evidence being requested. [RE: unredacted order applications and attachments]....................45

C. All response materials, returns, and seized/collected evidence relating to the N.D.Cal. 08-90330MISC-RS order obtained to facilitate locating the aircard, e.g., real-time location data. [Section I(C) of Submission Pursuant To LRCiv 37.1]....................46

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: real-time aircard location data, etc.]....................46

a. The FBI technical agents/personnel located the aircard precisely inside the confines of apartment No. 1122. [Stipulation No. 21][Stipulation Nos. 1, 2 and 4 integrated]....................46

b. After initially locating the aircard within apartment No. 1122, the government used its portable/transportable wireless device locator to verify the aircard location. [Stipulation No. 22][Stipulation Nos. 1, 2 and 4 integrated]....................48

c. The destroyed real-time aircard location data included data in the form generated by Harris products and nonpublic information used for aircard signal and data encryption, encoding, scrambling, spreading, and routing. [Stipulation Nos. 23-25] [Stipulation Nos. 1-2, 4, 26 and 30-42 integrated]....................49

2. Why the requested evidence is relevant and helpful to the defense. [RE: real-time aircard location data]....................50

a. Relevancy of the requested evidence with respect to proving that the FBI technical agents/personnel located the aircard precisely inside the confines of

- iii -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

apartment No. 1122. [RE: real-time aircard location data, etc.]....................................50

b. Relevancy of the requested evidence with respect to proving that after initially locating the aircard within apartment No. 1122, the government used its portable/transportable wireless device locator to verify the aircard location. [RE: real-time aircard location data, etc.]....................................52

c. Relevancy of the requested evidence with respect to knowing exactly what the real-time aircard location data and additional data consisted of. [RE: real-time aircard location data, etc.]....................................53

3. Why the government is obligated to provide the evidence being requested. [RE: real-time aircard location data]....................................53

D. All evidence relating to the real-time and historical geolocation techniques (e.g., triangulation techniques) and radio wave collection methods (e.g., cell site emulation, interrogation, active approach) used by the government agents/personnel and by the wireless device locators while searching for the aircard. [Section I(D) of Submission Pursuant To LRCiv 37.1]....................................55

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: geolocation techniques and radio wave collection methods]....................................55

a. The government obtained specific nonpublic keys, codes, masks, and data from Verizon Wireless used for aircard signal and data encryption, encoding, scrambling, spreading, and routing. [Stipulation No. 26][Stipulation Nos. 1-2, 4, 25 and 30-46 integrated]....................................55

b. The government placed surreptitious phone calls to the aircard and used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages showing aircard real-time cell site sector location information. [Stipulation Nos. 27-29] [Stipulation Nos. 1-3 and 46 integrated]....................................56

c. The government passively eavesdropped air interface signals being exchanged between the aircard and Verizon Wireless cell sites [Stipulation No. 30][Stipulation Nos. 1, 2, 4, 26 and 46 integrated]....................................57

d. The government instructed Verizon Wireless to send the aircard OTASP messages to facilitate the StingRay emulating a Verizon Wireless cell site. [Stipulation No. 31][Stipulation Nos. 1, 2, 4, 9, 26, 32 and 46 integrated]..............57

e. The government used cell site emulation, aircard emulation/cloning, and forced registration in order to locate the aircard. [Stipulation Nos. 32-34][Stipulation Nos. 1, 2, 4, 9, 26, 31 and 46 integrated]....................................60

f. The government sent location finding interrogation signals to the aircard in order to determine its location. [Stipulation No. 35][Stipulation Nos. 1, 2, 4, 26, 32, 36-41 and 46 integrated]....................................61

g. The government used geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion on aircard signals in order to triangulate the aircard's location. [Stipulation Nos. 36-41][Stipulation Nos. 1, 2, 4, 35 and 46 integrated]....62

h. The government shifted the location of the StingRay and took geolocation

measurement on aircard signals in multiple locations, i.e., active approach, in order to determine the aircard's location. [Stipulation No. 42][Stipulation Nos. 1, 2, 4, 35-41 and 46 integrated]....66

i. The government increased the transmission power of the aircard, caused an interruption in aircard service, and caused aircard service data transfer rates to fall below what would have otherwise been provided by Verizon Wireless. [Stipulation Nos. 43-45][Stipulation Nos. 1-4, 26, 30-42 and 46 integrated]....67

2. Why the requested evidence is relevant and helpful to the defense. [RE: geolocation techniques and radio wave collection methods]....69

a. Relevancy of the requested evidence with respect to proving that the government obtained from Verizon Wireless specific nonpublic keys, codes, masks, and data used for aircard signal and data encryption, encoding, scrambling, spreading, and routing. [RE: geolocation techniques and radio wave collection methods]....70

b. Relevancy of the requested evidence with respect to proving that the government placed surreptitious phone calls to the aircard and used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages. [RE: geolocation techniques and radio wave collection methods]....72

c. Relevancy of the requested evidence with respect to proving that the government passively eavesdropped air interface signals being exchanged between the aircard and Verizon Wireless cell sites. [RE: geolocation techniques and radio wave collection methods]....73

d. Relevancy of the requested evidence with respect to proving that the government instructed Verizon Wireless to send the aircard OTASP messages. [RE: geolocation techniques and radio wave collection methods]....74

e. Relevancy of the requested evidence with respect to proving that the government used cell site emulation, aircard emulation/cloning, and forced registration. [RE: geolocation techniques and radio wave collection methods]....77

f. Relevancy of the requested evidence with respect to proving that the government sent location finding interrogation signals to the aircard in order to determine its location. [RE: geolocation techniques and radio wave collection methods]....78

g. Relevancy of the requested evidence with respect to proving that the government used geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion on aircard signals in order to triangulate the aircard's location. [RE: geolocation techniques and radio wave collection methods]....80

h. Relevancy of the requested evidence with respect to proving that the government took geolocation measurement on aircard signals in multiple locations, i.e., active approach, in order to determine the aircard's location. [RE: geolocation techniques and radio wave collection methods]....82

i. Relevancy of the requested evidence with respect to proving that the government increased the transmission power of the aircard, caused an interruption in aircard service, and caused aircard service data transfer rates to fall below what would have otherwise been provided by Verizon Wireless. [RE: geolocation techniques and radio wave collection methods]....83

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

- v -

3. Why the government is obligated to provide the evidence being requested. [RE: geolocation techniques and radio wave collection methods]........................................83

E. All path movement information (e.g., GPS data) showing the geographical paths of the wireless device locators while searching for the aircard. [Section I(E) of Submission Pursuant To LRCiv 37.1]........................................84

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: path movement information for StingRay] [Stipulation Nos. 1-4, 14, 21, 22, 24, and 42 integrated]........................................84

2. Why the requested evidence is relevant and helpful to the defense. [RE: path movement information for StingRay]........................................85

3. Why the government is obligated to provide the evidence being requested. [RE: path movement information for StingRay]........................................85

F. All evidence relating to the specific wireless device locators (e.g., user manuals, test data, etc., for the StingRay) and related software (e.g., CDMA software, Geolocation software, etc.) used to search for and locate the aircard. [Section I(F) of Submission Pursuant To LRCiv 37.1]........................................86

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: specific devices and software used to locate the aircard]........................................87

a. The government did not use a hardware and/or software based mobile tracking device to locate the aircard and the StingRay and aircard are not hardware and/or software based mobile tracking devices. [Stipulation No. 47-49][Stipulation Nos. 2, 4 and 30-46 integrated]........................................87

b. The StingRay is not a hardware and/or software based pen register and/or trap and trace device. [Stipulation No. 50 and 51][Stipulation Nos. 2, 4 and 30-46 integrated]........................................88

c. The StingRay is capable of locating the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35, and 42-45. [Stipulation No. 52][Stipulation Nos. 2, 4, 21-26, and 30-46 integrated]89

2. Why the requested evidence is relevant and helpful to the defense. [RE: specific devices and software used to locate the aircard]........................................89

a. Relevancy of the requested evidence with respect to proving that the government did not use a hardware and/or software based mobile tracking device to locate the aircard and the StingRay and aircard are not hardware and/or software based mobile tracking devices. [RE: specific devices and software used to locate the aircard]......90

b. Relevancy of the requested evidence with respect to proving that the StingRay is not a hardware and/or software based pen register and/or trap and trace device. [RE: specific devices and software used to locate the aircard]........................................90

c. Relevancy of the requested evidence with respect to proving that the StingRay is capable of locating the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

radio wave collection methods listed in Stipulation Nos. 30-35, and 42-45. [RE: specific devices and software used to locate the aircard]........................................91

i. Relevancy of obtaining test data. [RE: specific devices and software used to locate the aircard]........................................91

ii. Relevancy of obtaining the physical devices themselves. [RE: specific devices and software used to locate the aircard]........................................92

iii. Relevancy of obtaining instructions manuals, operations manuals, user manuals, schematics, patent information, proprietary information, trade secrets, etc. [RE: specific devices and software used to locate the aircard]........................................92

3. Why the government is obligated to provide the evidence being requested. [RE: specific devices and software used to locate the aircard]........................................93

G. All evidence relating to the Pen/Trap network architecture in place between July 16, 2008 and August 1, 2008 beginning at the Verizon Wireless Access Function and ending at the FBI Collection Function. [Section I(G) of Submission Pursuant To LRCiv 37.1].......94

1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. [RE: Pen/Trap network architecture]........................................94

a. Neither the government nor Verizon Wireless took any extra steps in response to the "after receipt and storage" directive contained in the N.D.Cal. 08-90331MISC-RS order. [Stipulation No. 53][Stipulation Nos. 2, 3, 27 and 28 integrated]............94

2. Why the requested evidence is relevant and helpful to the defense. [RE: Pen/Trap network architecture]........................................96

3. Why the government is obligated to provide the evidence being requested. [RE: Pen/Trap network architecture]........................................98

H. The original data storage devices used to save the CDNRS files and LAESP messages resulting from the execution of the N.D.Cal. 08-90331MISC-RS order. [Section I(H) of Submission Pursuant To LRCiv 37.1][Stipulation No. 54][Stipulation Nos. 2, 22 and 27-29 integrated]........................................99

I. All communications relating to the execution of the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders that were sent/received between the government and the private entities associated with Verizon Wireless, Harris Corporation, and UTStarcom. [Section I(I) of Submission Pursuant To LRCiv 37.1][Stipulation Nos. 1-4, 9, 11-12, 14, 16-18, and 21-52 integrated]........................................100

J. All unredacted/unsummarized emails, reports of investigation, memorandums, rough notes, and other relevant documents (as specifically listed) relating to the mission to search for and locate the aircard. [Section I(K) of Submission Pursuant To LRCiv 37.1] [Stipulation Nos. 1-4, 9, 11-12, 14, 16-18, and 21-54 integrated]..................................100

VII. CONCLUSION........................................101

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

# Table of Cases

Alderman v. United States,
394 U.S. 165 (1969)....................54

Arizona v. Youngblood,
488 U.S. 51 (1988)....................41

Brady v. Maryland,
373 U.S. 83 (1963)....................3, 34, 43, 101

Company v. United States,
349 F.3d 1132 (9th Cir. 2003)....................83

Ex Parte Jackson,
96 U.S. 727 (1878)....................73

Federal Deposit Ins. Corp. v. New Hampshire Ins. Co.,
953 F.2d 478 (9th Cir. 1991)....................102

Florida v. Riley,
488 U.S. 445 (1989)....................38, 39, 71

Gwaduri v. INS,
362 F.3d 1144 (9th Cir. 2004)....................102

Herring v. United States,
129 S.Ct. 695 (2009)....................40

In Re Application For Pen Register And Trap/trace Device With Cell Site Location Authority,
396 F.Supp.2d 747 (S.D.Tex. 2005)....................97

In re Application of the United States,
415 F.Supp.2d 663 (S.D.W. Va.)....................76

In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register,
415 F.Supp.2d 211 (W.D.N.Y. 2006)....................80

In Re Application Of The United States Of America,
405 F.Supp.2d 435 (S.D.N.Y. 2005)....................88

In The Matter Of An Application Of The United States For An Order (1) Authorizing The Use Of A Pen Register And A Trap And Trace Device And (2) Authorizing Release Of Subscriber Information And/Or Cell Site Information,
396 F.Supp.2d 294 (E.D.N.Y. 2005)....................97, 98

- viii -

In The Matter of the Application Of The United States Of America For An Order Authorizing The Installation And Use Of A Pen Register And A Caller Identification System On Telephone Numbers [Sealed] And [Sealed] And The Production Of Real Time Cell Site Information,
402 F.Supp.2d 597 (D.Md. 2005)....................97

In The Matter Of The Application Of The United States Of America For An Order Authorizing The Installation And Use Of A Pen Register Device, A Trap And Trace Device, And For Geographic Location 'information,
497 F.Supp.2d 301 (P.R. 2007)....................97

In The Matter of the Application of United States of America For An Order Authorizing (1) Installation And Use Of A Pen Register And Trap And Trace Device or Process, (2) Access To Customer Records, And (3) Cell Phone Tracking,
441 F.Supp.2d 816 (S.D.Tex. 2006)....................80, 97

In The Matter Of An Application Of The United States Of America For Orders Authorizing The Installation And Use Of Pen Registers And Caller Identification Devices On Telephone Numbers [Sealed] And [Sealed],
416 F.Supp.2d 390 (D.Md. 2006)....................98

Kyles v. Whitley,
514 U.S. 419 (1995)....................99

Kyllo v. United States,
533 U.S. 27 (2001)....................39, 78, 79, 83, 84

Rakas v. Illinois,
439 U.S. 128 (1978)....................70

Times Mirror Co. v. United States,
873 F.2d 1210 (9th Cir. 1989)....................45

U.S. Telecom Ass'n v. F.C.C.,
227 F.3d 450 (D.C. Cir. 2000)....................80

United States v. Allums,
No. 2:08-CR-30 TS, District of Utah, Dkt. #128....................54, 86, 93, 94

United States v. Barton,
995 F.2d 931 (9th Cir. 1993)....................41, 42

United States v. Batiste,
868 F.2d 1089 (9th Cir. 1989)....................43

United States v. Cadet,
727 F.2d 1453 (9th Cir. 1984)....................43

- ix -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

United States v. Cedano-Arellano,
332 F.3d 568 (9th Cir. 2003)....94

United States v. Cooper,
983 F.2d 928 (9th Cir. 1993)....41, 42

United States v. Danovaro,
877 F.2d 583 (7th Cir. 1989)....46

United States v. DiCesare,
765 F.2d 890 (9th Cir.), *amended*, 777 F.2d 543 (9th Cir. 1985)....101

United States v. Dioguardi,
248 F.2d 1033 (2nd Cir. 1970)....54

United States v. Fernandez,
231 F.3d 1240 (9th Cir. 2000)....43

United States v. Forest,
355 F.3d 942 (6th Cir. 2004)....79

United States v. Forrester,
592 F.3d 972 (9th Cir. 2009)....46

United States v. Gamez-Orduno,
235 F.3d 453 (9th Cir. 2000)....3, 43, 101

United States v. Garcia,
474 F.3d 994 (7th Cir. 2007)....75, 83

United States v. Green,
670 F.2d 1148 (D.C. Cir. 1981)....42, 85

United States v. Irwin,
612 F.2d 1182 (9th Cir. 1980)....101

United States v. Jacobsen,
466 U.S. 109 (1984)....73, 75

United States v. Karo,
468 U.S. 705 (1984)....52, 74, 87

United States v. Knotts,
460 U.S. 276 (1983)....87

United States v. Kow,

- x -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

58 F.3d 423 (9th Cir. 1995)....................................................................................45

United States v. Leon,
468 U.S. 897 (1984)....................................................................................40, 41

United States v. Liebert,
519 F.2d 542 (3rd Cir. 1975)....................................................................................94

United States v. Mann,
389 F.3d 869 (9th Cir. 2004)....................................................................................71, 77

United States v. Medina,
524 F.3d 974 (9th Cir. 2008)....................................................................................101

United States v. Place,
462 U.S. 696 (1983)....................................................................................71

United States v. Reed,
15 F.3d 928 (9th Cir. 1994)....................................................................................99

United States v. SDI Future Health, Inc.,
568 F.3d 684 (9th Cir. 2009)....................................................................................45, 71

United States v. Van Horn,
789 F.2d 1492 (11th Cir. 1986)....................................................................................54

Waller v. Georgia,
467 U.S. 39 (1984)....................................................................................43

Whitaker v. Garcetti,
291 F.Supp.2d 1132, 1148-49 (C.D.Cal. 2003), *affirmed in part, vacated in part, and reversed in part, all on other grounds*, 486 F.3d 572 (9th Cir. 2007)................................33, 34

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

## I. INTRODUCTION

The government is withholding various pieces of evidence that the defendant needs in order to prepare and present his defense. All of the withheld discovery is relevant and helpful to the defendant's *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence* and will be used as evidence in support of those motions. The basis for the defendant's motions stems from the government's efforts to electronically locate an aircard that was being used with a laptop host computer to access the Internet through the Verizon Wireless cellular network. The government claims to have identified the aircard as being linked to the alleged IRS tax return bulk e-filing scheme. Once the aircard was identified, the government began a locating mission in order to pinpoint the exact location of the aircard. The government's "aircard locating mission" began at least as early as June 6, 2008 and ended approximately July 16, 2008 with the government obtaining the precise location of the aircard: 431 El Camino Real, Apartment No. 1122, Santa Clara, CA 95050 (hereafter "apartment No. 1122"). In locating the aircard, the government relied upon a slew of subpoenas and court orders none of which provided probable cause authorizing the Fourth Amendment searches and seizures conducted by the government. Among the various unreasonable searches and seizures was government use of a portable/transportable wireless device locator (*e.g.*, the Harris StingRay)[1] to pinpoint the precise location of the aircard within a Fourth Amendment protected space. Once the aircard was located and the defendant arrested, the government destroyed the real-time aircard location data obtained via the StingRay.

After obtaining the precise location of the aircard, the government applied for and received the N.D.Cal. 08-70460-HRL warrant to physically search apartment No. 1122 (Dkt. #566) and also secured an indictment against the defendant (Dkt. #003). Before the start of the aircard locating mission, the government had no information on where the aircard was

1. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 12-16, and Bates Nos. 15-16 of EXHIBIT 13 and Bates No. 01 of EXHIBIT 27 (explaining the Harris StingRay) (Dkt. #536).

- 1 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

located and the government had no information on who the defendant was or where he was located. Through a motion to suppress, the defendant intends to prove that the government's warrantless seizure of aircard location information, and the government's warrantless electronic search and seizure of the aircard, were done without proper judicial authority and in violation of the Fourth Amendment. The defendant also intends to argue for suppression of the aircard location evidence and all fruits thereof. The discovery provided thus far makes a strong showing of the government violating the Fourth Amendment, however, it is the withheld evidence that will allow the defendant to effectively prove the Fourth Amendment violations. The evidence the defendant needs in order to effectively present and argue his *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence* is described in the accompanying *Submission Pursuant LRCiv 37.1*. The facts the defendant expects the withheld evidence to prove are reflected in the accompanying *Submission Of Proposed Stipulations*.

In this memorandum, the defendant will draw from the previously disclosed evidence and other known information in order to prove that the withheld evidence is relevant and helpful to the defendant's upcoming motions. The defendant respectfully requests that the Court (1) order the government to disclose all evidence listed in the accompanying *Submission Pursuant To LRCiv 37.1* and all other evidence that may be relevant and helpful to the issues of suppression and dismissal for destruction of evidence, (2) perform an *in camera* inspection of the unredacted/unsummarized versions of the 28 redacted/summarized documents attached to the defendant's *First Submission Of Redacted And Summarized Documents For Requested In Camera Inspection* (Dkt. #588), and (3) perform an *in camera* inspection of all other evidence being requested through this filing that the Court may not order the government to disclose based off of this filing alone. In lieu of disclosure, the defendant respectfully requests that the Court order the government to either (1) provide substitute evidence or summaries of evidence that will prove the facts and satisfy the waivers contained in the accompanying *Submission Of Proposed Stipulations*, or (2) alleviate the defendant's need for the withheld evidence by exercising its option to stipulate to all facts

- 2 -

and waivers contained in the accompanying *Submission Of Proposed Stipulations*. The defendant is filing this motion pursuant to Brady v. Maryland, 373 U.S. 83 (1963), United States v. Gamez-Orduno, 235 F.3d 453, 461 (9th Cir. 2000), and Fed. R. Crim. P. 16(a)(1)(E) *et seq.*, and (a)(1)(F) *et seq.* All evidence being requested through this motion is being withheld by the government based on a claim of privilege. By failing to obtain and disclose the requested evidence—all of which is *Brady* material—the government is violating the defendant's Fifth Amendment due process rights and statutory rights under Rule 16 of the Federal Rules of Criminal Procedure.

## II. INCORPORATIONS

### A. External document incorporations.

The following additional motions/filings are hereby incorporated into this motion by reference pursuant to LRCiv 7.1(d)(2) when referenced through LRCrim 12.1:

*1. Submission Of Documents Related To District Of Arizona Grand Jury Subpoenas 07-03-609 And 07-03-615 Obtained To Facilitate Locating The Aircard* (Dkt. #565);

*2. Submission Of Documents Related To District Of Arizona Court Orders 08-3286MB-LOA, 08-3298MB-LOA, and 08-7273MB-ECV Obtained To Facilitate Locating The Aircard* (Dkt. #576 [sealed]);

*3. Submission Of Materials Related To Applications And Court Orders Numbered 08-90330 And 08-90331, Authorized By Magistrate Judge Richard Seeborg, Northern District Of California, On July 11, 2008* (Dkt. #470 [sealed]);

*4. Submission Of Materials Related To Search Warrant No. 08-70460, Authorized By Magistrate Judge Patricia V. Trumbull, Northern District Of California, On July 30, 2008* (Dkt. #464);

*5. Submission Of Documents Related To Original Northern District Of California 08-70460-HRL Search Warrant Used To Physically Search Apartment No. 1122* (Dkt. #566);

*6. Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (Dkt. #536);

*7. Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501);

*8. First Submission Of Redacted And Summarized Documents For Requested In Camera Inspection*; (Dkt. #588);

        9. *First Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues* (hereafter "*1st Consolidated Exhibits*") (Dkt. #587);

**B. Accompanying attachment incorporations.**

Also incorporated into this memorandum are the following document attachments included with this filing:

10. *Submission Pursuant To LRCiv 37.1* (Attachment 1);

11. *Submission Of Proposed Stipulations* (Attachment 2);

12. *Statement Pursuant To LRCiv 7.2(j)* (Attachment 3);

## III. CERTIFICATION PURSUANT TO LRCiv 7.2(j)

Pursuant to LRCiv 7.2(j), when referenced through LRCrim 12.1, the defendant has attached to this filing his *Statement Pursuant To LRCiv 7.2(j)* certifying that after personal consultation and sincere efforts to do so, counsel have been unable to satisfactorily resolve the discovery issues.

## IV. PROCEDURAL HISTORY

**A. D.Ariz. Grand Jury subpoenas 07-03-609 and 07-03-615.**

Prior to June 6, 2008, the government identified Verizon Wireless[2] network IP addresses 75.209.101.132, 75.208.105.186, and 75.209.41.104 as being possible end-source IP addresses responsible for submitting the alleged fraudulent e-filed tax returns. On June 6, 2008, the government served Verizon Wireless with D.Ariz. Grand Jury subpoena No. 07-03-609 seeking subscriber transactional records for the Verizon Wireless account assigned the three IP addresses listed above. *See* Dkt. #565-1. On June 16, 2008, the government served Verizon Wireless with D.Ariz. Grand Jury subpoena No. 07-03-615 seeking the same information sought by the first subpoena but only making reference to IP address

---

2. "Verizon Wireless operates the nation's most reliable and largest wireless voice and data network, serving more than 80 million customers. Verizon Wireless continues to lead the industry by offering the highest quality products and services while introducing innovative technology solutions." Verizon Wireless (website), *Verizon Wireless : Who We Are*, http://www.vzw-whoweare.com/leadership.php (last accessed Feb. 3, 2011).

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

75.209.41.104. *See* Dkt. #565-2. The two Grand Jury subpoenas were authorized by 18 U.S.C. § 2703(c)(2) and sought subscriber and transactional records regarding Verizon Wireless accounts assigned to the three source IP addresses listed above. *See* Dkt. #565.

On June 13, 2008, Verizon Wireless complied with D.Ariz. Grand Jury subpoena No. 07-03-609 by providing a return to AUSA Frederick A. Battista containing various information. *See* Dkt. #565-1. On June 18, 2008, Verizon Wireless complied with D.Ariz. Grand Jury subpoena No. 07-03-615 by providing a return to FBI Agent Richard J. Murray containing various information. *See* Dkt. #565-2. The Verizon Wireless returns reported that the source IP addresses were linked to a 1xEVDO "BroadbandAccess Connect Service" account[3] having wireless account number 270691733 (hereafter "aircard account") opened under the name of Travis Rupard.[4][5] *See* Dkt. #565. The Verizon Wireless returns further reported that the source IP addresses were specifically linked to a "UTStarcom PC5740" wireless device (hereafter "aircard") with mobile number 415-264-9596 and ESN/MEID 005-00717190. *See id*. The Verizon Wireless returns also consisted of logs containing at least 411,375 destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its laptop host computer during the date range of May 11, 2008 through June 12, 2008. *See id.*

### B. D.Ariz. order No. 08-3286MB-LOA, *i.e.*, the retroactive order.

On July 9, 2008, and while citing 18 U.S.C. § 2703(d), AUSA Battista signed and submitted an order application in the District of Arizona having docket No. 08-3286MB-LOA. *See* Dkt. #576-1. In the order application, AUSA Battista stated the following:

> [D.Ariz. Grand Jury subpoena Nos. 07-03-609 and 07-03-615] were authorized by the prosecutor assigned to this case after reading Section [18 U.S.C. §] 2703 and inadvertently concluding that [][destination IP addresses] may be requested

---

3 The aircard account also has a "per message billing" text message service. *See* Dkt. #565.

4. The defendant's original and superseding indictment names the defendant with an a.k.a. of Travis Rupard. *See* Dkt. #003 and #200.

5. The government was not able to locate the aircard with information obtained solely by the subpoenas.

- 5 -

> via a Grand Jury subpoena under Section [18 U.S.C. §] 2703(c). Verizon Wireless subsequently responded to the subpoenas; in one case providing a number of destination IP addresses... and in the second case providing a large number of destination IP addresses. The information was subsequently examined by members of the investigation team... [O]n July 7, 2008, the prosecutor was advised by an attorney with the Department of Justice's Office of Enforcement Operations that Section 2703(c) has been interpreted to only permit the collection of a subscriber's "source" IP addresses via a Grand Jury subpoena and not a subscriber's "destination" IP addresses. Upon receipt of this notice, the prosecutor informed his supervisor of these events and has since required that all of the information received by Verizon Wireless concerning destination IP addresses and information relating to the volume of the data transferred be sealed and not used in any manner in furtherance of the investigation.
>
> *Id.*, p. 14-15.

Based on the above, AUSA Battista requested that the court "enter an order, effective June 6, 2008, relating to the subject destination IP addresses and any related materials retroactively in this case." *Id.*, p. 15. AUSA Battista did not indicate that he intended to use, and in fact had already used, the destination IP addresses in an overall plan to locate the aircard within a Fourth Amendment protected space.

On July 9, 2008, United States Magistrate Judge Lawrence O. Anderson signed a "retroactive order" approving the D.Ariz. 08-3286MB-LOA order application. *See* Dkt. #576-2. The D.Ariz. 08-3286MB-LOA order was made effective June 6, 2008 and required Verizon Wireless to provide the government with the same aircard destination IP addresses that were already illegally obtained under D.Ariz. Grand Jury subpoena Nos. 07-03-609 and 07-03-615. Judge Anderson found that AUSA Battista "offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation." *Id.*, p. 1 (*see also* 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d)).

The government served Verizon Wireless with the D.Ariz. 08-3286MB-LOA order on an unknown date. On July 16, 2008, Verizon Wireless complied with the order by providing FBI Agent Murray with a return containing various information. *See* EXHIBIT 01 of *1st Consolidated Exhibits*. The Verizon Wireless return consisted of logs containing (1) the 411,375+ destination IP addresses accessed by the aircard from May 11, 2008 through June 5, 2008 that were already obtained via D.Ariz. Grand Jury subpoena Nos. 07-03-609 and 07-

03-615, and (2) 1,424,773+ destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer from June 5, 2008 through July 9, 2008.

**C. D.Ariz. order No. 08-3298MB-LOA, *i.e.*, historical cell site information order.**

On July 10, 2008, and while citing 18 U.S.C. § 2703(d), AUSA Battista signed and submitted an order application in the District of Arizona having docket No. 08-3298MB-LOA. *See* Dkt. #576-3. Through the order application, AUSA Battista sought an order requiring Verizon Wireless to provide the government with historical cell site information for the last 30 days so that it may "determine the cellular/data network's registration" of the aircard. *Id.*, p. 2-3. AUSA Battista further indicated that the sought after information is intended to "help government investigators to identify the individual(s) who are responsible" for the alleged scheme. *Id.*, p. 13. AUSA Battista did not indicate that he sought cell site location information, aircard location information, or other information that would assist the government in physically locating the aircard or aircard user.

On July 10, 2008, Judge Anderson signed an order approving the D.Ariz. 08-3298MB-LOA order application. *See* Dkt. #576-4. The D.Ariz. 08-3298MB-LOA order required Verizon Wireless to provide the government with the following historical cell site information:

> Cell site information and sector/distance information to determine the cellular/data network's registration of the assigned broadband access card(s) [(*i.e.*, aircard)] associated with data transmissions or connections for 30 days prior to the date of this Order.
>
> *Id.*, ATTACHMENT A.

Judge Anderson found that AUSA Battista "offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation." *Id.*, p. 1 (*see also* 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d)). However, Judge Anderson did not make a finding of probable cause that the information obtained would be evidence of a crime or that there was probable

- 7 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

cause to seize aircard location information.

The government served Verizon Wireless with the D.Ariz. 08-3298MB-LOA order on an unknown date. On July 12, 2008, Verizon Wireless complied with the order by providing FBI Agent Murray and Robert Byrne, Law Enforcement Online (LEO), a return containing aircard historical cell site information generated during the date range of June 10, 2008 through July 11, 2008. *See* EXHIBIT 02 of *1st Consolidated Exhibits*.[6] Among other information contained in the return, Verizon Wireless provided the government with historical cell site location information, *i.e.*, the latitude and longitude coordinates for cell sites accessed by the aircard during the relevant time frame. The nature of the historical cell site location information is further explained in the facts section of this memorandum, Section V(C), *infra*.

**D. D.Ariz. order No. 08-7273MB-ECV, *i.e.*, historical cell site information order.**

On July 16, 2008, and while citing 18 U.S.C. § 2703(d), AUSA Battista signed and submitted an order application in the District of Arizona having docket No. 08-7273MB-ECV. *See* Dkt. #576-5. Through the order application, AUSA Battista sought an order requiring Verizon Wireless to provide the government with the most current historical cell site information so that it may "determine the cellular/data network's registration" of the aircard. *Id.*, p. 2-3. AUSA Battista further indicated that the sought after information is intended to "help government investigators to identify the individual(s) who are responsible" for the alleged scheme. *Id.*, p. 13. AUSA Battista did not indicate that he sought cell site location information, aircard location information, or other information that would assist the government in physically locating the aircard or aircard user.

6. On August 1, 2008, and upon request of FBI Agent Murray, Verizon Wireless provided the government with a second return containing additional aircard historical cell site information generated during the date range of June 10, 2008 through July 11, 2008. *See* EXHIBIT 03 of *1st Consolidated Exhibits*; *see also* EXHIBIT 04 of *1st Consolidated Exhibits* (August 1, 2008 emails by FBI Agent Murray, sent to Verizon Wireless: requesting additional aircard historical cell site location information). FBI Agent Murray sought additional cell site location information from Verizon Wireless despite the fact that the D.Ariz. 08-3298MB-LOA order was already effectively returned on July 12, 2008.

- 8 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

On July 10, 2008, United States Magistrate Judge Edward C. Voss signed an order approving the D.Ariz. 08-7273MB-ECV order application. *See* Dkt. #576-6. The D.Ariz. 08-7273MB-ECV order required Verizon Wireless to provide the government with the following historical cell site information:

> Cell site information and sector/distance information to determine the cellular/data network's registration of the assigned broadband access card(s) [(*i.e.*, aircard)] associated with data transmissions or connections from July 11, 2008, to the date of this Order.
>
> *Id.*, ATTACHMENT A.

Judge Voss found that AUSA Battista "offered specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation." *Id.*, p. 1 (*see also* 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d)). However, Judge Voss did not make a finding of probable cause that the information obtained would be evidence of a crime or that there was probable cause to seize aircard location information.

The government served Verizon Wireless with the D.Ariz. 08-7273MB-ECV order on an unknown date. On July 31, 2008, Verizon Wireless complied with the order by providing Robert Byrne, LEO, a return containing aircard historical cell site information generated during the date range of June 11, 2008 through July 17, 2008. *See* EXHIBIT 05 of *1st Consolidated Exhibits*. Among other information contained in the return, Verizon Wireless provided the government with historical cell site location information, *i.e.*, the latitude and longitude coordinates for cell sites accessed by the aircard during the relevant time frame. The nature of the historical cell site location information is further explained in the facts section of this memorandum, Section V(C), *infra*.

### E. N.D.Cal. order No. 08-90330MISC-RS, *i.e.*, use and monitor a mobile tracking device order.

On July 11, 2008, and while citing Fed. R. Crim. P. 41(b), 18 U.S.C. §§ 2703 and 3117, and 28 U.S.C. § 1651, AUSA Shawna Yen signed and submitted an order application in the Northern District of California having docket No. 08-90330MISC-RS. *See* Dkt. #470-

1. Through the order application, AUSA Yen sought an order directing Verizon Wireless to (1) assist the government in the use and monitoring of a mobile tracking device for the aircard while the aircard is located inside private residences and other locations not open to public or visual surveillance, and (2) provide the government immediately on request with all information needed to ascertain the physical location of the aircard. *Id.* (application), p. 2-3. AUSA Yen also sought specific authority allowing the government to (1) ignore Fed. R. Crim. P. 41(f), (2) not serve a copy of the order on any owner of the aircard, (3) not make an inventory of any resulting information, and (4) destroy all data obtained by the order at the conclusion of the aircard locating mission. *Id.* (application), p. 3.

On July 11, 2008, United States Magistrate Judge Richard Seeborg signed an order approving some of AUSA Yen's requests made through the N.D.Cal. 08-90330MISC-RS order application. *See id.* (order). The N.D.Cal. 08-90330MISC-RS order required Verizon Wireless, for a period not to exceed 30 days and beginning no later than July 21, 2008, to provide the government with the following:

> [D]ata and information obtained from the monitoring of transmissions related to the location of the [][aircard], and shall monitor such transmissions, to extend to any time of the day or night as required, including the monitoring of the [][aircard] while the agents are stationed in a public location and the [][aircard] is (a) inside private residences, garages and/or other locations not open to the public or visual surveillance; and (b) anywhere else the [][aircard] may be present within the United States... being expressly limited to transmissions needed to ascertain the physical location of the [][aircard], and expressly excludes any voice communication and data content transmitted by Verizon Wireless to or from the [][aircard]; and... immediately on request with all information, facilities, and technical assistance needed to ascertain the physical location of the [][aircard] and the FBI shall compensate Verizon Wireless for reasonable expenses incurred in complying with any such request.
>
> *Id.* (order), p. 2-3.

In regards to Verizon Wireless being required to provide the government with the above described aircard location information, Judge Seeborg found that "specific and articulable facts establish that there are reasonable grounds to believe that the requested information pertaining to the location of the [][aircard] is relevant and material to an ongoing criminal investigation." *Id.* (order), p. 2 (*see also* 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d)). However, Judge Seeborg did not make a finding of probable cause that the information

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

obtained would be evidence of a crime, that there was probable cause to seize aircard location information, or that there was probable cause to search for and seize the aircard through surreptitious phone calls and government use of a wireless device locator (*e.g.*, the Harris StingRay).[7]

Regarding AUSA Yen's request to use and monitor a mobile tracking device, Judge Seeborg found that there was "probable cause to believe that the use and monitoring of a mobile tracking device for the [][aircard], will lead to evidence of violations of [the alleged offenses]... as well as to identification of the individuals who are engaged in the commission of these offenses." *Id.* (order), p. 2. However, Judge Seeborg did not find that there was probable cause to **install** a mobile tracking device nor did he expressly state in the operative section of the order that he authorized the government to install, use, or monitor a mobile tracking device after making the above quoted finding. Furthermore, Judge Seeborg did not grant AUSA Yen's request to order Verizon Wireless to "assist the agents in the use and monitoring of a mobile tracking device." *Id.* (application), p. 3.

Regarding AUSA Yen's request to destroy evidence and ignore what would otherwise have been standard warrant requirements, Judge Seeborg granted the request in full:

> WHEREAS the return and inventory requirements of Federal Rule of Criminal Procedure 41(f) do not apply to the information sought to be obtained by the instant application, Special Agents of FBI are therefore not required to serve a copy of this Order on any owner of the [][aircard], nor to make an inventory of any resulting information to be served on any such owner, except upon further Order of the Court. However, at the conclusion of the tracking mission, the investigating agency shall expunge all of the data obtained by this Court Order;
>
> *Id.* (order), p. 3.

Verizon Wireless was served with the N.D.Cal. 09-90330MISC-RS order on an unknown date. Nearly all events relating to the execution of the N.D.Cal. 09-90330MISC-RS order are unknown due to destruction of evidence and the government withholding the

7. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 12-16, and Bates Nos. 15-16 of EXHIBIT 13 and Bates No. 01 of EXHIBIT 27 (explaining the Harris StingRay) (Dkt. #536).

- 11 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

relevant and helpful evidence being requested through this motion. As far as the defendant is aware, the government did not comply with Rule 41(f) in the effect that the notation of time, receipt, service, and return requirements were not followed. Additionally, by virtue of violating Rule 41(f), the government prevented Judge Seeborg from complying with Rule 41(i).[8]

**F. N.D.Cal. order No. 08-90331MISC-RS, *i.e.*, pen register and trap and trace order.**

On July 10, 2008, and while citing 18 U.S.C. §§ 2703(c) and (d), and 18 U.S.C. §§ 3122 and 3123, AUSA Yen signed and submitted an order application in the Northern District of California having docket No. 08-90331MISC-RS. *See* Dkt. #470-2. Through the order application, AUSA Yen sought an order requiring Verizon Wireless to provide the government with real-time cell site location information pertaining to the aircard. AUSA Yen stated in the 08-90331MISC-RS order application that "the general geographical location of the [][aircard] derived from [real-time] cell site information... can [be] compare[d] [to] observations of the user of the [][aircard]... in order to verify the identification and approximate location of the user of the [][aircard]." *Id.* (application), p. 8.

On July 11, 2008, Judge Seeborg signed an order approving the N.D.Cal. 08-90331MISC-RS order application. *See id.* (order). The N.D.Cal. 08-90331MISC-RS order required Verizon Wireless to provide the government with the following real-time cell site information:

> For the Target Device [(*i.e.*, aircard)], after receipt and storage, records or other information pertaining to subscriber(s) or customer(s), including... cellsite information, provided to the United States for (a) the origination of a call from the Target Device or the answer of a call to the Target Device and (b) the termination of the call (but not including the contents of communications.)
>
> *Id.* (order), p. 4.

The N.D.Cal. 08-90331MISC-RS order required Verizon Wireless to provide the government with the above described information (which encompasses cell site location information as

8. Rule 41(i) reads, "[t]he magistrate judge to whom the warrant is returned must attach to the warrant a copy of the return, of the inventory, and of all other related papers and must deliver them to the clerk in the district where the property was seized." *Id.*

- 12 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

explained below), after receipt and storage, during the date range of July 11, 2008 through September 8, 2008 and "as soon as practicable, twenty four (24) hours a day for the duration of the Order," *i.e.*, in real-time. *Id.* (order), p. 5-6. Judge Seeborg found that AUSA Yen "certified that the information likely to be obtained... is relevant to an ongoing criminal investigation" and there are "specific and articulable facts showing that there are reasonable grounds to believe that... cell site information regarding the [][aircard is]... relevant and material to an ongoing criminal investigation." *Id.* (order), p. 1-2 (*see also* 18 U.S.C. § 3123, and 18 U.S.C. §§ 2703(c)(1)(B) and 2703(d)). However, Judge Seeborg did not make a finding of probable cause that the information obtained would be evidence of a crime, that there was probable cause to seize aircard location information, or that there was probable cause to search for and seize the aircard through surreptitious phone calls and government use of a wireless device locator (*e.g.*, the Harris StingRay).[9]

Judge Seeborg explained the "after receipt and storage" provision of the order to mean that the cell site information must "first [be] captured and recorded by the provider before being sent to the Investigative Agency." *Id.* (order), p. 4 fn. 6. Judge Seeborg defined "cell site information," as used in the order, to mean "the physical location and/or address of the cellular tower and identification of the particular sector of the tower receiving the signal[]" but also made clear his understanding that cell site information "does not provide the specific or precise geographical coordinates of the [][aircard]." *Id.* (order), p. 2 fn. 1. Furthermore, Judge Seeborg specifically forbade the government from obtaining "(1) any cell site information that might be available when the [][aircard] is turned 'on' but a call is not in progress; [and] (2) information that would allow [][the government] to triangulate multiple antenna tower locations and thereby attempt to determine the precise location of the user of the [][aircard]." *Id.* (order), p. 3.

Verizon Wireless was served with the N.D.Cal. 08-90331MISC-RS order on an unknown date. On July 16, 2008, the FBI configured its SF-Martinez DCS-3000 server (pen

---

9. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 12-16, and EXHIBIT 13 and 27 (Dkt. #536).

- 13 -

register and trap and trace device) to receive real-time LAESP messages from Verizon Wireless IAPs relating to the aircard utilizing the Verizon Wireless cellular network. The government used the SF-Martinez DCS-3000 server to receive LAESP messages (containing real-time cell site location information) that were generated in response to the government surreptitiously calling the aircard on July 16, 2008 and likely between July 18, 2008 and August 1, 2008. *See* EXHIBIT 06 of *1st Consolidated Exhibits*. The government later converted the LAESP messages to CDNRS formatted files for ease of use. *See* EXHIBIT 07, EXHIBIT 08, EXHIBIT 09, and EXHIBIT 10 of *1st Consolidated Exhibits*. The nature of the real-time cell site location information obtained via the SF-Martinez DCS-3000 server is further explained in the facts section of this memorandum, Section V(D), *infra*.

**G. N.D.Cal. warrant No. 08-70460-HRL (the original unexecuted and amended versions).**

On July 22, 2008, IRS-CI Agent Michael P. Fleischmann and AUSA Yen submitted a search warrant application and affidavit in the Northern District of California having docket No. 08-70460-HRL. *See* Dkt. #566-1. Through the N.D.Cal. 08-70460-HRL warrant application, IRS-CI Agent Fleischmann and AUSA Yen sought a search warrant to physically search for and seize items out of apartment No. 1122. *See id.* Paragraph No. 102 of IRS-CI Agent Fleischmann's affidavit in support of the N.D.Cal. 08-70460-HRL warrant application provides the only information linking the aircard location to apartment No. 1122:

> 102. Historical cell tower information and other investigative techniques have led the investigation team to the location of the Travis Rupard Broadband Access Card within the "domcilio" apartment complex; 431 El Camino Real; Apartment 1122; Santa Clara, California, 95050.
>
> *Id.*, p. 31.

In his affidavit, IRS-CI Agent Fleischmann also provided information on the rental application for apartment No. 1122:

> 103. On July, 2008, a Grand jury subpoena was issued to domicilio for the file information related to 431 El Camino Real, Apartment 1122, Santa Clara, California, 95050. The subpoena revealed the apartment is currently being rented by an individual claiming to be Steven Travis Brawner. The rental application indicates Brawner is a software engineer.

- 14 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

104. Brawner provided a California driver's license, license number D6870214. Further investigation revealed the California driver's license number is assigned to a female with a Chino Hills, California address.

105. In order to rent the apartment, Brawner was required by the rental company to provide a copy of the first page of what he claimed to be this 2006 tax return. The return purports to show an adjusted gross income (AGI) of $110,314. The social security number on the return is [REDACTED]4167. Internal records for the Internal Revenue Service were researched and revealed no tax return for 2006 was filed for Steven Brawner. Additionally, Social Security Administration records for social security number [REDACTED]4167 indicated that Steven Brawner died in 1997.

106. On July 21, 2008, Forensic Document Examiner William J. Flynn conducted a handwriting analysis of the original application documents for the Sacramento Post Office Box. After conducting the analysis of the documents, Mr. Flynn has advised that forensic evidence indicates common authorship among the documents.

*Id.*

On July 22, 2008 at 3:40pm, United States Magistrate Judge Howard R. Lloyd signed a "No-Knock" search warrant approving the N.D.Cal. 08-70460-HRL warrant application. *See* Dkt. #566-2. The N.D.Cal. 08-70460-HRL warrant required the government to search on or before July 31, 2008, and not to exceed ten (10) days, in the daytime from 6:00am to 10:00pm. *See id.* On July 30, 2008, the N.D.Cal. 08-70460-HRL warrant was returned **unexecuted** to United States Magistrate Judge Patricia V. Trumbull.

On July 30, 2008, IRS-CI Agent Fleischmann and AUSA Yen resubmitted amended versions of the original N.D.Cal. 08-70460-HRL search warrant application and affidavit in the Northern District of California. *See* Dkt. #464-2. IRS-CI Agent Fleischmann and AUSA Yen resubmitted the amended documents under the same docket number but this time to Magistrate Judge Trumbull. *See id.* In paragraph 2b of his amended affidavit, IRS-CI Agent Fleischmann stated the following regarding the amended nature of the search warrant application and affidavit:

b. Your affiant previously submitted an affidavit in support of a prior search warrant for the above address (431 El Camino Real; Apartment 1122; Santa Clara, California, 95050). Magistrate Judge Howard R. Lloyd authorized that warrant (# 08-70460 HRL) on July 22, 2008. That warrant has been returned unexecuted due to the ongoing nature of the investigation. This affidavit is substantially the same as the prior affidavit, with the exception of the information added in paragraphs 2b, 2c, 34a and 126, and the additions of

- 15 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

items 21 (gold) and 22 (the person of Steven Travis Brawner) in Attachment B. *Id.*, p. 1-2.

With respect to the additional information added in paragraphs 2c, 34a and 126: **(1)** paragraph 2c indicates that an indictment and arrest warrant issued on an unspecified date for "Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a Patrick Stout" in case No. CR08-814-PHX-DGC. *Id.*, p. 2; **(2)** paragraph 34a provides information regarding a purchase of gold made on May 20, 2008 using a debit card "linked to fraudulent tax refunds." *Id.*, p. 8-9; **(3)** paragraph 126 provides information in support of a night-time execution of the warrant and includes: *(a)* electronic gate key access records indicate that "the individual purporting to be Steven Travis Brawner accessed the domicilio apartment complex sixteen times between June 4, 2008 and July 23, 2008[,]" *(b)* "[d]uring the month of July 2008, daytime surveillance and spot check surveillance have not been able to observe any residents at the location[,]" and *(c)* "[o]n July 22, 2008, at approximately 7:20 pm, an FBI Special Agent acting in an undercover capacity knocked on the door using the ruse of a fast food delivery[,] [n]o one answered the door." *Id.*, p. 40-41. The remainder of the amended affidavit is the same as the original.

On July 30, 2008 at 2:30pm, Magistrate Judge Trumbull signed a "No-Knock and night-time" amended search warrant approving the N.D.Cal. 08-70460-HRL amended search warrant application. *See* Dkt. #464-1 (warrant). The N.D.Cal. 08-70460-HRL amended warrant required the government to search on or before August 11, 2008, and not to exceed ten (10) days, at any time of the day or night. *See id.* On August 3, 2008 at 5:20pm, the N.D.Cal. 08-70460-HRL amended warrant was executed to physically search apartment No. 1122 and then later returned to Magistrate Judge Trumbull on August 5, 2008. *See id.* (return).

## V. FACTS

The facts set forth below, in conjunction with the above procedural history, represent all of the known information regarding the government's efforts to search for and locate the aircard. The proceeding subsections, in conjunction with: (1) *Response To Government's*

- 16 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

*Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (Dkt. #536), (2) *First Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues* (Dkt. #587), and (3) *First Submission Of Redacted And Summarized Documents For Requested In Camera Inspection* (Dkt. #588), reference all of the evidence the defendant currently has in support of his planned motion to suppress. When reading the facts, the stipulations should also be considered as they provide additional information, albeit unconfirmed by the government, regarding the aircard locating mission.

Definitions for (1) FBI Digital Collection Program/Digital Collection Systems, (2) DCSNET (including Intercept Access Point (IAP) and Central Monitoring Plant (CMP)), (3) Lawfully Authorized Electronic Surveillance Protocol (LAESP), (4) Digital Collection System 3000 (DCS-3000), (5) DCS-3000 CDNRS Files, (6) Telephone Applications System, (7) FBI Cell Site Database, and (8) FBI Wireless Intercept and Tracking Team (WITT) Van (including DCS-1020), are all listed in EXHIBIT 05, EXHIBIT 06, EXHIBIT 07, EXHIBIT 08, EXHIBIT 09, EXHIBIT 10, EXHIBIT 11, and EXHIBIT 12, respectively, attached to the defendant's *Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (Dkt. #536).

**A. Details of the aircard and its laptop host computer.**

**1. Technical information.**

The aircard is a "UTStarcom PC5740 Broadband Connection Card For Verizon Wireless"[10] associated with the monthly billed 1xEVDO "BroadbandAccess Connect Service" account having wireless account number 270691733 opened under the name of Travis Rupard.[11] The associated aircard account is used for accessing the Internet through

10. *See* EXHIBIT 11 of *1st Consolidated Exhibits* (government web research on aircard).
11. *See* Section IV(A), *supra*.

- 17 -

the Verizon Wireless cellular network via cdma2000,[12] EVDO Rev. o,[13] standards and also has "per message billing" for text messages. The CDMA communications protocol, upon which the cdma2000 standards are based, was originally designed for military use[14] due to it being nearly impossible to intercept a CDMA signal.[15] The cdma2000 standards dictate a total of 27 physical channels upon which air interface radio waves may be sent/received between wireless devices and cell sites.[16] The government's filings relating to the D.Ariz. 08-3286MB-LOA, 08-3298MB-LOA, and 08-7273MB-ECV applications and court orders, and the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS applications and court orders, interchangeably refer to the aircard as the "Target Device," "target broadband access card," "Target Broadband Access Card/Cellular Telephone," "telephone," and other similar terms. The aircard is a cellular device that transmits and receives electronic communications through a radio transceiver and antenna contained in the device. The aircard is not a mobile telephone, is incapable of ringing or alerting to an incoming call, and does not handle wire communications. The aircard is a computer hardware "add-on card"

12. *See* Telecommunications Industry Association, ANSI/TIA-2000.1-D-1[E], *Introduction to cdma2000 Spread Spectrum Systems – Addendum 1*, (Arlington, VA: Jan., 2006), § 1.1, p. 1.1 ("The cdma2000 air interface standards specify a spread spectrum radio interface that uses Code Division Multiple Access (CDMA) technology to meet the requirements for Third Generation (3G) wireless communication systems.")

13. *See* EXHIBIT 11 of *1st Consolidated Exhibits* (government web research on aircard indicating that the aircard is not EVDO Rev. A capable); eogogicsinc (website), *cdma2000 Technologies: 1xRTT, EVDO, UMB, and EVDV*, "Next Step Up: cdma2000 1xEV-DO," http://www.eogogics.com/talkgogics/tutorials/cdma2000 (last accessed Jun. 9, 2011) (indicating that EVDO Rev. o was the original version of 1xEVDO prior to Rev. A).

14. *See* Levine , R.C., *Digital Switching: Cellular & PCS Lectures April 17 & 24, 2001*, Beta Scientific Laboratory, Inc. (Richardson, TX, 1996-2000), *available at* http://www.privateline.com/levine/CELPCS4.PDF (last accessed: Sep. 29, 2010), p. 59 ("CDMA was first developed for military point-to-point communications.").

15. *See* Bedell, Paul, *Cellular/PCS Management*, *available at* http://www.privateline.com/Cellbasics/CDMAmanage.pdf (last accessed Aug. 31, 2010), p. 225 ("CDMA was originally deployed as a battlefield communications system because it is very hard if not completely impossible to intercept CDMA transmissions.").

16. *See* ANSI/TIA-2000.1-D-1[E], § 1.1.2, Fig. 2, p. 1.4-1.6 (showing the physical layer cdma2000 network architecture with data and voice services having different network paths) and 2.2.2, Tab. 2 (listing the 27 physical channels used by cdma2000 wireless devices and cell sites), relevant sections attached as EXHIBIT 12 of *1st Consolidated Exhibits*.

- 18 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

that can only function when plugged into the PCMCIA slot of a host laptop computer.[17] In this case, the host laptop computer is an IBM ThinkPad (S/N #LV-C4398) with mouse, keys, docking station and power cord.[18] In order to function, the aircard draws power from the host laptop computer, stores data on the hard drive of the host laptop computer, and its functions and operations are accessed through VZAccess Manager software installed on the host laptop computer.[19] Once the aircard is plugged into the host laptop computer, the aircard user may use the VZAccess Manager software to access the Internet through the associated Verizon Wireless aircard account. In order to access the Internet, radio waves are transmitted to/from the aircard and the cell sites that are part of the Verizon Wireless cellular network. The radio waves sent between the aircard and the Verizon Wireless cellular network carry the signals that communicate data between the host laptop computer and the Internet. The associated aircard account does not have cellular telephone service[20] and the aircard hardware does not allow for placing telephone calls.

**B. Identification of the aircard and use of the illegally obtained destination IP addresses.**

On June 13, 2008, the government obtained identifying information for the aircard through source IP addresses allegedly used to e-file fraudulent tax returns. Shortly thereafter, the government obtained 411,375+ destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer.[21] The government then spent the next 26 days using the destination IP addresses to confirm that the

---

17. *See* EXHIBIT 11 of *1st Consolidated Exhibits* (government web research on aircard).

18. *See Submission Of Materials Related To Search Warrant No. 08-70460, Authorized By Magistrate Judge Patricia V. Trumbull, Northern District Of California, On July 30, 2008* (return) (Dkt. #464-1).

19. *See* EXHIBIT 11 of *1st Consolidated Exhibits* (government web research on aircard).

20. *See* EXHIBIT 13 of *1st Consolidated Exhibits* (on June 26, 2008, FBI Agent Murray was advised by Verizon Wireless that the aircard does not have telephone service); ANSI/TIA-2000.1-D-1[E], § 1.1.2, Fig. 2, p. 1.4-1.6 (showing the physical layer cdma2000 network architecture with data and voice services having different network paths), relevant sections attached as EXHIBIT 12 of *1st Consolidated Exhibits*.

21. *See* Section IV(A), *supra*, (discussing the D.Ariz. Grand Jury subpoenas).

- 19 -

*MEMORANDUM OF POINTS AND AUTHORITIES MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE CR08-814-PHX-DGC*

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

aircard was responsible for e-filing the numerous tax returns listed in the indictment.[22] Midway through the 26 day period, the government began to prepare and execute plans to use historical cell site location information, real-time cell site location information, and a portable/transportable wireless device locator to "ping and triangulate on a cellular broadband card we are 99% sure is him."[23] After beginning plans to search for and locate the aircard, AUSA Battista became aware that subpoenas obtained pursuant to 18 U.S.C. § 2703(c)(2) do not allow for compelling disclosure of an aircard user's destination IP addresses and only allow for disclosure of source IP addresses.[24] On July 8, 2008, AUSA Battista instructed the investigation team to place all aircard destination IP addresses into sealed envelopes[25] and then subsequently applied for a "retroactive order" to unseal the envelopes. On July 9, 2008, the "retroactive order" was granted[26] and the government then continued to make use of the aircard destination IP addresses to facilitate obtaining the precise location of the aircard.[27]

### C. Obtaining aircard historical cell site location information and creating the cell tower range chart/map.

On July 12, 2008, Verizon Wireless responded to the D.Ariz. 08-3298MB-LOA

---

22. *See* EXHIBIT 14 of *1st Consolidated Exhibits* (July 1, 2008 email by IRS-CI Agent Daun, sent to Nathan A. Watt: "We have correlated returns being filed from specific Proxy Ips, that this guy was also connected to at the same time."); EXHIBIT 15 of *1st Consolidated Exhibits* (July 7, 2008 email by IRS-CI Agent Medrano, sent to Constance M. Davis: "We strongly believe we have identified the [][suspect]...").

23. EXHIBIT 14 of *1st Consolidated Exhibits* (July 1, 2008 email by IRS-CI Agent Daun, sent to Nathan A. Watt); *see also* EXHIBIT 16 of *1st Consolidated Exhibits* (July 7, 2008 email by IRS-CI Agent Daun, sent to IRS-CI Agent Willert: the FBI plans to "triangulate down on the [][suspect's] broadband access card with Verizon in San Jose.").

24. *See* EXHIBIT 17 of *1st Consolidated Exhibits* (on July 7, 2008, USDOJ Office of Enforcement Operations notified AUSA Battista of an "issue" with the aircard destination IP addresses); *see also* Section IV(A), *supra*, (discussing the D.Ariz. Grand Jury subpoenas).

25. *See* EXHIBIT 18 of *1st Consolidated Exhibits* (July 8, 2008 email by AUSA Battista, sent to primary case agents: "Please place[] in a sealed envelope all copies of destination IP addresses and... discontinue any use of the information...").

26. *See* Section IV(B), *supra*.

27. *See* EXHIBIT 19 of *1st Consolidated Exhibits* (July 11, 2008 email by Albert A. Childress, sent to Brad Taylor *et al.*: the FBI will be able triangulate the suspect's location through use of a portable/transportable wireless device locator).

- 20 -

order[28] by emailing Robert Byrne, LEO, and FBI Agent Murray historical cell site information pertaining to the aircard and generated during the date range of June 10, 2008 through July 11, 2008.[29] Although the order only authorized obtaining historical cell site information to determine the network's registration of the aircard, the government obtained historical cell site **location** information showing the network's geographical location of the aircard. The information provided by Verizon Wireless indicated that the aircard had been historically located within signal range of the following cell sites:

**(1)** Cell site # 5; Latitude: 37.369733; Longitude: -121.923442; Street address: 2001 Gateway Place, San Jose, CA 95110;

**(2)** Cell site # 139; Latitude: 37.34955; Longitude: -121.943435; Street address: 900 Lafayette St, Santa Clara, CA 95050;

**(3)** Cell site # 153; Latitude: 37.418053; Longitude: -121.85978; Street address: 10000 Old Piedmont Rd., San Jose, CA 95132;

**(4)** Cell site # 268; Latitude: 37.346481; Longitude: -121.923164; Street address: 1070 Elm St, San Jose, CA 95126;

**(5)** Cell site # 279; Latitude: 37.3416; Longitude: -121.947941; Street Address: 490 Lincoln St., Santa Clara, CA 95050;

The historical cell site location information allowed the government to determine that the aircard was previously located within signal range of five cell sites covering parts of San Jose and Santa Clara, CA.[30][31] Within that coverage area was apartment No. 1122 at the Domicilio apartment complex.

---

28. *See* Section IV(C), *supra*.

29. *See* EXHIBIT 02 of *1st Consolidated Exhibits*.

30. *See* EXHIBIT 20 of *1st Consolidated Exhibits* (July 14, 2008 email by AUSA Battista, sent to AUSA Yen: the government is looking for the aircard in the area of San Jose International Airport and Santa Clara University).

31. On July 31, 2008, Verizon Wireless responded to the D.Ariz. 08-7273MB-LOA order by providing similar aircard historical cell site location information generated during the date range of June 11, 2008 through July 17, 2008. *See* EXHIBIT 05 of *1st Consolidated Exhibits*; *see also* Section IV(D), *supra*. However, the response came after the aircard had already been electronically located and likely played no role in the government's aircard locating mission.

- 21 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

On the morning of July 14, 2008, FBI Agent Kevin F. Killigrew created a cell tower range chart/map consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location estimate represented by a shaded area.[32] On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately *105,789,264 ft²* and the total land area making up the triangulated aircard location estimate is approximately *6,412,224 ft²*.[33] FBI Agent Killigrew created the cell tower range chart/map by completing the following steps: (1) obtaining the aircard historical cell site location information (covering June 10, 2008 through July 11, 2008) that was provided to the government by Verizon Wireless on July 12, 2008, (2) using the latitude and longitude coordinates of three of the five cell sites (cell site Nos. 268, 139, and 279) contained in the historical cell site location information to plot the cell site locations on a digital/computerized street map, (3) using prior knowledge of Verizon Wireless cell site signal ranges (*i.e.*, antenna radiation patterns) to draw signal range circles around each of the three cell site locations plotted on the digital/computerized street map, (4) using prior knowledge of typical Verizon Wireless cell site sector orientations (*i.e.*, sector azimuths at 0º, 120º, and 240º with sector radiation patterns covering 300º-60º, 60º-180º, and 180º-300º) to draw lines separating each of the noted signal range circles into three sectors each, (5) using the historical cell site location information to calculate which two cell sites were being accessed by the aircard most often (*i.e.*, cell site Nos. 268 and 139) and then weighting the respective signal range circle of the remaining cell site (*i.e.*, cell site No. 279) at a zero probability as covering the location of the aircard, (6) using the digital/computerized street map to calculate an overlapping signal range area for the two cell sites used by the aircard most often (*i.e.*, cell site Nos. 268 and 139), (7) using the

---

32. *See* EXHIBIT 21 of *1st Consolidated Exhibits* (cell tower range chart/map showing a *6,412,224 ft²* triangulated location estimate (marked with black pen lines) covering the location of apartment No. 1122); EXHIBIT 22 of *1st Consolidated Exhibits* (cell tower range chart/map with government's *6,412,224 ft²* triangulated location estimate marked in red and apartment No. 1122 marked with a yellow star).

33. *See* EXHIBIT 23 of *1st Consolidated Exhibits* (mathematical equation information for calculating the square footage of overlapping signal coverage areas of multiple cell sites and cell site sectors).

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

digital/computerized street map to calculate the three overlapping sector regions within the overlapping signal range area described in No. 6 above, (8) weighting two of the noted three overlapping sector regions covering non residential areas (*i.e.*, the airport as shown on the noted cell tower range chart/map) at a zero probability as covering the location of the aircard, and (9) weighting the remaining overlapping sector region (*i.e.*, the shaded area on the cell tower range chart/map) at maximum probability as covering the location of the aircard.[34] The shaded area on the cell tower range chart/map represents a government triangulated aircard location signature/fingerprint based off of the above explained statistical analysis, the known locations of Verizon Wireless cell sites, and the known azimuths and radiation patterns of Verizon Wireless cell site sectors. The shaded area on the cell tower range chart covers the location of apartment No. 1122 at the Domicilio apartment complex.[35]

**D. Triangulating the precise aircard location using Over-The-Air Service Provisioning, surreptitious phone calls, real-time cell site location information, and a portable/transportable wireless device locator (*e.g.*, the Harris StingRay).**

On July 15, 2008, FBI Agent Murray, IRS-CI Agent Denise L. Medrano, IRS-CI Agent Fleischmann, IRS-CI Agent Tracy L. Daun, and USPIS Inspector Wilson (hereafter collectively the "primary case agents") "flew to Santa Clara/San Jose to start triangulating the suspect's position."[36] Upon their arrival, the primary case agents met with FBI Agent William T. Ng at the Campbell FBI field office and later "met with several FBI agents with their Technical Service Division to help [][them] track the suspect's aircard."[37] On July 15, 2008, Verizon Wireless utilized network-initiated Over-The-Air Service Provisioning

---

34. *See* EXHIBIT 24 of *1st Consolidated Exhibits* (prosecution notation explaining how FBI Agent Killigrew indicated he created the cell tower range chart/map); EXHIBIT 25 of *1st Consolidated Exhibits* (January 7, 2011 email by FBI Agent Killigrew, sent to FBI Agent Murray: explaining the steps taken to create the cell tower range chart/map).

35. *See* EXHIBIT 22 of *1st Consolidated Exhibits* (cell tower range chart/map with government's *6,412,224 ft²* triangulated location estimate marked in red and apartment No. 1122 marked with a yellow star).

36. EXHIBIT 26 of *1st Consolidated Exhibits* (USPIS Investigation Details Report entries by USPIS Inspector Wilson).

37. *Id.*

- 23 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

(OTASP),[38] also known as Over-The-Air Parameter Administration (OTAPA), to surreptitiously write data to the aircard's hardware, *i.e.*, the Number Assignment Module (NAM),[39] in order to facilitate compatibility between the aircard, the Verizon Wireless network, and the government's portable/transportable wireless device locator and related equipment. Verizon Wireless "had a set-up problem with the 'Provisions'" and the government was therefore "not able to get a signal" on July 15th.[40] The following day, all OTASP issues were resolved, the required data had been written to the aircard's hardware, and the primary case agents were informed that the FBI technical agents/personnel "were able to track a signal and were using a '**Stingray**' to pinpoint the location of the aircard."[41]

In order to narrow the geographical search area of where to use the StingRay, the FBI technical agents/personnel needed to use real-time cell site location information to determine which Verizon Wireless cell site sector was providing service to the aircard. At the time, Verizon Wireless had not yet configured its network to provide FBI DCS-3000 servers (Pen/ Trap devices) with real-time cell site location information relating to a data connection for an aircard.[42] As a workaround, the FBI decided to "ping the number associated to the [air]card..."[43] in order to generate the needed data. By pinging the aircard (*i.e.*, placing

---

38. *See* Telecommunications Industry Association, ANSI/TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, (Arlington, VA: May, 2006), §§ 3.2, p. 3.2 and 4.2.2, p. 4.2.

39. The Number Assignment Module (NAM) is a set of mobile identification number related parameters stored in the aircard. *See id.*, § 1.2.1 (p. 1.4).

40. EXHIBIT 26 of *1st Consolidated Exhibits* (USPIS Investigation Details Report entries by USPIS Inspector Wilson).

41. *Id.* (emphasis added); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 12-16, and Bates Nos. 15-16 of EXHIBIT 13 and Bates No. 01 of EXHIBIT 27 (explaining the Harris StingRay) (Dkt. #536).

42. *See, e.g.,* EXHIBIT 27 of *1st Consolidated Exhibits* (FBI Agent Murray's rough notes indicating that no cell site data is available for an aircard when using a Pen/Trap device); EXHIBIT 28 of *1st Consolidated Exhibits* (June 27, 2008 email by FBI Agent Murray, sent to FBI Agent Leising: "Verizon Wireless can't separate tower data from content for a broadband card.").

43. EXHIBIT 26 of *1st Consolidated Exhibits* (USPIS Investigation Details Report entries by USPIS Inspector Wilson); *see also* EXHIBIT 27 of *1st Consolidated Exhibits* (FBI Agent Murray's rough notes indicating that "you have to call into the card.");

- 24 -

surreptitious telephone calls to the aircard without having it ring or answer),[44] the FBI would force Verizon Wireless to generate real-time cell site location information associated with a **voice call** (as apposed to an EVDO Rev. o data connection) that could be forwarded to the FBI SF-Martinez DCS-3000 server from a Verizon Wireless IAP.[45]

Beginning at 11:02am on July 16, 2008, the FBI began to place surreptitious telephone calls to the aircard while Verizon Wireless, acting pursuant to the N.D.Cal. 08-90331MISC-RS order, forwarded the resulting LAESP messages (*i.e.*, Pen/Trap data) to the FBI SF-Martinez DCS-3000 server in real-time.[46][47] The FBI continued to surreptitiously call the aircard a total of 32 times until 5:03pm on July 16, 2008.[48] The LAESP messages sent over that six hour period informed the FBI that the aircard was located within the signal coverage area of sector No. 3, Verizon Wireless cell site No. 5, having a latitude of 37.369733 and longitude of -121.923442 with a cell site street address of 2001 Gateway Place, San Jose, CA 95110.[49] While the FBI called/pinged the aircard, the real-time cell site location information was fed into the SF-Martinez DCS-1020 gateway server and sent

---

44. *See* EXHIBIT 13 of *1st Consolidated Exhibits* (on June 26, 2008, FBI Agent Murray was advised by Verizon Wireless that the aircard does not have telephone service).

45. The only other option for the government was to obtain a Title III wiretap warrant to receive real-time cell site location information along with the communications content of which the location data could not be separated. *See, e.g.*, EXHIBIT 26 of *1st Consolidated Exhibits* (Based on the destination IP addresses obtained via subpoenas, the government was "in the process of securing a Title 3" so that agents could "monitor the content of the computer that the [air]card [][was] being used [][with]" in order to "possibly triangulate the signal.")

46. *See* EXHIBIT 06 of *1st Consolidated Exhibits* (LAESP messages sent to the SF-Martinez DCS-3000 server (Pen/Trap device) by Verizon Wireless IAPs); *see also* EXHIBIT 07, EXHIBIT 08, EXHIBIT 09, and EXHIBIT 10 of *1st Consolidated Exhibits* (The FBI's "human readable" CDNRS files created from the Verizon Wireless LAESP messages).

47. The DCS-3000 SF-Martinez server is a pen register and trap and trace device used for CALEA based intercepts of call-identifying information (*i.e.*, Pen/Trap data). The CDNRS files in the exhibits cited in footnote 43, *supra*, identify the Pen/Trap device with "DCS Server Name: SF-Martinez Multiserver" and the definitions contained in exhibit Nos. 5-12 of the defendant's *Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (Dkt. #536) explain the FBI Digital Collection Program relevant to this case.

48. *See id.*

49. *See id.* (showing a "location = 5-3" relating to the FBI's surreptitious phone calls); *see also* Section V(C), *supra* (location information for Verizon Wireless cell site No. 5 in San Jose, CA).

over the Internet via a Virtual Private Network (VPN) to a wireless cellular modem (*i.e.*, the FBI's own aircard) paired with a laptop computer being accessed by the FBI technical agents/personnel who were operating the StingRay. The FBI technical agents/personnel used the real-time cell site location information to narrow the geographical area of where to search using the StingRay.

After six hours of placing surreptitious phone calls to the aircard and using the StingRay within the coverage area of sector No. 3, Verizon Wireless cell site No. 5, the FBI technical agents/personnel "were able to get a positive signal at an apartment complex in Santa Clara[,]"[50] *i.e.*, the Domicilio apartment complex located at 431 El Camino Real, Santa Clara, CA 95050. The Domicilio apartment complex is a gated community protected by private access electronic gates at all all entrances. Each ground level apartment within the complex has a floor architecture raised one story off the ground making all apartment units less accessible to the public. Each apartment at the complex has a mandatory deadbolt on all exterior front doors and a burglar alarm system wired to every exterior door and window. A private security guard service is on call and available to renters/occupants 24 hours a day along with nightly scheduled security foot patrols between 10:00pm and 2:00am. Square footage for the two bedroom "Mollino" apartment design (*e.g.,* apartment No. 1120 and 1126) is *1167* to *1255 ft²*; the studio "Albini" apartment design (*e.g.,* apartment No. 1122) is *489 ft²*; and the 1 bedroom "Ponti" apartment design (*e.g.,* apartment No. 1124) is *864* to *889 ft²*.[51] The building containing apartment No. 1122 is four stories high with apartment No. 1122 on the first floor.[52] The ceiling height for floor level apartments at Domicilio is *9 ft*.[53] The nearest road vehicle access areas are approximately *248 ft*, *300 ft*, *364 ft*, and *455 ft*

---

50. EXHIBIT 26 of *1st Consolidated Exhibits* (USPIS Investigation Details Report entries by USPIS Inspector Wilson).

51. *See* EXHIBIT 29 of *1st Consolidated Exhibits* (Domicilio apartment complex floor plans with square footage); EXHIBIT 30 of *1st Consolidated Exhibits* (Domicilio apartment complex site plan with apartment Nos. 1120, 1122, 1124, and 1126 labeled by the defense).

52. *See id.*

53. *See* EXHIBIT 31 of *1st Consolidated Exhibits* (relevant section of brochure for Domicilio apartment complex).

- 26 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

away from apartment No. 1122.[54]

**E. The precision of the government's aircard locating mission remains a debatable issue.**

The government claims to have destroyed the aircard location evidence obtained as a result of the FBI technical agents/personnel operating the StingRay.[55] The discovery provided to the defense regarding how precisely the aircard was located amounts to inconsistent and contradicting statements by government agents, supervisors, and AUSA Battista. On July 17, 2008, IRS-CI Agent Medrano stated that the precision of the aircard locating mission was to an area covering three apartments;[56] in her rough notes composed on an unspecified date, IRS-CI Agent Medrano indicated that the precision was to an area covering four apartments;[57] and in a report dated July 16, 2009, IRS-CI Agent Medrano suggested that the aircard locating mission was precise enough to locate the aircard precisely inside apartment No. 1122.[58] On July 17, 2008, AUSA Battista stated that the precision of the aircard locating mission was to an area covering four apartments;[59] later on July 17,

---

54. *See* EXHIBIT 32 of *1st Consolidated Exhibits* (Google Maps screenshot with distances in feet from apartment No. 1122 to the nearest road vehicle access areas labeled by the defense).

55. *See* EXHIBIT 33 of *1st Consolidated Exhibits* (Letter by AUSA Battista, sent to the defendant: "there is no record of the actual date and time the subject records were destroyed but one of the personnel who operated the subject equipment believes that they were destroyed shortly after [][the defendant's] arrest on August 3, 2008."); *see also Submission Pursuant LRCiv 37.1*, p. 7.

56. *See* EXHIBIT 34 of *1st Consolidated Exhibits* (July 17, 2008 email by IRS-CI Agent Medrano, sent to Albert A. Childress *et al.*: "the tech guys were able to narrow the signal to 3 apartments[,]... 1120, 1122, and 1124.").

57. *See* EXHIBIT 35 of *1st Consolidated Exhibits* (IRS-CI Agent Medrano rough notes stating that the government "identified [a] block of four apartments[,]" *i.e.*, "two empty[,] one 80 [][year old] guy[,] and one rented by 20 something year old[.]").

58. *See* EXHIBIT 36 of *1st Consolidated Exhibits* (July 16, 2009 report by IRS-CI agent Medrano stating that "[h]istorical cell tower information and **investigative techniques employed by FBI technical agents** led the investigative team to the location of the Travis Rupard Broadband Access Card: apartment 1122 at 431 El Camino Real, Santa Clara, California 95050." (emphasis added)).

59. *See* EXHIBIT 37 of *1st Consolidated Exhibits* (July 17, 2008 email by AUSA Battista, sent to Mark Eckenwiler *et al.*: "The historical and real time tracking information for our Target Broadband Access Card has lead [sic] us to an area the size of 4 specific apartment units...").

- 27 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

2008, AUSA Battista indicated that the "team" has narrowed the search down to a single apartment,[60] and on July 22, 2008, AUSA Battista stated that the government had confirmation of the aircard transmitting from apartment No. 1122.[61] On July 22, 2008, Albert A. Childress stated that the aircard was tracked to a specific apartment.[62] On July 22, 2008, FBI Agent Ng stated that the equipment used to locate the aircard was precise enough to locate the apartment belonging to the subject.[63] On August 7, 2008, USPIS Inspector Wilson stated that the precision of the aircard locating mission was to an area covering three apartments, *i.e.*, apartment Nos. 1120, 1122, and 1124.[64] On August 13, 2008, FBI Agent Murray stated that the precision of the aircard locating mission was to an area covering four apartments[65] and his undated rough notes list apartment Nos. 1120, 1122, 1124, and 1126.[66]

If the StingRay allowed the FBI technical agents/personnel to locate the aircard precisely inside apartment No. 1122, this would amount to a precision of approximately *489 $ft^2$* on the horizontal plane (the floor area of apartment No. 1122).[67] If the StingRay

---

60. *See* EXHIBIT 38 of *1st Consolidated Exhibits* (July 17, 2008 email by AUSA Battista, sent to AUSA Yen: "The team has narrowed the search down to an occupant of a single apartment.").

61. *See* EXHIBIT 39 of *1st Consolidated Exhibits* (July 22, 2008 email by AUSA Battista, sent to AUSA Yen: "We have confirmed that the Target Broadband Access Card is transmitting from this apartment.").

62. *See* EXHIBIT 40 of *1st Consolidated Exhibits* (July 22, 2008 email by Albert A. Childress, sent to Brad Taylor *et al.*: "we have tracked the AirCard being used for the false returns to that apartment...").

63. *See* EXHIBIT 41 of *1st Consolidated Exhibits* (July 22, 2008 internal document summary by FBI Agent Ng stating that by "[u]sing []equipment used to locate the subject aircard[], agents were able to locate the apartment unit where the subject is located.").

64. *See* EXHIBIT 26 of *1st Consolidated Exhibits* (August 7, 2008 report entry by USPIS Inspector Wilson stating that "[w]e were able to narrow down the signal to three possible apartments: #1120, #1122 and #1124.").

65. *See* EXHIBIT 42 of *1st Consolidated Exhibits* (August 13, 2008 email by FBI Agent Murray, sent to FBI Agent Huntsberry *et al.*: the operators of the equipment used to locate the aircard "successfully located the aircard in one of four apartments...").

66. *See* EXHIBIT 43 of *1st Consolidated Exhibits* (FBI Agent Murray rough notes listing apartment Nos. 1120, 1122, 1124, and 1126).

67. *See* EXHIBIT 29 of *1st Consolidated Exhibits* (Domicilio apartment complex floor plans with square footage); EXHIBIT 30 of *1st Consolidated Exhibits* (Domicilio apartment complex site plan with apartment Nos. 1120, 1122, 1124, and 1126 labeled by the defense).

- 28 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

allowed the FBI technical agents/personnel to locate the aircard to an area covering apartment Nos. 1120, 1122, and 1124, this would amount to a precision of approximately *2520* to *2633 ft²* on the horizontal plane (the combined floor area of the three apartments).[68] If the StingRay allowed the FBI technical agents/personnel to locate the aircard to an area covering apartment Nos. 1120, 1122, 1124, and 1126, this would amount to a precision of approximately *3687* to *3888 ft²* on the horizontal plane (the combined floor area of the four apartments).[69] However, two of the apartments were unoccupied and empty[70] so a real world precision calculation for the horizontal plane would be less than the above approximations under most scenarios. Assuming the government's "three apartment scenario"[71] and applying a Cartesian coordinate system, the precision of the StingRay's aircard location calculation is approximately *30.2 ft* along the *X* axis, *71.9 ft* along the *Y* axis, and *9 ft* along the *Z* axis.[72] Under **any** of the government's precision scenarios, the margin of error along the *X* axis is less than approximately *8 ft* considering the StingRay was able to eliminate possible aircard locations within the floor areas of all adjacent apartments across the hall[73] from apartment No. 1122, *i.e.*, apartment Nos. 1119, 1121, 1123, and 1125. Similarly, under **any** of the government's precision scenarios, the margin of error along the *Z* axis is less than approximately *9 ft* considering the StingRay was able to eliminate possible aircard locations within the vertical space occupied by all apartments spanning the area directly above the *9 ft* ceiling of apartment No. 1122, *i.e.*, apartment Nos. 1220, 1222, 1224,

---

68. *See id.*

69. *See id.*

70. *See* EXHIBIT 35 of *1st Consolidated Exhibits* (IRS-CI Agent Medrano rough notes stating that two of the apartments suspected of containing the aircard were empty).

71. The defendant rejects the government's "three apartment scenario" as inaccurate and untruthful. *See* Section VI(C)(1)(a), *infra*.

72. These calculations use the Domicilio apartment site plan (EXHIBIT 30 of *1st Consolidated Exhibits*) as a reference plane. Number values for Cartesian coordinate vectors are based off of *9 ft* ceilings for the floor level apartments at Domicilio and the approximate floor area dimensions of apartment Nos. 1120, 1122, and 1124.

73. The defendant is assuming the hallway between the relevant even numbered apartments and relevant odd numbered apartments is a generous approximation of *8 ft* wide. The defendant has been asking his defense to obtain blueprints for the relevant buildings for over a year but his requests go unfulfilled.

- 29 -

and 1226.

**F. After the FBI technical agents/personnel located the aircard, they handed off the aircard location evidence to the primary case agents so that they could attempt to establish "independent probable cause" to search apartment No. 1122.**

Once the FBI technical agents/personnel pinpointed the precise location of the aircard, they "handed off" the aircard location evidence to the primary case agents. The primary case agents then established a plan to obtain so-called "independent probable cause" to physically search apartment No. 1122. This aspect of the investigation is discussed in emails sent by AUSA Battista and IRS-CI Agent Medrano shortly after the FBI technical agents/personnel electronically located the aircard:

> The team has narrowed the search down to the occupant of a single apartment that was leased by a white male using a false CA Driver's License. We have the rental company's rental file and are now back checking all of the information in the file. The tenant also provided a copy of a tax return to the rental company as proof of employment and means to pay rent that was never filed with the IRS. **The main effort now may be to tie the target to the case without emphasis on the [REDACTED] [][(*i.e.*, portable/transportable wireless device locator)]**.
>
> EXHIBIT 38 of *1st Consolidated Exhibits* (emphasis added) (July 17, 2008 email by AUSA Battista sent to AUSA Yen).

> The **tech guys** were able to narrow the signal to 3 apartments. Today, we will be doing as much follow up research as we can. We need to develop **independent probable cause** of the search warrant...**FBI does not want to disclose the [REDACTED] [][(*i.e.*, portable/transportable wireless device locator)]** (understandably so). [][W]e need as much info (Accurint, IDRS, etc) on the individuals living in apartments 1120, 1122, and 1124 at the Domicilio Apartments at 431 El Camino Real, Santa Clara, CA 95050....
>
> EXHIBIT 34 of *1st Consolidated Exhibits* (emphasis added) (July 17, 2008 email by IRS-CI Agent Medrano sent to Albert A. Childress).

The primary case agents set out to establish so-called "independent probable cause" to facilitate a future attempt to conceal the "hand off" evidence and the investigative techniques employed by the FBI technical agents/personnel, *i.e.*, use of the StingRay and related equipment. Despite the government's plan, all evidence obtained after the aircard had been electronically located was in no way independent of the "hand off" evidence considering it was derived from investigative techniques centered on the location of the aircard, *i.e.*,

- 30 -

*MEMORANDUM OF POINTS AND AUTHORITIES MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE CR08-814-PHX-DGC*

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

apartment No. 1122. The investigative techniques stemming from the "hand off" evidence include, but are not limited to, the following: (1) obtaining the names and addresses of individuals receiving mail at various apartments, (2) obtaining utility information for various apartments and occupant driver license information, (3) running occupant driver license numbers through the California Department of Motor Vehicles, (4) running an IRS database query for tax records belonging to occupants of various apartments, (5) running an Accurint query for occupants of various apartments, (6) obtaining rental application records for various apartments,[74] (7) conducting a ruse Chinese food delivery at apartment No. 1122, [75] and (8) "renting" an apartment next door to apartment No. 1122 so that agents could use it as a surveillance post to watch apartment No. 1122.[76]

**G. The FBI technical agents/personnel electronically verified the aircard location on dates after it had been initially located.**

On July 24, 2008, FBI Agent Murray sent AUSA Battista an email stating that the FBI agents/personnel who operated the StingRay have not returned to verify the aircard but were asked to check on either July 25, 2008 or July 28, 2008.[77] The LAESP messages associated with the surreptitious phone calls placed to the aircard, and sent by Verizon Wireless IAPs to the SF-Martinez DCS-3000 server (Pen/Trap device), show additional recorded aircard activity occurring between July 18, 2008 and August 1, 2008. Some of the additional

---

74. *See* EXHIBIT 44 of *1st Consolidated Exhibits* (IRS-CI – Notations of which law enforcement officials assisted with the government's attempt to establish independent probable cause to physically search apartment No. 1122).

75. *See* EXHIBIT 45 of *1st Consolidated Exhibits* (July 22, 2008 email by FBI Agent Murray, sent to AUSA Battista: "Ruse tonight has been run. No one answered. Neighbors don't know the resident."); EXHIBIT 46 of *1st Consolidated Exhibits* (July 23, 2008 email by IRS-CI Agent Daun, sent to IRS-CI Agent Willert: "The subject did not answer his door when they attempted deliver food last night and he still hasn't been seen.").

76. *See* EXHIBIT 47 of *1st Consolidated Exhibits* (Rough notes by IRS-CI Agent Medrano and IRS-CI Agent Daun: "provided empty appt next door"); EXHIBIT 48 of *1st Consolidated Exhibits* (July 17, 2008 email by USPIS Inspector Wilson, sent to FBI Agent Murray: "man[a]gement knows it's [][law enforcement] related, they voluntar[il]y let us have the room... for a couple days."); EXHIBIT 49 of *1st Consolidated Exhibits* (August 4, 2008 FBI FD-302 Report by FBI Agent Murray RE: returning the keys to Manager Mona Chen for apartment No. 1124 at the Domicilo apartment complex).

77. *See* EXHIBIT 50 of *1st Consolidated Exhibits* (July 24, 2008 email by FBI Agent Murray, sent to AUSA Battista *et al.*).

- 31 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

activity was recorded on the same dates that FBI Agent Murray indicated the aircard would be checked, *i.e.*, July 25, 2008 and July 28, 2008. The additional activity is present in the raw LAESP messages but not present in the human readable 130735.062.sum CDNRS file created by the FBI from the raw LAESP messages.[78] The additional recorded activity present in the raw LAESP messages also appear to be incomplete when compared to the activity recorded on July 16, 2008.[79] The inconsistency in the two sets of records and missing data fields in the raw LAESP messages suggests that an agent likely tampered with the records in order to conceal government attempts to verify the location of the aircard (via surreptitious phone calls or other types of "pings") after July 16, 2008.

### H. The government seized evidence from apartment No. 1122 by executing the reissued version of the previously returned N.D.Cal. 08-70460-HRL search warrant.

On July 22, 2008, IRS-CI Agent Fleischmann and AUSA Yen obtained the N.D.Cal. 08-70460-HRL search warrant which required the government to search apartment No. 1122 by July 31, 2008.[80] "Since the identity of the subject was unknown, agents did not proceed with a search warrant of the apartment in case the subject used [][the apartment] only as an off-site to house his computer."[81] Instead of executing the warrant, agents decided that "it may be necessary to do another controlled delivery of money from the CI to the suspect..."[82] The affidavit for the amended N.D.Cal. 08-70460-HRL warrant application states that the original warrant was "returned unexecuted due to the ongoing nature of the

---

78. *Compare* EXHIBIT 10 (text file to PDF file conversion of 130735.062.sum) with EXHIBIT 06 (raw LAESP messages sent to the SF-Martinez DCS-3000 server by Verizon Wireless IAPs) of *1st Consolidated Exhibits*.

79. *See* EXHIBIT 06 of *1st Consolidated Exhibits* (raw LAESP messages sent to the SF-Martinez DCS-3000 server by Verizon Wireless IAPs).

80. *See* Section IV(G), *supra*.

81. *See* EXHIBIT 42 of *1st Consolidated Exhibits* (August 13, 2008 email by FBI Agent Murray, sent to FBI Agent Huntsberry *et al.*).

82. EXHIBIT 26 of *1st Consolidated Exhibits* (USPIS Investigation Details Report entries by USPIS Inspector Wilson).

- 32 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

investigation."[83] Once returned to Magistrate Judge Trumbull on July 31, 2008, the N.D.Cal. 08-70460-HRL warrant was void as a matter of law. When the government was finally ready to execute the search warrant, they amended the original N.D.Cal. 08-70460-HRL warrant application and resubmitted it in the Northern District of California. Notwithstanding the fact that the N.D.Cal. 08-70460-HRL warrant was void as a matter of law, the amended affidavit set forth no new information (later than July 23, 2008) that could arguably establish that probable cause still existed to search apartment No. 1122.[84] Magistrate Judge Trumbull reissued the previously returned warrant with a handwritten "AMENDED" notation added towards the top of the document.[85] On August 3, 2008, the government executed the N.D.Cal. 08-70460-HRL warrant and physically seized the aircard, the aircard's laptop host computer, and other evidence from inside apartment No. 1122.[86]

## VI. ARGUMENT

The investigation method used to gather evidence in the present case is known in the Ninth Circuit as the "hand off" procedure. The "hand off" procedure involves one set of investigators obtaining evidence through a questionable search and then "handing off" that evidence to a separate set of investigators "with only the specific instruction of when and where to be and the suggestion to 'investigate' (*i.e.*, obtain so-called 'independent' probable cause and later make an arrest based upon the 'independent' probable cause)." Whitaker v. Garcetti, 291 F.Supp.2d 1132, 1148-49 (C.D.Cal. 2003) (explaining the "hand off" procedure and finding it unconstitutional), *affirmed in part, vacated in part, and reversed in part, all on other grounds*, 486 F.3d 572 (9th Cir. 2007).[87] A search may be questionable "due to the search's patented illegality, the questionable integrity of the underlying affidavit, or just sheer neuroticism[.]" *Id.* at 1148. The hand off procedure facilitates the concealment of a

---

83. *See* Dkt. #464-2, p. 1-2 (affidavit by IRS-CI Agent Fleischmann).

84. *See* Section IV(G), *supra*.

85. *See* Dkt. #464-1 (warrant).

86. *See* Dkt. #464-1 (warrant return).

87. The Ninth Circuit expressed no view on the constitutionality of the "hand off" procedure. *See* Whitaker, 486 F.3d at 586.

- 33 -

questionable search employed to obtain otherwise unobtainable probable cause in support of a subsequent search and/or arrest. The hand off procedure also acts to stunt Fourth Amendment challenges by keeping elements of the questionable search hidden from defense counsel after charges are filed. According to *Whitaker*, the use of the "hand off" procedure is unconstitutional unless the probable cause used in support of the subsequent search and/or arrest is truly independent of the "hand off" evidence. *Id.* at 1151.

Every detail of the government's mission to search for and locate the aircard needs to be scrutinized under the Fourth Amendment so that the defendant can determine what government actions are classified as illegal searches and/or seizures in consideration of the relevant subpoenas and court orders. The *Whitaker* Court noted that "[t]he most basic clause in the Fourth Amendment, that is, the right to be free from unreasonable searches and seizures, would also be denuded of all real meaning if governmental authorities are permitted to perform a search that triggers Fourth Amendment scrutiny, yet are also permitted to conceal the existence of the search." *Id.* at 1148.[88] Under the *Brady* exculpatory evidence doctrine, "the *existence* of [][a] search seems to qualify as evidence 'favorable to an accused' (*i.e.*, exculpatory), since the discovery of such evidence allows the accused to suppress inculpatory evidence that would otherwise be admitted and used to convict..." *Id*. at 1149 fn. 36 (emphasis in original).[89] In light of there being numerous subsets of questionable searches and seizures relating to obtaining the location of the aircard, the government simply stating that some type of search occurred and then concealing nearly all evidence relating to that search is just as damaging to the defense as concealing the existence of the search altogether.[90]

---

88 *See also* Banks v. Dretke, 540 U.S. 668, 696 (2004) ("A rule... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process.").

89. *See also* Gamez-Orduno, 235 F.3d at 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." (internal citations omitted)).

90. Although the government has provided documents relating to various court orders, none of the related court orders address the searches and seizures currently being kept secret by the government, *i.e.*, details of the use of the StingRay.

- 34 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

The remainder of this section will argue for disclosure of all evidence relevant and helpful to the defense in scrutinizing the illegal government searches and seizures used to locate the aircard. The requested evidence relevant to each subheading below is described under the same subheading contained in the accompanying *Submission Pursuant To LRCiv 37.1*. The facts the defendant expects the withheld evidence to prove, and/or waivers that will alleviate the defendant's need for the withheld evidence, are listed under the same subheading contained in the accompanying *Submission Of Proposed Stipulations*. The relevancy of the requested evidence may be inferred by taking the inverse of each of the proposed stipulations listed under the identical subheading. Under each subheading below, the defendant will address the relevant category of withheld evidence by explaining (1) how previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations (if applicable), (2) how the government's agreement to the waivers in the relative proposed stipulations will alleviate the defendant's need for disclosure (if applicable), (3) why the requested evidence is relevant and helpful to the defense, and (4) why the government is obligated to provide the evidence being requested.[91]

**A. All evidence relating to the identities and roles of the witnesses to the mission to search for and locate the aircard. *[Section I(A) of Submission Pursuant To LRCiv 37.1]***

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. *[RE: identification of witnesses]***

**a. The government used a helicopter and/or a man-on-foot as a moveable platform for the portable/transportable wireless device locator(s). *[Stipulation No. 14][Stipulation Nos. 1-2, and 4 integrated]***

Apartment No. 1122 is isolated away from roads, streets, and parking lots where a WITT van could be driven while using a StingRay to locate the aircard. The nearest road vehicle access areas are approximately *248 ft*, *300 ft*, *364 ft*, and *455 ft* away from apartment

91. There are formatting variations for less complex categories of withheld evidence, *i.e.*, evidence addressed in Section VI(H), (I), and (J), *infra*.

No. 1122.[92] In order for the StingRay to achieve an *8 ft* margin of error on the *X* axis and a *9 ft* margin of error on the *Z* axis (as claimed by the government),[93] the FBI technical agents/personnel would likely need to use their locating equipment closer to apartment No. 1122 than what a road vehicle would allow. Use of a helicopter at low altitudes while hovering over apartment No. 1122[94] or use of a man-on-foot within the Domicilio apartment complex would allow the StingRay,[95] KingFish[96] or similar device to be used close enough to account for the minimal margins of error claimed by the government. Additionally, the KingFish is described by Harris as being man-portable and battery operated,[97] and Harris offers accessories for the StingRay to facilitate airborne deployment.[98]

---

92. *See* EXHIBIT 32 of *1st Consolidated Exhibits* (Google Maps screenshot with distances in feet from apartment No. 1122 to the nearest road vehicle access areas labeled by the defense).

93. *See* Section V(E), *supra*.

94. *See* McPherson, Rodney (Palm Bay, FL, US) *et al.*, Harris Corp., U.S. Patent No. 7,592,956 (Sep. 22, 2009), *available at* http://www.freepatentsonline.com/7592956.html (last accessed Feb. 22, 2011), p. 3 ln. 55-57 ("As will be appreciated by those skilled in the art, the effective range of the location determining system **may increase in embodiments including the airborne platform.**" (emphasis added)); Section VI(D)(1)(h), *infra* (addressing the "approach" radio wave collection method).

95. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 27 (Dkt. #536).

96. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed Mar. 9, 2011); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 02 of EXHIBIT 28 (Dkt. #536).

97. *See* Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed Mar. 9, 2011); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 29 (Dkt. #536).

98. *See* Miami, FL, USA – Legislative Files, Harris GCSD Price List (Sep. 2008), p. 1-8, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/48000.pdf (last accessed Mar. 9, 2011) (the price list has a StingRay accessory named "Airborne DF Kit CONUS" ($9,000), indicating that the StingRay may be used via helicopter); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 29 (Dkt. #536).

**b. The government destroyed the real-time aircard location data and other additional data after the date of Daniel Rigmaiden's arrest.** ***[Stipulation No. 15][Stipulation Nos. 2, 4, and 23-25 integrated]***

In a letter dated September 8, 2010, AUSA Battista claimed that the real-time aircard location data obtained via the StingRay was destroyed by the unidentified FBI technical agents/personnel after the defendant's arrest on August 3, 2008.[99] Although this is a good indication of the accuracy of the relevant fact, the government provided no actual evidence to this effect and will not agree to the defendant's stipulation.[100]

**2. How the government's agreement to the waivers in the relative proposed stipulations will alleviate the defendant's need for disclosure.** ***[RE: identification of witnesses]***

**a. Waiver of claims of good faith searches and seizures on the part of the unidentified FBI technical agents/personnel.** ***[Stipulation Nos. 11-13][Stipulation Nos. 2 and 4 integrated]***

Stipulation Nos. 11-13 amount to waivers of government good faith arguments that would require testimony by the unidentified FBI technical agents/personnel regarding their good faith in executing illegal searches and seizures. By the government stipulating to the relevant stipulations, the defendant's need to question the unidentified FBI technical agents/personnel with respect to claims of good faith illegal searches and seizures will be alleviated.

**b. Waiver of claims of good faith destruction of real-time aircard location data and other additional data by the unidentified FBI technical agents/personnel.** ***[Stipulation Nos. 16-19][Stipulation Nos. 2, 4, and 23-25 integrated]***

Stipulation Nos. 16-19 amount to waivers of government "lack of bad faith" and/or good faith arguments that would require testimony by the unidentified FBI technical agents/personnel regarding their destruction of real-time aircard location data and other additional data. By the government stipulating to the relevant stipulations, the defendant's

99. *See* EXHIBIT 33 of *1st Consolidated Exhibits* (Letter by AUSA Battista, sent to the defendant: "there is no record of the actual date and time the subject records were destroyed but one of the personnel who operated the subject equipment believes that they were destroyed shortly after [][the defendant's] arrest on August 3, 2008."); *see also Submission Pursuant LRCiv 37.1*, p. 7.

100. *See* attached the defendant's *Statement Pursuant To LRCiv 7.2(j)*.

- 37 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

need to question the unidentified FBI technical agents/personnel with respect to claims of "lack of bad faith" and/or good faith destruction of evidence will be alleviated.

**3. Why the requested evidence is relevant and helpful to the defense. *[RE: identification of witnesses]***

The requested identifying information for the unidentified FBI technical agents/personnel who operated the portable/transportable wireless device locator(s) is relevant and helpful to the defendant's *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence*. The relevancy relates to the defendant's need to question said witnesses with respect to (1) making challenges to government claims of good faith in conducting illegal searches and seizures, (2) making challenges to government claims of good faith in destroying evidence, and (3) proving the invasiveness of the unidentified FBI technical agents/personnel using the StingRay and other related equipment while in a helicopter and/or while on foot inside the Domicilio apartment complex. Without the requested evidence, or an adequate substitution, the defendant will be unable to question the relevant witnesses with respect to the relevant issues. If the defendant is unable to question the witnesses, he may not be able to effectively argue for a suppression remedy or dismissal and he will be prevented from raising certain Fourth Amendment arguments.

**a. Relevancy of the requested evidence with respect to proving that the government used a helicopter and/or a man-on-foot as a moveable platform for the portable/transportable wireless device locator(s). *[RE: identification of witnesses]***

**i. Use of a helicopter as a Fourth Amendment violation. *[RE: identification of witnesses]***

If the government used its portable/transportable wireless device locator and related equipment while in a helicopter hovering over apartment No. 1122, and at an altitude in violation of FAA regulations or at an altitude that is uncommon, the defendant will have grounds to argue a Fourth amendment violation. In *Riley*, the Supreme Court found that it was not unreasonable for the government to fly a helicopter over a private residence at 400 feet in order to search for an outdoor marijuana grow operation visible to the naked eye. *See* Florida v. Riley, 488 U.S. 445 (1989). The *Riley* court noted that it "would have been a

- 38 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

different case if flying at that altitude had been contrary to law or regulation." *Id*. at 451. In further support of its ruling, the *Riley* court articulated that "no intimate details connected with the use of the home or curtilage were observed, and there was no undue noise, and no wind or dust, or threat of injury." *Id.* at 452.

In the present case, if the government used a helicopter as a platform to operate and move the StingRay and related equipment then it would amount to an unreasonable search under *Riley*. Current FAA regulations prohibit helicopters from flying at altitudes lower than *1,000 ft* in congested areas unless the lower altitude "complies with any routes or altitudes specifically prescribed for helicopters by the FAA[.]" 14 C.F.R. §§ 91.119(d) and (d)(1). In order to get close to apartment No. 1122 using a helicopter, the government would need to violate FAA regulations. Additionally, the helicopter was being used to observe intimate details within apartment No. 1122 (*i.e.*, the aircard and its location) and not simply the curtilage as was a relevant factor in deciding the Fourth Amendment issue in *Riley*.

**ii. Use of a man-on-foot inside the Domicilio apartment complex as a Fourth Amendment violation. *[RE: identification of witnesses]***

If the government used a man-on-foot inside the Domicilio apartment complex, as a moveable platform for its portable/transportable wireless device locator(s), the defendant will be able to use that fact in further support of a showing that the government infringed upon an expectation of privacy that society is prepared to recognize as reasonable. In order to prove an illegal search, the defendant needs to show that "the individual manifested a subjective expectation of privacy in the object of the challenged search, and society is willing to recognize that expectation as reasonable." Kyllo v. United States, 533 U.S. 27, 33 (2001) (citation, internal quotation marks and brackets omitted). If the unidentified FBI technical agents/personnel entered the Domicilio apartment complex while using a portable/transportable wireless device locator, the defendant will be able to use that fact, in light of the heightened security features of the Domicilio apartment complex (*i.e.*, security foot patrols, electronic gate access, *etc.*),[101] in further support of proving that the

101. *See* Section V(D), *supra*.

- 39 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

government violated an expectation of privacy that society is prepared to recognize as reasonable.

**b.   Relevancy of the requested evidence with respect to determining a destruction date/time for the real-time aircard location data and other additional data. *[RE: identification of witnesses]***

The date and time when the real-time aircard location data and other additional data was destroyed will be relevant to any government claims of "lack of bad faith" and/or good faith in destroying relevant and helpful evidence relating to the location of the aircard.  If the government destroyed the evidence after the defendant's arrest then this fact will support the defendant's argument that the government was aware that the evidence was relevant and helpful to the defendant at the time it was destroyed.  If the government was aware that the evidence was relevant and helpful to the defense prior to its destruction, government claims of "lack of bad faith" and/or good faith will fail.  *See* Section VI(A)(3)(d), *infra*, for further legal discussion.

**c.   Relevancy of the requested evidence with respect to challenging government claims of good faith in executing illegal searches and seizures. *[RE: identification of witnesses]***

If the government makes claims of good faith with respect to conducting illegal searches and seizures, the defendant will need to disprove the government's claims by questioning the unidentified FBI technical agents/personnel who operated the portable/transportable wireless device locator(s) and related equipment.  In United States v. Leon, the Supreme Court created an exception to the exclusionary rule for when law enforcement officers seize evidence while acting in objectively reasonable reliance on a warrant that is later found invalid.  *See id.*, 468 U.S. 897, 914-15 (1984).  The Supreme Court referred to this "objectively reasonable reliance" as "good faith."  The good faith analysis includes a "particular officer's knowledge and experience, but that does not make the test any more subjective than the one for probable cause" which excludes "subjective intent[.]"  Herring v. United States, 129 S.Ct. 695, 703 (2009) (internal citations omitted). The "inquiry is confined to the objectively ascertainable question whether a reasonably well

trained officer would have known that the search was illegal in light of all of the circumstances." *Id.* at 703 (internal citation and quotation marks omitted). "It is necessary to consider the objective reasonableness, not only of the officer who eventually executed [] [the] warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." Leon, 468 U.S. at 923 fn. 24.

In the present case, the government obtained no warrants and instead obtained a series of subpoenas and court orders that collectively sought to locate the aircard. Notwithstanding the fact that the government obtained no warrants, misunderstood the cited statutes, and acted outside the bounds of the issued subpoenas/orders, the government may still argue the *Leon* good faith exception with respect to the defendant's request for suppression of evidence. If the government uses arguments claiming that the unidentified FBI technical agents/personnel acted in good faith while conducting illegal searches and seizures, the defendant will need to question those witnesses regarding their training, knowledge, and experience. A long line of Supreme Court cases supports this rationale. *See*, *e.g.*, the cases cited immediately above.

**d. Relevancy of the requested evidence with respect to challenging government claims of good faith in destroying evidence.** ***[RE: identification of witnesses]***

If the government makes claims of "lack of bad faith" and/or good faith with respect to destroying the real-time aircard location data and other additional data, the defendant will need to disprove the government's claims by questioning the unidentified FBI technical agents/personnel who destroyed the relevant evidence. The *Barton* court extended the *Youngblood* bad faith requirement to the destruction of evidence that may be potentially useful at a suppression hearing. *See* United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993). *See also* Arizona v. Youngblood, 488 U.S. 51, 58 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law."). In determining bad faith, the *Barton* court **adapted** the test used in *Cooper*: "[t]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time

it was lost or destroyed." Barton, 995 F.2d at 935 (alteration in original) (quoting United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993)). The *Barton* court adapted the *Cooper* test so that it would analyze the government's knowledge of the apparent impeachment value of the destroyed evidence instead of the apparent exculpatory value. *See* Barton, 995 F.2d at 936 ("No evidence was presented to demonstrate that the officers deliberately destroyed evidence in order to insulate the allegations... from impeachment.").

In his *Motion To Dismiss For Destruction Of Evidence*, the defendant is requesting that the Court extend the *Barton* rationale (relating to destruction of impeachment evidence in the context of a suppression hearing) to the destruction of evidence that had an apparent material value in proving illegal searches and seizures in general.[102] If the government uses counterarguments claiming that the unidentified FBI technical agents/personnel destroyed the evidence in good faith, the defendant will need to question those witnesses regarding their actions in destroying the evidence. In *Barton*, the defendant used testimony of the witness who destroyed the evidence in order to argue that the evidence was destroyed in bad faith. *See id.* at 935-36. In the present case, the defendant will need to do the same.

**4. Why the government is obligated to provide the evidence being requested. *[RE: identification of witnesses]***

It is a viable defense strategy for a defendant to confront witnesses at a suppression hearing or other hearing during the pretrial stages of the proceedings. A case previously cited by the government[103] in support of its argument to withhold evidence from the defendant held that the involvement of privileged information does not "extinguish a criminal defendant's strong interest in effective cross-examination of adverse witnesses at a suppression hearing." United States v. Green, 670 F.2d 1148, 1156 (D.C. Cir. 1981).[104]

---

102. The defendant's arguments include, but are not limited to, violations of scope with respect to acting outside the bounds of the judicially approved actions and conducting unreasonable searches and seizures with no judicial authorization whatsoever. Section VI(C)(2), *infra*, explains in detail how the destroyed the real-time aircard location data and other additional data is relevant and helpful to the defense.

103. *See* Dkt. #300, p. 9.

104. In *Green*, an officer "testified that he was in a 'hidden observation post' near 14th and V Streets, N.W. on December 6, 1980[], was making observation with a pair of 10 X 50

- 42 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

*See also* United States v. Batiste, 868 F.2d 1089, 1093 (9th Cir. 1989) ("[W]hen the government flatly refused to produce witnesses at the evidentiary hearing, the district court properly granted Batiste's motion to suppress evidence."). In the present case, even if the government continues to employ the "hand off" procedure and does not intend to question the unidentified FBI technical agents/personnel at a suppression hearing, the defendant will still call those adverse witnesses for direct examinations regarding their actions in locating the aircard.[105]

In *Cadet*, the Ninth Circuit found that "it was quite appropriate for the district court to conclude from the fact that the government did not intend to call a witness to the crime that there was a reasonable possibility that such person would be able to provide evidence favorable to the defense." United States v. Cadet, 727 F.2d 1453, 1469 (9th Cir. 1984). The *Cadet* court further held that "the district court's order compelling disclosure of the names and addresses of such witnesses did not constitute an abuse of discretion." *Id*. The holding in *Cadet* relied on *Brady* and applied to the disclosure of witness information relevant to the trial stage of the proceedings, *see id.*, however, "the due process principles announced in *Brady* and its progeny must be applied to certain pretrial proceedings, such as suppression hearings." United States v. Fernandez, 231 F.3d 1240, 1248 fn. 5 (9th Cir. 2000) (internal citation and quotation marks omitted); Gamez-Orduno, 235 F.3d at 461; *see also* Waller v. Georgia, 467 U.S. 39, 46 (1984) ("[S]uppression hearings often are as important as the trial itself.").

---

power binoculars and that the weather that morning was sunny and clear." *Id*. at 1153.

105. With respect to testifying as to the locations of where a StingRay was used, in a previous case FBI agent Shute testified that he conducted base station surveys using a StingRay at specific locations including Kmart, Home Savings Bank, and another bank. *See* United States v. Allums, No. 2:08-CR-30 TS, District of Utah, Dkt. #128, p. 34, ln. 11-25 and p. 35 ln. 1-7; *see also Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501).

- 43 -

*MEMORANDUM OF POINTS AND AUTHORITIES MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE CR08-814-PHX-DGC*

**B. Unredacted order applications and attachments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders obtained to facilitate locating the aircard. *[Section I(B) of Submission Pursuant To LRCiv 37.1]***

**1. How the government's agreement to the waivers in the relative proposed stipulations will alleviate the defendant's need for disclosure. *[<u>RE: unredacted order applications and attachments</u>]***

**a. Waiver of use of the relevant order applications and attachments. *[Stipulation No. 20][Stipulation Nos. 1-4 integrated]***

Stipulation No. 20 amounts to government waivers of (1) arguments claiming a good faith reliance on the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS order applications and attachments while conducting illegal searches and seizures to locate the aircard, and (2) arguments claiming that the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS order applications and attachments are relevant in determining the scope and particularity of the judicially approved actions authorized by the text of the issued orders. By the government stipulating to the relevant stipulations, the defendant's need to know the redacted text will be alleviated.

**2. Why the requested evidence is relevant and helpful to the defense. *[<u>RE: unredacted order applications and attachments</u>]***

The requested unredacted order applications and attachments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders are relevant and helpful to the defendant's *Motion To Suppress*. The relevancy relates to (1) making challenges to government claims of good faith reliance on the relevant redacted documents while conducting illegal searches and seizures, and (2) addressing the issues of scope and particularity regarding the terms of the issued orders. Without the requested evidence, or an adequate substitution, the defendant may not be able to effectively argue for a suppression remedy and he may not be able to effectively argue that the government violated the issued orders. In the event of a Court finding that the relevant documents contain "suitable words of reference," the defendant will need to know the redacted text in order to address the various issues explained in this section.

If the government successfully argues that the relevant redacted documents are part of

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

the issued orders, and that the relevant redacted documents accompanied the issued ordered during execution, the defendant will need to analyze the redacted text in order to determine whether the redactions contain information relevant to good faith arguments, scope, particularity, *etc.* "A warrant expressly incorporates an affidavit when it uses 'suitable words of reference'" United States v. SDI Future Health, Inc., 568 F.3d 684, 699 (9th Cir. 2009) (citation and internal quotation marks omitted). "We consider an affidavit to be part of a warrant, and therefore potentially curative of any defects, 'only if (1) the warrant expressly incorporated the affidavit by reference and (2) the affidavit either is attached physically to the warrant or at least accompanies the warrant while agents execute the search.'" *Id.* (quoting United States v. Kow, 58 F.3d 423, 429 fn. 3 (9th Cir. 1995)). Notwithstanding the fact that the issued orders are not warrants and the relevant redacted documents do not contain "suitable words of reference," the government may still argue that the relevant redacted documents are part of the issued orders and act to cure certain defects. If the government relies on the relevant redacted documents while making arguments claiming that the unidentified FBI technical agents/personnel acted in good faith while conducting illegal searches and seizures, or while making arguments that the relevant redacted documents cure defects in the orders relating to scope and particularity, the defendant will need to analyze the redacted text for relevance.

**3. Why the government is obligated to provide the evidence being requested. *[RE: unredacted order applications and attachments]***

The government is required to disclose unredacted copies of the N.D.Cal. order applications and attachments so that the defendant may have access to all papers related to the issuance and execution of the orders. In the warrant context, the Fourth Amendment implies that the right to contest a search and seizure necessarily requires that the target have access to all papers related to the issuance and execution of the warrant. *See, e.g.*, Times Mirror Co. v. United States, 873 F.2d 1210, 1220 (9th Cir. 1989) ("By requiring that all materials related to a warrant be assembled and lodged with the clerk of the district court, Rule 41(g) [(now Rule 41(i))] ensures that the materials will be in one location and in the

- 45 -

custody of the clerk of the district court **at the time that a suppression motion... is made**." (emphasis added)). A defendant's right to access warrant application documents implicitly extends to unredacted versions of the documents if the redacted text is relevant and helpful to the defense. In the context of applying the statutory text of 18 U.S.C. § 2518(9) (relevant to wiretaps), the Ninth Circuit found that "a defendant does not have a right to redacted portions of a wiretap application if the government is able (and willing) to defend the warrant without relying on the redacted information[ (thus making the redactions irrelevant)]" but then declined "to determine whether the government can redact information when that information is essential to the validity of the warrant." United States v. Forrester, 592 F.3d 972, 984-85 (9th Cir. 2009) (citing United States v. Danovaro, 877 F.2d 583, 588 (7th Cir. 1989)).

**C. All response materials, returns, and seized/collected evidence relating to the N.D.Cal. 08-90330MISC-RS order obtained to facilitate locating the aircard, *e.g.*, real-time location data. *[Section I(C) of Submission Pursuant To LRCiv 37.1]***

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. *[RE: real-time aircard location data, etc.]***

**a. The FBI technical agents/personnel located the aircard precisely inside the confines of apartment No. 1122. *[Stipulation No. 21][Stipulation Nos. 1, 2 and 4 integrated]***

The primary case agents offer conflicting opinions on how precisely the FBI technical agents/personnel located the aircard inside apartment No. 1122.[106] These opinions range from precisely inside apartment No. 1122, to three apartments, and to four apartments. Taking, for example, the government's claim of a three apartment scenario, it is a near impossibility that the equipment at issue located the aircard within an area covering apartment Nos. 1120, 1122 and 1124. If one considers the architecture of the Domicilio apartment complex and the relevant science, it is clear that the government's claim is inaccurate and untruthful. Such a relatively broad precision claim on the *Y* axis (approximately *71.9 ft*) raises serious doubts considering the government also claims to have eliminated apartment Nos. 1119, 1121, 1123 and 1125 (located approximately ***8 ft*** across the

106. *See* Section V(E), *supra*.

- 46 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

hall) and apartment Nos. 1220, 1222, 1224 and 1226 (located ***9 ft*** above the ground floor of the first story apartments).[107] The technology at issue does not produce such large variations in accuracy across the various reference planes and especially not in a manner that essentially draws out a very convenient cube encompassing a three apartment area so discriminate to eliminate the other apartments that are in extreme close proximity along the *X* and *Z* axis.[108]

Public information regarding the Harris line of wireless device locators indicates that the Harris products allow for locating wireless devices inside buildings[109] with precision accurate to a singe room.[110][111] Additionally, a Harris corporation patent relating to wireless device locating technology states that a test[112] using **only one** geolocation technique (*i.e.*, time-of-flight (TOF)) produced a **20 *ft*** worst case error location calculation:

> It was determined from the test results that... the ranges to several 802.11b target devices at varying distances were estimated... and the worst case error for the estimated range was never more than 20 ft.

---

107. *See id.*

108. The defendant's mobile telecommunications expert will testify that the government's claim of a three or four apartment scenario is extremely unlikely.

109. *See* Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed Mar. 9, 2011) (A **Harris employee** claims that the KingFish can be used "inside a multi-story building, or outside in rough terrain[.]"); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 22 (Dkt. #536).

110. *See* FBI Response to EFF FOIA Request Nos. 1056287-000 & 1056307-1, p. 41 (Aug. 27, 2007), *available at* http://www.eff.org/files/filenode/061708CKK/082707_dcs01.pdf (EFF PDF Set 1 of 6) (last accessed Jan. 11, 2011) (The FBI indicated that it has equipment allowing agents "to find phones hidden in an office building and a hotel..."); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 06 of EXHIBIT 34 (Dkt. #536).

111. *See* Lapin, *How To Get Anything On Anybody – Book 3*, p. 123 (Harris products are able to "track a cellular user to an area the size of a hotel room.").

112. Although the noted test was performed on an 802.11b device (operating approximately at the 2400mhz band), CDMA devices operated at bands just below 802.11b devices ranging from 450mhz to 2000mhz—a minuscule difference when considering the entire electromagnetic spectrum and relevant geolocation techniques. *See* Telecommunications Industry Association, TIA-2000.2-C-1[E], *Physical Layer Standard for cdma2000 Spread Spectrum Systems – Addendum 1*, (Arlington, VA: Jun., 2005), § 2.1.1.1, p. 2.1 ("Channel Spacing and Designation").

- 47 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

Billhartz, Thomas Jay (Melbourne, FL, US) *et al.*, Harris Corp., U.S. Patent No. 7,321,777 (Jan. 22, 2008), *available at* http://www.freepatentsonline.com/7321777.html (last accessed Feb. 16, 2011), p. 8 ln. 57-63.

The Harris StingRay and KingFish use numerous geolocation techniques (*e.g.*, time-of-flight, power-distance, angle of arrival, *etc.*) and then combine all the results using data fusion so that the location calculation is even more exacting.[113] By using data fusion, different families of measurements, and even measurements within families, can be combined in a weighted sense to arrive at an optimized wireless device location calculation.[114] There is a very strong showing that the FBI technical agents/personnel located the aircard precisely inside apartment No. 1122 and then simply communicated a less accurate location calculation[115] (albeit unintelligently and without due consideration of the relevant science) so that the prosecution would be protected from possible Fourth Amendment challenges.

**b. After initially locating the aircard within apartment No. 1122, the government used its portable/transportable wireless device locator to verify the aircard location.** ***[Stipulation No. 22][Stipulation Nos. 1, 2 and 4 integrated]***

As indicated in Section V(G), *supra*, FBI Agent Murray informed AUSA Battista of his plan to have the aircard location verified on July 25, 2008 or July 28, 2008. The LAESP messages show activity on numerous dates after July 16, 2008 including the two dates referenced above.[116] FBI Agent Murray also attempted to obtain additional aircard location

---

113. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 13 ln. 50-59 (addressing the technology integrated into the StingRay and KingFish); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Section II(D)(4), p. 20 (linking the StingRay datasheet to U.S. Patent No. 7,592,956) (Dkt. #536).

114. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 14 ln. 34-39.

115. This is the "hand off" procedure as understood in the Ninth Circuit. *See* Section V(F) and VI, *supra*; *see also Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 8 ("Using the law enforcement sensitive equipment, the FBI personnel were able to determine that the subject aircard was operating within an area the size of three to four apartments within the Domicilio Apartment Complex.... The FBI personnel only advised the investigation team of the area noted immediately above.") (Dkt. #465).

116. *See id.*; *see also* EXHIBIT 06 of *1st Consolidated Exhibits* (raw LAESP messages sent to the SF-Martinez DCS-3000 server by Verizon Wireless IAPs).

information from Verizon Wireless under the authority of a court order that was already effectively returned and void.[117] Given FBI Agent Murray's strong desire to verify the aircard location inside apartment No. 1122, and the LAESP messages showing additional activity on July 25, 2008, July 28, 2008, and on other dates, there is a strong showing that the location of the aircard was verified after July 16, 2008.

**c. The destroyed real-time aircard location data included data in the form generated by Harris products and nonpublic information used for aircard signal and data encryption, encoding, scrambling, spreading, and routing.** ***[Stipulation Nos. 23-25][Stipulation Nos. 1-2, 4, 26 and 30-42 integrated]***

There is a strong showing that the data destroyed by the government consisted of real-time aircard location data as described in Stipulation Nos. 23 and 24. Publicly available information indicates that the Harris line of wireless device locators generate the geolocation data described in the noted stipulations.[118][119][120][121] If the government used a StingRay, as used in this case, or other Harris portable/transportable wireless device

---

117. *See* Section IV(C) and fn. 6, *supra*.

118. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (Indicating that the StingRay "geolocation software overlays target tracks and tracking vehicle location on a digital map[.]"); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 27 (Dkt. #536).

119. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (Indicating that while using the AmberJack direction finding antenna, "information on the direction to the target is dynamically updated for display on the PC."); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 02 of EXHIBIT 27 (Dkt. #536).

120 *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed Mar. 9, 2011) ("Geolocation provides a user-friendly, geospatially accurate mapping routine which shows on-screen the exact location of the tracking vehicle, plus Direction of Arrival (DOA) information and/or estimated range/location information on the targeted phone."); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 28 (Dkt. #536).

121. *See* McPherson (Harris), U.S. Patent No. 7,592,956 (explaining various types of 3D geolocation data that may be generated by wireless device locators); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Section II(D)(4), p. 20 (linking the StingRay datasheet to U.S. Patent No. 7,592,956) (Dkt. #536).

- 49 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

locator then the noted geolocation data would have been generated. There is also a strong showing that the data destroyed by the government consisted of nonpublic information relating to registration authentication routines and aircard signal and data encryption, encoding, scrambling, and spreading as described in Stipulation Nos. 25 and 26. Technical standards addressing cdma2000 technology explain that the noted nonpublic keys, codes, masks, and data are used by wireless devices and cell sites while communicating via the CDMA protocol. *See* Section VI(D)(1)(a), *infra* (providing further information on the relevant nonpublic information). If the FBI technical agents/personnel used passive eavesdropping and/or cell site emulation then they would need the noted nonpublic information in order to circumvent security and interact with the aircard.

**2. Why the requested evidence is relevant and helpful to the defense. *[RE: real-time aircard location data]***

The requested real-time aircard location data and other additional data is relevant and helpful to the defendant's *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence*. The relevancy of the requested evidence relates to (1) proving that the FBI technical agents/personnel located the aircard precisely inside apartment No. 1122, (2) proving that the FBI technical agents/personnel verified the aircard location after it was initially located, and (3) learning exactly what the data consists of so that relevancy to other issues can be determined, *e.g.*, proving that the government used triangulation, sent radio waves to the aircard, wrote data to the aircard, and exerted dominion and control over the aircard and host laptop computer in general. Without the requested evidence, or an adequate substitution, the defendant may not be able to effectively prove certain Fourth Amendment violations.

**a. Relevancy of the requested evidence with respect to proving that the FBI technical agents/personnel located the aircard precisely inside the confines of apartment No. 1122. *[RE: real-time aircard location data, etc.]***

The discovery provided to the defendant thus far only accounts for the government

- 50 -

locating the aircard to an area covering approximately *6,412,224 ft²*.[122] The disclosed evidence in no way explains how the government's portable/transportable wireless device locator and related equipment located the aircard precisely inside apartment No. 1122 (approximately *489 ft²*) or even to an area covering apartment No. 1120, 1122, and 1124 as claimed by the government. Notwithstanding the fact that using a StingRay to locate the aircard to an area covering apartment Nos. 1120, 1122, and 1124 amounts to an unreasonable Fourth Amendment search and seizure as well,[123] if the government located the aircard precisely inside apartment No. 1122 then the defendant will be able to more effectively prove that an unreasonable search occurred. The government is already relying on a three to four apartment precision claim to insulate itself from the defendant's Fourth Amendment challenges. The government's argument with respect to illegal searches and seizures is that "[e]ven if defendant were to obtain the detailed information he seeks, however, it could not lead to suppression of any evidence... [because] the electronic surveillance techniques only led the investigative team to the general proximity of the subject aircard... [and] defendant had no expectation of privacy with respect to the general proximity of the aircard..."[124] If the defendant is given the real-time aircard location data then this will allow his mobile telecommunications expert to analyze the data and show that the FBI technical agents/personnel located the aircard precisely inside apartment No. 1122. By testing the validity of the claimed location result, the government's argument relating to a broader search will be rendered a non-issue and increase the effectiveness of the defendant's *Motion To Suppress*.

---

122. *See* Section V(C), *supra*.

123. Although there are Fourth Amendment violations under either a "one apartment" scenario or "three apartment" scenario, the arguments will be different as the Fourth Amendment violations are factually different.

124. *Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 14 (Dkt. #465).

**b. Relevancy of the requested evidence with respect to proving that after initially locating the aircard within apartment No. 1122, the government used its portable/transportable wireless device locator to verify the aircard location. *[RE: real-time aircard location data, etc.]***

If the government can somehow prove that the **initial** electronic search for the aircard inside apartment No. 1122 was legal then the defendant can argue that verifying the aircard location at a later time was a subsequent illegal search. In *Karo*, while addressing an entirely different and much more primitive electronic search, the Supreme Court found that "[e]ven if visual surveillance has revealed that the article to which the beeper is attached has entered the house, the later monitoring not only verifies the officers' observations but also establishes that the article remains on the premises." United States v. Karo, 468 U.S. 705, 715 (1984). In the present case, assuming the government successfully proves a three apartment scenario, and assuming the government successfully argues that locating the aircard to three apartments is not a Fourth Amendment violation, it would be a subsequent electronic search precisely targeted at apartment No. 1122 if (1) the government later electronically verified the aircard location (using a StingRay, *etc.*), and (2) the later verification came **after** the use of inferences to conclude that the aircard was located precisely inside apartment No. 1122. Such a targeted search designed to establish that the aircard remains on the premises would provide the defendant grounds to argue a Fourth Amendment violation based off of the reasoning in *Karo*. The date/time frames noted in Stipulation No. 22 relate primarily to dates/times prior to and between warrant application dates for warrants obtained to physically search apartment No. 1122. *See* Karo, 468 U.S. at 715 (Finding the verification of a beeper location a search because "the beeper was monitored for a significant period after the [][initial electronic search] and before the application for a warrant to [physically] search."). By analyzing the date/time stamps of the real-time aircard location data, the defendant's mobile telecommunications expert will be able to determine when the aircard was located and when its location was later verified.

- 52 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

**c. Relevancy of the requested evidence with respect to knowing exactly what the real-time aircard location data and additional data consisted of. *[RE: real-time aircard location data, etc.]***

Stipulation Nos. 23-25 are effectively a list of the relevant evidence the government likely destroyed. The defendant needs to know exactly what the destroyed evidence consisted of so that he can identify data that can be used as evidence in support of various related Fourth Amendment arguments. For example, if the data contains A-Keys and Shared Secret Data (SSD) then it would be reasonable to conclude that the government was cracking encoding, encryption and authorization procedures for aircard signals that act to protect the privacy of those signals.[125] If the data contains time-of-flight, power-distance, and angle of arrival measurements then it would be reasonable to conclude that the government utilized the respective geolocation techniques that are elements of triangulation.[126] If the additional data consisted of nonpublic keys, codes, masks, and data used during registration authentication routines and for aircard signal and data encryption, encoding, scrambling, spreading, and routing then this would indicate use of a cell site emulator, forced registration, and interrogation techniques.[127] The digital/computerized street maps and/or satellite imagery maps with an overlay of GPS points and tracks for the portable/transportable platform used to move the government's equipment while locating the aircard would offer evidence relating to use of a helicopter over apartment No. 1122 and/or a man-on-foot within the Domicilio apartment complex.[128] Determining relevancy of the real-time aircard location data and other additional data is important in the context of the defendant's *Motion To Dismiss For Destruction Of Evidence* considering there will be grounds for dismissal if relevant and helpful evidence was destroyed in bad faith.

**3. Why the government is obligated to provide the evidence being requested. *[RE: real-time aircard location data]***

Notwithstanding the fact that the government is claiming a privilege, the real-time

125. *See* Section VI(D)(2)(a), *infra* (discussing relevant arguments).

126. *See* Section VI(D)(2)(g), *infra* (discussing relevant arguments).

127. *See* Section VI(D)(2)(e) and (f), *infra* (discussing relevant arguments).

128. *See* Section VI(A)(3)(a)(i) and (ii), *supra* (discussing relevant arguments).

aircard location data and other additional data is evidence of a type that is typically disclosed in other cases. In *Van Horn*, the appellants were allowed to examine audio recordings created by a law enforcement sensitive microphone. *See* United States v. Van Horn, 789 F.2d 1492, 1507 (11th Cir. 1986).[129] The real-time aircard location data in the present case is the equivalent of the microphone recordings in *Van Horn*. Furthermore, in the wiretap context, the Supreme Court in *Alderman* required electronic surveillance records to be turned over to the defendant to further his ability to demonstrate that portions of the government's case were derived from the unlawful electronic surveillance. *See* Alderman v. United States, 394 U.S. 165, 181-82 (1969); *see also* United States v. Dioguardi, 248 F.2d 1033, 1038 (2nd Cir. 1970) (The court "place[d] the Government on the clearest possible notice of... the great desirability of making the program and other materials needed for cross-examination of computer witnesses... available to the defense..."). With respect to location data obtained specifically via the StingRay, in a previous case the government admitted into evidence various documents (shown on slides during a hearing) representing a defendant's cell phone location data obtained via call detail records, a test phone, and the Harris StingRay. *See* United States v. Allums, No. 2:08-CR-30 TS, District of Utah, Dkt. #128, p. 36-40; *see also* *Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501).

129. In *Van Horn*, the Eleventh Circuit addressed a law enforcement privilege and analyzed the district court's decision to "not allow the appellants to discover either the type of microphone used... or where the microphone was hidden." *Id.*

- 54 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

**D. All evidence relating to the real-time and historical geolocation techniques (*e.g.*, triangulation techniques) and radio wave collection methods (*e.g.*, cell site emulation, interrogation, active approach) used by the government agents/personnel and by the wireless device locators while searching for the aircard. *[Section I(D) of Submission Pursuant To LRCiv 37.1]***

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. *[RE: geolocation techniques and radio wave collection methods]***

**a. The government obtained specific nonpublic keys, codes, masks, and data from Verizon Wireless used for aircard signal and data encryption, encoding, scrambling, spreading, and routing. *[Stipulation No. 26][Stipulation Nos. 1-2, 4, 25 and 30-46 integrated]***

The prosecution is withholding what it refers to as aircard "subscriber information" based on a claim of law enforcement sensitive privilege and based on a claim under the Classified Information Procedures Acts (CIPA), codified at 18 U.S.C. app. III § *et seq.*[130] The noted aircard "subscriber information" is different from the previously disclosed aircard subscriber information obtained via the two D.Ariz Grand Jury subpoenas.[131] The only possible additional aircard "subscriber information" is the nonpublic keys, codes, masks, and data as described in Stipulation Nos. 25 and 26. Technical standards addressing cdma2000 technology explain that nonpublic keys, codes, masks, and data are used by wireless devices and cell sites during registration authentication routines and for signal and data encryption, encoding, scrambling, spreading, and routing on various OSI network layers.[132] In order to

130. *See* EXHIBIT 51 of *1st Consolidated Exhibits* (Explaining that a folder containing communications between the FBI and Verizon Wireless consists of "copies of the target number subscriber information Verizon provided pursuant to the Court Order. This information is proprietary information and law enforcement sensitive, and will not be released.... Additionally, some of the information that may be responsive is classified, and therefore, cannot be produced absent a CIPA proceeding.").

131. *See* Section IV(A), *supra* (the government provided the defendant some aircard subscriber information that is not considered law enforcement sensitive).

132. *See, e.g.*, Telecommunications Industry Association, ANSI/TIA-2000.5-D-1, *Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems*, (Arlington, VA: Sep., 2007), § 1.1.1, p. 1.11 (Explaining Long Code: "A PN sequence with period 2^42 - 1 that is used for scrambling on the Forward CDMA Channel and spreading on the Reverse CDMA Channel."); *id.*, § 1.1.1 (p. 1.2) (Explaining A-key: "A secret, 64-bit pattern stored in the mobile station and HLR/AC. It is used to generate/update the mobile station's Shared Secret Data."); *id.*, § 1.1.1 (p. 1.23) (Explaining Shared Secret Data (SSD): "A 128-bit pattern stored in the mobile station (in semi-permanent memory) and known by the base

configure a portable/transportable wireless device locator to successfully operate as an emulated cell site and perform other radio wave collection methods and geolocation measurement techniques as explained in Stipulation Nos. 30-35 and 42 (forced registration, aircard emulation, interrogation, *etc.*) and in Stipulation Nos. 36-41 (time-of-flight, power-distance, angle of arrival, *etc.*), the government would need to comply with the relevant published technical standards. For example, the government's emulated cell site would need the aircard's Shared Secret Data (SSD) in order for it to authenticate itself to the aircard as an authorized cellular network.[133] Additionally, use of passive eavesdropping[134] to collect radio waves for conducting geolocation measurements would also require that the government have access to nonpublic keys, codes, masks, and data used to protect the privacy of aircard signals from passive attacks.

**b. The government placed surreptitious phone calls to the aircard and used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages showing aircard real-time cell site sector location information.** ***[Stipulation Nos. 27-29][Stipulation Nos. 1-3 and 46 integrated]***

The facts section of this memorandum cites evidence explaining how the government placed surreptitious phone calls to the aircard without having the aircard ring. *See* Section V(D), *supra* (citing supporting evidence). The facts section also cites evidence explaining how the government used the SF-Martinez DC-3000 server (Pen/Trap device) to receive LAESP messages showing the aircard's cell site sector location information in real-time: sector No. 3, Verizon Wireless cell site No. 5, having a latitude of 37.369733 and longitude of -121.923442 with a cell site street address of 2001 Gateway Place, San Jose, CA 95110. *See id.* The definition for DCS-3000 explains how the SF-Martinez DC-3000 server is a pen

station. SSD is a concatenation of two 64-bit subsets: SSD_A, which is used to support the authentication procedures, and SSD_B, which serves as one of the inputs to the process generating the encryption mask and private long code."); *id.*, § 2.3.12.2 (p. 2-20) (Explaining signaling message encryption: "In an effort to enhance the authentication process and to protect sensitive subscriber information (such as PINs), a method is provided to encrypt certain fields of selected f-dsch or r-dsch signaling messages.").

133. *See id.*

134. *See* Section VI(D)(1)(c), *infra*.

register and trap and trace device. *See id.* and fn. 46 and 47, *supra*. The SF-Martinez DCS-3000 server was the Pen/Trap device responsible for receiving the LAESP messages considering it is specifically listed in the CDNRS files provided by the government. *See id.*

**c. The government passively eavesdropped air interface signals being exchanged between the aircard and Verizon Wireless cell sites *[Stipulation No. 30][Stipulation Nos. 1, 2, 4, 26 and 46 integrated]***

There is a possibility that the government used passive eavesdropping in **addition** to active interrogation in order to locate the aircard. The government previously claimed that "the FBI personnel tracked the defendant's aircard transmissions made over public airwaves, using equipment tuned to the same frequency as the aircard. Therefore, defendant could not have had a reasonable expectation of privacy over the radio emanations from his aircard."[135] The government then cited various cases addressing situations where passive eavesdropping was used. Additionally, datasheets for Harris products and other publicly available information indicate that Harris wireless device locators may operate passively.[136]

**d. The government instructed Verizon Wireless to send the aircard OTASP messages to facilitate the StingRay emulating a Verizon Wireless cell site. *[Stipulation No. 31][Stipulation Nos. 1, 2, 4, 9, 26, 32 and 46 integrated]***

Technical standards addressing cdma2000 technology explain that in order for a wireless device to connect to authorized cellular networks for service, certain data needs to be written to the device hardware so that authorized networks are recognized and unauthorized networks are ignored. In order for the aircard to recognize and access the government's emulated Verizon Wireless cell site as an authorized cellular network, Verizon Wireless would need to write data to the aircard hardware by sending OTASP messages

---

135. *Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 18 (Dkt. #465).

136 *See, e.g.*, Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34771.pdf (last accessed Mar. 9, 2011) (KingFish datasheet indicating that "[p]assive operations identify calling patterns and provide information on the suspect's area of operation."); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 02 of EXHIBIT 28 (Dkt. #536).

- 57 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

accomplishing the following: (1) disabling the service programming lock for the aircard programming module containing Number Assignment Module (NAM) indicators,[137] (2) modifying the System Selection for Preferred Roaming (SSPR) so that the aircard would connect to the government's emulated cell site as the preferred cellular system over Verizon Wireless,[138] (3) modifying the aircard preferred roaming list to include the government's emulated cell site as an available cellular system/network,[139] (4) creating an acquisition record and system record in the aircard containing parameters so that the aircard can acquire the cellular system created by the government's emulated cell site,[140] (5) setting the "System identification" (SID) acquisition record field to the SID of the government's emulated cell site,[141] (6) setting the "Network identification" (NID) acquisition record field to the NID of the government's emulated cell site,[142] (7) setting the "Relative priority

---

137. *See* ANSI/TIA-683-D-2005, § 3.3.6, p. 3.42 ("Access to the mobile station programming module containing NAM indicators and parameters (see 4.5.2, 4.5.3 and 4.5.4) that can be assigned values using Over-the-Air Service Provisioning is protected by the service programming lock. The service programming lock parameter contains the Service Programming Code (SPC) used for unlocking the mobile station parameters for programming or reprogramming. The service programming lock based on a single SPC protects parameters of all NAMs in the mobile station.").

138. *See* ANSI/TIA-683-D-2005, § 3.3.5, p. 3.42 ("The goal of System Selection for Preferred Roaming (SSPR) is for the mobile station to acquire the most preferred system using the information from the preferred roaming list (PR_LISTs-p) stored in the mobile station (see 3.5.5)....").

139. *See* ANSI/TIA-683-D-2005, § 3.5.5, p. 3.93 ("The preferred roaming list (PR_LISTs-p) contains information to assist the mobile station system selection and acquisition process, particularly when the mobile station is roaming. The preferred roaming list can be sent to the mobile station using Over-the-Air Service Provisioning (OTASP). The preferred roaming list is retained by the mobile station when power is turned off. Two categories of the preferred roaming list are defined: The Preferred Roaming List and the Extended Preferred Roaming List.").

140. *See* ANSI/TIA-683-D-2005, § 3.5.5.2, p. 3.98 ("An acquisition record contains parameters that the mobile station can use to acquire a system. Each type of acquisition record is tailored for use in acquiring a particular kind of system. Two categories of acquisition records are defined; Acquisition Records and Extended Acquisition Records. Table 3.5.5.2-1 defines the types of Acquisition Records....); *id.*, § 3.5.5.3 (p. 3.112) ("A system record contains parameters that the mobile station can use for identifying an acquired system, for determining whether an acquired system is the optimal system on which to operate and for determining the mobile station's roaming status. Two categories of system records are defined: System Records and Extended System Records.....").

141. *See* ANSI/TIA-683-D-2005, § 3.5.5.3.1, p. 3.113 (SID - System identification: "This field is set to the SID of the system associated with this record....").

142. *See id.* (NID - Network identification: "this record is equal to '01', this field is

- 58 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

indicator" (PRI) acquisition record field so that the government's emulated cell site will have the highest priority and be the first cellular system that the aircard attempts to access for service,[143] (8) modifying the Preferred User Zone List so that the most preferred User Zone is the User Zone belonging to the government's emulated cell site,[144] (9) setting the "User Zone priority" Preferred User Zone List field to the User Zone of the government's emulated cell site,[145] (10) setting the "User Zone ID" Preferred User Zone List field to the User Zone ID of the government's emulated cell site,[146] and (11) setting the "User Zone System ID" Preferred User Zone List field to the User Zone SID of the government's emulated cell site.[147] In order for the aircard to recognize and connect to the government's emulated cell site instead of a Verizon Wireless cell site, the aircard hardware would need to be configured, as explained above, by OTASP messages sent to the aircard via radio signals on the air interface. The facts section of this memorandum cites evidence explaining how OTASP messages were sent to the aircard in order to facilitate use of the StingRay. *See* Section V(D), *supra* (citing supporting evidence); *see also Submission Pursuant To LRCiv 37.1*, p. 11 (the government directed the defendant to make a request to Verizon Wireless for evidence relating to the OTASP messages sent to the aircard).

---

included and is set to the NID of the network associated with this record;...").

143 *See* ANSI/TIA-683-D-2005, § 3.5.5.3.1, p. 3.114 (PRI - Relative priority indicator: "... If the system associated with this system record is more desirable than the system associated with the next system record, this field is set to '1'....").

144. *See* ANSI/TIA-683-D-2005, § 3.5.7, p. 3.127 ("The Preferred User Zone List provides the mobile station with the priority and characteristics of the User Zones to which the mobile station is subscribed. The PUZL is used after the mobile station has completed system acquisition using the PRL or other techniques. Once a mobile station has found its preferred system, the PUZL is used to select the most preferred User Zone on that system. It should be noted that PUZL could have up to 4095 User Zone entries. A User Zone entry includes all of the information associated with the definition of a single user zone that is uniquely identified by the combination of User Zone ID and User Zone SID.").

145. *See* ANSI/TIA-683-D-2005, § 3.5.7, p. 3.129 (User Zone priority: "The priority by which User Zones are selected by the mobile station when more than one User Zone is present....").

146. *See id.* (User Zone ID: "Identification number for the User Zone. This is used over the air interface to identify the User Zone to the network and the mobile station.").

147. *See id.* (User Zone System ID: "The System Identifier (SID) associated with the User Zone ID. The User Zone ID and User Zone SID values together provide a unique identifier for the user zone.").

- 59 -

**e. The government used cell site emulation, aircard emulation/ cloning, and forced registration in order to locate the aircard.** ***[Stipulation Nos. 32-34][Stipulation Nos. 1, 2, 4, 9, 26, 31 and 46 integrated]***

Sending location finding interrogation signals using a portable/transportable wireless device locator is dependent on a cell site (*i.e.*, base station) emulator and forced registration with optional wireless device cloning.[148] The Harris datasheet for the StingRay, a device used by the government in this case, states that the StingRay's "interrogation capability **emulates base station** to collect MINs and ESNs through forced registration."[149] Lee Lapin, former government surveillance advisor, also indicated in his book that various Harris wireless device locators emulate base stations and force wireless devices to register with the government's emulated cellular networks.[150] The USDOJ Electronic Surveillance Manual explains that "[a] cell site simulator, digital analyzer, or a triggerfish can electronically force a cellular telephone to register its mobile identification number [] and electronic serial number [] when the cellular telephone is turned on."[151] Additionally, there is a strong showing that the government emulated a cell site in this case considering there is little reason to send OTASP messages to the aircard[152] unless the government needed the aircard to recognize and connect to its emulated cell site. The purpose behind an emulated cell site is to force a wireless device to disconnect from an actual cellular network and register with the government's emulated cellular network. Once a wireless device is forced to register with

---

148. As an option, if the government wishes to not deny the wireless device actual cellular service being provided by the wireless carrier, it will emulate/clone the wireless device and act as a proxy between the actual cellular network and the actual wireless device, *i.e.*, a man-in-the-middle attack. In this way the portable/transportable wireless device locator can forward all communications content to/from the wireless device and the actual cellular network providing actual cellular service.

149. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (StingRay datasheet (emphasis added)); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 27 (Dkt. #536).

150. *See* Lapin, Lee, *How To Get Anything On Anybody – Book 3*, Intelligence Here (Mt. Shasta, CA: Jan. 15, 2003), p. 122-23.

151. U.S. Dep't of Justice, *Electronic Surveillance Manual*, Electronic Surveillance Unit, Office of Enforcement Operations, Criminal Division (Washington, DC: rev. June 2005), p. 40.

152. *See* Section VI(D)(1)(d), *supra*.

- 60 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

the emulated cellular network, the government's portable/transportable wireless device locator will begin to transmit interrogation signals to the wireless device in order to find its location. Considering interrogation is the most effective way to collect large amounts of location finding response signals,[153] there is no reason why the government would not use interrogation in this case and such use would **require** cell site emulation and forced registration.

**f. The government sent location finding interrogation signals to the aircard in order to determine its location. *[Stipulation No. 35][Stipulation Nos. 1, 2, 4, 26, 32, 36-41 and 46 integrated]***

Using a portable/transportable wireless device locator to send location finding interrogation signals to a wireless device is the most effective way to collect a large amount of location finding response signals that can be measured using geolocation measurement techniques. Sending OTASP messages to the aircard[154] is indicative of cell site emulation which is in turn indicative of transmitting location finding interrogation signals via a portable/transportable wireless device locator.[155] The only other option for collecting radio waves from a wireless device is to use passive eavesdropping but passive eavesdropping alone would likely not require the government to send the aircard OTASP messages. The Harris datasheet for the StingRay, a device used by the government in this case, contains a heading reading "Transmit Capabilities" with "For Interrogation and Active Tracking and Location" under the heading.[156] Numerous other publicly available documents indicate that the StingRay and other Harris products operate by transmitting interrogation signals.[157]

153. *See* Section VI(D)(1)(f), *infra*.

154. *See id.*

155. *See* Section VI(D)(1)(e), *supra*.

156. *See* United States Patent and Trademark Office, Trademark Reg. No. 2,762,468 [StingRay] (registered Sep. 9, 2003), *all associated documents available via search at* http://tmportal.uspto.gov/external/portal/tow (last accessed Mar. 11, 2011); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates Nos. 15-16 of EXHIBIT 13 (Dkt. #536).

157. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 7-27 (Dkt. #536).

- 61 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

The term "interrogation" in the geolocation context has its roots in radar beacon technology[158] dating back to World War II. A Harris patent teaches that, in the geolocation context, a portable/transportable wireless device locator utilizing interrogation "prompts the target wireless communications device to send reply signals using the location finding signals, rather than passively waiting until the target device begins transmitting. This allows for **quicker and more efficient device location**."[159] Another Harris patent teaches that the location finding signal "may comprise a signal that would routinely prompt a transmission reply from the wireless transmitter under the applicable communications standard. Once the wireless transmitter receives the signal from the location determining system, the wireless transmitter transmits a reply signal that is received by the platform."[160] A Harris portable/transportable wireless device locator operating to locate a CDMA wireless device (*e.g.*, the aircard) will exploit elements of the cdma2000 communications standards and relevant data exchanges to facilitate the sending of high level interrogation signals.

**g. The government used geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion on aircard signals in order to triangulate the aircard's location. *[Stipulation Nos. 36-41][Stipulation Nos. 1, 2, 4, 35 and 46 integrated]***

The government used time-of-flight,[161] power-distance,[162] angle of arrival,[163]

---

158. Kelly, Robert J. and Cusick, Danny R., *Advances in Electronics and Electron Physics, Volume 68*, ed. Hawkes, Peter W., "Distance Measuring Equipment and Its Evolving Role in Aviation," Academic Press, Inc. (Orlando, FL : 1986), p. 7 ("The process by which a radar transmits a signal suitable for triggering the beacon is known as interrogation; the corresponding beacon transmission is termed the reply. Radar beacons which reply to interrogations are called transponders and the radar set used to interrogate a beacon is called an interrogator.").

159. Billhartz (Harris), U.S. Patent No. 7,321,777, p. 2 ln. 67 and p. 3 ln. 1-5 (emphasis added). The Harris patent also references U.S. Patent No. 5,706,010 (bridging the technology reference gap between radar and geolocation for wireless devices).

160. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 4 ln. 43-48.

161. *See* Stipulation No. 36 for brief technical explanation of time-of-flight.

162. *See* Stipulation No. 37 for brief technical explanation of power-distance.

163. *See* Stipulation No. 38 for brief technical explanation of angle of arrival.

- 62 -

received signal measurements,[164] statistical functions,[165] and data fusion[166] to triangulate the location of the aircard considering these are the standard three dimensional (3D) (*i.e.*, latitude, longitude, and elevation)[167] geolocation measurement techniques used by Harris portable/transportable wireless device locators. The Harris datasheet for the StingRay, a device used by the government in this case, states that the StingRay uses "direction-finding and **ranging techniques**" to locate wireless devices.[168] The Harris datasheet for the AmberJack, an antenna designed for use with the StingRay, states that the AmberJack "is a phased array direction finding (DF) antenna system capable of tracking and locating mobile phone users[] [by d]etermin[ing] **direction of arrival** and **received signal strength** of [a] phone's transmission"[169] The Harris product datasheets indicate use of time-of-flight, power-distance, and angle of arrival while naming the geolocation measurement techniques using less technical terms.[170] Harris patents addressing portable/transportable wireless device locator technology go into detailed explanations of

164. *See* Stipulation No. 39 for brief technical explanation of received signal measurements.

165. *See* Stipulation No. 40 for brief technical explanation of statistical functions.

166. *See* Stipulation No. 41 for brief technical explanation of data fusion.

167. *See* Miami, FL, USA – Legislative Files, Harris Sole Source Vendor Letter, p. 1 (Nov. 29, 2006), *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34768.pdf (last accessed Mar. 9, 2011) (Indicating that the KingFish can be used "inside a multi-story building, or outside in rough terrain[.]"); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 22 (Dkt. #536).

168. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (StingRay datasheet); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 27 (Dkt. #536).

169. Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 2, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (AmberJack datasheet); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 02 of EXHIBIT 27 (Dkt. #536).

170. Time-of-flight = ranging techniques; Power-distance = received signal strength; Angle of arrival = direction of arrival;

time-of-flight,[171] power-distance,[172] angle of arrival,[173] received signal measurements,[174] statistical functions,[175] and data fusion[176] for taking 3D geolocation measurements relating to the location of a wireless device. If the unidentified FBI technical agents/personnel used a StingRay or other Harris portable/transportable wireless device locator while locating the aircard then the government utilized triangulation via the geolocation measurement techniques described in Stipulation Nos. 36-41.

In the context of geolocating wireless devices, the meaning of triangulation has evolved into a generically used term encompassing any number of radio signal measurements taken at two or more collection points (simultaneity is **not** required) where radio signals are received from a wireless device. Triangles, angles, and stationary measurement points (as are needed in traditional triangulation) are not necessary elements of radio signal triangulation.[177] Inventors of wireless device locating technology use the term "triangulation" to generically refer to any number of geolocation measurement techniques

---

171. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 7 ln. 57 ("Time of Flight Based Approach").

172. *See id.*, p. 9 ln. 38 ("Received Signal Strength Indication Based Approach" [power-distance]).

173. *See id.*, p. 11 ln. 1 ("Angle of Arrival Approach").

174. *See id.*, p. 5 ln. 57-64 (The portable/transportable wireless device locator "may estimate the location of the wireless transmitter based upon the range measurements, the angle of arrival measurements, and the received signal strength measurements weighted by the received signal measurements, for example, at least one of bit-error rate measurements, received signal strength measurements, receiver metrics, and signal-to-noise measurements.").

175. *See id.*; Billhartz (Harris), U.S. Patent No. 7,321,777, p. 2 ln. 67 and p. 3 ln. 1-5 ("By way of example, the controller may estimate the range based upon an average of the propagation delays, though other suitable statistical functions may also be used (e.g., mean, median, mode, etc.)." (claim note omitted)).

176. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 13 ln. 50 ("Data Fusion Across Measurement Families").

177. In contrast, "[i]n navigation, surveying, and civil engineering, triangulation is a technique for precise determination of a ship's or aircraft's position, and the direction of roads, tunnels, or other structures under construction. It is based on the laws of plane trigonometry, which state that, if one side and two angles of a triangle are known, the other two sides and angle can be readily calculated." Hosch, William L., ed., *The Britannica Guide to Algebra and Trigonometry*, Britannica Educational Publishing (New York, NY: 2011), p. 266-67.

- 64 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

used to locate wireless devices.[178][179] Bromhead *et al.*, inventor of Sub-Sector Timing Advance Positions Determinations, used the term "triangulate" in reference to using signal power levels and signal timing measurements as a way to locate a wireless device.[180] Hildebrand *et al.* (Harris), inventor of Geolocation Of Cellular Phone Using Supervisory Audio Tone..., explained "triangulation" as using two receivers to determine radio signal angle of arrival and time difference of arrival to locate a cellular device.[181] Recent technical texts and papers also use "triangulation" to refer to measurements of distance, time, signal power, and signal direction as described in Stipulation Nos. 36-38.[182][183] It should

---

178. Even pop-culture fiction novelist, Tom Clancy, entertains his readers with a generic triangulation concept in the geolocation sense. *See* Preisler, Jerome, *Tom Clancy's Power Play: Zero Hour*, Berkley Publishing Group (New York, NY: 2003) p. 239 ("Bottom-of-the-line [GPS] units lock on to three sats and provide a two-dimensional fix on position—latitude and longitude. The coordinates are arrived at by simple **triangulation**...the travel time of the satellite signals beamed to the receiver times the speed of light [(*i.e.*, **time-of-flight**)]." (emphasis added)).

179. Even in the traditional sense of the term, "triangulation" also sometimes adopts a broader generic meaning that encompasses "trilateration." *See* Morris, Christopher G., ed., *Academic Press Dictionary of Science and Technology*, Gulf Publishing Group (San Diego, CA: 1992), p. 2265 (Defining "**trilateration**" as "a method of land surveying that uses triangulation to measure the distance between a series of points on the earth's surface.").

180. *Se*e Bromhead, Nicholas (Thornbury, AU), *et al.*, U.S. Patent App. No. 20040203921 (Oct. 14, 2004), *available at* http://www.freepatentsonline.com/y2004/0203921.html (last accessed Sep. 29, 2010), p. 2 ("**Signal power** level or **signal timing** measurements between the mobile terminal and three or more base stations are used to **triangulate**." (emphasis added)).

181. *Se*e Hildebrand, Robert C. (Indialantic) *et al.*, Harris Corp., U.S. Patent No. 6,292,665 (Sep. 18, 2001), *available at* http://www.freepatentsonline.com/6292665.html (last accessed Feb. 16, 2011), p. 1 ln. 46-49 ("Other proposals include the use of a phased array antenna and a pair of receiver stations to determine **angle of arrival** and difference in **time of arrival** for **triangulation** purposes." (emphasis added)).

182. *See*, *e.g.*, Dwivedi, Himanshu *et al.*, *Mobile Application Security*, McGraw-Hill (USA 2010), p. 332 (Explaining "Tower **Triangulation**" as using the "relative **power levels** of radio signals between a cell phone and a cell tower of a known location..." (emphasis added)).

183. *See*, *e.g.*, Morris, John B., Jr., *The Privacy Implications of Commercial Location-Based Services*, Center For Democracy & Technology, Testimony, before the House Committee on Energy and Commerce, Subcommittee on Commerce, Trade, and Consumer Protection and Subcommittee on Communications, Technology, and the Internet, 111th Cong. (Feb. 24, 2010), *available at* http://republicans.energycommerce.house.gov/Media/file/Hearings/CTCP/2010-2-24-LBS/Morris.Testimony.pdf (last accessed Apr. 29, 2011), p. 4 ("[I]f two or three cell towers can detect a mobile device at the same time, the carrier can triangulate from the towers to determine the approximate location of the phone... [and] if needed, make calculations based on the **strength** and **direction** of a phone's signal..." (emphasis added)).

- 65 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

also be noted that the traditional triangulation requirement of needing two stationary measurement points can be written out of the geolocation triangulation equation by use of the "approach" radio signal collection method. In U.S. Patent No. 7,592,956, McPherson *et al.* (Harris) teaches that as a portable/transportable wireless device locator "moves relative to the wireless transmitter..., the location determining processor generates a series of range bearing equations [that]... may be solved to provide an estimated location of the wireless transmitter."[184] In providing further explanation, McPherson *et al.* also makes reference to figure No. 8, attached to the cited patent, showing a portable/transportable wireless device locator aboard an airplane taking three different range bearing measurements from three different positions in order to triangulate the location of a cellular phone. Figure No. 8 is attached as EXHIBIT 52 of *1st Consolidated Exhibits* (showing the triangulation procedure). *See also* Section VI(D)(1)(h), *infra* (further explaining the "approach" method).

**h. The government shifted the location of the StingRay and took geolocation measurement on aircard signals in multiple locations, *i.e.*, active approach, in order to determine the aircard's location. *[Stipulation No. 42][Stipulation Nos. 1, 2, 4, 35-41 and 46 integrated]***

Shifting the location of a portable/transportable wireless device locator while collecting location finding signals is the primary benefit of using a portable and/or transportable wireless device locator (*e.g.*, the StingRay) as apposed to a stationary wireless device locator (*e.g.*, a cell site with location finding hardware and software). The USDOJ Electronic Surveillance Manual explains that "[l]aw enforcement possesses electronic devices that allow agents to determine the location of certain cellular phones[, and b]y **shifting the location of the device**, the operator can determine the phone's location more precisely using **triangulation**."[185] There is no logical reason why the FBI technical agents/personnel would handicap themselves by using a portable/transportable wireless device locator in a stationary position. The Harris datasheet for the StingRay, a device used by the government in this case, states that the StingRay uses "active approach" to locate wireless

184. McPherson (Harris), U.S. Patent No. 7,592,956, p. 5 ln. 28-36 (claim note omitted); *see also* Section VI(D)(2)(h), *supra* (addressing "approach" specifically).

185. U.S. Dep't of Justice, *Electronic Surveillance Manual*, p. 45 (emphasis added).

- 66 -

devices.[186] A Harris patent teaches that a portable/transportable wireless device locator engaged in "approach" is fixed to a portable/transportable platform such as an airplane, helicopter, or car, so that it can collect geolocation measurements during movement relative to the wireless device being located,[187] *i.e.*, as it "approaches" the wireless device. "As the platform moves relative to the wireless transmitter, the accuracy of the location estimate improves if the trajectory of the platform: breaks symmetry with regards to the wireless transmitter, reduces ambiguity resolution, and minimizes geometric dilution of precision (GDOP)."[188] The Harris patent further teaches that "it may be preferable to encircle the approximate location of the wireless transmitter to provide more accurate results, *i.e.*, breaking the symmetry."[189] If the unidentified FBI technical agents/personnel used a StingRay, or other Harris portable/transportable wireless device locator, while locating the aircard then the government shifted the location of the device while taking geolocation measurements of aircard signals within the geographical area surrounding the aircard (as described in Stipulation No. 42).

**i. The government increased the transmission power of the aircard, caused an interruption in aircard service, and caused aircard service data transfer rates to fall below what would have otherwise been provided by Verizon Wireless. *[Stipulation Nos. 43-45][Stipulation Nos. 1-4, 26, 30-42 and 46 integrated]***

The cdma2000 technical standards indicate that the CDMA protocol depends upon power control of all wireless devices accessing service through the same cell site.[190] Cell

---

186. *See* Miami, FL, USA – Legislative Files, Harris Product Datasheets, p. 1, *available at* http://egov.ci.miami.fl.us/Legistarweb/Attachments/34769.pdf (last accessed Mar. 9, 2011) (StingRay datasheet); *see also Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, Bates No. 01 of EXHIBIT 27 (Dkt. #536).

187. *See* McPherson (Harris), U.S. Patent No. 7,592,956, p. 3 ln. 48-57.

188. *Id.*, p. 6 ln. 13-17 (claim note omitted).

189. *Id.*, p. 6 ln. 50-53 (claim note omitted).

190. *See* ANSI/TIA-2000.2-C-1[E], §§ 2.1.2.3, p. 2.46 ("The mobile station shall provide three independent means for output power adjustment: an open loop estimation performed by the mobile station, a closed loop correction involving both the mobile station and the base station, and, for Radio Configurations 3 through 6, a code channel attribute adjustment performed by the mobile station and the base station.") and 2.1.2.3.2, p. 2.56 ("...the mobile

sites set the transmit power of each wireless device to prevent one or more devices from overpowering signals from devices that may be further away from the cell site.[191] Power control involved in the CDMA protocol can be exploited by a cell site emulator to surreptitiously increase the quality of the location finding signals being transmitted by a target wireless device. By increasing the transmit power of a wireless device, the received signal measurements (as described in Stipulation No. 39) can be more effectively utilized for statistical function (as described in Stipulation No. 40) and data fusion (as described in Stipulation No. 41). By increasing the quality of the data used in the statistical functions and data fusion, the portable/transportable wireless device locator will be able to more efficiently and precisely locate a wireless device. There is no reason why the device(s) used by the FBI technical agents/personnel in this case would not exploit CDMA power control considering it is a simple way to increase the locating precision of a portable/transportable wireless device locator.

If the government's emulated cell site was not forwarding on the legitimate aircard signals to an actual Verizon Wireless cell site (as described in Stipulation No. 34) then the aircard would have been denied cellular service (*i.e.*, a denial-of-service attack) and would have been unable to access the Internet. Under this scenario, the government would have caused a major interruption in aircard service (as described in Stipulation No. 44). If the government's emulated cell site was forwarding legitimate aircard signals on to an actual Verizon Wireless cell site then the aircard would have suffered a decrease in Internet data transfer rates (as described in Stipulation No. 45) considering the emulated cell site, acting as a proxy for a man-in-the-middle attack, would have a "device latency time" acting to delay

station shall adjust its mean output power level in response to each valid power control bit (see 3.1.3.1.11) received on the Forward Fundamental Channel, the Forward Dedicated Control Channel, or the Common Power Control Channel.").

191. *See* Levine , R.C., (Richardson, TX, 1996-2000), p. 58 ("When multiple transmitters send signals with different PN codes to a common receiver, the RSSI of all the signals must be very close to equal, or the strongest one will dominate all the others and only it can be decoded without errors. This was a major problem which caused malfunctions of a trial CDMA system used in tests by the Groupe Spécial Mobile in 1986 in Paris. Qualcomm revived the idea of CDMA for cellular in 1989 with an improved closed- loop feedback power control to keep all the received signals from deviating in individual power levels.").

the forwarding of signals sent to/from the aircard and an actual Verizon Wireless cell site. Similarly, if the government was passively eavesdropping aircard signals that were being sent to/from the aircard and an actual Verizon Wireless cell site, this would cause a decrease in Internet data transfer rates (as described in Stipulation No. 45) considering the government's portable/transportable wireless device locator would be consuming some aircard signal power that would have otherwise been dedicated to the actual Verizon Wireless cell site providing service to the aircard.[192]

**2. Why the requested evidence is relevant and helpful to the defense. *[RE: geolocation techniques and radio wave collection methods]***

The requested evidence relating to geolocation techniques and radio wave collection methods used to locate the aircard is relevant and helpful to the defendant's *Motion To Suppress*. The relevancy relates to (1) proving that the government obtained certain nonpublic information related to aircard signal and data encryption, *etc.*, (2) proving that the StingRay and other portable/transportable wireless device locators are not Pen/Trap devices, (3) proving that the government used passive eavesdropping on the air interface to collect aircard signals without having received the signals directly from Verizon Wireless, (4) proving that the government wrote data to the aircard and used power from the host laptop computer, (5) proving that the government forced the aircard to disconnect from the Verizon Wireless cellular network and register with the government's emulated cell site, (6) proving that the government transmitted a signal through the walls of apartment No. 1122 to the aircard's receive antenna with said signal designed to routinely prompt a transmission reply, (7) proving that the government used geolocation measurement techniques that amount to triangulation, (8) proving that the government used its StingRay in multiple locations, (9) proving that the government increased transmission power for the aircard, interrupted aircard service, and denied the aircard service, and (10) proving other facts relevant to other Fourth Amendment issued discussed in other sections of this memorandum. Without the requested

192. The defendant's mobile telecommunications expert will testify that interference of this nature is likely.

evidence, or an adequate substitution, the defendant may not be able to effectively prove certain Fourth Amendment violations.

**a. Relevancy of the requested evidence with respect to proving that the government obtained from Verizon Wireless specific nonpublic keys, codes, masks, and data used for aircard signal and data encryption, encoding, scrambling, spreading, and routing. *[RE: geolocation techniques and radio wave collection methods]***

If the government obtained nonpublic keys, codes, masks, and data used for aircard signal and data encryption, encoding, scrambling, spreading, and routing then the defendant will have grounds to argue an unreasonable Fourth Amendment seizure. Evidence from this category in the possession of Verizon Wireless, such as Shared Secret Data (SSD), A-Keys, encryption keys, *etc.*, is information that society would expect to remain private and protected under the Fourth Amendment. There is a legitimate expectation of privacy in the noted nonpublic information considering it is used to prevent attackers from passively eavesdropping wireless device signals and used to prevent attackers from using emulated cell sites to take complete control over wireless devices and their service.[193] The Supreme Court previously found that a "legitimate expectation of privacy must have a source outside the Fourth Amendment," such as "understandings that are recognized or permitted by society." Rakas v. Illinois, 439 U.S. 128, 143 fn. 12 (1978). Society has an understanding that it is unlawful to intercept radio communications that are not readily accessible to the general public. *See* 18 U.S.C. §§ 2511(1)(g) and (i) (criminalizing the practice).[194] The term "readily accessible to the general public" means radio signals that are not "scrambled or encrypted[]" and not "transmitted using modulation techniques whose essential parameters have been withheld from the public with the intention of preserving the privacy of such communication[.]" 18 U.S.C. §§ 2510(16), (16)(A) and (B). There is a legitimate expectation of privacy in the nonpublic keys, codes, masks, and data at issue in this case considering they are used for scrambling, encrypting, and modulating CDMA radio signals

193. *See* Section VI(D)(1)(a), *supra*.

194. Title III of the Omnibus Crime Control and Safe Streets Act of 1968; Pub. L. No. 90-351, 82 Stat. 212 (1968) (codified at 18 U.S.C. §§ 2510-20).

- 70 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

so that those signals are not readily accessible to the general public and fall under the protections of 18 U.S.C. §§ 2510-20.[195]

The N.D.Cal. 08-90330MISC-RS order does not contain a finding of probable cause to seize the relevant nonpublic information.[196] In the order, Judge Seeborg found "that specific and articulable facts establish that there is reasonable grounds to believe that the requested information pertaining to the location of the [][aircard] is relevant and material to an ongoing criminal investigation" and later commands Verizon Wireless to provide "all information[]... needed to ascertain the physical location of the [][aircard]..."[197] In his *Motion To Suppress*, the defendant will argue (1) the order required a finding of probable cause to seize the relevant information from Verizon Wireless,[198] (2) the order did not authorize seizing the relevant information as it was not specifically listed,[199] and (3) the order lacked particularity with its use of the phrase "all information," making it impossible for the person conducting the search to reasonably identify the things authorized to be seized.[200]

Additionally, the defendant needs to be provided with the relevant nonpublic keys,

---

195. Looking to relevant statutes and regulations to determine a legitimate expectation of privacy is a practice previously used by the Supreme Court. *See* Riley, 488 U.S. 445 (1989) (analyzing FAA regulations to determine whether one has a reasonable expectation of privacy in curtilage viewed from a hovering helicopter).

196. The N.D.Cal. 08-90331MISC-RS order (used to obtain Pen/Trap data) does not even remotely apply to the government seizing the relevant nonpublic information. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

197. *See* Dkt. #470-1, p. 2-3 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

198. *See* United States v. Place, 462 U.S. 696, 701 (1983) ("In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized.").

199. *See* SDI Future Health, Inc., 568 F.3d at 704-05 (warrant authorizing seizure of internal company memorandums without specifying categories of memorandums was overbroad because internal communications cover wide subject matter).

200. *See* SDI Future Health, Inc., 568 F.3d at 702 ("Particularity is the requirement that the warrant must clearly state what is sought."); United States v. Mann, 389 F.3d 869, 877 (9th Cir. 2004) ("The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized.").

codes, masks, and data used for aircard signal and data encryption, encoding, scrambling, spreading, and routing so that he may determine which of the 27 cdma2000 air interface channels were being monitored by the government.[201] The government's argument seems to be that "there is no reasonable expectation of privacy in broadcasts an individual makes over the public airwaves which are knowingly exposed to everyone in the area by virtue of transmission, and can be overheard by anyone having a radio receiver tuned into the same channel."[202] By reverse engineering the relevant requested data, the defendant's mobile telecommunications expert will be able to determine which of the 27 cdma2000 channels the data relates and whether the channels being monitored by the government were publicly accessible (as claimed by the government) without use of the relevant nonpublic keys, codes, masks, and data. Such an analysis will show that the government's claims are false and render the government's argument a non-issue.

**b. Relevancy of the requested evidence with respect to proving that the government placed surreptitious phone calls to the aircard and used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages. *[RE: geolocation techniques and radio wave collection methods]***

The government is now referring to the StingRay as a "pen register trap trace device."[203] The defendant needs evidence relating to the government's use of the SF-Martinez DCS-3000 server (an actual Pen/Trap device) in order to differentiate between it and the government's portable/transportable wireless device locator (not a Pen/Trap device). By differentiating between the two types of surveillance equipment, the defendant will be able to show that the N.D.Cal. 08-90331MISC-RS order, authorizing use of a Pen/Trap device, did not authorize use of the StingRay. By proving that the N.D.Cal. 08-90331MISC-

201. *See* Section V(A)(1), *supra* (explaining how cdma2000 standards dictate 27 physical channels on the air interface and how CDMA signals are nearly impossible to intercept).

202. *Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 17 (Dkt. #465). The government went on to cite a series of cases that address analog cellular signals and unsecured WIFI—not the military grade encoded and encrypted spread spectrum CDMA communications protocol relevant in this case. *See id.*

203. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 30-31 (Dkt. #536).

RS order did not authorize use of the StingRay, the defendant will have further support for his argument that use of the StingRay was unauthorized and a violation of the Fourth Amendment requiring suppression. *See also* Section VI(F)(2)(b), *infra* (discussing further relevancy argument).

**c. Relevancy of the requested evidence with respect to proving that the government passively eavesdropped air interface signals being exchanged between the aircard and Verizon Wireless cell sites. *[RE: geolocation techniques and radio wave collection methods]***

If the government used a portable/transportable wireless device locator to passively eavesdrop air interface signals being exchanged between the aircard and Verizon Wireless cell sites then the defendant will have grounds to argue an unreasonable Fourth Amendment search. As previously explained,[204] signal encoding, encryption, scrambling and authorization routines act to maintain the privacy and security of CDMA signals. Passively eavesdropping air interface signals being exchanged between the aircard and Verizon Wireless cell sites would require the government to use nonpublic information to decrypt, decode and descramble the signals in order to identify them as belonging to the aircard. The government would effectively be "opening" the "sealed packaging" of the signals acting to keep the data and signaling information private. Under this reasoning, the defendant would be able to argue that a Fourth Amendment search occurred similar to the Fourth Amendment search discussed in *Ex Parte Jackson*.

In *Ex Parte* Jackson, the Supreme Court stated that "[n]o law of Congress can place in the hands of officials connected with the postal service any authority to invade the secrecy of letters and such sealed packages in the mail[.]" Ex Parte Jackson, 96 U.S. 727, 733 (1878); *see also* United States v. Jacobsen, 466 U.S. 109, 114 (1984) ("Letters and sealed packages are in the general class of effects in which the public at large has a reasonable expectation of privacy; warrantless searches of such effects are presumptively unreasonable."). There is a reasonable expectation of privacy in the aircard signaling messages that are "sealed" for transport considering they contain information communicating the location of the aircard and

204. *See* Section VI(D)(1)(a), *supra*.

- 73 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

aircard user[205] within a Fourth Amendment protected space, *i.e.*, apartment No. 1122. *See*, *e.g.*, Karo, 468 U.S. at 716 ("Indiscriminate monitoring of property that has been withdrawn from public view would present far too serious a threat to privacy interests in the home to escape entirely some sort of Fourth Amendment oversight."). Any claim of a "third party rule"[206] by the government with respect to passively eavesdropped signals is irrelevant in this context considering the aircard signaling data was being obtained by the government via its own equipment and not directly from Verizon Wireless, *i.e.*, a so-called "third party." Additionally, neither the N.D.Cal. 08-90330MISC-RS order nor the N.D.Cal. 08-90331MISC-RS order authorized the government to collect radio waves right out of the air using its own equipment and both orders were directed at Verizon Wireless.[207][208] In the N.D.Cal. 08-90331MISC-RS order, Judge Seeborg expressly required that all cell site information be "first captured and recorded by the provider before being sent to the Investigative Agency."[209]

**d. Relevancy of the requested evidence with respect to proving that the government instructed Verizon Wireless to send the aircard OTASP messages.** ***[RE: geolocation techniques and radio wave collection methods]***

If the government had Verizon Wireless send the aircard OTASP messages then the defendant will have grounds to argue an unreasonable Fourth Amendment seizure.[210] As

---

205. The aircard signaling messages at issue are used to perform geolocation measurement techniques (time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion) in order to calculate the location of the aircard. *See* Section VI(D)(1)(g), *supra*, and Stipulation Nos. 36-41 (briefly explaining the noted geolocation measurement techniques).

206. *See* SEC v. Jerry T. O'Brian, Inc., 467 U.S. 735, 743 (1984) ("[W]hen a person communicates information to a third party... he cannot object if the third party conveys that information or records thereof to law enforcement authorities"); Smith v. Maryland, 442 U.S. 735, 743-44 (1979) ("This Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties.")

207. *See* Dkt. #470-1 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

208. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

209. *Id.* (order), p. 4 and fn. 6.

210. Additionally, by reverse engineering the OTASP messages sent to the aircard, the

previously explained, sending the aircard OTASP messages will result in data being written to the aircard's hardware.[211] The government would need to use OTASP messages to surreptitiously write data to the aircard's hardware in order to force it to connect to the government's emulated cell site. Such government actions amount to an unreasonable Fourth Amendment seizure of the aircard and host laptop computer. *See* Jacobsen, 466 U.S. at 120 fn. 18 (1984) ("[T]he decision by government authorities to exert dominion and control over [][an item] for their own purposes clearly constitutes a 'seizure[.]'"). In the context of this category of evidence, the government exerted dominion and control over the aircard by (1) using the aircard's Number Assignment Module (NAM)[212] to store data without the consent of the owner, and (2) using the aircard's system resources to process the OTASP messages without the consent of the owner. The government's actions amount to an unreasonable seizure of the aircard considering writing data to the aircard takes up data storage space within the aircard hardware. *See* United States v. Garcia, 474 F.3d 994, 996 (7th Cir. 2007) (Finding that installation of a mobile tracking device on a car did not amount to a seizure because it "did not take up room that might otherwise have been occupied by passengers or packages..."). The government's actions amount to an unreasonable seizure of the host laptop computer considering the processing of OTASP messages by the aircard consumes electricity being fed to the aircard from the host laptop computer.[213]—electricity the government did not pay for. *See id.* (Finding that installation of a mobile tracking device on a car did not amount to a seizure because it "did not draw power from the car's engine or battery..."). Furthermore, considering the use of OTASP messages involves sending signals to the aircard and causing the aircard to send out response signals, similar Fourth

---

defendant's mobile telecommunications expert will be able to confirm that the government used a cell site emulator while searching for the aircard. *See* Section VI(D)(1)(d), *supra*. (explaining how OTASP would need to be used to force the aircard to recognize the government's emulated cell site as an authorized cellular network). Such confirmation will assist in proving Fourth Amendment violations with respect to using a cell site emulator, forced registration, aircard emulation/cloning, and location finding interrogation signals.

211. *See* Section VI(D)(1)(d), *supra*.

212. *See* fn. 39, *supra*.

213. *See* Section V(A)(1), *supra* (explaining how the aircard is dependent on the host laptop computer for power and other functions).

- 75 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

Amendment arguments would apply as discussed in Section VI(D)(2)(f), *supra* (addressing the government's use of location finding interrogation signals sent through the walls of apartment No. 1122 to the aircard).

Neither the N.D.Cal. 08-90330MISC-RS order nor the N.D.Cal. 08-90331MISC-RS order authorized the government or Verizon Wireless to write data to the aircard's hardware or steal electricity in order to facilitate its mission to search for and locate the aircard.[214] [215] Any reliance on the provision contained in the N.D.Cal. 08-90330MISC-RS order requiring Verizon Wireless to provide "all... technical assistance needed to ascertain the physical location of the [][aircard]..."[216] suffers from the same probable cause, scope, and particularity problems discussed in Section VI(D)(2)(a), *supra*. For a comparison with respect to scope and particularity, a cell site location information case addressed by Judge Stanley in the Southern District of West Virginia analyzed a court order that required the wireless carrier to provide the government with "all information, facilities, and technical assistance necessary to operate a pen register with a caller identification device and/or trap and trace device and cell site location authority on the subject cellphone, subject to the limitations of 18 U.S.C. § 3121(c), as the service provider may have available, to compare and report all call-identifying and cell site location information." In re Application of the United States, 415 F.Supp.2d 663 (S.D.W. Va.). Notwithstanding the fact that the quoted order lacked a probable cause finding to seize location information, it was still particular in what information it sought and gave objective standards to distinguish the information to be seized and assistance to be provided. "In determining whether a description is sufficiently precise, we have concentrated on [(among other parameters)]... whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not..." Mann, 389 F.3d at 878 (internal citations and quotation marks

214. *See* Dkt. #470-1 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

215. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

216. *See* Dkt. #470-1, p. 2-3 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

- 76 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

omitted).

**e. Relevancy of the requested evidence with respect to proving that the government used cell site emulation, aircard emulation/cloning, and forced registration. *[RE: geolocation techniques and radio wave collection methods]***

If the government used cell site emulation, forced registration, and/or aircard emulation/cloning then the defendant will have grounds to argue an unreasonable Fourth Amendment seizure. Even if no denial or interruption in service resulted, forcing the aircard to disconnect from an actual Verizon Wireless cell site and then forcing the aircard to register with the government's emulated cell site amounts to an unreasonable Fourth Amendment seizure of the aircard and host laptop computer. The use of a cell site emulator, forced registration, and/or aircard emulation/cloning results in additional proof of an unreasonable seizure considering (1) the aircard is no longer accessing the Verizon Wireless cellular network and is instead accessing the government's emulated cellular network, (2) the government is causing the aircard to transmit signals that it would not otherwise have been transmitting, (3) the aircard is being forced to receive signals that it would not otherwise have been receiving,[217] (4) the government is causing data to be written to the aircard hardware in the form of, *e.g.*, the emulated cell site pilot pseudo number (PN) offset sequence code, and (5) if aircard emulation/cloning is being used, the government is conducting a man-in-the-middle attack, if aircard emulation/cloning is not being used, the government is conducting a denial-of-service attack. Use of a cell site emulator, *etc.*, would provide further evidence in support of the government exerting dominion and control over the aircard and host laptop computer. *See* Section VI(2)(D)(d), *supra*, for further legal discussion.

Neither the N.D.Cal. 08-90331MISC-RS order nor the N.D.Cal. 08-90330MISC-RS order authorized use of a cell site emulator, forced registration, or aircard emulation/cloning.

---

217. Considering the government's emulated cell site has different characteristics and identifying information when compared to an actual Verizon Wireless cell site, the signals spanning all OSI network layers will differ depending on which cellular network the aircard is accessing. The defendant's mobile telecommunications expert will testify to this effect.

[218][219] In the N.D.Cal. 08-90331MISC-RS order, Judge Seeborg expressly required that all cell site information be "first captured and recorded by the provider before being sent to the Investigative Agency."[220] A cell site emulator receives aircard signals directly out of the air and not from Verizon Wireless. Additionally, use of a cell site emulator in conjunction with the "approach" method fits squarely in line with a common sense interpretation of Judge Seeborg's definition of "triangulation" contained in the N.D.Cal. 08-90331MISC-RS order (prohibiting the government from using triangulation). Use of a cell site emulator would be a factual element providing further support for the defendant's Fourth Amendment arguments discussed in Section VI(2)(D)(g), *supra* (addressing triangulation), and in Section VI(2)(D)(h), *supra* (addressing "approach").

**f. Relevancy of the requested evidence with respect to proving that the government sent location finding interrogation signals to the aircard in order to determine its location. *[RE: geolocation techniques and radio wave collection methods]***

If the government routinely transmitted a signal to the aircard's receive antenna with said signal designed to routinely prompt a transmission reply from the aircard's transmit antenna then the defendant will have grounds to argue an unreasonable Fourth Amendment search. Sending the aircard location finding interrogation signals while the aircard is located inside apartment No. 1122 will result in those location finding signals penetrating through the exterior walls of the apartment in order to reach the aircard. A search of this nature goes beyond that explained in *Kyllo* stating that when the government "obtain[s] by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion... [it] constitutes a search." Kyllo, 533 U.S. at 34. The dissent in *Kyllo* did not agree with the majority's reasoning that the monitoring of heat transmissions from the exterior of a home constitutes a search but still

218. *See* Dkt. #470-1 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

219. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

220. *Id.* (order), p. 4 and fn. 6.

- 78 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

disapproved of the use of warrantless "through-the-wall" surveillance. *Id.* at 36. If addressing the electronic search involved in this case, both the majority and dissent in *Kyllo* would find that the government's use of "through-the-wall" location finding interrogation signals implicates the Fourth Amendment.

Neither the N.D.Cal. 08-90331MISC-RS order nor the N.D.Cal. 08-90330MISC-RS order authorized the government or Verizon Wireless to use location finding interrogation signals as a substitute for a physical search of apartment No. 1122.[221][222] The N.D.Cal. 08-90330MISC-RS order commanded Verizon Wireless to "provide agents of the FBI data and information obtained from the **monitoring** of transmissions"[223] and nothing in the order authorized Verizon Wireless or the government to obtain data and information from the **sending** of transmissions to the aircard. Similarly, the N.D.Cal. 08-90331MISC-RS order authorized the government to "install, or cause to be installed, and use a pen register to record or decode dialing, routing, addressing, or signaling information **transmitted from** the [][aircard]" and to "install, or cause to be installed, and use a trap and trace device on the [] [aircard] to capture and record the **incoming** electronic or other impulses..."[224] with nothing authorizing the sending of transmissions to the aircard. Additionally, use of interrogation provides further support for the defendant's Fourth Amendment arguments considering neither order authorized Verizon Wireless or the government to initiate the aircard signal or cause the aircard to transmit signals that would not have otherwise been transmitted. *See* United States v. Forest, 355 F.3d 942, 951(6th Cir. 2004) (Rejecting application of the "third party rule" discussed in *Smith v. Maryland* considering while locating appellant the government "caused [][his] phone to send out signals.").

---

221. *See* Dkt. #470-1 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

222. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

223. *See* Dkt. #470-1, p. 2 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

224. *See* Dkt. #470-2, p. 2-3 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

- 79 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

**g. Relevancy of the requested evidence with respect to proving that the government used geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion on aircard signals in order to triangulate the aircard's location. *[RE: geolocation techniques and radio wave collection methods]***

If the government conducted triangulation to locate the aircard then the defendant has grounds to argue an unreasonable Fourth Amendment search. The geolocation measurement techniques described in Stipulation Nos. 36-41 are all elements of triangulation in the geolocation sense[225] and if the government used the techniques to locate the aircard inside apartment No. 1122 then it conducted an unreasonable search. Numerous courts have expressed privacy concerns over the government using triangulation to locate wireless devices within Fourth Amendment protected spaces. *See*, *e.g.*, U.S. Telecom Ass'n v. F.C.C., 227 F.3d 450, 464 (D.C. Cir. 2000) (In addressing challenges made to technical standards for wireless carriers to follow when complying with Pen/Trap orders, the D.C. Circuit approved of the FCC's rejection of "the New York Police Department's proposal that would have required triangulating signals from multiple cellular antenna towers to pinpoint a wireless phone's precise location throughout a call's duration[]" because such a capability "poses difficulties that could undermine individual privacy." (internal citation and quotation marks omitted)); In The Matter of the Application of United States of America For An Order Authorizing (1) Installation And Use Of A Pen Register And Trap And Trace Device or Process, (2) Access To Customer Records, And (3) Cell Phone Tracking, 441 F.Supp.2d 816, 827 and 837 (S.D.Tex. 2006) (Noting that "unlimited cell site data, including all cell site activations when the phone was on, control channels, signal strength, and other network information [] would permit 'triangulation' of the user's location[]" and that "triangulation... data [would] unquestionably implicate Fourth Amendment privacy rights."); *see also* In re Application of the United States for an Order Authorizing the Installation and Use of a Pen Register, 415 F.Supp.2d 211, 218 (W.D.N.Y. 2006) ("When asked what evidentiary standard

225. *See* Section VI(D)(1)(g), *supra* (explaining how it is not subject to reasonable dispute that the geolocation measurement techniques at issue amount to triangulation).

- 80 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

should be paired with the Pen Statute when the government seeks real time cell site data that can be used to triangulate the cell phone to anything more precise than 'general location information,' government counsel's immediate and unequivocal response was 'probable cause.'").

Neither the N.D.Cal. 08-90331MISC-RS order nor the N.D.Cal. 08-90330MISC-RS order authorized the government or Verizon Wireless to use triangulation to locate the aircard.[226][227] In the N.D.Cal. 08-90331MISC-RS order, Judge Seeborg expressly prohibited the government from obtaining "information that would allow [][the government] to triangulate multiple antenna tower locations and thereby attempt to determine the precise location of the user of the [][aircard]" and noted that triangulation refers to a technique involving the use of "strength, angle, and timing" of the aircard's signal.[228] Triangulating the aircard location by conducting the geolocation measurement techniques addressed in this section, and shifting the location of a portable/transportable wireless device locator (*i.e.*, the FBI's "antenna tower"), is the same as triangulating multiple antenna tower locations[229] that belong to Verizon Wireless. In addition to violating the general anti-triangulation sentiment, using a portable/transportable wireless device locator in the way described above also fits squarely in line with a common sense interpretation of Judge Seeborg's definition of cell tower triangulation. By showing that the government triangulated the aircard location using geolocation measurement techniques and the "approach" method, the defendant will be

---

226. *See* Dkt. #470-1 (order); *see also* Section IV(E), *supra* (discussing the N.D.Cal. 08-90330MISC-RS order).

227. *See* Dkt. #470-2 (order); *see also* Section IV(F), *supra* (discussing the N.D.Cal. 08-90331MISC-RS order).

228. *Id.*, p. 3 and fn. 4 (order). The noted measurement of (1) "strength" refers to "power-distance," (2) "angle" refers to "angle of arrival," and (3) "timing" refers to "time-of-flight"—all geolocation measurement techniques used by the StingRay.

229. It is generally accepted that "antenna tower" is synonymous with "cell site" and "base station." For example, many cell sites are not on towers at all and are instead located on rooftops, inside elevators, or within buildings. *See*, *e.g.*, ACLU, *Position Paper/Sample Brief: Prospective Cell Phone Location Tracking*, *available at* http://www.aclu.org/files/assets/DRAFT_real-time_cell_site_brief.pdf (last accessed May 26, 2011), p. 3 ("[T]he latest generation of cellular towers now may cover an area as small as a tunnel, subway, specific roadway, particular floor of a building, or even an individual home or office." (footnote and internal citations omitted)).

- 81 -

able to prove that the order was not followed and thus show the government's lack of good faith in relying on the order while conducting unreasonable triangulation techniques.

Additionally, by analyzing the general precision of the geolocation measurement techniques used by the government's portable/transportable wireless device locator, the defendant's mobile telecommunications expert will be able to determine how precisely the StingRay is capable of locating the aircard inside apartment No. 1122. This is an important analysis considering there is clear dispute regarding the accuracy of the aircard locating mission and the government has likely destroyed the evidence relating to the real-time aircard location data obtained via the StingRay.

**h. Relevancy of the requested evidence with respect to proving that the government took geolocation measurement on aircard signals in multiple locations, *i.e.*, active approach, in order to determine the aircard's location. *[RE: geolocation techniques and radio wave collection methods]***

It will be indicative of triangulation if the government shifted the location of a portable/transportable wireless device locator while collecting location finding signals from the aircard. Section IV(D)(1)(g), *supra*, explains how triangulation can be done using a portable/transportable wireless device locator by shifting its location to take geolocation measurements from multiple reference points. Section IV(D)(1)(h), *supra*, explains how law enforcement will shift the location of a portable/transportable wireless device locator in order to determine a phone's location more precisely using triangulation. Section IV(D)(2)(g), *supra*, discusses legal arguments relating to the use of triangulation by the government while searching for and locating the aircard. If the government used the "approach" method while locating the aircard then this will be a factual element in support of the defendant's triangulation arguments and arguments relating to the government locating the aircard precisely inside apartment No. 1122.

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

- 82 -

**i. Relevancy of the requested evidence with respect to proving that the government increased the transmission power of the aircard, caused an interruption in aircard service, and caused aircard service data transfer rates to fall below what would have otherwise been provided by Verizon Wireless.** ***[RE: geolocation techniques and radio wave collection methods]***

If the government was increasing transmit power then this action would be a factual element further supporting the defendant's unreasonable seizure arguments regarding theft of electricity. *See, e.g.*, Section IV(D)(2)(d), *supra* (legal arguments discussing the theft of electricity with respect to forcing the aircard to process OTASP messages). If the government was denying the aircard service or decreasing the quality of service then either of these actions would be a factual element in support of an overall unreasonable seizure of the aircard and host laptop computer. *See* Garcia, 474 F.3d at 996 (Finding that installation of a mobile tracking device on a car did not amount to a seizure because it “did not affect the car's driving qualities...”); *see also* Company v. United States, 349 F.3d 1132, 1145 (9th Cir. 2003) (Addressing an order for wiretap assistance and finding that “eavesdropping is not permitted with 'a minimum of interference' if service is completely shut down as a result of the surveillance.”).

**3. Why the government is obligated to provide the evidence being requested.** ***[RE: geolocation techniques and radio wave collection methods]***

The evidence requested under this category needs to be analyzed by the defense and placed on the record so that the invasiveness of the technology can be properly addressed. While deciding whether “off-the-wall” thermal imaging used to detect heat within a home constitutes a search within the meaning of the Fourth Amendment, the Supreme Court conducted a detailed analysis of the technology, methods and precision behind the government's thermal imaging techniques. *See* Kyllo, 533 U.S. 27 (2001). In *Kyllo*, the Supreme Court noted that the government's thermal imaging device “converts radiation into images based on relative warmth—black is cool, white is hot, shades of gray connote relative differences; in that respect, it operates somewhat like a video camera showing heat images.” *Id.* at 29. Prior to reaching the Supreme Court, the Ninth Circuit remanded the case for an

evidentiary hearing regarding the intrusiveness of thermal imaging. "On remand the District Court found that the Agema 210 is a non-intrusive device which emits no rays or beams and shows a crude visual image of the heat being radiated from the outside of the house; it did not show any people or activity within the walls of the structure; the device used cannot penetrate walls or windows to reveal conversations or human activities; and no intimate details of the home were observed." *Id.* at 30 (citation, internal quotation marks, and brackets omitted). The government's portable/transportable wireless device locator is far more complex than the thermal imaging device addressed in *Kyllo* and the technical details need to be revealed if a proper Fourth Amendment analysis is to be conducted.

**E. All path movement information (*e.g.*, GPS data) showing the geographical paths of the wireless device locators while searching for the aircard. *[Section I(E) of Submission Pursuant To LRCiv 37.1]***

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. *[RE: path movement information for StingRay] [Stipulation Nos. 1-4, 14, 21, 22, 24, and 42 integrated]***

The facts the defendant expects the path movement information to prove are related to other categories of withheld evidence. The path movement information for the StingRay and/or other portable/transportable wireless device locator should include GPS coordinates (and/or other location data), including altitude, recorded over a period of time covering the use of the StingRay (as described in Stipulation No. 24). The path movement information will (1) confirm whether the government used a helicopter or man-on-foot within the Domicilio apartment complex (*see* Section VI(A)(1)(a), *supra*), (2) provide additional evidence regarding how precisely the aircard was located (*see* Section VI(C)(1)(a), *supra*)—based on how closely to apartment No. 1122 the StingRay or other device was used (*e.g.*, within the complex or on the walkway in between apartment No. 1122 and the baseball field),[230] (3) provide additional evidence on whether the aircard location was later verified (*see* Section VI(C)(1)(b), *supra*)—considering the date/time stamps for the GPS data and/or

230. *See* EXHIBIT 30 of *1st Consolidated Exhibits* (Domicilio apartment complex site plan showing a walkway in between the exterior wall of apartment No. 1122 and the Santa Clara University baseball field).

other location data will indicate when the StingRay or other device was used, and (4) confirm whether the "approach" method was used (*see* Section VI(D)(1)(h), *supra*), further proving triangulation techniques (*see* Section VI(D)(1)(g), *supra*)—considering the GPS data and/or other location data will indicate whether the government shifted the location of the StingRay or other device while locating the aircard.

**2. Why the requested evidence is relevant and helpful to the defense. *[RE: path movement information for StingRay]***

The requested evidence relating to the path movement information is relevant and helpful to the defendant's *Motion To Suppress*. The relevancy relates to the Fourth Amendment arguments that coincide with the subsections of this memorandum that are discussed immediately above in Section VI(E)(1), *supra* (listed 1 through 4). The following coinciding subsections should be referenced for the relevant Fourth Amendment arguments: (1) Section VI(A)(3)(a)(i) and (ii), *supra* (Fourth Amendment arguments relating to use of a helicopter or man-on-foot), (2) Section VI(C)(2)(a), *supra* (Fourth Amendment arguments arguments relating to locating the aircard precisely inside apartment No. 1122), (3) Section VI(C)(2)(b), *supra* (Fourth Amendment arguments relating to verifying the aircard location after it was initially located), and (4) Section VI(D)(2)(h) and (g), *supra* (Fourth Amendment arguments relating to use of triangulation to locate the aircard).

**3. Why the government is obligated to provide the evidence being requested. *[RE: path movement information for StingRay]***

The path movement information for the StingRay, as it was used to locate the aircard, is essentially information regarding a fluid surveillance location. The surveillance location in this case is many surveillance locations logged over a period of time, *e.g.*, GPS coordinates for the portable/transportable platform used to move the StingRay and/or other device. In *Green*, the court recognized a "surveillance location privilege" because "revelation of a surveillance location might [] threaten the safety of public officers using the observation post, or lead to adversity for cooperative owners or occupants of the building." Green, 670 F.2d at 1155. The evidence being requested by the defendant relating to the

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

locations at which the government used electronic surveillance devices to search for the aircard has nothing to do with the type of "observation posts" discussed in *Green*. The government has already revealed that the Domicilio apartment complex manager gave extensive assistance to the government including use of an apartment right next door to apartment No. 1122.[231] If the government used its StingRay within the Domicilio apartment complex, or possibly on the walkway in between apartment No. 1122 and the baseball field, then that fact will not reveal any additional information regarding cooperating owners or observation posts. Likewise, evidence regarding the use of a helicopter hovering over apartment No. 1122 will not jeopardize any cooperating witnesses considering the defense has no need to know the helicopter pilot's name. Evidence relating to the position of the helicopter over apartment No. 1122 will not jeopardize an "observation post"[232] considering a low flying noisy helicopter announces its position regardless. With respect to path movement information obtained specifically via the StingRay, in *Allums* FBI agent Shute testified as to the locations of where he operated the StingRay. *See* United States v. Allums, No. 2:08-CR-30 TS, District of Utah, Dkt. #128, p. 7, ln. 8-10; *see also Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501).

**F. All evidence relating to the specific wireless device locators (*e.g.*, user manuals, test data, *etc.*, for the StingRay) and related software (*e.g.*, CDMA software, Geolocation software, *etc.*) used to search for and locate the aircard. *[Section I(F) of Submission Pursuant To LRCiv 37.1]***

*****

**Note:** *Even with the government stipulating to all stipulations listed and referenced under this category, the defendant still needs full disclosure of this category of evidence considering the requested evidence may reveal addition Fourth Amendment violations the defendant is currently unaware of.*

*****

231. *See* Section V(F) and fn. 76, *supra*.

232. An "observation post" that will likely never be used again.

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations. *[RE: specific devices and software used to locate the aircard]***

**a. The government did not use a hardware and/or software based mobile tracking device to locate the aircard and the StingRay and aircard are not hardware and/or software based mobile tracking devices. *[Stipulation No. 47-49] [Stipulation Nos. 2, 4 and 30-46 integrated]***

Based on an analysis of the historical origins of 18 U.S.C. § 3117, enacted in 1986 as part of the Electronic Communications Privacy Act (ECPA), it is clear that "mobile tracking device" does not apply to portable/transportable wireless device locators as used in this case.[233] The 1986 House Report discusses only conventional, surreptitiously installed "beeper" homing devices[234] of the type at issue in the two then-recent landmark Supreme Court decisions United States v. Knotts, 460 U.S. 276 (1983) (beeper installed in a can of chloroform and used to track movement of car) and United States v. Karo, 468 U.S. 705 (1984) (beeper installed in a can of ether and tracked into residences). Although the ECPA's legislative history deals extensively with cellular telephones in other areas, the discussion of mobile tracking devices omits any mention of them. Furthermore, the Senate Report on the ECPA includes a glossary of technological terms defining "electronic tracking devices" as homing devices "which might be placed in an automobile, on a person, or in some other item."[235] Furthermore, the USDOJ Electronic Surveillance Manual has mobile tracking devices listed in an entirely different section than portable/transportable wireless device locators.[236]

---

233. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (explaining the Harris StingRay and other portable/transportable wireless device locators) (Dkt. #536).

234. *See* H.R. Rep. No. 467, 99th Cong., 2d Sess. At 60 (1986).

235. S. Rep. No. 541, 99th Cong., 2d Sess. 10 (1986), reprinted in 1986 U.S. Code. Cong. & Admin. News 3555, 3564.

236. *See* U.S. Dep't of Justice, *Electronic Surveillance Manual*, p. iii (having Section XIII titled "PEN REGISTERS/TRAPS AND TRACES" and Section XIV titled "CELL SITE SIMULATORS/DIGITAL ANALYZERS/TRIGGERFISH").

- 87 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

**b. The StingRay is not a hardware and/or software based pen register and/or trap and trace device.** ***[Stipulation No. 50 and 51][Stipulation Nos. 2, 4 and 30-46 integrated]***

A portable/transportable wireless device locator does not meet the definition of pen register or trap and trace device considering the locating of wireless devices is not included in the relevant definitions. *See* 18 U.S.C. §§ 3127(3) (pen registers) and 3127(4) (trap and trace devices). The only statute that may be construed to allow Pen/Trap devices to obtain location information, albeit in a roundabout way and not solely pursuant to a Pen/Trap order, is 47 U.S.C. §§ 1002(a)(2) and (2)(B), *i.e.*, the Communications Assistance For Law Enforcement Act (CALEA).[237] However, CALEA applies to actual Pen/Trap devices that receive Pen/Trap data directly from wireless carriers and not to the StingRay.[238] For example, the N.D.Cal. 08-90331MISC-RS order applies to the government's use of the SF-Martinez DCS-3000 server, *i.e.*, an actual Pen/Trap device, that received Pen/Trap data directly from Verizon Wireless IAPs.[239] Furthermore, the USDOJ Electronic Surveillance Manual has Pen/Trap devices listed in an entirely different section than portable/transportable wireless device locators.[240]

Additionally, a closer analysis of the Pen/Trap statutes further supports the fact that a portable/transportable wireless device locator does not meet the definition of a Pen/Trap device. In a section labeled “Limitations” contained in 18 U.S.C. § 3121, titled “General prohibitions on pen register and trap and trace device use...,” the statute states that “[a] government agency authorized to install and use a pen register or trap and trace device... shall use technology reasonably available to it that restricts the recording **or decoding** of

---

237. *See* fn. 253, *infra*.

238. *See* 47 U.S.C. §§ 1002, *et seq.* (applying legislation to “telecommunications carriers”); *see also* In Re Application Of The United States Of America, 405 F.Supp.2d 435, 438 (S.D.N.Y. 2005) (Explaining a requirement in the Southern District of New York that information obtained by the government's Pen/Trap device may not be “obtained by the Government directly” and must instead be “transmitted from the provider digitally to a computer maintained by the Government.”).

239. *See* Section V(D), *supra*.

240. *See* U.S. Dep't of Justice, *Electronic Surveillance Manual*, p. iii (having Section XVI titled “MOBILE TRACKING DEVICES” and Section XIV titled “CELL SITE SIMULATORS/DIGITAL ANALYZERS/TRIGGERFISH”).

- 88 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

electronic or other impulses to the... signaling information utilized in the processing and transmitting of... electronic communications so as not to include the content of any... electronic communications." 18 U.S.C. § 3121(c) (emphasis added). In order to operate as a cell site emulator as to perform a man-in-the-middle attack (as described in Stipulation No. 34),[241] a portable/transportable wireless device locator would need to **decode** the electronic communications content contained in transmitted aircard signals and then repackage that content for transport to an actual Verizon Wireless cell site. A device that operates to decode signaling information that includes the content of electronic communications runs astray of what the Pen/Trap statutes cover.

**c. The StingRay is capable of locating the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35, and 42-45. *[Stipulation No. 52][Stipulation Nos. 2, 4, 21-26, and 30-46 integrated]***

As discussed in Section VI(D)(1)(c), (e), (f), (g), (h), and (i), *supra*, there is overwhelming evidence that the StingRay and other Harris portable/transportable wireless device locators use the geolocation measurement techniques and radio wave collection methods described in Stipulation Nos. 36-41, 30-35, and 42-45. As discussed in Section VI(C)(1)(a), *supra*, there is overwhelming evidence that the StingRay and other Harris portable/transportable wireless device locators are capable of locating the aircard precisely inside apartment No. 1122.

**2. Why the requested evidence is relevant and helpful to the defense. *[RE: specific devices and software used to locate the aircard]***

The requested evidence relating to the specific devices and software used to locate the aircard is relevant and helpful to the defendant's *Motion To Suppress*. The relevancy relates to (1) proving that the StingRay and other portable/transportable wireless device locators are not mobile tracking devices, (2) proving that the StingRay and other portable/transportable

241. The only other option is to ignore the communications content, not forward it to Verizon Wireless, and perform a denial-of-service attack.

- 89 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

wireless device locators are not Pen/Trap devices, and (3) proving that the StingRay is capable of locating the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35, and 42-45. Without the requested evidence, or an adequate substitution, the defendant may not be able to effectively prove certain Fourth Amendment violations.

**a. Relevancy of the requested evidence with respect to proving that the government did not use a hardware and/or software based mobile tracking device to locate the aircard and the StingRay and aircard are not hardware and/or software based mobile tracking devices. *[RE: specific devices and software used to locate the aircard]***

The N.D.Cal. 08-90330MISC-RS order is titled "...For The Use And Monitoring Of A Mobile Tracking Device..." and the government may claim reliance on this order for its use of the StingRay. Although the government currently asserts that the StingRay is not a mobile tracking device and is a Pen/Trap device,[242] the government may flipflop at any time while litigating the suppression issue. If the government makes a bold claim that the StingRay is a mobile tracking device, or that the N.D.Cal. 08-90330MISC-RS order applies to the use of the StingRay, the defendant will need all evidence under this category to prove that the StingRay is not a mobile tracking device and that the N.D.Cal. 08-90330MISC-RS order does not authorize use of the StingRay.

**b. Relevancy of the requested evidence with respect to proving that the StingRay is not a hardware and/or software based pen register and/or trap and trace device. *[RE: specific devices and software used to locate the aircard]***

The N.D.Cal. 08-90331MISC-RS order authorizes use of a pen register and trap and trace device and the government may claim reliance on this order for its use of the StingRay. The government is currently claiming that the StingRay is a Pen/Trap device[243] and making this claim may in preparation for arguments claiming that the N.D.Cal. 08-90331MISC-RS

242. *See Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, p. 30 (Dkt. #536).

243. *See id.*

order authorizes use of the StingRay. While litigating the suppression issue, if the government makes a bold claim that the StingRay is a Pen/Trap device, or that the N.D.Cal. 08-90331MISC-RS order applies to the use of the StingRay, the defendant will need all evidence under this category to prove that the StingRay is not a Pen/Trap device and that the N.D.Cal. 08-90331MISC-RS order does not authorize use of the StingRay.

**c. Relevancy of the requested evidence with respect to proving that the StingRay is capable of locating the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35, and 42-45. *[RE: specific devices and software used to locate the aircard]***

This is a circular argument that reverts back to Section VI(D)(2)(c), (e), (f), (g), (h), and (i), *supra* and Section VI(C)(2)(a), *supra*. If the government does not provide the evidence shown to be relevant in those sections (*e.g.*, the destroyed real-time aircard location data, geolocation techniques, radio wave collection methods, *etc.*) then the defendant's mobile telecommunications expert can use StingRay user manuals, software, test data, the physical devices themselves, *etc.*, to conduct various tests and reverse engineer the Harris devices in order to prove the same relevant facts. The subsections that follow provide some further specific analyses.

**i. Relevancy of obtaining test data. *[RE: specific devices and software used to locate the aircard]***

As explained in Section VI(C)(1)(a), *supra*, a previous Harris test performed on a portable/transportable wireless device locator produced results showing a worst case error location accuracy of *20 ft*. The *20 ft* accuracy resulted from use of only one geolocation technique, *i.e.*, time-of-flight. The test data for the specific portable/transportable wireless device locator(s) used to locate the aircard in this case will provide evidence on how precisely the device is capable of locating wireless devices. The defendant's mobile telecommunications expert can analyze evidence of this nature and provide insight into how precisely the aircard was located inside apartment No. 1122. This is an important task considering the government likely destroyed the real-time aircard location data obtained via

- 91 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

the StingRay[244] and there is clear dispute regarding how precisely the aircard was located.[245] The relevancy of determining precision with respect to the defendant's Fourth Amendment arguments is discussed in Section VI(C)(2)(a), *supra*.

**ii. Relevancy of obtaining the physical devices themselves.** ***[RE: specific devices and software used to locate the aircard]***

The defendant needs access to the actual portable/transportable wireless device locator(s) used to locate the aircard inside apartment No. 1122. The defendant's mobile telecommunications expert can conduct tests using the equipment in and around the Domicilio apartment complex and determine how precisely the aircard was located. This is an important task for the same reasons explained in the subsection immediately above. The relevancy of determining precision with respect to the defendant's Fourth Amendment arguments is discussed in Section VI(C)(2)(a), *supra*.

**iii. Relevancy of obtaining instructions manuals, operations manuals, user manuals, schematics, patent information, proprietary information, trade secrets, *etc.*** ***[RE: specific devices and software used to locate the aircard]***

The defendant needs access to the instructions manuals, operations manuals, user manuals, schematics, patent information, proprietary information, trade secrets, software, *etc.*, relating to the portable/transportable wireless device locator(s) used to locate the aircard inside apartment No. 1122. The defendant's mobile telecommunications expert can analyze the requested evidence in order to determine exactly what type of geolocation techniques and radio wave collection methods the portable/transportable wireless device locators use. This analysis will act to confirm that the StingRay conducted the various searches and seizures discussed in Section VI(D)(1) *et seq.*, *supra* (discussing geolocation techniques and radio wave collection methods), which will in turn support the coinciding arguments in Section VI(D)(2), *et seq.*, *supra*.

---

244. *See* Section VI(A)(1)(b), *supra*.

245. *See* Section VI(C)(1)(a), *supra*.

- 92 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

**3. Why the government is obligated to provide the evidence being requested.** ***[RE: specific devices and software used to locate the aircard]***

The government likely destroyed the aircard real-time location information obtained via the StingRay.[246] The government is also withholding technical details regarding the geolocation techniques and radio wave collection methods used to locate the aircard inside apartment No. 1122. The evidence requested under this category may alleviate the defendant's need for the destroyed aircard real-time location data, the geolocation techniques, and radio wave collection methods. In *Liebert*, the Third Circuit agreed that in place of computer data evidence that was unavailable, the government's alternative evidence, which included virtually every last detail of the technology used to create the data, was sufficient to alleviate the defendant's need for the evidence at issue. *See* United States v. Liebert, 519 F.2d 542, 550 (3rd Cir. 1975). In place of providing the defendant with tax return "nonfiling lists" that were deemed privileged, the government in *Liebert* provided "(a) all the relevant IRS handbooks documenting the procedures, machine operations, and other relevant information pertaining to its electronic data processing system; (b) statistical analyses relating to the Service's ability to discover and report accurately failures to file returns; (c) an expert familiar with all aspects of the nonfiling lists; (d) an expert familiar with all aspects of the processing of work through the Mid-Atlantic Service Center; and (e) an expert who has made studies on the reliability of the Service's data processing systems." *Id.* (footnote omitted).

In the present case, the real-time aircard location data (generated by a computer like in *Liebert*)[247] is unavailable because it was destroyed and the defendant is now without the evidence he needs to test the government's claim of locating the aircard to three apartments instead of precisely inside apartment No. 1122. The evidence relating to the geolocation techniques and radio wave collection methods is also unavailable considering the

246. *See* Section VI(A)(1)(b), *supra*.

247. The StingRay and other portable/transportable wireless device locators manufactured by Harris are essentially computer peripherals that function only after being plugged into a laptop, personal data assistant, or other suitable location determining processor. *See* Stipulation No. 4.

- 93 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

government refuses to provide it to the defendant. The government should be required to provide the defendant with similar detailed evidence, as was provided in *Liebert*, so that he will have an adequate substitute for what the government destroyed and refuses to provide. With respect to identifying the device used to locate the aircard, in *Allums* FBI agent Shute testified that the make and model of the portable/transportable wireless device locator he used to do base station surveys to determine a suspect's location was the StingRay from Harris Corporation. *See* United States v. Allums, No. 2:08-CR-30 TS, District of Utah, Dkt. #128, p. 7, ln. 8-10; *see also Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501). With respect to the StingRay user manuals, test data, *etc.*, the Ninth Circuit found in *Cedano-Arellano* that this type of evidence is discoverable. *See* United States v. Cedano-Arellano, 332 F.3d 568, 570-71 (9th Cir. 2003) ("handler's log, all training records and score sheets, certification records, and training standards and manuals" relating to a narcotics detector dog were discoverable under Rule 16).

**G. All evidence relating to the Pen/Trap network architecture in place between July 16, 2008 and August 1, 2008 beginning at the Verizon Wireless Access Function and ending at the FBI Collection Function.** ***[Section I(G) of Submission Pursuant To LRCiv 37.1]***

**1. How previously disclosed evidence and known information support the truthfulness of the facts contained in the relative proposed stipulations.** ***[RE: Pen/Trap network architecture]***

**a. Neither the government nor Verizon Wireless took any extra steps in response to the "after receipt and storage" directive contained in the N.D.Cal. 08-90331MISC-RS order.** ***[Stipulation No. 53][Stipulation Nos. 2, 3, 27 and 28 integrated]***

The government previously stated that information regarding its compliance with the "after receipt and storage" requirement of the N.D.Cal. 08-90331MISC-RS order is not in its possession, custody, or control[248]—indicating that the FBI and/or Verizon Wireless (one in the same) failed to actively comply with the order. The fact that the government failed to preserve the requested evidence shows that it is extremely likely that the government ignored the relevant provision of the order as described in Stipulation No. 53. With respect to the

248. *See* Section VI(G)(3), *infra*.

- 94 -

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

requested network architecture proving such a violation, technical standard TIA/EIA/J-STD-025A contains example networking for CALEA based intercepts showing how law enforcement may receive call-identifying information (*i.e.*, Pen/Trap data) at the same time or even **before** the wireless carrier uses Pen/Trap data to facilitate service for the customer/user.[249] The noted technical standard shows how the FBI may connect a Central Monitoring Plant to a Verizon Wireless IAP via a dedicated data circuit, dedicated data link, or packet switched link.[250] Depending on the protocol stack involved in connecting the Verizon Wireless Delivery Function to the FBI Collection Function, varying delays will be present before the FBI receives Pen/Trap data. For example, there is a greater delay when using a packet switched link to deliver Pen/Trap data to the FBI as apposed to a dedicated data circuit. On the wireless carrier side, Verizon Wireless may connect an Access Function to a Delivery Function through either a bridged circuit or looped circuit.[251] Depending on the type of circuit used to connect the functions, there is a possibility of the Delivery Function receiving call-identifying information before the Access Function utilizes that information for the purpose of providing aircard service. For example, a looped circuit would result in the prospective Pen/Trap data being switched out of the Access Function as a circuit, looped into the Delivery Function, and then back into the Access Function.[252] If the SF-Martinez DCS-3000 server was connected to the Verizon Wireless Delivery Function via a dedicated data circuit, and if Verizon Wireless connected the Access Function to the Delivery Function via a looped circuit, then it is probable that the FBI received at least some aircard Pen/Trap data prior to Verizon Wireless utilizing that data in support of aircard service—showing that aircard Pen/Trap data was not sent "after receipt and storage" even under a liberal interpretation of the provision of the order. This is only one of many possible examples of how the requested network architecture information will show whether Verizon

249. *See* Telecommunications Industry Association, TIA/EIA/J-STD-025A, *Lawfully Authorized Electronic Surveillance* (Arlington, VA: May, 2006), Annex A, p. 87-94 (showing example diagrams of CALEA network Bridged Access and Looped Access).

250. *See Id.*

251. *See id.*, Fig. Nos. 20 and 21.

252. *See Id.*

- 95 -

Wireless "stored" Pen/Trap data (for however long) before providing it to the government.

**2. Why the requested evidence is relevant and helpful to the defense. *[RE: Pen/Trap network architecture]***

The requested evidence relating to the Pen/Trap network architecture in place between July 16, 2008 and August 1, 2008, beginning at the Verizon Wireless Access Function and ending at the FBI Collection Function, is relevant and helpful to the defendant's *Motion To Suppress*. The defendant will be arguing that in order for the N.D.Cal. 08-90331MISC-RS order to be in compliance with CALEA[253] and the Fourth Amendment, the government was required to supplement the Pen/Trap statutes with a Rule 41 warrant founded upon probable cause to seize real-time aircard cell site location information from Verizon Wireless. The defendant will argue that such a probable cause warrant would need to specifically authorize (1) seizing real-time cell site location information pertaining to the aircard within a Fourth Amendment protected space, and (2) searching for and locating the aircard within a Fourth Amendment protected space. If the defendant is successful in arguing a Fourth Amendment violation with respect to the N.D.Cal. 08-90331MISC-RS order, the government may then claim that the investigators acted with a good faith reliance on the issued order. If the defendant can prove that the government violated provisions of the order that were meant to limit the invasiveness of the authorized actions (*e.g.*, the "after receipt and storage" provision), it will show the government's lack of good faith while violating the Fourth Amendment. By providing the requested network architecture information, the defendant's mobile telecommunications expert will be able to determine if the "after receipt and storage" provision was violated. *See* Section VI(G)(1)(a), *supra*, for one example of how such an analysis may resolve the issue.

The N.D.Cal. 08-90331MISC-RS order required Verizon Wireless to provide the

---

253. CALEA requires that telecommunications carriers be capable of "expeditiously isolating and enabling the government, pursuant to a court order or other lawful authorization, to access call-identifying information that is reasonably available to the carrier — [] except that, with regard to information acquired solely pursuant to the authority for pen registers and trap and trace devices..., such call-identifying information s**hall not include any information that may disclose the physical location of the subscriber**..." 47 U.S.C. § 1002(a)(2) and (a)(2)(B) (emphasis added).

- 96 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

MEMORANDUM OF POINTS AND AUTHORITIES
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

government with real-time cell site location information pursuant to the pen register and trap and trace (Pen/Trap) statutes (18 U.S.C. §§ 31122 and 3123) and the Stored Communications Act (SCA) (18 U.S.C. §§ 2703(c)(1)(B), (c)(2) and (d)). Combining the Pen/Trap statutes with the SCA to obtain real-time cell site location information is known as the "hybrid" or "dual" theory for cell site surveillance.[254] The "hybrid theory" is used by the government in an attempt to comply with provisions of CALEA prohibiting the acquisition of real-time cell site location information "solely pursuant to the authority for pen register and trap and trace devices..." 47 U.S.C. § 1002(a)(2)(B). The "hybrid theory" has been rejected by numerous courts as being either unconstitutional or unsupported by the statutes at issue.[255] Considering the SCA does not allow for compelling disclosure of information not yet in storage, the government supports the "hybrid theory" with an additional theory known as the "instantaneous storage theory." The government's "instantaneous storage theory" argues that the SCA allows for the production of real-time cell site location information that does not exist at the time the order issues.[256] To facilitate the "instantaneous storage theory," the

---

254. *See*, *e.g.*, In Re Application For Pen Register And Trap/trace Device With Cell Site Location Authority, 396 F.Supp.2d 747, 761 (S.D.Tex. 2005) (Coining the term "hybrid theory," and noting the government's faulty argument that "cell site data enjoys a unique status under electronic surveillance law – a new form of electronic surveillance combining the advantages of the pen/trap law and the SCA [] without the respective limitations.").

255. *See*, *e.g.*, Smith S.D.Tex. 2006 Opinion, 441 F.Supp.2d at 837 ("The constitutional difficulties of the dual theory for cell site surveillance are inherent."); In The Matter Of The Application Of The United States Of America For An Order Authorizing The Installation And Use Of A Pen Register Device, A Trap And Trace Device, And For Geographic Location 'information, 497 F.Supp.2d 301, 312 (P.R. 2007) ("Congress has not authorize disclosure of cell site information in the statutes proffered by the government – namely the Pen Register Statute combined with the SCA."); In The Matter of the Application Of The United States Of America For An Order Authorizing The Installation And Use Of A Pen Register And A Caller Identification System On Telephone Numbers [Sealed] And [Sealed] And The Production Of Real Time Cell Site Information, 402 F.Supp.2d 597, 604 fn. 11 (D.Md. 2005) ("Section 2703(c) of the SCA does not seem to contemplate allowing the government to access any cell site information that does not exist at the time the order is entered."); Smith S.D.Tex 2005 Opinion, 396 F.Supp.2d at 760 ("2703(d) contemplates the production of existing records, not documents that may be created at some future date related to some future communication.").

256. *See*, *e.g.*, In The Matter Of An Application Of The United States For An Order (1) Authorizing The Use Of A Pen Register And A Trap And Trace Device And (2) Authorizing Release Of Subscriber Information And/Or Cell Site Information, 396 F.Supp.2d 294, 315 (E.D.N.Y. 2005) (Coining the term "instantaneous storage theory" and explaining that "the government's argument appears to be that cell site information could then in theory be quickly 'stored' by the provider [(acting pursuant to the SCA)], who could then in theory

- 97 -

N.D.Cal. 08-90331MISC-RS order required that the government obtain real-time cell site location information "after receipt and storage" and "as soon as practicable, twenty four (24) hours a day for the duration of the Order." *Id.* at p. 4 & fn. 6, and 6 (emphasis added). By showing that the network architecture used to connect the SF-Martinez DCS-3000 server to the Verizon Wireless IAPs did not allow for compliance with the "after receipt and storage" provision for LAESP messages,[257] the defendant will be able to prove that the order was not followed and thus show a lack of good faith with respect to the government's reliance on the issued order while conducting illegal searches and seizures.

**3. Why the government is obligated to provide the evidence being requested.** ***[RE: Pen/Trap network architecture]***

The defendant requested that the government provide information regarding Verizon Wireless complying with the "after receipt and storage" requirement of the N.D.Cal. 08-90331MISC-RS order, *i.e.*, "all discovery regarding the 'time lapse' between Verizon Wireless storing real time cell site information and Verizon Wireless providing the real time cell site information to the government[.]"[258] In response, the government stated that the requested discovery "is not in the possession, custody, or control of the United States."[259] The requested information regarding Verizon Wireless complying with the "after receipt and storage" requirement of the N.D.Cal. 08-90331MISC-RS order is information that should be in the possession, custody, or control of the government. The Fourth Amendment "prohibit[s] unreasonable intrusions by private individuals who are acting as government

---

quickly 'disclose' it to the government investigators").

257. The amount of time lapse involved with a cellular provider complying with the "after receipt and storage" requirement of an order issued pursuant to the SCA is a factual issue that has been considered in cases addressing the validity of the "instantaneous storage theory." *See*, *e.g.*, In The Matter Of An Application Of The United States Of America For Orders Authorizing The Installation And Use Of Pen Registers And Caller Identification Devices On Telephone Numbers [Sealed] And [Sealed], 416 F.Supp.2d 390, 395 (D.Md. 2006) ("[T]he government does not detail how long the requested information will be 'stored' by the provider before transmission."); Orenstein E.D.N.Y. 2005 Opinion, 396 F.Supp.2d at 314 ("Of greater concern is the absence of any indication of how the government would, as a practical matter, obtain 'disclosure' of cell site information from the provider after the fact – however quickly – rather than intercept the information by means of its pen register.").

258. *Submission Pursuant LRCiv 37.1*, p. 15 (attached).

259. *Id.*, p. 16.

instruments or agents[,]" United States v. Reed, 15 F.3d 928, 931 (9th Cir. 1994), and the government was required to obtain the requested evidence considering "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case..." Kyles v. Whitley, 514 U.S. 419, 437 (1995). Considering the government failed to preserve the requested evidence, it should be required to provide an adequate substitute or concede that the "after receipt and storage" provision of the N.D.Cal. 08-90331MISC-RS order was violated. In this case, the adequate substitute is the requested network architecture information requested by the defendant.

**H. The original data storage devices used to save the CDNRS files and LAESP messages resulting from the execution of the N.D.Cal. 08-90331MISC-RS order.** ***[Section I(H) of Submission Pursuant To LRCiv 37.1][Stipulation No. 54][Stipulation Nos. 2, 22 and 27-29 integrated]***

The defendant needs access to the original storage devices used to log the aircard related LAESP messages and used to create the resulting CDNRS files. The facts section of this memorandum cites evidence explaining how the FBI likely deleted data out of the logged LAESP messages in order to conceal that agents continued to "ping" the aircard after July 16, 2008. *See* Section V(G), *supra* (citing supporting evidence). The defendant needs his mobile telecommunications expert to conduct a forensic analysis of the original storage devices used to log the LAESP messages and used to create the CDNRS files so that he may determine if LAESP data was deleted or altered by government agents. Evidence of deleted or altered LAESP data will show an attempt to conceal additional access to the aircard and will help the defendant's arguments with respect to the government continuing to "ping" the aircard after July 16, 2008. The relevancy of proving that the government continued to "ping" the aircard after July 16, 2008, with respect to the defendant's Fourth Amendment arguments, is discussed in Section VI(C)(2)(b), *supra*.

- 99 -

*MEMORANDUM OF POINTS AND AUTHORITIES*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

**I. All communications relating to the execution of the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders that were sent/received between the government and the private entities associated with Verizon Wireless, Harris Corporation, and UTStarcom.** ***[Section I(I) of Submission Pursuant To LRCiv 37.1] [Stipulation Nos. 1-4, 9, 11-12, 14, 16-18, and 21-52 integrated]***

The requested communications relating to the execution of the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders is relevant and helpful to the defendant's *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence*. The defendant needs the evidence requested under this category because it will provide further information on all other categories of withheld evidence being requested through this motion. The defendant expects the requested evidence to prove many of the facts discussed in Section VI *et seq.*, *supra*, which will in turn provide support for the coinciding Fourth Amendment arguments. This is a reasonable assumption considering the government is withholding the requested communications based on the same claim of privilege asserted over the other withheld evidence. Therefore, if the Court finds that evidence from other categories of requested evidence is relevant and helpful to the defense then the defendant's argument is that the communications, as they relate to the withheld evidence, are also relevant and helpful to the defense. If the Court does not find disclosure necessary based on this filing alone then the defendant respectfully requests that the Court conduct an *in camera* inspection of all withheld communications so that relevance may be better determined.

**J. All unredacted/unsummarized emails, reports of investigation, memorandums, rough notes, and other relevant documents (as specifically listed) relating to the mission to search for and locate the aircard.** ***[Section I(K) of Submission Pursuant To LRCiv 37.1] [Stipulation Nos. 1-4, 9, 11-12, 14, 16-18, and 21-54 integrated]***

The requested unredacted and unsummarized documents relating to the government's efforts to search for and locate the aircard are relevant and helpful to the defendant's *Motion To Suppress* and *Motion To Dismiss For Destruction Of Evidence*. The defendant needs the evidence requested under this category because it will provide further information on all other categories of withheld evidence being requested through this motion. The defendant expects the requested evidence to prove many of the facts discussed in Section VI *et seq.*,

*supra*, which will in turn provide support for the coinciding Fourth Amendment arguments. This is a reasonable assumption considering the government is withholding the requested unredacted/unsummarized documents based on the same claim of privilege asserted over the other withheld evidence. Additionally, the documents themselves clearly relate to the aircard locating mission. The redacted and summarized versions of the documents at issue are attached to the defendant's *First Submission Of Redacted And Summarized Documents For Requested In Camera Inspection* (Dkt. #588). If the Court does not find disclosure necessary based on this filing alone then the defendant respectfully requests that the Court conduct an *in camera* inspection of all 28 withheld documents attached to the relevant filing so that relevance may be better determined.

## VII. CONCLUSION

The defendant respectfully requests that the Court grant relief as listed in the accompanying motion. All of the requested evidence is relevant and helpful to the defense and should be disclosed pursuant to *Brady*, *Gamez-Orduno*, and Rule 16 of the Federal Rules of Criminal Procedure. If the government disputes any issue of material fact contained in this memorandum or in any of the accompanying documents then the defendant respectfully requests that an evidentiary hearing be held so that expert affidavits and testimony may be presented in order to settle any factual disputes relating to cellular and/or geolocation technology.[260] These experts should at least include the defendant's mobile telecommunications expert, Harris Corporation engineers, and Verizon Wireless engineers. If the government fails to dispute any fact contained in this memorandum or in any of the accompanying documents then the defendant respectfully requests that the Court accept the defendant's version of the facts as truth.[261]

---

260. *See* United States v. DiCesare, 765 F.2d 890, 896 (9th Cir.), *amended*, 777 F.2d 543 (9th Cir. 1985) (Finding that an evidentiary hearing is required because the defendant "made an offer of proof sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issue of fact going to the validity of the search are in question." (internal citation and quotation marks omitted)); United States v. Medina, 524 F.3d 974, 983 (9th Cir. 2008); *see also* United States v. Irwin, 612 F.2d 1182, 1187 (9th Cir. 1980) (applying the same rule to an evidentiary hearing on a motion to dismiss the indictment).

261. This would be similar to when a party "fails to appear at the time and place assigned for oral argument" on a motion and the court taking such non-compliance as "a consent to

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

the... granting of the motion..." LRCiv 7.2(i), *when referenced through* LRCrim 12.1. *See also* Gwaduri v. INS, 362 F.3d 1144, 1146 (9th Cir. 2004) (Addressing a motion for attorneys fees, "the court may treat the government's non-opposition as constituting a failure to offer a basis for a finding of substantial justification and, thus, a failure to carry its burden of proof."); Federal Deposit Ins. Corp. v. New Hampshire Ins. Co., 953 F.2d 478, 484 (9th Cir. 1991) (In the context of a civil claim, "[d]effects in evidence submitted in opposition to a motion for a summary judgment are waived absent a motion to strike or other objection." (internal quotation marks and citation omitted)).

- 102 -

***MEMORANDUM OF POINTS AND AUTHORITIES***
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THEGOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*