**SUBMISSION OF PROPOSED STIPULATIONS**

**MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE**

## I.      PREREQUISITE STIPULATIONS

The stipulations listed under this section do not directly pertain to any of the evidence being withheld by the government.  Each stipulation below falls into one or more of the following two categories: (1) stipulations that pertain to general indisputable facts (Stipulation Nos. 1-4) that are later referenced in other stipulations directly pertaining to the withheld evidence, and (2) stipulations that will make litigating the suppression issues less complex in general (Stipulation Nos. 5-10) and otherwise pertain to general indisputable facts.

1.      Apartment No. 1122 is an apartment inside the Domicilio apartment complex located at 431 El Camino Real, Apartment No. 1122, Santa Clara, CA. 95050.  The Domicilio apartment complex is a gated community protected by private access electronic gates at all all entrances.  Each ground level apartment at the complex has a floor architecture raised one story off the ground making all apartment units less accessible to the public.  Each apartment within the complex has a mandatory deadbolt on all exterior front doors and a burglar alarm system wired to every exterior door and window.  A private security guard service is on call and available to renters/occupants 24 hours a day along with nightly scheduled security foot patrols between 10:00pm and 2:00am.  Square footage for the two bedroom "Mollino" apartment design (*e.g.,* apartment No. 1120 and 1126) is *1167* to *1255 ft²*, the studio "Albini" apartment design (*e.g.,* apartment No. 1122) is *489 ft²*, and the 1 bedroom "Ponti" apartment design (*e.g.,* apartment No. 1124) is *864* to *889 ft²*.  The building containing apartment No. 1122 is four stories high with apartment No. 1122 on the first floor.  The ceiling height for floor level apartments at Domicilio is *9 ft.*  The nearest road vehicle access areas are approximately *248 ft*, *300 ft*, *364 ft*, and *455 ft* away from apartment No. 1122.

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

2.      The aircard is a "UTStarcom PC5740 Broadband Connection Card For Verizon Wireless" associated with the monthly billed 1xEVDO "BroadbandAccess Connect Service" account having wireless account number 270691733 opened under the name of Travis Rupard.  The associated aircard account is used for accessing the Internet through the Verizon Wireless cellular network via cdma2000, EVDO Rev. o standards and also has "per message billing" for text messages.  The CDMA communications protocol, upon which the cdma2000 standards are based, was originally designed for military use due to it being nearly impossible to intercept a CDMA signal.  The cdma2000 standards dictate a total of 27 physical channels upon which air interface radio waves may be sent/received between wireless devices and cell sites.  The government's filings relating to the D.Ariz. 08-3286MB-LOA, 08-3298MB-LOA, and 08-7273MB-ECV applications and court orders, and the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS applications and court orders, interchangeably refer to the aircard as the "Target Device," "target broadband access card," "Target Broadband Access Card/Cellular Telephone," "telephone," and other similar terms. The aircard is a cellular device that transmits and receives electronic communications through a radio transceiver and antenna contained in the device.  The aircard is not a mobile telephone, is incapable of ringing or alerting to an incoming call, and does not handle wire communications.  The aircard is a computer hardware "add-on card" that can only function when plugged into the PCMCIA slot of a host laptop computer.  In this case, the host laptop computer is an IBM ThinkPad (S/N #LV-C4398) with mouse, keys, docking station and power cord.  In order to function, the aircard draws power from the host laptop computer, stores data on the hard drive of the host laptop computer, and its functions and operations are accessed through VZAccess Manager software installed on the host laptop computer.  Once the aircard is plugged into the host laptop computer, the aircard user may use the VZAccess Manager software to access the Internet through the associated Verizon Wireless aircard account.  In order to access the Internet, radio waves are transmitted to/from the aircard and the cell sites that are part of the Verizon Wireless cellular network.  The radio waves sent between the aircard and the Verizon Wireless cellular network carry the signals that

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

communicate data between the host laptop computer and the Internet.  The associated aircard account does not have cellular telephone service and the aircard hardware does not allow for placing telephone calls.

3.      The term "cell site information" (also referred to as "cell site data," "cell site records," and other similar terms) is an ambiguous catch-all phrase and not a standardized term.  There are numerous and varying categories of data that make up the totality of cell site information.  The data categories that may be available for disclosure by a wireless carrier will differ depending upon various elements such as service plan, service features, wireless device type, and cell site design.  The data categories of cell site information are essentially endless and may include wireless device equipment identification number, originating telephone number, destination telephone number, cell site identification number, cell site street address, cell site latitude and longitude coordinates, cell site sector orientation, cell site coverage area, system identification number, mobile switching center identification number, switch identification number, signal time-of-flight, signal angle of arrival, signal power strength, event start date/time, event stop date/time, event duration, amount of data downloaded, and amount of data uploaded.  Whenever a radio signal is sent/received between a wireless device and a wireless carrier cell site, cell site information may be generated and stored for law enforcement use (historical cell site information) or forwarded to law enforcement in real-time (real-time cell site information).

4.      A portable/transportable wireless device locator and related equipment includes at least one antenna, an amplifier, transceiver connected thereto, and a location determining processor coupled to the transceiver for transmitting/receiving a plurality of location finding signals sent/received to/from a target wireless device from among numerous wireless devices within range of the wireless device locator.  The target wireless device transmits respective reply signals for each of the transmitted location finding signals and, under certain conditions, a wireless device locator may also use passive eavesdropping to collect unsolicited wireless device location finding signals that were not prompted by the wireless device locator.  Additionally, the location determining processor of the wireless device

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1   locator cooperates with the transceiver for receiving the solicited and/or unsolicited location

2   finding signals.  The location determining processor may be a personal data assistant,

3   personal computer, or other suitable computing device with required software.  The wireless

4   device locator is carried by a platform moveable relative to the target wireless device.  The

5   platform may comprise an airborne platform, such as an aircraft, or a ground based platform

6   such as an automobile or person on foot.  The wireless device locator includes a Global

7   Positioning System (GPS) receiver as a platform position determining system.  The GPS

8   receiver provides the wireless device locator with a current geographical location of the

9   platform.  The GPS receiver cooperates with the location determining processor so that the

10  target wireless device may be located with longitude, latitude, and elevation coordinates

11  tethered to the accuracy of the GPS coordinates for the platform.  The location determining

12  processor may also provide for a proximity indicator involving a graphic display of an arrow

13  pointing along the azimuth ($\Theta$) and elevation ($\gamma$) angles in the direction of the target wireless

14  device with a distance value designating the distance from the wireless device locator to the

15  target wireless device.  Said proximity indicator coordinates are not tethered to the accuracy

16  of GPS coordinates and are instead tethered to known landmarks and/or relative points of

17  position for the wireless device locator in relation to reference planes and reference vectors,

18  *e.g.*, known altitudes and known compass bearings.  While fixed to the platform and during

19  movement relative to the target wireless device, the wireless device locator collects a series

20  of geolocation measurements via the received reply signals and/or via passively received

21  unsolicited signals.  These geolocation measurements are used to triangulate the location of

22  the wireless device and are superimposed over a computerized map for advantageous

23  reliability and searching/locating capabilities.  Geolocation of RF signals is defined as the

24  problem of precise localization (or geolocation) of spatially separated sources emitting

25  electromagnetic energy in the form of radio signals within a certain frequency bandwidth by

26  observing their received signals at spatially separated sensors (or array elements) of the

27  geolocation of RF signals system.

28          5.      Via  District of Arizona Grand Jury subpoena Nos. 07-03-609 and 07-03-615,

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

the government obtained at least 411,375 destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer from May 11, 2008 through June 5, 2008.  At the time the government sought said subpoenas, the government ultimately intended to use subsequent judicial authorization to facilitate physically locating the device identified via the subpoenas.

6.     Between June 13, 2008 and July 8, 2008, the government used the noted destination IP addresses (as described in Stipulation No. 5) to identify the aircard and aircard account as being the end-source Internet connection responsible for submitting the alleged fraudulent e-filed tax returns.  Between June 13, 2008 and July 8, 2008, the government used the noted destination IP addresses to narrow down the physical location of the aircard to Northern California.

7.     Via District of Arizona order No. 08-3286MB-LOA (*i.e.*, the "retroactive order"), the government obtained copies of the 411,375+ destination IP addresses accessed by the aircard from May 11, 2008 through June 5, 2008 that were already obtained via District of Arizona Grand Jury subpoena Nos. 07-03-609 and 07-03-615 (as described in Stipulation No. 5), and (2) 1,424,773+ destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer from June 5, 2008 through July 9, 2008.

8.     On the morning of July 14, 2008,  FBI Agent Kevin F. Killigrew created a cell tower range chart/map (ITEM No. 2 of May 12, 2009 discovery set) consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location estimate represented by a shaded area.  On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately *105,789,264 ft²* and the total land area making up the triangulated aircard location estimate is approximately *6,412,224 ft²*.  FBI Agent Killigrew created the cell tower range chart/map by completing the following steps: (1) obtaining the aircard historical cell site location information (covering June 10, 2008 through July 11, 2008) that was provided to the government by Verizon Wireless on July 12, 2008, (2) using the latitude and longitude

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

coordinates of three of the five cell sites (cell site Nos. 268, 139, and 279) contained in the historical cell site location information to plot the cell site locations on a digital/computerized street map, (3) using prior knowledge of Verizon Wireless cell site signal ranges (*i.e.*, antenna radiation patterns) to draw signal range circles around each of the three cell site locations plotted on the digital/computerized street map, (4) using prior knowledge of typical Verizon Wireless cell site sector orientations (*i.e.*, sector azimuths at 0º, 120º, and 240º with sector radiation patterns covering 300º-60º, 60º-180º, and 180º-300º) to draw lines separating each of the noted signal range circles into three sectors each, (5) using the historical cell site location information to calculate which two cell sites were being accessed by the aircard most often (*i.e.*, cell site Nos. 268 and 139) and then weighting the respective signal range circle of the remaining cell site (*i.e.*, cell site No. 279) at a zero probability as covering the location of the aircard, (6) using the digital/computerized street map to calculate an overlapping signal range area for the two cell sites used by the aircard most often (*i.e.*, cell site Nos. 268 and 139), (7) using the digital/computerized street map to calculate the three overlapping sector regions within the overlapping signal range area described in No. 6 above, (8) weighting two of the noted three overlapping sector regions covering non residential areas (*i.e.*, the airport as shown on the noted cell tower range chart/map) at a zero probability as covering the location of the aircard, and (9) weighting the remaining overlapping sector region (*i.e.*, the shaded area on the cell tower range chart/map) at maximum probability as covering the location of the aircard.  The shaded area on the cell tower range chart/map represents a government triangulated aircard location signature/fingerprint based off of the above explained statistical analysis, the known locations of Verizon Wireless cell sites, and the known azimuths and radiation patterns of Verizon Wireless cell site sectors.  The shaded area on the cell tower range chart covers the location of apartment No. 1122 at the Domicilio apartment complex.

9.      In order to search for and locate the aircard, Verizon Wireless, under the instruction of the government, utilized network-initiated Over-The-Air Service Provisioning (OTASP), also known as Over-The-Air Parameter Administration (OTAPA), to

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

surreptitiously write data to the aircard's hardware, *i.e.*, the Number Assignment Module (NAM), in order to facilitate compatibility between the aircard, the Verizon Wireless network, and the government's portable/transportable wireless device locator(s) and related equipment. If it was not for the government's mission to search for and locate the aircard, the OTASP messages would have never been written to the aircard hardware.

10.    If one or more of the following is suppressed: (1) the aircard destination IP addresses, (2) the aircard historical cell site location information, (3) the aircard real-time cell site location information collected by the SF-Martinez DCS-3000 server (Pen/Trap device), (4) the aircard geolocation measurements and data collected by the government's portable/transportable wireless device locator(s) and related equipment, or (5) the keys, codes, masks, and data obtained by the government that are used during registration authentication routines and for aircard and Verizon Wireless cell site signal and data encryption, encoding, scrambling, and spreading for various OSI network layers—then all evidence associated with the aircard location, and associated with apartment No. 1122 and its occupant/renter, will become fruits of the poisonous tree and not attenuated from any one of the five numbered categories of suppressed evidence described immediately above. The noted fruits of the poisonous tree with respect to all evidence associated with the aircard location includes, but is not limited to, the evidence indicated in the five numbered categories of aircard location evidence described immediately above. The noted fruits of the poisonous tree with respect to apartment No. 1122 and its occupant/renter includes, but is not limited to, name and address information from the local post office facility, utility records and information, driver license records and information, motor vehicle record checks, tax records, Accurint information, identities, rental agency records, handwriting comparisons, pictures, video footage, photocopies of documents, ruse Chinese food delivery, surveillance of the area surrounding apartment No. 1122, analysis of electricity use, analysis of Domicilio apartment complex access card use, apartment keys, fruits of subsequent physical searches of apartment No. 1122, fruits of other subsequent and related searches, *etc.*

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

## II.    PRIMARY STIPULATIONS

The stipulations listed under this section directly pertain to the evidence being withheld by the government and are either a *reflection* of what the defendant expects the withheld evidence to prove or are other proposed stipulated facts or waivers that will alleviate the underlying needs that require the withheld evidence.  The stipulations are organized under the categories of withheld evidence that are addressed in the accompanying motion and memorandum and in the accompanying *Submission Pursuant To LRCiv 37.1*.  Some stipulations apply to more than one category of evidence and are noted at the end of each applicable section.  Other than Section II(F), *infra* (the category of evidence relating to the actual devices used to locate the aircard), if the government stipulates to all stipulations listed under any given section then the defendant's need for the evidence requested under that category will be alleviated.  The evidence being requested under each category is listed in the accompanying *Submission Pursuant To LRCiv 37.1*.

### A.    All evidence relating to the identities and roles of the witnesses to the mission to search for and locate the aircard.

11.    The unidentified agents/personnel who operated the portable/transportable wireless device locator(s) and related equipment did not read the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS court orders prior to using said equipment to search for and locate the aircard.

12.    The unidentified agents/personnel who operated the portable/transportable wireless device locator(s) and related equipment were not relying on their knowledge, training, and experience—or on the knowledge, training, and experience of others—while manifesting the opinion that their actions in using said equipment to search for and locate the aircard were legal and in compliance with the Fourth Amendment.

13.    With respect to the government's efforts to search for and locate the aircard, the government agrees to waive and not use all good faith arguments that would raise a disputed issue of material fact that can only be effectively settled by the Court and/or challenged by

1  the defendant by having the unidentified agents/personnel (who operated the

2  portable/transportable wireless device locator(s) and related equipment) testify and answer

3  the defendant's and/or the government's and/or the Court's questions while under oath.

4      14.   The unidentified agents/personnel who operated the portable/transportable

5  wireless device locator(s) and related equipment, used to search for and locate the aircard,

6  were using said equipment while (1) flying around in a helicopter and hovering said

7  helicopter over apartment No. 1122 at an altitude that was lower than what is permitted by

8  FAA regulations, and (2) carrying said equipment while walking around on foot within the

9  Domicilio apartment complex.

10      15.   The real-time aircard location data and other additional data (as described in

11  Stipulation Nos. 23-25) was destroyed after the date of Daniel Rigmaiden's arrest, *i.e.*, after

12  August 3, 2008.

13      16.   Prior to destroying the real-time aircard location data and other additional data

14  (as described in Stipulation Nos. 23-25) the unidentified agents/personnel who operated the

15  portable/transportable wireless device locator(s) and related equipment harbored a belief that

16  the destroyed geolocation data would be valuable, relevant, and helpful to the defense of

17  Daniel Rigmaiden.  The above referenced "defense" is defined as challenging the

18  government's actions in locating the aircard as being an unreasonable and warrantless search

19  and seizure under the Fourth Amendment.

20      17.   The unidentified agents/personnel who operated the portable/transportable

21  wireless device locator(s) and related equipment were not relying on their knowledge,

22  training, and/or experience—or on the knowledge, training, and/or experience of others—

23  while manifesting the opinion that their actions in destroying the real-time aircard location

24  data and other additional data (as described in Stipulation Nos. 23-25) were legal and in

25  compliance with the Fifth Amendment.

26      18.   The unidentified agents/personnel who operated the portable/transportable

27  wireless device locator(s) and related equipment were not relying on any agency, department,

28  or government policy while manifesting the opinion that their actions in destroying the real-

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  time aircard location data and other additional data (as described in Stipulation Nos. 23-25)

2  were legal and in compliance with the Fifth Amendment.

3       19.    With respect to the government's actions in destroying the real-time aircard

4  location data and other additional data (as described in Stipulation Nos. 23-25), the

5  government agrees to waive and not use all "lack of bad faith" and/or good faith arguments

6  that would raise a disputed issue of material fact that can only be effectively settled by the

7  Court and/or challenged by the defendant by having the unidentified agents/personnel (who

8  destroyed said real-time aircard location data and other additional data) testify and answer

9  the defendant's and/or the government's and/or the Court's questions while under oath.

10      **\*.**    In addition to the stipulations specifically listed in this section, additional

11  stipulations are also required in order to alleviate the defendant's need for the evidence

12  requested under this category.  The following prerequisite stipulations (Section I, *supra*)

13  apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations

14  listed under other categories of withheld evidence apply to this category of withheld

15  evidence: Stipulation Nos. 23-25.

16

17      **B.**    **Unredacted order applications and attachments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders obtained to facilitate locating the aircard.**

18

19      20.    Considering the order applications and affidavits used to obtain the N.D.Cal.

20  08-90331MISC-RS and 08-90330MISC-RS orders were not incorporated into the issued

21  orders by reference, and considering said order applications and affidavits were not

22  accompanying said issued orders during any actions taken by the government

23  agents/personnel who searched for and located the aircard while using the

24  portable/transportable wireless device locator(s) and related equipment, said order

25  applications and affidavits were not part of the issued orders and are neither relevant nor

26  applicable in determining (1) the scope and particularity of the judicially approved actions

27  authorized in said issued orders, and (2) the manifested good faith belief of any government

28  agent/personnel that his/her actions in using said equipment to search for and locate the

1   aircard were legal and in compliance with the Fourth Amendment.

2   **\*.**   In addition to the stipulations specifically listed in this section, additional

3   stipulations are also required in order to alleviate the defendant's need for the evidence

4   requested under this category.  The following prerequisite stipulations (Section I, *supra*)

5   apply to this category of withheld evidence: Stipulation Nos. 1-4.

6

7   **C.   All response materials, returns, and seized/collected evidence relating to the N.D.Cal. 08-90330MISC-RS order obtained to facilitate locating the aircard, *e.g.*, real-time location data.**

8

9   21.   The unidentified government agents/personnel used a portable/transportable

10  wireless device locator and related equipment to locate the aircard precisely inside the

11  confines of apartment No. 1122 but informed primary case agents IRS-CI Agent Michael P.

12  Fleischmann,  IRS-CI Agent Denise L. Medrano, IRS-CI Agent Tracy L. Daun, and USPIS

13  Inspector James L. Wilson that the aircard was located only as precise as one of three

14  apartments at the Domicilio apartment complex, *i.e.*, apartment Nos. 1120, 1122, and 1124.

15  22.   On July 16, 2008, the unidentified government agents/personnel used a

16  portable/transportable wireless device locator and related equipment to initially locate the

17  aircard within apartment No. 1122.  After initially locating the aircard inside apartment No.

18  1122, the unidentified government agents/personnel used said equipment to verify the aircard

19  location inside apartment No. 1122 within each of the following date/time ranges: (1) on one

20  or more occasions between July 17, 2008 12:00am and July 22, 2008 3:40pm, (2) on one or

21  more occasions between July 23, 2008 12:00am and July 30, 2008 2:30pm, and (3) on one or

22  more occasions between July 31, 2008 12:00am and August 1, 2008 1:21am.

23  23.   The nature of the destroyed geolocation data relating to the location of the

24  aircard, and collected by the government's portable/transportable wireless device locator(s)

25  and related equipment via the geolocation measurements described in Stipulation Nos. 36-

26  41, included, but was not limited to, the following: (1) time stamped three dimensional (3D)

27  geolocation measurements represented by the Cartesian coordinate system (x, y, z) and

28  specifically consisting of aircard longitude, latitude, and elevation coordinates that are

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

tethered to the accuracy of the GPS coordinates of the portable/transportable platform containing the wireless device locator and related equipment, (2) time stamped three dimensional (3D) geolocation measurements represented by the Polar coordinate system (R, Θ, γ) and specifically consisting of aircard azimuth angle, elevation angle, and distance value coordinates that are tethered to known landmarks and/or relative points of position for the wireless device locator in relation to reference planes and reference vectors, *e.g.*, a known altitude and known compass bearing, (3) digital/computerized street maps and/or satellite imagery maps and/or other imagery maps with an overlay of estimated 3D geolocation points and tracks for the aircard that were generated as said equipment was operated to locate the aircard, (4) one or more final digital/computerized mapped 3D geolocation points showing the final and most precise calculated location of the aircard.

24.    Additional destroyed data relating to the location of the aircard, and collected by the government's portable/transportable wireless device locator(s) and related equipment, consisted of, but was not limited to, the following: digital/computerized street maps and/or satellite imagery maps with an overlay of Global Positioning System (GPS) points and tracks for the portable/transportable platform (*e.g.*, automobile, helicopter, airplane, person on foot, *etc.*) used to move said equipment (as described in Stipulation No. 42) while locating the aircard.

25.    Additional destroyed data relating to the location of the aircard and relating to obtaining the location of the aircard consisted of nonpublic keys, codes, masks, and data for the aircard and Verizon Wireless (as described in Stipulation No. 26) used during registration authentication routines and for aircard signal and data encryption, encoding, scrambling, spreading, and routing on various OSI network layers.  Said nonpublic keys, codes, masks, and data were used by the government's portable/transportable wireless device locator(s) and related equipment to conduct radio wave collection methods as described in Stipulation Nos. 30-35 and 42.

*.    In addition to the stipulations specifically listed in this section, additional stipulations are also required in order to alleviate the defendant's need for the evidence

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

requested under this category.  The following prerequisite stipulations (Section I, *supra*)
apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations
listed under other categories of withheld evidence apply to this category of withheld
evidence: Stipulation Nos. 26, 30-35, and 42.

> **D.**   **All evidence relating to the real-time and historical geolocation techniques (*e.g.*, triangulation techniques) and radio wave collection methods (*e.g.*, cell site emulation, interrogation, active approach) used by the government agents/personnel and by the wireless device locators while searching for the aircard.**

26.     In order to search for and locate the aircard, the government obtained from
Verizon Wireless specific, keys, codes, masks, and data (including, but not limited to, Public
Long Codes, Private Long Codes, Public Long Code Masks, Private Long Code Masks,
Authorization Keys (A-Key), Shared Secret Data (SSD), encryption keys, signal slotting
information, *etc.*) used for aircard signal message encryption and data encryption, encoding,
scrambling, spreading, and routing on various OSI network layers spanning the Physical
Layer, Medium Access Control (MAC) Sublayer, Link Access Control (LAC) Sublayer, and
elements of upper layer signaling responsible for signaling control over other layers and
responsible for the transferring of communications content.  Some of said keys, codes,
masks, and data were nonpublic information and were used to maintain privacy, secrecy, and
security (*i.e.*, prevent passive and active eavesdropping) of aircard signaling messages/data
including (1) signaling messages/data used to identify an aircard signal among many other
signals, and (2) signaling messages/data that can be used to perform the geolocation
measurements described in Stipulation Nos. 36-41.  Some of said keys, codes, masks, and
data that were nonpublic information were used during registration authentication routines to
prevent unauthorized individuals from emulating Verizon Wireless cell sites, emulating the
aircard, and conducting man-in-the-middle attacks.

27.     The government placed surreptitious telephone calls to the aircard, as logged in
the LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) and
resulting CDNRS files (ITEM No. 11 of September 9, 2009 discovery set), in order to cause

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

a Verizon Wireless cell site sector to transmit a paging signal (indicating an incoming call) to the aircard's receive antenna via a common forward link paging channel.  The government's surreptitious phone calls resulted in said paging signals being sent to the aircard's receive antenna from the Verizon Wireless cell site sector providing cellular service to the aircard while it was located inside apartment No. 1122.  Considering the aircard is not a telephone and does not have telephone service, the surreptitious phone calls did not cause the aircard to "ring" and otherwise did not cause the aircard to notify the aircard user that the government was calling the aircard.

28.     During the course of placing surreptitious phone calls to the aircard while it was located inside apartment No. 1122 (as described in Stipulation No. 27), government agents/personnel used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) containing aircard real-time cell site information provided by a Verizon Wireless Intercept Access Point (IAP).  The SF-Martinez DCS-3000 server received said LAESP messages in real-time but after the surreptitious phone calls were forwarded to internal Verizon Wireless phone numbers established to handle calls that cannot be connected.

29.     The government's actions in placing surreptitious phone calls to the aircard and receiving LAESP messages (as described in Stipulation Nos. 27-28) resulted in the government obtaining in real-time (on July 16, 2008) the identity and location of the Verizon Wireless cell site sector providing service to the aircard, *i.e.*, sector No. 3, Verizon Wireless cell site No. 5, having a latitude of 37.369733 and longitude of -121.923442 with a cell site street address of 2001 Gateway Place, San Jose, CA 95110.

30.     The government configured its portable/transportable wireless device locator(s) and related equipment, using the nonpublic keys, codes, masks, and data described in Stipulation No. 26, to facilitate decoding, decrypting, descrambling, and despreading aircard signals and data that were collected by said equipment by passively eavesdropping air interface signals being exchanged between the aircard and Verizon Wireless cell site(s). The referenced "passive eavesdropping" techniques were used to facilitate the government's

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1    efforts to search for and locate the aircard inside apartment No. 1122.

2          31.    The network-initiated Over-The-Air Service Provisioning (OTASP), also

3    known as Over-The-Air Parameter Administration (OTAPA), discussed in Stipulation No. 9,

4    was used to write data to the aircard hardware (*i.e.*, the Number Assignment Module (NAM))

5    consisting OTASP messages accomplishing the following: (1) disabling the service

6    programming lock for the aircard programming module containing Number Assignment

7    Module (NAM) indicators, (2) modifying the System Selection for Preferred Roaming

8    (SSPR) so that the aircard would connect to the government's emulated cell site as the

9    preferred cellular system over Verizon Wireless, (3) modifying the aircard preferred roaming

10   list to include the government's emulated cell site as an available cellular system/network,

11   (4) creating an acquisition record and system record in the aircard containing parameters so

12   that the aircard can acquire the cellular system created by the government's emulated cell

13   site, (5) setting the "System identification" (SID) acquisition record field to the SID of the

14   government's emulated cell site, (6) setting the "Network identification" (NID) acquisition

15   record field to the NID of the government's emulated cell site, (7) setting the "Relative

16   priority indicator" (PRI) acquisition record field so that the government's emulated cell site

17   will have the highest priority and be the first cellular system that the aircard attempts to

18   access for service, (8) modifying the Preferred User Zone List so that the most preferred

19   User Zone is the User Zone belonging to the government's emulated cell site, (9) setting the

20   "User Zone priority" Preferred User Zone List field to the User Zone of the government's

21   emulated cell site, (10) setting the "User Zone ID" Preferred User Zone List field to the User

22   Zone ID of the government's emulated cell site, and (11) setting the "User Zone System ID"

23   Preferred User Zone List field to the User Zone SID of the government's emulated cell site.

24   The above OTASP messages were required in order to facilitate the government's

25   portable/transportable wireless device locator(s) and related equipment operating as an

26   emulated Verizon Wireless cell site.

27         32.    The government configured its portable/transportable wireless device

28   locator(s) and related equipment, using the nonpublic keys, codes, masks, and data described

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

in Stipulation No. 26, to emulate a CDMA based Verizon Wireless cell site in the cellular service area covering apartment No. 1122.  The government's emulated cell site sent and received radio signals as if it were an actual cell site part of the Verizon Wireless cellular network providing service to Verizon Wireless customers.  The government's emulated cell site transmitted its own pilot pseudo number (PN) offset sequence code to identify itself to the aircard as a Verizon Wireless cell site available for providing cellular service.

33.     The government positioned its portable/transportable wireless device locator(s) and related equipment, while configured to emulate a Verizon Wireless cell site, within signal range of the aircard and began transmitting a pilot pseudo number (PN) offset sequence code with a stronger signal than the pilot PN offset sequence codes being transmitted by actual Verizon Wireless cell sites in the area.  By transmitting a pilot PN offset sequence code with a stronger signal than other cell sites in the area, the government took the place of Verizon Wireless and took control of the cellular service provided to the aircard.  In doing so, the government forced the aircard to disconnect from the Verizon Wireless cell site providing it service and forced the aircard to register/connect to the government's emulated cell site.  The referenced "forced registration" techniques were used to facilitate the government's efforts to search for and locate the aircard inside apartment No. 1122.

34.     The government's portable/transportable wireless device locator and related equipment, configured to emulate a Verizon Wireless cell site, also emulated the aircard by using identifying information for the aircard (*e.g.*, EIN), and the nonpublic keys, codes, masks, and data described in Stipulation No. 26, so that it could communicate with an actual Verizon Wireless cell site as if it were the actual aircard.  In other words, the government's portable/transportable wireless device locator and related equipment appeared as a Verizon Wireless cell site to the actual aircard while appearing as the aircard to an actual Verizon Wireless cell site with a service area covering apartment No. 1122.  The government's portable/transportable wireless device locator and related equipment was able to receive and forward all radio signals sent between the actual aircard and an actual Verizon Wireless cell site while having complete access to identifying information for the signals and complete

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

access to the data contained in the signals.  The referenced "aircard emulation" techniques were used to facilitate the government's efforts to search for and locate the aircard inside apartment No. 1122.

35.     Using its portable/transportable wireless device locator and related equipment, the government routinely transmitted a signal (*i.e.*, location finding interrogation signals) to the aircard's receive antenna with said signal designed to routinely prompt a transmission reply from the aircard's transmit antenna under the CDMA communications protocol.  The government's wireless device locator and related equipment collected the aircard's reply signals at its receive antenna and subjected the reply signals to the geolocation measurements described in Stipulation Nos. 36-41.  The geolocation measurements were conducted in order to triangulate the aircard location inside apartment No. 1122.

36.     In order to search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government made time-of-flight (TOF) measurements on numerous transmitted aircard signals with each measurement consisting of (1) obtaining the propagation delay time of the aircard signal by subtracting the time at which the aircard transmitted the signal from the time at which the wireless device locator and related equipment received the signal, and (2) obtaining the distance between the aircard and the wireless device locator by multiplying the propagation delay time by the speed of light.  Said geolocation measurements were taken in three dimensions (3D) (x, y, z and/or R, Θ, γ coordinates) and were used to triangulate the location of the aircard inside apartment No. 1122.

37.     In order to search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government made power-distance measurements on numerous transmitted aircard signals with each measurement consisting of (1) obtaining the loss power value of the aircard signal by subtracting the signal receive power (as received at the wireless device locator and related

- 17 -

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

equipment) from the signal transmission power (as transmitted from the aircard), and (2) obtaining the distance between the aircard and the wireless device locator by using the loss power value and the inverse square law of signal strength over increasing distances.  Said geolocation measurements were taken in three dimensions (3D) (x, y, z and/or R, Θ, γ coordinates ) and were used to triangulate the location of the aircard inside apartment No. 1122.

38.     In order to search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government made angle of arrival (AOA) measurements on numerous transmitted aircard signals with each measurement consisting of (1) receiving the aircard signal at an antenna connected to the wireless device locator with said antenna being a phased array antenna with multiple antenna elements that are electronically steered by a digital signal processor, and (2) obtaining the angle of arrival of the aircard signal (*i.e.*, the direction to the aircard from the wireless device locator) by subjecting the received aircard signal to an angle of arrival determination routine via the digital signal processor coupled to each antenna element.  Said geolocation measurements were taken in three dimensions (3D) (x, y, z and/or R, Θ, γ coordinates), which includes azimuth and elevation angle, and were used to triangulate the location of the aircard inside apartment No. 1122.

39.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used received signal measurements (*e.g.*, bit-error rate measurements, received signal strength measurements, receiver metrics, and signal-to-noise ratio measurements) in order to weight the reliability of the measurements corresponding to the measurement families described in Stipulation Nos. 36-38.

40.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used statistical functions (*e.g.*, average, medium, mean, mode, *etc.*) on groups of aircard geolocation measurements within any given set of measurements corresponding to the measurement families described in Stipulation Nos. 36-38.

41.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used data fusion by combining and simultaneously using the aircard geolocation measurements spanning the measurement families described in Stipulation Nos. 36-38.  In using data fusion, the government combined, in a weighted sense, different families of measurements and also measurements within families.

42.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government collected numerous geolocation measurements (corresponding to the measurement families described in Stipulation Nos. 36-38) during movement of said equipment in the geographical area surrounding the aircard (*i.e.*, "active approach").  By doing so, the government's portable/transportable wireless device locator and related equipment took geolocation measurements in numerous different locations, broke symmetry with the aircard, and encircled the approximate location of the aircard until it was located.

43.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government sent instructions/commands to the aircard via radio signals that caused the aircard to transmit signals to said equipment at a higher transmit power than the aircard would have normally transmitted if it were accessing cellular service through an actual Verizon Wireless cell site with a service area covering apartment No. 1122.

44.     As a result of the government's mission to search for and locate the aircard

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

using its portable/transportable wireless device locator(s) and related equipment, the government caused an interruption in aircard service and otherwise denied the aircard cellular service, for however long, from the Verizon Wireless cell site providing service to the aircard while it was inside apartment No. 1122.

45.     As a result of the government's mission to search for and locate the aircard using its portable/transportable wireless device locator(s) and related equipment, the government caused aircard service data transfer rates (Internet access speed) to fall below what would have otherwise been provided by the Verizon Wireless cellular network had the government not been interfering with aircard forward and reverse link signals using its portable/transportable wireless device locator(s) and related equipment.

46.     The government would not have been able to locate the aircard if at least one of the following actions were not completed: (1) obtaining the nonpublic keys, codes, masks, and data from Verizon Wireless as described in stipulation No. 26 (2) placing surreptitious phone calls to the aircard as described in Stipulation No. 27, (3) collecting LAESP massages relating to the aircard location as described in Stipulation Nos. 28-29, (4) passively eavesdropping aircard signals as described in Stipulation No. 30, (5) having Verizon Wireless utilized network-initiated Over-The-Air Service Provisioning (OTASP) to send/write messages/data to the aircard hardware as described in Stipulation No. 9 and 31, (6) configuring a portable/transportable wireless device locator and related equipment to emulate a Verizon Wireless cell site as described in stipulation No. 32, (7) configuring a portable/transportable wireless device locator and related equipment to emulate the aircard as described in stipulation No. 34 (8) forcing the aircard to register to the government's emulated cell site as described in Stipulation No. 33, (9) routinely transmitting a signal to the aircard's receive antenna with said signal designed to routinely prompt a transmission reply from the aircard's transmit antenna as described in Stipulation No. 35, (10) conducting the geolocation measurement techniques as described in Stipulation Nos. 36-41 to triangulate the aircard location, (11) collecting numerous geolocation measurements during movement of a portable/transportable wireless device locator and related equipment as described in

Stipulation No. 42, (12) causing the aircard to transmit signals at a higher transmit power as described in Stipulation No. 43, (13) causing an interruption in aircard service as described in Stipulation No. 44, or (14) causing a decrease in aircard service data transfer rates as described in Stipulation No. 45.

\*.    In addition to the stipulations specifically listed in this section, additional stipulations are also required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4 and 9.

**E.    All path movement information (*e.g.*, *GPS data*) showing the geographical paths of the wireless device locators while searching for the aircard.**

\*.    There are no stipulations specifically listed under this category, however, other stipulations are required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 14, 21, 22, 24, and 42.

**F.    All evidence relating to the specific wireless device locators (*e.g.*, user manuals, test data, *etc.*, for the StingRay) and related software (*e.g.*, CDMA software, Geolocation software, *etc.*) used to search for and locate the aircard.**

47.    Mobile tracking devices and tracking devices are one-way radio communication devices that emit a signal on a specific radio frequency.  This signal can be received by special tracking equipment, and allows the user to trace the geographical location of the transponder.  Such "homing" devices are used by law enforcement personnel to keep track of the physical whereabouts of the sending unit, which might be placed in an automobile, on a person, or in some other item.  The terms "mobile tracking device" and "tracking device" are confined to the transponder/beeper type devices placed upon the object

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

or person to be tracked as described in the *Knotts* and *Karo* Supreme Court opinions.

48.     The government did not install a hardware and/or software based mobile tracking device on the aircard, in the aircard, or to the aircard and the aircard was not being used and/or monitored as a mobile tracking device.

49.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are not singly or collectively hardware and/or software based mobile tracking devices and said equipment was not being used and/or monitored as a mobile tracking device.

50.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are not singly or collectively hardware and/or software based pen registers and/or trap and trace devices (as defined in 18 U.S.C. §§ 3127(3) and 3127(4)) and said equipment was not being used and/or monitored as a pen register and/or trap and trace device.

51.     Notwithstanding the fact that government agents/personnel did not actively access or read, through use of their own eyes, the content of Internet communications being sent/received to/from the aircard's host laptop computer via aircard signals, the government's portable/transportable wireless device locator(s) and related equipment, used by the unidentified government agents/personnel to search for and locate the aircard, still decoded and had access to said communications content.  The Internet communications content being sent/received to/from the aircard host laptop computer would have been available for human viewing if said operators of said equipment had instructed said equipment to reveal said communications content for their personal human viewing.

52.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are capable of triangulating the location of the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35 and 42-45.

*.     In addition to the stipulations specifically listed in this section, additional

- 22 -

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

stipulations are also required in order to **partially** alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 21-26, and 30-46.  **Note:** *Even with the government stipulating to all stipulations listed and referenced under this category, the defendant still needs full disclosure of this category of evidence considering the requested evidence may reveal addition Fourth Amendment violations the defendant is currently unaware of.*

> **G.** **All evidence relating to the Pen/Trap network architecture in place between July 16, 2008 and August 1, 2008 beginning at the Verizon Wireless Access Function and ending at the FBI Collection Function.**

53.     While facilitating the execution of the N.D.Cal. 08-90331MISC-RS order, LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) generated in response to the government's surreptitious telephone calls made to the aircard (as described in Stipulation Nos. 27-28), and sent by a Verizon Wireless Intercept Access Point (IAP) to the government's pen register and trap and trace device (*i.e.*, the SF-Martinez DCS-3000 server), were received by the government just as quickly as it receives LAESP messages from the same Verizon Wireless IAP while facilitating the execution of any other Pen/Trap order that may or may not require Verizon Wireless and the government to receive Pen/Trap data (*i.e.,* LAESP messages) "after receipt and storage."  In other words, neither the government nor Verizon Wireless took any extra steps in response to the "after receipt and storage" directive contained in the N.D.Cal. 08-90331MISC-RS order and, with respect to Verizon Wireless' receipt, storage, and transmission of Pen/Trap data, execution of said order occurred no differently than execution of any other Pen/Trap order intended to be used to obtain LAESP messages.

**\*.**     In addition to the stipulations specifically listed in this section, additional stipulations are also required in order to alleviate the defendant's need for the evidence

SUBMISSION OF PROPOSED STIPULATIONS
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 27 and 28.

    **H.**  **The original data storage devices used to save the CDNRS files and LAESP messages resulting from the execution of the N.D.Cal. 08-90331MISC-RS order.**

  54.  The government deleted some data fields contained in the LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) relating to the government's surreptitious phone calls placed to the aircard (as described in Stipulation Nos. 27-29).  The deleted fields in the LAESP messages would have shown that the government continued to surreptitiously call the aircard (or conduct other "pings") on July 18, 2008 10:46am, July 19, 2008 8:21pm, July 21, 2008 4:59pm, July 24, 2008 6:17pm, July 25, 2008 6:35pm, July 27, 2008 9:21pm, July 28, 2008 12:53am, July 29, 2008 01:28am, July 31, 2008 6:33pm, and August 01, 2008 01:21am, in order to verify that the aircard was still located inside apartment No. 1122 (as described in Stipulation No. 22).

  *\*.*  In addition to the stipulations specifically listed in this section, additional stipulations are also required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation No. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 22 and 27-29.

    **I.**  **All communications relating to the execution of the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders that were sent/received between the government and the private entities associated with Verizon Wireless, Harris Corporation, and UTStarcom.**

  *\*.*  There are no stipulations specifically listed under this category, however, other stipulations are required in order to alleviate the defendant's need for the evidence requested

under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 9, 11-12, 14, 16-18, and 21-54.

> **J.    All unredacted/unsummarized emails, reports of investigation, memorandums, rough notes, and other relevant documents (as specifically listed) relating to the mission to search for and locate the aircard.**

**\*.**    There are no stipulations specifically listed under this category, however, other stipulations are required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, *supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos.  9, 11-12, 14, 16-18, and 21-54.

///
///
///
///
///
///
///
///
///
///
///
///
///
///