1                **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3               _____

4   **United States of America,**     )

5                 Plaintiff,    )   **CR 08-00814-PHX-DGC**

6        vs.             )   Phoenix, Arizona

)   **September 22, 2011**

7   **Daniel David Rigmaiden,**    )

8                 Defendant.   )

_____)

9

10

11

12

13        **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14       **REPORTER'S PARTIAL TRANSCRIPT OF PROCEEDINGS**

15                <u>**MOTION HEARING**</u>

16        (EXCLUDING SEALED EX PARTE DISCUSSIONS)

17

18

19

20

21   Official Court Reporter:

Patricia Lyons, RPR, CRR

22   Sandra Day O'Connor U.S. Courthouse, Suite 312

401 West Washington Street, Spc. 41

23   Phoenix, Arizona  85003-2150

(602) 322-7257

24

Proceedings Reported by Stenographic Court Reporter

25   Transcript Prepared by Computer-Aided Transcription

14:26:43   1                          **A P P E A R A N C E S**

2

3       For the Government:

4               U.S. Attorney's Office
                By:  **FREDERICK A. BATTISTA,** ESQ.
14:26:43   5               By:  **JAMES KNAPP,** ESQ.
                40 North Central Ave., Ste 1200
6               Phoenix, AZ  85004

7

8       The Defendant in Propria Persona:

9
                **Daniel David Rigmaiden**
14:26:43  10               Central Arizona Detention Center – Florence
                P.O. Box 6300
11              Florence, AZ  85132

12

13      Shadow Counsel for the Defendant:

14              Law Office of Philip A. Seplow
                By:  **PHILIP A. SEPLOW,** ESQ.
14:26:43  15               2000 N. 7th St.
                Phoenix, AZ  85006
16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

14:26:43  1

2

3          THE COURTROOM DEPUTY:  Criminal case 08-814, United

4    States of America versus Daniel David Rigmaiden.  This is the

14:00:58  5    time set for motion hearing.

6          MR. BATTISTA:  Good afternoon, Your Honor.  Fred

7    Battista on behalf of the United States.  Present with me at

8    counsel table is Assistant United States Attorney James Knapp

9    and IRS CI Special Agent Denise Medrano.

14:01:12  10         THE COURT:  All right.  Good afternoon.

11         THE DEFENDANT:  Good afternoon, Your Honor.  Daniel

12   Rigmaiden on behalf of himself.

13         THE COURT:  All right.  Good afternoon.

14         MR. SEPLOW:  Good afternoon, Your Honor.  Philip

14:01:20  15   Seplow with Mr. Rigmaiden.

16         THE COURT:  Good afternoon.

17         Give me just a minute to get organized here.

18         Okay.  Our primary purpose today is for the hearing

19   on your motion, Mr. Rigmaiden, for the disclosure of

14:01:54  20   additional government information.  I also want to talk before

21   we adjourn about a related request for in camera inspection

22   that you filed, Mr. Rigmaiden, that is at Docket 588.  And

23   then there's some ex parte things we'll need to talk about as

24   well.

14:02:17  25         But the primary issue is the motion for disclosure of

additional information.  I have read your motion.  It's the

longest motion I've ever read, Mr. Rigmaiden, 102 pages.  But

I have to say you didn't waste a lot of space.  You did repeat

some because of the way you organized it, but it was -- I wish

we had 100 percent of the lawyers who could write as clearly

as you do.  We don't.  It was well written, well documented.

I've created myself a nine-page chart to keep track

of everything that was argued by you and by the government in

that motion.  And I've read the government's response and I

read the reply.  I've read the Northern District of California

orders.  I've read the cases cited by the government in

support of the law enforcement privilege, *Roviaro* and the ones

that follow from it.

And what I want to do today to help me figure out how

to rule on this is talk you through some conclusions I've

reached and get your reaction to them, and then I'll obviously

give you a chance to address other matters at the end.  But

let me tell you some of my conclusions so that you can respond

to the questions that are related to them.

It seems clear to me that the case law has recognized

the law enforcement privilege and has applied it to technical

kinds of information.  *Roviaro* was the start of that.  That

wasn't a technical information case.  That was a confidential

informant.  But cases like the *Green* case from the District of

Columbia and others had expanded it to the technical kinds of

14:04:13  1    information that are sought here.

2          The standard that *Roviaro* adopts is whether the

3    information sought by the defendant would be relevant and

4    helpful.  If so, the privilege gives way, assuming the

14:04:31  5    privilege applies in the first place.

6          Throughout your brief, Mr. Battista, you used a

7    different phrase.  You used "compelling need," arguing that

8    the defendant has to show a compelling need in order to

9    overcome the privilege.

14:04:47  10   As I've read the cases that you have cited, the only

11   cases that come close to a compelling need case are civil

12   cases.  The criminal cases following *Roviaro* talk about

13   relevant and helpful information, and that includes the *Green*

14   case from the District of Columbia that you cited, the *Van*

14:05:13  15   *Horn* case that you primarily relied upon from the Eleventh

16   Circuit.

17         And so I mean, I'll certainly let you address this in

18   a moment -- maybe, Mr. Knapp, you're going to be the one to

19   address it -- but I don't see in the criminal case law where

14:05:31  20   Mr. Rigmaiden has to show a compelling need.  It seems to me

21   if he shows it is relevant and helpful, then under the

22   standard of *Roviaro* he's entitled to the evidence.

23         *Roviaro* and the cases that follow it make clear that

24   I have to engage in a balancing.  If I find the information is

14:05:49  25   sensitive law enforcement information and therefore entitled

14:05:52  1    to a qualified privilege, then I have to balance the

2    government's interest in keeping it confidential against

3    Mr. Rigmaiden's need for it.

4         And if I conclude that it would be relevant and

14:06:04  5    helpful to his defense, then I must require that it be

6    disclosed.  But the cases are pretty clear that there's no

7    formula for that balancing.  It's a case by case, all facts

8    considered kind of analysis.

9         It seems clear to me that the courts have permitted

14:06:26 10    trial courts to hold ex parte hearings for the purpose of

11    determining if the information is privileged, if it is truly

12    law enforcement sensitive information.  And I know that that's

13    a request you made, Mr. Battista, is that we hold an ex parte

14    hearing so you can present evidence to show why the technology

14:06:42 15    at issue in this case is sensitive.  And I know you oppose

16    that, Mr. Rigmaiden, we'll talk about that in a moment.

17         But from this case law it appears to me that if I'm

18    going to rule on the motion, depending on what I hear from you

19    in a minute, I need to hold a hearing of some kind, probably

14:07:01 20    ex parte, to decide if the privilege applies to this

21    information.

22         If I were to conclude that it does not apply, then I

23    would order it disclosed because it's not privileged.  If I

24    were to conclude that the privilege does apply, then I would

14:07:13 25    have to do a balancing applying the relevant and helpful

14:07:19  1    standard under *Roviaro*.

2         There are other factors that come into the analysis.

3    The *Hardy* case and others that have been cited say I should

4    also consider whether the defendant has access to other

14:07:33  5    information that would allow him to make the same point as the

6    privileged information.  That's a factor to put into the

7    balancing.

8         Now, with those principles in mind, I have an idea of

9    how this is likely to play out.  But before we talk about

14:07:52  10   that, let me just give you each -- each side an opportunity to

11   address any of those basic thoughts I've shared.  Mr. Battista

12   or Mr. Knapp, do you have any disagreement with anything I've

13   said so far?

14             MR. BATTISTA:  No, Your Honor.  I talked to Mr. Knapp

14:08:04  15   and we don't object --

16             THE COURT:  Just a little louder, please.

17             MR. BATTISTA:  We don't disagree with anything you

18   have stated, including the standard with respect to relevance

19   versus compelling need.

14:08:18  20             THE COURT:  Okay.  Mr. Rigmaiden, let's --

21   Mr. Seplow, pull the mike down right in front of him, would

22   you?

23             THE DEFENDANT:  I don't disagree with any of that.

24   One point is, I think that you can consider -- if you are

14:08:33  25   going to consider ex parte submissions or hearings, you could

14:08:36  1    consider affidavits first before actually having a hearing

2    where you take testimony.  That way it would kind of minimize

3    the amount of hearings where I wouldn't be allowed to be

4    present.  So other than that, it's pretty much the only thing

14:08:51  5    that I can think of.

6              THE COURT:  All right.  Well, let me share with you

7    my thought on how this might play out.  I've tried to envision

8    how we go forward in this case, and I've come up with the

9    following thoughts.  The purpose of you seeking this

14:09:10  10    information, Mr. Rigmaiden, is so you can make the argument at

11    a motion to suppress hearing that I should suppress the

12    evidence that resulted from locating the aircard for violation

13    of the Fourth Amendment.

14             The standard of proof at a motion to suppress is

14:09:30  15    preponderance of the evidence.  That's the standard that I

16    would apply in defining the facts at that hearing in order to

17    decide whether there's been a Fourth Amendment violation.

18             And it seems to me if I were to find the government's

19    information privileged and if I were to allow the government

14:09:50  20    to withhold that information, then this is how things might

21    play out at a hearing, and I'm walking through this because I

22    want both of your reactions to this.

23             Let's just take an example of one of the categories

24    of -- Mr. Rigmaiden, do you need to be able to take notes?

14:10:11  25             THE DEFENDANT:  It would be nice.

14:10:12  1          THE COURT:  I'm going to ask the marshals to uncuff

2     his right arm.  You're right-handed, right?

3          THE DEFENDANT:  Yes.

4          Thank you.

14:10:29  5          THE COURT:  Let's take an example of one of the

6     categories of evidence Mr. Rigmaiden wants and what he

7     believes it would show.  The category I'm just pulling out as

8     an example is, Mr. Rigmaiden asserts that the secret

9     technology that the government used to find the aircard does a

14:10:51  10    couple of things.  Well, he's alleged more than this but I'm

11    going to focus on two for my example.

12         He argues that it boosts the signal on the aircard,

13    so the government device tells the aircard to boost its

14    signal.  And he argues that it writes software to the laptop

14:11:10  15    to which the aircard is attached.  And the essence of

16    Mr. Rigmaiden's argument, as I understand it, is that the

17    government's device in effect commandeers and takes over the

18    laptop, writes software, controls the signal strength, and

19    that's a seizure for purposes of the Fourth Amendment

14:11:33  20    analysis.

21         Now, if I were to conclude that the method by which

22    the device works is privileged, and if I were also to conclude

23    that the government doesn't have to produce the details of

24    whether it writes software to the laptop or boosts the signal

14:11:53  25    of the aircard because Mr. Rigmaiden has other means for

14:11:55  1   making that argument, then it seems to me when we get to the

2   suppression hearing, this is what's likely to happen:

3        Mr. Rigmaiden will present evidence, as he has in his

4   motion, that the device the government uses boosts the signal

14:12:13  5   strength and writes software to the hard drive, and he has

6   evidence from the Harris products criteria.  He's got evidence

7   from government documents.  He's pulled it from a number of

8   different sources.

9        The government at that suppression hearing could not

14:12:29 10   respond by saying, "No, here's how it works," because you've

11   withheld that information.  Therefore, I would find by a

12   preponderance of the evidence that he's right, that this

13   device does, in fact, boost the signal and does write software

14   to the laptop.  And I would take that factual finding into

14:12:50 15   account when I ruled on the motion to suppress because I would

16   find by a preponderance of the evidence, which is all that is

17   needed, he's shown that that's what this kind of a device

18   does.

19        If the government were at the suppression hearing to

14:13:12 20   say, "Well, we're not going to put any of the sensitive

21   information into evidence but we want to call an expert or an

22   agent to testify that most of these devices don't do that,

23   they don't boost signal strength, they don't write software to

24   the laptop," it seems to me that I need to do one of two

14:13:33 25   things.  I either need to say, "Well, if you're saying most of

11

14:13:36  1   them don't but some of them do, then you've got to give him

       2   the evidence with which he can figure out whether this one

       3   does," or I've got to find in his favor on this question of

       4   fact because he's presented evidence that that's how the

14:13:49  5   device works.  You haven't ruled it out with your evidence

       6   because some do that.  So by a preponderance of the evidence I

       7   will find that the device in this case boosts signal strength

       8   and writes software to the laptop.

       9         Now, if we were to go to that point, it seems to me

14:14:07 10   that Mr. Rigmaiden's rights would not have been compromised

      11   because he's been able to make the point as to how the device

      12   works, and I'm accepting it as true by a preponderance of the

      13   evidence.  The government couldn't complain because it

      14   withheld the information with which it could disprove that if,

14:14:23 15   in fact, it could disprove it.

      16         And I would then rule on the Fourth Amendment issue

      17   with that fact established and decide whether or not that

      18   gives rise to a Fourth Amendment violation.

      19         I'm interested in your reactions to that possible

14:14:42 20   scenario as to how it plays out.

      21         MR. BATTISTA:  Two points.  First of all --

      22         THE COURT:  A little louder, again, Mr. Battista.

      23   That mike is feeling a little faint.

      24         MR. BATTISTA:  Let me switch.

14:14:54 25         THE COURT:  Sure.  You can use them both.

12

14:15:02  1       MR. BATTISTA:  Two points.  First of all, Your Honor,

2  I think there's a threshold issue here which we have briefly

3  mentioned in our pleadings, is that the defendant has to

4  establish standing to make these arguments.

14:15:13  5       From the government's perspective the evidence is

6  clear that the apartment that was rented was rented under a

7  false identity in the name -- under the name of Brawner.  The

8  aircard was obtained and maintained under another false

9  identity of Rupard.

14:15:30 10       It's my understanding that Mr. Brawner was deceased.

11  It's my understanding that Mr. Rupard -- there was a Travis

12  Rupard alive at the time of this offense.  So the defendant

13  has one threshold that he has not crossed yet in terms of the

14  fact that -- that does he even have standing to make any

14:15:49 15  claims with respect to the location of the aircard or the

16  actual apartment?

17       A second point is that this equipment that was

18  operated, while it did interface with the aircard, only

19  allowed the investigators to obtain information that got them

14:16:11 20  into the general area of the card.  So the question is:

21  Does -- while the equipment was, in fact, communicating

22  directly with the aircard, the agents -- the investigators --

23  whether they were agents -- the FBI personnel -- regardless of

24  their titles, the FBI personnel couldn't tell exactly where

14:16:32 25  the aircard was.

14:16:34   1          So does the defendant have an expectation of privacy

2    in the area of the size of three to four apartments, which

3    includes the public areas of the apartment, the walkways, and

4    also the interiors of other apartments?

14:16:52   5          THE COURT:  Well, let me jump in at that point,

6    Mr. Battista, and ask -- make a point about those two and then

7    ask you a question.  I understand that you are arguing

8    generally that the defendant cannot establish a Fourth

9    Amendment violation because the aircard was procured by fraud.

14:17:11  10   I know you've made that argument.

11          I hadn't understood you before to suggest that I

12   should have that issue briefed and decided before we go any

13   farther in the factual development in this case, but if you

14   want to make that point, we can -- you can.

14:17:25  15          But I understand that's part of your argument, that's

16   part of your reason for why there's no Fourth Amendment

17   violation.

18          I also understand you're arguing that the device

19   could get no more specific than three or four apartments.

14:17:38  20   We're going to talk more about that in a minute.  But that's

21   part of your Fourth Amendment response.

22          It seems to me, though, that the point of what I'm

23   trying to get at now is, if we were to go through a

24   suppression hearing, I would say Mr. Rigmaiden has established

14:17:51  25   by a preponderance of the evidence that the device boosts the

14

14:17:56   1   signal of the aircard and writes software to the laptop.

2            Now, with those facts established, is there a Fourth

3   Amendment violation?  Now, I may conclude with you, no,

4   there's not, because he doesn't have standing.  Or I may

14:18:09   5   conclude, no, there's not, because even if it does that stuff

6   to the laptop, it's no more precise than three or four

7   apartments and that's not a Fourth Amendment violation.

8            So I understand those arguments are at play, but I

9   guess what I'm really interested in is, do you agree that

14:18:25  10   because of the fact that you have not disclosed what the

11   device does to the aircard signal strength or what it does in

12   terms of writing software to the laptop's hard drive, then at

13   a hearing, where he presents evidence in support of that, I'm

14   likely to find by a preponderance of the evidence that he's

14:18:44  15   proved his point.

16            MR. BATTISTA:  One moment.

17            (Government counsel confer.)

18            MR. BATTISTA:  Your Honor, I think one -- an

19   additional threshold would be the fact that whether or not

14:19:42  20   this -- these individual points that the defendant is making

21   with respect to, let's just say boosting the signal or using

22   the energy of -- using the electricity of the laptop, another

23   issue is, is whether or not it's material in this case.

24            In other words, it's the government's position that

14:20:02  25   we did obtain a search warrant under Rule 41, and that in

14:20:07  1   order to execute a search warrant under Rule 41, obviously the

2   government is entitled to do certain things to execute that

3   warrant.  Example could be, there are times when forced entry

4   has to be done where flash bangs might be used, explosives

14:20:26  5   might be used.  A significant -- there might be a significant

6   amount of activity by law enforcement in order to make entry.

7          In this particular case, any operation of the

8   equipment is a de minimis impact on the operation of the

9   aircard and the defendant's -- I'm not aware of any impact on

14:20:49  10   his computer, but in terms of the cell site simulator and the

11   use with respect to the aircard, all of this impact is

12   de minimis.

13          THE COURT:  Well, you're arguing the Fourth Amendment

14   issue again, and I'm not asking you to concede that if he

14:21:04  15   established those two facts, there's a Fourth Amendment

16   violation.  I understand you've got the arguments you've made

17   and others as to why there's no Fourth Amendment violation.

18          Let me ask the question differently.  Let's assume

19   that we are now at the suppression hearing, and let's assume

14:21:19  20   I've said the information is privileged and he's got other

21   information with which to make his case.  He puts on the

22   evidence, he's already got it in the documents, that it boosts

23   the signal strength and that it writes software to the hard

24   drive, and I turn to you.  Are you going to try to present

14:21:39  25   evidence to rebut that?  And if so, where does that evidence

16

14:21:43  1    come from if you have withheld the actual workings of this

2    particular device?

3         MR. BATTISTA:  Well, Your Honor, I'm here

4    representing obviously the position of the Department of

14:21:51  5    Justice and the Federal Bureau of Investigation.  So they're

6    taking the position that they don't want to disclose this

7    information.  If I'm placed in a situation where the

8    disclosure of that -- any information could result in the

9    suppression in this case, then the folks that I'm dealing with

14:22:15  10   have to cross that bridge, and I have to confer with them.

11         So it's kind of an interesting situation that the

12   parties are being placed in in this situation -- in this

13   instance.  In other words, I don't know what's critical for

14   the Court to make a determination as to whether or not there's

14:22:36  15   a Fourth Amendment violation.

16         If the Court believes there's a list of things that

17   could possibly have happened that could result in a Fourth

18   Amendment violation that could result in supression, then the

19   folks that are seeking to withhold this information, that I'm

14:22:53  20   representing, they're going to have to do their own balancing

21   test.

22         So I can't -- I can't control that.  Now, if I can

23   foresee ahead of time what is critical, then I can go back and

24   confer and -- you know, from my perspective I would love to be

14:23:11  25   able to just disclose everything and proceed, but I don't

14:23:16    1    control the evidence.

2              THE COURT:  Well, my problem with that, Mr. Battista,

3    is it seems to me the time for them to do that balancing was

4    in response to his motion.  What you're sort of saying is,

14:23:25    5    let's get a peek at where the Judge is going and on the stuff

6    that is really important to him, we'll disclose it, but not

7    until we know it is really important to the Judge will we

8    disclose it or consider disclosing it.

9              That's not the way it typically works.  He's given us

14:23:40   10    a very comprehensive list of information he wants, and it

11    seems to me it is in response to that list that the Department

12    of Justice needs to ask, can we go forward withholding all of

13    this?  Are we willing to take the consequences if it may

14    result in a finding of a Fourth Amendment violation?

14:23:56   15              Or are there categories in this list -- and you did

16    some of that because you made some concessions in your

17    response, that we'll talk about in a minute.  Is there -- are

18    there categories here that aren't that sensitive to us so

19    we'll give it up now so that we've got the ability to argue it

14:24:11   20    at the suppression hearing?

21              MR. BATTISTA:  I think the thinking, Your Honor, of

22    the government has been that this information is privileged.

23    And that if the Court performs a balancing test and believes

24    that there is a reasonable basis for it to be withheld, that

14:24:31   25    the government then in a sense shouldn't be prejudiced by that

18

14:24:35  1    and then said, "Well, you know, you haven't disclosed it and

2    then you can't respond, therefore, I'm just going to find

3    against you."

4              THE COURT:  Well, but here's the problem.  If I rule

14:24:46  5    in response to this motion and this hearing today that he

6    doesn't get the information as to whether it boosts signal

7    strength or writes to the hard drive, and we're in here in a

8    couple of months and he presents evidence that it does, and

9    you've withheld the information that says it doesn't, it seems

14:25:07 10    to me at that hearing, when I'm making those findings of fact,

11    I have to rule for him because you haven't produced the

12    information to rebut what he's saying.

13              What I hear you suggesting is, if I get to that

14    point, then I should adjourn the hearing and say, "Okay, go

14:25:22 15    back and reconsider whether you really want to give it to

16    him."  And that seems a little late in the game when the

17    purpose of this motion is to find out what's on the table from

18    the government that he can use in support of the motion.

19              MR. BATTISTA:  Take a minute, Your Honor?

14:25:40 20              THE COURT:  Sure.

21              (Government counsel confer.)

22              MR. BATTISTA:  Your Honor, to clarify the record, is

23    the Court taking the position that, let's say in the ex parte

24    proceeding the direct evidence was presented to the Court that

14:27:48 25    in this particular case the signal was not boosted and that is

14:27:54  1   sealed, it's not available to the defendant, but the Court

2   ex parte has that information, the defendant makes an argument

3   that generally or similar equipment or it's possible that --

4   and, again, we're just -- for purposes of argument we're

14:28:13  5   just -- this is just for purposes of argument, the device

6   boosts the signal of the aircard.

7        If the Court in an ex parte hearing makes a

8   determination that the information is privileged but learns

9   direct evidence with respect to the particular device with the

14:28:29 10   actual operators that this did not happen, but then makes a

11   finding that -- for whatever reasons, that this information is

12   privileged, the defendant makes an argument which turns out to

13   be supposition based upon the evidence that he can gather from

14   external sources.

14:28:46 15        Would the Court then -- it's the government's

16   position that the Court, then, could still make a finding that

17   in this particular case it did not happen based upon the

18   information in the public record and what is sealed.

19        THE COURT:  Well, you've put your finger on another

14:29:01 20   issue that I've wrestled with, which is what is the purpose of

21   the ex parte hearing?  I'll give you my initial thoughts.  I

22   haven't come to rest on this.

23        But it seems to me if I hold an ex parte hearing,

24   there is one purpose and that is for me to decide if this is

14:29:18 25   law enforcement sensitive information.  If it is, then I have

14:29:21  1    to do the balancing.  So I would anticipate that the kind of

2    evidence I would get at that hearing would not be it does or

3    it does not boost the signal strength.  It would be testimony

4    by an agent saying, "This is why we can't make it public.

14:29:37  5    This is where we use it in investigations.  If we were to make

6    it public, this would be the consequence.  It would affect

7    these kinds of cases.  It is very sensitive stuff."

8         So one purpose of the hearing would be to establish

9    that it is law enforcement sensitive, and that's what I

14:29:55 10    understood the hearing to be.

11         Now, I've wondered about the question you've asked,

12    which is, let's say that you want to go beyond that in this

13    ex parte hearing and you want to present evidence that will

14    rebut evidence that Mr. Rigmaiden is presenting publicly.

14:30:11 15    That seems to me to be improper because what you're asking me

16    to do is find a fact in this case on the basis of evidence

17    presented that he's never seen and that he can't test and his

18    expert can't address and he can't cross-examine.

19         It seems to me when it comes to finding the facts

14:30:30 20    that will give rise to the Fourth Amendment issue, those facts

21    have to be found in a hearing where both sides participate.

22    Otherwise -- well, I'll tell you the other way I've thought

23    about it.

24         If it's important enough -- let's take the boosting

14:30:48 25    the signal strength.  If it's important enough for you to be

14:30:52   1   addressing it in an ex parte hearing, then it's relevant.  The

2   first part of the *Roviaro* test is met.  And if you're

3   presenting to me evidence that directly contradicts evidence

4   he has, then getting the evidence you produce would be helpful

14:31:09   5   to him because he could rebut it or challenge it.  So the very

6   fact that you're presenting it at an ex parte hearing means it

7   is relevant and helpful.  And if it is relevant and helpful,

8   then under *Roviaro* it overcomes the privilege and he should

9   get it.

14:31:28  10        That thinking has also caused me to think that the

11   purpose of the ex parte hearing cannot be for you to present

12   evidence to rebut facts he is asserting publicly.  It really

13   should be limited to determining whether or not this is law

14   enforcement sensitive information, and that's the only

14:31:42  15   evidence I would hear.

16        Which is a long-winded way of saying, if I'm right

17   about that -- and I'll give you a minute to explain why I'm

18   wrong, if I am.  But if I'm right about that, then we won't

19   have a situation where he's presenting evidence in open court

14:31:55  20   that it boosts the signal strength and you're presenting

21   evidence in an ex parte hearing that it doesn't.

22        MR. BATTISTA:  Well, then, I see a situation, Your

23   Honor, where you find -- we find -- there's a finding that the

24   information is law enforcement sensitive but the defendant

14:32:12  25   makes an argument, the Court believes that it's somehow

relevant, and then we're prejudiced.

And the defendant -- then, we're being compelled to disclose this information that's law enforcement sensitive, otherwise we may risk suppression in this case. And I would like to think there's more flexibility within the law to simply say, if the defendant can come up with some reason to make an argument with suppression, then he's entitled to the information.

And it's -- you know, I -- we're attempting to do a balancing. We've done -- to this point we've done a balancing. We've taken the position that we don't think the defendant's entitled to it. We think that the Court can rule without this information.

If the Court believes that it can't -- it has to consider certain additional information that at this point in time we don't think that the Court needs, I think that at the time of the hearing the government should be able to waive -- if necessary, we should have the opportunity at that hearing to waive the privilege.

We've always attempted to deal with the defendant in good faith. These are -- there are issues with respect to the technology that it's my understanding go well beyond this case, and that's -- you know, the defendant has asked for the actual device, the defendant has asked for the actual software.

23

14:33:41  1          We attempted to enter into some reasonable

2      stipulations with the defendant about the actual operation and

3      the actual equipment, but the defendant's stipulations were

4      basically, the government is to agree that they acted outside

14:33:57  5      of the scope of the court orders and acted out of the scope of

6      the authority of their employment.  Now, how can we even begin

7      to stipulate about the operation of the equipment without

8      getting into the -- you know, the software and the components?

9          I mean, I would love to enter into some reasonable

14:34:19  10     stipulations about what the equipment does and doesn't do in

11     general terms about the specific equipment that was used in

12     this case.  But I haven't been able to get through to the

13     defendant about, you know, what's reasonable so that he can

14     make his arguments but then we can protect the law enforcement

14:34:41  15     privilege with respect to other cases and other investigations

16     that have absolutely nothing to do with this single case.

17         So that's an issue, and I really don't think -- we've

18     been dealing in good faith.  We've withheld this information

19     in good faith.  We have public policy reasons for doing it.

14:35:04  20     If the Court at the time of the suppression hearing were to

21     believe that particular pieces of evidence were material to

22     its decision as to whether or not the evidence is subject to

23     suppression, we should have the opportunity at that time to

24     waive the privilege.

14:35:19  25         I mean, the defendant, as you said, he's made

14:35:22  1    arguments in 102 pages.  He's made hundreds of discovery

2    requests.  I mean, it all can't be relevant.  It all can't be

3    material.  But we shouldn't be -- you know, we've tried to do

4    the best we can to disclose information to help the defendant

14:35:41  5    make his arguments.  At the very least we shouldn't be

6    prejudiced and not be able to waive a privilege if it's

7    critical at a suppression hearing.

8          THE COURT:  All right.  I understand your position,

9    Mr. Battista.

14:35:59  10          Mr. Rigmaiden, do you have thoughts on the things

11    we've covered so far?

12          THE DEFENDANT:  I think that your assessment is right

13    on point.  I mean, most of what you said I've come across that

14    in my research, and it's gone into a lot of my motions.  So I

14:36:18  15    agree with everything you're saying.

16          As far as the government --

17          THE COURT:  Well, let me just jump in and say I'm not

18    at rest on this yet so don't assume I've ruled.

19          THE DEFENDANT:  Okay.  Okay.  What the government is

14:36:29  20    asking is that I sacrifice some of my Fourth Amendment

21    arguments just so that they don't have to give up what I'm

22    asking for, and they want to tone down my stipulations to a

23    point where they're just not admitting to everything, just

24    admitting to some parts of what they did; enough of what they

14:36:46  25    actually did to think that maybe I won't be able to prove

14:36:50 1     Fourth Amendment violation but not enough for me to make my

2     entire point.

3           So I think the stipulations that I presented cover --

4     I mean, I think they're basic enough for the government to

14:37:00 5     stipulate to those and for me to make my arguments.  But if

6     they're not in agreement with those, I think the only other

7     option is for them to turn over the evidence.

8        THE COURT:  When I looked at the stipulations,

9     Mr. Rigmaiden, they looked overbroad to me because you were

14:37:17 10     asking for more than an agreement that certain facts existed.

11     You wanted them to waive positions or waive claims or make

12     admissions that had a legal consequence, and that's different

13     from having them admit a fact such as the device boosted the

14     aircard signal.  So I'm not of a mind to in effect adopt your

14:37:41 15     stipulations as though those were the facts in the case.

16        They have made some admissions, I think, in the

17     briefs that I want to go through and make sure we're all in

18     agreement with so that those are admitted for purposes of the

19     motion you'll eventually file.  But did you have other

14:37:59 20     thoughts?

21        THE DEFENDANT:  Well, with the stipulations that are

22     more waivers, I think that with those ones there really isn't

23     anything to stipulate to.  They have to let me question the

24     witnesses if I'm trying to get -- find out if they destroyed

14:38:11 25     evidence in bad faith or if they conducted these searches in

14:38:15  1    good faith when they were violating the orders.  And the only

2    way for me to find that out is to put the witnesses on the

3    stand and ask them.

4         THE COURT:  Okay.  Let me come to one other related

14:38:29  5    point.  This is sort of beating the same issue over again, but

6    I want to make sure that we focus on exactly how this will

7    play out.

8         You mentioned, Mr. Battista, the question of whether

9    this device allowed the agents to pinpoint the computer in

14:38:49 10    Apartment 1122 or whether it simply gave them a broader range

11    of three or four apartments.

12        Mr. Rigmaiden has made logical arguments that the

13    device on the vertical access must have been precise to a

14    range of 9 feet, which is the height of the ceiling in the

14:39:12 15    apartments.  And if it wasn't precise to a range of 9 feet,

16    you wouldn't know that it was the three apartments on the

17    first floor.  It would be the three apartments on the first,

18    second, and third floor.  So it is a pretty logical argument

19    that the vertical access range was 9 feet.

14:39:31 20        He's also made the argument that the horizontal

21    access was 8 feet because you ruled out the apartment across

22    the hall, it was 8 feet across the hall.

23        And then he has quoted information from Harris and

24    other products that devices of this type can locate a cell

14:39:46 25    phone in a room.  Now, I know you disagree with that, and an

27

14:39:53  1    important part of what the government has been saying is that

2    didn't happen in this case; we only narrowed it down to a

3    three or four apartment range, and then we did good

4    old-fashioned investigative work to find which one it was.

14:40:08  5         But if we're at the hearing and he presents the

6    evidence from makers of similar devices, or maybe this device,

7    that you can pinpoint it within a room, and he makes the

8    logical argument that you had to narrow it down to 9 feet on

9    the vertical access, and you haven't presented evidence on

14:40:25 10    that, it seems to me if I'm weighing the preponderance of the

11    evidence at that hearing, I'm likely to conclude that this

12    device located it in Apartment 1122, because there's nothing

13    you're presenting to counter that evidence.

14         It's the same problem I just talked about but it's a

14:40:42 15    little finer point because this is an important issue even

16    under what you said a moment ago.  I guess what I'm asking is:

17    How are you going to argue at the suppression hearing that it

18    was three to four apartments when you have declined to

19    disclose the very information that would show whether or not

14:40:58 20    it narrowed it down to three or four apartments versus one?

21    How are you going to do that at the suppression hearing?

22         MR. BATTISTA:  Your Honor, at this point in time the

23    government proposed that the case agent would be hearsaying in

24    the testimony that he has talked to the tech agents, so he

14:41:26 25    could testify through hearsay in terms of the extent to which

14:41:31   1   the equipment was operated and what the results were based on

2   the tech agent's operation of the equipment in this case.

3           THE COURT:  So we'd have the case agent saying under

4   oath, "They told me that the equipment only narrowed it down

14:41:47   5   to four apartments."

6           MR. BATTISTA:  Three to four apartments, Your Honor,

7   in this case.

8           THE COURT:  And Mr. Rigmaiden wouldn't be able to

9   cross-examine on that issue very effectively.  I mean, I'm

14:41:59  10   sure the case agent would say, "That's what they told me."

11   But then I'm being asked to decide this very critical issue on

12   the Fourth Amendment taking the hearsay of the case agent

13   against very specific technical information Mr. Rigmaiden has

14   given me that says these devices can locate it in a room.

14:42:21  15           Now, when I do that preponderance of the evidence

16   evaluation and I'm weighing the hearsay of the case agent

17   versus the very specific technical information, do you really

18   want me to make the decision on that balance of the evidence?

19   I mean, I can't -- just because it's a case agent reporting

14:42:37  20   hearsay, I can't say that trumps any technical information, it

21   has to be true.

22           This is the problem I foresee at the suppression

23   hearing and -- but I understand you to be saying that if you

24   withheld it, you're not going to -- well, or you -- I

14:42:53  25   understand you'd be saying you'd either use the hearsay of the

14:42:55   1   case agent or you may decide in the dynamics of that

2   suppression hearing that you're going to waive the privilege

3   on the precise location that was identified by the device and

4   you're going to disclose the information.

14:43:07   5          MR. BATTISTA:  Well, what we have to do in that case,

6   Your Honor, is that we would then have to -- we would be

7   forced to disclose information that we don't believe is

8   material.  We may have to be forced to disclose the identity

9   of the tech agent.  Forced to disclose the exact identity of

14:43:26  10   the equipment so we can come in and prove a negative.  That's

11   in a sense what we'd have to do.

12          And I understand that the Court needs the government

13   to rebut the defendant's claims based on information that is

14   available to him, but which is not the information of the --

14:43:43  15   of what happened in this case.  I understand the situation

16   that we'll be in.  I don't have a good answer for you at this

17   time.  I will tell you that, again, because I'm representing

18   interests that aren't sitting in the courtroom today, Your

19   Honor, and --

14:44:04  20          THE COURT:  Well, you know, it seems to me,

21   Mr. Battista, that you could choose to litigate this issue on

22   that basis, and you could argue he doesn't have standing so we

23   win on the Fourth Amendment.  You could argue that even if the

24   device pinpointed it in his apartment, it wasn't an illegal

14:44:25  25   search and argue why.

30

14:44:28   1          You could -- you know, there's various Fourth

2     Amendment arguments you could make.  But it seems to me the

3     one you can't make is a technical evidence argument that the

4     device didn't work that way when you withheld the technical

14:44:44   5     evidence.

6          MR. BATTISTA:  I understand, Your Honor.  So that's

7     a -- so I have to regroup and decide whether or not -- what

8     risk we're willing to accept.

9          THE COURT:  Well, and that gets me back to the

14:44:58  10     practical question.  So what we're saying is that we want to

11     go forward with extensive briefing and preparation and a

12     suppression hearing with witnesses here with the understanding

13     that you might choose during that hearing to regroup and to

14     change your strategy and to disclose information so we have to

14:45:17  15     do the suppression hearing over again after the information

16     has been given to him and his experts had the time to evaluate

17     it, and we re-brief it all over again.  That doesn't seem like

18     a very efficient way to get this problem solved.

19          MR. BATTISTA:  Your Honor, one thing I would propose

14:45:32  20     is that -- I would propose that I order a transcript of these

21     proceedings and that I share these -- the transcript of the

22     proceedings with the Department of Justice and the FBI.  I've

23     been dealing directly with folks in both areas on this case

24     for quite some time.  And the position of the Court is clear.

14:45:57  25     The arguments have been crystallized.

14:46:00  1    If I can get any flexibility, I'd love to do it.  In

2    perhaps in -- like in a week or two I could come back to the

3    Court and we could continue this discussion, and I might have

4    some additional information.  I apologize that I don't have

14:46:22  5    additional information for --

6         THE COURT:  Well, let's come back to that suggestion.

7    There's other ground I want to cover that may shed light on

8    those issues as well.  Was there any -- was there something

9    else you wanted to say on that point?

14:46:35  10        MR. BATTISTA:  No, Your Honor.

11        THE COURT:  All right.  Anything from you,

12    Mr. Rigmaiden, on those issues?

13        THE DEFENDANT:  No, Your Honor.

14        THE COURT:  Let me just make a few other observations

14:46:40  15    of related points, and then I want to talk about some specific

16    facts.

17        One of the arguments that was made by the government,

18    a bit indirectly in its response, was that Mr. Rigmaiden has

19    not made the Rule 16(a)(1)(E) prima facie showing that the

14:47:04  20    evidence he seeks is material to preparing his defense.  I

21    don't agree with that.  I think he has.

22        Now, maybe the one exception to that is his very

23    broad claim near the end where he says getting the manuals may

24    identify other Fourth Amendment violations he's not aware of.

14:47:23  25    That clearly doesn't satisfy 16(a)(1)(E)(i).

14:47:27  1          But with respect to all of the others, he's given us

2     lots of reason to think that the evidence may be in possession

3     of the government and he's explained why it might be helpful,

4     and I think that does satisfy that requirement.  So I'm not

14:47:38  5     going to deny his request on a Rule -- on the basis of his

6     failure to make a Rule 16 showing.  If I deny his request, it

7     will be because of the balancing I've done after I decide

8     whether or not this is privileged.

9          Let me ask another question.  I don't mean to be

14:47:55 10     focusing entirely on the government but -- well, I guess I do

11     mean to be because that's where I've got the questions.

12     Mr. Battista, I understood from your response the government

13     to be arguing that it had a warrant, which was Order 330 from

14     the Northern District of California, to use a mobile tracking

14:48:16 15     device to locate the aircard, and therefore there was no

16     Fourth Amendment violation.

17          I did not understand the government to be arguing

18     that it could have done all of this without a warrant because

19     use of this device to locate the aircard is not a search and

14:48:36 20     seizure for purposes of the Fourth Amendment.

21          MR. BATTISTA:  Your Honor, I think as we pointed out

22     in the case law -- in our memo, the case law in this area is

23     not clear.  There are parts of the country where a statement

24     of probable cause is not required by the courts.  I think --

14:49:08 25     so the Department of Justice in different parts of the country

14:49:13  1    takes a different position.

2         We were in the Northern District of California.  It

3    was the -- my understanding that the courts in the Northern

4    District of California, particularly the court that we

14:49:27  5    presented this application in, required a warrant.  In other

6    words, while the Department of Justice does take the position

7    that a warrant is not required, we feel more secure in this

8    case because we believe that we did obtain a warrant.

9         The 9300, I think 0, is listed under -- does list

14:49:55 10    Rule 41.  There is an extensive affidavit, 16, 17 pages long.

11    There is -- we believe there is a statement of probable cause

12    in that.  So we believe that the argument can be made that you

13    don't need a warrant, but in this particular case we do have a

14    warrant.

14:50:16 15         THE COURT:  Well, here's the reason for the question.

16    Much of what Mr. Rigmaiden is seeking is designed to support

17    an argument that this was an unlawful search and seizure.  For

18    example, boosting the signal strength of the card and writing

19    to the software was a seizure of the computer and the aircard.

14:50:45 20         If the government was to say, "We agree, but we had a

21    warrant," then his need to prove that's a seizure or a search

22    doesn't exist anymore.  So I don't have to give him that

23    information.  You're agreeing it's a seizure and a search.

24    You're just staking your position on the validity of the

14:51:05 25    warrant.  And then what I have to decide is, was it a valid

14:51:08  1    warrant?  Was it exceeded?

2          But if you're also going to argue, "Even if you find,

3    Judge, the warrant wasn't valid or it was exceeded, there was

4    no Fourth Amendment violation because it wasn't a search or a

14:51:18  5    seizure," then I think I have to make sure he has the evidence

6    with which to argue that it was a search or a seizure.

7          MR. BATTISTA:  I understand, Your Honor.  Again,

8    we're back to the chicken and egg issues here in terms of we

9    have to balance the defendant's need versus --

14:51:42 10          THE COURT:  Well, I'm not asking -- I'm not asking

11    what you're willing to disclose.  I guess I'm just asking, are

12    you going to take the position in response to the suppression

13    motion that using the device to locate the aircard was not a

14    Fourth Amendment search or seizure?  Therefore, even if I find

14:52:01 15    the warrant invalid, there's no Fourth Amendment violation.

16          MR. BATTISTA:  That's a big question, Your Honor.

17    Can I take a minute on that, too?

18          THE COURT:  Yeah, you can.

19          MR. BATTISTA:  Thank you.

14:52:14 20          THE COURT:  You can take more than a minute.  I mean,

21    if you want to think about it and let us know later, that's

22    fine, but --

23          MR. BATTISTA:  Yeah, I --

24          THE COURT:  -- but that affects what's relevant for

14:52:23 25    purposes of this motion.

14:52:24  1        MR. BATTISTA:  That's got a very bright line in it,

2    Your Honor.  Let me think back and I will report back.

3        THE COURT:  All right.  Let me ask another question

4    of you, Mr. Battista.  In his voluminous exhibits,

14:53:26  5    Mr. Rigmaiden has included as Exhibit 26, an investigation

6    details report by U.S. postal service inspector.

7        MR. BATTISTA:  Your Honor, could you tell me what

8    docket number that --

9        THE COURT:  Yeah, it's Docket 587, Exhibit 26.

14:53:56 10   You're going to know what I'm talking about, I think, in just

11   a moment.  The report on page 7 --

12       MR. BATTISTA:  Excuse me, Your Honor, I have

13   Docket 587 in front of me so I'll just --

14       THE COURT:  Turn to Exhibit 26.

14:54:21 15       MR. BATTISTA:  Yes, Your Honor.

16       THE COURT:  This print is really small.  Turn to the

17   second page of that exhibit.  About 3 inches down it says:  On

18   7/15/08 we were informed that they were able to track a signal

19   and were using a, quote, StingRay, close quote, to pinpoint

14:54:45 20   the location of the aircard.  It goes on to talk about the

21   nature of the apartment.

22       Mr. Rigmaiden has been arguing that the government

23   was using a StingRay produced by Harris.  This document seems

24   to support that.

14:55:10 25       MR. BATTISTA:  Let me respond to that, Your Honor.

14:55:11  1          THE COURT:  Yeah, please.

       2          MR. BATTISTA:  I've sought to explain to

       3   Mr. Rigmaiden, and the example I use, and I talked about this

       4   case so many times, is Kleenex and tissue.  Kleenex is a brand

14:55:28  5   name but it's a tissue.  People regularly refer to tissue as

       6   Kleenex.  "I need to blow my nose.  Will you give me a

       7   Kleenex?"  Everyone knows what they're talking about.

       8          In the law enforcement world, there's a StingRay and

       9   then there's the generic term "StingRay" meaning all types of

14:55:46 10   devices.  The five case agents were using the term "StingRay"

      11   as the term "Kleenex."  They did not operate the equipment.

      12   They did not know what the equipment is.  They didn't receive

      13   any training on the equipment.

      14          So they were -- in the course of the investigation,

14:56:09 15   the term "StingRay" was used as a generic term.  I've

      16   explained this to the defendant numerous times.  None of the

      17   five investigators know the make, model, manufacturer of the

      18   exact equipment.  There were tech agents out there.  They're

      19   the ones who possessed the equipment, operated the equipment.

14:56:29 20          So, yes, the word "StingRay" is in the discovery.

      21   When they're using the term "StingRay," and I've explained

      22   this to the defendant, it's Kleenex.  It's tissue.  They don't

      23   know.  It could be a StingRay.  It could not be.  It could be

      24   something else.  They didn't know what it was.  They didn't

14:56:48 25   see it.  They didn't operate it.

14:56:51   1        THE COURT:  All right.  Mr. Rigmaiden, did you want

2    to address anything we've said about that?

3        THE DEFENDANT:  About the StingRay, does it matter

4    what they knew?  Doesn't it matter the people who used it,

14:57:05   5    what they knew?  I mean, I should know what it is.  Is it the

6    StingRay made by Harris or the StingRay generic made by

7    another company?  I don't think it makes a difference.  I'm

8    sure that whatever the device is, they've got to be somewhat

9    the same.

14:57:17   10        But if they're going to make these arguments that

11    it's not capable of locating the aircard down to a single

12    apartment, then I think I should be able to know the make and

13    model of it.  But I mean, I'm not law enforcement so whether

14    or not StingRay is a generic term or not, I can't really say

14:57:34   15    anything about that.  But I'm sure tissue is a lot more common

16    than StingRay, in any event.

17        THE COURT:  All right.  Let me talk through some of

18    the categories of information Mr. Rigmaiden has requested.  In

19    Part A of his motion he requests information that would allow

14:57:55   20    him to determine whether the mobile device was used on foot or

21    with a helicopter.

22        And I understand your helicopter argument is based on

23    the *Riley* case that concerned a helicopter hovering low over a

24    house, Mr. Rigmaiden.

14:58:13   25        The government has said, I think admitted in its

14:58:15 1   response that it was used on foot and it was used on foot

2   within the apartment complex.  Is that right, Mr. Battista?

3       MR. BATTISTA:  Yes, Your Honor.

4       THE COURT:  Now, I understand you'd like to try to

14:58:32 5   dispute that to show it was in a helicopter because of the

6   *Riley* case, but it seems to me -- and I'll consider whether

7   that is a sufficient basis to outweigh the privilege if I find

8   the privilege exists.

9       But it seems to me for purposes of what is argued in

14:58:46 10  the motion to suppress, the government has admitted that it

11  was a mobile device used on foot in the apartment complex and

12  you can rely on that.  Do you have any basis for disagreeing

13  with that, Mr. Rigmaiden?

14      THE DEFENDANT:  Well, if the prosecution is saying in

14:59:06 15  their motion that they expect their witness to testify to

16  that, then is that the same as evidence?  I mean, I'm --

17      THE COURT:  Well, I guess my point is, since they say

18  that in a file document, 602, I'm going to accept as true that

19  it was on foot in the apartment.  If you want to argue that

14:59:24 20  using it on foot in the apartment was part of the Fourth

21  Amendment violation, as you've argued in your motion, because

22  it was inside a secure apartment, there were security gates,

23  they were already inside the protected space of the apartment

24  dwellers, it seems to me you can make those arguments based on

14:59:42 25  the admission they've made in the response.

14:59:46  1          THE DEFENDANT:  Yes, if you accept that as a fact,

2      then, yeah, I could.

3          THE COURT:  The second category in Part A is you want

4      information concerning the date and time of the data

14:59:55  5      destruction that occurred.  The government in its response

6      admits the data was destroyed.  In fact, the court order said

7      it should be.  And in his letter to you, that you cite in your

8      motion, Mr. Battista said the agents aren't entirely sure but

9      they believe it was destroyed shortly after your arrest on

15:00:21 10      August 3rd of 2008.

11          You've argued in your motion that if the data was

12      destroyed shortly after your arrest, that raises Fourth

13      Amendment problems and destruction of evidence problems.

14          Again, it seems to me that the government is agreeing

15:00:34 15      it was destroyed and it happened after you were arrested, not

16      before, which I think is the critical distinction for the

17      argument you're making.  And, again, you can assume those

18      facts are true for purposes of making your Fourth Amendment

19      argument.  Do you disagree with that?

15:00:51 20          THE DEFENDANT:  If you accept that as a fact, then,

21      yes, I can make my argument with that.

22          THE COURT:  Am I right that that's what you said,

23      Mr. Battista?

24          MR. BATTISTA:  That's correct, Your Honor.

15:01:01 25          THE COURT:  You -- the third category you make under

40

15:01:04   1   Part A is that you need to question the agents involved in the

2   admission to rebut any argument the government might make that

3   the conduct in this case comes under the good faith exception

4   to the warrant requirement.

15:01:26   5        But the case law is very clear that it's an objective

6   good faith test.  It's not a subjective test.  It's not what

7   was in the law enforcement purpose -- person's mind.  It is

8   whether looking at the facts that occurred a court would say

9   it was objectively reasonable for them to assume the warrant

15:01:44  10   covered the search or the warrant was valid.  Since it's an

11   objective test, I'm having difficulty understanding why you

12   need to question the agents about their subjective

13   understanding.

14        THE DEFENDANT:  With the good faith -- I guess if you

15:02:02  15   say it's just subjective, I'll have to agree with you on that

16   because you're the judge, but I know that with the destruction

17   of evidence in *Barton* they question --

18        THE COURT:  That's a different question.

19        THE DEFENDANT:  Okay.

15:02:13  20        THE COURT:  Yeah.  We'll talk about that in a minute.

21   But the good faith exception recognized in the *Leon* case is

22   clearly objective.  In fact, the Supreme Court says that in

23   *Leon*.

24        THE DEFENDANT:  Yes.  Well, I thought I read some

15:02:25  25   parts of those cases and similar cases that say that you

15:02:28  1   consider the agent's training and experience, you can question

2   them on that.  I don't know if that's in line with your

3   reasoning or not but --

4         THE COURT:  Yeah, you're right, but then it's still

15:02:37  5   an objective test.

6         THE DEFENDANT:  Yeah.

7         THE COURT:  So your point is you'd want to inquire

8   about training and experience?

9         THE DEFENDANT:  Well, if the government doesn't raise

15:02:44  10  a good faith argument that would require considering their

11  training and experience, then I wouldn't need to question them

12  on that.

13        THE COURT:  Okay.

14        Yeah, the last point that you make under Part A is

15:02:58  15  the one you just mentioned, which is, it's not a Fourth

16  Amendment argument, it's a due process argument, that there

17  was a bad faith destruction of evidence in this case.  And

18  your argument is, you need to question the agents to determine

19  the circumstances under which the data was destroyed so that

15:03:16  20  you can I think establish two things.  One is that they knew

21  it was potentially exculpatory, and, number two, they were

22  acting in bad faith.  So you can satisfy the *Youngblood* test

23  for a due process violation.

24        And on this issue I wanted to ask you the question,

15:03:35  25  Mr. Battista, if Mr. Rigmaiden wants to argue that this

15:03:40  1   destruction of evidence was a due process violation of

2   *Youngblood*, if I find -- and I don't know if I would, but if I

3   find that a reasonable agent would have known that that data

4   is potentially exculpatory under a Fourth Amendment argument,

15:04:00  5   how does he address the bad faith issue if he doesn't know

6   anything about what the agents did or why they destroyed it or

7   when they destroyed it?

8        MR. BATTISTA:  Your Honor, at this time we're not

9   aware of any basis for a finding of bad faith.  In other

15:04:18  10   words, going into the operation, the court order was

11   specifically to destroy the information.  There's been

12   statements now in the public record that that's also FBI

13   policy.  So they were following a court order and FBI policy,

14   so there obviously were valid reasons for doing it.

15:04:43  15        So somehow the defendant would have to come up with a

16   reason of basis to say that in the face of a court order, an

17   FBI policy, that there was something in this information that

18   the agents knew about and then knowingly and intentionally

19   decided to destroy contrary to the court order and contrary to

15:05:05  20   FBI policy.  And I'm not aware of what that could possibly be.

21        Again, if there's some -- again, I'm in a position

22   now, I don't know -- I don't see a basis.  If there is a

23   basis, then, again, I -- and I apologize that I don't have all

24   the answers standing here.  But if there is some basis that

15:05:31  25   puts this case in jeopardy, then, you know, I may have to

15:05:35   1    waive some privilege and I may have to produce some testimony.

2         THE COURT:  All right.  Let's talk for a minute about

3    Category B of Mr. Rigmaiden's motion.  He wants to obtain

4    unredacted copies of the applications that were submitted in

15:05:52   5    support of the warrant and the order in the Northern District

6    of California.

7         And, Mr. Rigmaiden, your reason for making that

8    argument is because of case law which says that the affidavit

9    in support of a warrant effectively becomes a part of the

15:06:09  10    warrant if there's inclusive language in the warrant and it's

11    attached to the warrant.

12         Mr. Battista, is the government going to argue in

13    this case that the two Northern District of California orders

14    include the application?  And so when I decide the validity or

15:06:30  15    the scope of those orders and that warrant, I must look at the

16    application as well?

17         MR. BATTISTA:  For purposes of the application of

18    the -- or the execution of the orders or the warrant, Your

19    Honor?  In terms of whether or not they were --

15:06:51  20         THE COURT:  Yeah, I think this is an execution issue

21    because of the case law that says even if a warrant is

22    deficient, if there was sufficient detail in the attached

23    affidavit, then the execution was valid.

24         MR. BATTISTA:  It's very minor information that's

15:07:10  25    withheld, Your Honor.  The government withheld it under the

15:07:14  1    privileged argument.  I'll to have reserve my response to that

2    and look into it and see what our position is on that.

3          THE COURT:  I assume you would agree, Mr. Battista,

4    that if you make that argument, you couldn't rely on any

15:07:29  5    portion of the application that is redacted.

6          MR. BATTISTA:  Right.

7          THE COURT:  Let me flag another issue that is similar

8    to the ones we've already talked about in terms of, we've

9    talked about the precision with which the device located the

15:09:08 10    aircard is an issue.  We've talked about whether or not the

11    device boosts signal power or writes software to the laptop.

12          A similar kind of issue is the question of whether

13    the government used the device after July 16th of 2008 to

14    verify that the aircard was still in the apartment.

15:09:33 15          Mr. Battista -- or, I'm sorry, Mr. Rigmaiden argues

16    that the documents he's received suggest that there was going

17    to be a verification that it was still there afterward and

18    that the LAESP messages suggest that, in fact, there was a

19    verification that occurred on July 25th and July 28th.  The

15:09:55 20    government flatly denies that there was.  Said there was no

21    verification after July 16.

22          It seems to me to be precisely the same kind of issue

23    we've talked about.  If we're at the suppression hearing and

24    Mr. Rigmaiden puts in evidence Agent Murphy's [sic] message to

15:10:14 25    you, Mr. Battista, that he wanted to verify the location on

15:10:17  1    July 25th and 28th, and if Mr. Rigmaiden puts in evidence the

2    LAESP messages showing activity on those dates to suggest that

3    there was a verification, and I have an agent on the stand

4    reporting hearsay that the agents told them that didn't

15:10:35  5    happen, I'm left weighing specific information from the

6    discovery versus hearsay from the government on that question

7    of whether it was verified after July 16th.  So it's the same

8    issue we've got on those other points that I think we need to

9    think about, or the government needs to think about.

15:10:57 10         Comments from either side on those issues?

11         MR. BATTISTA:  Your Honor, I think that -- and just

12    for the record, Your Honor, it's Special Agent Murray instead

13    of Murphy but that's just --

14         THE COURT:  Did I misread it or did it say Murphy in

15:11:17 15    the brief?  I might have misread it.  Okay.  It's Murray.

16    Thank you.

17         MR. BATTISTA:  Again, just for clarification,

18    Your Honor.

19         I think we would have more detailed information on

15:11:32 20    that because the FBI Special Agent Murray was the one who was

21    in charge of coordinating the teams, making the requests for

22    the teams.  So the teams didn't take any action without him

23    taking action.

24         There is some -- you know, I think that the

15:11:51 25    government should be able to respond to that particular

15:11:53  1    information based on the testimony of Special Agent Murray and

2    also someone from the FBI who could interpret the data that

3    has been turned over to the defendant.

4          There is some -- there are some anomalies or unex- --

15:12:12  5    not fully explained activity on the aircard records after the

6    16th, but that activity was not caused by any -- the equipment

7    after the 16th -- you know, the testimony of Special Agent

8    Murray was, he never requested the equipment, he never

9    coordinated the equipment, the equipment was never brought

15:12:38 10    out, the team was never brought out.

11          I think we should be able to rebut that testimony

12    through an interpretation of the records.  Plus the warrant

13    was still in effect for 30 days, Your Honor, so there was

14    additional timeframe.  But once the three to four apartments

15:13:00 15    were located, the team's work was done.

16          THE COURT:  Well, I understand the warrant was still

17    in effect --

18          MR. BATTISTA:  I guess my --

19          THE COURT:  -- you mentioned that, but that's not the

15:13:07 20    relevancy.

21          MR. BATTISTA:  Yeah.

22          THE COURT:  The relevancy of the point I think for

23    Mr. Rigmaiden's point was -- well, go ahead.  What were you

24    going to say?

15:13:15 25          MR. BATTISTA:  I think we should be able to rebut

15:13:16  1    that with evidence with respect to the case agent and

2    interpretation of the records from the aircard, Your Honor,

3    which the defendant has.

4         THE COURT:  I think -- I think Mr. Rigmaiden's point

15:13:28  5    is that after the 16th -- well, or at least by the 25th and

6    28th you knew it was Apartment 1122, so any verification on

7    those dates would have been apartment specific, even if I were

8    to accept that the location initially was not apartment

9    specific.

15:13:48 10         MR. BATTISTA:  Your Honor, I think the Court could

11    find in hearing that we wouldn't have bothered because the

12    evidence will show within several days -- within two to three

13    to four days after the 16th we had acquired the lease

14    application to the apartment, which was obtained under -- with

15:14:04 15    a false identity through the use of a false tax return.

16         So as I said before, once we did the investigation of

17    the three to four apartments, the lease application was the

18    bull's-eye for us, and then all the investigative efforts was

19    focused on 1122.

15:14:22 20         So I think the Court could make a finding that there

21    would be no good reason to tie up a technical team two or

22    three times to come to tell us something that we didn't need

23    to know, because it's clear from the discovery and all the

24    efforts that once that lease application was uncovered through

15:14:40 25    the grand jury subpoena, which the defendant has, all energy

15:14:43  1    was focused on the defendant's apartment.

2            So I think we could rebut that, Your Honor, and the

3    Court could make a finding.  Regardless of what argument the

4    defendant could make, there's no reason to have brought that

15:14:54  5    team out after the 16th.

6            THE COURT:  Did you want to say anything on that

7    issue, Mr. Rigmaiden?

8            THE DEFENDANT:  Yes.  The records are inconsistent

9    between what the FBI created from the LAESP messages to what

15:15:05 10    they created -- what they used to actually go off of as a

11    human readable form.  So my argument is that I need to look at

12    the original storage devices they stored the information on to

13    see if somehow something was erased off of there or if they

14    left something out that would further drive the fact they were

15:15:25 15    pinging the card after the 16th.

16            And even if they got the lease application

17    afterwards, they would still want to know that it's in there

18    if they're going to go and execute a search warrant.  So just

19    because they know they have the lease application doesn't mean

15:15:36 20    that there's no benefit from continuing pinging the card after

21    that.

22            THE COURT:  All right.  Mr. Rigmaiden also argues

23    under Section C that the device that was used likely generated

24    realtime data that was also destroyed, and he cites various

15:16:00 25    sources suggesting that these devices do create realtime data.

15:16:06   1          It seems pretty obvious to me, not knowing much about

2    technology or this device, that it generated realtime data.

3    The device that was handheld was telling the agent something.

4    Is the government disputing that the device generated realtime

15:16:27   5    data?

6          MR. BATTISTA:  Well, I think, Your Honor, the

7    government admitted in its pleadings that a cell site

8    simulator was used.  So if -- obviously if the equipment is

9    simulating a cell site and communicating with the aircard,

15:16:43  10    something has to be happening in realtime at that point.

11          THE COURT:  He also -- well, let me ask you a

12    question, Mr. Battista.  Is it the government's position that

13    the data destruction portion of the Northern District of

14    California order applied to data from the device as well as

15:17:21  15    data obtained from Verizon?

16          MR. BATTISTA:  Yes, Your Honor.  Any -- any data --

17    it's my understanding that any data that the team collected

18    was destroyed.

19          THE COURT:  So the realtime data from the device

15:17:41  20    would have been destroyed as well?

21          MR. BATTISTA:  Any data that the team collected,

22    whether it was -- I mean, obviously if the cell site simulator

23    is not being used, the aircard transmits to a Verizon cell

24    tower, then through the orders then the information is then

15:18:01  25    transmitted to the FBI, and then the FBI transmits it to the

15:18:05  1    team so you have that data.

2              And at some point obviously the -- when the cell site

3        simulator is in operation, this is all being gathered under

4        the authority of the order.  So whether or not it is,

15:18:19  5    quote/unquote, coming from Verizon to the FBI or directly to

6        the FBI through the use of the simulator, it's my

7        understanding that all of that -- all or any of the data that

8        was collected by the team was destroyed.

9              THE COURT:  Okay.

15:18:43  10          MR. BATTISTA:  Your Honor, and that's -- this is the

11       information that's collected pursuant to the tracking warrant.

12       I mean, we obviously also have -- 331 was the pen register

13       trap and trace, and that would allow us to retain different

14       information under 331.

15:19:02  15          THE COURT:  All right.  I want to talk to you in a

16       minute about the distinction between the pen register and the

17       device, if there is one.

18             Let's talk about Category D of Mr. Rigmaiden's

19       requests.  The first category he seeks is -- well, he asserts

15:19:22  20       that the government obtained nonpublic keys, codes, masks, and

21       data in order to emulate a cell tower.

22             Mr. Rigmaiden, when I read your motion, I couldn't --

23       well, my understanding initially was that you're contending

24       the government would have obtained this information from

15:19:55  25       Verizon, but later I wasn't sure if you were claiming that the

15:20:01   1   government obtained keys, codes, masks, and data from the

2   aircard itself directly.  Are you making one or the other of

3   those arguments?

4          THE DEFENDANT:  Yeah, my argument is that they got it

15:20:15   5   from Verizon Wireless, so this is inside information that

6   Verizon uses so they can communicate with the aircard to know

7   that it's authorized to access the network.

8          So if the government wanted to emulate their own cell

9   tower, they need to get -- they would need that same

15:20:29  10   information from Verizon and load it into their cell -- their

11   cell site and then access the aircard that way.  So I'm saying

12   that information -- seizing that information from Verizon

13   wasn't approved by the orders and it was a Fourth Amendment

14   violation.

15:20:45  15          THE COURT:  All right.

16          Mr. Battista, you've admitted the device simulated a

17   cell tower.  Since the aircard was a Verizon aircard, it seems

18   logical that the device simulated a Verizon cell tower.  Is

19   that something you can agree to?

15:21:06  20          MR. BATTISTA:  Yes, Your Honor, but I don't know

21   exactly what codes or, you know, different things that the

22   device would have to do in order to simulate a Verizon air

23   tower.  But obviously in order to communicate with the

24   aircard, the aircard would have to believe that it was

15:21:26  25   communicating with a Verizon tower.

52

15:21:30  1       THE COURT:  So the --

2       MR. BATTISTA:  Aircards also had the capability to

3  roam and communicate with other towers.  So there may be other

4  capabilities, Your Honor, that I'm not prepared to respond to

15:21:43  5  at this point, but I would agree with you that the most

6  logical explanation would be that in a sense the simulator is

7  acting like a Verizon tower.

8       THE COURT:  The next category of information that

9  Mr. Rigmaiden seeks under Section D is his assertion that the

15:22:17 10  government placed surreptitious phone calls to the aircard.

11  And I assume by that, Mr. Rigmaiden, it's your assertion that

12  the device sent signals to the aircard.  It wasn't

13  communicating just with Verizon, it was communicating directly

14  with the aircard.

15:22:52 15       THE DEFENDANT:  Well, for some reason they were

16  calling the aircard over a six-hour period.  I guess they were

17  using -- the government said they were using just an ordinary

18  phone, I guess a landline phone, just to cause it to generate

19  data.  I don't know why they were doing that over a six-hour

15:23:05 20  period.  That's some of the information I'm trying to get from

21  them.

22       But whether or not they needed to do that in order to

23  operate the StingRay, or whatever they were using, I don't

24  know the answer to that either.  But I know that one of the

15:23:18 25  pen trap orders said it actually has to be engaged in a phone

15:23:24  1    call, so I don't know if maybe they were just making phone

2    calls to make it as if they were complying with the order or

3    if they were making the phone calls because they actually had

4    to do that in order to generate signals they could pick up on.

15:23:34  5         But if they're actually emulating a cell site and the

6    aircard is connecting to the cell site, there would already be

7    a whole lot of other signals going back and forth in between

8    the aircard and the cell site if the aircard was trying to

9    access the cell site to make a data connection, which is what

15:23:50 10    it normally does, instead of a voice call.

11         But I'm just trying to get the details on exactly why

12    they're calling the aircard, and for that purpose -- I want to

13    know why they're calling the aircard so I can kind of

14    differentiate between the StingRay and the pen trap device,

15:24:07 15    which is actually a computer that sits in an FBI office.

16         So it is important that I make a distinction between

17    the two different devices so I can show that the pen trap

18    order doesn't actually cover the StingRay, it only covers the

19    computer that they use.  And whatever they had for the

15:24:24 20    StingRay doesn't really play to that either, but I'm trying to

21    make the distinction between the two devices.

22         THE COURT:  Mr. Battista, when I read your

23    memorandum, I was a bit confused on what you are calling pen

24    register and trap and trace equipment.  Because you use that

15:24:49 25    phrase and then you put in quotes, equipment, and then you

54

refer to the equipment, but then later you talk about handheld equipment that was used from within the Domicilio apartment complex.  Is the government contending that the device that was used in this case, the handheld device, is a pen register and a trap and trace device?

MR. BATTISTA:  Sometimes the FBI uses as a term of art the tracking equipment and pen register and trap and trace device.  But the -- there's the tracking equipment that incorporates the cell site simulator and then there's the standard pen register trap and trace which then collects the phone data that is generated by the account holder with Verizon.

So there's been different references to the equipment as this case has evolved, so I haven't -- I mean, the equipment that was used, the physical equipment that was out in the field to locate the aircard, the mobile equipment that could be transported in a vehicle and the handheld equipment, that's the cell site simulator.  That's the tracking devices.

And then you have simultaneously in operation your standard pen register and trap and trace that is also assisting the investigators to get data.  So you've got two things going on simultaneously.

THE COURT:  All right.  We've got what I'm calling Order 330.  It's the one that you have characterized as the tracking device warrant.

55

15:27:12   1          MR. BATTISTA:  Correct.

        2          THE COURT:  And then we have Order 331 that

        3     specifically authorizes the installation of a pen register and

        4     trap and trace device.  Were those two orders talking about

15:27:29   5     different equipment?

        6          MR. BATTISTA:  I think, Your Honor, the government

        7     sought these orders simultaneously because the equipment would

        8     be being used in conjunction.  In other words, certain

        9     information is going directly to Verizon and then Verizon is

15:27:51   10     transmitting that information to the FBI, and then that

        11     information is then transmitted out to the tech team in the

        12     field.  So the equipment is being operated simultaneously hand

        13     in glove.  In other words --

        14          THE COURT:  Well, I understand that.  My problem is

15:28:10   15     that the tracking device warrant, that's your phrase, which is

        16     Document 330, specifically authorizes the FBI to use a, quote,

        17     mobile tracking device, closed quote.  That's what it says in

        18     the order.

        19          MR. BATTISTA:  Correct.

15:28:39   20          THE COURT:  If I look at 331, it authorizes the

        21     installation of, quote, a pen register and trap and trace

        22     device, closed quote.

        23          MR. BATTISTA:  Correct.

        24          THE COURT:  Those look like they're separate kinds of

15:28:50   25     equipment or separate pieces of equipment.  I understand they

15:28:52  1    were simultaneous.

2              MR. BATTISTA:  They are separate equipment, Your

3    Honor.

4              THE COURT:  Okay.  So is it correct to conclude that

15:28:59  5    331 concerned what you described as a more traditional trap

6    and trace device --

7              MR. BATTISTA:  Correct.

8              THE COURT:  -- and that 330 governed the mobile stuff

9    in the field that was used to simulate a cell tower?

15:29:19 10            MR. BATTISTA:  One moment, Your Honor.

11            THE COURT:  Yeah.

12            (Government counsel confer.)

13            MR. BATTISTA:  There are obviously two separate

14   pieces of equipment.  My understanding was that we were using

15:29:36 15   both orders and both sets of equipment as a type of a hybrid

16   to authorize the operation.  So at this point in time, I'm not

17   willing to limit myself to say 330 is only tracking device,

18   331 is only pen register.  I think the thinking was that these

19   two in conjunction were a legal hybrid to -- that they should

15:30:03 20   be looked at together to authorize the tracking mission.

21            THE COURT:  All right.  Let me see if I can make sure

22   I understand what you said.  I think you've indicated that

23   there was a mobile device used that simulated a cell tower,

24   and there was a separate piece of equipment that is more a

15:30:29 25   traditional pen register that recorded phone numbers.

57

15:30:32  1          MR. BATTISTA:  Correct.

2          THE COURT:  What you're not comfortable doing today

3     is saying that Order 330 only applied to the first category

4     and Order 331 only applied to the second category?

15:30:45  5          MR. BATTISTA:  That's correct, Your Honor.

6          THE COURT:  Mr. Rigmaiden, does that clarification

7     help you?

8          THE DEFENDANT:  Um, yes.

9          THE COURT:  All right.  The next category that

15:31:49 10     Mr. Rigmaiden seeks under Section D concerns the question of

11     whether the government passively eavesdropped on exchanges.

12          It seemed to me, Mr. Rigmaiden, when I read your

13     motion, that you were pursuing two sort of alternative

14     hypotheses.  One is that the equipment was a passive listener

15:32:13 15     in which event it would still have had to do things.  The

16     other was that it was active and it actually simulated a cell

17     tower.  And that you had arguments that regardless of which it

18     is, they still create Fourth Amendment problems.

19          The government has now affirmatively agreed that it

15:32:34 20     was simulating a cell tower and -- and I'll clarify this in a

21     minute with Mr. Battista -- it specifically says that the

22     equipment sent and received signals directly to and from the

23     aircard.  That's paragraph 2 on page 3 of Document 602.

24          So it seems to me the government is agreeing that it

15:32:55 25     was a simulated cell tower that was communicating directly

58

15:33:00  1    with the aircard.  In light of that admission by the

2    government, it seems to put you squarely in one of the two

3    theories you were pursuing, and it makes the other one, the

4    passive listening theory, no longer relevant.  Am I right

15:33:17  5    about that?

6              THE DEFENDANT:  That's right.

7              THE COURT:  You asserted as well in your motion, this

8    is still under Part D, that you believe the government

9    instructed Verizon to send aircard messages to -- send the

15:33:52 10    aircard messages to allow the mobile tracking device to pick

11    it up.

12              You've asserted flatly, Mr. Battista, that the

13    government didn't instruct Verizon to send signals to the

14    aircard; is that right?

15:34:16 15              MR. BATTISTA:  That's correct, Your Honor.

16              THE COURT:  Well, this seems to me, then, to be

17    another one of those categories we've identified where there's

18    a disagreement on the facts and where Mr. Rigmaiden has

19    evidence to support his version, and whether or not you can

15:34:37 20    rebut it will depend in part upon whether or not you assert

21    privileged information.  It's just another one of those

22    categories, I would say.

23              MR. BATTISTA:  Your Honor, there may also be the

24    possibility that the cell phone providers regularly in the

15:34:54 25    normal course of business communicate with the cell phone so

15:34:58  1    that there may be evidence of communications during this

2    timeframe that are not initiated by the government; it's just

3    the normal course of business between the cell phone provider

4    and one of its accounts.

15:35:42  5              THE COURT:  Okay.  The next and last -- actually, no,

6    it's not the last.  The next argument you make under Section

7    D, Mr. Rigmaiden, is that the government used the device as a

8    cell site simulator and forced registration.  You say

9    alternatively the government used a man-in-the-middle attack

15:36:31 10    where it was picking up signals and sending them on to

11    Verizon.

12              It seems the government has admitted in this process

13    of this briefing that it simulated a cell tower and

14    communicated directly with the aircard, which seems again to

15:36:49 15    make irrelevant your man-in-the-middle attack and make

16    relevant your argument that it was sending signals directly to

17    the aircard.  Am I right about that?

18              THE DEFENDANT:  Actually, if -- just because they

19    admit to a cell site emulator doesn't necessarily mean they're

15:37:13 20    admitting to forced registration or a man-in-the-middle attack

21    or a denial-of-service attack.  It would have to be either a

22    man in the middle or denial of service.

23              Because if they're mimicking a cell tower, it's not

24    necessarily forwarding any signals on to Verizon.  So if

15:37:23 25    they're mimicking a cell tower and the aircard is connecting

to the cell tower and the cell tower is connecting to an

actual Verizon Wireless cell tower, then that would be a

man-in-the-middle attack because they're basically acting as

the man in the middle forwarding the signal over.

So that would be one Fourth Amendment issue that I

would have to argue that would be separate from denial of

service, meaning maybe the aircard is just trying to connect

and it's trying to access the Internet, but instead of

forwarding the signal on, they're actually denying the aircard

service.

So those are the two differences but each of those

requires forced registration and requires writing pseudo

number offset codes to the aircard hardware.  But those are

two elements that they are not actually admitting to.  And it

also requires them forcing the aircard to disconnect from

Verizon Wireless.  And these are all elements I can use to

argue different types of seizures or just helps support an

overall seizure.

But just them saying they emulated a cell site, if it

comes to a suppression hearing and I make these detailed

arguments, I think it's another one of those issues -- it's

just another factual issue that we're not in agreement on.  It

would have to be either a man in the middle or denial of

service or it could be both.  Maybe they started doing one and

went to another.  I really don't know.

15:38:46  1        MR. BATTISTA:  Your Honor, if I could clarify.

2    Obviously if you have a cell site simulator, the equipment is

3    acting as a cell site, so there is -- the simulator is between

4    the card and the tower.

15:39:07  5        THE COURT:  Well, are you saying that the simulator

6    in this case was taking the message it received from the

7    aircard and sending it on to a Verizon tower?

8        MR. BATTISTA:  That's my understanding, Your Honor.

9        THE COURT:  Which would be what Mr. Rigmaiden has

15:39:21  10   called the man in the middle.

11       MR. BATTISTA:  Right.  In other words, I'm not aware

12   of anything but a de minimis -- a potential of anything but a

13   de minimis denial of service.  And I don't believe that any of

14   the records that have been provided to the defendant would

15:39:36  15   indicate that there was ever anything but a de minimis denial

16   of service.

17       THE DEFENDANT:  I think I would need the evidence on

18   that because they could do either one, denial of service or

19   man in the middle, and there's different Fourth Amendment

15:39:54  20   issues with either one of those.  I mean, they could pick man

21   in the middle now because they think that I have a lesser

22   chance of succeeding on Fourth Amendment violation for man in

23   the middle, but maybe they were actually doing denial of

24   service.

15:40:05  25       I think that's -- this is one of the reasons why I

15:40:06   1   need to see the evidence because I need to determine exactly

2   how this was done.  I mean, I don't see how the prosecution

3   can stand up now and kind of guess on it.  I mean, he doesn't

4   sound too sure of himself.

15:40:22   5        THE COURT:  All right.  The next category is your

6   assertion, Mr. Rigmaiden, that the government would have sent

7   interrogation signals to the aircard that penetrated the walls

8   of Apartment 1122.  I was going to clarify this a moment ago

9   and I didn't.

15:40:42  10        But, Mr. Battista, in paragraph 2 on page 3 of your

11   response you say, "The equipment mimicked a Verizon cell tower

12   and sent and received signals directly to and from the

13   aircard."  So you are agreeing this device sent signals into

14   Apartment 1122 to the aircard and received signals directly

15:41:07  15   back from the aircard?

16        MR. BATTISTA:  Yes, Your Honor.

17        THE COURT:  That seems to me to be a relevant

18   clarification for purposes of your argument, Mr. Rigmaiden.

19        THE DEFENDANT:  The signals that wouldn't ordinarily

15:41:19  20   be transmitted?  They would agree to that?

21        MR. BATTISTA:  I will state we are simulating the

22   tower.  We are not Verizon Wireless so --

23        THE COURT:  So they normally wouldn't have been sent?

24        MR. BATTISTA:  Correct.

15:42:16  25        THE COURT:  The next category under Part D I think

15:42:18  1   falls into -- it's yet another example of an area where

2   there's just going to be a disagreement -- well, where the

3   government isn't going to be willing to give Mr. Rigmaiden the

4   information he wants for privilege reasons, and that is his

15:42:33  5   assertion that the device would have used various

6   three-dimensional geo-location measurement techniques such as

7   time of flight, power distance, angle of arrival, received

8   signal measurements, statistical analysis, infusion of data.

9   All of which, in Mr. Rigmaiden's view, fall within the generic

15:43:03  10   term of triangulation.

11        My understanding is that the government has not

12   agreed that it did any of those specific things.  Am I right

13   about that, Mr. Battista?

14        MR. BATTISTA:  Yes, Your Honor.

15:43:20  15        THE COURT:  So that's another example, I think, of

16   the kinds of issues we've identified earlier where he'll make

17   certain assertions at the hearing, and your ability to rebut

18   it may depend upon what you have or have not withheld as

19   privileged.  Again, recognizing you've got other Fourth

15:43:40  20   Amendment arguments you'll make.

21        We're about to the end of this but there's another

22   request under Subpart D that Mr. Rigmaiden makes, which is, he

23   wants to know whether the government shifted the location of

24   the device.  And the government in paragraph 3 on page 3

15:44:00  25   specifically admits that the FBI used the equipment in

15:44:07  1    multiple locations.

2             That seems to address the concern you had, doesn't

3    it, Mr. Rigmaiden?

4             THE DEFENDANT:  Yes.  If you're willing to accept

15:44:16  5    that as a fact, then, yeah.

6             THE COURT:  Well, it seems to me -- well, my

7    understanding is you're admitting that, Mr. Battista, this

8    device was used -- wasn't in a single location, it was moved?

9             MR. BATTISTA:  Absolutely, Your Honor.

15:44:32  10            THE COURT:  Right.

11            MR. BATTISTA:  And again, you know, if we could have

12   entered into reasonable limited stipulations, Your Honor,

13   there's certain things like this that I appreciate all of the

14   Court's efforts and everyone's patience in this regard, but

15:44:54  15   there were things that we were prepared to admit to.

16            THE COURT:  The last category in Part D concerns

17   things we've sort of already touched on, which is how much of

18   an interruption in aircard service was caused by the device.

19            He specifically asserts that it increased the signal

15:45:19  20   strength on the aircard.  It caused an interruption in aircard

21   service.  It caused aircard transfer rates to fall.  And my

22   understanding is, you haven't admitted any of those facts,

23   correct?

24            MR. BATTISTA:  Correct, Your Honor.

15:45:35  25            THE COURT:  Tricia, if you can hang on for two more

15:45:40  1    minutes, we'll finish this part and take a break.

2              Part E of Mr. Rigmaiden's motion concerns the path of

3        movement that was actually taken, and part of your reason for

4        wanting that, I think, Mr. Rigmaiden, was to distinguish

15:46:08  5    between helicopter and on foot, also to determine how close to

6        the apartment the equipment got.  The government has admitted

7        that it was on foot, it moved around, and it was within the

8        apartment complex.  What additional detail do you need on path

9        of movement?

15:46:31 10         THE DEFENDANT:  Well, if they were using the device

11       down the hallway and stopped, like, right in front of the

12       door, then that would be a pretty good indication that they

13       located it directly in the apartment, and that some of the

14       data would have been logged with that.

15:46:42 15         And the other issue is, there's going to be time

16       stamps, so if they were using the equipment after the 16th to

17       verify the location, then those time stamps would show that.

18       But, again, this is probably data they destroyed.

19             THE COURT:  Did you want to say anything on that,

15:47:06 20    Mr. Battista?

21             MR. BATTISTA:  No, Your Honor.  I'm just checking on

22       something.

23             THE COURT:  Okay.  Category F --

24             MR. BATTISTA:  Your Honor, perhaps if I could just

15:47:32 25    revisit that for a second.  If the defendant can answer the

15:47:37  1    question, what else does he need to know?

2         THE COURT:  Well, I think he wants to know, was the

3    device used outside the door of the apartment, or he said in

4    his papers, was it used between the apartment wall and the

15:47:49  5    baseball field, which I understand would be next to the

6    apartment.  Is that right?

7         THE DEFENDANT:  That's right.

8         THE COURT:  In other words, was it immediately

9    adjacent to the apartment when it was used?  And his point is,

15:48:00  10   if it was used right outside the wall from where the aircard

11   was, it's evidence they were pinpointing it in that apartment

12   as opposed to in three or four.

13        MR. BATTISTA:  I'll look into that.

14        THE COURT:  All right.  One other question, then, and

15:48:48  15   that concerns this phrase that is in Order 331.  And the

16   phrase is "after receipt and storage."

17        Here's the issue in my mind, Mr. Battista.  The

18   definition of that phrase in Order 331 is that it's talking

19   about -- well, it was intended to ensure that the information

15:49:38  20   that was given to the FBI was first captured and recorded by

21   Verizon before being given to the FBI.

22        You've admitted that the device used did something

23   other than that.  The handheld device got data directly from

24   the aircard, not from Verizon.  And I understand that's

15:50:10  25   arguably under Order 330, but it gets back to the question we

15:50:14  1   had a moment ago.  If both orders apply to both devices, then

2   how is it receiving information directly from the aircard

3   could satisfy the "after receipt and storage" requirement of

4   the 331 Order?

15:50:36  5        MR. BATTISTA:  Your Honor, I think the thinking is

6   that you're looking at the two pieces of -- the two orders and

7   the equipment all in conjunction, but obviously the trap and

8   trace order is dealing with certain operations of the

9   equipment.

15:50:57 10        And so I think that the viewing of using these as a

11  hybrid is that they would authorize the use of both equipment

12  but that the receipt and storage aspect of 331 would not

13  prevent the operation of the tracking device because the

14  tracking device could not -- I'm not aware of a way for the

15:51:25 15  tracking device even to operate if it's not simulating the

16  tower.

17        THE COURT:  Well, my assumption has been, and it

18  could be wrong, that the reason the attorney in the Northern

19  District of California put that "after receipt and storage"

15:51:41 20  provision into 331 was because that avoided a Fourth Amendment

21  problem.

22        If you're getting the information from a third party,

23  Verizon, then it's not a search and seizure of the defendant.

24  You're getting information, under a statute, from a third

15:51:58 25  party.  And that's why they put it in, was to make sure it

15:52:01  1    didn't create a Fourth Amendment problem.

2         It seems to me that when it comes to the tracking

3    device, that clearly wasn't contemplated, it was going to take

4    information directly from the aircard, and so that is covered

15:52:15  5    by the warrant in 330.

6         MR. BATTISTA:  Correct.

7         THE COURT:  And that's why I'm having trouble with

8    the notion that both orders applied to both pieces of

9    equipment.

15:52:25  10        MR. BATTISTA:  I think, Your Honor, my understanding

11   is the way the equipment operates is that the tracking device

12   equipment, the overall operation can't function without the

13   assistance of the other information that the pen register and

14   trap and trace are also generating.

15:52:47  15        In other words, if you have the team out in the field

16   with just the tracking device but without getting the other

17   information from Verizon or the carrier, I don't think that

18   they can perform their tasks, that the team could function, so

19   they needed both of these -- all of this equipment up and

15:53:11  20   running at the same time.

21        So the information that they were gathering from

22   Verizon pursuant to the trap and trace and pen register, that

23   was first going to Verizon and then being transmitted to the

24   FBI.

15:53:37  25        THE COURT:  Okay.  Did you want to say anything on

69

15:53:39  1    that, Mr. Rigmaiden?

2              THE DEFENDANT:  Yeah.  On -- the pen trap device was

3    getting realtime cell site information from Verizon from the

4    phone calls they were making, so that information is coming

15:53:48  5    directly from Verizon but it's coming in realtime.  So that

6    was supposed to be covered by pen trap -- pen register -- pen

7    trap statute, but there's another statute under the

8    Communications Assistance For Law Enforcement Act that says

9    you can't get location information with just a pen register.

15:54:05  10         So what attorneys or prosecutors have been doing is

11   they throw in the Stored Communications Act as a supportive

12   statute and they try to rely on that.  But the problem with

13   the Stored Communications Act is that it only addresses stored

14   data, not data that they receive in realtime.

15:54:21  15         So in order to get around that what they did is they

16   came up with this after receipt and storage thing they kind of

17   tack on, but it's just kind of lip treatment.  They don't

18   actually do anything different.  At least that's my theory.

19         So the evidence I'm asking for is going to prove that

15:54:37  20   they actually operated the pen register in the same way that

21   they would operate it if they weren't getting location

22   information, and that the "after receipt and storage" and

23   Stored Communications Act was just thrown in there to kind of

24   support the application as a whole.  It didn't actually do

15:54:50  25   anything different.

15:54:52  1         THE COURT:  Therefore, what?  They violated the act?

        2         THE DEFENDANT:  Therefore, they violated the act.

        3    Plus it would be a Fourth Amendment violation because they're

        4    getting location information while the aircard was within a

15:55:03  5    Fourth Amendment protected space.  And by showing they

        6    violated the act and the statutes, I can show they didn't rely

        7    on those in good faith if there was a Fourth Amendment

        8    violation.

        9         That's in addition to the order not applying to the

15:55:43 10    StingRay because after receipt and storage there was no way

       11    they could do that with their own equipment, so it kind of

       12    goes both ways with that.

       13         THE COURT:  All right.  We've been at this for an

       14    hour and 55 minutes.  We need to take a break.  I've only got

15:56:01 15    another 15 minutes of things for us to cover, but let's let

       16    the court reporter get a break.  We'll come back in ten

       17    minutes, at five after the hour.

       18         MR. SEPLOW:  Judge, can you make that 12?  I've got

       19    to get something out of my car.

15:56:12 20         THE COURT:  Better make it 15.  Ten after the hour.

       21         (Recess taken from 3:56 to 4:12.)

       22         THE COURT:  All right.  Let me just run through a few

       23    more facts that I think have been more or less established by

       24    the government's filing.  We may have covered them all but let

16:12:43 25    me just make sure.

16:12:57   1          You have agreed, Mr. Battista, as we've already

2    mentioned, that the device was used in multiple locations.

3    And then you say in paragraph 3 of Document 602 that, "The FBI

4    analyzed signals exchanged between the equipment and the

16:13:15   5    aircard in order to determine the aircard's location,"

6    correct?

7          MR. BATTISTA:  Yes, Your Honor.

8          THE COURT:  I know that's not the detail you've

9    argued, Mr. Rigmaiden, but it's similar, I mean at least in

16:13:30  10    terms of them analyzing those direct signals for purposes of

11    determining location.

12          My understanding, Mr. Battista, of your triangulation

13    point in the response is that you did not triangulate existing

14    cell towers to locate the aircard, which was what Order 331

16:14:13  15    prohibited and you're saying, "We didn't do that," right?

16          MR. BATTISTA:  Correct, Your Honor.

17          THE COURT:  Are you taking a position on whether you

18    triangulated in the broad sense of the word the data that you

19    obtained from the various locations at which the mobile device

16:14:28  20    was used?

21          MR. BATTISTA:  Your Honor, I think obviously what --

22    the equipment is mobile, it's being used on foot.  The

23    operators have to take a reading, move, take another reading,

24    move, take another reading.  So the point that the government

16:14:50  25    is trying to make is that we didn't triangulate using multiple

16:14:55  1    cell towers, and we didn't triangulate by using multiple

2    pieces of simulation equipment simultaneously.

3          With respect to what type of analysis was done by

4    using the individual pieces of equipment alone, I'm not -- you

16:15:17  5    know, we haven't disclosed the exact details of what those --

6    the equipment is capable of.  But I think in terms of our --

7    our position on triangulation is viewing it as simultaneous

8    use of people -- pieces of equipment to allow you to take

9    multiple measurements at the same time to, quote, triangulate

16:15:39 10    in on whatever you're trying to determine.  So in that sense

11    there was no triangulation.

12          In terms of taking a measurement, moving, taking

13    another measurement, moving, taking another measurement, yes,

14    we did that.

16:16:30 15          THE COURT:  All right.  Mr. Rigmaiden, during the

16    course of this discussion, I think we've identified a number

17    of facts that are not going to be disputed for purposes of the

18    suppression hearing.  I've tried to make note of them.  I

19    probably mentioned them in my order.  Are there categories

16:16:47 20    I've missed that you think we ought to talk about?

21          THE DEFENDANT:  I know I mentioned the original

22    storage devices that they used to save the CDNRS and LAESP

23    messages, which are basically the realtime cell site

24    information that was gathered by the pen trap device, not by

16:17:11 25    the StingRay or the cell site emulator but actually by the

16:17:15  1  computer at the FBI local office connected to Verizon

2  Wireless.

3  And I wanted to get the data off of -- I wanted to

4  have a mirror of the sections of those drives where they got

16:17:26  5  that information from because I see discrepancies between the

6  two sets of data.  That was Section H.

7  THE COURT:  And this is so your expert can conduct a

8  forensic analysis to see if agents deleted information?

9  THE DEFENDANT:  Yes.  Because if you look at the

16:17:58  10  messages that were generated after the 16th, they're

11  incomplete.  They don't look the same as the ones that were

12  generated during the time where it's not disputed that they

13  were actually calling the aircard, but after the 16th there

14  was still -- there was still data being produced but it looks

16:18:14  15  different than the data that was produced prior to the 16th.

16  So it looks as if somebody went in and deleted certain

17  sections out and just didn't do a very good job of it.

18  And the fact that the CDNRS files, which are

19  basically created off of the LAESP data, the human readable

16:18:32  20  form of that -- of the CDNRS files has no data after the 16th,

21  so it kind of looks like they're trying to hide anything that

22  happened after the 16th, when you look at those two sets of

23  data side by side.  So by looking at the hard drives we can

24  determine if there's anything on there that didn't make it on

16:18:50  25  to the CDs that the government gave the defendants.

16:18:58   1          THE COURT:  Do you have anything you can say on that,

2     Mr. Battista, in way of -- by way of clarification?

3          MR. BATTISTA:  Nothing at this point, Your Honor.

4          THE COURT:  All right.  Mr. Battista, what is it you

16:19:31   5     propose we do after today?

6          MR. BATTISTA:  Your Honor, if the Court issues an

7     order that identifies what perhaps has been resolved, that

8     would be helpful.  I have talked to the court reporter, a copy

9     of the transcript has informally been ordered, I will have the

16:19:58  10     paperwork cut.  We'll have the transcript in less than seven

11     days.  Upon receipt we will review it, highlight the issues,

12     forward it to the FBI and Justice.

13          Perhaps the defendant, after seeing what the

14     government is willing to agree to, would be open to an

16:20:22  15     additional opportunity to sit down where we could try to

16     resolve some things.  I'm willing to meet with their

17     investigators.  We can break out our laptops together and

18     perhaps we can agree to some additional things to further

19     limit the -- what happened.

16:20:48  20          In other words, I'd be willing to sit down with the

21     defendant and try to see if we could agree to a stipulation of

22     like, okay, when the guys had the backpack and they were

23     moving, where did they go?  Where did they walk in the halls?

24     Where did they walk around the apartment complex?

16:21:04  25     Mr. Rigmaiden, are you satisfied?  Yes.  Can we stipulate to

16:21:08  1   that?  End of stipulation.

2          Not, they didn't -- you know, they weren't acting --

3   they knowingly were acting outside the scope of the order, or

4   something like that.

16:21:19  5          I think if Mr. Rigmaiden is open to some

6   stipulations, additional stipulations along the lines of what

7   we proffered in our pleadings, I think that he can see that he

8   can make his arguments without getting into some of the

9   additional specific technical nature of the items.

16:21:42  10         So that's a possibility.  I don't know if the

11  defendant is willing to do that but I'm willing to offer it.

12  I'm willing to meet with the defendant with the investigators.

13  But it's got to be in the spirit of, like, things along the

14  lines of what we've discussed today and what the government

16:21:57  15  has offered in its pleadings.  I'm willing to go the extra

16  mile to try to resolve some additional matters along the lines

17  that we resolved things today.  So that's number two.

18         So one is the transcript to get everyone's attention

19  on the -- east of the Mississippi.  Two, I'm willing to meet

16:22:19  20  with the defendant.

21         Three, we'd like to analyze the Court's order.

22         And then, four, I think perhaps an additional hearing

23  in several weeks.  Then perhaps we could narrow the issues

24  further before the defendant -- before we take the next step.

16:22:37  25  That's my proposal.

76

16:22:39  1          And, again, if the defendant is willing to meet with

2     us with the understanding of, this is what we're looking at,

3     I'm more than willing to do that.  And then the defendant

4     could understand that we could enter into a written

16:22:52  5     stipulation that we would both agree to that the Court would

6     accept as facts similar to what we've done here today.

7          That's just what comes to mind right now.  I don't

8     know anything else at this point.

9          THE COURT:  Mr. Rigmaiden, what are your thoughts?

16:23:12  10          THE DEFENDANT:  I'm hoping you'll rule on my motion

11    and decide what evidence I'm entitled to and what evidence I'm

12    not entitled to and then summarizing whatever we've settled

13    today as well and then take it from there.  I guess the

14    government would have to assert privilege and go on from that

16:23:29  15    point.

16          THE COURT:  Well, if we were just going to forge

17    ahead, the next step would be that I would hold an ex parte

18    hearing and hear the government's explanation as to why this

19    is sensitive law enforcement information.

16:23:54  20          If I then determined that it is sensitive law

21    enforcement information entitled to a qualified privilege,

22    then I would do the balancing, and I would do it in light of

23    the discussion we've had today, and at that point I would

24    issue an order.

16:24:15  25          I think Mr. Battista is suggesting a somewhat

77

16:24:21  1    different approach, which is that rather than just launch down

2    that road, he would confer with folks at DOJ in light of

3    what's been done at the hearing, maybe get some more

4    authorization to disclose information.

16:24:35  5            You all could talk about whether there are additional

6    factual stipulations to be entered into to further narrow the

7    issues before I hold the ex parte hearing and make a ruling on

8    the disputed issues.  What is your response to that?

9            THE DEFENDANT:  Which one is faster?

16:24:53 10            THE COURT:  Which one is faster?

11            THE DEFENDANT:  Which avenue would be -- get to a

12    solution quicker?

13            THE COURT:  I don't know.  And let me explain why.

14    If we go the route of my holding an ex parte hearing and

16:25:17 15    issuing a decision on this order, I think there's a decent

16    possibility -- I don't know this to be the case, but I think

17    there's a decent possibility I would find that it is law

18    enforcement sensitive, I would do the balancing.

19            And in light of the factual concessions or admissions

16:25:35 20    we've arrived at, plus all of the information you've

21    generated, I would probably come out allowing the government

22    to withhold some of the information.  And if I did that, we

23    could get to that point pretty quickly.  I think we can hold

24    the ex parte hearing and I could hand down that ruling.

16:25:55 25            The problem would be then we'd brief the motion to

78

16:25:58 1    suppress.  But if we go down that road, we could get to the

2    suppression hearing and run into the practical issue I raised

3    before, which is, in light of the way the facts are coming

4    out, the government decides it wants to waive some portion of

16:26:12 5    the privilege or disclose additional information, which would

6    then add steps after that.

7         The alternative, where they confer with the folks

8    back east, you all try to reach stipulations, could get on the

9    table more facts relevant to the Fourth Amendment issue more

16:26:31 10   quickly, but I then may still need to do an ex parte hearing

11   and, you know, those steps on the rest of some of the issues.

12   And I just don't know which of those is likely to play out

13   more quickly.  I understand why you're asking that question,

14   but I can't tell you which is going to get us to the end of

16:26:49 15   the Fourth Amendment decision more quickly.

16        THE DEFENDANT:  Maybe we could try the government's

17   approach for a reasonable amount of time.  I mean, I guess we

18   might as well give it a shot.

19        THE COURT:  Well, maybe what we ought to do is this.

16:27:18 20   It's going to take a week to get the transcript.  I assume it

21   takes a bit of time for you, then, to confer with folks back

22   east, Mr. Battista.  And after that you'd then talk about a

23   possible stipulation.  So we're looking three or four weeks

24   before that process can be completed.  Is that -- before all

16:27:37 25   of that can be completed.  Is that about right?

16:27:40  1        MR. BATTISTA:  I would estimate at least three weeks,

          2    Your Honor.

          3        THE COURT:  What we could do is set a hearing in a

          4    little over three weeks.  I just, when I was off the bench,

16:27:52  5    was told that a trial in Fresno I was supposed to preside over

          6    the week of October 17th settled.  So that opens up some time

          7    that week.  The rest of October is really jammed up.

          8        But we could set another hearing to finish this topic

          9    in October, probably on the 19th of October.  And the things

16:28:29 10    we would do between then is, you would take the transcript,

         11    you would talk to the folks back in Washington.  After having

         12    done that, both sides would sit down and try to talk about

         13    additional factual stipulations, see what you could agree on.

         14    We would then get together again on the 19th and find out

16:28:49 15    where we are and what's left of this dispute that I need to

         16    rule on.

         17        Another thing we could do in the process is, I'd

         18    issue an order itemizing the factual issues I think we've

         19    agreed on today those are set down.

16:29:05 20        I'm guessing if we do that, Mr. Rigmaiden, that's

         21    probably going to get us to a meaningful Fourth Amendment

         22    suppression hearing more quickly.  I don't know that for sure.

         23    But if you're willing to do that, I think that's probably

         24    likely to be the most promising route.

16:29:28 25        THE DEFENDANT:  Yeah, we can try that.

16:29:30   1    THE COURT:  An important point, I think you already

2    understand this, is that the purpose of your sitting down with

3    Mr. Battista and Mr. Knapp will be to try to agree on facts.

4    If your position is you want them to agree on legal positions,

16:29:46   5    you know, like they were outside the scope of an order or

6    something else like that, that's not the purpose.  The purpose

7    is to see if we can do in that meeting more of what we did

8    today, which is say this fact is established, this one is, and

9    then you can make your arguments from those.  Are you

16:30:02  10    agreeable to doing that?

11    THE DEFENDANT:  Yeah, as long as whatever we --

12    whatever facts we agree to satisfy my need for the evidence

13    then --

14    THE COURT:  Well, if they don't -- I mean, if you

16:30:14  15    want them to agree to ten facts and you all meet and you can

16    only agree to six, then when get together again on the 19th,

17    the things remaining in dispute will be those four facts that

18    aren't agreed to, and then I'll rule on your motion on those

19    issues.  So I don't think it needs to be an all or nothing

16:30:30  20    proposition.  The idea is to make progress.

21    THE DEFENDANT:  Okay.

22    MR. BATTISTA:  That's correct, Your Honor.  I'm not

23    proposing and I don't expect we would meet and that we

24    would -- that I could agree to stipulate and satisfy all of

16:30:43  25    the defendant's concerns.  I'm just offering to see if we --

16:30:47   1   we've made progress today.  I'm offering to see if we can have

       2   another session that would be as fruitful.  But, again, I

       3   agree 100 percent, I don't expect that we would be able to

       4   agree on every single fact.

16:31:02   5       THE COURT:  Are you agreeable to giving a try at

       6   that, Mr. Rigmaiden?

       7       THE DEFENDANT:  Yes.

       8       THE COURT:  All right.  Then we will plan to get

       9   together again at 2 p.m. on October 19th.  And I will get out

16:31:19   10  in the next few days an order that recounts what we've done

      11  here today and the facts that we have settled.

      12       All right.  I've got some ex parte matters that I

      13  want to talk to you about, Mr. Rigmaiden.  Are there other

      14  matters we need to talk about from your side, Mr. Battista?

16:31:42   15      MR. BATTISTA:  No, Your Honor.  For the defendant's

      16  information, he may not have received them yet, we've

      17  responded to four of the five pending motions and the fifth

      18  one will be responded to by tomorrow.

      19      We have agreed in our replies, the 2703(d) orders

16:32:01   20  that were submissions, we've agreed that those documents can

      21  be unsealed.  That's just to give the defendant a little

      22  preview of what's going on.  But all of the motions -- and I

      23  believe that once we respond to the fifth motion, which will

      24  be filed by tomorrow, I think that that's -- outside of this

16:32:23   25  matter, that's all that's outstanding that I'm aware of.  I

16:32:27  1   just want to make sure that we're all on the same page.

2          THE COURT:  All right.  Mr. Rigmaiden, do you have

3   matters you want to raise while the government is here?

4          THE DEFENDANT:  No, I don't.

16:32:38  5          THE COURT:  Okay.

6          MR. BATTISTA:  What I'll do for Mr. Rigmaiden's

7   notice, I will send a letter to him proposing a date and time

8   when we meet, and we'll work out the particulars of the

9   meetings at that time.

16:32:53  10          THE COURT:  All right.

11          MR. BATTISTA:  If he has any -- one final thing.  If

12   he has any suggestions about -- because, again, he's in

13   custody, in terms of time of day or whatever that would work

14   best in terms of us meeting, he can let me know that, and

16:33:08  15   we'll try to work our schedules around his schedule.

16          THE COURT:  Okay.  Thank you.

17          We'll go ahead and excuse the government.

18          (Sealed ex parte discussion outside the presence of

19   the Government were reported but not transcribed herein.)

16:39:17  20          (End of transcript.)

21                 * * * * *

22

23

24

25

# C E R T I F I C A T E

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 29th day of September, 2011.


s/ Patricia Lyons, RMR, CRR
Official Court Reporter