1 | Daniel Rigmaiden
Agency # 10966111
2 | CCA-CADC
PO Box 6300
3 | Florence, AZ 85132
Telephone: none
4 | Email: none

5 | Daniel David Rigmaiden
Pro Se, Defendant

6

7 | **UNITED STATES DISTRICT COURT**

8 | **DISTRICT OF ARIZONA**

9

10 | United States of America,                     No. CR08-814-PHX-DGC

11 |        Plaintiff,                             CLARIFICATION OF VARIOUS
                                                   PENDING DISCOVERY ISSUES
12 | v.

13 | Daniel David Rigmaiden, et al.,

14 |        Defendant.

15

16 |        Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits this

17 | *Clarification Of Various Pending Discovery Issues*.  The defendant is filing this

18 | memorandum to provide some clarification on various pending discovery issues relating to

19 | his planned Fourth Amendment arguments.  The need for the defendant providing

20 | clarification arises from the complexities of the facts and the defendant's failure to articulate

21 | various issues well enough at the September 22, 2011 court hearing.  The need for

22 | clarification also arises from the government's October 5, 2011 letter to the defendant

23 | requesting that he identify additional issues not identified in the Court's order at Dkt. #644-1.

24 | In order to help focus and streamline various pending discovery issues, the defendant

25 | provides the following:[1]

26 | ///

27 | _____

28 | 1.      Attached to this memorandum is an edited version of the defendant's previously
submitted *Submission Of Proposed Stipulations* (Dkt. #592-3) with various sections crossed
out and other sections highlighted for clarity.  *See* EXHIBIT 03.

*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

## A.   HARRIS IS CURRENTLY THE ONE AND ONLY MANUFACTURER OF "STINGRAY TYPE GEAR."

At the September 22, 2011 court hearing, the government claimed that "StingRay" was like the term "Kleenex" in the sense that they are both trademarked terms but used by people generically.  Put another way, the government's argument is that someone with a runny nose may refer to ABC Brand tissue as "Kleenex" in the same way that an FBI agent may refer to ABC Brand portable/transportable wireless device locators as "StingRays"—notwithstanding the fact that Harris sells the StingRay under the trademarked term of "StingRay."  The government's analogy fails for a reason the defendant neglected to remember in his sleep deprived delirium at the September 22, 2011 court hearing, *i.e.*, Harris Corporation is currently the only United States manufacturer of any type of portable/transportable wireless device locator.[2]  Harris is what is referred to as a "sole source vendor" and it means just that—the **sole source** for portable/transportable wireless device locators.  Via a Harris "sole source vendor" letter dated September 29, 2010, Michael E. Dillon of Harris stated that "[t]he Harris StingRay and KingFish systems are the only cooperative portable/man-portable standard +12VDC powered/battery powered multiprotocol surveillance systems currently available."  Dkt. #536-3 (EXHIBIT 19).  Three weeks after the aircard was located, Lin Vinson of Harris stated that "[t]he Harris StingRay and KingFish vehicular-based systems are the only portable standard +12VDC powered CDMA, GSM, UMTS, and iDEN interrogation, tracking and location, and signal information collection systems currently available."  *Id.* (EXHIBIT 25).  With respect to the government's claim of generic names, a February 23, 2007 government document, titled "USABook > Electronic Surveillance > Cell Site Simulators, Triggerfish, Cell Phones," has a list of generic "Kleenex" type law enforcement names for cell site emulators and neither "StingRay" nor "KingFish" is listed:

> A cell site simulator (sometimes called a <u>digital analyzer</u>, <u>cell site locator</u>, <u>triggerfish</u>, <u>ESN reader</u>, or <u>swamp box</u>) is a mobile device that can electronically force a cell phone to register its telephone number (MIN),

2.   The Smith Myers CSS2001 "Swamp Box" was once available for GSM based phones but it is not currently being manufactured and is useless for locating cdma2000 wireless devices such as the aircard.

*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

electronic serial number (ESN), and information about its location, when the phone is turned on.  This can be done without the user knowing about it, and without involving the cell phone provider.

USDOJ (M.D. La.) Response to ACLU FOIA Request No. 07-4130 (Aug. 12, 2008), *available at* http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf, p. 18 (last accessed Jan. 11, 2011) (emphasis added) (p. 1-3 and 18 attached as <u>EXHIBIT 01</u>)

Considering the only portable/transportable wireless device locators (cell cite emulators) currently available are the Harris StingRay, StingRay II, and KingFish, the defendant contends that the government had no choice but to use those devices—regardless of what may be a generic law enforcement term—to locate the aircard.  This is an important disputed fact considering the defendant's Fourth Amendment arguments are largely based on details that are specific to the Harris StingRay, StingRay II, and KingFish—not some "phantom" device that does not even exist.  The government should have no problem identifying the precise equipment used considering FBI agent William Shute previously testified that the make and model of the portable/transportable wireless device locator he used to do base station surveys to determine a suspect's location was the StingRay from Harris Corporation. *See* <u>United States v. Allums</u>, No. 2:08-CR-30 TS, Dkt. #128 (Feb. 24, 2009), p. 7, ln. 8-10 (District of Utah); *see also* the defendant's *Request For Judicial Notice Of Facts Relevant To The Issue Of Governmental Privileges* (Dkt. #501).

## B.  ARE THE STINGRAY, STINGRAY II, AND KINGFISH "MOBILE TRACKING DEVICES," "PEN REGISTERS," "TRAP AND TRACE DEVICES," OR SOMETHING ELSE?

The defendant's position is that the Harris StingRay, StingRay II, and KingFish are not "mobile tracking devices" or "tracking devices" as the terms were understood by Congress in 1986 when it enacted 18 U.S.C. § 3117 or as the terms were understood by the Advisory Committee in 2006 when it amended Rule 41 of the Federal Rules of Criminal Procedure. *See* the defendant's *Motion For Discovery* (Dkt. #592-1), Section VI(F)(1)(a).  Furthermore, the defendant's position is that the Harris StingRay, StingRay II, and KingFish are not "pen registers" or "trap and trace devices" as defined in 18 U.S.C. §§ 3127(3) (pen registers) and 3127(4) (trap and trace devices).  *See id.*, Section VI(F)(1)(b).  Whether the StingRay and

other portable/transportable wireless device locators can be classified as "mobile tracking devices," *i.e.*, beepers and GPS devices placed on a car or in a package to be tracked, is a disputed fact relevant to the defendant's *Motion To Suppress*. *See id.*, Section VI(F)(2)(a). Likewise, whether the StingRay and other portable/transportable wireless device locators can be classified as "pen registers and/or trap and trace devices" is also a disputed fact relevant to the defendant's *Motion To Suppress*. *See id.*, Section VI(F)(2)(b). Adding to the dispute is the fact that the government refers to its portable/transportable wireless device locators as "pen registers" and/or "trap and trace devices" in letters to the defendant while the Court's order at Dkt. #644-1 refers to the devices as "mobile tracking devices." The defendant is unclear on exactly how the devices are to be legally classified in the context of his Fourth Amendment arguments and believes that the devices do not fit any current legal definition— either statutory or case law. The above explained confusion and contradiction is a good real-world example of how the defendant's defense is being prejudiced by the government's withholding of user manuals and full details on the specific devices used to locate the aircard.

## C.   AT LEAST <u>TWO</u> PORTABLE/TRANSPORTABLE WIRELESS DEVICE LOCATORS WERE USED TO LOCATE THE AIRCARD, NOT ONE, AND THE DEFENDANT IS CHALLENGING USE OF BOTH, NOT JUST THE HAND-HELD DEVICE USED BY A MAN-ON-FOOT WITHIN THE DOMICILIO APARTMENT COMPLEX.

The government has already admitted to using at least two separate portable/transportable wireless device locators to locate the aircard. The first device was a transportable wireless device locator (*i.e.*, either the Harris StingRay or StingRay II (*see* the *Wilson Report*)) for use in an automobile or aerial vehicle, and the second device was a portable wireless device locator (the only one currently manufactured is the Harris KingFish) for use by a man-on-foot. The fact that at least two separate devices were used to locate the aircard is significant considering each device may implicate a wireless user's Fourth Amendment rights in different ways. For example, the KingFish may operate by conducting a denial-of-service attack while the StingRay may operate by conducting a man-in-the-

CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES
CR08-814-PHX-DGC

1  middle attack.  One device may have caused an interruption in aircard service or increased

2  transmission power of the aircard while the other may have not.  The defendant is

3  challenging the government's use of both devices (or *all* devices if there was more than two),

4  not just the hand-held device that was used at the conclusion of the aircard locating mission.

5  All previously raised discovery issues apply to every device used by the government

6  considering the defendant needs to know about all equipment used in order to effectively

7  draft and argue his *Motion To Suppress*.

### D.  DATA OBTAINED, DATA DESTROYED, AND DATA NOT DESTROYED.

10      The court's order reads "all data generated by the mobile tracking device **and**

11  **received by Verizon** as part of the locating mission was destroyed by the government[.]"  *Id.*

12  p. 2 (emphasis added).  The defendant believes the quoted section emphasized in bold is

13  incorrect.[3]  As far as the defendant can ascertain, Verizon Wireless was not involved in

14  collecting aircard signals associated with the government's emulated cell sites so there would

15  be no data (geolocation, raw aircard signals, or otherwise) for Verizon Wireless to receive

16  and then subsequently destroy.  In contrast, the real-time cell site location information (not

17  collected by the government's emulated cell sites) that was sent to the FBI's SF-Martinez

18  DCS-3000 (Pen/Trap device) by a Verizon Wireless network switch (referred to as an

19  Intercept Access Point (IAP)) is on the record at Dkt. #587-1.[4]  However, there is additional

20  data that was *provided* to the government by Verizon Wireless, seemingly under the N.D.Cal.

21  orders, and it has not been destroyed.  This additional data is described by the government as

22  follows:

23      The folder contains copies of the target number subscriber information Verizon
24      provided pursuant to the Court Order.  This information is proprietary

---

25  3.      However, the defendant does not dispute that the government destroyed geolocation
   data it generated using its own devices based off of aircard signals it collected directly from
26  the aircard.  *See* the defendant's *Motion To Dismiss For Destruction Of Evidence* (Dkt.
   #595).

27  4.      *See* EXHIBIT 06 of Dkt. #587-1 (LAESP messages sent to the SF-Martinez DCS-
   3000 server (Pen/Trap device) by Verizon Wireless IAPs); *see also* EXHIBIT 07, EXHIBIT
28  08, EXHIBIT 09, and EXHIBIT 10 of Dkt. #587-1 (The FBI's "human readable" CDNRS
   files created from the Verizon Wireless LAESP messages).

information and law enforcement sensitive, and will not be released.

Finally, the folder contains Verizon's CALEA form titled, "Electronic Surveillance Worksheet." At the bottom, a disclaimer states, "VZW Proprietary. Use Pursuant to Conpany [sic] Policies and Procedures Ver1.07.02." The CALEA document must accompany any court order submitted to Verizon. It contains the FBI's contact personnel and billing information, the target number, and states that the order is a pen register/trap & trace. This document contains information which is classified and cannot be released or made public.

The FBI is asserting the law enforcement privilege over the unclassified portion of the information withheld as noted above. Additionally, some of the information that may be responsive is classified, and therefore, cannot be produced absent a CIPA proceeding.

ITEM No. 2 of June 29, 2011 discovery set, p. 2 (*see* EXHIBIT 51 of Dkt. #587-3 and REDACTED DOC. 28 of Dkt. #588-1).

The defendant addressed the above evidence in his *Motion For Discovery* (Dkt. #592-1), §§ VI(D)(1)(a) and VI(D)(2)(a) and requested that the claimed classified/privileged information be reviewed by the Court *in camera*.[5] The claimed classified/privileged data provided to the government by Verizon Wireless was needed by the FBI in order to configure its emulated cell sites to be recognized by the aircard and to facilitate communications to/from the aircard while geolocation data was generated. The defendant believes that the claimed classified/privileged data is the nonpublic keys, codes, masks, and data addressed in the defendant's *Motion For Discovery* (Dkt. #592-1), §§ VI(D)(1)(a) and VI(D)(2)(a). At least some of this data is unique to the aircard and also stored in the aircard, *i.e.*, Shared Secret Data and A-Keys, as well as stored by Verizon Wireless. The defendant is arguing that a cellular service user has a reasonable expectation of privacy in this type of data considering (1) some of it is stored in the user's wireless device, and (2) all of it is used to prevent signal/ data eavesdropping and unauthorized access to wireless devices by unauthorized cell sites (*e.g.*, non Verizon Wireless cell sites). As explained at Dkt. #592-1, the defendant needs the requested data so that he can support his argument that seizure of the data without a proper and particularized probable cause warrant was a Fourth Amendment violation. If the

---

5.    The defendant requested that the Court "perform an *in camera* inspection of all other evidence being requested through [][Dkt. #592] that the Court may not order the government to disclose based off of th[at] filing alone." Dkt. #592-1, p. 2.

CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES
CR08-814-PHX-DGC

1  government continues to withhold the data based on a claim that it is classified, or fails to

2  identify the data with detail, then there is a need for implementing the procedures outlined in

3  the Classified Information Procedures Acts (CIPA), codified at 18 U.S.C. app. III § *et seq*—

4  which is far more strict than common-law procedures for a claim of law enforcement

5  privilege.

6              **E.       IT IS MORE LIKELY THAT THE GOVERNMENT
                          CONDUCTED A DENIAL-OF-SERVICE ATTACK, NOT A MAN-
7                         IN-THE-MIDDLE ATTACK, WHILE LOCATING THE
                          AIRCARD.**

8

9             The government's claim that it conducted a man-in-the-middle attack while locating

10 the aircard, as apposed to a denial-of-service attack, is unlikely.  Verizon Wireless cell sites

11 do not operate while being transported around in an automobile, helicopter, or by a man-on-

12 foot.  Verizon Wireless cell sites are stationary with a physical cable (typical) connected to

13 another piece of networking hardware making up the cellular network.  In order for a

14 government operated emulated cell site to become part of the Verizon Wireless cellular

15 network, the emulated cell site would need to use a separate antenna to forward signals

16 to/from an actual Verizon Wireless cell site (*i.e.*, the man-in-the-middle operation as

17 explained at the September 22, 2011 court hearing).  In order to accommodate the

18 government, Verizon Wireless would need to go out of its way to configure one of its cell

19 sites to communicate with the government's emulated cell site for the man-in-the-middle

20 attack.[6]  This would be a complex and unnecessary step for both Verizon Wireless and the

21 government and it would serve no purpose in the government's efforts to locate the aircard.

22 The more likely scenario is a denial-of-service attack on the aircard because the government

23 would just operate their own clandestine cellular network, using a cell site emulator, while

24 not having to take the extra and unnecessary step of injecting itself into the Verizon Wireless

25 network so as to provide the aircard Internet access.  The denial-of-service attack is the easy

26

27    _____
      6.     The only other option for a man-in-the-middle attack is to have the emulated cell site
28 also clone the aircard and connect to a Verizon Wireless cell site as if it were the aircard.  For
      a brief explanation of wireless device cloning, *see* the defendant's *Submission Of Proposed
      Stipulations*, Stipulation No. 34 (Dkt. #592-3).

CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES
CR08-814-PHX-DGC

1  route and, therefore, the more likely route.  Considering a denial-of-service attack is more

2  likely, the government should be required to provide evidence proving its unsubstantiated

3  claim that a man-in-the-middle attack was conducted.

4       The matter of whether the government conducted a man-in-the-middle attack or

5  denial-of-service attack is a relevant disputed fact for two reasons: (1) in the sense of a

6  seizure, it is likely more intrusive to use a denial-of-service attack to deny the aircard

7  complete Internet access than to use a man-in-the-middle attack to hijack service and provide

8  the aircard diminished Internet access, and (2) from a technical standpoint, it is easier to have

9  an emulated cell site conduct a denial-of-service attack and this casts doubt upon the

10  prosecution's September 22, 2011 assumption that the FBI conducted a man-in-the-middle

11  attack.  The defendant has sent the government a letter requesting that it make precise

12  inquiries to the FBI regarding the matter.  *See* EXHIBIT 02.

### F.     THE REMAINING DISPUTED DISCOVERY ISSUES.

14       At the September 22, 2011 court hearing, the Court informed the defendant that his

15  proposed stipulations at Dkt. #592-3 are over broad.  The defendant took his original

16  stipulations and edited them as follows:

17       1.     For settled facts, the defendant has crossed out relevant sections in red.

18       2.     For unsettled facts that are blatantly true, yet the government refuses to

19  stipulate to, the defendant has crossed out relevant sections in orange.  Despite the

20  government's refusal to stipulate, these facts can be proven by the defendant albeit through

21  lengthier filings, additional experts, longer witness questioning, more court time, subpoenas

22  for evidence, *etc.*

23       3.     For facts that are unsettled but require waivers, the defendant has crossed out

24  relevant sections in blue.  For these sections, there are no adequate stipulations and the

25  defendant needs the government to produce the relative coinciding evidence listed in the

26  defendant's *Submission Pursuant To LRCiv 37.1* (Dkt. #592-2).

27       4.     For unsettled facts that remain to be resolved, the defendant has highlighted the

28  most relevant sections in yellow and additional elaborations and/or notes that may have been

1 | added are highlighted in green.

2 |      The edited stipulations are attached as <u>EXHIBIT 03</u>.  They reflect upon the remaining

3 | disputed discovery issues.

4 |               * * * * *

5 |      This filing and all attachments were drafted and/or prepared by the *pro se* defendant,

6 | however, he authorizes his shadow counsel, Philip Seplow, to file this filing and all

7 | attachments on his behalf using the ECF system.  The defendant is appearing *pro se* and has

8 | never attended law school.  The defendant's filings, however inartfully pleaded, must be

9 | liberally construed and held to less stringent standards than formal pleadings drafted by

10 | lawyers.  *See* <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).

11 | ///

12 | ///

13 | ///

14 | ///

15 | ///

16 | ///

17 | ///

18 | ///

19 | ///

20 | ///

21 | ///

22 | ///

23 | ///

24 | ///

25 | ///

26 | ///

27 | ///

28 | ///

*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

Respectfully Submitted:

PHILP SEPLOW, Shadow Counsel, on
behalf of DANIEL DAVID RIGMAIDEN,
Pro Se Defendant:


s/ Philip Seplow
Philip Seplow
Shadow Counsel for Defendant.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

**CERTIFICATE OF SERVICE**

        I hereby certify that on:                          I caused the attached document to be electronically transmitted to the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:


Taylor W. Fox, PC
Counsel for defendant Ransom Carter
2 North Central Ave., Suite 735
Phoenix, AZ 85004

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Peter S. Sexton
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

James R. Knapp
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

By: s/ Daniel Colmerauer
(Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))