**EXHIBIT INDEX**

**CLARIFICATION OF VARIOUS  PENDING DISCOVERY ISSUES**

EXHIBIT 01:    USDOJ (M.D. La.) Response to ACLU FOIA Request No. 07-4130 (Aug. 12, 2008), *available at* http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf, p. 18 (last accessed Jan. 11, 2011) (list of generic "Kleenex" type law enforcement names for cell site emulators with neither "StingRay" nor "KingFish" listed) (p. 1-3 and 18 of FOIA response attached).

EXHIBIT 02:    Letter from Daniel Rigmaiden to AUSA Frederick A. Battista RE: Whether the FBI conducted a man-in-the-middle attack, denial-of-service attack, or both; (Date: October 11, 2011).

EXHIBIT 03:    *Submission Of Proposed Stipulations* [EDITED 10/12/2011] (**showing the remaining disputed discovery issues**); Note: the original version of *Submission Of Proposed Stipulations* is attached to the defendant's *Motion For Disclosure Of All Relevant And Helpful Evidence Withheld By The Government Based On A Claim Of Privilege* (Dkt. #592, #592-3).  The edited version attached to this filing is color coded for clarity as follows:

      1.     For settled facts, the defendant has ~~crossed out relevant sections in red.~~

      2.     For unsettled facts that are blatantly true, yet the government refuses to stipulate to, the defendant has ~~crossed out relevant sections in orange.~~  Despite the government's refusal to stipulate, these facts can be proven by the defendant albeit through lengthier filings, additional experts, longer witness questioning, more court time, subpoenas for evidence, *etc.*

      3.     For facts that are unsettled but require waivers, the defendant has ~~crossed out relevant sections in blue.~~  For these sections, there are no adequate stipulations and the defendant needs the government to produce the relative coinciding evidence listed in the defendant's *Submission Pursuant To LRCiv 37.1* (Dkt. #592-2).

      4.     For unsettled facts that remain to be resolved, the defendant has ==highlighted the most relevant sections in yellow== and additional elaborations and/or notes that may have been added are ==highlighted in green.==

⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇
⬇ **EXHIBIT 01** ⬇

*ATTACHED EXHIBITS*
*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

USDOJ (M.D. La.) Response to ACLU FOIA Request No. 07-4130 (Aug. 12, 2008), *available at* http://www.aclu.org/pdfs/freespeech/cellfoia_release_074130_20080812.pdf, p. 18 (last accessed Jan. 11, 2011) (list of generic "Kleenex" type law enforcement names for cell site emulators with neither "StingRay" nor "KingFish" listed) (p. 1-3 and 18 of FOIA response attached).



U.S. Department of Justice

Executive Office for United States Attorneys
Freedom of Information/Privacy Act Staff
600 E Street, N.W., Room 7300
Washington, D.C.  20530
202-616-6757   Fax 202-616-6478

---

Requester:  Catherine Crump _____ Request Number: ___07-4130_____

Subject of Request: Mobile Phone Tracking (Item 1-4)_____ AUG **12** 2008

Dear Requester:

Your request for records under the Freedom of Information Act/Privacy Act has been processed.  This letter constitutes an interim reply from the Executive Office for United States Attorneys, the official record-keeper for all records located in this office and the various United States Attorneys' Offices.  To provide you the greatest degree of access authorized by the Freedom of Information Act and the Privacy Act, we have considered your request in light of the provisions of both statutes.

The records you seek are located in a Privacy Act system of records that, in accordance with regulations promulgated by the Attorney General, is exempt from the access provisions of the Privacy Act, 28 C.F.R. § 16.81.  We have also processed your request under the Freedom of Information Act and are making all records required to be released, or considered appropriate for release as a matter of discretion, available to you.  This letter is a [ **X** ] partial [    ] full denial.

Enclosed please find:

__37__ page(s) are being released in full (RIF);
__2__ page(s) are being released in part (RIP);
_____ page(s) are withheld in full (WIF).  **The redacted/withheld documents were reviewed to determine if any information could be segregated for release.**

The exemption(s) cited for withholding records or portions of records are marked below.  An enclosure to this letter explains the exemptions in more detail.

| Section 552 | | | Section 552a |
|---|---|---|---|
| [    ] (b)(1) | [    ] (b)(4) | [    ] (b)(7)(B) | [ **X** ] (j)(2) |
| [    ] (b)(2) | [ **X** ] (b)(5) | [    ] (b)(7)(C) | [    ] (k)(2) |
| [    ] (b)(3) | [    ] (b)(6) | [    ] (b)(7)(D) | [    ] (k)(5) |
| _____ | [    ] (b)(7)(A) | [ **X** ] (b)(7)(E) | [    ] _____ |
| _____ | | [    ] (b)(7)(F) | |

(Page 1 of 2)

[ X ] _47_ additional page(s) originated with another government component.  **These records were found in the U.S. Attorney's Office files and may or may not be responsive to your request.** These records will be referred to the following component for review and direct response to you: Department of Justice, Criminal Division.

[ X ] _4_ additional page(s) originated with another government component.  **These records were found in the U.S. Attorney's Office files and may or may not be responsive to your request.** These records will be referred to the following component for consultation and our office will respond to you after their review:  U.S. Marshals Service .

[ X ]   See additional information attached.

Although I am aware that this request is the subject of ongoing litigation and that appeals are not ordinarily acted on in such situations, I am required by statute and regulation to inform you that if you consider my response to be a denial of your request, you have the right to file an administrative appeal by writing within 60 days from the date of this letter to the **Office of Information and Privacy, United States Department of Justice, 1425 New York Avenue, Suite 11050, Washington, D.C. 20530-0001**.  In light of the fact that this is an interim response, I would ask that you wait until the EOUSA has issued its final response in this request before you file an appeal.

Sincerely,

William G. Stewart II
Assistant Director

Enclosure(s)

## EXPLANATION OF EXEMPTIONS

### FOIA: TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)   (A) specifically authorized under criteria established by and Executive order to be kept secret in the in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order;

(b)(2)   related solely to the internal personnel rules and practices of an agency;

(b)(3)   specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)   trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)   inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)   personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)   records or information compiled for law enforcement purposes, but only the extent that the production of such law enforcement records or information (A) could reasonably be expected to interfere with enforcement proceedings, (B) would deprive a person of a right to a fair trial or an impartial adjudication, (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy, (D) could reasonably be expected to disclose the identity of a confidential source, (E) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or (F) could reasonably be expected to endanger the life or physical safety of any individual.

(b)(8)   contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)   geological and geophysical information and data, including maps, concerning wells.

### PRIVACY ACT: TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)   information complied in reasonable anticipation of a civil action proceeding;

(j)(2)   material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control, or reduce crime or apprehend criminals;

(k)(1)   information which is currently and properly classified pursuant to Executive Order 12356 in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)   investigatory material complied for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)   material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)   required by statute to be maintained and used solely as statistical records;

(k)(5)   investigatory material compiled solely for the purpose of determining suitability eligibility, or qualification for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his identity would be held in confidence;

(k)(6)   testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)   material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his identity would be held in confidence.

## USABook > Electronic Surveillance > Cell Site Simulators, Triggerfish, Cell Phones

A cell site simulator (sometimes called a digital analyzer, cell site locator, triggerfish, ESN reader, or swamp box) is a mobile device that can electronically force a cell phone to register its telephone number (MIN), electronic serial number (ESN), and information about its location, when the phone is turned on. This can be done without the user knowing about it, and without involving the cell phone provider.

Section 216 of the Patriot Act altered the definition of a pen register in 18 U.S.C. § 3127 (3) so that it includes these devices. Consequently, a pen register/trap and trace order must be obtained by the government before it uses such a device.

The use of a triggerfish to locate cellular telephones is an issue of some controversy. The Office of Enforcement Operations (OEO) encourages AUSAs to contact Mark Eckenwiler at (202) 616-0435 if they have questions or concerns.

**Note.** It may also be possible to flash the firmware of a cell phone so that you can intercept conversations using a suspect's cell phone as the bug. You don't even have to have possession of the phone to modify it; the "firmware" is modified wirelessly. This law enforcement tool was recently discussed in a Memorandum Opinion from SDNY, and has been getting a bit of news coverage lately. The authority for doing this can be found in 18 U.S. C. § 2518(11), but it sounds like something that you would not want to do without checking with OEO first.

See also:

- *Electronic Surveillance Manual* Chapter XIV

- Electronic Surveillance Issues

- *Federal Narcotics Prosecutions* § 3.16

- 76 ALR4th 536 ("Search and Seizure of Telephone Company Records Pertaining to Subscriber as Violation of Subscriber's Constitutional Rights")

- USABook topic pages: Electronic Surveillance; Pen Registers

updated 02/23/07

↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓
↓ **EXHIBIT 02** ↓

*ATTACHED EXHIBITS*
*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

Letter from Daniel Rigmaiden to AUSA Frederick A. Battista RE: Whether the FBI conducted a man-in-the-middle attack, denial-of-service attack, or both; (Date: October 11, 2011).

October 11, 2011
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: Whether the FBI conducted a man-in-the-middle attack, denial-of-service attack, or both;
Page # 1 of 2

_____

*Delivered in Electronic Format Via*:                          *to:*

*on:*                    *by:*                    *under the instruction of Daniel Rigmaiden.*

Daniel Rigmaiden
Agency #10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Dear Fred:

      This letter is in regards to your guess made at the September 22, 2011 court hearing that the FBI's cell site emulator was conducting a man-in-the-middle attack as apposed to solely a denial-of-service attack or some combination of the two.  At the hearing, your statement was surrounded by a series of assumptions that may or may not be reflective of the actual events that occurred.  Be advised that I still need all discovery showing what type of disruption in aircard service the FBI's portable/transportable wireless device locators caused while locating the aircard.  This includes evidence showing whether the government conducted a man-in-the-middle attack, denial-of-service attack, a combination of the two, or something else altogether.  I have already addressed this matter in my *Motion For Discovery* (Dkt. #592-1), §§ VI(D)(1)(i) and VI(D)(2)(i), but I suspect that this very important disputed discovery issue may be disregarded by the Court due to you admitting to the "lesser of two evils" based on your mere assumptions regarding the technical operation of the equipment used.  Therefore, I request that the United States Attorneys Office complete the following steps:

      1.    Ask the FBI for a full explanation on what sort of impact the aircard locating mission had on aircard service, however great or minuscule.

      2.    Ask the FBI whether the two (or more) cell site emulators were forwarding the aircard signal to/from an actual Verizon Wireless cell site in order to provide the aircard some type of Internet access service while the aircard was being located.

October 11, 2011
Daniel Rigmaiden – CR08-814-PHX-DGC
RE: Whether the FBI conducted a man-in-the-middle attack, denial-of-service attack, or both;
Page # 2 of 2

_____

      3.     Ask the FBI whether the two (or more) cell site emulators were sending and receiving signals to/from the aircard but not providing the aircard any sort of Internet access service.

      4.     Ask the FBI why it needed to call the aircard repeatedly over a 6 hour period while the first phone call that resulted in generation of real-time cell site location information (sector No. 3 of Verizon Wireless cell site No. 5) seemingly accomplished the goal of narrowing the search area for use of the StingRay and KingFish.

      Once you receive answers, please forward them to me.  These matters are extremely important to my Fourth Amendment defense.  Please be advised that having an emulated cell site receive the aircard signal and then forward it on to an actual Verizon Wireless cell site is far more complex an endeavor than simply having it deny the aircard Internet access service.  Once you obtain answers, please also assemble all relevant and material discovery that is supportive of the answers and then provide that discovery to me or, if the government refuses to provide it, please prepare the discovery for any possible future *ex parte* proceedings regarding government privilege.  Please be advised that this is not a new discovery request but a reiteration and clarification of a previous one.

* * * * *

      I appreciate your assistance with the matters outlined in this letter.


Sincerely,



s/ Daniel Rigmaiden
Daniel Rigmaiden
Pro Se, Defendant

*ATTACHED EXHIBITS*
*CLARIFICATION OF VARIOUS PENDING DISCOVERY ISSUES*
*CR08-814-PHX-DGC*

**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**
**↓ EXHIBIT 03 ↓**

*Submission Of Proposed Stipulations* [EDITED 10/12/2011] (**showing the remaining disputed discovery issues**); Note: the original version of *Submission Of Proposed Stipulations* is attached to the defendant's *Motion For Disclosure Of All Relevant And Helpful Evidence Withheld By The Government Based On A Claim Of Privilege* (Dkt. #592, #592-3).  The edited version attached to this filing is color coded for clarity as follows:

　　　1.　　For settled facts, the defendant has ~~crossed out relevant sections in red.~~

　　　2.　　For unsettled facts that are blatantly true, yet the government refuses to stipulate to, the defendant has ~~crossed out relevant sections in orange.~~  Despite the government's refusal to stipulate, these facts can be proven by the defendant albeit through lengthier filings, additional experts, longer witness questioning, more court time, subpoenas for evidence, *etc.*

　　　3.　　For facts that are unsettled but require waivers, the defendant has ~~crossed out relevant sections in blue.~~  For these sections, there are no adequate stipulations and the defendant needs the government to produce the relative coinciding evidence listed in the defendant's *Submission Pursuant To LRCiv 37.1* (Dkt. #592-2).

　　　4.　　For unsettled facts that remain to be resolved, the defendant has highlighted the most relevant sections in yellow and additional elaborations and/or notes that may have been added are highlighted in green.

## SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]

**MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE**

## I.      PREREQUISITE STIPULATIONS

The stipulations listed under this section do not directly pertain to any of the evidence being withheld by the government.  Each stipulation below falls into one or more of the following two categories: (1) stipulations that pertain to general indisputable facts (Stipulation Nos. 1-4) that are later referenced in other stipulations directly pertaining to the withheld evidence, and (2) stipulations that will make litigating the suppression issues less complex in general (Stipulation Nos. 5-10) and otherwise pertain to general indisputable facts.

1.      Apartment No. 1122 is an apartment inside the Domicilio apartment complex located at 431 El Camino Real, Apartment No. 1122, Santa Clara, CA. 95050.  The Domicilio apartment complex is a gated community protected by private access electronic gates at all all entrances.  Each ground level apartment at the complex has a floor architecture raised one story off the ground making all apartment units less accessible to the public.  Each apartment within the complex has a mandatory deadbolt on all exterior front doors and a burglar alarm system wired to every exterior door and window.  A private security guard service is on call and available to renters/occupants 24 hours a day along with nightly scheduled security foot patrols between 10:00pm and 2:00am.  Square footage for the two bedroom "Mollino" apartment design (e.g., apartment No. 1120 and 1126) is 1167 to 1255 ft², the studio "Albini" apartment design (e.g., apartment No. 1122) is 489 ft², and the 1 bedroom "Ponti" apartment design (e.g., apartment No. 1124) is 864 to 889 ft².  The building containing apartment No. 1122 is four stories high with apartment No. 1122 on the first floor.  The ceiling height for floor level apartments at Domicilio is 9 ft.  The nearest road vehicle access areas are approximately 248 ft, 300 ft, 364 ft, and 455 ft away from apartment No. 1122.

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

2. The aircard is a "UTStarcom PC5740 Broadband Connection Card For Verizon Wireless" associated with the monthly billed 1xEVDO "BroadbandAccess Connect Service" account having wireless account number 270691733 opened under the name of Travis Rupard. The associated aircard account is used for accessing the Internet through the Verizon Wireless cellular network via cdma2000, EVDO Rev. o standards and also has "per-message billing" for text messages. The CDMA communications protocol, upon which the cdma2000 standards are based, was originally designed for military use due to it being nearly impossible to intercept a CDMA signal. The cdma2000 standards dictate a total of 27 physical channels upon which air interface radio waves may be sent/received between wireless devices and cell sites. The government's filings relating to the D.Ariz. 08-3286MB-LOA, 08-3298MB-LOA, and 08-7273MB-ECV applications and court orders, and the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS applications and court orders, interchangeably refer to the aircard as the "Target Device," "target broadband access card," "Target Broadband Access Card/Cellular Telephone," "telephone," and other similar terms. The aircard is a cellular device that transmits and receives electronic communications through a radio transceiver and antenna contained in the device. The aircard is not a mobile telephone, is incapable of ringing or alerting to an incoming call, and does not handle wire communications. The aircard is a computer hardware "add-on card" that can only function when plugged into the PCMCIA slot of a host laptop computer. In this case, the host laptop computer is an IBM ThinkPad (S/N #LV-C4398) with mouse, keys, docking station and power cord. In order to function, the aircard draws power from the host laptop computer, stores data on the hard drive of the host laptop computer, and its functions and operations are accessed through VZAccess Manager software installed on the host laptop computer. Once the aircard is plugged into the host laptop computer, the aircard user may use the VZAccess Manager software to access the Internet through the associated Verizon Wireless aircard account. In order to access the Internet, radio waves are transmitted to/from the aircard and the cell sites that are part of the Verizon Wireless cellular network. The radio waves sent between the aircard and the Verizon Wireless cellular network carry the signals that

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

communicate data between the host laptop computer and the Internet. The associated aircard account does not have cellular telephone service and the aircard hardware does not allow for placing telephone calls.

3.   The term "cell site information" (also referred to as "cell site data," "cell site records," and other similar terms) is an ambiguous catch-all phrase and not a standardized term. There are numerous and varying categories of data that make up the totality of cell site information. The data categories that may be available for disclosure by a wireless carrier will differ depending upon various elements such as service plan, service features, wireless device type, and cell site design. The data categories of cell site information are essentially endless and may include wireless device equipment identification number, originating telephone number, destination telephone number, cell site identification number, cell site street address, cell site latitude and longitude coordinates, cell site sector orientation, cell site coverage area, system identification number, mobile switching center identification number, switch identification number, signal time-of-flight, signal angle of arrival, signal power strength, event start date/time, event stop date/time, event duration, amount of data downloaded, and amount of data uploaded. Whenever a radio signal is sent/received between a wireless device and a wireless carrier cell site, cell site information may be generated and stored for law enforcement use (historical cell site information) or forwarded to law enforcement in real-time (real-time cell site information).

4.   A portable/transportable wireless device locator and related equipment includes at least one antenna, an amplifier, transceiver connected thereto, and a location determining processor coupled to the transceiver for transmitting/receiving a plurality of location finding signals sent/received to/from a target wireless device from among numerous wireless devices within range of the wireless device locator. The target wireless device transmits respective reply signals for each of the transmitted location finding signals and, under certain conditions, a wireless device locator may also use passive eavesdropping to collect unsolicited wireless device location finding signals that were not prompted by the wireless device locator. Additionally, the location determining processor of the wireless device

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1   locator cooperates with the transceiver for receiving the solicited and/or unsolicited location

2   finding signals.  The location determining processor may be a personal data assistant,

3   personal computer, or other suitable computing device with required software.  The wireless

4   device locator is carried by a platform moveable relative to the target wireless device.  The

5   platform may comprise an airborne platform, such as an aircraft, or a ground based platform

6   such as an automobile or person on foot.  The wireless device locator includes a Global

7   Positioning System (GPS) receiver as a platform position determining system.  The GPS

8   receiver provides the wireless device locator with a current geographical location of the

9   platform.  The GPS receiver cooperates with the location determining processor so that the

10  target wireless device may be located with longitude, latitude, and elevation coordinates

11  tethered to the accuracy of the GPS coordinates for the platform.  The location determining

12  processor may also provide for a proximity indicator involving a graphic display of an arrow

13  pointing along the azimuth (Θ) and elevation (γ) angles in the direction of the target wireless

14  device with a distance value designating the distance from the wireless device locator to the

15  target wireless device.  Said proximity indicator coordinates are not tethered to the accuracy

16  of GPS coordinates and are instead tethered to known landmarks and/or relative points of

17  position for the wireless device locator in relation to reference planes and reference vectors,

18  e.g., known altitudes and known compass bearings.  While fixed to the platform and during

19  movement relative to the target wireless device, the wireless device locator collects a series

20  of geolocation measurements via the received reply signals and/or via passively received

21  unsolicited signals.  These geolocation measurements are used to triangulate the location of

22  the wireless device and are superimposed over a computerized map for advantageous

23  reliability and searching/locating capabilities.  Geolocation of RF signals is defined as the

24  problem of precise localization (or geolocation) of spatially separated sources emitting

25  electromagnetic energy in the form of radio signals within a certain frequency bandwidth by

26  observing their received signals at spatially separated sensors (or array elements) of the

27  geolocation of RF signals system.

28          5.      Via  District of Arizona Grand Jury subpoena Nos. 07-03-609 and 07-03-615,

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/13/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

the government obtained at least 411,375 destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer from May 11, 2008 through June 5, 2008.  At the time the government sought said subpoenas, the government ultimately intended to use subsequent judicial authorization to facilitate physically locating the device identified via the subpoenas.

6.    Between June 13, 2008 and July 8, 2008, the government used the noted destination IP addresses (as described in Stipulation No. 5) to identify the aircard and aircard account as being the end-source Internet connection responsible for submitting the alleged fraudulent e-filed tax returns.  Between June 13, 2008 and July 8, 2008, the government used the noted destination IP addresses to narrow down the physical location of the aircard to Northern California.

7.    Via District of Arizona order No. 08-3286MB-LOA (i.e., the "retroactive order"), the government obtained copies of the 411,375+ destination IP addresses accessed by the aircard from May 11, 2008 through June 5, 2008 that were already obtained via District of Arizona Grand Jury subpoena Nos. 07-03-609 and 07-03-615 (as described in Stipulation No. 5), and (2) 1,424,773+ destination IP addresses pertaining to websites and other Internet resources accessed by the aircard and its host laptop computer from June 5, 2008 through July 9, 2008.

8.    On the morning of July 14, 2008,  FBI Agent Kevin F. Killigrew created a cell tower range chart/map (ITEM No. 2 of May 12, 2009 discovery set) consisting of a street map, plotted Verizon Wireless cell site sectors belonging to cell site Nos. 268, 139, and 279, and a triangulated aircard location estimate represented by a shaded area.  On the chart/map, the total land area collectively covered by cell site Nos. 268, 139, and 279 is approximately 105,789,264 ft² and the total land area making up the triangulated aircard location estimate is approximately 6,412,224 ft². FBI Agent Killigrew created the cell tower range chart/map by completing the following steps: (1) obtaining the aircard historical cell site location information (covering June 10, 2008 through July 11, 2008) that was provided to the government by Verizon Wireless on July 12, 2008, (2) using the latitude and longitude

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  coordinates of three of the five cell sites (cell site Nos. 268, 139, and 279) contained in the

2  historical cell site location information to plot the cell site locations on a

3  digital/computerized street map, (3) using prior knowledge of Verizon Wireless cell site

4  signal ranges (i.e., antenna radiation patterns) to draw signal range circles around each of the

5  three cell site locations plotted on the digital/computerized street map, (4) using prior

6  knowledge of typical Verizon Wireless cell site sector orientations (i.e., sector azimuths at 0°,

7  120°, and 240° with sector radiation patterns covering 300°-60°, 60°-180°, and 180°-300°) to

8  draw lines separating each of the noted signal range circles into three sectors each, (5) using

9  the historical cell site location information to calculate which two cell sites were being

10  accessed by the aircard most often (i.e., cell site Nos. 268 and 139) and then weighting the

11  respective signal range circle of the remaining cell site (i.e., cell site No. 279) at a zero

12  probability as covering the location of the aircard, (6) using the digital/computerized street

13  map to calculate an overlapping signal range area for the two cell sites used by the aircard

14  most often (i.e., cell site Nos. 268 and 139), (7) using the digital/computerized street map to

15  calculate the three overlapping sector regions within the overlapping signal range area

16  described in No. 6 above, (8) weighting two of the noted three overlapping sector regions

17  covering non residential areas (i.e., the airport as shown on the noted cell tower range chart/

18  map) at a zero probability as covering the location of the aircard, and (9) weighting the

19  remaining overlapping sector region (i.e., the shaded area on the cell tower range chart/map)

20  at maximum probability as covering the location of the aircard.  The shaded area on the cell

21  tower range chart/map represents a government triangulated aircard location

22  signature/fingerprint based off of the above explained statistical analysis, the known

23  locations of Verizon Wireless cell sites, and the known azimuths and radiation patterns of

24  Verizon Wireless cell site sectors.  The shaded area on the cell tower range chart covers the

25  location of apartment No. 1122 at the Domicilio apartment complex.

26      9.   In order to search for and locate the aircard, Verizon Wireless, under the

27  instruction of the government or while acting as agent for the government, utilized network-

28  initiated Over-The-Air Service Provisioning (OTASP), also known as Over-The-Air

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  Parameter Administration (OTAPA), to surreptitiously write data to the aircard's hardware,

2  i.e., the Number Assignment Module (NAM), in order to facilitate compatibility between the

3  aircard, the Verizon Wireless network, and the government's portable/transportable wireless

4  device locator(s) and related equipment.  If it was not for the government's mission to search

5  for and locate the aircard, the OTASP messages would have never been written to the aircard

6  hardware.  Regardless of whether the government instructed Verizon Wireless to send the

7  OTASP messages, the government was fully aware that the OTASP messages needed to be

8  sent to the aircard, and data written to the aircard, in order to facilitate operation of the

9  government's portable/transportable wireless device locators.

10         10.    If one or more of the following is suppressed: (1) the aircard destination IP

11  addresses, (2) the aircard historical cell site location information, (3) the aircard real-time

12  cell site location information collected by the SF-Martinez DCS-3000 server (Pen/Trap

13  device), (4) the aircard geolocation measurements and data collected by the government's

14  portable/transportable wireless device locator(s) and related equipment, or (5) the keys,

15  codes, masks, and data obtained by the government that are used during registration

16  authentication routines and for aircard and Verizon Wireless cell site signal and data

17  encryption, encoding, scrambling, and spreading for various OSI network layers—then all

18  evidence associated with the aircard location, and associated with apartment No. 1122 and its

19  occupant/renter, will become fruits of the poisonous tree and not attenuated from any one of

20  the five numbered categories of suppressed evidence described immediately above.  The

21  noted fruits of the poisonous tree with respect to all evidence associated with the aircard

22  location includes, but is not limited to, the evidence indicated in the five numbered

23  categories of aircard location evidence described immediately above.  The noted fruits of the

24  poisonous tree with respect to apartment No. 1122 and its occupant/renter includes, but is not

25  limited to, name and address information from the local post office facility, utility records

26  and information, driver license records and information, motor vehicle record checks, tax

27  records, Accurint information, identities, rental agency records, handwriting comparisons,

28  pictures, video footage, photocopies of documents, ruse Chinese food delivery, surveillance

of the area surrounding apartment No. 1122, analysis of electricity use, analysis of Domicilio apartment complex access card use, apartment keys, fruits of subsequent physical searches of apartment No. 1122, fruits of other subsequent and related searches, etc.

## II.   PRIMARY STIPULATIONS

The stipulations listed under this section directly pertain to the evidence being withheld by the government and are either a *reflection* of what the defendant expects the withheld evidence to prove or are other proposed stipulated facts or waivers that will alleviate the underlying needs that require the withheld evidence.  The stipulations are organized under the categories of withheld evidence that are addressed in the accompanying motion and memorandum and in the accompanying *Submission Pursuant To LRCiv 37.1*. Some stipulations apply to more than one category of evidence and are noted at the end of each applicable section.  Other than Section II(F), *infra* (the category of evidence relating to the actual devices used to locate the aircard), if the government stipulates to all stipulations listed under any given section then the defendant's need for the evidence requested under that category will be alleviated.  The evidence being requested under each category is listed in the accompanying *Submission Pursuant To LRCiv 37.1*.

### A.   All evidence relating to the identities and roles of the witnesses to the mission to search for and locate the aircard.

11.   The unidentified agents/personnel who operated the portable/transportable wireless device locator(s) and related equipment did not read the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS court orders prior to using said equipment to search for and locate the aircard.  [How can the prosecution prove a "good faith" reliance on an order without identifying who executed the order and without having those individuals testify that they read the order and had it with them while locating the aircard?]

12.   The unidentified agents/personnel who operated the portable/transportable wireless device locator(s) and related equipment were not relying on their knowledge,

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  training, and experience—or on the knowledge, training, and experience of others—while

2  manifesting the opinion that their actions in using said equipment to search for and locate the

3  aircard were legal and in compliance with the Fourth Amendment.  [If a Fourth Amendment

4  violation is found, how can the prosecution prove **objective** "good faith" (based on training

5  and experience) without having the agents/personnel who destroyed the evidence testify?]

6       13.   With respect to the government's efforts to search for and locate the aircard, the

7  government agrees to waive and not use all good faith arguments that would raise a disputed

8  issue of material fact that can only be effectively settled by the Court and/or challenged by

9  the defendant by having the unidentified agents/personnel (who operated the

10  portable/transportable wireless device locator(s) and related equipment) testify and answer

11  the defendant's and/or the government's and/or the Court's questions while under oath.

12       14.   The unidentified agents/personnel who operated the portable/transportable

13  wireless device locator(s) and related equipment, used to search for and locate the aircard,

14  were using said equipment while (1) flying around in a helicopter and hovering said

15  helicopter over apartment No. 1122 at an altitude that was lower than what is permitted by

16  FAA regulations, and (2) carrying said equipment while walking around on foot within the

17  Domicilio apartment complex.

18       15.   The real-time aircard location data and other additional data (as described in

19  Stipulation Nos. 23-25) was destroyed after the date of Daniel Rigmaiden's arrest, i.e., after

20  August 3, 2008.

21       16.   Prior to destroying the real-time aircard location data and other additional data

22  (as described in Stipulation Nos. 23-25) the unidentified agents/personnel who operated the

23  portable/transportable wireless device locator(s) and related equipment harbored a belief that

24  the destroyed geolocation data would be valuable, relevant, and helpful to the defense of

25  Daniel Rigmaiden.  The above referenced "defense" is defined as challenging the

26  government's actions in locating the aircard as being an unreasonable and warrantless search

27  and seizure under the Fourth Amendment.  [How can the prosecution prove **subjective**

28  "good faith" destruction (based on what the agents/personnel were thinking) without having

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1   the agents/personnel who destroyed the evidence testify?]

2     17. The unidentified agents/personnel who operated the portable/transportable

3   wireless device locator(s) and related equipment were not relying on their knowledge,

4   training, and/or experience—or on the knowledge, training, and/or experience of others—

5   while manifesting the opinion that their actions in destroying the real-time aircard location

6   data and other additional data (as described in Stipulation Nos. 23-25) were legal and in

7   compliance with the Fifth Amendment.  [How can the prosecution prove **objective** "good

8   faith" destruction (based on training and experience) without having the agents/personnel

9   who destroyed the evidence testify?]

10    18. The unidentified agents/personnel who operated the portable/transportable

11  wireless device locator(s) and related equipment were not relying on any agency, department,

12  or government policy while manifesting the opinion that their actions in destroying the real-

13  time aircard location data and other additional data (as described in Stipulation Nos. 23-25)

14  were legal and in compliance with the Fifth Amendment.  [Where is the "destroy the

15  evidence" FBI policy and how can the prosecution prove reliance on a policy without

16  producing it and without having the agents/personnel who destroyed the evidence testify that

17  they relied on the policy?]

18    19. With respect to the government's actions in destroying the real-time aircard

19  location data and other additional data (as described in Stipulation Nos. 23-25), the

20  government agrees to waive and not use all "lack of bad faith" and/or good faith arguments

21  that would raise a disputed issue of material fact that can only be effectively settled by the

22  Court and/or challenged by the defendant by having the unidentified agents/personnel (who

23  destroyed said real-time aircard location data and other additional data) testify and answer

24  the defendant's and/or the government's and/or the Court's questions while under oath.

25    *. In addition to the stipulations specifically listed in this section, additional

26  stipulations are also required in order to alleviate the defendant's need for the evidence

27  requested under this category.  The following prerequisite stipulations (Section I, *supra*)

28  apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations

1  listed under other categories of withheld evidence apply to this category of withheld

2  evidence: Stipulation Nos. 23-25.

3

4  **B.    Unredacted order applications and attachments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders obtained to facilitate locating the aircard.**

5

6  20.    Considering the order applications and affidavits used to obtain the N.D.Cal.

7  08-90331MISC-RS and 08-90330MISC-RS orders were not incorporated into the issued

8  orders by reference, and considering said order applications and affidavits were not

9  accompanying said issued orders during any actions taken by the government

10 agents/personnel who searched for and located the aircard while using the

11 portable/transportable wireless device locator(s) and related equipment, said order

12 applications and affidavits were not part of the issued orders and are neither relevant nor

13 applicable in determining (1) the scope and particularity of the judicially approved actions

14 authorized in said issued orders, and (2) the manifested good faith belief of any government

15 agent/personnel that his/her actions in using said equipment to search for and locate the

16 aircard were legal and in compliance with the Fourth Amendment.

17 *.    ~~In addition to the stipulations specifically listed in this section, additional~~

18 ~~stipulations are also required in order to alleviate the defendant's need for the evidence~~

19 ~~requested under this category.  The following prerequisite stipulations (Section I, *supra*)~~

20 ~~apply to this category of withheld evidence: Stipulation Nos. 1-4.~~

21

22 **C.    All response materials, returns, and seized/collected evidence relating to the N.D.Cal. 08-90330MISC-RS order obtained to facilitate locating the aircard, *e.g.*, real-time location data.**

23

24 21.    The unidentified government agents/personnel used a portable/transportable

25 wireless device locator and related equipment to locate the aircard precisely inside the

26 confines of apartment No. 1122 but informed primary case agents IRS-CI Agent Michael P.

27 Fleischmann,  IRS-CI Agent Denise L. Medrano, IRS-CI Agent Tracy L. Daun, and USPIS

28 Inspector James L. Wilson that the aircard was located only as precise as one of three

apartments at the Domicilio apartment complex, *i.e.*, apartment Nos. 1120, 1122, and 1124.

22.     On July 16, 2008, the unidentified government agents/personnel used a portable/transportable wireless device locator and related equipment to initially locate the aircard within apartment No. 1122.  After initially locating the aircard inside apartment No. 1122, the unidentified government agents/personnel used said equipment to verify the aircard location inside apartment No. 1122 within each of the following date/time ranges: (1) on one or more occasions between July 17, 2008 12:00am and July 22, 2008 3:40pm, (2) on one or more occasions between July 23, 2008 12:00am and July 30, 2008 2:30pm, and (3) on one or more occasions between July 31, 2008 12:00am and August 1, 2008 1:21am.

23.     The nature of the destroyed geolocation data relating to the location of the aircard, and collected by the government's portable/transportable wireless device locator(s) and related equipment via the geolocation measurements described in Stipulation Nos. 36-41, included, but was not limited to, the following: (1) time stamped three dimensional (3D) geolocation measurements represented by the Cartesian coordinate system (x, y, z) and specifically consisting of aircard longitude, latitude, and elevation coordinates that are tethered to the accuracy of the GPS coordinates of the portable/transportable platform containing the wireless device locator and related equipment, (2) time stamped three dimensional (3D) geolocation measurements represented by the Polar coordinate system (R, Θ, γ) and specifically consisting of aircard azimuth angle, elevation angle, and distance value coordinates that are tethered to known landmarks and/or relative points of position for the wireless device locator in relation to reference planes and reference vectors, *e.g.*, a known altitude and known compass bearing, (3) digital/computerized street maps and/or satellite imagery maps and/or other imagery maps with an overlay of estimated 3D geolocation points and tracks for the aircard that were generated as said equipment was operated to locate the aircard, (4) one or more final digital/computerized mapped 3D geolocation points showing the final and most precise calculated location of the aircard.  *** Note: this stipulation (No. 23) can be disregarded if stipulation Nos. 21 and 22 above are resolved.  Otherwise, this stipulation is relevant considering I need to prove the precision of the devices used so that I

*SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1   can further support my claim that the aircard was located precisely inside apartment No.

2   1122, and I need to identify the destroyed geolocation data to show that it was relevant to my

3   defense (so as to support my *Motion To Dismiss For Destruction Of Evidence* (Dkt. #595)).

4   ***

5           24.     Additional destroyed data relating to the location of the aircard, and collected

6   by the government's portable/transportable wireless device locator(s) and related equipment,

7   consisted of, but was not limited to, the following: digital/computerized street maps and/or

8   satellite imagery maps with an overlay of Global Positioning System (GPS) points and tracks

9   for the portable/transportable platform (*e.g.,* automobile, helicopter, airplane, person on foot,

10   *etc.*) used to move said equipment (as described in Stipulation No. 42) while locating the

11   aircard.   *** Note: this stipulation (No. 24) can be disregarded if stipulation Nos. 21 and 22

12   above are resolved.   Otherwise, this stipulation is relevant considering I need to prove the

13   precision of the devices used so that I can further support my claim that the aircard was

14   located precisely inside apartment No. 1122, and I need to identify the destroyed geolocation

15   data to show that it was relevant to my defense (so as to support my *Motion To Dismiss For*

16   *Destruction Of Evidence* (Dkt. #595)). ***

17           25.     Additional destroyed data relating to the location of the aircard and relating to

18   obtaining the location of the aircard consisted of nonpublic keys, codes, masks, and data for

19   the aircard and Verizon Wireless (as described in Stipulation No. 26) used during registration

20   authentication routines and for aircard signal and data encryption, encoding, scrambling,

21   spreading, and routing on various OSI network layers.   Said nonpublic keys, codes, masks,

22   and data were used by the government's portable/transportable wireless device locator(s) and

23   related equipment to conduct radio wave collection methods as described in Stipulation Nos.

24   30-35 and 42.

25           *.     In addition to the stipulations specifically listed in this section, additional

26   stipulations are also required in order to alleviate the defendant's need for the evidence

27   requested under this category. The following prerequisite stipulations (Section I, supra)

28   apply to this category of withheld evidence: Stipulation Nos. 1-4.   The following stipulations

listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 26, ~~30~~ 31, ~~32,~~ 33-35, ~~and 42.~~

**D.     All evidence relating to the real-time and historical geolocation techniques (*e.g.*, triangulation techniques) and radio wave collection methods (*e.g.*, cell site emulation, interrogation, active approach) used by the government agents/personnel and by the wireless device locators while searching for the aircard.**

26.     In order to search for and locate the aircard, the government obtained from Verizon Wireless specific, keys, codes, masks, and data (including, but not limited to, Public Long Codes, Private Long Codes, Public Long Code Masks, Private Long Code Masks, Authorization Keys (A-Key), Shared Secret Data (SSD), encryption keys, signal slotting information, *etc.*) used for aircard signal message encryption and data encryption, encoding, scrambling, spreading, and routing on various OSI network layers spanning the Physical Layer, Medium Access Control (MAC) Sublayer, Link Access Control (LAC) Sublayer, and elements of upper layer signaling responsible for signaling control over other layers and responsible for the transferring of communications content.  Some of said keys, codes, masks, and data were nonpublic information and were used to maintain privacy, secrecy, and security (*i.e.*, prevent passive and active eavesdropping) of aircard signaling messages/data including (1) signaling messages/data used to identify an aircard signal among many other signals, and (2) signaling messages/data that can be used to perform the geolocation measurements described in Stipulation Nos. 36-41.  Some of said keys, codes, masks, and data that were nonpublic information were used during registration authentication routines to prevent unauthorized individuals from emulating Verizon Wireless cell sites, emulating the aircard, and conducting man-in-the-middle attacks.

27.     ~~The government placed surreptitious telephone calls to the aircard, as logged in the LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) and resulting CDNRS files (ITEM No. 11 of September 9, 2009 discovery set), in order to cause a Verizon Wireless cell site sector to transmit a paging signal (indicating an incoming call) to the aircard's receive antenna via a common forward link paging channel.  The government's~~

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

surreptitious phone calls resulted in said paging signals being sent to the aircard's receive antenna from the Verizon Wireless cell site sector providing cellular service to the aircard while it was located inside apartment No. 1122.  Considering the aircard is not a telephone and does not have telephone service, the surreptitious phone calls did not cause the aircard to "ring" and otherwise did not cause the aircard to notify the aircard user that the government was calling the aircard.

28.   During the course of placing surreptitious phone calls to the aircard while it was located inside apartment No. 1122 (as described in Stipulation No. 27), government agents/personnel used the SF-Martinez DCS-3000 server (Pen/Trap device) to receive LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) containing aircard real-time cell site information provided by a Verizon Wireless Intercept Access Point (IAP).  The SF-Martinez DCS-3000 server received said LAESP messages in real-time but after the surreptitious phone calls were forwarded to internal Verizon Wireless phone numbers established to handle calls that cannot be connected.

29.   The government's actions in placing surreptitious phone calls to the aircard and receiving LAESP messages (as described in Stipulation Nos. 27-28) resulted in the government obtaining in real-time (on July 16, 2008) the identity and location of the Verizon Wireless cell site sector providing service to the aircard, i.e., sector No. 3, Verizon Wireless cell site No. 5, having a latitude of 37.369733 and longitude of -121.923442 with a cell site street address of 2001 Gateway Place, San Jose, CA 95110.

30.   The government configured its portable/transportable wireless device locator(s) and related equipment, using the nonpublic keys, codes, masks, and data described in Stipulation No. 26, to facilitate decoding, decrypting, descrambling, and despreading aircard signals and data that were collected by said equipment by passively eavesdropping air interface signals being exchanged between the aircard and Verizon Wireless cell site(s).  The referenced "passive eavesdropping" techniques were used to facilitate the government's efforts to search for and locate the aircard inside apartment No. 1122.

31.   The network-initiated Over-The-Air Service Provisioning (OTASP), also

*SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/13/2011]*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

1    known as Over-The-Air Parameter Administration (OTAPA), discussed in Stipulation No. 9,

2    was used to write data to the aircard hardware (*i.e.*, the Number Assignment Module (NAM))

3    consisting of OTASP messages accomplishing the following: [configuring the aircard with

4    the identification and authentication data for the government's emulated cell site so that the

5    aircard would allow the government's StingRay (or StingRay II) and KingFish to hijack the

6    aircard signal and force the aircard to connect to the government's emulated cellular network;

7    without the OTASP messages and data being written to the aircard, the government would

8    not have been able to locate the aircard.] (1) disabling the service programming lock for the

9    aircard programming module containing Number Assignment Module (NAM) indicators, (2)

10   modifying the System Selection for Preferred Roaming (SSPR) so that the aircard would

11   connect to the government's emulated cell site as the preferred cellular system over Verizon

12   Wireless, (3) modifying the aircard preferred roaming list to include the government's

13   emulated cell site as an available cellular system/network, (4) creating an acquisition record

14   and system record in the aircard containing parameters so that the aircard can acquire the

15   cellular system created by the government's emulated cell site, (5) setting the "System

16   identification" (SID) acquisition record field to the SID of the government's emulated cell

17   site, (6) setting the "Network identification" (NID) acquisition record field to the NID of the

18   government's emulated cell site, (7) setting the "Relative priority indicator" (PRI) acquisition

19   record field so that the government's emulated cell site will have the highest priority and be

20   the first cellular system that the aircard attempts to access for service, (8) modifying the

21   Preferred User Zone List so that the most preferred User Zone is the User Zone belonging to

22   the government's emulated cell site, (9) setting the "User Zone priority" Preferred User Zone

23   List field to the User Zone of the government's emulated cell site, (10) setting the "User

24   Zone ID" Preferred User Zone List field to the User Zone ID of the government's emulated

25   cell site, and (11) setting the "User Zone System ID" Preferred User Zone List field to the

26   User Zone SID of the government's emulated cell site.  The above OTASP messages were

27   required in order to facilitate the government's portable/transportable wireless device

28   locator(s) and related equipment operating as an emulated Verizon Wireless cell site.

32. ~~The government configured its portable/transportable wireless device locator(s) and related equipment, using the nonpublic keys, codes, masks, and data described in Stipulation No. 26, to emulate a CDMA based Verizon Wireless cell site in the cellular service area covering apartment No. 1122.  The government's emulated cell site sent and received radio signals as if it were an actual cell site part of the Verizon Wireless cellular network providing service to Verizon Wireless customers.~~  *The government's emulated cell site transmitted its own pilot pseudo number (PN) offset sequence code to identify itself to the aircard as a Verizon Wireless cell site available for providing cellular service.*

33. *The government positioned its portable/transportable wireless device locator(s) and related equipment,* ~~while configured to emulate a Verizon Wireless cell site, within signal range of the aircard~~ *and began transmitting a pilot pseudo number (PN) offset sequence code with a stronger signal than the pilot PN offset sequence codes being transmitted by actual Verizon Wireless cell sites in the area.  By transmitting a pilot PN offset sequence code with a stronger signal than other cell sites in the area,* ~~the government took the place of Verizon Wireless and took control of the cellular service provided to the aircard.~~  In doing so, the government forced the aircard to disconnect from the Verizon Wireless cell site providing it service and forced the aircard to register/connect to the government's emulated cell site.  The referenced "forced registration" techniques were used to facilitate the government's efforts to search for and locate the aircard inside apartment No. 1122.

34. The government's portable/transportable wireless device locator and related equipment, configured to emulate a Verizon Wireless cell site, also emulated the aircard by using identifying information for the aircard (*e.g.*, EIN), and the nonpublic keys, codes, masks, and data described in Stipulation No. 26, so that it could communicate with an actual Verizon Wireless cell site as if it were the actual aircard.  In other words, the government's portable/transportable wireless device locator and related equipment appeared as a Verizon Wireless cell site to the actual aircard while appearing as the aircard to an actual Verizon Wireless cell site with a service area covering apartment No. 1122.  The government's portable/transportable wireless device locator and related equipment was able to receive and

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  forward all radio signals sent between the actual aircard and an actual Verizon Wireless cell

2  site while having complete access to identifying information for the signals and complete

3  access to the data contained in the signals.  The referenced "aircard emulation" techniques

4  were used to facilitate the government's efforts to search for and locate the aircard inside

5  apartment No. 1122.  *** Note: this stipulation (No. 34) can be disregarded if the

6  government did not conduct a man-in-the-middle attack and instead only conducted a denial-

7  of-service attack, or conducted a man-in-the-middle attack without cloning the aircard. ***

8       35.   Using its portable/transportable wireless device locator and related equipment,

9  the government routinely transmitted a signal (*i.e.*, location finding interrogation signals) to

10  the aircard's receive antenna with said signal designed to routinely prompt a transmission

11  reply from the aircard's transmit antenna under the CDMA communications protocol.  The

12  government's wireless device locator and related equipment collected the aircard's reply

13  signals at its receive antenna and subjected the reply signals to the geolocation measurements

14  described in Stipulation Nos. 36-41.  The geolocation measurements were conducted in order

15  to triangulate the aircard location inside apartment No. 1122.

16       36.   In order to search for and locate the aircard while using its

17  portable/transportable wireless device locator and related equipment, while configured to

18  emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the

19  government made time-of-flight (TOF) measurements on numerous transmitted aircard

20  signals with each measurement consisting of (1) obtaining the propagation delay time of the

21  aircard signal by subtracting the time at which the aircard transmitted the signal from the

22  time at which the wireless device locator and related equipment received the signal, and (2)

23  obtaining the distance between the aircard and the wireless device locator by multiplying the

24  propagation delay time by the speed of light.  Said geolocation measurements were taken in

25  three dimensions (3D) (x, y, z and/or R, Θ, γ coordinates) and were used to triangulate the

26  location of the aircard inside apartment No. 1122.  *** Note: this stipulation (No. 36) is

27  relevant because (1) time-of-flight is an element of triangulation in the geolocation context

28  and I am arguing that use of triangulation to locate a wireless devices is a Fourth Amendment

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1  search, (2) I need to prove the precision of the devices used (by showing the advanced

2  geolocation technology) so that I can further support my claim that the aircard was located

3  precisely inside apartment No. 1122, and (3) I need to identify the destroyed geolocation data

4  to show that it was relevant to my defense (so as to support my *Motion To Dismiss For*

5  *Destruction Of Evidence* (Dkt. #595)).***

6       37.   In order to search for and locate the aircard while using its

7  portable/transportable wireless device locator and related equipment, while configured to

8  emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the

9  government made power-distance measurements on numerous transmitted aircard signals

10  with each measurement consisting of (1) obtaining the loss power value of the aircard signal

11  by subtracting the signal receive power (as received at the wireless device locator and related

12  equipment) from the signal transmission power (as transmitted from the aircard), and (2)

13  obtaining the distance between the aircard and the wireless device locator by using the loss

14  power value and the inverse square law of signal strength over increasing distances.  Said

15  geolocation measurements were taken in three dimensions (3D) (x, y, z and/or R, Θ, γ

16  coordinates ) and were used to triangulate the location of the aircard inside apartment No.

17  1122.  *** Note: this stipulation (No. 37) is relevant because (1) power-distance

18  measurements is an element of triangulation in the geolocation context and I am arguing that

19  use of triangulation to locate a wireless devices is a Fourth Amendment search, (2) I need to

20  prove the precision of the devices used (by showing the advanced geolocation technology) so

21  that I can further support my claim that the aircard was located precisely inside apartment

22  No. 1122, and (3) I need to identify the destroyed geolocation data to show that it was

23  relevant to my defense (so as to support my *Motion To Dismiss For Destruction Of Evidence*

24  (Dkt. #595)).***

25       38.   In order to search for and locate the aircard while using its

26  portable/transportable wireless device locator and related equipment, while configured to

27  emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the

28  government made angle of arrival (AOA) measurements on numerous transmitted aircard

signals with each measurement consisting of (1) receiving the aircard signal at an antenna connected to the wireless device locator with said antenna being a phased array antenna [(a beam forming antenna that uses a concentrated antenna lobe as a "through-the-wall" search beam)] with multiple antenna elements that are electronically steered by a digital signal processor, and (2) obtaining the angle of arrival of the aircard signal (*i.e.*, the direction to the aircard from the wireless device locator) by subjecting the received aircard signal to an angle of arrival determination routine via the digital signal processor coupled to each antenna element.  Said geolocation measurements were taken in three dimensions (3D) (x, y, z and/or R, Θ, γ coordinates), which includes azimuth and elevation angle, and were used to triangulate the location of the aircard inside apartment No. 1122.  *** Note: this stipulation (No. 38) is relevant because (1) angle of arrival is an element of triangulation in the geolocation context and I am arguing that use of triangulation to locate a wireless devices is a Fourth Amendment search, (2) I need to prove the precision of the devices used (by showing the advanced geolocation technology) so that I can further support my claim that the aircard was located precisely inside apartment No. 1122, (3) phased array beam forming antennas send out "through-the-wall" search beams and this provides support for my Fourth Amendment argument that the government used sense-enhancing technology to search apartment No. 1122, and (4) I need to identify the destroyed geolocation data to show that it was relevant to my defense (so as to support my *Motion To Dismiss For Destruction Of Evidence* (Dkt. #595)). ***

39.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used received signal measurements (*e.g.*, bit-error rate measurements, received signal strength measurements, receiver metrics, and signal-to-noise ratio measurements) in order to weight the reliability of the measurements corresponding to the measurement families described in Stipulation Nos. 36-38. *** Note: this stipulation (No. 39) is relevant because (1) received signal measurements is an element of triangulation in the geolocation

*SUBMISSION OF PROPOSED STIPULATIONS (EDITED 10/13/2011)*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

context and I am arguing that use of triangulation to locate a wireless devices is a Fourth Amendment search, (2) I need to prove the precision of the devices used (by showing the advanced geolocation technology) so that I can further support my claim that the aircard was located precisely inside apartment No. 1122, and (3) I need to identify the destroyed geolocation data to show that it was relevant to my defense (so as to support my *Motion To Dismiss For Destruction Of Evidence* (Dkt. #595)).***

40.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used statistical functions (*e.g.*, average, medium, mean, mode, *etc.*) on groups of aircard geolocation measurements within any given set of measurements corresponding to the measurement families described in Stipulation Nos. 36-38.*** Note: this stipulation (No. 40) is relevant because (1) statistical functions on geolocation data is an element of triangulation in the geolocation context and I am arguing that use of triangulation to locate a wireless devices is a Fourth Amendment search, (2) I need to prove the precision of the devices used (by showing the advanced geolocation technology) so that I can further support my claim that the aircard was located precisely inside apartment No. 1122, and (3) I need to identify the destroyed geolocation data to show that it was relevant to my defense (so as to support my *Motion To Dismiss For Destruction Of Evidence* (Dkt. #595)).***

41.     In order to more precisely search for and locate the aircard while using its portable/transportable wireless device locator and related equipment, while configured to emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the government used data fusion by combining and simultaneously using the aircard geolocation measurements spanning the measurement families described in Stipulation Nos. 36-38.  In using data fusion, the government combined, in a weighted sense, different families of measurements and also measurements within families. *** Note: this stipulation (No. 41) is relevant because (1) statistical functions on geolocation data is an element of triangulation in the geolocation context and I am arguing that use of triangulation to locate a wireless devices

*SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

1  is a Fourth Amendment search, (2) I need to prove the precision of the devices used (by

2  showing the advanced geolocation technology) so that I can further support my claim that the

3  aircard was located precisely inside apartment No. 1122, and (3) I need to identify the

4  destroyed geolocation data to show that it was relevant to my defense (so as to support my

5  *Motion To Dismiss For Destruction Of Evidence* (Dkt. #595)).***

6  42.  ~~In order to more precisely search for and locate the aircard while using its~~

7  ~~portable/transportable wireless device locator and related equipment, while configured to~~

8  ~~emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the~~

9  ~~government collected numerous geolocation measurements (corresponding to the~~

10  ~~measurement families described in Stipulation Nos. 36-38) during movement of said~~

11  ~~equipment in the geographical area surrounding the aircard (i.e., "active approach").  By~~

12  ~~doing so, the government's portable/transportable wireless device locator and related~~

13  ~~equipment took geolocation measurements in numerous different locations, broke symmetry~~

14  ~~with the aircard, and encircled the approximate location of the aircard until it was located.~~

15  43.  In order to more precisely search for and locate the aircard while using its

16  portable/transportable wireless device locator and related equipment, while configured to

17  emulate a Verizon Wireless cell site and prompting the aircard to transmit signals, the

18  government sent instructions/commands to the aircard via radio signals that caused the

19  aircard to transmit signals to said equipment at a higher transmit power than the aircard

20  would have normally transmitted if it were accessing cellular service through an actual

21  Verizon Wireless cell site with a service area covering apartment No. 1122.

22  44.  As a result of the government's mission to search for and locate the aircard

23  using its portable/transportable wireless device locator(s) and related equipment, the

24  government caused an interruption in aircard service and otherwise denied the aircard

25  cellular service [(*i.e.*, a denial-of-service attack)], for however long, from the Verizon

26  Wireless cell site providing service to the aircard while it was inside apartment No. 1122.

27  45.  As a result of the government's mission to search for and locate the aircard

28  using its portable/transportable wireless device locator(s) and related equipment, the

*SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

1   government caused aircard service data transfer rates (Internet access speed) to fall below

2   what would have otherwise been provided by the Verizon Wireless cellular network had the

3   government not been interfering with aircard forward and reverse link signals using its

4   portable/transportable wireless device locator(s) and related equipment.  *** Note: this

5   stipulation (No. 45) can be disregarded if the government did not conduct a man-in-the-

6   middle attack and instead only conducted a denial-of-service attack. ***

7        46.      The government would not have been able to locate the aircard if at least one

8   of the following actions were not completed: (1) obtaining the nonpublic keys, codes, masks,

9   and data from Verizon Wireless as described in stipulation No. 26 (2) placing surreptitious

10  phone calls to the aircard as described in Stipulation No. 27, (3) collecting LAESP massages

11  relating to the aircard location as described in Stipulation Nos. 28-29, (4) passively

12  eavesdropping aircard signals as described in Stipulation No. 30, (5) having Verizon Wireless

13  utilized network-initiated Over-The-Air Service Provisioning (OTASP) to send/write

14  messages/data to the aircard hardware as described in Stipulation No. 9 and 31, (6)

15  configuring a portable/transportable wireless device locator and related equipment to emulate

16  a Verizon Wireless cell site as described in stipulation No. 32, (7) configuring a

17  portable/transportable wireless device locator and related equipment to emulate the aircard as

18  described in stipulation No. 34 (8) forcing the aircard to register to the government's

19  emulated cell site as described in Stipulation No. 33, (9) routinely transmitting a signal to the

20  aircard's receive antenna with said signal designed to routinely prompt a transmission reply

21  from the aircard's transmit antenna as described in Stipulation No. 35, (10) conducting the

22  geolocation measurement techniques as described in Stipulation Nos. 36-41 to triangulate the

23  aircard location, (11) collecting numerous geolocation measurements during movement of a

24  portable/transportable wireless device locator and related equipment as described in

25  Stipulation No. 42, (12) causing the aircard to transmit signals at a higher transmit power as

26  described in Stipulation No. 43, (13) causing an interruption in aircard service as described

27  in Stipulation No. 44, or (14) causing a decrease in aircard service data transfer rates as

28  described in Stipulation No. 45.

*.    In addition to the stipulations specifically listed in this section, additional stipulations are also required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, supra) apply to this category of withheld evidence: Stipulation Nos. 1-4 and 9.

E.    All path movement information (*e.g.*, *GPS data*) showing the geographical paths of the wireless device locators while searching for the aircard.

*.    There are no stipulations specifically listed under this category, however, other stipulations are required in order to alleviate the defendant's need for the evidence requested under this category.  The following prerequisite stipulations (Section I, supra) apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations listed under other categories of withheld evidence apply to this category of withheld evidence: Stipulation Nos. 14, 21, 22, 24, and 42.

F.    All evidence relating to the specific wireless device locators (*e.g.*, user manuals, test data, *etc.*, for the StingRay) and related software (*e.g.*, CDMA software, Geolocation software, *etc.*) used to search for and locate the aircard.

47.    Mobile tracking devices and tracking devices are one-way radio communication devices that emit a signal on a specific radio frequency.  This signal can be received by special tracking equipment, and allows the user to trace the geographical location of the transponder.  Such "homing" devices are used by law enforcement personnel to keep track of the physical whereabouts of the sending unit, which might be placed in an automobile, on a person, or in some other item.  The terms "mobile tracking device" and "tracking device" are confined to the transponder/beeper type devices placed upon the object or person to be tracked as described in the *Knotts* and *Karo* Supreme Court opinions.

48.    The government did not install a hardware and/or software based mobile tracking device on the aircard, in the aircard, or to the aircard and the aircard was not being used and/or monitored as a mobile tracking device.

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

49.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are not singly or collectively hardware and/or software based mobile tracking devices and said equipment was not being used and/or monitored as a mobile tracking device.

50.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are not singly or collectively hardware and/or software based pen registers and/or trap and trace devices (as defined in 18 U.S.C. §§ 3127(3) and 3127(4)) and said equipment was not being used and/or monitored as a pen register and/or trap and trace device.

51.     Notwithstanding the fact that government agents/personnel did not actively access or read, through use of their own eyes, the content of Internet communications being sent/received to/from the aircard's host laptop computer via aircard signals, the government's portable/transportable wireless device locator(s) and related equipment, used by the unidentified government agents/personnel to search for and locate the aircard, still decoded and had access to said communications content.  The Internet communications content being sent/received to/from the aircard host laptop computer would have been available for human viewing if said operators of said equipment had instructed said equipment to reveal said communications content for their personal human viewing.  *** Note: This stipulation is relevant considering a device that decodes communications content cannot be classified as a Pen/Trap device. ***

52.     The portable/transportable wireless device locator(s) and related equipment used by the unidentified government agents/personnel to search for and locate the aircard are capable of triangulating the location of the aircard precisely inside apartment No. 1122 by conducting the geolocation measurement techniques listed in Stipulation Nos. 36-41 and the radio wave collection methods listed in Stipulation Nos. 30-35 and 42-45.  *** Note: this stipulation (No. 52) can be disregarded if stipulation Nos. 21 and 22 above are resolved. Otherwise, this stipulation is relevant considering I need to prove the precision of the devices used so that I can further support my claim that the aircard was located precisely inside

*SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]*
*MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE*
*WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE*
*CR08-814-PHX-DGC*

1   apartment No. 1122. ***

2       **\*.**    In addition to the stipulations specifically listed in this section, additional

3   stipulations are also required in order to **partially** alleviate the defendant's need for the

4   evidence requested under this category. ~~The following prerequisite stipulations (Section I,~~

5   ~~*supra*) apply to this category of withheld evidence: Stipulation Nos. 1-4.~~ The following

6   stipulations listed under other categories of withheld evidence apply to this category of

7   withheld evidence: Stipulation Nos. 21-26, and ~~30~~, 31, ~~32~~, 33-41, ~~42~~, and 43-46.  **Note:**

8   *Even with the government stipulating to all stipulations listed and referenced under this*

9   *category, the defendant still needs full disclosure of this category of evidence considering the*

10  *requested evidence may reveal addition Fourth Amendment violations the defendant is*

11  *currently unaware of.*

12

13          **G.**    **All evidence relating to the Pen/Trap network architecture in place between July 16, 2008 and August 1, 2008 beginning at the Verizon Wireless Access Function and ending at the FBI Collection Function.**

14

15

16      53.    While facilitating the execution of the N.D.Cal. 08-90331MISC-RS order,

17  LAESP messages (ATTACHMENT No. 1 of January 28, 2011 discovery set) generated in

18  response to the government's surreptitious telephone calls made to the aircard (as described

19  in Stipulation Nos. 27-28), and sent by a Verizon Wireless Intercept Access Point (IAP) to

20  the government's pen register and trap and trace device (*i.e.*, the SF-Martinez DCS-3000

21  server), were received by the government just as quickly as it receives LAESP messages

22  from the same Verizon Wireless IAP while facilitating the execution of any other Pen/Trap

23  order that may or may not require Verizon Wireless and the government to receive Pen/Trap

24  data (*i.e.,* LAESP messages) "after receipt and storage."  In other words, neither the

25  government nor Verizon Wireless took any extra steps in response to the "after receipt and

26  storage" directive contained in the N.D.Cal. 08-90331MISC-RS order and, with respect to

27  Verizon Wireless' receipt, storage, and transmission of Pen/Trap data, execution of said order

28  occurred no differently than execution of any other Pen/Trap order intended to be used to

1  obtain LAESP messages.

2      **.**   In addition to the stipulations specifically listed in this section, additional

3  stipulations are also required in order to alleviate the defendant's need for the evidence

4  requested under this category.  The following prerequisite stipulations (Section I, *supra*)

5  apply to this category of withheld evidence: Stipulation Nos. 1-4.  The following stipulations

6  listed under other categories of withheld evidence apply to this category of withheld

7  evidence: Stipulation Nos. 27 and 28.

8

9      **H.**   **The original data storage devices used to save the CDNRS files and LAESP messages resulting from the execution of the N.D.Cal. 08-90331MISC-RS order.**

10

11      54.   The government deleted some data fields contained in the LAESP messages

12  (ATTACHMENT No. 1 of January 28, 2011 discovery set) relating to the government's

13  surreptitious phone calls placed to the aircard (as described in Stipulation Nos. 27-29).  The

14  deleted fields in the LAESP messages would have shown that the government continued to

15  surreptitiously call the aircard (or conduct other "pings") on July 18, 2008 10:46am, July 19,

16  2008 8:21pm, July 21, 2008 4:59pm, July 24, 2008 6:17pm, July 25, 2008 6:35pm, July 27,

17  2008 9:21pm, July 28, 2008 12:53am, July 29, 2008 01:28am, July 31, 2008 6:33pm, and

18  August 01, 2008 01:21am, in order to verify that the aircard was still located inside

19  apartment No. 1122 (as described in Stipulation No. 22).

20      **.**   In addition to the stipulations specifically listed in this section, additional

21  stipulations are also required in order to alleviate the defendant's need for the evidence

22  requested under this category.  The following prerequisite stipulations (Section I, *supra*)

23  apply to this category of withheld evidence: Stipulation No. 1-4.  The following stipulations

24  listed under other categories of withheld evidence apply to this category of withheld

25  evidence: Stipulation Nos. 22 and 27-29.

26

27

28

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

SUBMISSION OF PROPOSED STIPULATIONS [EDITED 10/12/2011]
MOTION FOR DISCLOSURE OF ALL RELEVANT AND HELPFUL EVIDENCE
WITHHELD BY THE GOVERNMENT BASED ON A CLAIM OF PRIVILEGE
CR08-814-PHX-DGC

1     **I.**     **All communications relating to the execution of the N.D.Cal. 08-**
        **90330MISC-RS and 08-90331MISC-RS orders that were**

2         **sent/received between the government and the private entities**
        **associated with Verizon Wireless, Harris Corporation, and**

3         **UTStarcom.**

4    **\*.**     There are no stipulations specifically listed under this category, however, other

5 stipulations are required in order to alleviate the defendant's need for the evidence requested

6 under this category. ~~The following prerequisite stipulations (Section I, supra) apply to this~~

7 ~~category of withheld evidence: Stipulation Nos. 1-4.~~  The following stipulations listed under

8 other categories of withheld evidence apply to this category of withheld evidence:

9 Stipulation Nos.  9, 11-12, 14, 16-18, and 21-26, ~~27-30~~, 31, ~~32~~, 33-41, ~~42~~ and 43-54.

10

11    **J.**     **All unredacted/unsummarized emails, reports of investigation,**
        **memorandums, rough notes, and other relevant documents (as**

12         **specifically listed) relating to the mission to search for and locate**
        **the aircard.**

13

14    **\*.**     There are no stipulations specifically listed under this category, however, other

15 stipulations are required in order to alleviate the defendant's need for the evidence requested

16 under this category. ~~The following prerequisite stipulations (Section I, supra) apply to this~~

17 ~~category of withheld evidence: Stipulation Nos. 1-4.~~ The following stipulations listed under

18 other categories of withheld evidence apply to this category of withheld evidence:

19 Stipulation Nos.  9, 11-12, 14, 16-18, and 21-26, ~~27-30~~, 31, ~~32~~, 33-41, ~~42~~ and 43-54.

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///