1                  UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ARIZONA

3                  _____

4    United States of America,        )
                                       )
5                     Plaintiff,       )     CR 08-00814-PHX-DGC
                                       )
6          vs.                         )     Phoenix, Arizona
                                       )     October 28, 2011
7    Daniel David Rigmaiden,           )
                                       )
8                     Defendant.       )
     _____)

9

10

11

12

13        BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  STATUS CONFERENCE

16              (EX PARTE DISCUSSION NOT INCLUDED)

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RPR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 41
23   Phoenix, Arizona   85003-2150
     (602) 322-7257
24
     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

14:26:43  1                        **A P P E A R A N C E S**

          2

          3    For the Government:

          4                U.S. Attorney's Office
                           By:  **FREDERICK A. BATTISTA**, ESQ.
14:26:43  5                40 North Central Ave., Ste 1200
                           Phoenix, AZ  85004
          6

          7

          8    The Defendant, Pro Per:

          9                **Daniel David Rigmaiden**
                           Central Arizona Detention Center – Florence
14:26:43  10               P.O. Box 6300
                           Florence, AZ  85132
          11

          12   Shadow Counsel for the Defendant:

          13               Law Office of Philip A. Seplow
                           By:  **PHILIP A. SEPLOW**, ESQ.
          14               2000 N. 7th St.
                           Phoenix, AZ  85006
14:26:43  15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

14:26:44   1                    **P R O C E E D I N G S**

        2

        3              THE COURTROOM DEPUTY:  Criminal case 08-814 United

        4     States of America versus Daniel David Rigmaiden.  This is the

14:31:48   5     time set for motions hearing.

        6              MR. BATTISTA:  Fred Battista on behalf of the United

        7     States.  Also present at counsel table is Assistant United

        8     States Attorney James Knapp and IRS CI Special Agent Denise

        9     Medrano.

14:32:03  10              THE COURT:  Good afternoon.

       11              THE DEFENDANT:  Good afternoon, Your Honor.  Daniel

       12     Rigmaiden on behalf of himself.

       13              MR. SEPLOW:  Good afternoon, Your Honor.  Philip

       14     Seplow.  Behind me I have Mark Horne who has been helping me a

14:32:14  15     little bit.

       16              THE COURT:  We had originally scheduled this hearing

       17     to talk about additional efforts the government and

       18     Mr. Rigmaiden were going to make on reaching stipulations of

       19     fact that would make it possible for us to go forward with a

14:32:51  20     suppression hearing.  We held a hearing on September 22nd

       21     where we made some progress on stipulations of fact and our

       22     hope was a meeting could further that effort.

       23              I've learned from preparation for today's meeting

       24     that that -- today's hearing that that meeting has not

14:33:11  25     occurred.  I've read the document that was filed by

14:33:19  1    Mr. Rigmaiden called Clarification of Various Pending

2    Discovery Issues.  I've also read the document from the

3    government titled Memorandum Regarding Discovery, and I've

4    also read the Notice of Stipulation Meeting Failure filed by

14:33:50  5    Mr. Rigmaiden.

6            There are a number of things that we need to talk

7    about, Mr. Rigmaiden, regarding your defense that have been

8    raised in a couple of motions that have been filed, as well as

9    the ex parte motions.  Some of those we'll discuss ex parte.

14:34:10  10   But I want to talk for a minute about this effort at

11   stipulations.

12           MR. SEPLOW:  Your Honor, I don't mean to interrupt.

13   Can I make a statement before we start?

14           THE COURT:  What's that?

14:34:23  15           MR. SEPLOW:  Can I do it?

16           THE COURT:  Yeah.

17           MR. SEPLOW:  I just think it is incumbent upon me to

18   tell the Court I went to see Daniel about an hour and a half,

19   two hours ago to read him the government's memorandum because

14:34:42  20   he hadn't had that yet, and make sure he has everything before

21   we come here.  And I read his motion regarding sleep

22   deprivation a while ago, but I really just really, really read

23   it carefully in the last hour, and I can tell you today he's

24   not in the best shape to go forward.  When I was read -- I

14:35:02  25   think I can do this on the record.  I don't think it has to be

14:35:04  1    ex parte.  I don't think I'm giving away any confidential

2    information.

3             As I was reading the government's memorandum, he was

4    zoning out on me.  That's not like him.  I had to read a

14:35:13  5    couple things a few times to him.

6             When I visit him at CCA, he's as sharp as anyone I've

7    ever met in my life.

8             I tried to figure out how much sleep he had until

9    today.  This is nothing to do with the Court, it's not the

14:35:25  10   Court's fault, but let me get my notes.  Today's the 28th of

11   October, right?  Okay.  So he woke up at 6:30 on the 27th day

12   of October and he worked.  And his usual regimen is he goes to

13   bed around 11:30.  That night he went to bed at 11:00.  This

14   morning, going back on the clock, he's woken up at 11:30.  So

14:35:59  15   he really doesn't sleep at all.  From 6:30 yesterday to 6:30

16   this morning is 24 hours, and then eight hours more.  That's

17   32 hours he has been up.

18            So I just don't know how much he's going to be able

19   to retain in his normal what I call very, very intelligent

14:36:21  20   mindset.

21            Also, I don't know if you had a chance to read it,

22   but when I read it he talked about he let something slip by

23   him on the 22nd, and I think he might have made a

24   clarification.

14:36:32  25            So I think the Court should know that.

14:36:34   1          And, you know, I thought about what remedies there

2      are.  He certainly doesn't want to go to the Joe Arpaio jail;

3      he's not going to be able to do what he does there.  Lisa told

4      me she thinks the buses still go back and forth twice a day.

14:36:50   5          THE COURT:  They don't.  I checked on that today.

6          MR. SEPLOW:  Okay.  That's why he didn't get the

7      sleep in the morning.

8          THE COURT:  Well, I shouldn't say they don't.  They

9      do, but one leaves at 5:30 and the next one leaves at 7:00.

14:37:03  10   So it doesn't result in additional sleep.

11         I've read all of this stuff, Mr. Seplow, including

12     the attachments.  I was going to talk about it in a moment.  I

13     wanted to ask the government some questions first.

14         MR. SEPLOW:  Okay.

14:37:20  15         THE COURT:  I understand what you said,

16     Mr. Rigmaiden, in what you have filed.  I've got questions

17     about it.  Perhaps we ought to talk about it now since

18     Mr. Seplow has raised the question of whether you're able to

19     proceed today.

14:37:36  20         You've been representing yourself in this case for 22

21     months, since January 7, 2010.  Has the procedure for getting

22     people up and getting them to court changed during that time

23     at CCA?

24         THE DEFENDANT:  Yes, it has.

14:37:51  25         THE COURT:  What has been the change -- pull the mike

14:37:56  1    right in front of him, Mr. Seplow.

2         THE DEFENDANT:  If you have court after 12 noon, back

3    in late 2008, early 2009 they would wake you up after

4    breakfast -- or not wake up; you're already up.  And you end

14:38:10  5    up being transferred to the courthouse in the morning.  And if

6    you had court prior to 12 noon, then they would do what they

7    did today, wake up at 11:30 and then you leave your pod at

8    1:00 and you're basically up all night before court.  That's a

9    change that's been done since --

14:38:28  10        THE COURT:  When did that change occur?

11        THE DEFENDANT:  I really don't know, but it was

12   probably right around the time I started representing myself I

13   would say.  Maybe a little bit before that.

14        THE COURT:  Well, here's one of the questions.  We've

14:38:42  15   had a lot of hearings in the last 22 months apparently under

16   the transportation procedures you're now under.  In my

17   observations, you've been sharp and attentive in all of those

18   proceedings.  I've never perceived you to be not tracking or

19   being confused or unable to focus.  You've been very effective

14:39:05  20   in every one of those proceedings.

21        I've read the point that you made that you missed the

22   one point during the September 22nd hearing where the

23   government asserted that StingRay was a generic word and you

24   disagree with that and you didn't catch it.  That's the one

14:39:23  25   point you identified from the September 22nd hearing.

14:39:28  1          But you've never raised this issue in the 22 months

2     you've been representing yourself until recently, and it

3     sounds as though you've been under the same procedures the

4     entire time.  So that's why I asked if something had changed.

14:39:43  5          I'm not understanding why, if you're able, as it

6     appeared to me you were, to represent yourself effectively for

7     the last 20 months why something changed in September or now

8     that makes you unable to do so.  Could you address that.

9          THE DEFENDANT:  I think the proceedings are getting

14:40:00  10    more complex.  Dealing with all this technology, it's hard to

11    remember everything while not being able to sleep.  And a lot

12    of the legal arguments are more complex as well.

13         If I have to agree to certain things, like the

14    government says XYZ happened and you ask me, is that good

14:40:19  15    enough for you to make your argument, and I say yes, while I

16    haven't slept, and maybe a few days later after I've recovered

17    from that I think, wait a minute, I didn't see this other

18    point and that's actually not good enough, but now it's too

19    late because I already said it was.  That's my main concern.

14:40:33  20    That's why I'm raising the issue now.

21         I probably should have raised it earlier, but it was

22    just that even under the sleep deprivation before, I was

23    dealing with it and I was trying to work it out with CCA, and

24    it's just at a point now where I just don't want to risk

14:40:47  25    anything happening that's going to have a larger effect than

14:40:52  1   something that may have happened in the past.

2          THE COURT:  The papers that you filed indicate that

3   it's your pattern of sleep to go to bed about 11:30 at night,

4   sometimes 11:00, and it would be difficult for you to change

14:41:15  5   that.  You also indicated there's noise in your pod before

6   that time.

7          I'm assuming there's nothing in terms of procedure at

8   CCA that prevents you from trying to sleep at 5 p.m. on the

9   night before you go to court, or 6 p.m.  Is that true?

14:41:36  10          THE DEFENDANT:  Other than the noise and people going

11   in and out of the cell.  Plus my natural sleeping patterns --

12   I tried to do that before every court hearing, I lay down and

13   try to go to sleep, but I end up laying there and not falling

14   asleep.  So it never works out for me.  And if I do start to

14:41:51  15   nod off, I'll hear something and snap right back awake again.

16   It never works like that for me.  I'm a light sleeper, so --

17          THE COURT:  You indicated in the papers you filed

18   that you don't want to be brought to a closer facility that

19   would shorten the transportation time, both because you think

14:42:23  20   it would be difficult to maintain the kind of defense

21   technology and work that you're able to do at CCA and because

22   you're just concerned the local facility is a tougher place to

23   stay.  Am I right about that?

24          THE DEFENDANT:  Yes, and one other point I didn't

14:42:41  25   mention is when you're looking at 32 hours of no sleep, the

14:42:45  1   fact one jail is 15 minutes away and another one is an hour

2   and a half, I mean it doesn't really make too much of a

3   difference.  I don't think it's how close the jail is, I think

4   it has to do with the jail wanting to save money by running

14:42:57  5   one trip instead of two.

6            THE COURT:  Well, it has to do with the number of

7   inmates that need to be processed as well for transport to

8   court, I think.  I don't know what time they get them up to

9   bring them to federal court at the county jail, but I don't

14:43:12  10  think they have as many inmates to bring here daily as they do

11  at CCA.

12           Are you feeling unable to proceed with the hearing

13  today?

14           THE DEFENDANT:  I would rather not.  I'd rather have

14:43:33  15  sleep beforehand.  But I'm not sure what type of

16  alternative -- I'm sure there's some alternatives that would

17  be worse than me proceeding, depending what you're thinking

18  of.  Along the same lines of if you say you absolutely have to

19  have sleep from now on so I'm going to move you to Maricopa

14:43:51  20  County jail, I can see more problems coming from that than

21  continuing while under sleep deprivation.

22           So I guess it's kind of a complex question.  But I

23  would rather -- I guess the bottom line is I'd rather be able

24  to sleep before doing anything in the courtroom.

14:44:08  25           THE COURT:  All right.  I understand that point.

14:44:11  1          Mr. Battista, do you have thoughts on this issue?

2          MR. BATTISTA:  Judge, obviously I don't have any

3     control over the security and handling of the inmates, but my

4     honest opinion is, Your Honor, if I was Mr. Rigmaiden and I

14:44:33  5     was representing myself in this case, that I would want more

6     sleep.  That's all I can say.  And I'm saying that that's my

7     honest opinion of what my thoughts are.  That's all I can say.

8          I don't control and I don't have any impact over how

9     prisoners are transported or dealt with, but I think to a

14:44:55 10     certain extent Mr. Rigmaiden has a point.

11          THE COURT:  All right.

12          Well, I have made inquiries today of CCA and talked

13     to the marshal's office as well about what, if any,

14     alternative transportation arrangements are in existence.

14:45:13 15     Such as whether there are different transportation

16     arrangements applied to inmates who are in trial day after day

17     than those who are brought for a single hearing.  I haven't

18     got word back on that yet.

19          I'm going to wait until I hear from them before I

14:45:34 20     decide what, if any, action should be taken on this request of

21     yours, Mr. Rigmaiden.  But in the meantime, I do want to talk

22     to you about the ex parte motions you've filed and some

23     procedural matters.  I'm not going to ask you to make any

24     complex factual stipulations today.  But I -- based on my

14:45:53 25     conversation with you, I do think we can talk about these more

14:45:56  1  basic matters and I wanted to get you in here to do that

2  because they're holding up your development of the case, based

3  on what you've said in the many motions that you've filed.

4      And what I want to talk about first and what I was

14:46:09  5  starting on a moment ago is this whole notion whether it makes

6  any sense at all to have a meeting to try to arrive at

7  different stipulations.

8      Mr. Rigmaiden, you sent a letter to Mr. Battista on

9  October 11, 2011 that I read that -- in which you said that

14:46:29 10  the following conditions must apply before you would come to a

11  meeting, and then you listed nine different conditions that

12  had to apply, including that the meeting not occur at CCA,

13  that it not occur through any kind of a window or security

14  screen, that you not be subjected to lack of sleep before the

14:46:51 15  meeting, that you be provided water during the meeting, that

16  you not be handcuffed during the meeting, that you not be

17  searched before the meeting, and that you be given use

18  immunity for anything you might say during the meeting.

19      Mr. Rigmaiden -- I'm sorry.  Mr. Battista responded

14:47:14 20  in a letter indicating given those conditions he didn't think

21  the meeting would work.

22      And then you wrote back and said you didn't intend to

23  offend him by what you asserted, but you needed those kinds of

24  arrangements before you could meet.

14:47:34 25      After you wrote those letters, you provided me with

14:47:37  1   this document titled Clarification of Various Pleading

2   Discovery Issues where you took your previously proposed

3   stipulations and you color coded them -- orange, red, yellow,

4   blue -- as to things you thought were truly necessary or

14:47:52  5   things you could prove or things that had already been

6   resolved by stipulation.

7          I assume you've seen that, Mr. Battista?

8          MR. BATTISTA:  Yes, Your Honor.

9          THE COURT:  And you've been able to look at it in the

14:48:04  10  color version?

11         MR. BATTISTA:  Yes, we have it in color.

12         THE COURT:  All right.

13         So the question I was going to ask you, Mr. Battista,

14  is given the communications that occurred before about the

14:48:12  15  conditions of the meeting and given this follow-up effort by

16  Mr. Rigmaiden I think to narrow somewhat his stipulations, is

17  it the government's view that it makes sense for you to try to

18  talk further or not?

19         MR. BATTISTA:  Two points, Your Honor.  First of all,

14:48:28  20  the government has filed, which the Court has noted, the

21  government's memorandum re motion for discovery.  I would like

22  point to out there is a typographical error.  I will after

23  this hearing, probably either late today or Monday, file an

24  amended version of this.

14:48:46  25         On page 2, line 9, that's the -- there should have

14:48:54   1    been, after -- on line 9 where it says "that it did," the

           2    sentence should have also said "that it did cause a brief

           3    disruption of service."

           4         In other words, that sentence could be read to say

14:49:07   5    that the government was agreeing to allow the Court to

           6    consider either a man in the middle type of event or

           7    disruption of service event.  That is incorrect.

           8         The government is willing to concede that when the

           9    equipment, subject equipment, was being operated, it resulted

14:49:24  10    in a disruption of service.  Because I think -- the defendant,

          11    I think, has indicated he has different arguments based upon

          12    the nature of the operation of the equipment and what resulted

          13    and what it caused.

          14         So I think that in the government's concession now in

14:49:44  15    the memorandum that for purposes of this case the Court and

          16    the defendant can argue as if a search has occurred, that's

          17    also significant -- these two concessions should also

          18    considerably limit what the defendant needs to consider.

          19         With respect to the parties' meeting, Judge, I've

14:50:10  20    tried to be optimistic, I've tried to be flexible, I've tried

          21    to be helpful, but when we get these letters from the

          22    defendant making demands, particularly demanding use immunity,

          23    requiring me to go to the Department of Justice, requiring a

          24    great deal of effort on my behalf to generate such a letter,

14:50:33  25    this is not just something I sit down on my computer and

15

14:50:38  1    write, it gets to the point where frankly it's just not worth

2    the effort, Judge.

3         I've been working on this case for three years and

4    I've tried to help.  I've got here for Mr. Rigmaiden, I've got

14:50:52  5    the last piece of computer equipment that I ordered for him

6    that the government's paid for; we've got his hard drives that

7    he can have at CCA.

8         We've done a lot of accommodation.  So when I try to

9    continue to work with him and I get letters like this with

14:51:09 10    demands, it just -- the indication to me is it's just not

11    worth the effort.  And that's just my position at this point.

12    I'd rather just proceed with litigation and not attempt to

13    keep trying to work with someone that's going to not only make

14    demands but take a lot of shots at the government, too, on top

14:51:30 15    of it, and then publish the matters in open pleadings that are

16    available to the court.

17         So continued opportunities to take shots at

18    prosecution, continued opportunities at demands, at this point

19    in time, Judge, unless the Court -- if the Court believes that

14:51:49 20    the government should make the effort, I'm willing to make the

21    effort.  If the Court is asking me what my position is subject

22    to the Court making a recommendation that I proceed further,

23    at this point in time I just don't think it's worth the

24    effort.

14:52:06 25         THE COURT:  Do you have any thoughts on that issue

16

14:52:07  1   Mr. Rigmaiden?

2          THE DEFENDANT:  Yes.  I don't really see these as

3   demands.  These are just requests that I've made.  I think

4   that protecting my constitutional rights is something that I

14:52:16  5   should have in mind and that's why I was asking for the

6   derivative use immunity.  If they already have all the

7   evidence they need, which is what they told me, I don't see

8   why that would be a problem.

9          A couple other things about that letter.  I didn't

14:52:29 10   say I wouldn't be subjected to a strip search, I just didn't

11   want the strip search done in a group of 8 to 10 other people

12   where it's so close quarters that I have to come in contact

13   with other naked men.  That's what I'm asking for.  If they

14   want to strip search me, they can go ahead and do that.  But I

14:52:46 15   want it done where I can maintain my dignity when that's

16   happening.  Otherwise, if I'm going to come to this meeting,

17   I'm going to be thinking about that experience and I'm not

18   going to be able to concentrate so it will be a waste of time.

19          Same thing has to do with the water and the other

14:52:58 20   conditions.  I don't really see how these are demands.  I

21   mean, Mr. Seplow could bring me a bottle of water and I could

22   sleep and they could get me up at 6 in the morning.  I don't

23   see how these are unreasonable.

24          I mean, maybe they don't like the tones of my letter,

14:53:11 25   but I don't set out to put a tone in my letter, I just write

14:53:15  1  down whatever the facts are.  I don't really try to candy coat

2  things.  Maybe I should.  It's probably something I should

3  figure out how to do better.  But it's not my intention to go

4  and take shots at people or make it look like I'm taking shots

14:53:31  5  at people.  I'm trying to say what it is I think I need in

6  order to have a meeting.

7          And those strip searches happen here, so it is

8  something the government can control.  They can tell the

9  marshals or CCA to strip this guy by himself.  I don't think

14:53:57  10  it's that difficult a task.  It would take an extra three

11  minutes.

12          THE COURT:  Is it your position, Mr. Rigmaiden, you

13  must have use immunity before you talk with them about further

14  stipulations?

14:54:07  15          THE DEFENDANT:  Yes.

16          THE COURT:  Okay.  All right.  This is what I'm going

17  to do.  We're not going to have further discussions on this.

18  I'm just going to rule on the motion that Mr. Rigmaiden has

19  filed.  That's what I indicated I would do if we got to today

14:54:23  20  and further stipulations hadn't been reached.  I'm not

21  optimistic any further discussions would occur, or if they did

22  occur that there would be significant additional agreement.

23          So I'm going to rule on the motion for discovery that

24  Mr. Rigmaiden has filed.  I'm going to, in ruling on that, I'm

14:54:41  25  going to take into account these additional positions that

14:54:46   1   you've taken, Mr. Battista, in your memorandum regarding the

2   motion for discovery.  I assume it's your intent that I do

3   that?

4           MR. BATTISTA:  Yes, Your Honor.

14:54:58   5           THE COURT:  And I will also look back on your

6   color-coded document, Mr. Rigmaiden, to make sure that what I

7   think is still requested from you is consistent with what you

8   think is still requested.

9           As I indicated in the order that I entered in early

14:55:15  10   October after the last hearing we had, if I have to rule on

11   the motion, what I'm going to do is identify the issues that

12   are still in dispute.  In fact, I tried to do that somewhat in

13   my October 5th order.  I'm then going to hold an ex parte

14   hearing and I'm going to allow the government to present

14:55:37  15   evidence in support of its claim that the information

16   requested by Mr. Rigmaiden is sensitive law enforcement

17   information.  The only issue in that ex parte hearing will be

18   whether the government can make a showing it's sensitive law

19   enforcement information.

14:55:57  20           If I conclude that the government has made that

21   showing, then I'm going to apply the balancing required by the

22   *Roviaro* case, which is I'm going to ask if the information

23   would be relevant and helpful to Mr. Rigmaiden's defense.

24   And, if so, then that will overcome the government's qualified

14:56:16  25   privilege and I will order information to be disclosed to him.

14:56:20  1   If that balancing suggests that it would not be relevant and

2   helpful to the defense, then I will not require that it be

3   disclosed.

4        So after we hold the ex parte hearing, I will issue

14:56:32  5   an order that either requires the government to produce

6   additional information to Rigmaiden or does not, and I'll

7   explain why.

8        And once any additional information I require to be

9   disclosed is disclosed, we're going forward with the

14:56:50  10   suppression hearing.

11        What that means is we're going to need to figure out

12   the timing for the filing of the motion to suppress that you

13   have in the works, Mr. Rigmaiden, and the nature of the

14   hearing.  I think you've indicated, Mr. Rigmaiden, that you're

14:57:04  15   going to want your expert to come and testify at that hearing.

16   And I'm assuming that there may be government evidence as

17   well, so that's likely to be a one- or two-day evidentiary

18   hearing we'll end up holding in connection with that motion to

19   suppress.

14:57:25  20        So after today's hearing the task is going to be mine

21   to rule on the motion, set the ex parte hearing, and then

22   after the ex parte hearing do the *Roviaro* balancing if the

23   government has shown it's sensitive information, and then

24   issue an order.  And that will take, I assume, several weeks

14:57:45  25   to complete because once I get an order out you're going to --

14:57:48  1   we're going to have to arrange an ex parte hearing and you'll

2   have to get the witnesses here who can make the showing you

3   think you need to make, Mr. Battista.

4          Are there any comments or questions from either side

14:57:59  5   on that?

6          MR. BATTISTA:  No, Your Honor.

7          THE DEFENDANT:  I had a few comments and some

8   questions.  With the hearing is the government going to submit

9   a written claim of privilege before the hearing's considered?

14:58:15 10   I know some of the information they're claiming is classified,

11   so wouldn't that bring in Classified Information Procedures

12   Act?  And they have to get the Attorney General or someone

13   under him to claim privilege for that information and then the

14   privileged information would have to come from somebody who

14:58:29 15   isn't the prosecutor in the case?

16          THE COURT:  I can't remember, Mr. Rigmaiden, if you

17   made that request in the five or six inches of briefing I've

18   got on this issue.  Has that request been made by you?

19          THE DEFENDANT:  It's in the response to the

14:58:48 20   government request for ex parte in-camera hearing regarding

21   privilege.

22          THE COURT:  Are you going to be making the argument,

23   Mr. Battista, that information is classified in addition to an

24   argument that it is entitled to a law enforcement privilege?

14:59:02 25          MR. BATTISTA:  At this time I'm not aware of us doing

14:59:04  1   that.  If we do do that -- if at any time we would have to

2   make an argument based upon something being classified, then

3   we would do the appropriate filings.

4          THE COURT:  But at this point, it's your expectation

14:59:19  5   you're going to rely simply on the --

6          MR. BATTISTA:  Law enforcement --

7          THE COURT:  -- law enforcement privilege.

8          MR. BATTISTA:  Correct, Your Honor.

9          THE COURT:  Obviously, Mr. Rigmaiden, if they rely on

14:59:27 10   the qualified privilege for law enforcement information, they

11   don't need to comply with the classified information statute.

12          THE DEFENDANT:  They've already claimed some of the

13   evidence is classified, so that's the evidence I'm referring

14   to.

14:59:38 15          THE COURT:  Well, I'm not going to grant any argument

16   that it's classified without them complying with the statute.

17   My understanding is that at the ex parte hearing they're not

18   intending to make that assertion.  Obviously, if they do,

19   they'll have to comply with the statute.

14:59:51 20          THE DEFENDANT:  All right.

21          THE COURT:  Did you have any other comments or

22   questions?

23          THE DEFENDANT:  There's a few issues regarding

24   pending discovery issues I wanted to make sure were clear

15:00:01 25   before you make your ruling, if I could go over a few of

22

15:00:04   1   those.

2          THE COURT:  Sure.

3          THE DEFENDANT:  One of them is the geo-location

4   techniques.  Even if the government's claiming that or they're

15:00:15   5   going to stipulate the aircard was located directly inside the

6   apartment, I would still need information on the precise

7   geo-location techniques because another argument I'm making is

8   the government used triangulation, and depending what type of

9   techniques they used, those would be elements of

15:00:32   10   triangulation.  I could prove they triangulated the aircard

11   location.  I think that is important because in one of the

12   orders it says they can't use triangulation, and also there's

13   also various case law that says using a triangulation in and

14   of itself is a Fourth Amendment violation.

15:00:48   15          That is one important point I don't want to have

16   overlooked.  And one of those geo-location techniques is angle

17   of arrival.  And with that technique, what they use is a

18   beamforming antenna which is -- there's two different types

19   antennas.  There's omnidirectional antenna and then there's

15:01:03   20   directional antenna.

21          Omnidirectional sends radiowaves out in every

22   direction, and directional antenna obviously sends it in a

23   single direction.  And with the beamforming antenna, it's kind

24   of like a high tech directional antenna they can beam whatever

15:01:18   25   they need to search, so it's beaming through people's houses

15:01:21   1   into their belongings and searching out whatever type of radio

2   device they're looking for.  So the angle-of-arrival

3   geo-location technique and whether or not they used that type

4   of antenna is important to my argument because I think that by

15:01:37   5   talking about the technology behind that antenna I can show

6   what they did was more intrusive than if they used just an

7   ordinary antenna that is not precisely designed to be a sort

8   of search beam.  So that's -- those are the issues with the

9   geo-location techniques.

15:01:57  10          And I'm also looking --

11          THE COURT:  Before you leave that, let me make sure I

12   understand your point.

13          You want the -- you want to know if they used

14   triangulation both because if they did you think it exceeded

15:02:08  15   the order obtained in San Francisco, and also you think

16   there's case law that suggests that's more problematic.

17   That's one issue, as I understand it.

18          THE DEFENDANT:  Yes.

19          THE COURT:  And then I understand the second issue to

15:02:20  20   be you want to know the nature of the antenna that was used,

21   whether it was omnidirectional or it was a focused direction

22   because you think that could bear upon how intrusive the

23   search was.  Have I got those right?

24          THE DEFENDANT:  Yes.  Specifically a beamforming

15:02:34  25   antenna because --

24

15:02:35  1          THE COURT:  Say that more slowly.  A what?

2          THE DEFENDANT:  Beamforming antenna.  Because they

3     specifically lock on to a device even if they're driving

4     around with a StingRay or walking around with some other

15:02:47  5     device, then even if they change direction, the antenna will

6     still continue to lock on to the target and search it out.  So

7     I want to be able to use that technology to support Fourth

8     Amendment argument.

9          THE COURT:  So it is your argument a beamforming

15:03:01 10     antenna is more intrusive because it has a more constant

11     connection with the aircard?

12          THE DEFENDANT:  Yes.  And more precise, targeted beam

13     that they can use.

14          THE COURT:  Okay, go ahead.

15:03:35 15          THE DEFENDANT:  With the witnesses, I think that if

16     the government's going to claim they were relying on a policy

17     in one of the orders, I should be able to ask them if they

18     actually read the order or read the policy or had it with

19     them.  And that goes with both destroying the evidence and

15:03:48 20     conducting the searches.  So that's an important point on the

21     witness information.

22          But I suppose if the policy they're relying on, you

23     find that it isn't objectively reasonable, then I guess there

24     wouldn't be any need to question them.  But if the policy's

15:04:04 25     reasonable, then I should be able to determine if they

15:04:06  1   actually relied on that policy.  And the same with the order.

2            So those are the points with the witness information.

3            Also --

4            THE COURT:  Hold on just a minute.

15:04:39  5            Okay, go ahead.

6            THE DEFENDANT:  And this is something I mentioned in

7   my clarification motion about the nonpublic information.  This

8   is information that would be in the aircard but also in the

9   possession of Verizon Wireless.  They call it shared secret

15:04:56  10  data.  So if it's shared, it's kind of like a handshake

11  routine where they give a code word or they ask a question --

12  Verizon Wireless will ask the aircard a question, the aircard

13  will ask Verizon Wireless a question.  As long as they both

14  know the answer, they're authorized to communicate.  This type

15:05:14  15  of nonpublic information is used to prevent people from

16  eavesdropping on signals or setting up their own cell towers

17  or highjacking signals, stuff like that.

18           So I think if the government got this information

19  from Verizon, then I can claim they should have had a seizure

15:05:30  20  warrant to specifically take that information considering it

21  is that information that's used to secure the signals so that

22  communications are private and signal information is private.

23           THE COURT:  What's the name for that kind of

24  information?

15:05:42  25           THE DEFENDANT:  It's -- specifically in the technical

15:05:45  1   standards they called it shared secret data and A-keys and I

2   guess there's long codes and short codes.  It's really a whole

3   lot of different information they need.  In order for a cell

4   site to communicate with a cell phone there's a lot of

15:06:02  5   nonpublic information that's transferred back and forth.

6   I'm not an expert on all of it or any of it, but I

7   just kind of know in broad terms I know that it exists and

8   there's no way that the government can get the aircard to

9   communicate without getting that information from Verizon

15:06:18  10   first.

11   THE COURT:  And the relevancy is you believe to

12   obtain that information from Verizon the government needed a

13   warrant or order?

14   THE DEFENDANT:  Yeah.  Specifically asking for that

15:06:36  15   information.

16   THE COURT:  Okay.  Go ahead.

17   THE DEFENDANT:  Another thing that has to be done in

18   order for the aircard to recognize the government's equipment

19   is, if not the government, then Verizon has to send certain

15:06:57  20   data to the aircard in order for it to recognize their

21   equipment.  For instance, every cell site has an ID number and

22   every device has a listing of certain ID numbers that it knows

23   are authorized cell sites, so if the government wanted to

24   force the aircard or another device to connection to it, they

15:07:15  25   would need Verizon to tell the aircard this is our ID number

15:07:19  1    of our device, make sure you program the aircard to recognize

2    us and to connect to us before any other Verizon cell tower

3    that might be in the area.  That way they have priority over

4    the signal.  So I wanted to kind of clarify on that.

15:07:33  5          That's -- in my pleadings I refer to that as the

6    over-the-air service provisioning messaging.  And this has to

7    do with writing data to the aircard.  And there's similar data

8    that's written to the aircard by the government's devices, and

9    that's just a necessary element of any cell phone

15:07:58 10    communicating with any cell tower.  But if it's a government

11    cell tower, that's information that wouldn't ordinarily be

12    written to the aircard.  So I'm trying to get discovery on

13    that.

14          I know the government's claiming they didn't actually

15:08:11 15    write any data to the aircard.  So even with me saying I know

16    how this works, I think that them providing the evidence such

17    as a user manual for the equipment, I can go through the user

18    manual and be able to show that this is actually how it

19    happens and there really is data written to the aircard, and

15:08:28 20    possibly even the laptop computer considering the aircard is

21    plugged into the laptop and they kind of share resources.  But

22    at this point it's kind of hard to determine how much exactly

23    is handled by the aircard and how much by the laptop unless I

24    have somebody examine those things.

15:08:45 25          THE COURT:  All right.

28

15:08:50  1        THE DEFENDANT:  I'm trying to find -- I want the

2    government to give me a list of the data that they destroyed.

3    They're just claiming they destroyed whatever was -- whatever

4    they obtained through the order, but I'm kind of unclear

15:09:02  5    exactly what it was.

6        I know there's the geo-location information that

7    would show where the aircard was located precisely.  I know

8    they're willing to say it was located directly in the

9    apartment, but there could be other data there, too, that

15:09:15 10    might affect my arguments, like possibly this other shared

11    secret data and other information that's used to authenticate

12    wireless devices to cell sites.  Maybe that data was in there

13    and they destroyed that.

14        So some of the stuff I'm asking for I don't even know

15:09:30 15    if they're withholding it based on the claim of privilege or

16    if it was actually destroyed, so I'm trying to get a more

17    detailed list on exactly what it was they had destroyed.

18        I spoke of path movement information.  If they're

19    going to say it was located directly in the apartment, then I

15:09:54 20    don't need that.

21        THE COURT:  You're talking about where they walked

22    while holding the device?

23        THE DEFENDANT:  Yes.

24        THE COURT:  If they agree it located the device in

15:10:04 25    the apartment, that becomes irrelevant?

15:10:07  1          THE DEFENDANT:  Yeah, I think so.

2          THE COURT:  That was the whole purpose of it, right?

3          THE DEFENDANT:  Yeah.

4          THE COURT:  All right.

15:10:12  5          THE DEFENDANT:  I know that they've already agreed

6     they sent signals to the aircard and the aircard sent signals

7     to their equipment, but more precisely in my pleadings I'm

8     looking for them -- I'm trying to prove that they actually

9     forced the aircard to disconnect from Verizon Wireless and

15:10:31 10     forced it to connect to their equipment.  Meaning it didn't

11     have a choice.  They just exploited vulnerabilities in the

12     CDMA protocol to make the aircard say, okay, I'm done with

13     Verizon and I'm going to connect to the government.

14          However they did that I suppose is not necessarily

15:10:47 15     important, but I do know forced registration is something that

16     comes up a lot in Harris literature, so I know this is

17     something that's done.  I'm not sure if they're willing to

18     stipulate to something like that or not.

19          Another --

15:11:08 20          THE COURT:  Hold on just a minute.

21          By the way, before you go on, Mr. Knowlton are you

22     aware your hearings is at 4 not at 3?

23          MR. KNOWLTON:  Yes, Your Honor, when we went

24     downstairs we saw that.

15:11:25 25          THE COURT:  Okay.  You're welcome to sit in.  I just

15:11:27   1   didn't want you thinking we were running over.

2   All right, go ahead.

3   THE DEFENDANT:  The relevancy of the forced

4   registration would be to prove they seized the aircard where

15:12:10   5   if the aircard voluntarily went to their equipment then I

6   suppose it might be less intrusive than if the government's

7   actually forcing it to connect to its equipment.

8   And along the same lines of the government sending

9   and receiving signals back and forth from the aircard, it goes

15:12:28   10   deeper than that because they're not just monitoring ordinary

11   signals that would be sent back and forth during ordinary

12   communication.  What they're actually doing is sending a

13   special type of signal called interrogation signal and they

14   repeatedly send these signals to the aircard and it's signals

15:12:46   15   that don't need to be sent under ordinary circumstances.

16   It's not like they're just waiting for communications

17   to be sent back and forth and they're analyzing though

18   signals.  They're sending special signals to the aircard and

19   forcing the aircard to send response signals back.

15:13:01   20   So these interrogation techniques have their roots in

21   radar technology.  So I think if they're using radar to locate

22   something, that helps my Fourth Amendment argument as well.

23   THE COURT:  Well, in the order that I entered after

24   the September 22nd hearing, one of the facts that was agreed

15:13:19   25   to at the hearing was that the mobile tracking device

15:13:22  1    generated –– I'm sorry, wrong line.  The mobile tracking

2    device sent signals to and received signals from the aircard,

3    and that the signals sent by the mobile tracking device to the

4    aircard are signals that would not have been sent to the

15:13:47  5    aircard in the normal course of Verizon's operation of a cell

6    town.  Isn't that the point you're making?

7         THE DEFENDANT:  I think it might be a little bit

8    different because with interrogation they're sending ––

9    they're sending more signals than ordinary.  So I guess if

15:14:04  10   they could add that they're sending repeatedly over and over

11   again lots of signals that wouldn't be sent.

12        I mean, if a cellular device is talking to one cell

13   tower, then signals are being sent.  If it's talking to

14   another one, then signals are being sent that wouldn't

15:14:23  15   ordinarily be sent if it was connected to the first cell

16   tower.  But that doesn't prove anything about interrogation

17   techniques.

18        MR. BATTISTA:  Your Honor, I don't know if that would

19   be necessary or relevant in light of the government's

15:14:47  20   concession that when the device is in communication with the

21   simulator there is a disruption of service such that it can't

22   communicate with Verizon.  So regardless of the nature of the

23   signal, it's being prevented from communicating from Verizon

24   Wireless.

15:15:11  25        So if it's the nature of the signal –– is it being

92

15:15:14  1   sent one second, half a second, quarter of a second -- what

2   the power level is of it or whatever, is it really relevant if

3   whatever the card's doing is it's preventing the card --

4   whatever the simulator is doing -- in this particular case

15:15:30  5   we're saying it's not -- service is being disrupted.  So I

6   don't know if we look at it from that vein.

7        THE COURT:  Okay.  I appreciate that.

8        I understood, Mr. Rigmaiden, your point to be that

9   even though the government has agreed that the device sends

15:15:48  10  signals to the aircard that would not be sent in the normal

11  course of business and even though they've agreed that that

12  will cause a disruption of service between the aircard and the

13  Internet, you want to be able to argue that it sends ten times

14  as many to the aircard as a cell tower would and that's more

15:16:06  15  intrusive.  Is that the idea?

16       THE DEFENDANT:  That and the fact they're sending a

17  specially crafted signal designed just to locate the device

18  and it's sent and caused the device to send a response signal

19  that they used and they measure that signal to locate it.

15:16:20  20  Because this falls along the definition of radar technology.

21  I think if I can prove they're using radar technology to

22  locate something, it helps the fact that they're doing a

23  Fourth Amendment search.

24       THE COURT:  Okay.  Go ahead, Mr. Rigmaiden.

15:16:59  25       THE DEFENDANT:  When they say it interrupted service

33

15:17:01  1   briefly, what's the definition of "briefly"?  That's --

2         THE COURT:  Okay.  Anything else?

3         THE DEFENDANT:  And to what extent?  Like, did they

4   decrease the Internet transfer rates or did they block it

15:17:18  5   completely?  I kind of need a little bit more detail exactly

6   what the interruption was.  Because depending how great the

7   interruption is, I think it has relevance to whether or not

8   they seized the aircard.

9         THE COURT:  Do you know the answer to that,

15:17:36 10   Mr. Battista?

11         MR. BATTISTA:  Not at this time, Your Honor.  We may

12   or may not be willing to provide any additional information on

13   that.

14         THE COURT:  All right.

15:17:51 15         Anything else, Mr. Rigmaiden?

16         THE DEFENDANT:  I'm still trying to figure out if

17   these are mobile tracking devices or pen trap devices.  That's

18   something I mentioned in my clarification.

19         THE COURT:  You did, and the government addressed

15:18:04 20   that to some degree in the affidavit that was attached to

21   their memorandum.

22         THE DEFENDANT:  I haven't been able to read --

23         THE COURT:  Right.  I guess my point is you'll get

24   more information on that and can formulate a position.  They

15:18:18 25   do -- the agent that provided an affidavit in support of the

15:18:21  1    government's position asserts that the device operates in a

2    way that causes it to fall within the statutory definition of

3    a trap and trace device.  Obviously, you may disagree with

4    that.  But there is an explanation for that in the affidavit.

15:18:43  5         THE DEFENDANT:  Okay.  And with the real-time cell

6    site information that's covered under the 90331 order, which

7    is different than the StingRay and other equipment, there's

8    the after receipt and storage provision of that order.

9         Normally with a pen trap order the information isn't

15:19:31  10   stored at all, it's collected and sent right away.  At most

11   it's buffered.  But the order requires that they store the

12   information -- or it requires that Verizon stores the

13   information before it's sent.  And they haven't provided me

14   with any type of evidence showing that that was done.  So I

15:19:47  15   just wanted to make sure that I point that out.  That's still

16   an unresolved issue.

17        THE COURT:  Summarize that for me again in a sentence

18   or two.

19        THE DEFENDANT:  Pen registers forward information

15:20:01  20   without storing it.  The pen trap order says they have --

21   Verizon has to store the information.  So I'm looking for the

22   evidence proving that Verizon actually stored it before

23   sending it to the government.

24        THE COURT:  Because that's what the order required?

15:20:21  25        THE DEFENDANT:  That's what the order requires and

15:20:22   1   also they cite the Stored Communications Act in the order.  So

2   if they're seeking stored communication, then obviously the

3   data would need be stored.  And as far as I know, as far as I

4   can tell, pen trap data is sent in real-time.  It's not saved

15:20:42   5   or stored or anything like that.

6            So if it turns out what they were doing was a Fourth

7   Amendment violation, I can use the fact they violated the

8   order to show they couldn't rely on it in good faith, and same

9   with the statute that they cited, because if the information

15:21:01  10   isn't stored, then they misunderstood the law, and there's no

11   good faith reliance on misunderstandings of the law.

12            THE COURT:  Okay.  Anything else?

13            THE DEFENDANT:  I asked that certain documents be

14   reviewed in camera.  I put them on the record.  I don't -- I

15:21:25  15   don't know where the docket number sheet is here but I think

16   it was filed right along with the first consolidated exhibits

17   memorandum.  Something like 28 documents that are redacted.

18            THE COURT:  I remember that.

19            THE DEFENDANT:  Okay.  There's a few documents in

15:21:43  20   there that aren't redacted, they're actually summaries.  I

21   just wanted to clarify that with the documents that are

22   summaries, I'm asking that you look at the actual documents

23   that they summarized to see if there's anything relevant in

24   there, and the other documents just to look at the unredacted

15:22:00  25   versions.

15:22:00  1    And then with the communications, I'm asking for the

2    same review.  There's communications sent between the

3    government and Verizon and some of those communications might

4    contain information about the nonpublic information they need

15:22:13  5    to use to configure their equipment to communicate with the

6    aircard, and that goes back to one of my seizure arguments

7    from earlier.

8    THE COURT:  All right.

9    THE DEFENDANT:  That's all the issues I wanted to

15:22:27  10   kind of touch on other than -- I mean, that's not everything,

11   but whatever else you mentioned in your order and other issues

12   and my clarification, but these are -- what I just went over,

13   just extra things I may not have mentioned specifically I

14   needed to clarify.  But it's not meant to cover everything.

15:22:45  15   THE COURT:  I understand.  I've got your whole motion

16   and everything attached to it that we talked through before.

17   Mr. Battista, do you have any thoughts on any of this

18   or on my plan to go ahead and rule on the motion for

19   discovery?

15:23:04  20   MR. BATTISTA:  Nothing from the government, Your

21   Honor.

22   THE COURT:  Am I safe in assuming that the

23   government's position now is that it has disclosed everything

24   it's going to disclose and that the additional concessions

15:23:25  25   made in the memorandum for purposes of this case are the only

15:23:30 1   concessions that will be made, so that I can assume for

2   purposes of my ruling that everything else that Mr. Rigmaiden

3   has claimed, the government will not disclose, and, therefore,

4   I need to go forward with a ruling on the privilege?

15:23:47 5            THE DEFENDANT:  That's correct, Your Honor.

6            THE COURT:  This came -- this thought comes from your

7   statement when we were here on September 22nd about the

8   possible need for the government to regroup after my ruling,

9   and what I'm trying to avoid is a situation where I go through

15:24:07 10  an ex parte hearing -- well, I first decide what the defendant

11  would be entitled to, and then I hold an ex parte hearing to

12  see if it's sensitive, then I do the *Roviaro* balancing, and

13  then I order something to be produced and the government says,

14  well, we'll take a different position.  I don't want to have

15:24:29 15  to do this twice, so I just want to make sure you're satisfied

16  that everything the government will disclose or concede has

17  been disclosed and conceded.

18           MR. BATTISTA:  I believe so, Your Honor.  Again, I'm

19  not saying there may be -- I mean, as the Court is aware,

15:24:46 20  there's numerous pleadings, numerous requests.  There may be

21  something we missed.  There's nothing that's been brought to

22  my attention in the court today or the Court's order.

23  Obviously if something comes to light we'd disclose it

24  immediately.  But the vast majority -- I can't say 100

15:25:04 25  percent, but almost everything, 99.5 percent, yes, Your Honor,

15:25:09  1    that's our position.

2              I think the only other point we would want to make is

3         that we're making these arguments in good faith.  We're making

4         them on behalf of the FBI.  If the Court makes a ruling and

15:25:25  5    there's something that's critical, I think we should still

6         have the ability to waive the privilege if at some later date

7         it's critical to our case.  I don't think our hands should be

8         tied such that we can't waive the privilege.  But we're not

9         proposing the Court just go -- we're not seeking to just test

15:25:46  10   the Court to see what we can get away with.

11             In other words, we believe we have a good faith basis

12        for this position and we're willing to present the matter to

13        the Court in camera.

14             We've obviously spent a lot of time analyzing the

15:25:59  15   requests, so I think that we'd be willing to proceed along

16        those lines as long as the Court understands our position.

17        Our position and where we're coming from.

18             THE COURT:  All right.  Let me ask one other

19        question.  The plan after the September 22nd hearing, as I

15:26:15  20   recall, was that you were going to get a transcript of that

21        hearing.  With that transcript in hand, you were going to

22        confer with the folks in Washington.  Am I correct in assuming

23        that the concessions you made and the memorandum you filed are

24        as a result of that effort?

15:26:30  25             MR. BATTISTA:  Absolutely, Your Honor.  The

15:26:31  1    transcript and the Court's order were forwarded to both -- a

2    number of components in the Department of Justice and FBI

3    counsel in Virginia.  They were given both the transcript and

4    order.  We've conferred.

15:26:44  5        In an attempt to distill the issues, focus the case,

6    we were able to generate these concessions which we believe

7    are very significant.  I mean, the defendant is -- seems to be

8    requesting a number of pieces of information to be able to

9    make the argument that a search was conducted.  We're willing

15:27:08 10    to say the Court can assume for purposes of this case a search

11    was conducted.  So whether it was a little search, medium size

12    search, or a big search, it was a search.  So I think for

13    purposes of the suppression hearing, a number of the things

14    the defendant's requesting may ultimately not be relevant.

15:27:33 15        THE COURT:  Well, let me ask you a question on that

16    point.  That's the first concession you make in your

17    memorandum.  And in the past you have alluded to a couple of

18    arguments that would suggest that there was no Fourth

19    Amendment interest in the information that was seized by the

15:27:54 20    government, such as its information that the defendant's

21    computer and aircard put out into the ether and you simply --

22    and there's no expectation of privacy with the information out

23    there.  Another argument was you don't have an expectation of

24    privacy in information generated by a fraudulently obtained

15:28:14 25    aircard or a fraudulently obtained laptop computer and

15:28:20  1    therefore there was no reasonable expectation of privacy.  Am

2    I understanding you to be saying you're not going to argue

3    those things now?

4         MR. BATTISTA:  I believe that that would go to

15:28:30  5    standing, Your Honor.  And if I may consult.

6         (Counsel confer.)

7         MR. BATTISTA:  I think, yes, we did get a warrant.

8    Our position will be and then for purposes of this case the

9    basis would be that a warrant was obtained and the Court can

15:29:01 10    conduct a Fourth Amendment analysis, but I think it is still

11    appropriate for the Court to take into consideration whether

12    or not the defendant in this particular case even has standing

13    to raise a Fourth Amendment argument in this particular case

14    in light of his connection to the particular -- the apartment

15:29:21 15    and the equipment.

16         THE COURT:  So you do still intend to make the

17    standing argument?

18         MR. BATTISTA:  That's correct, Your Honor.

19         THE COURT:  Then how does your first concession in

15:29:29 20    your memorandum eliminate the need for any disclosures?  I'm

21    not understanding how the first concession then simplifies the

22    case.

23         MR. BATTISTA:  Well, I'm a bit lost, Your Honor.  I

24    mean --

15:29:48 25         THE COURT:  Well, what you said in the first

15:29:49  1    concession is the United States proposes the Court assume

2    arguendo for defendant's motion for discovery and any

3    forthcoming motion to suppress that the aircard trapping --

4    tracking operation was a Fourth Amendment search and seizure.

15:30:05  5    And then you have a long footnote.

6          What I assumed you to be saying there is that we're

7    not going to be talking about standing or reasonable

8    expectation of privacy, we're going to address the question of

9    whether the government satisfied the Fourth Amendment in the

15:30:21  10   actions it took to find the aircard.

11         MR. BATTISTA:  I think that would be assuming the

12   defendant has standing.  Our standing arguments are very

13   specific.  They just relate to the defendant's connection to

14   this particular equipment.

15:30:44  15        THE COURT:  Let me ask it differently, then.  What

16   issue does this concession take out of the case?

17         MR. BATTISTA:  Your Honor, if the government had

18   not -- we're admitting -- for purposes of this case we're

19   acknowledging that a search occurred so that a warrant would

15:31:11  20   be acquired.  Would be generally acquired.  Now, there are

21   times when a search, let's say a search is -- let's --

22   example, generic example:  Apartment.  The occupant and the

23   lessee of the apartment has an expectation of privacy in the

24   apartment.  Burglar is in the apartment.  Government conducts

15:31:39  25   a search that would require a warrant.  Government happens to

15:31:43  1    find burglar in the apartment who has no expectation of

2    privacy, burglar is searched, incriminating evidence is found

3    on the burglar.  Burglar tries to challenge the search.

4         In that case maybe the government did have to have a

15:32:00  5    warrant to enter the apartment to search for whatever, but the

6    fact that the burglar -- does the burglar have an expectation

7    of privacy for the results of that search?

8         In this case, in a sense the government is viewing

9    the situation as if the defendant was a legal lessor.  If the

15:32:23 10    defendant had not obtained the aircard using a fraudulent

11    name, if the defendant had not purchased the laptop using a

12    fraudulent name, if -- in a sense, if he wasn't the burglar,

13    he could raise this Fourth Amendment argument.

14         I'm looking at the standing in the sense of, like, it

15:32:41 15    depends on who's raising the argument.  I think if you look

16    at, for purposes of the tracking mission and locating the

17    aircard, if someone wasn't in the defendant's shoes, as the

18    government views it, they could make the Fourth Amendment

19    argument.

15:32:59 20         Our argument is that the Court would simply need to

21    conduct the standing analysis before we reach the Fourth

22    Amendment argument.  And in a sense if the Court finds the

23    defendant has standing, then the Court should do a Fourth

24    Amendment analysis and look to the warrant.  But if the

15:33:17 25    defendant doesn't have standing, it's our position that

43

15:33:20  1    whether it was a search or not, a search is irrelevant.

2         THE COURT:  Well, let me ask this question to try to

3    clarify my thinking on this:  Before the Supreme Court's

4    decision on the thermal imaging equipment there was a

15:33:43  5    disagreement in the courts as to whether a device that picked

6    up thermal image of a house was a search or was not a search.

7    Those courts that said it wasn't a search said there's no

8    Fourth Amendment issue.  The Supreme Court says it is a

9    search; it is a Fourth Amendment issue.

15:34:02 10         What you're saying, I think, is that you're not going

11    to make the argument that was adopted by the courts that said

12    it's not a search.  In other words, you're not going to take

13    the position that this device does not conduct a search

14    because it doesn't intrude into private space.  You're going

15:34:18 15    to admit that it does intrude into private space, that it is a

16    search.  It was justified in this case by the warrant, you'll

17    argue.  But you're not going to take the position that because

18    these signals from the aircard were sent outside the house,

19    the capture of them was not a search.

15:34:37 20         Is that correct?

21         MR. BATTISTA:  For purposes of this case, Your Honor.

22         THE COURT:  Okay.  Let me make a note.

23         Mr. Rigmaiden, it seems to me that much of what you

24    have been seeking information for was to support your argument

15:35:29 25    that the government's device was sufficiently intrusive to

constitute a Fourth Amendment search, and to rebut the notion that it was sort of a passive interception that doesn't constitute search.

If the government is agreeing that the aircard is sufficiently intrusive to constitute a search, it seems to me that does affect the amount of information you needed to support that argument.  Do you see it differently?

THE DEFENDANT:  Yes, Your Honor.  There's two issues.  The first one is if the government says it conducted a search, Fourth Amendment search, and that they're relying on these orders when conducting that search, then I need to know the details of the search that resulted and then getting to the location of the aircard so I can prove that the orders weren't particular in what they did authorize them to do, because there's nothing in there about increasing signal strength or sending signals into the apartment or causing the aircard to transmit signals back to them and them sending signals to the aircard.

These are all details they need to go through to prove that what the judge actually authorized isn't what they actually did.  Even if they were relying on the order, even if it was a Fourth Amendment search and they were willing to admit it was a Fourth Amendment search.

And the second issue is if they're going to raise standing issue, I don't have standing in the apartment and the

15:36:51  1   aircard, aircard account, or whatever they're going to claim,

2   then depending on the separate precise Fourth Amendment

3   searches and seizures that they conducted, it's going to

4   affect whether or not they prevail on those standing

15:37:06  5   arguments.

6           For example, if they say I don't have standing in the

7   records that were held at Verizon, then maybe my argument that

8   they got shared secret data and A-keys in order to configure

9   their device, maybe I lose standing on that issue because it

15:37:21 10   was in the possession of a third party.  I don't agree with

11   that, but that's just one example.

12          So that's one example of why I need to know exactly

13   what they did, because if I can prove standing in some issues

14   and if they're able to prove I lack standing in others, then

15:37:34 15   it comes down to whether or not the issues I do have standing

16   in, if those were actually the cause of them getting to the

17   apartment.

18          THE COURT:  Okay.  I think I understand the parties'

19   positions on that.

15:37:58 20          Let me make sure of one other fact.  Your third

21   concession, Mr. Battista, is that I can assume for purposes of

22   this motion that when the agents operated the device, they

23   were able to say the aircard is in apartment 1122.

24          MR. BATTISTA:  Correct, Your Honor.

15:38:20 25          THE COURT:  So you're conceding for purposes of the

15:38:22  1    argument that it was precise enough to put the aircard and

2    computer in that apartment.

3         MR. BATTISTA:  In the apartment, yes, Your Honor.

4         THE COURT:  Okay.

15:38:41  5         Okay.  Those are helpful clarifications and, as I

6    indicated before, I'll rule on this motion.

7         Mr. Rigmaiden has filed a motion to continue the

8    trial.  I assume you don't object to that, Mr. Battista?

9         MR. BATTISTA:  Correct, Your Honor.

15:39:05 10         (The Court and the courtroom deputy confer.)

11         THE COURT:  We'll talk about the new trial date in

12   just a minute.

13         The only other matters that I have are all ex parte

14   and defense-related matters.  Are there additional matters,

15:39:26 15   Mr. Battista, you wanted to raise today?

16         MR. BATTISTA:  Just since we're all here, Your Honor,

17   I have for the defendant the hard drives and a memo that

18   discusses what's on the hard drives for the defendant, and

19   also the last piece of computer equipment that the defendant

15:39:43 20   needs.  I'm proposing to provide them to Mr. Seplow so that

21   Mr. Seplow can get them to the defendant and just check to see

22   if that's agreeable.

23         THE COURT:  What is the last piece of equipment

24   you're referring to?

15:39:57 25         MR. BATTISTA:  It's just a part -- it's a computer

47

15:40:02  1  device, an attachment that Mr. Rigmaiden needs to be able to

2  operate the hard drives and access the data that's in the hard

3  drives.

4          So obviously Mr. -- I believe that Mr. Seplow would

15:40:15  5  take it to CCA, CCA will then inspect it and then provide it

6  and store it with the rest of the equipment that

7  Mr. Rigmaiden's been accessing.

8              THE COURT:  Are you all right with that, Mr. Seplow?

9              MR. SEPLOW:  Yeah, sure, if Mr. Rigmaiden is.

15:40:29  10              THE COURT:  I was going to ask him as well.

11              THE DEFENDANT:  Yes.

12              THE COURT:  Okay.  Go ahead and get it to Mr. Seplow,

13  if you would.  We'll go ahead and excuse the government so I

14  can talk to Mr. Rigmaiden about defense matters.

15:40:40  15          We're also going to ask folks in the courtroom not

16  related to this case to please step out.

17              MR. BATTISTA:  Your Honor, do you need us to remain

18  available or are we excused?

19              THE COURT:  No.  You're excused.

15:40:51  20              MR. BATTISTA:  Thank you, Judge.

21              THE COURT:  Thank you.

22          Before you leave, I'm going to grant the 90-day

23  continuance of the trial date.  The trial date is November

24  8th.  90 days will take it to February 8th and that will be

15:41:13  25  the new trial date, recognizing we've still got to resolve the

48

15:41:18  1    motion to suppress before we actually try this case.

2              MR. BATTISTA:  Thank you, Your Honor.

3              Your Honor, does the Court -- I understand that the

4    Court has a pretty extensive trial calendar coming up.  Does

15:41:28  5    the Court have any idea when -- a ballpark when the ex parte

6    in camera proceeding may be scheduled?

7              THE COURT:  We're going to have to do it in November

8    probably because December is pretty booked and I start a trial

9    the beginning of January that's going to go two months.

15:41:47 10    January and February.  So I haven't looked at my calendar to

11   find precise dates.  I'll obviously have Lisa communicate with

12   you to narrow it down, but I think it's going to have to

13   happen in November.

14             MR. BATTISTA:  That's understandable, Your Honor.

15:42:00 15    We'll work with the courtroom deputy to schedule something.  I

16   just needed to get an idea so we can start marshaling the

17   forces.

18             THE COURT:  Okay.  Thanks very much.

19             (Sealed ex parte discussion reported but not

15:42:10 20    transcribed herein.)

21             (End of transcript.)

22                              *  *  *  *  *

23

24

25

# **C E R T I F I C A T E**

I, PATRICIA LYONS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control, and to the best of my ability.

DATED at Phoenix, Arizona, this 22nd day of November, 2011.

s/ Patricia Lyons, RMR, CRR
Official Court Reporter