1
Daniel Rigmaiden
Agency # 10966111
2
CCA-CADC
PO Box 6300
3
Florence, AZ 85132
Telephone: none
4
Email: none
5
Daniel David Rigmaiden
Pro Se, Defendant
6

7       **UNITED STATES DISTRICT COURT**

8       **DISTRICT OF ARIZONA**

9

10  United States of America,

11          Plaintiff,

12  v.

13  Daniel David Rigmaiden, et al.,

14          Defendant.

15

No. CR08-814-PHX-DGC

MOTION FOR RECONSIDERATION
AND CLARIFICATION OF THE
COURT'S ORDER AT DKT. #723

16          Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits this

17  *Motion For Reconsideration And Clarification Of The Court's Order At Dkt. #723*.  The

18  Court's Order at Dkt. #723 mainly addresses the defendant's *Motion For Disclosure Of All*

19  *Relevant And Helpful Evidence Withheld By The Government Based On A Claim Of*

20  *Privilege* (Dkt. #592).

21          Through this motion, the defendant requests that the Court reconsider its directive

22  requiring that the defendant's *Motion To Suppress* be limited to 50 pages and that it be filed

23  by February 17, 2012.  The defendant is not capable of complying with the Court's

24  instructions unless he completely abandons a large amount of his Fourth Amendment

25  arguments—arguments that neither the Court nor the government have been made aware of

26  prior to this filing.  The defendant would rather not explain the extent of his *Motion To*

27  *Suppression* prior to filing it but he will do so anyways because the tactical advantage the

28  government will gain through this filing will be less destructive to the defendant's carefully

planned defense than having to give up the majority of his Fourth Amendment arguments in order to comply with the Court's page limitations and time constraints.  Through this motion, the defendant will explain the full scope of his *Motion To Suppress* in support of his request that he be permitted more than 50 pages to argue his points and more than six weeks to complete the motion.

The defendant is also asking for (1) reconsideration of some portions of the Court's order relating to the denial of the defendant's requests for disclosure of evidence the government claims is privileged, and (2) clarification on the Court's interpretation of the government's concession that the aircard locating mission was an overall Fourth Amendment search and seizure.

I.  **ARGUMENT**

  A.  **Request for clarification on the Court's understanding of the government's claim that a Fourth Amendment search and seizure occurred.**

The Court's order at Dkt. #723 states the following:

> "First, for purposes of Defendant's motion to suppress, the government agrees that the Court may assume that the aircard tracking operation was a Fourth Amendment search and seizure." *Id.* at 14-15 (internal citations omitted).  "While making this concession, the government states that it is reserving its right to assert that Defendant lacks standing to make certain Fourth Amendment arguments....  As Defendant notes, such a reservation of rights can be viewed as inconsistent with the government's concession....  Thus, if the government is conceding that the search which located Defendant's aircard constituted a search and seizure for purposes of the Fourth Amendment, it necessarily must be conceding that Defendant had a reasonable expectation of privacy in the aircard.  The Court understands this to be the government's concession...." *Id.* at 15 fn. 6.

The defendant agrees with the Court's reasoning and he is not requesting that the Court reconsider the above quoted conclusion.  However, there are places, objects, records, resources, and combinations thereof that relate to the the government's searches and seizures that may or may not be covered by the government's collateral concession that the defendant had a reasonable expectation of privacy in the aircard.  There are also various specific and independent actions conducted by the government that the Court may or may not see as falling under the government's expressed concession that "the aircard tracking operation was

a Fourth Amendment search and seizure." Due to the defendant's confusion, he requests clarification from the Court as outlined below.

### 1.   Request for clarification No. 1.

In preparation of his *Motion To Suppress*, the defendant requests clarification from the Court on its conclusion that the government's concession that "the aircard tracking operation was a Fourth Amendment search and seizure" means that the defendant had a reasonable expectation of privacy in the aircard. The defendant is unclear and needs guidance on the following issues prior to drafting his *Motion To Suppress*:

1.   Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the host laptop computer used with the aircard while the government claims that the laptop was obtained by "fraud," *i.e.*, purchased using an alias? The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

2.   Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the confines of apartment No. 1122 while the government claims that the apartment was obtained by "fraud," *i.e.*, rented under an alias? The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

3.   Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the aircard account used with the aircard while the government claims that the aircard account was obtained by "fraud," *i.e.*, applied for under an alias? The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

4.   Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the aircard signals traveling through the air and collected by the FBI in order to conduct triangulation techniques while the government will likely come up with some type of argument claiming that the defendant had no reasonable expectation of privacy in said signals? The defendant asserts that the

*MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURT'S ORDER AT DKT #723 CR08-814-PHX-DGC*

government's concession applies and that the answer to this question is in the affirmative.

     5.     Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the aircard's **historical** cell site location information obtained from Verizon Wireless while the government claims that the defendant had no reasonable expectation of privacy in said data because of the "third party" disclosure rule?[1]  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

     6.     Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the aircard's **real-time** cell site location information obtained from Verizon Wireless while the government claims that the defendant had no reasonable expectation of privacy in said data because of the "third party" disclosure rule?[2]  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

     7.     Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the Domicilio apartment No. 1122 gate key access records (geolocation data) obtained from Quality Alarm Service while the government claims that the defendant had no reasonable expectation of privacy in said data because of the "third party" disclosure rule?[3]  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

     8.     Does the government's collateral "reasonable expectation of privacy" concession extend past the physical aircard and apply to the aircard's 1.8 million destination IP addresses obtained from Verizon Wireless while the government claims that the defendant

---

1.     In <u>United States v. Miller</u>, 425 U.S. 435 (1976), the Supreme Court rejected a Fourth Amendment challenge to a subpoena for bank records on the ground that such documents were not "'private papers'" but were instead "the business records of the banks[]" in which a customer "can assert neither ownership nor possession." *Id.* at 440.  In <u>Smith v. Maryland</u>, 442 U.S. 735 (1979), the Supreme Court expanded on *Miller* and reasoned that the government's acquisition of an individual's dialed telephone numbers does not implicate the Fourth Amendment because "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Id.* at 743-44.

2.     *See* fn. 2, *supra*.

3.     *See* fn. 2, *supra*.

*MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURT'S ORDER AT DKT #723*
*CR08-814-PHX-DGC*

had no reasonable expectation of privacy in said data because of the "third party" disclosure rule?[4]  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

      9.    Does the government's collateral "reasonable expectation of privacy" concession also mean that the government concedes that the defendant had a legitimate possessory interest (applicable to seizure arguments) in all applicable places, objects, records, resources, and combinations thereof involved in Nos. 1 through 8 above?  The defendant asserts that the government's concession applies to possessory interests and that the answer to this question is in the affirmative.

      10.    Does the government's collateral "reasonable expectation of privacy" concession also mean that the government concedes that it meaningfully interfered with the defendant's legitimate possessory interest (applicable to seizure arguments) in all applicable places, objects, records, resources, and combinations thereof involved in Nos. 1 through 8 above?   The defendant asserts that the government's concession applies to the government's meaningful interference and that the answer to this question is in the affirmative.

      The defendant needs clarification on Nos. 1 through 10 above because he needs to determine whether to formulate arguments showing his reasonable expectation of privacy and possessory interest in the respective places, objects, records, resources, and combinations thereof.  The bulk of the defendant's Fourth Amendment arguments have the potential to implicate more than just one's reasonable expectation of privacy and possessory interest in the physical aircard.  The defendant is unclear on whether the full scope of his Fourth Amendment arguments will be approached by the Court under a presumption that he had a reasonable expectation of privacy and possessory interest in **absolutely anything and everything**.

      For example, does the defendant have to overcome the "third party" disclosure rule by proving his reasonable expectation of privacy in (1) the aircard historical cell site location information, (2) the aircard real-time cell site location information, (3) the apartment No.

MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURTS ORDER AT DKT #723
CR08-814-PHX-DGC

---

4.    *See* fn. 2, *supra*.

1122 gate key access records (geolocation information), and (4) the aircard's 1.8 million

destination IP addresses that contain communications content?[5]  Likewise, does the

defendant have to present evidence and arguments to negate the government's position that

the use of alias (*see* listed questions Nos. 1-3, p. 4, *supra*) destroys any reasonable

expectation of privacy and/or possessory interest in a given place, object, *etc.*?  Does the

defendant have to prove that he had a reasonable expectation of privacy in the data stored on

the aircard and seized by the FBI through an electronic intrusion, or that he had a reasonable

expectation of privacy in the aircard signals traveling through the air and collected by the

FBI for triangulation purposes?  The defendant seeks clarification from the Court on the

issues explained in this section.

### 2.   Request for clarification No. 2.

In preparation of his *Motion To Suppress*, the defendant requests clarification from the

Court on the government's expressed concession that "the aircard tracking operation was a

Fourth Amendment search and seizure."  The defendant is unclear and needs guidance on the

following issues prior to drafting his *Motion To Suppress*:

1.     Does the government's expressed "the aircard tracking operation was a Fourth

Amendment search and seizure" concession include the separate and independent seizure of

the aircard and host laptop computer via the FBI having Verizon Wireless write data to the

aircard via OTASP/OTAPA messages?  The defendant asserts that the government's

concession applies and that the answer to this question is in the affirmative.

2.     Does the government's expressed "the aircard tracking operation was a Fourth

Amendment search and seizure" concession include the separate and independent seizure of

the aircard and host laptop computer via the FBI forcing the aircard to connect to its cell site

emulators?  The defendant asserts that the government's concession applies and that the

---

5.     In the present case, the government attempts to equate the seized geolocation records
and destination IP addresses in the possession of Verizon Wireless and the apartment No.
1122 gate key access records in the possession of Quality Alarm Service to the business
documents discussed in *Miller* and to the dialed telephone numbers discussed in *Smith*.  The
defendant does not agree and has extensive case law to support his position that the "third
party" disclosure rule does not apply.

answer to this question is in the affirmative.

3.    Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent seizure of the aircard and host laptop computer via the FBI writing data to the aircard via its cell site emulators?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

4.    Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent seizure of the aircard and host laptop computer via the FBI having Verizon Wireless reprogram the aircard via OTASP/OTAPA messages to respond to the FBI's phone call based denial-of-service attack?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

5.    Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent seizure of the aircard and host laptop computer via the FBI using the host laptop computer power source to facilitate its aircard locating mission and increasing transmission power of aircard signals?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

6.    Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent seizure of the aircard and host laptop computer via the FBI denying the aircard Internet access service on July 16, 2008 for a 14 hour period?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

7.    Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent seizure of the aircard and host laptop computer via the FBI disabling standard signal encryption for aircard signals while it transmitted its ESN and other data?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

8.      Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure of the aircard and host laptop computer via the FBI remotely accessing the aircard's hardware for the purpose of seizing the aircard's stored serial number (ESN)?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

9.      Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure of the aircard and host laptop computer via the FBI sending radio waves to the aircard instructing it to generate and transmit an abundance of signals that were subsequently seized?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

10.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure of the aircard and host laptop computer via the FBI using a beam-forming antenna (*i.e.*, an electronic search beam) to send location finding interrogation signals into apartment No. 1122?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

11.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure of the aircard and host laptop computer via the FBI using the aircard's location finding response signals to conduct triangulation techniques?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

The defendant needs clarification of Nos. 1 through 11 above because he needs to determine whether to formulate arguments showing that the respective actions are independent searches and/or seizures.  Showing independent Fourth Amendment searches and/or seizures is required if the defendant is to prove scope and particularity violations.[6]

6.      *See* <u>United States v. Grubbs</u>, 547 U.S. 90, 97 (2006) ("The Fourth Amendment,

Consider the following analogy:

> Government agents have a warrant to search a home but not the home owner's car parked on the street in front of the home. The agents then search the home but while doing so they open a sealed box located in the home and seize evidence from within the box. The agents then search the car parked in front of the home and seize evidence from within the car. The search of the car and seizure of evidence contained therein was a separate search and seizure and therefore outside the scope of the warrant authorizing the search of the home. The opening and searching of the sealed box contained within the home was not a separate search and seizure as the warrant to search the home also implicitly covered the sealed box within the home.

At a previous court hearing, and without conceding to any specific action, the government claimed that the above listed separate Fourth Amendment searches and/or seizures are like the search of the sealed box while the defendant claimed that the they are like the search of the car. In light of the government's position, the very broad and all inclusive concession that "the aircard tracking operation was a Fourth Amendment search and seizure" sheds no light on whether the above listed independent action are separate Fourth Amendment searches and seizures or simply incidental to the government's conceded yet undefined "Fourth Amendment search and seizure." The defendant seeks clarification from the Court on the issues explained in this section.

### 3.   Request for clarification No. 3.

In preparation of his *Motion To Suppress*, the defendant requests clarification from the Court on the government's expressed concession that "the aircard tracking operation was a Fourth Amendment search and seizure." The defendant is unclear and needs guidance on the following issues prior to drafting his *Motion To Suppress*:

1.      Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the government compelling Verizon Wireless to turn over **historical** cell site location information on the aircard? The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

however, does not set forth some general 'particularity requirement.' It specifies only two matters that must be 'particularly described' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" (brackets omitted)).

2.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the government using aircard historical cell site location information to infer the location of the aircard inside apartment No. 1122?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

3.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the FBI using triangulation and location signature techniques on the aircard historical cell site location information to narrow down the location of the aircard?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

4.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the government compelling Verizon Wireless to turn over **real-time** cell site location information on the aircard?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

5.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the government compelling Verizon Wireless to turn over 1.8 million aircard destination IP addresses containing communications content?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

6.     Does the government's expressed "the aircard tracking operation was a Fourth Amendment search and seizure" concession include the separate and independent search and seizure involving the government compelling Quality Alarm Service to turn over electronic gate key access records for apartment No. 1122 containing geolocation information?  The defendant asserts that the government's concession applies and that the answer to this question is in the affirmative.

The defendant needs clarification on Nos. 1 through 6 above because he needs to determine whether to formulate arguments showing that the respective actions are independent searches and/or seizures.  In order to support arguments that the government conducted Fourth Amendment searches and seizures when it compelled geolocation data and destination IP addresses from Verizon Wireless and geolocation data from Quality Alarm Service, the defendant's *Motion To Suppress* depends on proving that the actions listed at Nos. 1 through 6 were actual Fourth Amendment searches and/or seizures requiring probable cause as apposed to "specific and articulable facts" or no findings at all.  The defendant seeks clarification from the Court on the issues explained in this section.

> **B.      Based on new evidence provided by the government, the defendant requests that the Court reconsider its *entire* order denying the defendant's request for disclosure of evidence being withheld based on a claim of privilege.**

The Court's order at Dkt. #723 states the following:

> "Defendant has provided extensive technical information concerning devices available on the market that can be used to locate cell phones and aircards.  He has provided information concerning Harris Corporation, a manufacturer of such devices, as well law enforcement materials reflecting the use of some technical devices.  See Docs. 587, 592.  **The government, however, has not disclosed the specific devices used in locating Defendant's aircard or how the equipment was operated, and the Court concludes that the precise equipment used by the FBI and the precise manner in which it was used constitutes sensitive law enforcement information.**  Disclosing the particular equipment used, and how it was used, would disclose how the FBI seeks to track mobile electronic devices such as the aircard."  *Id.* at 12-13 (emphasis added).

The above reasoning is the primary underlying basis for the Court's order denying all of the defendant's requests for evidence.  Based on new evidence received by the defendant from the government on October 6, 2011 and on December 9, 2011,[7] the facts considered by the Court in support of its reasoning are now shown to be false.

Originally, the defendant pointed out that the government already disclosed the precise make and model of the equipment used to locate the aircard through a report drafted

---

7.      The evidence was provided on CDs delivered to the defendant's shadow counsel's office.  The defendant received the CDs at CCA-CADC in mid December.

- 11 -

by USPIS Inspector James L. Wilson and through rough notes drafted by IRS-CI Agent

Denise L. Medrano. *See First Submission Of Consolidated Exhibits Relating To Discovery*

*And Suppression Issues*, EXHIBIT 26 (Wilson Report indicating that a "Stingray" was used)

(Dkt. #588-1); *Response To Government's Memorandum Regarding Law Enforcement*

*Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 39

(Medrano rough notes with trademarked, case-correct, "**St**ing**R**ay" term listed) and

EXHIBIT 40 (IRS-CI Agent Tracy L. Daun asked IRS-CI Jeffrey H. Willert if she could

assist the FBI with triangulating down on the aircard location) (Dkt. #536-4).  The Court

asked the government about this matter during the September 22, 2011 court hearing:

> THE COURT: All right. Let me ask another question of you, Mr. Battista.  In his voluminous exhibits, Mr. Rigmaiden has included as Exhibit 26, an investigation details report by U.S. postal service inspector.
>
> MR. BATTISTA: Your Honor, could you tell me what docket number that --
>
> THE COURT: Yeah, it's Docket 587, Exhibit 26. You're going to know what I'm talking about, I think, in just a moment.  The report on page 7 --
>
> MR. BATTISTA: Excuse me, Your Honor, I have Docket 587 in front of me so I'll just --
>
> THE COURT: Turn to Exhibit 26.
>
> MR. BATTISTA: Yes, Your Honor.
>
> THE COURT: This print is really small. Turn to the second page of that exhibit.  About 3 inches down it says: On 7/15/08 we were informed that they were able to track a signal and were using a, quote, StingRay, close quote, to pinpoint the location of the aircard. It goes on to talk about the nature of the apartment.  Mr. Rigmaiden has been arguing that the government was using a StingRay produced by Harris.  This document seems to support that.
>
> MR. BATTISTA: Let me respond to that, Your Honor.
>
> THE COURT: Yeah, please.
>
> MR. BATTISTA: I've sought to explain to Mr. Rigmaiden, and the example I use, and I talked about this case so many times, is Kleenex and tissue. Kleenex is a brand name but it's a tissue.  People regularly refer to tissue as Kleenex.  "I need to blow my nose. Will you give me a Kleenex?"  Everyone knows what they're talking about.
>
> In the law enforcement world, there's a StingRay and then there's the generic term "StingRay" meaning all types of devices. The five case agents were using the term "StingRay" as the term "Kleenex."  They did not operate

the equipment.  They did not know what the equipment is.  They didn't receive any training on the equipment.

So they were -- in the course of the investigation, the term "StingRay" was used as a generic term.  I've explained this to the defendant numerous times.  None of the five investigators know the make, model, manufacturer of the exact equipment.  There were tech agents out there.  They're the ones who possessed the equipment, operated the equipment.  So, yes, the word "StingRay" is in the discovery.  When they're using the term "StingRay," and I've explained this to the defendant, it's Kleenex.  It's tissue.  They don't know.  It could be a StingRay.  It could not be.  It could be something else.  They didn't know what it was.  They didn't see it.  They didn't operate it.

*September 22, 2011 Status Conference, Partial Transcript of Proceedings*, p. 35-36, 14:52:24 - 14:56:48.

In response, the defendant filed his *Clarification Of Various Pending Discovery Issues* (Dkt. #653) on October 13, 2011.  In his filing, the defendant explained how AUSA Battista's argument does not make sense.  *See id*.  In its order at Dkt. #723, the Court agreed with the government's "Kleenex" argument and reiterated its belief that the government has not disclosed the precise make and model of the equipment to the defendant.  The defendant now has new evidence showing that AUSA Battista presented false information to the Court in support of his claim that the precise make and model of the equipment used to locate the aircard has not been disclosed to the defense.

On October 6, 2011, the government provided the defense with two "case write ups" prepared by FBI Agent Richard J. Murray wherein he stated that he "ran a field test with IRS of a similar aircard and communicated with OTD to ensure that the tracking would not be detected by the subject."  *See* EXHIBIT 01.  Additionally, on December 9, 2011, the government provided the defense with a chart of text messages sent to/from FBI Agent Murray during the time the aircard was being located on July 16-17, 2008.  *See* EXHIBIT 02.  According to the chart, on July 16, 2008 at 1:46am, FBI Agent Murray told FBI Agent Kevin F. Killigrew that "[w]e verified the ability to pull the card over through testing on an irs verizon card. Atech agent from [REDACTED: TTA First Name], is here helping out and he has top game."  *See id*.

Clearly, FBI Agent Murray (a primary case agent) and one or more IRS-CI agents (all primary case agents) conducted a test using a similar aircard and the equipment used to

*MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURT'S ORDER AT DKT #723*
*CR08-814-PHX-DGC*

locate the actual aircard.  Based on this new evidence, AUSA Battista's claim that the five

primary case agents "didn't know what [the surveillance equipment] was[,]  [t]hey didn't see

it,  [t]hey didn't operate it"[8] is clearly false.  Considering the case agents did know the exact

make and model of the equipment used to locate the aircard, the "StingRay" term stated in

USPIS Inspector Wilson's report and in IRS-CI Agent Medrano's rough notes must refer

specifically to the actual equipment used to locate the aircard.  Additionally, because the

primary case agents had the training and experience needed to conduct tests using the

StingRay, the following claim considered by the Court also need to be reevaluated:

> "Agent Morrison also explained the training and skill required to operate the equipment, that only a limited number of agents have acquired the training and skill, and why disclosure of their identities would jeopardize their safety and make it impossible for the FBI to use these agents in future surveillance operations, eliminating them as valuable law enforcement assets."  *Id*. at 12.

Likewise, it would be no loss to the FBI to train new technical agents as the training is an

elementary two day course offered by Harris Corporation:

> The Harris RayFish® product line includes the StingRay II, StingRay, and KingFish systems, which are compatible with the CDMA2000, GSM, and iDEN (Nextel) protocols.
> ...
> Harris also sells training on the use of the RayFish product line and accessories. Standard training sessions are **2 days per class** with a maximum class size of 4 students.
>
> *Response To Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary*, EXHIBIT 19 (Letter by Michael E. Dillon, Major Account Manager Wireless Products Group, Harris Corporation) (emphasis added).

Because the government has already disclosed the particular equipment used, the primary

factual basis upon which the Court's order is based needs to be reevaluated.  The

prosecution's "Kleenex" argument was simply back peddling to facilitate a cover-up of

mistakenly revealed information regarding the precise equipment used to locate the aircard.

Because the Court so heavily relied upon a "not disclosed" reasoning, the defendant requests

that the order at Dkt. #723 be reconsidered, **in its entirety**, in light of the new evidence

---

8.      *September 22, 2011 Status Conference, Partial Transcript of Proceedings*, p. 36, 14:56:29 - 14:56:48.

discussed above.

**C.    Based on new evidence provided by a group of proposed *Amici*, the defendant requests that the Court reconsider its *entire* order denying the defendant's request for disclosure of evidence being withheld based on a claim of privilege.**

The Court's order at Dkt. #723 states the following:

> "Even if some of the technology were publicly available, the precise technology used by the FBI in this case and the precise manner in which it was used, if disclosed, would educate the public and adversaries of law enforcement on how precisely to defeat FBI surveillance efforts.  The Court is not persuaded by Defendant's arguments that the privilege is inapplicable because modern surveillance technology is widely understood." *Id.* at 13.

The defendant recently became aware that there is a group of experts and researchers[9] with skills in the areas of computer science, privacy, security, and surveillance who wish to file an *Amici* brief on the issue addressed by the Court at Dkt. #723.  Due to an interoffice outgoing mail problem,[10] the motion for leave to file the brief was not filed until recently.  Although the *Amici* brief is late, it is still early enough to be considered in support of the defendant's motion for reconsideration.  The group of *Amici* will prove that the public has already been educated on (1) how to build their own StingRays for approximately $1500, and (2) how to precisely detect and defeat the FBI's StingRay for as little as $20—yes, twenty dollars.  In other words, they will prove that the public widely understands the precise technology at issue and not simply modern surveillance technology in a generic sense.  The defendant requests that the Court allow the *Amici* brief to be filed and that the order at Dkt. #723, **in its entirety**, be reconsidered in light of the filing.

---

9.     These individuals are (1) Jacob Appelbaum, Staff Research Scientist, Security and Privacy Research Lab, University of Washington, (2) David Burgess, co-founder and lead developer of the OpenBTS project, (3) Eric King, Human Rights and Technology Advisor, Privacy International, (4) Aaron Martin, PhD, Information Systems and Innovation Group, Department of Management, London School of Economics and Political Science, (5) Christopher Parsons, Doctoral Candidate, Political Science, University of Victoria, (6) Christopher Soghoian, Graduate Fellow, Center for Applied Cybersecurity Research, Indiana University, and (7) Katrin Verclas, MobileActive Corp.  *Amici* submitted their brief in their individual capacities.  The affiliations listed are for identification purposes only.

10.    The motion for leave to file the *Amici* brief was scheduled to be filed on January 5, 2012, the same day the Court entered its order at Dkt. #723.

### D.   Based on manifest error, the defendant requests that the Court reconsider the portion of its order finding that evidence relating to the specific portable/transportable wireless device locators used by the government is not discoverable under Rule 16.

The Court's order at Dkt. #723 states the following:

"Defendant seeks production of all evidence relating to the specific mobile tracking device used by the government, including user manuals, test data, and related software.  Doc. 592-1 at 97.  Defendant states that he needs this information because "the requested evidence may reveal additional Fourth Amendment violations the defendant is currently unaware of."  *Id.*  As noted above, however, Rule 16(a)(1)(E)(i) does not authorize a fishing expedition.  Defendant must make a threshold showing of materiality before disclosure is required.  *Santiago*, 46 F.3d at 894; *Mandel*, 914 F.2d at 1219."  *Id.* at 24-25.

It was manifest error for the Court to find that the requested user manuals, test data, related software, and other evidence listed in the defendant's *Motion For Discovery*, "Submission Pursuant To LRCiv 37.1," § F, p. 12-14 (Dkt. #592-2), are not discoverable under Rule 16.  All other categories of evidence the Court found were discoverable are contained in the requested evidence relating to the specific portable/transportable wireless device locators used by the government, including user manuals, test data, and related software.  In fact, the requested user manuals would provide the majority of the evidence requested by the defendant that the Court found to be discoverable under Rule 16.[11]  It is impossible for the Court to find that the user manuals, *etc.* are not discoverable while finding that the majority of the other categories of evidence are discoverable because they are one in the same.  As explained below, the Court misread the defendant's *Motion For Discovery* (Dkt. #592).

In the section of his *Motion For Discovery* (Dkt. #592) addressing his request for user manuals, test data, related software, and other relative evidence, the defendant stated the following:

"This is a circular argument that **reverts back to Section VI(D)(2)(c), (e), (f), (g), (h), and (i),** *supra* **and Section VI(C)(2)(a),** *supra*.  If the government does not provide the evidence shown to be relevant in those sections (*e.g.*, the destroyed real-time aircard location data, geolocation techniques, radio wave collection methods, *etc.*) then the defendant's mobile telecommunications expert can use StingRay user manuals, software, test data, the physical devices themselves, *etc.*, to conduct various tests and reverse engineer the Harris devices in order to prove the same relevant facts.  The subsections that follow

---

11.   The defendant made it clear at Dkt. #623 that he "goes on for **8 pages** explaining his specific need for that category of requested evidence."  *Id.*, p. 15.

provide some further specific analyses." *Motion For Discovery*, § VI(F)(2)(c), p. 91 (Dkt. #592).

The defendant's request for user manuals, *etc.* therefore applied to § VI(D)(2)(e), p. 77, § VI(D)(2)(g), p. 80, § VI(D)(2)(i), p. 83, and § VI(F)(2)(c)(iii), p. 92 :

> "Relevancy of the requested evidence with respect to proving that the government used cell site emulation, aircard emulation/cloning, and **forced registration.**" Subsection title from *Motion For* Discovery, § VI(D)(2)(e), p. 77 (Dkt. #592).

> ――――

> "Relevancy of the requested evidence with respect to proving that the government used **geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion** on aircard signals in order to triangulate the aircard's location." Subsection title from *Motion For* Discovery, § VI(D)(2)(g), p. 80 (Dkt. #592).

> ――――

> "Relevancy of the requested evidence with respect to proving that the government **increased the transmission power of the aircard**, caused an interruption in aircard service, and caused aircard service data transfer rates to fall below what would have otherwise been provided by Verizon Wireless." Subsection title from *Motion For* Discovery, § VI(D)(2)(i), p. 83 (Dkt. #592).

> ――――

> "The defendant needs access to the instructions manuals, operations manuals, user manuals, schematics, patent information, proprietary information, trade secrets, software, etc., relating to the portable/transportable wireless device locator(s) used to locate the aircard inside apartment No. 1122. The defendant's mobile telecommunications expert can analyze the requested evidence in order to determine exactly what type of geolocation techniques and radio wave collection methods the portable/transportable wireless device locators use. **This analysis will act to confirm that the StingRay conducted the various searches and seizures discussed in Section VI(D)(1) *et seq.*, *supra* (discussing geolocation techniques and radio wave collection methods)**, which will in turn support the coinciding arguments in Section VI(D)(2), *et seq.*, *supra*." *Motion For* Discovery, § VI(F)(2)(c)(iii), p. 92 (Dkt. #592).

Rather than repeat over and over again the reasons why the defendant needs the requested evidence, he instead incorporated the prior sections of requested evidence that would be contained in the user manuals and other evidence requested in § VI(F) of Dkt. #592. In its order at Dkt. #723, the Court found that evidence relating to the following is discoverable under Rule 16: (1) an increase in aircard transmission power, (2) forced registration, and (3) geolocation measurement techniques in the form of time-of-flight, power-distance, angle of arrival, received signal measurements, statistical functions, and data fusion.[12]  Considering

_____

12.     The other categories of evidence incorporated into § VI(F) of Dkt. #592 (*i.e.*, § VI(D)

1  those categories of discoverable evidence are contained in the evidence listed in the

2  defendant's *Motion For Discovery*, "Submission Pursuant To LRCiv 37.1," § F, p. 12-14

3  (Dkt. #592-2), it was manifest error for the Court to find that the requested user manuals, test

4  data,  related software, and other evidence were not discoverable under Rule 16.

**E.  Based on new evidence provided by the government, the defendant requests that the Court reconsider its order denying the defendant's request for disclosure of communications content between the FBI and Verizon Wireless or, in the alternative, his request for the FBI's "destroy the evidence" policy.**

8  The Court's order at Dkt. #723 states the following:

> "Defendant seeks production of all communications between the government and private entities associated with Verizon Wireless and various companies that manufacture electronic surveillance equipment.  Doc. 592-1 at 111. Defendant seeks this information 'because it will provide further information on all other categories of withheld evidence being requested through this motion.' *Id*.  Defendant asserts that this 'is a reasonable assumption considering the government is withholding the requested communications based on the same claim of privilege asserted over the other withheld evidence.' *Id*.  Defendant has not made the threshold showing of materiality required for production under Rule 16(a)(1)(E)(i).  Santiago, 46 F.3d at 894; Mandel, 914 F.2d at 1219." *Id*. at 26-27.

15  Originally, the government led the defendant to believe that Verizon Wireless did not provide

16  the FBI with any data relating to the location of the aircard while acting pursuant to the

17  N.D.Cal. 08-90330MISC-RS order.  Based on new evidence received by the defendant from

18  the government on December 9, 2011,[13] it is now clear that Verizon Wireless provided the

19  FBI with distance information relating to the location of the aircard.  *See* EXHIBIT 03 (FBI

20  technical agent claiming that "Verizon gave a distance from the tower to the target.").  There

21  is a high probability that the newly identified geolocation data was provided to the FBI

22  through written communications because the majority of the geolocation data provided to the

23  FBI by Verizon Wireless was done through written communications.  *See First Submission*

24  *Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 02

25  (Verizon Wireless emailed geolocation data), EXHIBIT 03 (Verizon Wireless emailed

MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURT'S ORDER AT DKT #723 CR08-814-PHX-DGC

27  (2)(c), (f), and (h), and § VI(C)(2)(a)), the Court asserts the government's stipulations alleviate the defendant's need for that evidence.

28  13.    The evidence was provided on a CD delivered to the defendant's shadow counsel's office.  The defendant received the CD at CCA-CADC in mid December.

- 18 -

geolocation data), and EXHIBIT 05 (Verizon Wireless emailed geolocation data).  The

requested Verizon Wireless communications will provide the exact geolocation data Verizon

Wireless provided to the FBI.

The noted distance information is much more intrusive than simply providing a cell

site sector.  Knowing only the sector the aircard is accessing tells nothing about how far

away the aircard is from the sector.  The FBI relied upon the distance information as a

starting point of where to use its portable/transportable wireless device locators so if the

distance information is suppressed the subsequent searches and seizures relating to the FBI's

use of its own equipment become fruits of a prior illegal search and seizure.  The N.D.Cal.

08-90330MISC-RS order commanded that "Verizon Wireless... provide to agents of the FBI

data and information obtained from the monitoring of transmissions related to the location of

the [][aircard]," Dkt. #470-1 (order) at 2.  Now that the government has finally admitted to

receiving geolocation data from Verizon Wireless under the N.D.Cal. 08-90330MISC-RS

order, the defendant needs the data (contained in the Verizon Wireless communications) in

order to determine whether it was obtained outside the scope of what the order authorized.

[14]  Additionally, the precision of the geolocation data provided to the FBI by Verizon

Wireless under the N.D.Cal. 08-90330MISC-RS order will also bear upon the Fourth

Amendment analysis.  The defendant requests that the Court reconsider its order and find

that the requested Verizon Wireless communications are discoverable under Rule 16 and

should be disclosed despite any government claim of privilege.

In the alternative, if the FBI destroyed the Verizon Wireless communications

containing the newly identified geolocation data, the defendant is now prejudiced by the

FBI's destruction of evidence because he is unable to make scope violation arguments.  Due

to this prejudice, the defendant needs a copy of the "destroy the evidence" policy purportedly

relied upon by the FBI when it destroyed all evidence obtained under the N.D.Cal. 08-

90330MISC-RS order.  The defendant needs the policy to support his *Flyer* type suppression

---

14.    For example, Verizon Wireless could have obtained the geolocation data not from
"monitoring of transmissions" but through some other means.  The defendant has a right to
know how a search was executed and what was seized.

1   argument.  *See* Dkt. #723 at 28.  If the government destroyed the newly identified

2   geolocation data, the defendant requests that the Court reconsider its order and find that the

3   requested "destroy the evidence" policy is discoverable under Rule 16 and should be

4   disclosed despite any government claim of privilege.

5        **F.**   **Based on manifest error, the defendant requests that the Court**

6             **amend its order so that the government is required to place all**
          **withheld evidence on the sealed record for a proper appellate**

7             **review.**

8         It was manifest error for the Court to not require the government to placed all

9   withheld evidence on the sealed record making it available for a proper appellate review in

10  the event of an appeal.  Without the evidence being on the record, the Ninth Circuit will have

11  no way to determine if the defendant's need for the evidence outweighs the government's

12  need for concealment.  The defendant requests that the Court amend its order to require that

13  the government assemble and place on the sealed record all evidence being withheld based

14  on a claim of privilege.  This evidence should include all user manuals for the equipment

15  used to locate the aircard, unredacted versions of all documents requested by the defendant,

16  and all other withheld evidence listed in the defendant's *Motion For Discovery*, "Submission

17  Pursuant To LRCiv 37.1," (Dkt. #592-2).

18       **G.**   **Based on manifest error, the defendant requests that the Court**

19            **amend its order so that the government is required to place**
          **evidence on the sealed record showing the exact make and model of**
          **the equipment used to locate the aircard.**

20

21        It was manifest error for the Court to not require the government to place evidence on

22  the sealed record showing the exact make and model of the equipment used to locate the

23  aircard.  Based on an analysis of the wording contained in various documents currently on

24  the public record, the defendant determined that there is a very high probability that the

25  government did not inform the Court of the exact make and model of the equipment used to

26  locate the aircard.  There is no indication that the government identified the equipment at the

27  *ex parte* hearing regarding law enforcement privilege or placed evidence on the sealed record

28  identifying the equipment.  The Court's order at Dkt. #723 depends upon its finding that the

MOTION FOR RECONSIDERATION AND CLARIFICATION
OF THE COURT'S ORDER AT DKT #723
CR08-814-PHX-DGC

1   government did not reveal to the defendant the exact make and model of the equipment used

2   to locate the aircard.  The defendant has presented strong evidence showing that the

3   government did reveal the exact make and model of the equipment (*i.e.*, the Harris

4   StingRay).  If the government did in fact use the Harris StingRay then that needs to be on the

5   sealed record so that the defendant's claim is further substantiated.  Without the evidence

6   being on the record, the Ninth Circuit will have no way to determine if the underlying

7   reasoning for the Court's order is based on a factual fallacy.

8           **H.     Based on manifest error due to the Court not having all of the facts,
                     the defendant requests that the Court reconsider the portion of its
9                    order imposing page and time limitations upon the defendant for
                     his *Motion To Suppress*.**
10

11      The Court's order at Dkt. #723 states the following:

12          "The Court will require that Defendant file his Fourth Amendment
        motion to suppress by **February 17, 2012**.  The Court views this as a
13      reasonable deadline given Defendant's full-time access to a laptop computer
        and the fact that he already has largely completed relevant information and
14      constructed relevant legal arguments."  *Id.* at 30.

15          "Defendant's motion to suppress shall not exceed 50 pages in length.
        The Court imposes this page limitation because of Defendant's tendency to file
16      extremely long documents, such as his motion for production which exceeded
        100 pages.  Moreover, Defendant at one time suggested that his motion to
17      suppress could range up to 400 pages.  Fifty pages will allow Defendant ample
        opportunity to present all of his Fourth Amendment arguments."  *Id.* (footnote
18      omitted).

19      The defendant requests that Court reconsider its ruling that the defendant's *Motion To*

20   *Suppress* be limited to 50 pages and be completed within a six week period.[15]  The Court

21   determined that 50 pages would provide the defendant "ample opportunity to present all of

22   his Fourth Amendment arguments[]" without knowing the majority of the defendant's Fourth

23   _____

24   15.     The defendant assumes that the Court means 50 pages of arguments.  *See* LRCiv
     7.2(e)(1) ("Unless otherwise permitted by the Court, a motion including its supporting
25   memorandum, and the response including its supporting memorandum, each shall not exceed
     seventeen (17) pages, **exclusive of**... **any required statement of facts.**" (emphasis added)).
26   The technical facts relating to the government's aircard locating mission are extensive and
     the defendant is challenging **ten** different orders/subpoenas/warrants—ten times the amount
     of documents challenged in a conventional *Motion To Suppress*.  In order to prove various
27   technical claims by a preponderance of the evidence such as the FBI seizing data from the
     aircard's internal storage, deactivating encryption, writing data to the aircard via cell site
28   emulators, increasing signal power transmission, *etc.*, the defendant needs a thorough
     technical facts sections.

Amendment arguments—let alone **all** of them.  The Court made its decision based on an assumption that the full scope of the defendant's suppression arguments were outlined in the defendant's *Motion For Discovery* (Dkt. #592).  Considering the majority of the defendant's Fourth Amendment arguments have not been revealed to the Court or to the government, the Court's assumption regarding the scope of the defendant's arguments is incorrect.  The Court also seemingly made its decision based on a conclusion that the defendant would not need to make any "reasonable expectation of privacy," "legitimate possessory interest," or "Fourth Amendment search and seizure" arguments whatsoever in his *Motion To Suppress*.  *See* Section I(A), *supra*.  If the Court were to proceed under the conclusion that the government conceded (1) the defendant had a reasonable expectation of privacy in anything and everything, (2) the defendant had a possessory interest in anything and everything, and (3) any possible government action the defendant can prove by a preponderance of the evidence is a "Fourth Amendment search and seizure," then the 50 page limit would probably be enough room for the defendant to effectively present arguments **solely** on the issues raised in his *Motion For Discovery* (Dkt. #592).  However, the outcome of the governments concession discussed in Section I(A), *supra*, is unresolved and the issues raised at Dkt. #592 are not all of the defendant's Fourth Amendment arguments.

First, as the following table will represent, the defendant is challenging **ten different documents** upon which the government relied when conducting Fourth Amendment violations:

| # | Document Challenged Under Fourth Amendment | Related Arguments developed at Dkt. #592 |
|---|---|---|
| 1 | D.Ariz. Grand Jury subpoena No. 07-03-609 | NONE |
| 2 | D.Ariz. Grand Jury subpoena No. 07-03-615 | NONE |
| 3 | D.Ariz. 08-3286MB-LOA order | NONE |
| 4 | D.Ariz. 08-3298MB-LOA order | NONE |
| 5 | D.Ariz. 08-7273MB-LOA order | NONE |
| 6 | N.D.Cal. 08-90330MISC-RS order | SOME |

*MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURTS ORDER AT DKT #723*
*CR08-814-PHX-DGC*

| 7 | N.D.Cal. 08-90331MISC-RS order | MINIMAL |
| 8 | N.D.Cal. 08-70460-HRL search warrant **(original)** | NONE |
| 9 | N.D.Cal. 08-70460-HRL search warrant **(amended)** | NONE |
| 10 | D.Ariz. Grand Jury subpoena No. 07-03-709 | NONE |

As indicated above, the defendant's *Motion For Discovery* (Dkt. #592) only presented threshold arguments relating to the N.D.Cal. 08-90330MISC-RS and 08-90331MISC-RS orders and even those arguments were not complete or all inclusive.

Second, as the following table will represent, there are also numerous Fourth Amendment searches and seizures (relating to both withheld evidence and disclosed evidence) that the Court was not aware of when deciding the 50 page limit and six week time limit:

| # | Specific government action asserted to be a Fourth Amendment search and/or seizure | Relative Search and/or seizure Arguments developed at Dkt. #592 |
|---|---|---|
| 1 | Compelling Verizon Wireless to turn over historical cell site location information on the aircard. | NONE |
| 2 | Using aircard historical cell site location information to infer the location of the aircard inside apartment No. 1122. | NONE |
| 3 | Using triangulation and location signature techniques on the aircard historical cell site location information to narrow down the location of the aircard. | NONE |
| 4 | Compelling Verizon Wireless to turn over real-time cell site location information on the aircard. | NONE |
| 5 | Compelling Verizon Wireless to turn over 1.8 million aircard destination IP addresses containing communications content. | NONE |
| 6 | Compelling Quality Alarm Service to turn over electronic gate key access records for apartment No. 1122 containing geolocation information. | NONE |
| 7 | Having Verizon Wireless write data to the aircard via OTASP/OTAPA messages. | SOME |
| 8 | Forcing the aircard to connect to FBI cell site emulators. | MINIMAL |
| 9 | Writing data to the aircard via FBI cell site emulators. | NONE |

- 23 -

| 10 | Having Verizon Wireless reprogram the aircard via OTASP/OTAPA messages to respond to the FBI's denial-of-service attack. | NONE |
|---|---|---|
| 11 | Using the host laptop computer power source to facilitate its aircard locating mission and increasing transmission power of aircard signals. | SOME |
| 12 | Denying the aircard Internet access service on July 16, 2008 for much longer than a "brief" period. | SOME |
| 13 | Disabling standard signal encryption for aircard signals while it transmitted its ESN and other data. | NONE |
| 14 | Remotely accessing the aircard's hardware for the purpose of seizing the aircard's stored serial number (ESN). | NONE |
| 15 | Sending radio waves to the aircard instructing it to generate and transmit an abundance of signals that were subsequently seized. | NONE |
| 16 | Using a beam-forming antenna (*i.e.*, an electronic search beam) to send location finding interrogation signals into apartment No. 1122. | SOME |
| 17 | Using the aircard's location finding response signals to conduct triangulation techniques. | SOME |
| 18 | Search of apartment No. 1122 using door key allegedly seized from defendant upon his arrest. | NONE |
| 19 | Warrantless search of seized storage devices three years after original warrant issued and returned. | NONE |

The table above is not all inclusive of the arguments the defendant needs to develop.[16]  In addition to establishing that each listed action was a separate Fourth Amendment search and/or seizure, the defendant also needs to present companion arguments on (1) whether the defendant had a reasonable expectation of privacy and possessory interests in the claimed searched/seized places and/or objects,[17] (2) whether each of the government's Fourth Amendment searches and/or seizures was reasonable as a result of an adequate judicial authorization or exception to the warrant requirement, (3) whether a claim of "good faith"

---

16.    Additionally, for many of the actions listed in the table, whether the defendant needs to prove that each is a separate Fourth Amendment search and/or seizure remains unresolved. *See* Section I(A), *supra*.

17.    The issue of whether the defendant needs to present "reasonable expectation of privacy" and "possessory interests" arguments remains unresolved.  *See* Section I(A), *supra*.

1   entitles the government to a "free pass" for each of its otherwise unreasonable Fourth

2   Amendment searches and/or seizures, and (4) whether suppression is an adequate remedy for

3   each of the government's unreasonable Fourth Amendment searches and/or seizures.  Most of

4   the needed companion arguments have either not been developed at all in the defendant's

5   *Motion For Discovery* (Dkt. #592) or they are only minimally developed.

6       The defendant is also raising numerous challenges to the N.D.Cal. 08-70460-HRL

7   search warrant and underlying affidavit such as (1) the warrant was invalid as a matter of law

8   due to it being returned prior to execution, (2) the warrant contained a reckless omission

9   under *Franks*, (3) the government exceeded the scope of the warrant, (4) crucial facts in

10  support of the affidavit lacked a temporal reference point, and (5) the warrant affidavit

11  lacked probable cause to search apartment No. 1122.  Similar to the other previously

12  undisclosed arguments, the Court was not aware of any of the above when it decided a 50

13  page limit and six week time limit for the defendant's *Motion To Suppress*.

14      The defendant does not plan to file a 400 page motion as previously theorized.  His

15  previous estimate was based on an intention to outline all the possible ways that the

16  government may have located the aircard so that he could argue how each of those scenarios

17  violated the Fourth Amendment and requires suppression.[18]  The defendant has abandoned

18  his previous plan and has instead settled on asserting the most likely scenario rather than

19  every scenario.  Although this will negatively impact the defendant's defense, it will make

20  his filings shorter for the Court.  The defendant does not strive to file lengthy motions.

21  Instead, he strives to cover every point so that his arguments are successful.  The defendant

22  understands that long filings take up a lot of the Court's time while numerous other people

23  also require the Court's attention.  However, the Court's limited time and resources should

24  not be a reason to force the defendant to sacrifice most of his Fourth Amendment arguments

25  (many of which the Court is only now being made aware of) and, in effect, turn the

26  defendant's Fourth Amendment defense into a crap shoot.  Likewise, the time restraints will

27  _____

28  18.    This strategy was based on the fact that the government is withholding all evidence
    related to its portable/transportable wireless device locators making it nearly impossible for
    the defendant to figure out exactly what occurred during the aircard locating mission.

1  also result in the defendant having to abandon the majority of his Fourth Amendment

2  arguments.  There are numerous reasons as to why six weeks is not enough time for the

3  defendant to finish his *Motion To Suppress*:

4        1.      The defendant has to establish his own set of facts in light of the government

5  withholding evidence and it will take more than six weeks to fully research and prove

6  various technical claims such as (1) the FBI writing data to the aircard via its cell site

7  emulators,[19] (2) the FBI increasing transmission power of aircard signals to a maximum

8  degree, (3) the FBI denying the aircard Internet access service on July 16, 2008 for much

9  longer than a "brief" period, (4) the FBI disabling standard signal encryption for aircard

10  signals while it transmitted its ESN and other data, (5) the FBI remotely accessing the

11  aircard's hardware for the purpose of seizing the aircard's stored serial number (ESN),  (6)

12  the FBI sending radio waves to the aircard instructing it to generate and transmit an

13  abundance of signals that were subsequently seized, and (7) the FBI having Verizon Wireless

14  reprogram the aircard via OTASP/OTAPA messages to respond to the FBI's denial-of-service

15  attack.  Other than Nos. 2 and 3, none of these matters were addressed or even known to the

16  Court at the time it issued its order at Dkt. #723.

17        2.      Between October 6, 2011, and December 16, 2011, the government provided

18  the defendant with 1,621 pages of discovery.  Some of this discovery is relevant to the

19  defendant's *Motion To Suppress* and is even cited in this motion.  Considering the

20  government continues to provide the defendant with discovery 41 months after his arrest, the

21  defendant will need more than six weeks to prepare his *Motion To Suppress*.

22        3.      The defendant is yet to gain access to the seized storage device drive images.

23  Although the government has provided the hard drives to the defense, CCA-CADC refused

24  to allow the defendant's court-appointed paralegal, Mark Horne, to bring the drives into the

25  CCA-CADC visitation area for legal visits.  The defendant is still working with CCA-CADC

---

27  19.    The FBI writing data to the aircard using its own cell site emulators is completely
separate from Verizon Wireless writing data to the aircard using OTASP and OTAPA.  The
28  two separate acts have different Fourth Amendment implications due to how the
authorizations are construed in the N.D.Cal. 08-90330MISC-RS order.

MOTION FOR RECONSIDERATION AND CLARIFICATION
OF THE COURT'S ORDER AT DKT #723
CR08-814-PHX-DGC

1  to cut through all the red tape in order to have approval for Mr. Horne to bring the drives

2  with him when he visits the defendant.

3      4.   The defendant does not have a runner service as the Court asserts.  There is no

4  one willing to drive all the way to CCA-CADC just to get paid for travel time.

5      5.   The defendant is not receiving assistance from anyone who has experience in

6  cdma2000 1xEV-DO cellular protocols such as IS-856 and IS-878[20]—experience that is

7  needed if the government plans to contest any of the defendant's technical claims either with

8  or without privilege evidence.  It is extremely relevant and important that either the

9  defendant or someone on his defense understand the noted protocols to a degree where the

10  defendant's *Motion To Suppress* will adequately explain (1) how the FBI wrote data to the

11  aircard via its cell site emulators, (2) how the FBI increased transmission power of aircard

12  signals to a maximum degree, (3) how the FBI denied the aircard Internet access service on

13  July 16, 2008 for much longer than a "brief" period, (4) how the FBI disabled standard

14  signal encryption for aircard signals while the aircard transmitted its ESN and other data, (5)

15  how the FBI remotely accessed the aircard's hardware for the purpose of seizing the aircard's

16  stored serial number (ESN),  (6) how the FBI sent radio waves to the aircard instructing it to

17  generate and transmit an abundance of signals that were subsequently seized, and (7) how

18  the FBI had Verizon Wireless reprogram the aircard via OTASP/OTAPA messages to respond

19  to the FBI's denial-of-service attack.  The government denies all of the above and will likely

20  attempt to submit an expert to falsely claim that the defendant is incorrect.

21      6.   Although the defendant has access to a laptop at CCA-CADC, he does not

22  have access to the Internet or to any databases containing information other than a

23  substandard LexisNexis CD system accessible from a book reader separate from his laptop.

24  The defendant has to rely on members of his defense to obtain the resource the defendant

25  requests.  Considering members of the defense know nothing about cdma2000 1xEV-DO

26  cellular protocols, geolocation techniques, electronic intrusions, *etc.*, the process of receiving

27

28

---

20.   The defendant has submitted an *ex parte* motion to remove his surveillance expert because he has not assisted the defendant in relevant areas due to a lack of knowledge and unwillingness to learn.

needed research material is a very time consuming process.  Typical research is conducted as follows: Someone other than the defendant will run a web based search according to the defendant's instructions and then mail or bring the defendant a paper print-out of the search results.  The defendant then circles (with a pen) the next links he wants to go to and returns the paper to his defense.  Someone other than the defendant then visits the links the defendant circled, prints out the pages located at the links, provides those pages to the defendant, and the process is continually repeated.  This process has been going on for about two years.  Sometimes the defendant waits over a month to receive technical resources that would take him literally 30 seconds to obtain if he searched for them himself.  Similar problems exist with case law research.  Given the novel issues involved, a lot of the cases the defendant needs in support of his *Motion To Suppress* are too new to be available at CCA-CADC as they update their case law database, at best, once a year.

7.     Six weeks is not enough time for the defendant to draft ten suppression motions in one.[21]

8.     Because the federal government takes too long to pay vouchers, members of the defendant's defense refuses to purchase certain items the defendant needs in order to prepare his defense—despite the fact that the Court already approved funding for the purchases.  Due to a lack of required resources, it takes the defendant an extremely long time to redact documents for exhibits.  In order to do redactions, the defendant needs to convert each PDF file page into an editable image file, draw on the image file, convert the images back to PDF, and then assemble the independent PDF files into a single PDF file—all the while having to jump through numerous hoops to ensure that the resulting PDF file is not so large that it cannot be uploaded to PACER.

9.     Being provided with the time needed to prepare his *Motion To Suppress* is more important to the defendant than getting to trial sooner than later.

If the defendant is not permitted the space and time to challenge all of the identified

---

21.    As noted above, the defendant is challenging ten different documents upon which the government relied while violating the Fourth Amendment.

Fourth Amendment violations (*see* table above and Section I(A), *supra*) then it will be a violation of the defendant's Fifth Amendment due process rights and First Amendment right to access the courts.  If the defendant is constrained to 50 pages and six weeks time then he will essentially have to throw all of the Fourth Amendment violations into a hat and then draw out just few to present in order to comply with the Court's order at Dkt. #723.  As a result, the majority of the defendant's Fourth Amendment challenges will never be placed on the record and, if the defendant's "crap shoot" *Motion To Suppress* is denied and the defendant convicted at trial, those omitted Fourth Amendment arguments will never be addressed on appeal.  Therefore, the defendant requests that the Court amend its order in the manner listed in Section II(H), *infra*.

## II.   **CONCLUSION**

Based on the points and authorities set forth herein, the defendant respectfully requests that this motion be granted and that the Court amend its order at Dkt. #723 as follows:

### 1.   **Relating to Section I(B).**

1.       Require the government to disclose **all** evidence found to be discoverable under Rule 16 based on the reasoning that the government has already informed the defense of the the precise device used to locate the aircard.

### 2.   **Relating to Section I(C).**

2.       Require the government to disclose **all** evidence found to be discoverable under Rule 16 based on *Amici* reasoning that information on how to make a StingRay and defeat a StingRay (for $20) is already publicly known.

### 3.   **Relating to Section I(D).**

3.       Find that all evidence listed in the defendant's *Motion For Discovery,* "Submission Pursuant To LRCiv 37.1," § F, p. 12-14 (Dkt. #592-2) is discoverable under Rule 16 based on the reasoning that other Rule 16 evidence is contained in the requested user manuals, test data, related software, and other § F (Dkt. #592-2) listed evidence.

4.       Despite the government's claim of privilege, require that the government

disclose all evidence listed in the defendant's *Motion For Discovery*, "Submission Pursuant To LRCiv 37.1," § F, p. 12-14 (Dkt. #592-2) based on the reasoning in Section I(B) and (C), *supra*.

### 4.   Relating to Section I(E).

5.   Require the government to disclose all communication between Verizon Wireless and the FBI relating the aircard locating mission based on the reasoning that it contains the newly identified geolocation data.

6.   In the alternative, if the FBI destroyed the Verizon Wireless communications containing the newly identified geolocation data, require the government to disclose the "destroy the evidence" FBI policy relied upon by the FBI technical agents when they destroyed the data based on the reasoning that the defendant's defense is now prejudiced.

### 5.   Relating to Section I(F).

7.   Require the government to assemble and place on the sealed record **all** evidence being withheld due to a claim of privilege based on the reasoning that the evidence should be made available for a proper appellate review.

### 6.   Relating to Section I(G).

8.   Require the government to place evidence on the sealed record showing the exact make and model of the equipment used to locate the aircard based on the reasoning that the Ninth Circuit will have no way to determine if the underlying reasoning for the Court's order is based on a factual fallacy.

### 7.   Relating to Section I(H).

This section is written from the Court's perspective for the sake of simplicity in wording:

9.   The defendant will prepare his motion using an amount of pages that he believes is required in order to raise all valid Fourth Amendment challenges.

10.   Once the defendant finishes his motion, he will work with his Shadow Counsel, Philip Seplow, and his paralegal, Mark Horne, to refine and shrink the motion as much as possible.

*MOTION FOR RECONSIDERATION AND CLARIFICATION OF THE COURTS ORDER AT DKT #723*
*CR08-814-PHX-DGC*

MOTION FOR RECONSIDERATION AND CLARIFICATION
OF THE COURTS ORDER AT DKT #723
CR08-814-PHX-DGC

11.     Once the defense has the absolute shortest motion possible, the defendant will file a motion for leave to file the motion and attach the proposed motion for the Court's review.

12.     The Court will review the motion and make a determination on whether it is excessive in length, or otherwise a waste of space.

13.     If the motion is adequately refined and limited for addressing all the valid arguments raised by the defendant then the Court will allow the motion to be filed.

14.     If the motion is not adequately refined and if the Court finds it to be excessive, the Court will identify which entire sections the defendant should delete from his motion.

15.     The defendant will delete the sections identified by the Court and file the amended version of the motion as the defendant's *Motion To Suppress*.

16.     The original unedited motion will remain on the record so that, in the event of a later appeal, the defendant will be able to raise arguments to the Ninth Circuit as to why he thinks the Court erred in requiring that he delete some of his Fourth Amendment arguments in order to meet a page limitation requirement.

17.     The defendant will be provided with the time he needs to complete his *Motion To Suppress*, *i.e.*, longer than six weeks.

The defendant also requests that the Court provide clarification on the issues raised in Section I(A), *supra*.

This motion was drafted and prepared by the *pro se* defendant, however, he authorizes his shadow counsel, Philip Seplow, to file this motion and all attachments on his behalf using the ECF system.  The defendant is appearing *pro se* and has never attended law school.  The defendant's filings, however inartfully pleaded, must be liberally construed and held to less stringent standards than formal pleadings drafted by lawyers.  *See* Haines v. Kerner, 404 U.S. 519, 520 (1972).

LRCrim 12.2(a) requires that the undersigned include the following statement in all motions: "Excludable delay under 18 U.S.C. § 3161(h)(1)(D) will occur as a result of this motion or of an order based thereon."

- 31 -

1    Respectfully Submitted:

2

3                                           PHILP SEPLOW, Shadow Counsel, on

4                                           behalf of DANIEL DAVID RIGMAIDEN,<br>                                          Pro Se Defendant:

5

6                                           s/ Philip Seplow

7                                           Philip Seplow<br>                                          Shadow Counsel for Defendant.

8

9    ///

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

26    ///

27    ///

28    ///

*MOTION FOR RECONSIDERATION AND CLARIFICATION*
*OF THE COURTS ORDER AT DKT #723*
*CR08-814-PHX-DGC*

**CERTIFICATE OF SERVICE**

I hereby certify that on:                    I caused the attached document to be electronically transmitted to the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Taylor W. Fox, PC
Counsel for defendant Ransom Carter
2 North Central Ave., Suite 735
Phoenix, AZ 85004

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Peter S. Sexton
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

James R. Knapp
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

By: s/ Daniel Colmerauer
(Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))