Daniel Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132
Telephone: none
Email: none

Daniel David Rigmaiden
Pro Se, Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR08-814-PHX-DGC |
| Plaintiff, | MEMORANDUM REGARDING IMAGING THE AIRCARD |
| v. | |
| Daniel David Rigmaiden, et al., | |
| Defendant. | |

Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits this *Memorandum Regarding Imaging The Aircard*.  The defendant is filing this memorandum to provide information to the Court and to the government regarding the aircard data retrieval discussed in the defendant's motions at Dkt. #597 and #735 and discussed at the January 27, 2012 status conference.

## I.    INFORMATION

### A.    Can data be written to an aircard by Verizon Wireless?

During the January 27, 2012 status conference, AUSA Battista indicated that he would "look into the possibility whether or not on an independent matter it's even possible for the information -- any type of information to be written onto the air card."[1]  The defense has looked into this matter and determined that information can be written to the aircard.  The

---

1.    *January 27, 2012 Status Conference, Partial Transcript of Proceedings* [MR. BATTISTA], p. 7-8.

1. aircard is a type of wireless device referred to as an "Access Terminal."[2]  Every Access

2. Terminal has one or more internal electronic storage devices in the form of either an

3. integrated memory chip or Removable User Identity Module (R-UIM).  A section of the

4. Access Terminal's internal storage is called the Number Assignment Module (NAM)[3] used

5. to store a copy of the Electronic Serial Number (ESN) and the Mobile Identification Number

6. (MIN).[4]  In addition to storing the ESN and MIN, the NAM also stores other numeric

7. indicators and parameters used for Access Terminal operation.[5]  For example, among other

8. categories of data, each Access Terminal NAM also stores: (1) the Preferred Roaming List,

9. [6] (2) the Extended Preferred Roaming List,[7] (3) Shared Secret Data (SSD),[8][9] and (4)

10. manufacturer-specific NAM parameters.[10]  The numeric indicators and parameters stored

---

11,12. 2.    The aircard is a "UTStarcom PC5740 Broadband Connection Card For Verizon Wireless."  *See* EXHIBIT 11 of *I*st *Consolidated Exhibits* (Dkt. #587-1) (government web research on aircard).

13,14. 3.    *See* CTIA [website], Glossary of Terms C-D, http://www.ctia.org/media/industry_info/index.cfm/AID/10321 (last accessed: Aug., 30, 2011) ("NAM (Number Assignment Module): The NAM is the electronic memory bank in the wireless phone that stores its specific telephone number and electronic serial number.").

15,16,17. 4.    *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 1.2.1, p. 1.3 ("Mobile Identification Number (MIN).  The 34-bit number that is a digital representation of the 10-digit number assigned to a mobile station."); *compare also id.* ("Mobile Directory Number.  A dialable directory number which is not necessarily the same as the mobile station's air interface identification, *i.e.*, MIN, IMSI_M or IMSI_T.").

18,19. 5.    *See id.*, § 3.1, p. 3.1 ("The NAM indicators are parameters that can be assigned values using Over-the-Air Service Provisioning are specified in 4.5.2, 4.5.3, 4.5.4 and 4.5.6.").

20,21. 6.    *See id.*, § 4.5.3, p. 4.38 *et seq.* (explaining the NAM Preferred Roaming List and Extended Preferred Roaming List parameter blocks); *id.*, § 3.5.5, p. 3.93 (Explaining the Preferred Roaming List and Extended Preferred Roaming List stored on the NAM).

21. 7.    *See* fn. 6, *supra*.

22,23,24,25. 8.    *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 3.1, p. 3.1 ("The standard NAM indicators, stored in the mobile station's permanent and semi-permanent memory, are defined in F.3 of [1, 7]." (referring to TIA-2000.5-D));  *See* TIA-2000.5-D, *Upper Layer (Layer 3) Signaling Standard for cdma2000 Spread Spectrum Systems*, Annex F, § F.3, p. F.4 (Listing A-Key, Shared Secret Data A, and Shared Secret Data B as NAM indicators.).

26,27. 9.    *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 3.5.8.14, p. 3.158 ([RE: reverse link] HRPD Access Authentication CHAP SS Parameters); *id.*, § 4.5.7.10, p. 4.56 ([RE: forward link] HRPD Access Authentication CHAP SS Parameters).

28. 10.    *See id.*, § 3.1, p. 3.1 ("Manufacturer-specific NAM parameters may be defined within a Parameter Block Type reserved for manufacturer-specific parameter definitions." (internal

on the NAM can be updated by the wireless carrier by writing and/or deleting data on the NAM via Over-the-Air Parameter Administration (OTAPA)[11]—a component of Over-the-Air Service Provisioning (OTASP).  OTASP is the process of reading,[12] writing,[13] and/or deleting[14] data to/from the internal storage device (*e.g.*, NAM) of an Access Terminal using commands sent by the Access Network (*i.e.*, the cell site)[15] to the Access Terminal over the air interface (*i.e.*, from the cell tower antenna to the Access Terminal).[16]  OTASP "allows a potential wireless service subscriber to activate (*i.e.*, become authorized for) new wireless service, and allows an existing wireless subscriber to make changes in existing services without the intervention of a third party [(*i.e.*, physical access to the user's device by a human)]."[17]  OTASP can be initiated by either the Access Terminal or Access Network.[18]  When initiated by the Access Network, the wireless carrier conducts Over-the-Air Parameter Administration (OTAPA)[19] to update the NAM or other operational parameters in the

---

table references omitted)).

11.   *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Parameter Administration (OTAPA).  Network initiated OTASP process of provisioning mobile station operational parameters over the air interface.").

12.   *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 3.5, p. 3.48 *et seq.* (explaining the data sent to Access Networks by Access Terminals via reverse link messages during OTASP).

13.   *See id.*, § 4.5, p. 4.9 *et seq.* (explaining the data sent to Access Terminals by Access Networks via forward link messages during OTASP).

14.   *See id.*

15.   The term "Access Network" is the proper term used to refer to a "cell site" or "cell tower" in the context of a 1xEV-DO data network—the type of network compatible with the aircard involved in the present case.

16.   *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Service Provisioning (OTASP).  A process of provisioning mobile station operational parameters over the air interface.").

17.   *See* Telecommunications Industry Association, TIA-41.000-E-4[E], *Introduction to Mobile Application Part (MAP)* (Arlington, VA: Sept. 2007), § 3.1, p. 000.22.

18.   TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 3.2, p. 3.2 ("Over-the-air service provisioning (OTASP) can be initiated in two ways: by the user and by the network.").

19.   *See id.*, § 1.2.1, p. 1.4 ("Over-the-Air Parameter Administration (OTAPA). Network initiated OTASP process of provisioning mobile station operational parameters over the air interface."); *id.* § 3.2, p. 3.2 ("The network-initiated procedure... is also built upon the over-the-air programming protocol and procedures that support the OTASP feature.").

1  Access Terminal over-the-air.[20]  "OTAPA sessions are initiated autonomously by the

2  network, and proceed without any subscriber involvement or knowledge and with no

3  limitation on the subscriber's ability to receive telecommunications services."[21]

**B.  How will the case benefit from obtaining stored data contained on the aircard?**

6  An analysis of technical standards positively confirms that the FBI needed Verizon

7  Wireless to write data to the aircard and reprogram the aircard via OTAPA in order to

8  facilitate the FBI's aircard locating mission.  First, in order to locate the aircard, Verizon

9  Wireless needed to update the aircard's Preferred Roaming List so that it would recognize the

10  FBI's emulated cell sites as authorized cellular networks.  Second, in order to cause the

11  aircard to respond to the FBI's surreptitious phone calls, Verizon Wireless needed to update

12  the aircard's manufacturer-specific NAM parameters, or update the baseband processor

13  software, so that the aircard would not simply ignore 1xRTT paging signals generated in

14  response to ordinary phone calls.[22]  Therefore, the primary data the defendant seeks to

15  retrieve and analyze is (1) all data stored on the aircard's NAM, *e.g.*, Preferred Roaming List,

16  Extended Preferred Roaming List, and manufacturer-specific NAM parameters; and (2) the

17  baseband processor software/firmware.[23]

18  Although the government does not flat out deny that Verizon Wireless wrote data to

19  the aircard and reprogrammed the aircard, it does maintain the position that the FBI had no

20  knowledge, and currently has no knowledge, of any such action taken by Verizon Wireless.

---

20.   *See id.* § 3.2, p. 3.2 ("OTAPA provides a tool for the wireless service provider to update NAM indicators and parameters.").

21.   *See* TIA-41.000-E-4[E], *Introduction to Mobile Application Part (MAP)*, § § 3.1, p. 000.21.

22.   Under a standard configuration, the aircard has no telephone capabilities.  *See, e.g.*, <u>EXHIBIT 13</u> of *1st Consolidated Exhibits* (Dkt. #587-1) (on June 26, 2008, FBI Agent Murray was advised by Verizon Wireless that the aircard does not have telephone capabilities).

23.   The baseband processor software/firmware is not stored within the NAM but in some other unknown area within the aircard.  The information the defense needs in order to figure out where and how to get to the baseband processor software/firmware was requested through a subpoena that the Court denied.  *See June 6, 2012 ORDER* denying [614] Motion for Subpoena to Verizon Wireless FURTHER denying [616] Motion for subpoena to UTStarcom FURTHER denying [643] Supplemental Motion for Subpoenas to Verizon, Harris and UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

1  In response to the defendant's *Motion To Suppress*, the defendant anticipates that the

2  government will deny that Verizon Wireless wrote data to the aircard and reprogrammed the

3  aircard.[24]   Therefore, it is beneficial if all data is extracted from the aircard for analysis.

4  However, there is a possibility that after the aircard was located by the FBI, Verizon Wireless

5  restored the aircard's original configuration through a subsequent OTAPA session.  If Verizon

6  Wireless restored the aircard's original configuration after the aircard locating mission, the

7  data the defendant seeks to retrieve would have been overwritten and is now lost.  Therefore,

8  imaging the aircard will result in two possible outcomes: (1) if the sought after data was not

9  overwritten, an analysis of the retrieved data will confirm that the FBI had Verizon Wireless

10 write data to the aircard and reprogram the aircard; or (2) if the sought after data was

11 overwritten, the data will be unavailable for analysis and no insight will be provided on

12 whether the FBI had Verizon Wireless write data to the aircard and reprogram the aircard.

13
   **C.      Methods for retrieving data from a storage device contained within
14            an Access Terminal (*e.g.*, smart phone, aircard, *etc.*).**

15          During the January 27, 2012 status conference, AUSA Battista indicated that he would

16 "ask [][his] experts and see if it's possible [to image the aircard] and then communicate with

17 the defendant about that, how he would like to proceed."[25]   The defense has looked into

18 this matter and determined that various methods can be used to retrieve information from an

19 aircard—whether a full image or otherwise.[26]   In order to understand how data may be

20 retrieved from an aircard, it is beneficial to first address the task in terms of an Access

21 Terminal in the form of a smart phone.  Product documentation from Oxygen Software, a

22 maker of smart phone forensic software, discusses three ways to obtain information from

23 smart phones: (1) logical analysis, (2) physical analysis, and (3) analysis using agent

24 _____

25 24.     The defendant has this anticipation because (1) the government does not have much
   left to argue than to deny the defendant's factual claims, and (2) it is a logical transition for
   the government to go from "no knowledge" to "did not happen."

26 25.     *January 27, 2012 Status Conference, Partial Transcript of Proceedings* [MR.
   BATTISTA], p. 5.

27 26.     The Court had asked if an aircard could be imaged in the same way that a computer
28 may be imaged.  The short answer is that an aircard can be imaged but not in the same
   simplistic way that a computer hard drive is imaged.

application.[27]   Although the Oxygen PDF does not directly explain "logical analysis," it probably means connecting the smart phone to a computer and using software to pull data from the phone such as the address book, tasks, and messages.[28]   Such a "logical analysis" would involve connecting a USB cable from the smart phone to a computer and using some type of standard synchronization protocol such as SyncML (used to sync a computer to a phone and vise versa) to read data from the smart phone.   In contrast, the noted "analysis using agent application" refers to Oxygen's software "app" which is installed on the smart phone and used to access additional stored information not available through a "logical analysis."[29]   However, even Oxygen's software is incapable of extracting "Memory dumps and protected system files"[30]—which is another way of saying that "analysis using agent application" is incapable of imaging a smart phone.   However, even if a "logical analysis" or "analysis using agent application" could conduct memory dumps and access protected system files, the memory and files discussed by Oxygen probably do not relate to the NAM or to the baseband processor and likely only relate to the smart phone operating system (*e.g.*, Android, BlackBerry OS, LiMo, iOS, *etc.*) which has very little relation to the operations of the baseband processor.[31]

---

27.   *See* Oxygen Software, *Mobile forensic analysis for smartphones*, PDF presentation provided at ISS World Europe 2008, *available at* http://wikileaks.org/spyfiles/files/0/34_200810-ISS-PRG-OXYGEN.pdf (last accessed: Mar. 5, 2012); *see also* EXHIBIT 01 (PDF attached).

28.   The explained "logical analysis" would **not** be considered "imaging" the device in the same way an investigator typically takes a bit-for-bit image of an entire computer hard drive.

29.   The explained "analysis using agent application" would **not** be considered "imaging" the device in the same way an investigator typically takes a bit-for-bit image of an entire computer hard drive.

30.   *See* Oxygen Software, *Mobile forensic analysis for smartphones*, p. 9; *see also* EXHIBIT 01 (PDF attached).

31.   It has been suggested that hacking techniques and a sophisticated "app"—possibly one that conducts an "analysis using agent application"—could gain access to the baseband processor and related storage devices.   *See* Kravets, David, *iPhone Jailbreaking Could Crash Cellphone Towers, Apple Claims | Threat Level | Wired.com*, http://www.wired.com/threatlevel/2009/07/jailbreak/ (last accessed: Feb. 12, 2012) ("The company's filing explained that jailbreaking could allow hackers to alter[] the iPhone's BBP — the 'baseband processor' software, which enables a connection to cell phone towers."). However, such a feet has never been publicly disclosed and the Oxygen product does not have such a capability.

In the case of an aircard based Access Terminal, the solution is even more complex because there is no operating system to run "apps" or to facilitate the storage of files such as an address book.  Because an aircard does not store files in the way that a smart phone stores files, there is no need to "sync" files stored on an aircard to files stored on a computer.  In other words, there is no way to use a "logical analysis" (by exploiting a sync function) or an "analysis using agent application" (by installing an "app") to retrieve any type of data from an aircard—whether it be a full data image or otherwise.  Other than for the alternative discussed in Section I(C)(1), *infra*, in order to obtain *any* data from an aircard (full image or otherwise), a "physical analysis" must be conducted.  Such an analysis would require (1) figuring out where in the aircard the sought after data is "physically" stored, (2) taking the aircard apart and accessing the located storage device(s) (*i.e.*, memory chip(s)), (3) extracting the stored data from the memory chip(s) with a standard chip reader, and (4) reading and displaying the data in an intelligible format.  An experienced electrical engineer could easily and quickly complete the task if he/she had access to the information the defendant **attempted** to subpoena from UTStarcom (the manufacturer of the aircard involved in the present case).[32][33]  However, as explained in the proceeding subsection, there is one alternative to a full fledged "physical access" imaging (*i.e.*, taking the aircard apart) that may act to solve the complex problem.  Unfortunately, even the alternative requires inside information from either UTStarcom, Verizon Wireless, or both.

### 1. The needed NAM parameters may be obtainable via a new OTAPA session conducted from an emulated Access Network.

As previously explained, the FBI had Verizon Wireless write data to the aircard's

---

32.     The Court denied the defendant's request to have the UTStarcom subpoena issued. *See June 6, 2012 ORDER* denying [614] Motion for Subpoena to Verizon Wireless FURTHER denying [616] Motion for subpoena to UTStarcom FURTHER denying [643] Supplemental Motion for Subpoenas to Verizon, Harris and UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

33.     It is *not* impossible for an electrical engineer to conduct a "physical analysis" of the aircard without the technical documentation in the possession of UTStarcom.  However, without the technical documentation the defendant attempted to subpoena, the number of engineers capable of conducting the analysis would be decreased and the analysis itself would be more expensive and labor intensive.

1  NAM via radio waves sent from a cell tower to the aircard (*i.e.*, an OTAPA session).  An

2  OTAPA session can also be used to read data from an Access Terminal NAM.  In order to

3  read data from a specific NAM, the Access Network (*i.e.*, the cell tower) transmits a

4  Configuration Request Message to the Access Terminal.[34]  In response to the Configuration

5  Request Message, the Access Terminal transmits a Configuration Response Message

6  providing the Access Network with its stored NAM parameters.[35]  The model of aircard

7  involved in the present case has an external antenna connector located under the plastic

8  casing.  The connector is not meant for use with an external antenna but for direct interfacing

9  with an emulated Access Network for testing purposes.  In a test environment, an emulated

10  Access Network can be plugged directly into the aircard via the noted connector.  Once

11  plugged in, and once the aircard and emulated Access Network are powered on, the emulated

12  Access Network can send the aircard commands (such as the noted Configuration Request

13  Message) in the same way that an actual Access Network (*i.e.*, cell tower) would send

14  commands over the air interface.  The type of emulated Access Network needed is not a

15  StingRay or similar surveillance device but a device used by radio engineers to test wireless

16  devices.  Once the aircard is connected to the emulated Access Network via the noted

17  connector, an OTAPA session can be initiated and the aircard's stored NAM parameters can

18  be downloaded.[36]  As discussed below, there are various issues that may arise if attempting

19  such a endeavor.

20

21

---

22  34.     *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread
23  Spectrum Systems*, § 3.3.1, p. 3.12-3.13.

24  35.     *See id*.

25  36.     Depending on UTStarcom's design, the noted connector may also be used to interface
with other types of hardware (such as a conventional computer) that may be capable of
downloading all stored data contained on the aircard including the NAM, baseband processor
26  software/firmware, and everything else (*i.e.*, a full image) using a method not publicly
known.  However, the defendant's request to obtain technical information on the aircard from
27  UTStarcom was denied by the Court so these issues remain a mystery.  *See June 6, 2012
ORDER* denying [614] Motion for Subpoena to Verizon Wireless FURTHER denying [616]
28  Motion for subpoena to UTStarcom FURTHER denying [643] Supplemental Motion for
Subpoenas to Verizon, Harris and UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

### a. If done incorrectly, powering on the aircard may cause stored data to be deleted or written over.

If the aircard is powered on for the purpose of connecting to an emulated Access Network, it may not use the antenna connector interface and may search for actual Access Networks (*i.e.*, cell sites in the area) over the air interface.  There may be certain leads within the aircard that need to be bridged, or some other unknown process executed, in order for the aircard to be instructed to access the emulated Access Network via the antenna connector instead of using its built-in antenna to seek out actual Access Networks.  If the aircard detects an actual Access Network instead of interfacing with the emulated Access Network, it may eventually receive current date/time information.  This may be a problem because some wireless devices are designed to delete certain stored data if the device has not been powered on for a certain amount of time.[37]  Additionally, if the aircard accesses the actual Access Network for a long enough period, it may write new data to the aircard's NAM that will overwrite the data sought to be retrieved.

In order to avoid the data deletion issue, full technical documentation on the aircard would need to be obtained (in order to learn how to make the aircard interface with the antenna connector instead of the built-in antenna) **or** the emulated Access Network would need to be used inside a Faraday cage—a metal cage designed to prevent radio signal from entering the confines of the cage.  If used inside a Faraday cage, an engineer can simply use the emulated Access Network to access the aircard over the air interface (*i.e.*, via radio waves).[38]  If the air interface is used, as apposed to the external antenna connector interface, technical data *may not* be needed from UTStarcom in order to obtain **only** the

---

37.    Once powered on, the aircard may compare its last stored date/time to the current date/time and determine that certain data is no longer current and needs to be deleted or overwritten.

38.    Because the aircard will be in a Faraday cage, it will be blocked from accessing any real Access Networks that may be within range of the test environment.  Therefore, use of the external antenna connector can be avoided and the engineer can just operate the emulated Access Network over the air interface while the aircard uses its built-in internal antenna.

MEMORANDUM REGARDING IMAGING THE AIRCARD
CR08-814-PHX-DGC

1  stored NAM parameters.[39][40]  Under either interface scenario, the date/time provided to

2  the aircard by the emulated Access Network would need to be set to shortly after the

3  date/time the aircard was last turned off.  This way, if applicable, the aircard will be tricked

4  into believing that all of its stored data (that may be subject to deletion) is fairly current.

5  6  **b.  In order to access the aircard's NAM using an emulated Access Network, the aircard's stored Shared Secret Data will likely be needed.**

7  There are protections in place that prevent unauthorized access to an Access

8  Terminal's stored NAM parameters.  Prior to reading, writing, and/or deleting data to/from an

9  Access Terminal NAM, the  Access Network must first complete SPC/SPL and SPASM

10  security procedures to unlock and gain access to the NAM.  The Service Programming Code

11  (SPC)[41] and Service Programming Lock (SPL) parameter[42] contained on the NAM

12  "prevents the over-the-air provisioning of certain mobile station parameters by an

13  unauthorized network entity."[43]  The SPL parameter contains the SPC, taking a numeric

14  value of 1 to 999,999,[44] "used for unlocking the mobile station parameters for

15  programming or reprogramming."[45]  Due to the weak security of the SPC/SPL

16  "combination lock" type mechanism,[46] an Access Terminal NAM also uses the Subscriber

17

18  39.    However, obtaining any data from the aircard using an OTAPA session that is not specifically defined in publicly available technical standards will require inside information from UTStarcom.  For example, in order to retrieve the data discussed in footnote No. 36 (if possible), inside information would be needed from UTStarcom.

20  40.    Even if inside technical information is not needed from UTStarcom, inside information from Verizon Wireless would likely be needed, *i.e.*, the aircard's Shared Secret Data.  *See* Section I(C)(1)(b), *infra*.

22  41.    *See* TIA-683-D, *Over-the-Air Service Provisioning of Mobile Stations in Spread Spectrum Systems*, § 1.2.1, p. 1.5 ("Service Programming Code (SPC).  A secret code assigned to the mobile station and known to the authorized network entity.")

24  42.    *See id.* ("Service Programming Lock (SPL). A protection provided for preventing the over-the-air provisioning of certain mobile station parameters by unauthorized network entity by way of verifying the Service Programming Code (SPC).").

25  43.    *Id.*, § 1.1, p. 1.1.

26  44.    *Id.*, § 3.3.6, p. 3.43, Table 3.3.6-1 (Service Programming Code Values).

27  45.    *Id.*, § 3.3.6, p. 3.42.

28  46.    A numeric security code or combination having only 999,999 possible values is susceptible to a "brute force" attack.

Parameter Administration Security Mechanism (SPASM).  SPASM serves the same purpose as SPC/SPL[47] but, instead of a simple numeric code, SPASM utilizes the Shared Secret Data (SSD) stored on the NAM and known only to the Access Terminal and home AN-AAA server.[48]  SPASM uses cryptographic keys and mathematical equations to conduct a type of challenge-response between the Access Terminal and Access Network so that the Access Terminal can verify that it is having its NAM provisioned by an authorized entity.[49]

In theory, a brute force attack will easily crack the aircard's SPC.  However, the SPASM requires that the emulated Access Network know the aircard's Shared Secret Data. The needed Shared Secret Data is only stored in two places: (1) on the NAM which is inaccessible without the Shared Secret Data, and (2) within a database maintained by Verizon Wireless.  The defendant attempted to subpoena the aircard's Shared Secrete Data from Verizon Wireless but the Court denied the defendant's request to have the subpoena issued. [50]  The Shared Secret Data is a 128-bit number that cannot be guessed or cracked.  There is likely a method to get around having to know the aircard's Shared Secret Data in order to access the NAM via OTAPA in a test environment but information on that method is contained in the aircard technical documentation the defendant attempted to subpoena from UTStarcom.  The Court denied the defendant's request to have the UTStarcom subpoena issued.[51]

**c.    If the stored NAM parameters do not contain data showing that the aircard was reprogrammed, the baseband processor software/firmware would need to be retrieved.**

If OTAPA were to be used to download all data stored on the aircard's NAM, it may

---

47.    *See id.*, § 1.2.1, p. 1.5 ("Subscriber Parameter Administration Security Mechanism (SPASM).  Security mechanism protecting parameters and indicators of active NAM from programming by an unauthorized network entity during the OTAPA session.")

48.    *See id.*, § 3.3.7, p. 3.43 (explaining how SPASM works).

49.    *See id.*

50.    *See June 6, 2012 ORDER* denying [614] Motion for Subpoena to Verizon Wireless FURTHER denying [616] Motion for subpoena to UTStarcom FURTHER denying [643] Supplemental Motion for Subpoenas to Verizon, Harris and UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

51.    *See id.*

1   not reveal manufacturer-specific NAM parameters showing that the aircard was

2   reprogrammed to respond to incoming voice calls.  Under that scenario, a full fledged

3   "physical analysis" would need to be performed in order to retrieve the aircard's baseband

4   processor software/firmware.[52]  There is no publicly available documentation explaining

5   how to retrieve baseband processor software from an Access Terminal using an OTAPA

6   session or, specific to the aircard involved in the present case, through some other method

7   via the external antenna connector under the aircard casing.  If such retrievals are possible,

8   the technical documentation in the possession of UTStarcom would provide needed

9   information.  If not possible, a "physical analysis" would need to be conducted in order to

10  obtain the baseband processor software/firmware—which may or not require the same

11  UTStarcom technical documentation (depending on the skill of the engineer).

### D.   Applying the above theories, how might data be retrieved from the aircard?

14      The defendant has located two different individuals who know how to do the "logical

15  analysis" and "analysis using agent application" as explained in Section I(C), *supra*.

16  However, neither individual knows how to conduct a "physical analysis" involving

17  disassembling the aircard and retrieving stored data from an aircard memory chip.  Each

18  individual claims that although there are many people who have the ability to conduct a

19  "physical analysis" of the aircard, nearly all of them only provide services to the

20  government.  However, the two individuals located by the defendant each claim that he/she

21  knows of someone else who is both willing and able to conduct the "physical analysis" for

22  the defense.  Unfortunately, neither is willing to provide the name of their willing/able

23  secondary individual (who may even be the same person) unless the defendant uses the

24  primary individual as an "advisor" and "go between" at cost.  The defendant does not know

25  of any direct assistance he may receive from either of the primary individuals other than the

26  noted referrals.

---

52.    The reasoning is that the aircard's baseband processor software/firmware was flashed (*i.e.*, replaced) via the air interface so that it would respond to the FBI's surreptitious phone calls placed to the aircard—which lacks telephone capabilities otherwise.

1    In contrast, for retrieving only the stored NAM parameters from the aircard, there are

2    likely numerous individuals who can perform the noted OTAPA session which requires no

3    "physical analysis."  For example, every wireless carrier in the country has multiple

4    engineers who have the ability and equipment needed to conduct an OTAPA session in a test

5    environment.  As soon as the defendant's court-appointed defense follows his instructions

6    explaining how to locate an adequate expert, the defendant will have someone willing and

7    able to conduct the noted OTAPA session.  Of course, the success of such an endeavor

8    ultimately depends on the availability of the aircard's Shared Secret Data in the possession of

9    Verizon Wireless[53] and/or on the availability of other technical information relating to the

10   operations of the aircard in the possession of UTStarcom.[54]  Similarly, the success of a

11   "physical analysis" of the aircard will ultimately depend on the availably of technical

12   information relating to the operations of the aircard in the possession of UTStarcom.

13                                            * * * * *

14       This filing and all attachments were drafted and/or prepared by the *pro se* defendant,

15   however, he authorizes his shadow counsel, Philip Seplow, to file this filing and all

16   attachments on his behalf using the ECF system.  The defendant is appearing *pro se* and has

17   never attended law school.  The defendant's filings, however inartfully pleaded, must be

18   liberally construed and held to less stringent standards than formal pleadings drafted by

19   lawyers.  *See* Haines v. Kerner, 404 U.S. 519, 520 (1972).

20       It is not expected that excludable delay under 18 U.S.C. § 3161(h) will occur as a

21   result of this memorandum.

22   ///

23   _____

24   53.    The Court previously denied the defendant's request to obtain the needed information
     in the possession of Verizon Wireless.  *See June 6, 2012 ORDER* denying [614] Motion for
     Subpoena to Verizon Wireless FURTHER denying [616] Motion for subpoena to UTStarcom

25   FURTHER denying [643] Supplemental Motion for Subpoenas to Verizon, Harris and
     UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

26   54.    The Court previously denied the defendant's request to obtain the needed information
     in the possession of UTStarcom.  *See June 6, 2012 ORDER* denying [614] Motion for

27   Subpoena to Verizon Wireless FURTHER denying [616] Motion for subpoena to UTStarcom
     FURTHER denying [643] Supplemental Motion for Subpoenas to Verizon, Harris and

28   UTStarcom as to Daniel David Rigmaiden (1) (Dkt. #725).

Respectfully Submitted:

PHILP SEPLOW, Shadow Counsel, on
behalf of DANIEL DAVID RIGMAIDEN,
Pro Se Defendant:


s/ Philip Seplow
Philip Seplow
Shadow Counsel for Defendant.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

*MEMORANDUM REGARDING IMAGING THE AIRCARD*
*CR08-814-PHX-DGC*

1

**CERTIFICATE OF SERVICE**

2

3        I hereby certify that on:                I caused the attached document to be

4   electronically transmitted to the Clerk's Office using the ECF system for filing and
    transmittal of a Notice of Electronic Filing to the following ECF registrants:

5

6   Taylor W. Fox, PC
    Counsel for defendant Ransom Carter
7   2 North Central Ave., Suite 735
8   Phoenix, AZ 85004

9   Frederick A. Battista
    Assistant United States Attorney
10  Two Renaissance Square
11  40 North Central Ave., Suite 1200
    Phoenix, AZ 85004
12

13  Peter S. Sexton
    Assistant United States Attorney
14  Two Renaissance Square
    40 North Central Ave., Suite 1200
15  Phoenix, AZ 85004

16
    James R. Knapp
17  Assistant United States Attorney
    Two Renaissance Square
18  40 North Central Ave., Suite 1200
    Phoenix, AZ 85004
19

20

21

22

23

24

25

26

27  By: s/ Daniel Colmerauer
    (Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))

28

*MEMORANDUM REGARDING IMAGING THE AIRCARD*
*CR08-814-PHX-DGC*