1  Daniel Rigmaiden
   Agency # 10966111
2  CCA-CADC
   PO Box 6300
3  Florence, AZ 85132
   Telephone: none
4  Email: none

5  Daniel David Rigmaiden
   Pro Se, Defendant

6

7              **UNITED STATES DISTRICT COURT**

8                 **DISTRICT OF ARIZONA**

9

10  United States of America,                    No. CR08-814-PHX-DGC

11         Plaintiff,                            REPLY TO GOVERNMENT'S RESPONSE
                                                 TO DEFENDANT'S MOTION TO
12  v.                                           SUPPRESS

13  Daniel David Rigmaiden, et al.,

14         Defendant.

15

16        Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits *Reply To*

17  *Government's Response To Defendant's Motion To Suppress*.  This reply addresses the

18  government's arguments contained in *Government's Response To Defendant's Motion To*

19  *Suppress* (Dkt. #873), which is a response to the defendant's *Motion To Suppress* (Dkt. #824)

20  and related filings (specifically, Dkt. #830,[1] #826,[2] #867,[3] and #847).[4][5]

21        The government's response addressed only some of the arguments making up the

22  totality of the suppression issues.  In this reply, the defendant will address the issues of which

23  ――――――――――――――――――――――――――――――――――――――――――――――――
    1.     *Submission Of Two Memoranda That Were Meant To Be Attached To Docket No. 824.*

24  2.     *First Submission Of Corrections To Motion To Suppress.*

25  3.     *First Supplement To Motion To Suppress RE: Search And Seizure Of Digital Evidence*
    *Under N.D.Cal. Warrants.*

26  4.     *Motion For Order Requiring Government To Comply With Data Deletion Requirements*
    *Of N.D.Cal. 08-70460-HRL/PVT, 08-70503-PVT, AND 08-70502-PVT Warrants.*

27  5.     The defendant's filings at Dkt. #857 and #858 were denied as moot in light of Dkt. #830.
    *See July 13, 2012 Court Order* (Dkt. #859).  Additionally, the government did not acknowledge
28  Dkt. #867, which was filed based on the government's **newly provided June 21, 2012 evidence**.
    *See also* Dkt. #868 and #869 (*Motion For Disclosure RE: Digital Evidence Search*).

                                    - 1 -

the government provided non-sparse input or the issues of which the government misconstrued in order to better suit its response.  Throughout this reply, sections from the the defendant's original suppression filings will be referenced where needed.  However, a lack of reference to any given section or argument does not mean that the defendant is conceding a point or abandoning an argument.[6]  All of the defendant's original suppression arguments contained in his *Motion To Suppress* and related filings remain in full force and effect.  Although this reply provides very important input, it is not a sufficient guide or "cliff notes" to the defendant's initial suppression filings.

In this reply, the defendant references additional evidence for the first time.  The defendant requires the additional evidence in order to respond to the government's untruthful and/or unsubstantiated factual assertions made for the first time in its response.  There is no way to respond to untruthful/unsubstantiated factual assertions without presenting evidence in support of reality.  Considering the Court noted that "reply memoranda are not the place for new evidence, and the Court routinely disregards evidence presented for the first time in a reply[,]"[7] the defendant has labeled all new exhibits in **<span style="color:red">RED BOLD UNDERLINE</span>** so that they may be easily disregarded if the Court so chooses.  However, *see Motion For Leave To Place Additional Evidence On The Record Responsive To Government Claims Contained In Response To Motion To Suppress* (Dkt. #897).

**I.    REPLY**

    **A.    The defendant was not a thief or a fugitive and the government's "bad guy rule" argument blows a whole lot of hot air.**

The government's position is that the defendant was without Fourth Amendment rights as a result of him being a "thief and a fugitive"[8] at the time of the aircard locating mission.  First, the defendant is innocent unless found guilty by a jury.  At the time of the challenged Fourth Amendment violations, the defendant was—and to this day remains—innocent of all

---

6.    For example, the so-called third-party disclosure rule was thoroughly addressed in the defendant's previous suppression filings.

7.    *September 4, 2012 Court Order* (Dkt. #879, p. 1)

8.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 2).

REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

allegations contained in the government's response.[9]   Nevertheless, even the recent Sixth

Circuit opinion relied upon by the government reiterates that commission of a crime and an

illegally possessed cell phone are irrelevant when determining one's reasonable expectation

of privacy.[10]   A prior Sixth Circuit case made very clear that criminal activity, use of an

agent, and use of an alias does not defeat one's reasonable expectation of privacy.[11]   The

Ninth Circuit has similarly held that illegal activity or law enforcement interest in stopping

crime does not destroy one's reasonable expectation of privacy.[12]   As for the government's

"fugitive" claim, the defendant was not indicted until July 23, 2008[13] and a warrant for his

arrest did not issue until July 30, 2008[14]—two weeks after the aircard had already been

located.   Therefore, the defendant was not a federal fugitive when the Fourth Amendment

violations occurred.   Furthermore, between July 30, 2008 and the defendant's arrest on

August 3, 2008, the defendant was not aware of his arrest warrant and was therefore not a

---

9.      The defendant also disputes **all** of the government's factual claims listed in *Government's Response To Defendant's Motion To Suppress* (Dkt. #873) unless those claims are specifically listed in the defendant's *Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1), *First Supplement To Motion To Suppress RE: Search And Seizure Of Digital Evidence Under N.D.Cal. Warrants* (Dkt. #867), or in this reply.

10.      *See* United States v. Skinner, ___ F.3d ___, No. 09-649, p. 7, fn. 1 (6th Cir., Aug. 14, 2012) ("We do not mean to suggest that there was no reasonable expectation of privacy *because* Skinner's phone was used in the commission of a crime, or that the cell phone was illegally possessed.").   Notably, the court in *Skinner* decided the case based on an application of *Knotts*.

11.      "Although accepting that the brothers possessed a subjective expectation of privacy in the room, the government labels that expectation objectively unreasonable in light of the criminal activity conducted there, the use of an agent to rent the rooms, and the agent's use of an alias. Finding that none of these circumstances—individually or cumulatively—defeat the reasonableness of the privacy expectation here, we reverse."   United States v. Domenech, 623 F.3d 325, 329 (6th Cir. 2010) (listing cases finding similar).

12.      *See* United States v. Barajas-Avalos, 359 F.3d 1204, 1214 (9th Cir. 2004) (Interpreting *Sandoval* to hold that "a search of the interior of a makeshift tent violated the appellant's reasonable expectation of privacy even though he was camped illegally..." (citing Sandoval, 200 F.3d at 661)); *see also* United States v. Winsor, 846 F.2d 1569, 1575 (9th Cir. 1988) (rejecting government argument "that the search, however intrusive, passes constitutional muster because Winsor's privacy interests were outweighed by the law enforcement interests at stake."); United States v. Davis, 849 F.2d 414, 415 (9th Cir. 1988) ("We also reject the government's assertion that there is a contraband exception to the fourth amendment.").

13.      *See* Original Indictment (Dkt. #003).

14.      *See Submission Of Materials Related To Search Warrant No. 08-70460, Authorized By Magistrate Judge Patricia V. Trumbull, Northern District Of California, On July 30, 2008* (Dkt. #464-1, p. 14) (authorizing seizure of "Steven Travis Brawner, a.k.a. Travis Rupard, a.k.a. Patrick Stout[,]" *i.e.*, the defendant listed under his aliases.).

fugitive.[15]  The defendant's then outstanding state warrant[16] also holds no relevance to the

Fourth Amendment analysis considering it was unknown to the government and the

defendant until well after the defendant's arrest and later identification as Daniel David

Rigmaiden.[17]

     Rather than address the relevant facts, the government attacked the defendant's

character[18] in a vain attempt to draw attention away from the numerous Fourth Amendment

violations perpetrated by the government.  Even if its "bad guy rule"[19][20] argument had

merit, the government presented no evidence linking the defendant to any of the alleged

emails discussing firearms, threats of violence, a U.S. government instigated civil war, rogue

and treasonous U.S. Intelligence Agents, or any other ridiculous claim that would only be

taken seriously by children at story-time.  In its response, the government notes that many of

the emails in support of its "bad guy rule" were "sent on [an] unknown date,"[21] meaning

---

15.     *See* In The Matter Of An Application Of The United States Of America For An Order Authorizing Disclosure Of Location Information Of A Specified Wireless Telephone, No. 10-2188-SKG, 2011 U.S. Dist. LEXIS 85638, p. 6 (D. Md., Aug. 3, 2011) ("The government referred to defendant as a 'federal fugitive' and 'the subject fugitive,' but alleged no facts to support defendant's fugitive status.  There was no indication that defendant was aware of the charge or arrest warrant, and the government did not so allege." (internal citations omitted)).

16.     Similar to the imminent future of the present case, the California state case noted in the government's response was dismissed and will not be prosecuted.

17.     *See*, *e.g.*, Moreno v. Baca, 431 F.3d 633 (9th Cir. 2005) (holding that "police officers cannot retroactively justify a suspicionless search and arrest on the basis of an after-the-fact discovery of an arrest warrant...").

18.     *See Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 2-38, *etc.*).

19.     The government's "bad guy rule" in the context of rebutting a Fourth Amendment challenge is essentially the same as the "halo effect" applied by prosecutors in the context of a jury trial.  *See*, *e.g.*, United States v. Green, 324 F.Supp.2d 311, 319 fn. 14 (D.Mass. 2004) ("They have described a 'halo effect,' meaning that once a juror hears about misconduct, he transmutes that bad act into evidence of bad character, which deflects the jurors from fairly assessing the evidence.").  However, prosecutors rarely attempt such nefarious tactics in the context of a federal judge deciding an issue as opposed to an inexperienced layman.  *See*, *e.g.*, United States v. Williams, 124 F.3d 411, 417 (3rd Cir. 1997) ("[I]n reviewing the issuance of a search warrant,... it does not follow that a judicial officer, in weighing the public interest, may properly take into account his or her personal opinions regarding the need for or importance of the criminal provisions that appear to have been violated." (internal citations omitted)).

20.     There is no known evidence that the government ever personally referred to the heart of its rebuttal as the "bad guy rule."

21.     *See*, *e.g.*, *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 25).

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

there is no logged source of origin.[22]  Regardless of origin, even the prosecution's own

agents advised that the alleged inquiry relating to a purchase of firearms made to "CI 2"—an

individual who was already an illegal gun dealer,[23] drug dealer,[24] working as an

"associate" for the Gambino crime family,[25][26] and the unequivocal leader/organizer of the

alleged scheme[27][28][29]—was simply done to test if "CI 2" was legit and no purchase of

firearms was ever planned.  The ATF advised IRS-CI Agent Medrano that the requested guns

---

22.     In any event, the defendant did **not** author the government's emails.  For example, the government referenced an email stating that the author would "stick to making AR15s, AK47s and M4s in [][his] garage."  *Id.* (Dkt. #873, p. 28).  However, the defendant lived in an apartment at the Domicilio apartment complex, which had **no garage** of where to set up a gun-making shop.

23.     *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues,* **EXHIBIT 01** (Dkt. #898-1) (select documents provided by the government to the defense relating to "CI 2" being involved in a **firearms trafficking** scheme).

24.     *See id.,* **EXHIBIT 01** (Dkt. #898-1) ("CI2 said he is working on some other deals with the confidential informant (CI) and that CC1 LNU is supposed to be getting some 'white' **(meaning cocaine)** and that... [][CI2] wants a piece of that action because it will be a big money thing, a huge payday." (ATF quoting "CI 2") (emphasis added)).

25.     *See id.,* **EXHIBIT 02** (Dkt. #898-1) ("['CI 2'] stated that he has done previous 'work' with the **Gambino crime family** out of New York State." (emphasis added)); *id.,* **EXHIBIT 03** (Dkt. #898-1) ("CI 2" providing agents with "contact phone number for associate of CI 2 from NY (Gambino family);").

26.     The government does **not** allege that the entity it refers to as "the Hacker" was aware that "CI 2" was leading the alleged conspiracy while working under the Gambino crime family.

27.     Before "CI 2" (a.k.a. "JP" in various telephone conversations) was arrested and became a confidential informant, he stated to "CI 1" that the individual the government later coined "the Hacker" was some "**punk kid**" and, at that time, "CI 2" so kindly allowed him a week off of work considering "CI 2" had the "punk kid" slaving "12, 15 hours a day." *Id.,* **EXHIBIT 04** (Dkt. #898-1) (emphasis added).

28.     "A crime family is a highly structured criminal enterprise with a well defined chain-of-command.  At the apex of the family's hierarchy is the 'boss,' who carries sole authority to approve murders and induct new members into the family.  A 'consigliere' and 'underboss' comprise the next tier in the family's organization hierarchy.  The consigliere functions as an advisor to the boss and assists in the settlement of disputes among members, while the underboss oversees the family's illegal endeavors when the boss is unavailable and conveys orders to the members.  Under the consigliere and underboss are the 'capos' or 'captains,' who control 'crews' or 'regimes' of 'soldiers,' otherwise known as 'made men.'  The soldiers, in turn, sponsor various **'associates,'** who are best described as criminal colleagues of the family who, for various reasons, have not been formally initiated into the ranks." United States v. Pungitore, 910 F.2d 1084, 1098 (3rd Cir. 1990) (citations omitted) (emphasis added).  In the present case, the government does not allege that the so-called "punk kid" was knowingly "working" for the Gambino crime family in the way "CI 2" was knowingly "working" for the Gambino crime family.  Therefore, even if one were to assume that the defendant was the unwitting "punk kid" (*i.e.,* "the Hacker"), he was still well below "CI 2"—an "associate" in the mob hierarchy.

29.     The government's "CI 2" was such a good leader/organizer that he even had his wife working in a teller position at a bank so that she could advise him on how to get away with the proceeds from his various criminal enterprises.  *See Fourth Submission Of Consolidated*

were either "next to impossible to get" or were "video game stuff/items" and that "CI 2" was just being tested to see if he was "the real deal."[30]   Other agents also advised that whoever was on the other end of the emails was suspicious that "CI 2" had become a confidential informant.[31]   Likewise, after the defendant's arrest, FBI Agent Murray advised his supervisor that any threat of violence at a Kinkos was "pure smoke."[32]   Furthermore, the defendant's own brother made it clear to government agents that the defendant is "not super-violent"[33] and "has not expressed anti-government sentiments[]"[34]—further evidence of the defendant's non-authorship of the quoted emails.   After a search of the defendant's home and storage unit, the government found no evidence relating to weapons, missiles, artificially intelligence robot assassins, secret government documents from the CIA, or any other evidence supporting "Team Hacker's"[35]—and at least one magistrate's—pipe dream of turning their investigation into a movie.[36]   Now that we're all grounded back in reality, on to the *relevant* issues...

### B.   Reply to government response RE: claim that keyhole/key search and seizure was authorized and/or reasonable.

The initial search of the defendant's person by the arrestee (*i.e.*, Santa Clara police officers – not federal agents) was a "valid" search incident to an invalid arrest.   However, the

---

*Exhibits Relating To Discovery And Suppression Issues*, **EXHIBIT 05** (Dkt. #898-1) ("CI 2" (a.k.a. "JP") reporting to "CI 1" regarding the extensive and detailed information "CI 2" obtained from his wife about inside banking practices in order to assist with the alleged scheme). Even by his own organized crime standards, "CI 2" was an *ultra-criminal* in the sense that he spat in the face of the age-old gangster creed of "leaving the wife and kids out of it."

30.   *Id.*, **EXHIBIT 06** (Dkt. #898-1).

31.   *See id.*, **EXHIBIT 07** (Dkt. #898-1).

32.   *See id.*, **EXHIBIT 08** (Dkt. #898-1) (FBI Agent Murray indicating that "[t]he cover team claim was pure smoke.").

33.   *Id.*, **EXHIBIT 09** (Dkt. #898-1) (IRS-CI interview of the defendant's brother).

34.   *Id*

35.   The cinematic term, "Team Hacker," is what the primary case agents labeled themselves while investigating the alleged scheme.   *See id.*, **EXHIBIT 10** (Dkt. #898-1) ("Team Hacker is Law Enforcement officers Medrano, Fleischmann, Murray, Daun and Wilson.").

36.   On August 6, 2008, the affiant to all of the N.D.Cal. search warrants, *i.e.*, IRS-CI Agent Michael P. Fleischmann, sent a text message to FBI Agent Richard J. Murray stating, "I just remembered the judge said this case could be a movie[.]"   *See id.*, **EXHIBIT 11** (Dkt. #898-1) ([So much for "neutral" and "detached" magistrates.]).   Perhaps IRS-CI Agent Fleischmann would like his part to be played by Leonardo DiCaprio?

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

1  search of the key and keyhole at apartment No. 1122 by a federal agent was too remote in

2  time and place to be a search incident to arrest.  *See* United States v. Maddox, 614 F.3d 1046,

3  1049 (9th Cir. 2010).  The defendant was not arrested anywhere near apartment No. 1122.

4  Rather, he was arrested on the sidewalk in front of Buck Shaw Stadium[37]—more than a

5  third of a mile away from the front entrance of the Domicilio apartment complex.[38]  FBI

6  Agent Vinh Nguyen taking the defendant's keys from a Santa Clara police officer[39] at the

7  site of arrest and transporting those keys to apartment No. 1122 at the Domicilio apartment

8  complex was an illegal Fourth Amendment seizure of the keys.  Because the defendant was

9  struck with a police cruiser, beaten by Santa Clara police officers, pat searched, and placed

10  into handcuffs,[40] FBI Agent Nguyen's actions did not serve the purpose of finding weapons

---

11  37.     *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression
12  Issues*, **EXHIBIT 12** (Dkt. #898-1) (Santa Clara police officer Dominic Sandoval indicating
   that the pursuit of the defendant ended on the sidewalk in front of Buck Shaw Stadium); *Second
13  Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT
   106 (Dkt. #821-6) (FBI Agent Kobzanets indicating that the defendant fell to the ground after
14  being hit by the police cruiser and was thereafter arrested).  Note: The defendant did not resist
   arrest after being hit by the Santa Clara police cruiser.  The story to the contrary contained in
15  Dominic Sandoval's police report was concocted after the defendant advised Santa Clara police
   officers that he would be suing them for hitting him with the police cruiser and for the police
16  brutality that occurred *after* he was placed into handcuffs.  Additionally, the Santa Clara fire
   department advised the Santa Clara police department and federal agents that the defendant had
17  suffered serious injuries and needed to go to the hospital.  Law enforcement informed the fire
   department that the defendant would be brought to the hospital after being taken to the police
18  station and law enforcement signed a waiver provided to them by the fire department.  However,
   law enforcement never took the defendant to the hospital despite the fire department's
19  recommendation and the defendant's specific requests.  Instead, federal agents capitalized on the
   situation by attempting to interrogate the defendant at the Santa Clara police station immediately
20  after he suffered head injuries.  Later, at the Santa Clara county jail, an intake nurse made
   comments to USPIS Inspector James L. Wilson regarding the defendant's abnormal vital signs.

21  38.     *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression
   Issues*, **EXHIBIT 13** (Dkt. #898-1) (google maps view of Buck Shaw Stadium (marked with
22  red star), the Domicilio apartment complex (marked with green star), and Starbucks (marked
   with yellow star)).  Note: using the distance legend embedded on the map, the approximate
23  distance from the sidewalk measured from the center of Buck Shaw stadium to the entrance of
   the Domicilio apartment complex is 0.35 miles along El Camino Real.

24  39.     *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression
   Issues*, EXHIBIT 06 (Dkt. #863-1) ("... Steven Brawner was arrested by Santa Clara PD.  Santa
25  Clara PD conducted the search incident to arrest.  Vinh of FBI took possession of the keys that
   were in Brawner's pockets to check to see if they opened the apartment in question."); *Second
26  Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT
   106 (Dkt. #821-6) (same).

27  40.     *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And
28  Suppression Issues*, **EXHIBIT 12** (Dkt. #898-1) ("I [] kicked Brawner's left arm and dropped
   my knee on his shoulder....  I struck him (3) times with my (R) elbow on his left shoulder blade

the defendant may use or evidence he may conceal or destroy at the time and place of arrest. Absent a warrant directed at federal agents, the key should have remained in the possession of the arresting entity, *i.e.*, the Santa Clara police department, and placed into the defendant's booking property.

Furthermore, FBI Agent Nguyen's subsequent use of one of the keys to turn the tumbler within the front door keyhole of apartment No. 1122[41] was an illegal Fourth Amendment search of the defendant's home **and**, separately, of the defendant's key.  For one thing, the area within the defendant's front door keyhole that can only be occupied/accessed by using the key paired with the lock is within the curtilage of the defendant's home.  Mere public access to the keyhole is of no consequence.  A random key inserted into the defendant's front door keyhole would not be able to turn and access the area of the tumbler that only the matching key can access.  The government trespassed into that area for the purpose of obtaining information, *i.e.*, knowledge that the keys from the defendant's pocket opened apartment No. 1122.  Contrary to the government's suggestion, FBI Agent Nguyen was not executing the N.D.Cal. 08-70460-HRL/PVT warrant at the time of the keyhole/key search.  The government admitted that the warrant was executed after FBI Agent Nguyen's use of the keys[42] and he/she is not listed amongst the ten federal agents who executed the relevant warrant.[43]  Nevertheless, execution of the N.D.Cal. 08-70460-HRL/PVT warrant did not gather the seized information obtained via the keyhole/key search.  Nothing in the

---

area.... No weapons were found.... Brawner had several abrasions to the side of his face.  He also had a small (1") cut on [] his right hand.  Brawner received these injuries when he tripped and fell to the ground.").  Note: the defendant was actually *hit* to the ground by the police cruiser and the cut on his hand and some of the abrasions were inflicted by Santa Clara police officer Dominic Sandoval.  Officer Sandoval's report has no account of him witnessing the defendant fall to the ground so he is in no position to claim, as he falsely did in his report, that the defendant "received [][his] injuries when he tripped and fell to the ground." *Id*.  Although officer Sandoval falsifying a police report in order to mask his misconduct is of no relevance here, it is still an interesting tidbit to add to the overall assessment of how poorly *all* law enforcement actors conducted themselves in light of the defendant's clearly established rights.

41. *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, <u>EXHIBIT 06</u> (Dkt. #863-1).

42. *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 34 and 64).

43. *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, <u>EXHIBIT 06</u> (Dkt. #863-1).

warrant authorized seizure of the defendant's keys from his person by non-arresting federal agents, transporting the keys more than a third of a mile away to a location that was not even visible, and using the keys to unlock the front door of apartment No. 1122 for the purpose of seizing information, *i.e.*, knowledge that one of the defendant's keys open the apartment.

### C. Reply to government response RE: claim that search of the defendant's home residence under the returned/voided warrant was reasonable.

The government claimed that the "[d]efendant cites no authority for the striking proposition that law enforcement cannot seek a second warrant after the first is returned unexecuted."[44]  The defendant never made this argument.  The defendant argued that the government *should have* sought a second warrant considering the first warrant was returned and rendered void as a matter of law.[45]  Rather than seek a second warrant, the government went to a different magistrate seeking approval of an amended version of the previously returned/voided warrant and continued to execute that warrant after the original 10-day expiration date.  The warrant papers relied upon by the government were no more valid than the contents of the first magistrate's waste-paper basket.  Legitimizing the government's actions in this context will begin a slippery slope ending with the government's infinite resurrection of returned/voided warrants, months or even years forgotten, whether executed or unexecuted, and under the same original docket number.  Given the government's general tendency to whisk aside the Constitution in order to further law enforcement interests, there is no telling what type of sneaky and intolerable abuses will stem from such a practice.

### D. Reply to government response RE: claim that the affidavit in support of the returned/voided warrant contained sufficient probable cause.

The defendant thoroughly addressed this issue in his *Memorandum Re: Fourth Amendment Violations (re: N.D.Cal. 08-70460-HRL/PVT)*, (Dkt. #830-1, p. 5-7), *Argument*, Section II(B).  The defendant has additional cases in support of his prior arguments: United States v. Evans, 97 F.Supp.2d 95, 97 (D.C.Tenn. 1951) (still located close to man's dwelling

---

44.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 63).

45.   *See Memorandum Re: Fourth Amendment Violations (re: N.D.Cal. 08-70460-HRL/PVT)*, (Dkt. #830-1, p. 3-4), *Argument*, Section II(A).

1  house did not constitute sufficient basis for finding of probable cause to believe that man had

2  illicit whiskey concealed in house); <u>Rosencranz v. United States</u>, 356 F.2d 310, 318 (1st Cir.

3  1960) (Concluding "that a combination of undated, conclusory information from an

4  anonymous source and an undated general allegation of personal observation by the affiant,

5  with no other reasonably specific clues to the time of their happening, is inadequate" for

6  determining probable cause to issue search warrant.); <u>United States v. Boyd</u>, 422 F.2d 791,

7  792 (6th Cir. 1970) ("[W]hen the date of [][an] observation is not supplied to the

8  commissioner under oath, the door is opened to inference of a present offense based on stale

9  information.  Generally, the courts have refused to uphold warrants based—or possibly based

10  —on stale information.").

11
12  **E.  Reply to government response RE: claim that continuous and unauthorized review of seized digital evidence, most of which is beyond the scope of relevant warrants, is reasonable.**

13      Although the government continues to withhold evidence (*see* Dkt. #868 and #869),

14  the defendant addressed this issue in his *First Supplement To Motion To Suppress RE:*

15  *Search And Seizure Of Digital Evidence Under N.D.Cal. Warrants*, (Dkt. #867).  However,

16  the government raised some odd points requiring the defendant's reply.  First, the

17  government claimed the following:

18      The investigative agents filed a return [][within the required time frame] and
19      within approximately 30 days after the execution of the warrant Agent Daun
        destroyed any forensic images of devices that did not contain material
20      responsive to the search warrant.  The physical devices that did not contain
        responsive material or contraband have been segregated for return to defendant
21      and have not been searched.

22      *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 65).

23  The above claim is a red herring that only acts to confuse the relevant issues.  With respect to

24  suppression, the defendant's arguments do not pertain to the seized physical data storage

25  devices or encrypted virtual drives that **do not** contain material responsive to the warrants.

26  [46]  The defendant's suppression arguments only pertain to the forensic images containing

27
28  _____

46.   Nevertheless, IRS-CI Agent Daun did not destroy all of the images as the government
claims.  On October 26, 2011 the government gave the defense some of the very images it now
claims were destroyed within 30 days.  However, the defendant requested an order requiring the

material responsive to each search warrant along with "many more files than those that fall

within the parameters of [][each] Search Warrant and its attachments."[47]

The government also claimed that "Agent Daun found a file labeled 'filesalot.dcv' that

contains the bulk of the incriminating information in this case."[48]  This again causes

confusion.  The file "filesalot.dcv" is a DriveCrypt encrypted container file that contains no

plaintext incriminating information.  If the file "filesalot.dcv" were to be printed out onto

paper then it would contain unreadable gibberish.  Only after the DriveCrypt container file is

mounted as an encrypted virtual drive does plaintext information become

viewable/accessible.  Once mounted, a new drive letter appears within the Microsoft

Windows operating system and the corresponding drive is indistinguishable from a physical

hard drive.[49]  IRS-CI Agent Daun explained this in her "Computer Forensic Report," which

also indicates that she imaged "filesalot.dcv" as if it were a physical hard drive.[50][51]  The

relevant warrants do not support seizing "filesalot.dcv" as a file because it contains no

viewable/accessible information.  Likewise, the relevant warrants do not support seizing

"filesalot.dcv" as a file, encrypted virtual drive, or image of said encrypted virtual drive

because it "actually contain[s] many more files than those that fall within the parameters of

[][each] Search Warrant and its attachments."[52]  Seizing all files within the "filesalot.dcv"

---

destruction of all non-responsive seized data and devices (Dkt. #847) that is yet to receive a
ruling.

47.   *Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression
Issues*, <u>EXHIBIT 01</u> (Dkt. #863-1, p. 36) ("Computer Forensic Report" by IRS-CI Agent Daun
RE: search of data storage devices and encrypted virtual drives seized from apartment No. 1122
and storage unit No. A-47, p. 31).

48.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 65).

49.   IRS-CI Agent Daun noted that "filesalot.dcv" was mounted as drive "T" at the time of the
search.  *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression
Issues*, <u>EXHIBIT 01</u> (Dkt. #863-1, p. 9).

50.   *See id.*, <u>EXHIBIT 01</u> (Dkt. #863-1, p. 16) ("The image of 'filesalot.dcv' virtual container
file was analyzed using EnCase.").

51.   *See also* SecurStar [website], *SecurStar, Encryption Software Solutions - Products -
DriveCrypt*, http://www.securstar.com/products_drivecrypt.php (last accessed: Dec. 16, 2010)
(explaining the DriveCrypt product and encrypted virtual drives utilizing *.dcv container files).

52.   *Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression
Issues*, <u>EXHIBIT 01</u> (Dkt. #863-1, p. 36) ("Computer Forensic Report" by IRS-CI Agent Daun
RE: search of data storage devices and encrypted virtual drives seized from apartment No. 1122
and storage unit No. A-47, p. 31).

1   encrypted virtual drive is analogous to seizing an entire physical safe—of which the

2   government has the combination—and all items within that safe simply because a few of the

3   items are within the parameters of the relevant search warrant.

4           The government also claimed it "anticipates that IRS Special Agent Tracy Daun will

5   testify that... within 30 days of the execution of the warrant, she created forensic copies, or

6   'images,' of the seized devices and determined which of those devices contained material

7   responsive to the search warrant."[53]  Again, another red herring.  The defendant argued that

8   IRS-CI Agent Daun failed to "complete an off-site **search**... for evidence of crime... no later

9   than thirty (30) calendar days after the initial execution of the warrant[,]"[54] and her 30-day

10   "determination" of which devices contain evidence does not erase the violation.  The

11   government further claimed that it "anticipates that IRS Special Agent Tracy Daun will

12   testify that... [t]he **images** of devices or storage media that did not contain responsive

13   material were destroyed... less than 30 days after the execution of the warrant."[55]  This is

14   yet another red herring—not to mention, a lie.[56]  The relevant warrants clearly state that the

15   government also must "destroy – and to delete from any devices or storage media or copies

16   that it has retained or made – copies of any **data** that are outside the scope of the warrant but

17   that were copied or accessed during the search process..."[57]  The term used in the warrant is

18   "data," not "images" as claimed by the government,[58] and said term (*i.e.*, "**data**")

19   encompasses the files within the images of encrypted virtual drives that IRS-CI Agent Daun

20

21   53.     *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 37).

22   54.     *See, e.g.*, *Submission Of Documents Related To Original Northern District Of California 08-70460-HRL Search Warrant Used To Physically Search Apartment No.* 1122, "Computer

23   Search Protocol For The Northern District Of California," ¶ 5 (Dkt. #566-2, p. 16) (emphasis added).

24   55.     *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 37) (emphasis added).

25   56.     *See* fn. No. 46, *supra*.

26   57.     *E.g.*, *Submission Of Documents Related To Original Northern District Of California 08-70460-HRL Search Warrant Used To Physically Search Apartment No. 1122*, "Computer

27   Search Protocol For The Northern District Of California," ¶ 5 (emphasis added) (Dkt. #566-2, p. 16-17).

28   58.     *See Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 37) (falsely claiming that the warrant "required the United States to... delete images that do not contain responsive material within 120 days.").

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

1   notes do not "fall within the parameters of [][each] Search Warrant and its attachments."[59]

2         The government also claimed that it "retained any devices that it determined

3   contained contraband – e.g., stolen financial or identity information."[60]  However, the

4   relevant warrants make clear that the government may only retain a physical device if the

5   device **itself** "is contraband, a forfeitable instrumentality of the crime, or fruit of crime,"[61]

6   and that the government may only retain copies of data if "the copies are contraband, a

7   forfeitable instrumentality of the crime, or fruit of crime."[62]  There is no authority to

8   indefinitely maintain all data on a device and thereafter continue a three-year fishing

9   exhibition through that data simply because *some* data was determined to be "contraband" or

10  because the physical device may be later sold at auction as part of a forfeiture.  Such a

11  reading of the relevant warrants would, in effect, read out the particularity, scope,

12  minimization, and data deletion requirements the government failed to follow.  *See, e.g.,*

13  United States v. Collins, 2012 U.S. Dist. LEXIS 35980, Case No.: 11-CR-00471-DLJ (PSG),

14  p. 12 (N.D.Cal., Mar. 16, 2012) ("[E]ven if the law ultimately permits the forfeiture of a

15  given <u>device</u>..., the law does not permit the retention of <u>data</u> on that device that has not been

16  shown or even alleged to have been an 'instrumentality' of the alleged crimes.").  In the

17  present case, although all "contraband" data was isolated to DVDs and a CD by IRS-CI

18  Agent Daun more that three years ago (albeit not within the 30-day search window), the

19  government continues to maintain that it can indefinitely possess and fish through the rest of

20  the defendant's imaged data[63] even while admitting that the data does not "fall within the

21  parameters of the Search Warrant[s] and [][their] attachments."[64]  "The government...

---

22  59.   *Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression
      Issues,* EXHIBIT 01 (Dkt. #863-1, p. 36) ("Computer Forensic Report" by IRS-CI Agent Daun
23    RE: search of data storage devices and encrypted virtual drives seized from apartment No. 1122
      and storage unit No. A-47, p. 31).

24  60.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 37-38).

25  61.   *E.g., Submission Of Documents Related To Original Northern District Of California 08-
      70460-HRL Search Warrant Used To Physically Search Apartment No. 1122,* "Computer Search
26    Protocol For The Northern District Of California," ¶ 5 (emphasis added) (Dkt. #566-2, p. 16).

    62.   *E.g., id.,* ¶ 5 (emphasis added) (Dkt. #566-2, p. 16-17).
27
    63.   *See First Supplement To Motion To Suppress RE: Search And Seizure Of Digital
      Evidence Under N.D.Cal. Warrants,* (Dkt. #867).
28
    64.   *Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression*

*REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS*
*CR08-814-PHX-DGC*

1   should not be retaining images of files or documents that, in large part, do not contain

2   information within the scope of the warrant." United States v. Fu-Tain Lu, No. CR-09-00341

3   RMW, Doc. No. 112, p. 4 (N.D.Cal., Sept. 16, 2010).

4          The government also claimed that "[a]ny further searches to be conducted by Agent

5   Daun will be limited to the materials she identified via her 2009 analysis[,]"[65] *i.e.*, data

6   isolated/seized to the previously noted DVDs and CD.  However, the defendant already

7   presented evidence that IRS-CI Agent Daun's never-ending fishing exhibition is being

8   conducted through all files contained within all forensic images and not just the files

9   contained in her "Computer Forensic Report" assembled in 2009.[66]  The government also

10  failed to answer the defendant's discovery request regarding the nature and extent of IRS-CI

11  Agent Daun's (and other agents') fishing exhibition.  *See* Dkt. #868 and #869.  In *Fu-Tain Lu*,

12  the "court f[ound] that the defense is entitled to know what documents and files the

13  government **looked at** in the search of the mirror images."  *Id.*, Doc. No. 112, p. 4 (emphasis

14  added).  Therefore, the defendant in the present case has a right to know what *all* agents

15  **looked at**, even if what was looked at was not copied to IRS-CI Agent Daun's DVDs and

16  CD.  *See id.*, Doc. No. 112, p. 5 (Denying motion to suppress "without prejudice to

17  reconsideration if the defense discovers that the Government did a search of the mirror

18  images that was not reasonably designed to find only documents, files or data described in

19  the warrant[.]").  *See also* N.D.Cal. warrants stating that "the government must make all

20  reasonable efforts to use methods and procedures that will locate and expose only those

21  categories of files, documents, or other electronically stored information that are identified

22  with particularity in the warrant..."  *E.g.*, Dkt. #566-2, p. 17.

23         The government also claimed that the "[d]efendant cites no case for the remarkable

24  proposition that law enforcement can no longer look at evidence of crime once it has been

---

Issues, EXHIBIT 01 (Dkt. #863-1, p. 36) ("Computer Forensic Report" by IRS-CI Agent Daun RE: search of data storage devices and encrypted virtual drives seized from apartment No. 1122 and storage unit No. A-47, p. 31).

65.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 38).

66.    *See First Supplement To Motion To Suppress RE: Search And Seizure Of Digital Evidence Under N.D.Cal. Warrants*, (Dkt. #867, p. 8-10), *Facts*, Section I (discussing IRS-CI Agent Daun's October 2011 seizure of defendant's communication with Jacqueline Gardiner).

1   properly seized."[67]  The government's straw-man fallacy misses the point.  The defendant

2   argued, among many other points, that the evidence was *improperly* searched/seized beyond

3   the 30-day search window expiration dates.  The government may only conduct subsequent

4   searches of a seized item if "it remains in the legitimate uninterrupted possession of the

5   police[.]"  Hell's Angels Motorcycle Corp. v. Mckinley, 360 F.3d 930, 934 (9th Cir. 2004)

6   (internal citation omitted).  However, after the 30-day search windows had expired, any

7   legitimate government possession was bluntly interrupted and the defendant's reasonable

8   expectation of privacy was restored.

9          Finally, the government claimed that "the length of time that the United States has

10  spent analyzing the lawfully seized material is reasonable in light of the amount of

11  incriminating data seized and the defendant's efforts at concealing his crimes through

12  encryption, false identities, and other methods."[68]  If the government needed more time

13  then it could have filed for extensions as permitted by the terms of the relevant warrants.

14  Additionally, IRS-CI Agent Daun was able get around the encryption issue as soon as she sat

15  down at the defendant's computer.[69][70]

16            **F.    Reply to government response RE: claim that there is no authority
                      to support the defendant's *Motion For Order Requiring Government
17                    To Comply With Data Deletion Requirements... (Dkt. #847).***

18         The government claimed that the "defendant provides no authority to support his

19  motion to order the United States to digitally and then physically destroy the devices and

20  forensic images lawfully seized as evidence pursuant to search warrant."[71]  However, the

21  defendant never argued that anything was *lawfully* seized and instead argued that there were

22  no lawful searches or seizures.  Nevertheless, as cited authority in support of

---

67.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 65).

68.    *Id.* (Dkt. #873, p. 66).

69.    *Id.* (Dkt. #873, p. 26) ("Fortunately for the investigation team,... [w]hen entry was made pursuant to the search warrant, [the] defendant's computer was found to be unsecured and logged on, no password was needed in this instance in order to access the files.").

70.    *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues,* **EXHIBIT 14** (Dkt. #898-1) (August 25, 2008 email from IRS-CI Agent Daun to AUSA Battista: "I was able to image each of the items and feel pretty confident that I have gotten around the encryption issue.").

71.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 66).

*REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC*

deletion/destruction, the defendant quoted the terms contained in the very warrants the

government continues to violate.[72]  Additionally, in *Church of Scientology*—a case

addressing the government's unlawful acquisition of tapes through an IRS summons—the

Supreme Court noted that a Court can order the type of relief requested by the defendant:

> Even though it is now too late to prevent, or to provide a fully satisfactory
> remedy for, the invasion of privacy that occurred when the IRS obtained the
> information on the tapes, a court does have power to effectuate a partial
> remedy by ordering the Government to destroy or return any and all copies it
> may have in its possession.

*Church of Scientology v. United States*, 506 U.S. 9, 13 (1992).[73]

### G. Reply to government response RE: reliance on *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995) to support claim that the defendant's allegations are not evidence.

The government cites to *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995)

in support of its claim that "[a]llegations in a motion are not evidence," and its presumption

that the defendant "will present expert testimony at a suppression hearing in an attempt to

prove his allegations."[74]  Contrary to the government's presumption, the defendant should

not be required to present any further evidence or expert testimony in support of his

*Technical Explanations*[75] and related allegations contained in his *General Facts*.[76]  Based

on the law of the case doctrine, the government is not in a position to contest the allegations

at issue.  "Under this doctrine, a court is ordinarily precluded from reexamining an issue

previously decided by the same court, or a higher court, in the same case."  *Yonemoto v.*

---

72.  *See Motion For Order Requiring Government To Comply With Data Deletion Requirements Of N.D.Cal. 08-70460-HRL/PVT, 08-70503-PVT, AND 08-70502-PVT Warrants* (Dkt. #847).

73.  *See also* United States v. Le Clair, 315 F.Supp. 853 (E.D.Wis. 1970) ("The seizure was blatantly unlawful, and the government is not entitled to retain either the originals or any copies which may have been made from such originals by the government."); Goodman v. United States, 369 F.2d 166, 168 (9th Cir. 1966) ("Assuming arguendo that the searches were unlawful, we must consider whether the copies must be returned to the appellants in addition to the originals.  We hold that they must.").

74.  *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 53).

75.  *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 4-123), *Technical Explanations*, Section II.

76.  *See id.*, (Dkt. #824-1, p. 140-195), *General Facts*, Section IV.

Dep't of Veterans Affairs, 648 F.3d 1049, 1058-59 (9th Cir. 2011) (internal citation and quotation marks omitted).  "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  Arizona v. California, 460 U.S. 605, 618 (1983).  The law of the case applicable to the current proceeding is as follows: **(1)** The defendant asked the government for all evidence in its possession relating to the equipment used by the FBI to carry out Fourth Amendment activity. **(2)** The government refused the defendant's request based on a claim of "law enforcement privilege." **(3)** The defendant then filed his *Motion For Disclosure Of All Relevant And Helpful Evidence Withheld By The Government Based On A Claim Of Privilege* (Dkt. #592). **(4)** The Court thereafter found the requested evidence discoverable under Rule 16 but upheld the government's "law enforcement privilege" considering "Defendant has ample information from government disclosures and his extensive command of technical information to construct whatever arguments he wishes to assert concerning the Fourth Amendment implications of the aircard locating mission."[77] **(5)** The Court also reiterated that when rebutting the defendant's allegations, "[t]he government will rely only on evidence disclosed to Defendant."[78] **(6)** At a hearing prior to the issuance of the quoted order, the Court indicated that the government would not be permitted to present its own expert or agent, or use other means not involving the disclosure of evidence, to rebut the defendant's self-collected evidence and technical explanations regarding the aircard locating mission.[79] **(7)** It was also discussed that the time has passed

---

77.   *January 4, 2012 Court Order* (Dkt. #723, p. 29-30).

78.   *Id.* (Dkt. #723, p. 15).

79.

     [THE COURT:] ... Now, if I were to conclude that the method by which the device works is privileged, and if I were also to conclude that the government doesn't have to produce[, for example,] the details of whether it writes software to the laptop or boosts the signal of the aircard because Mr. Rigmaiden has other means for making that argument, then it seems to me when we get to the suppression hearing, this is what's likely to happen:

     Mr. Rigmaiden will present evidence, as he has in his motion, that the device the government uses boosts the signal strength and writes software to the hard drive, and he has evidence from the Harris products criteria.  He's got evidence from government documents.  He's pulled it from a number of

*REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS CR08-814-PHX-DGC*

for the government to disclose previously withheld evidence regarding the aircard locating mission.[80]

Under the above articulated "law of the case," *Davis* provides better guidance than *Zermeno*. In *Davis*, the defense asserted certain facts in a brief "and the government stipulated to th[o]se facts in its opposition brief." United States v. Davis, 332 F.3d 1163, 1168 (9th Cir. 2003). The *Davis* court reasoned that "[s]uch admissions, which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact, are binding on both parties and the court, including this court." *Id.* (internal citation and quotation marks omitted). Because the government previously decided to withhold all evidence responsive to the allegations at issue, it has effectively stipulated to the defendant's version of the events. The government cannot now claim that it "did not do a number of the

---

different sources.

The government at that suppression hearing could not respond by saying, "No, here's how it works," because you've withheld that information. Therefore, I would find by a preponderance of the evidence that he's right, that this device does, in fact, boost the signal and does write software to the laptop. And I would take that factual finding into account when I ruled on the motion to suppress because I would find by a preponderance of the evidence, which is all that is needed, he's shown that that's what this kind of a device does.

*September 22, 2011 Motion Hearing, Partial Transcript of Proceedings*, 14:11:33 – 14:14:07.

80.

THE COURT: … [T]here's various Fourth Amendment arguments you could make. But it seems to me the one you can't make is a technical evidence argument that the device didn't work that way when you withheld the technical evidence.

MR. BATTISTA: I understand, Your Honor. So that's a -- so I have to regroup and decide whether or not -- what risk we're willing to accept.

THE COURT: Well, and that gets me back to the practical question. So what we're saying is that we want to go forward with extensive briefing and preparation and a suppression hearing with witnesses here with the understanding that you might choose during that hearing to regroup and to change your strategy and to disclose information so we have to do the suppression hearing over again after the information has been given to him and his experts had the time to evaluate it, and we re-brief it all over again. **That doesn't seem like a very efficient way to get this problem solved**.

*Id.*, 14:44:04 – 14:45:32 (emphasis added).

things defendant has alleged[]"[81][82] while simultaneously maintaining the position that the

discoverable evidence backing up its claim is off limits.  Furthermore, unlike the

government, the defendant has presented actual evidence in support of his allegations in the

form of sources cited in the *Technical Explanations* and *General Facts* sections of his

motion.  A number of the resources are already on the record including thousands of pages of

technical standards.  The remaining resources are published books, publicly available

technical standards, and other similar documents of which anyone can look up on the web

and/or on "Google Books" at no cost.  If this is not adequate to satisfy the preponderance of

the evidence standard applicable to suppression motions then the defendant requests that the

Court reconsider his motion for appointment of an expert.[83]

### H.   Reply to government response RE: warrantless acquisition of historical cell site location information, historical electronic gate location information, and destination IP addresses.

The government addressed the defendant's allegation of illegal searches and seizures

relating to historical cell site location information, historical electronic gate location

information, and destination IP addresses.  However, the government also grouped in a

nonexistent challenge to the government "compel[ling] the Domicilio Apartment Complex to

turn over a copy of defendant's rental agreement file[.]"[84]  This nonexistent challenge is

another of the government's straw-man fallacies.  The defendant did not challenge the

obtaining of rental records and the prosecution is grouping in said records in order to bolster

an otherwise weak response to the pertinent challenge.[85]  In a recent unpublished opinion,

---

81.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 53).

82.   Although the government ambiguously claimed that "a number" of the defendant's allegations are not true, it failed to deny any of the specific allegations the defendant presented in numbered paragraphs.  In the context of a civil action, failure to deny an allegation is taken as a judicial admission.  *See* American Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 227 (9th Cir. 1988) ("A statement in a complaint, answer or pretrial order is a judicial admission, as is a failure in an answer to deny an allegation.").

83.   *See Ex Parte Motion To Appoint 1xEV-DO Rel. 0, Etc. Expert To Defense* (Dkt. #866).

84.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 39).

85.   Likewise, in order to further suit its straw-man argument, the government incorrectly stated that the defendant is "suggesting that [] third parties should not have created or maintained the records in the first place."  *Id.* (Dkt. #873, p. 44).  To the contrary, the defendant argued that the government should have used a warrant to obtain the defendant's historical cell site location information, real-time cell site location information, historical electronic gate location

the Ninth Circuit noted that the government's use of "cell site location information raises important and troublesome privacy questions not yet addressed by this court." United States v. Reyes, 435 Fed.Appx. 596, 598 (9th Cir. 2011).  The Third Circuit also found that historical cell site location information would implicate the Fourth Amendment "if it [] disclose[s] location information about the interior of a home."  In The Matter Of The Application Of The United States Of America For An Order Directing A Provider Of Electronic Communication Service To Disclose Records To The Government, 620 F.3d 304, 317 (3rd Cir. 2010).[86]  The government can do as much "grouping in" of nonexistent arguments as it likes but it will not erase the multitude of Fourth Amendment violations infecting its investigation like a virus.

In his Motion To Suppress, Memorandum Re: Fourth Amendment Violations (Dkt. #824-1), Argument, Sections V(C)(4), V(C)(5), and V(C)(8) respectively, the defendant explained how the government used the defendant's historical cell site location information, real-time cell site location information, and historical electronic gate location information to locate the aircard and the defendant inside his home.  The government also conceded that "the aircard tracking operation was a Fourth Amendment search and seizure[,]"[87] which, at the very least, encompasses the location information addressed in this section.  As for the destination IP addresses, the defendant explained in his Motion To Suppress, Memorandum Re: Fourth Amendment Violations (Dkt. #824-1, p. 257-63), Argument, Section V(C)(9), how the government's warrantless acquisition of destination IP addresses violated the defendant's reasonable expectation of privacy.  In response to the defendant's arguments, the government

information, and destination IP addresses—even if the service provider intermediaries logged or had access to that information.

86.    For the defendant's 1.8 million destination IP addresses, which amount to communications content and other private information, the Ninth Circuit articulated in Forrester that its ruling on the destination IP addresses applicable to that case "does not imply that more intrusive techniques or techniques that reveal **more content information** are also constitutionally identical to the use of a pen register[.]"  United States v. Forrester, 512 F.3d 500, 511 (9th Cir. 2008) (emphasis added).

87.    See Government's Memorandum Re Motion For Discovery (Dkt. #674, p. 1) (footnote omitted); see also January 4, 2012 Court Order (Dkt. #723, p. 14-15) ("[F]or purposes of Defendant's motion to suppress, the government agrees that the Court may assume that the aircard tracking operation was a Fourth Amendment search and seizure.").

asserted that subpoenas and 2703(d) orders do not implicate one's Fourth Amendment rights. However, the government misses the point.  The defendant argued that a subpoena (or similar) is not a "talisman that dissolves all constitutional protections."  <u>United States v. Dionisio</u>, 410 U.S. 1, 11 (1973).  For example, a 2703(d) order for cell site location information "would violate the Fourth Amendment absent a showing of probable cause [][if] it allows police access to information which reveals a cell phone user's location within the interior or curtilage of his home."  <u>In The Matter Of The Application Of The United States Of America For An Order Directing A Provider Of Electronic Communication Service To Disclose Records To The Government</u>, 620 F.3d at 320 (Tashima, J., concurring).  All of the government's arguments relating to subpoenas and 2703(d) orders are just as irrelevant here as they would be if the government were to use, for example, a subpoena to record the defendant's phone conversations or a 2703(d) order to physically search his home.[88]  The government was required to use proper probable cause warrants considering, for one matter, locational privacy vis-a-vis a home residence was well established in the 1980's with cases such as *Knotts* and *Karo*.

> ### I.     Reply to government response RE: good-faith reliance on statutes, judicial authorization, and existing precedent relating to warrantless acquisition of <u>destination IP addresses</u>.

The government cites to <u>Davis v. United States</u>, 131 S.Ct. 2419 (2011) in support of its claim that it relied in good-faith on binding appellate precedent when it used subpoenas to obtain and utilize the defendant's 1.8 million destination IP addresses.[89]  In this context, the only case arguably applicable to the government's *Davis* claim is <u>United States v. Forrester</u>, 512 F.3d 500 (9th Cir. 2008).  However, a *Forrester*-based good-faith claim only applies to using Pen/Trap orders issued under 18 U.S.C. § 3121-27[90] while the government in the

---

88.     The government notes that the "[d]efendant cites no case, and the United States is aware of none, in which a federal court has ever suppressed cell-site records, IP address records, or security systems records."  *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 45).  The government then goes on to cite various cases where motions to suppress cell site location information were denied.  However, none of the cases cited by the government address the government's use of cell site location information or similar information to surveil a subject *inside his home* – as the government did here.

89.     *See id.* (Dkt. #873, p. 48).

90.     *See* <u>Forrester</u>, 512 F.3d at 511-12 (9th Cir. 2008).

- 21 -

present case used mere subpoenas issued under 18 U.S.C. § 2703(c)(2)—a statutory violation already conceded by the government[91]—and thereafter a "retroactive" 2703(d) order which is also illegal under the SCA.[92]  The government's claim of good-faith reliance fails because agents violated the SCA by using "but-for"[93] subpoenas and a retroactive order unsupported by the provisions of the SCA.  *See* <u>United States v. Warshak</u>, 631 F.3d 266, 289 (6th Cir. 2010) (in face of constitutional challenge, no good-faith if SCA violation is but-for cause of obtaining evidence).  Additionally, even if the Court ignores the SCA violations during its good-faith analysis, *Forrester* "does not imply that more intrusive techniques or techniques that reveal **more content information** are also constitutionally identical to the use of a pen register[.]"  <u>Forrester</u>, 512 F.3d at 511 (emphasis added).  Obtaining the defendant's 1.8 million destination IP addresses is far enough beyond the bounds of *Forrester* to implicate the above quoted caveat and destroy the government's *Davis* claim.

### J.   Reply to government response RE: good-faith reliance on statutes, judicial authorization, and existing precedent relating to warrantless acquisition of <u>historical cell site location information</u>.

The government cites to <u>United States v. Warshak</u>, 631 F.3d 266 (6th Cir. 2010) in support of its claim that it relied in good-faith on the SCA when it used 2703(d) orders to obtain and utilize the defendant's historical cell site location information.[94]  However, *Warshak* does not help the government's good-faith claim.  The provisions of the SCA addressed in *Warshak* clearly authorized the *email* surveillance relevant to that case.  *See* <u>Warshack</u>, 631 F.3d at 289 (Considering emails are specifically addressed in the text of the SCA, "it was not plain or obvious that the SCA was unconstitutional, and it was therefore

---

91.   For the two D.Ariz subpoenas used to obtain the defendant's destination IP addresses (*i.e.*, 07-03-609 and 07-03-615), the relied upon 18 U.S.C. § 2703(c)(2) is plainly inapplicable.  *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 139), *Procedural History*, Section III(B) (the government agrees that the destination IP addresses were obtained in violation of the SCA).

92.   *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 360-61), *Argument*, Section V(G)(7)(b) (explaining how the SCA provides no support for issuing "retroactive orders" intended to undo prior violations of the statute).

93.   But-for the government using illegal subpoenas and an illegal "retroactive" 2703(d) order, it would have never obtained the defendant's 1.8 million destination IP addresses.

94.   *See Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 48-49).

*REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS* CR08-814-PHX-DGC

reasonable for the government to rely upon the SCA in seeking to obtain the contents of Warshak's emails."). In the present case, the government misunderstood the SCA—a statute that does not mention geolocation information—by applying 2703(d) instead of obtaining a warrant under 2703(c)(1)(A). As previously noted, locational privacy vis-a-vis a home residence was well established in the 1980's with *Knotts* and *Karo*. Due to the well established norm and the government's intention to locate the defendant in his home, 2703(d) was simply inapplicable and the proper avenue was a probable cause warrant. This misunderstanding of the law precludes application of the good-faith exception. *See, e.g.*, United States v. Twilley, 222 F.3d 1092, 1094 (9th Cir. 2000) (an officer does not act "objectively reasonable" if "his belief [in the law] was wrong" and there "is no good-faith exception to the exclusionary rule for police who do not act in accordance with governing law."); *see also* Warshack, 631 F.3d at 289 ("it seems evident that an officer's failure to adhere to the boundaries of a given statute should preclude him from relying upon it in the face of a constitutional challenge"); United States v. Whiting, 781 F.2d 692, 698 (9th Cir. 1986) (refusing to apply the *Leon* good faith exception to an illegal search conducted by a government employee who mistakenly believed that export regulations authorized his search); Roska v. Sneddon, 437 F.3d 964, 978 (10th Cir. 2006) (denying qualified immunity because officials "failed to actually comply with the statute upon which they purportedly relied.").[95] *See also Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 357-63), *Argument*, Sections V(G)(7) (Consolidated "no good-faith" argument RE: mistaken understanding of the law).

Additionally, even if the issuing magistrates had discretion to examine the facts and

---

95.    The government noted that the Supreme Court in *Krull* extended the good-faith exception to the exclusionary rule for when law enforcement seize evidence while acting in objectively reasonable reliance on a statute later found to be unconstitutional. Illinois v. Krull, 480 U.S. 340 (1987). However, **unconstitutionality of the SCA is not the defendant's argument**. The defendant argued the inapplicability of 2703(d) in light of his reasonable expectation of privacy and the government's failure to understand that it was required to obtain a warrant under 2703(c)(1)(A). The government refuses to acknowledge that extension of the good-faith exception to situations where an officer violates the statute upon which he was relying "does not follow inexorably from [][the *Krull*] decision" because "[i]n that context, the relevant actors are not legislatures or magistrates, but police officers." *Id.* at 360 fn. 17.

issue 2703(d) orders for historical cell site location information where **no** reasonable expectation of privacy is implicated,[96] the government never indicated in its applications that it actually sought any type of location information at all—let alone location information pertaining to the aircard and the defendant *inside his home*.[97]  The government's deceitfulness robbed the issuing magistrates of their opportunity to "mak[e] a judgment about the possibility that such disclosure would implicate the Fourth Amendment, as it could if it would disclose location information about the interior of a home."[98]  On these orders, there can be no good-faith reliance on the magistrates' mere uninformed issuance.  *See* United States v. Rettig, 589 F.2d 418, 423 (9th Cir. 1978) ("A judicial officer cannot perform the function of issuing a warrant particularly describing the places to be searched and the things to be seized... where the police fail to disclose an intent to conduct a search the purposes and dimensions of which are beyond that set forth in the affidavits.").

### K.   Reply to government response RE: good-faith reliance on statutes, judicial authorization, and existing precedent relating to warrantless acquisition of <u>historical electronic gate location information</u>.

The government makes a general good-faith claim regarding its warrantless acquisition of the defendant's historical electronic gate location information used to locate the aircard and the defendant *inside his home*.  As previously noted, locational privacy vis-a-vis a home residence was well established in the 1980's with *Knotts* and *Karo*.  All the government had was a mere subpoena—which was executed like a warrant[99]—and there is

---

96.   *See* <u>In The Matter Of The Application Of The United States Of America For An Order Directing A Provider Of Electronic Communication Service To Disclose Records To The Government</u>, 620 F.3d at 316 (agreeing with the EFF that, when faced with a request for authorization to obtain historical cell site location information, "a magistrate or judge can, at his or her discretion, require the Government to obtain a warrant or an order.").

97.   The defendant explained in his *Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 337-39), *Argument*, Section V(F)(3)(b), how the D.Ariz. 08-3298MB-LOA and 08-7273MB-ECV orders and order applications entirely fail to include the word "location" in any applicable context.

98.   <u>In The Matter Of The Application Of The United States Of America For An Order Directing A Provider Of Electronic Communication Service To Disclose Records To The Government</u>, 620 F.3d at 317.

99.   *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 255-56), *Argument*, Section V(C)(8)(b)(i) (FBI Agent Murray and a Quality Alarm Service

1   no case law, statute, or magistrate assurance of which the government could have been

2   relying upon in good-faith.

3       **L.    Reply to government response RE: particularity violations relating**
        **to the D.Ariz. 07-03-609 and 07-03-615 Grand Jury subpoenas and**
4       **08-3286MB-LOA order.**

5       For the the 1.8 million destination IP addresses, the government stated that the

6   "[d]efendant cites no authority suggesting that lack of particularity is a basis for suppressing

7   information obtained through a subpoena or 2703(d) order."[100]  However, the government

8   ignores the fact that it was the overly broad subpoenas and order that formed the foundation

9   of the relevant Fourth Amendment violations.  Had the government originally obtained a

10  2703(d) order particular to, for example, the "175 IP addresses..." corresponding to

11  "electronically filed returns for the 2007 tax year[,]"[101] then there would have been no

12  implication of the defendant's reasonable expectation of privacy.  The particularity violation

13  needs to be analyzed in the context of the Fourth Amendment as opposed to the SCA or rules

14  applicable to subpoenas.  *See, e.g.,* Sibron v. New York, 392 U.S. 40, 59-62 (1968) (holding

15  it is unnecessary to first examine the facial validity of statutory authority for a warrantless

16  search in light of the Fourth Amendment; concern is rather with facts of the actual search).

17  The particularity violation also bears upon the government's good-faith claim.  *See Motion*

18  *To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 357-63),

19  *Argument*, Section V(G)(3) (Consolidated "no good-faith" argument RE: particularity

20  violations).

21      **M.    Reply to government response RE: reliance on Dalia v. United**
        **States, 441 U.S. 238 (1979) to justify various warrantless searches**
22      **and seizures involving FBI use of cell site emulators.**

23      The government again attempted to rewrite the defendant's suppression arguments,

24  this time to better suit its argument that "[n]othing in the language of the Constitution or in

25  _____

26  employee downloaded geolocation data from each fob reader at the Domicilio apartment
    complex).

    100.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 48).

27  101.   *Submission Of Documents Related To Original Northern District Of California 08-*
28  *70460-HRL Search Warrant Used To Physically Search Apartment No. 1122* (affidavit, p. 3)
    (#566-1, p. 5).

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

this Court's decisions interpreting that language suggests that... search warrants [] must include a specification of the precise manner in which they are to be executed." United States v. Dalia, 441 U.S. 238, 257 (1979).[102]  In order to fit its *Dalia*-based response, the government incorrectly generalized the defendant's argument's on page Nos. 292-96 and 301-02[103] as claiming that "the execution [of N.D.Cal. 08-90330MISC-RS] exceeded the scope because the warrant did not specifically authorize the FBI to use a cell site simulator."[104][105]  Contrary to the government's assessment, the defendant identified three independently **searched** places/items that were beyond the scope of the N.D.Cal. 08-90330MISC-RS order:[106] **(1)** private residences,[107] **(2)** the aircard,[108] and **(3)** the host laptop computer.[109]  Nowhere in the order does it state that the government can **search** the noted places/items for evidence.[110]  Likewise, the defendant identified at least seven independently **seized** items/information that were beyond the scope of the N.D.Cal. 08-

REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

102.    *See Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 51).

103.    *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 306-10 and 315-16).

104.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 50-51).

105.    It should be noted that the N.D.Cal. 08-90330MISC-RS *order* is not a *warrant*.  The word "warrant" appears nowhere within the order, the order did not command the government to do anything at all, the order expressly omits numerous provisions of Rule 41 applicable to warrants, the only applicable finding in the order is "specific and articulable facts," and the order commands the destruction of evidence.  Any implied authority that can be construed from the mere existence of a *warrant* does not apply to the N.D.Cal. 08-90330MISC-RS *order*.

106.    *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 303-06), *Argument*, Section V(F)(1).

107.    To the extent that the N.D.Cal. 08-90330MISC-RS order authorized **Verizon Wireless** to monitor aircard transmissions while the aircard was located inside private residences, that authorization (1) did not pertain to the government's use of any equipment separate from Verizon Wireless, (2) did not authorize a search of private residences in order to seize evidence, and (3) was issued upon a finding of "specific and articulable facts" as opposed to the probable cause finding.  *See id.* (Dkt. #824-1), *Argument*, Section V(F)(1)(a), (e), and (f); *see also* Section I(N), *infra* (addressing the government's attempt to rely upon language in *Karo*).

108.    To the extent that the N.D.Cal. 08-90330MISC-RS order merely mentions the aircard, it did not authorize the government or Verizon Wireless to **search** the device in order to **seize** data stored on the device or to **seize** the device itself.

109.    The government conducted research on the aircard prior to seeking the N.D.Cal. 08-90330MISC-RS order and that research informed the government that the aircard can only operate if coupled to a host laptop computer.  *See First Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 11 (Dkt. #587-1) (government web research on aircard).

110.    *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 306-09), *Argument*, Section V(F)(1)(a) (analyzing N.D.Cal. 08-90330MISC-RS order).

90330MISC-RS order:[111] **(1)** the aircard, **(2)** the host laptop computer, **(3)** data stored on the aircard, **(4)** signal transmissions emanating from the aircard (which encompasses signal strength, angle-of-arrival, time-of-flight, *etc.*), **(5)** the location of the aircard while inside a private residence,[112] **(6)** the aircard Internet access service, and **(7)** the electricity being provided to the aircard and host laptop computer.  Nowhere in the order does it state that the government can seize the noted items/information.[113]  In other words, even if the "mobile tracking device" term contained in the order actually read "cell site simulator," the order would still fail to list the places/items/information the FBI searched and seized.  The rest of the challenges contained on page Nos. 292-96 and 301-30 relate to particularity violations and lack of applicable probable cause findings, which are also beyond the context of *Dalia*.

However, if the Court rejects the defendant's arguments relating to specific Fourth Amendment searches and seizures – and thereafter continues on to analyze the government's application of *Dalia* – the N.D.Cal. 08-90330MISC-RS order is still not saved from its **scope and particularity pitfalls**.  For example, if the Court finds that the N.D.Cal. 08-90330MISC-RS order need *not* authorize the specific searches and seizures identified by the defendant—a notion the defendant finds appalling—then, in light of the technology being absent from case law and statutes at the time, the order should have at least explained, in some context if not in the context of *specific* searches and seizures, that the government was setting out to **(1)** use its *own* portable cell site emulators that will broadcast a private cellular network, **(2)** commandeer the aircard and laptop for the government's own use, **(3)** hijack the aircard's connection from Verizon Wireless, **(4)** download the aircard's stored data such as ESN, **(5)** write data to the aircard, **(6)** reprogram the aircard's operations, **(7)** transmit signals into private areas in order to seek out the aircard, **(8)** force the aircard to transmit signals that would not normally be transmitted, **(9)** collect the aircard's transmitted signals for the purpose of geolocation analysis (*e.g.*, signal strength, angle-of-arrival, time-of-flight, *etc.*),

---

111.   *See id.* (Dkt. #824-1, p. 303-06), *Argument*, Section V(F)(1).

112.   Although the N.D.Cal. 08-90330MISC-RS order makes reference to Verizon Wireless monitoring the aircard while inside private residences, the order does not state that said location(s), information of said location(s), or geolocation data are seizable evidence.

113.   *See id.* (Dkt. #824-1, p. 306-09), *Argument*, Section V(F)(1)(a).

REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

**(10)** conduct triangulation techniques, **(11)** deny the aircard Internet access service, and **(12)** hijack the aircard's power source.  Articulating the above would have provided the issuing magistrate the opportunity to understand all the resulting necessary Fourth Amendment implications prior to deciding whether to issue the order as drafted by the government.  As explained below, an intelligent analysis of *Dalia* supports the defendant's conclusion.

The *Dalia* court addressed a claim that FBI agents violated the Fourth Amendment by relying upon an order issued under 18 U.S.C. §§ 2510-2522 ("Title III") to covertly enter an office to install an electronic listening device while the order failed to explicitly authorize entry into the premises.  Dalia, 441 U.S. at 249-259.  The *Dalia* court found no Fourth Amendment violation because "[t]he legislative history of Title III underscores Congress' understanding that courts would authorize electronic surveillance in situations where covert entry of private premises was necessary."  *Id.* at 251.  "It is understandable, therefore, that by the time Title III was discussed on the floor of Congress, those Members who referred to covert entries indicated their understanding that such entries would necessarily be a part of the bugging authorized under Title III."  *Id.* at 251-52.  In the present case, there is no statute, and thus no legislative history, addressing the government's use of cell site emulators to locate wireless devices.  The government also failed to inform the issuing magistrate that it intended to use cell site emulators to locate the aircard.  In other words, there is no separate Fourth Amendment activity that could have necessarily been inferred by the issuing magistrate other than what may have been inferred from the "mobile tracking device" term used in the order.  The most recent *Dalia*-type discussion relating to "mobile tracking devices" was done in the context of 18 U.S.C. § 3117 and Fed. R. Crim. Pro. 41—both cited by the issuing magistrate in the N.D.Cal. 08-90330MISC-RS order.  In the committee note for the 2006 amendment to Rule 41 applicable to mobile tracking devices, the Advisory Committee on the Federal Rules of Criminal Procedure indicated that "[t]he amendment provides that a magistrate judge may issue a warrant... to install and use a tracking device, as the term is defined in 18 U.S.C. § 3117(b)...."[114]  Later, the Committee revealed its

---

114.   109th Congress, 2d Sess., House Doc. 109-104, *Amendments to the Federal Rules of*

REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

1  understanding of the definition contained in 18 U.S.C. § 3117(b) by explaining that a

2  tracking device may be installed "in the trunk of the defendant's car" or monitored "while the

3  car is in the defendant's garage"[115]—clearly suggesting a beeper/GPS type mobile tracking

4  device as opposed to a cell site emulator.  Additionally, nowhere in the committee note does

5  it explain any Fourth Amendment activity that can be necessarily inferred from the term

6  "mobile tracking device."  The underlying reasoning supporting the Supreme Court's

7  decision in *Dalia* simply does not apply to the Fourth Amendment activity at issue in the

8  present case.  *See also* <u>United States v. Oliva</u>, No. 10-30126, p. 8371 (9th Cir., Jul. 20, 2012)

9  ("We agree that if the government seeks authorization for the use of **new technology**..., it

10  must specifically request that authority, the court must scrutinize the need for such

11  surveillance and the authorization orders must be **clear and unambiguous**." (emphasis

12  added)).  Because the public, courts, and lawmakers were all in the dark regarding the Fourth

13  Amendment implications of cell site emulators, the equipment qualified as "new technology"

14  in the *Oliva* context at the time it was used to locate the aircard—notwithstanding the fact

15  that the technology was secretly and covertly in use since the 1990's.

16        **N.**    **Reply to government response RE: reliance on <u>United States v.</u>**

17                **<u>Karo</u>, 468 U.S. 705 (1984) to justify its various warrantless searches and seizures relating to use of cell site emulators.**

18        The government cites to <u>United States v. Karo</u>, 468 U.S. 705, 718 (1984) in support of

19  its claim that there was no need to specify that an unknown "place" or "places" would be

20  **searched** by the government.[116]  First, the place (*i.e.*, real property) to be searched is only

21  one of many issues relating to the government's numerous Fourth Amendment searches and

22  seizures conducted via its cell site emulators.  Second, with respect to the "place," the

23  defendant did not argue that the government should have listed 431 El Camino Real,

24  Apartment No. 1122, Santa Clara, CA 95050.  The defendant argued, among other matters,

25  that the government should have listed "private residences" as places to be **searched** by the

---

26

27  *Criminal Procedure* (May 8, 2006), *available at* http://www.gpo.gov/fdsys/pkg/CDOC-
   109hdoc104/pdf/CDOC-109hdoc104.pdf (last accessed: Sept. 11, 2012), p. 57 (PDF, p. 61).

28  115.   *Id.*, p. 59 (PDF, p. 63).

    116.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 52).

*REPLY TO GOVERNMENT'S RESPONSE TO*
*DEFENDANT'S MOTION TO SUPPRESS*
*CR08-814-PHX-DGC*

**government** using radio wave transmissions that will **enter** those private residences.  The N.D.Cal. 08-90330MISC-RS order merely states that **Verizon Wireless** "shall provide to agents of the FBI data and information obtained from the **monitoring of transmissions** related to the location of the [][aircard]... including the monitoring of the [][aircard] while... the [][aircard] is (a) inside private residences..."[117]  The authority contained in the N.D.Cal. 08-90330MISC-RS order falls short of constitutional requirements considering (1) it was the government carrying out Fourth Amendment activity, not Verizon Wireless, and (2) that activity involved sending interrogation signals through the walls of private residences for the purpose of **searching** for a person and his possessions.  In contrast, *Karo* involved the use of a government owned beeper that passively transmitted radio signals from within a private residence.  Unlike cell site emulators, use of a *Karo* style beeper requires no through-the-wall electronic entry into private residences for the purpose of conducting the equivalent of a physical search within that residence resulting in the seizure of an item that does not belong to the government.  Notwithstanding the fact that a street address need not be listed, the government still needed specific authority for **agents** to electronically **enter** random private residences for the purpose of **searching** for and **seizing** the aircard, *etc.*[118]

### O.  Reply to government response RE: claim that the N.D.Cal. 08-90330MISC-RS affidavit saves deficiencies in the 90330MISC-RS order.

As explained in the defendant's *Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 306-09), *Argument*, Section V(F)(1)(a), the N.D.Cal. 08-90330MISC-RS order was directed at and applied solely to Verizon Wireless[119] and did

---

117.    *Submission Of Materials Related To Applications And Court Orders Numbered 08-90330 And 08-90331, Authorized By Magistrate Judge Richard Seeborg, Northern District Of California, On July 11, 2008* (order, p. 2) (Dkt. #470-1).

118.    Additionally, with respect to any evidence obtained from Verizon Wireless, the government contradicts itself by claiming that the particularity requirement does not apply to "all data, information, facilities, and technical assistance" considering *all* "data" and *all* "information" are clearly "things to be seized" that need to be further particularized.  *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 316-17), *Argument*, Section V(F)(1)(g).

119.    *Compare In The Matter Of The Application Of The United States Of America For An Order...*, 616 F.2d 1122, 1130 (9th Cir, 1980), wherein "[t]he order was directed to **both** the IRS agents and to Mountain Bell." *Id*. (emphasis added).  *See also id*. at 1125 fn. 3 (the text of the order reads "TO: Special Agents of the Internal Revenue Service, United States Department of

not authorize or command the government to do anything at all—whether a search, seizure, or otherwise.  In spite of the order, the FBI operated its own equipment to access, search, and seize the aircard while it was not even connected to Verizon Wireless.  This alone is enough to grant the defendant's *Motion To Suppress*.  In an attempt to get around this glaring pitfall, the government misquoted the following wording contained in the N.D.Cal. 08-90330MISC-RS order affidavit while arguing that the quoted text cures the order's deficiency: "the equipment the government sought to use 'ultimately generate[s] a signal that fixes the geographic position' of the aircard."[120]  However, the *full* and non-misconstrued version of the text reiterates that the order application **only** requested authority to have Verizon Wireless locate the aircard, not the government:

> Special Agent Murray has confirmed with a representative of Verizon Wireless that the Target Broadband Access Card/Cellular Telephone may be capable of being monitored by a mobile tracking device.  In addition, the representative of Verizon Wireless believes that a telephone call to the Target Broadband Access Card/Cellular Telephone may generate a transmission between the card and one or more cell sites.  The cell sites provide a link between the Target Broadband Access Card/Cellular Telephone and Verizon Wireless facilities, where the Verizon Wireless and then determine the general location of the Target Broadband Access Card/Cellular Telephone.  The mobile tracking equipment ultimately generate a signal that fixes the geographic position of the Target Broadband Access Card/Cellular Telephone.

> *Submission Of Non-Redacted Affidavit Submitted In Support Of N.D.Cal. 08-90330MISC-RS Order Application Seeking Order To Locate The Aircard*, p. 17 ¶ No. 42 (Dkt. #888-1).

The above wording coincides with the text of the issued order, which is **only** directed at Verizon Wireless and **only** authorizes Verizon Wireless to conduct certain actions and fails to authorize the government to do anything at all:

> This matter is before the Court pursuant to an Application..., which Application requests an Order directing **Verizon Wireless** to assist agents of the Federal Bureau of Investigation (FBI) by providing all information, facilities, and technical assistance needed to ascertain the physical location of

---

the Treasury and the Mountain States Telephone and Telegraph Company[.]").

120.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 50 (quoting the N.D.Cal. 08-90330MISC-RS order application affidavit out of context)); *see also id.* (Dkt. #873, p. 51-52) ("[T]o the extent that the warrant itself was unclear, the application and supporting affidavit show what the FBI intended to do: use mobile tracking equipment to find the aircard.").

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

1   the [][aircard]..., through the use and monitoring of a mobile tracking device
for the [][aircard] with service by **Verizon Wireless**...

2

3   *Submission Of Materials Related To Applications And Court Orders Numbered
08-90330 And 08-90331, Authorized By Magistrate Judge Richard Seeborg,
Northern District Of California, On July 11, 2008* (order, p. 1 (emphasis
added)) (Dkt. #470-1).

4

5          The Court therefore ORDERS,... that **Verizon Wireless**, within ten (10)
days of the signing of this Order and for a period not to exceed 30 days, unless

6   extended by the Court, shall provide to agents of the FBI data and information
obtained from the monitoring of transmissions related to the location of the []

7   [aircard], and shall monitor such transmissions, to extend to any time of the
day or night as required, including the monitoring of the [][aircard] while the

8   agents are stationed in a public location and the [][aircard] is (a) inside private
residences, garages and/or other locations not open to the public or visual

9   surveillance; and (b) anywhere else the [][aircard] may be present within the
United States []; said ORDER being expressly limited to [monitoring]

10  transmissions needed to ascertain the physical location of the [][aircard], and
expressly excludes any voice communications and data content transmitted by

11  Verizon Wireless to or from the [][aircard];

12  *Id.* (order, p. 2-3 (emphasis added)) (Dkt. #470-1).[121]

13         Nevertheless, even if the affidavit attached to the N.D.Cal. 08-90330MISC-RS order

14  application *could* somehow save the deficient order, it contains no language incorporating

15  the affidavit at all—let alone sufficiently.  The order only states that "[t]his matter is before

16  the Court pursuant to an **Application**... by Assistant united States Attorney Shawna

17  Yen..."[122][123] and fails to mention FBI Agent William Ng's affidavit.  Additionally, the

18  government refuses to present evidence or testimony indicating that the FBI technical agents

19  met the second necessary requirement of having the affidavit with them while executing the

20  order.  "We consider an affidavit to be part of a warrant, and therefore potentially curative of

21  

22  121.   Also, *compare* the N.D.Cal. 08-90330MISC-RS order, merely authorizing "Verizon
Wireless... [to] provide to agents of the FBI data and information obtained from the monitoring

23  of transmissions...," to the warrant on the record at *Second Submission Of Consolidated Exhibits
Relating To Discovery And Suppression Issues*, <u>EXHIBIT 114</u> (Dkt. #821-6), authorizing the

24  search of "[t]he wireless signal broadcasting the SSID 'BELKIN54G'..." and a "TO:" field
followed by "SPECIAL AGENT JAMES D. COLE and any Authorized Officer of the United

25  States." The later authorizes government agent activity while the former only authorizes Verizon
Wireless activity.

26  122.   *Submission Of Materials Related To Applications And Court Orders Numbered 08-90330
And 08-90331, Authorized By Magistrate Judge Richard Seeborg, Northern District Of
California, On July 11, 2008* (order, p. 1 (emphasis added)) (Dkt. #470-1).

27  123.   This wording is also insufficient to incorporate the **application** by AUSA Yen.  *See

28  Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 324-26),
*Argument*, Section V(F)(1)(j).

1  any defects, only if (1) the warrant expressly incorporated the affidavit by reference **and** (2)

2  the affidavit either is attached physically to the warrant or at least accompanies the warrant

3  while agents execute the search." United States v. SDI Future Health, Inc., 553 F.3d 1246,

4  1258 (9th Cir. 2009) (citation and internal quotation marks omitted) (emphasis added)).[124]

5  Additionally, because FBI Agent Ng prepared the affidavit, this is not a case where there may

6  be support for a good-faith claim "because the same agents who executed the warrant

7  prepared the affidavit." United States v. Lei, 525 F.3d 709, 731 (9th Cir. 2008).  The

8  defendant will subpoena the three unidentified FBI technical agents who purportedly

9  executed the 08-90330MISC-RS order.  If the government fails to produce those witnesses

10  for testimony,[125] it lacks the means to prove that any of them had the order application,

11  affidavit, or even the order with him/her while conducting the numerous Fourth Amendment

12  searches and seizures identified by the defendant.[126]

> ### P.  Reply to government response RE: "fraud," *i.e.*, use of aliases, destroys the defendant's reasonable expectation of privacy.

15      The government argued that "society's interests would be better served by a policy

16  that gave no protection to the privacy interests of individuals in defendant's position, a thief

17  and fugitive who concealed his true identity and location in order to operate a sophisticated

18  and complex tax fraud scheme with fraudulently obtained Aircard, apartment and

19  laptop..."[127]  In support of its position, the government attempted to construe *Caymen* to

20  apply to the defendant's use of aliases, which the government labels as "fraud."[128]  *Caymen*

---

124.   *See also* United States v. McGrew, 122 F.3d 847, 850 (9th Cir. 1997) ("If the 'incorporated' affidavit does not accompany the warrant, agents cannot claim good faith reliance on the affidavit's contents.").

125.   The government claims that the identities of the three FBI technical agents who operated the equipment to locate the aircard are "law enforcement sensitive" and cannot be revealed.  *See also January 4, 2012 Court Order* (Dkt. #723, p. 12) (The Court agreed with the government and concluded that "[d]isclosures of the specific identities of agents involved in this operation could jeopardize their safety and would effectively eliminate them as law enforcement assets used in electronic surveillance.").

126.   The government cannot provide hearsay testimony from a primary case agent considering the government maintains the position that none of the primary case agents accompanied the FBI technical agents while they executed the order.

127.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 61).

128.   *See id.* (Dkt. #873, p. 57).  Although not precisely articulated at Dkt. #873, the

1   held that a thief has no reasonable expectation of privacy in the property he steals.[129]   The

2   government argued that *Caymen* extends to the defendant's use of aliases because "[t]here is

3   no reason to distinguish property obtained by fraud [(*i.e.*, using an alias)] from property

4   stolen by robbery or trespass."[130]   Assuming arguendo that this reasoning is correct, the

5   government still failed to acknowledge that if Caymen had been in possession of the stolen

6   property at the time of the search, it would "raise the questions at issue in cases where a

7   guest is still using a room that he obtained by fraudulent use of a credit card."  <u>Caymen</u>, 404

8   F.3d at 1199 (footnote omitted) (citing <u>United States v. Cunag</u>, 386 F.3d 888 (9th Cir. 2004);

9   <u>United States v. Bautista</u>, 362 F.3d 584 (9th Cir. 2004)).   In other words, had Caymen been in

10  possession of the computer he stole, he would have maintained his reasonable expectation of

11  privacy at least until the store took steps towards repossession.  *See* <u>Cunag</u>, 386 F.3d at 895.

12  In the present case, the defendant maintained possession of his apartment and belongings

13  during the time of the aircard locating mission, no steps were taken towards repossession,

14  and the relevant entities were not even aware of the defendant's use of aliases when the

15  challenged Fourth Amendment activity occurred.  *See* <u>United States v. Young</u>, 573 F.3d 711,

16  719-20 (9th Cir. 2009) ("Here, the district court acknowledged the possibility of fraud, but

17  correctly distinguished Young's situation from that in *Cunag* by noting that hotel

18  management was completely unaware of such a possibility and that, as a result, the alleged

19  fraud did not destroy Young's expectation of privacy in the room...").   In the present case, not

20  even the government was aware of the so-called "fraud" (*i.e.*, assumed *deceased* identities)

21  relating to the defendant's apartment, electricity, and laptop computer until **after** the aircard

22  locating mission had concluded.  Also, the defendant cannot stress enough that (1) he did **not**

23  provide any name at all—*i.e.*, no arguable "fraud"—when he made the in-person cash

24

25  _____

26  government perceivably means "identity fraud" relating to the defendant's use of aliases
    corresponding to the one living person and two deceased persons.  Or, possibly the government

27  means some type of "contract fraud" in the sense that the defendant did not reveal his true
    identity while entering into agreements with Domicilio, Verizon Wireless, Lenovo, *etc*.

    129.   *See* <u>United States v. Caymen</u>, 404 F.3d 1196, 1200 (9th Cir. 2005)

28  130.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 57).

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

purchase of his aircard,[131] and (2) the aircard was forced to **not** access the Verizon Wireless

account, which was opened under the name of "Travis Rupard" (*i.e.*, assumed *living*

identity), at the time the FBI technical agents conducted their Fourth Amendment searches

and seizures.[132][133]   In other words, at least for the physical aircard, laptop, electricity, and

the defendant's apartment, there simply is no underlying factual support for the government's

arguments relating to "fraud" considering the defendant's aliases were either unknown or

simply not in play during the time of the challenged Fourth Amendment activity.

The government also relied upon the Tenth Circuit's *Johnson* decision in its attempt to

twist *Caymen* out of context.  *See* United States v. Johnson, 584 F.3d 995 (10th Cir. 2009).  In

*Johnson*, police discovered evidence that Shannon Haroldsen's driver license was stolen and

used by Johnson's girlfriend to rent a storage unit.  *See id*.  The events that followed can be

summed up as follows:

> Haroldsen was informed "that the police had found her identification and rental
> agreement in her name, she stated that she had not rented the unit and agreed to
> come to the police station in the morning to consent to a search of the storage
> unit...."  A detective named "McKnight" then "met with Haroldsen and asked
> her to sign a consent to search form for the storage unit referenced in the rental
> agreement. []  After signing a consent to search form, Haroldsen accompanied
> Detective McKnight to the storage unit facility.  Detective McKnight explained
> to the manager of the storage facility, Sherry Kinsey, that police wanted to
> search a storage unit that had been rented in Haroldsen's name but that
> Haroldsen had not actually rented the unit or agreed to have the unit rented in
> her name.  The manager then provided Detective McKnight with copies of
> documents concerning the unit's rental including the rental agreement and a
> receipt for one month's rent.  Attached to the rental agreement, which bore
> Haroldsen's name and address, was a photocopy of Haroldsen's driver license
> [(which had the real Haroldsen's actual picture)].... []  The manager showed
> Detective McKnight the storage unit, which was secured by a heavy-duty lock.
> Because the lock could not be cut and Haroldsen had consented to the search,
> the manager of the facility gave Detective McKnight permission to open the
> unit by cutting the latch."

Johnson, 584 F.3d at 997-997.

---

131.   *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 211-12), *Argument*, Section V(A)(2).

132.   *See id.* (Dkt. #824-1, p. 182-84), *General Facts*, Section IV(B)(8).

133.   The government's "alias = 'fraud' = no expectation of privacy" argument, if it were to be accepted by the Court, is only arguably relevant to the "Travis Rupard" Verizon Wireless **account**.  However, even in the context of the account, no steps were taken towards repossession or cancellation of service and Verizon Wireless was unaware of the defendant's use of an alias. Again, the government's argument lacks the requisite factual foundation.

Had the *Johnson* case been addressed in the Ninth Circuit, the court would have likely also found that Johnson had no reasonable expectation of privacy in the storage unit.  However, its finding would **not** have been because Johnson's girlfriend used a stolen driver license but because management "justifiably t[oo]k[] 'affirmative steps to repossess'" the storage unit. Cunag, 386 F.3d at 895; Bautista, 362 F.3d at 590 (same).  *See also* United States v. Domenech, 623 F.3d 325, 329 (6th Cir. 2010) ("[T]he criminal activity conducted there, the use of an agent to rent the rooms, and the agent's use of an alias... [do not]—individually or cumulatively—defeat the reasonableness of the privacy expectation...").  The government also relied on *Johnson* in support of its argument that "nothing could have stopped the true Travis Rupard carrying a copy of his Social Security Card, from gaining access to the Aircard's account."[134]  However, nothing could have stopped the identity fraud victims in *Cunag*, *Bautista*, *Caymen*, and *Young* from gaining access to the rooms and computer acquired in their names either.  In the Ninth Circuit, a mere "possibility" is not enough. Rather, there must be knowledge of the so-called "fraud" and justifiable and affirmative steps must be taken towards repossession.[135]

### Q.   Reply to government response RE: attempt to distinguish United States v. Issacs, 708 F.2d 1365 (9th Cir. 1983) to support claim that the defendant had no reasonable expectation of privacy.

The government claimed that the "defendant's reliance on United States v. Issacs for the precept that his reasonable expectation of privacy in his apartment extended also to the laptop and aircard is misplaced."[136]  Contrary to the government's claim, the present case is directly on point with *Issacs*.  In sum, the government may not "argue possession but deny expectation of privacy where the circumstances of the case make such positions necessarily inconsistent." Issacs, 708 F.2d at 1368.  The circumstances of the present case are nearly identical to those in *Issacs*:  The defendant's aircard and laptop were possessed by him within

---

134.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 57).

135.   Under the government's reasoning, it would be legal for federal agents to skip over the repossession and/or warrant step prior to a spontaneous *kicking-in* of a front door to a home residence, seizing all items therein, and occupying that space indefinitely simply because it was rented or purchased by the resident under an alias.  After all, the resident would have no reasonable expectation of privacy.

136.   *Id.* (Dkt. #873, p. 60).

his home residence.  Issacs' journals were possessed by him within his home residence.  The government conceded that the defendant in the present case "still had a reasonable expectation of privacy in the apartment itself..."[137]  Likewise, the government conceded that Issacs "had a legitimate expectation of privacy in the invaded place[.]" Issacs, 708 F.2d at 1368 (internal citation and quotation makes omitted).  Therefore, in both cases, "the distinction the government seeks to draw between an expectation of privacy in the space invaded and the items seized is untenable." Id.  While it is true that the defendant "cannot in this context rely on estoppel to discharge his allotted burden of proof," United States v. Singleton, 987 F.2d 1444, 1449 (9th Cir. 1993), the defendant need not offer any proof establishing his reasonable expectation of privacy in his home considering the fact was already established through a government concession of which the defendant does not dispute.  See Steagald v. United States, 451 U.S. 204, 211 (1981) ("We conclude, however, that the Government, through its assertions, concessions, and acquiescence, has lost its right to challenge petitioner's assertion that he possessed a legitimate expectation of privacy in the searched home."); Davis, 332 F.3d at 1168 (When both parties agree on a fact, it has "the effect of withdrawing [][the] fact from issue and dispensing wholly with the need for proof of the fact...").  Notwithstanding the fact being withdrawn from issue as of the date the government filed Dkt. #465, there is still a great deal of evidence on the record—which is referenced in the defendant's *Motion To Suppress*—proving the defendant's reasonable expectation of privacy in his home.

> **R.     Reply to government response RE: claim that the defendant had no reasonable expectation of privacy because he had no public connections to his aliases.**

Although irrelevant in the Ninth Circuit, the government argued that the "defendant went to great lengths to have no public connection to 'Travis Rupard' or any of his other aliases, so it follows that he does not have a legitimate expectation of privacy..."[138]  The government attempted to distinguish the use of an alias discussed in United States v.

---

137.   *Government's Memorandum Regarding Law Enforcement Privilege And Request For An Ex Parte And In Camera Hearing If Necessary* (Dkt. #465, p. 22 fn. 3).

138.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 59).

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

*Villarreal*, 963 F.2d 770, 772-73 (5th Cir. 1992) from the defendant's use of aliases based on the reasoning that the defendant in *Villarreal* "was known by at least one witness by the fictitious name connected to two shipping drums full of marijuana that Customs agents opened without court authorization."[139]  However, in the present case, the government's own evidence shows that numerous witnesses either know the defendant under one of his aliases—and have detailed opinions regarding the defendant—or have longstanding records on the defendant under one of his aliases.  For example: (1) FBI Agent Murray interviewed a witness named Zeljka Grabovcic who knows the defendant as Steven Brawner,[140] (2) the defendant established his more than two year long relationship with Verizon Wireless as Travis Rupard,[141] (3) IRS-CI Agent Medrano interviewed the facility manager at CBD Indoor Mini Storage and he confirmed that Daniel Aldrich rented unit No. A-47 using an ID having a photo similar to the photo on the defendant's Steven Brawner ID,[142][143][144] (4) FBI Agent Peter A. Jackson interviewed a witness named Jeff Koche who knows the defendant as Daniel Aldrich going back five years prior to his arrest,[145] and (5) the defendant established his nearly five year long relationship with Wired Plastic[146] and

---

139.  *Id.*

140.  *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, **EXHIBIT 15** (Dkt. #898-1).

141.  *See* evidence cited in footnote Nos. 1183, 1184, 1185, 1186, 1187, 1188, 1189, 1190, 1191, 1192, 1193, and 1194 of *Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 213-14), *Argument*, Section V(C)(3).

142.  *See Submission Of Documents Related To Northern District Of California 08-70502-HRL Search Warrant Used To Physically Search Storage Unit No. A-47*, Affidavit by IRS-CI Agent Fleischmann (Dkt. #846-1, p. 52).

143.  *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, **EXHIBIT 16** (Dkt. #898-1) (storage unit A-47 rental records containing photocopy of ID corroborating Affidavit by IRS-CI Agent Fleischmann's affidavit).

144.  *See id.*, **EXHIBIT 17** (Dkt. #898-1) (CBD Indoor Mini Storage facility manager, James Mathews, informed IRS-CI Agent Medrano that "Aldrich does not come in often and has not seen him in awhile.").

145.  *See id.*, **EXHIBIT 18** (Dkt. #898-1) (Jeff Koche also identified the defendant as Daniel Aldrich in a photo lineup).

146.  *See Second Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 086 (Dkt. #821-5) (Letter and account records from the defendant's Wired Plastic prepaid debit card provider indicating that the defendant has been known to Wired Plastic as Andrew Johnson since the August 28, 2003.).

Lenovo[147] as Andrew Johnson.  The government also contended in its factual statement that "[a]t the time of his arrest, defendant was living in the apartment under the false Brawner identity with no means of traceability or recourse if he walked away from the terms of the lease or apartment."[148]  However, the defendant gave Domicilio the address of a then two year old private mail box of where the defendant could be contacted.[149]  After-the-fact reality also conflicts with the government's claim of no accountability.  Domicilio was able to contact the defendant after his arrest while he was at the Santa Clara County Jail and later while he was at CCA-CADC in Florence, AZ.[150]  The defendant was renting month-to-month[151] and satisfactorily closed out his lease after his arrest.[152]

### S.   Reply to the government's response RE: claim that the defendant had no reasonable expectation of privacy in the area outside of his apartment.

The government claimed that the "defendant appears to contend[] that he had a reasonable expectation of privacy in the common areas around the apartment he occupied..."[153]  The defendant did not make this argument and said argument is irrelevant to all challenged Fourth Amendment searches and seizures.

### T.   Reply to the government's response RE: blanket claim of no reasonable expectation of privacy in "anything," which may perceivably apply to the defendant's storage unit.

In its response, the government claimed for the first time that "[t]he government has

---

147.   *See id.*, EXHIBIT 084 (Dkt. #821-5) (The defendant's Lenovo purchase account records showing that Lenovo has known the defendant as Andrew Johnson since August 30, 2007).

148.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 36).

149.   *See id*.

150.   *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, **EXHIBIT 19** (Dkt. #898-1) (Domicilio letters sent to the defendant after his arrest).

151.   *See Second Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 090 (Dkt. #821-5) (records indicating that the defendant would continue renting apartment No. 1122 "month to month" after April 30, 2008).

152.   *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, **EXHIBIT 19** (Dkt. #898-1) ("Upon receiving your notice to vacate the premises, we were able to enter the unit and assess for damages, charges, or abandoned possessions.  The unit was completely clean with all possessions removed.  As a result, the only cleaning and damage related charges were for a touch-up cleaning for small missed spots and a prorated charge for carpet shampoo.").

153.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 61).

never conceded that defendant had a valid expectation of privacy in **anything** that he

obtained, possessed, or maintained through the use of a fraudulent identity[.]"[154]  The

defendant already established his reasonable expectation of privacy in all places, items, and

information relevant to his filings at Dkt. #824 and #830.  Although the government failed to

assert the argument specifically,[155] one remaining searched place that the government *may*

now claim that the defendant has no "standing" is the defendant's storage unit relevant to

Dkt. #867.[156]  The search of storage unit No. A-47 was not directly challenged at Dkt. #824

and #830 because relevant evidence was withheld until after the defendant filed his *Motion*

*To Suppress*.[157]  Additionally, the search of the defendant's storage unit is a direct fruit of

the illegal searches/seizures addressed at Dkt. #824 and #830, *i.e.*, rental records were found

on the defendant's home computer along with the combination to the padlock securing the

unit.[158]  Nevertheless, the defendant had a reasonable expectation of privacy in his storage

unit.  Despite its own evidence and an IRS-CI affidavit to the contrary, the government now

appears to sweep up the defendant's storage unit into its overall claim of "alias = 'fraud' = no

expectation of privacy."  The government's claim is without merit considering (1) the

defendant personally rented the storage unit using a name, ID number, and social security

number that he invented,[159] (2) the government referred to the storage unit as the

---

154.  *Id.* (Dkt. #873, p. 60 (emphasis added)).

155.  *See* United States v. Huggins, 299 F.3d 1039, 1050 fn. 15 (9th Cir. 2002) ("the government can waive the standing defense by not asserting it").

156.  *See First Supplement To Motion To Suppress RE: Search And Seizure Of Digital Evidence Under N.D.Cal. Warrants* (making challenge to digital evidence search/seizure relevant to data storage devices seized from storage unit No. A-47).

157.  *See id.* (Dkt. #867, p. 1-3).

158.  *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 05 (Dkt. #863-1) (August 7, 2008 email from IRS-CI Agent Daun to Jeffrey Willert: "[O]ne of the documents [seized from the defendant's computer] identified a storage unit he had in another 'fake' identity."); *Submission Of Documents Related To Original Northern District Of California 08-70502-HRL Search Warrant Used To Physically Search Storage Unit No. A-47* (Dkt. #846-1, p. 52) ("[D]uring the ongoing execution of the second warrant relating to the subject apartment,... computer records relating to a storage unit were identified....  The computer records list a combination for the lock on the unit.").

159.  *See* defendant's declaration RE: *Daniel Rigmaiden's storage unit was unit No. A-47 at CBD Indoor Mini Storage, 570 Cinnabar Street, San Jose, California 95110* (Dkt. #894-1).

defendant's in its search warrant application/affidavit,[160] (3) the government sufficiently

established the defendant's ownership for the magistrate,[161] (4) the name used to rent the

storage unit was not associated with any of the alleged crimes, (5) the picture on the ID used

to rent the storage unit matched the defendant's likeness and picture on the ID used to rent

his home residence,[162] (6) the government located data backups in the defendant's storage

unit matching data previously found in the defendant's home,[163] (7) the name used to rent

the storage unit was "Daniel Aldrich," while the defendant's true first name is "Daniel" and

at least one witness knows the defendant as "Daniel Aldrich" going back five years prior to

the search,[164] and (8) no steps were taken to repossess the storage unit prior to execution of

the search warrant.

### U.    Reply to government response RE: concession that the defendant had a possessory interest in the relevant items and places.

The government claimed that the defendant had no reasonable expectation of privacy

while at the same time conceding the defendant's legitimate possessory interest in his

apartment, laptop, aircard, *etc*.[165] The government's concession is enough to support the

---

160.    *See Submission Of Documents Related To Original Northern District Of California 08-70502-HRL Search Warrant Used To Physically Search Storage Unit No. A-47* (Dkt. #846-1, p. 53) ("There is probable cause to believe that the 'Hacker' will have one or more computers at **his** residence and/or storage unit..." (emphasis added)); *id.* (Dkt. #846-1, p. 3) ("The location to be searched is a self storage unit currently rented by a person using the name Daniel Clifton Aldrich who also currently uses the name Steven Travis Brawner.").

161.    *See Submission Of Documents Related To Original Northern District Of California 08-70502-HRL Search Warrant Used To Physically Search Storage Unit No. A-47* (Dkt. #846-1, p. 52) ("The facility's rental records for the unit include a photo copy of a drivers' license in the name of Daniel Clifton Aldrich.  The image in the drivers' license... **appears to be arrestee**." (emphasis added) (referring to the arrest of the defendant on August 3, 2008)).

162.    *See id.* (Dkt. #846-1, p. 52) ("The facility's rental records for the unit include a photo copy of a drivers' license in the name of Daniel Clifton Aldrich[] [which] ...is similar to the image in the Steven Travis Brawner [license].").

163.    *Compare* image of "filesalot.dcv" contained on storage device seized from apartment No. 1122 with image of "filesalot_bak_3-31-2008" contained on storage device seized from storage unit No. A-47. *Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 01 (Dkt. #863-1, p. 16 and 30) ("Computer Forensic Report" by IRS-CI Agent Daun RE: search of data storage devices and encrypted virtual drives seized from apartment No. 1122 and storage unit No. A-47, p. 11 and 25).

164.    *See* Section I(R), *supra* (discussing government interview of Jeff Koche).

165.    *See Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 60) (The government agreed that the defendant "personally possessed, obtained, or maintained the items.").

defendant's "standing" to challenge all identified and uncontested searches/seizure analyzed

under a *Jacobsen* meaningful-interference-with-possessory-interest analysis, *Jones* trespass-

to-obtain-information analysis, and/or *Soldal* meaningful-interference-with-liberty-interest

analysis[166]—all of which do not require a reasonable expectation of privacy.

**V.   Reply to government response RE: claim that there was no
*Jacobsen*-type or *Soldal*-type seizure of the aircard, *etc.* because the
defendant did not detect the FBI technical agents conducting the
aircard locating mission.**

The government claimed that the "efforts conducted by the FBI in the course of

locating the Aircard on July 16, 2008... were so insignificant they went undetected by

defendant."[167]  The government's claim is senseless.  Among other actions causing a

meaningful interference, the FBI technical agents used the defendant's electricity, wrote data

to and reprogrammed the defendant's aircard, deactivaed the defendant's signal encryption,

and denied the defendant access to the Internet.[168]  The defendant experienced a

deprivation of his electricity considering he was paying for his electricity through Silicon

Valley Power.[169]  The defendant also experienced the two denial-of-service attacks, first

conducted via surreptitious phone calls[170] and later through total signal hijacking via cell

site emulators,[171] considering he was unable to use his Internet service during that time.

[172]  Simply because the defendant was unaware at that time that the denial-of-service

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

---

166.   *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 265), *Argument*, Section V(D)(2), (4), and (5); id. (Dkt. #824-1, p. 271), *Argument*, Section V(E).

167.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 35).

168.   *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 184), *General Facts*, Section IV(B)(9).

169.   *See id.* (Dkt. #824-1, p. 213), *Argument*, Section V(A)(4).

170.   *See id.* (Dkt. #824-1, p. 182), *General Facts*, Section IV(B)(8).

171.   *See id.* (Dkt. #824-1, p. 182), *General Facts*, Section IV(B)(9)(i).

172.   During the FBI's two separate denial-of-service attacks, the aircard was on and the defendant was using the aircard in an *attempt* to access the Internet.  If the defendant was not attempting to use his aircard while being forcibly denied access to the Verizon Wireless network, it would have been impossible for the FBI to access the aircard via its cell site emulators.  The LAESP logs of the defendant's repeated aircard reconnect attempts during the first denial-of-service attack and the inability of the FBI's equipment to conduct a man-in-the-middle attack during the second denial-of-service attack is evidence that the defendant experienced the denial-of-service attacks –  even if he did not detect that the FBI was behind the misdeeds.

attacks, theft of electricity, reprogramming of the aircard's operations, deactivation of

encryption, and other identified actions were a result of an FBI perpetrated aircard locating

mission does not somehow mean that no meaningful seizure occurred or that the defendant's

liberty interests were not meaningfully intruded upon.

### W.   Reply to government response RE: claim that technical violations of the N.D.Cal. order do not merit suppression.

In its response, the government cited various cases in support of an argument that

"suppression is not an appropriate remedy for a failure to make a return or serve a copy of

the warrant, or for other technical violations."  However, more accurately, suppression is not

a remedy for technical violations unless (1) "the defendant was prejudiced, in the sense that

the search would not have occurred or would not have been so abrasive if law enforcement

had followed the Rule" **or** (2) "officers acted in 'intentional and deliberate disregard' of a

provision in the Rule." United States v. Williamson, 439 F.3d 1125, 1132 (9th Cir. 2006)

(citation omitted).  Only one of the above quoted conditions need be met in order to merit

suppression.  In response to the defendant's uncontested claim[173] that he would have

immediately moved from apartment No. 1122 after being served with the order on July 17,

2008, the government claimed that it "could have sought delayed notice for precisely that

reason."[174]  However, there is no evidence that the government was considering delayed

notice and the N.D.Cal. 08-90330MISC-RS order application and order do not mention or

authorize delayed notice.  When analyzing what the government "could" or "would" have

done, agents never took advantage of their opportunity to seek permission to conduct a

"delayed" (i.e., extended) computer forensic search with respect to the N.D.Cal. 08-70460-

HRL/PVT and 08-70502-PVT warrants.  Using the execution of those warrants as a guide, it

is unlikely that the government even considered delayed notice or would have sought

delayed notice with respect to the N.D.Cal. 08-90330MISC-RS order.

---

173.   The government did not contest the defendant's claim that he would have immediately moved after being served and the government even noted that the defendant "spen[t] a significant portion every day seeking to avoid detection or identification[.]" Government's Response To Defendant's Motion To Suppress (Dkt. #873, p. 53).

174.   Government's Response To Defendant's Motion To Suppress (Dkt. #873, p. 55).

REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

The government also claimed that it "would have obtained the location of defendant's aircard even if it did not commit these technical violations..."[175]  Even if the government would have went forward with its aircard locating mission under a condition that it must comply with service requirements, the later in-person search of apartment No. 1122 would have never produced evidence or the defendant.  Had the defendant been served on July 17, 2008, or shortly thereafter, he would have moved from apartment No. 1122 with all of his belongings before the government's execution of the N.D.Cal. 08-70460-HRL/PVT search warrant.  The government had already returned one warrant unexecuted considering agents—numbering in the double digits and conducting 24-hour surveillance—lacked the fundamental investigatory skills to "see" the defendant on the numerous occasions he came and went from his apartment.  Considering the defendant would have been long gone and unseen after being served, the government would have never been able to physically place the defendant at the apartment.  The amended version of the N.D.Cal. 08-70460-HRL/PVT search warrant would have likely been returned unexecuted or, in the alternative, no evidence would have been produced if the warrant had been executed considering the defendant and his belonging would have been long gone.  Based on the above reasoning, failure to serve the defendant with the N.D.Cal. 08-90330MISC-RS order was a "but-for" cause of obtaining the defendant's arrest and evidence through execution of the N.D.Cal. 08-70460-HRL/PVT search warrant.  Therefore, even if the aircard location survives, there is still a long list of evidence that should be suppressed as a remedy for failure to serve the defendant with a copy of the N.D.Cal. 08-90330MISC-RS order.

The government also claimed that "in this case the agents had no real opportunity to serve the owner of the aircard with a copy of the tracking warrant[.]"[176]  The government's claim contradicts reality.  On July 22, 2008, an undercover agent posed as a "Chinese food delivery man" and knocked on the defendant's door[177] while yelling "Chinese food!"  The

---

175.  *Id.* (Dkt. #873, p. 55).

176.  *Id*.

177.  *See First Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues,* EXHIBIT 46 (Dkt. #587-3) (July 23, 2008 email by IRS-CI Agent Daun, sent to IRS-CI Agent Willert: "The subject did not answer his door when they attempted deliver food last night

REPLY TO GOVERNMENT'S RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS
CR08-814-PHX-DGC

1    defendant did not answer his door to the agent because he did not order Chinese food and

2    never answers his door to unexpected visitors.[178]  The agent thereafter left a Chinese food

3    menu on the defendant's front door.[179]  Approximately 30 minutes later, the defendant

4    opened his front door and brought the menu into his apartment.[180]  Had the government

5    placed a copy of the N.D.Cal. 08-90330MISC-RS order on the defendant's door as opposed

6    to a Chinese food takeout menu, the defendant would have been served.  The government

7    should not be let off the hook when it serves a suspect with a menu from a Chinese food

8    restaurant instead of serving him with a copy of the order purportedly relied upon to violate

9    his Fourth Amendment rights.

10          Finally, the government claimed that it did not need to provide the defendant notice

11   because the N.D.Cal. 08-90330MISC-RS order was used to "obtain non-content information

12   associated with a customer or subscriber of an electronic communication service[] [and] is a

13   warrant under [18 U.S.C.] § 2703(c)(1)."[181]  The Stored Communications Act ("SCA"),

14   *i.e.*, 18 U.S.C. § 2703 *et seq.*, does not apply to FBI agents using their own cell site

15   emulators to conduct a multitude of real-time Fourth Amendment searches and seizures

16   entirely separate from the Verizon Wireless network.  Additionally, the government arguing

17   that the SCA applies to the N.D.Cal. 08-90330MISC-RS order supports the defendant's

18   argument that the order was directed **only** at Verizon Wireless and **only** authorized actions to

19   be conducted by Verizon Wireless, a provider of an electronic communication service under

20   the SCA.

21   _____

     and he still hasn't been seen."); *Fourth Submission Of Consolidated Exhibits Relating To*
22   *Discovery And Suppression Issues*, **EXHIBIT 20** (Dkt. #898-1) (discussing ruse Chinese food
     delivery).

23   178.    *See Motion To Suppress*, defendant's declaration RE: *Daniel Rigmaiden's residence was
     at 431 El Camino Real, Apartment No. 1122, Santa Clara, CA.* 95050  (Dkt. #824-2, p. 2), ¶ 4,
24   p. 2.

     179.    *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression
25   Issues*, **EXHIBIT 21** (Dkt. #898-1) (menu was placed on door of apartment No. 1122);
     **EXHIBIT 22** (Dkt. #898-1) (video screenshot of undercover FBI agent placing Chinese food
26   restaurant menu on door of apartment No. 1122 on July 22, 2008).

     180.    *See Fourth Submission Of Consolidated Exhibits Relating To Discovery And Suppression
27   Issues*, **EXHIBIT 23** (Dkt. #898-1) (menu placed on door of apartment No. 1122 was removed);
     *id.*, **EXHIBIT 24** (Dkt. #898-1).

28   181.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 55).

### X.   Reply to government response RE: claim that agents are entitled to the good-faith exception to the exclusionary rule for any Fourth Amendment violation relating to use of cell site emulators.

In support of a claim of good-faith, the government noted that the N.D.Cal. 08-90330MISC-RS order "was similar to numerous cell phone tracking warrants issued across the United States by other U.S. magistrate judges, including U.S. magistrate judges here in the District of Arizona."[182]  This is an interesting claim to make considering, for one thing, all orders issued in the District of Arizona relating to any type of real-time surveillance of a wireless device remain **forever** sealed from the defendant and the public.  Any "similar" orders unsealed or leaked in other districts were already placed on the record by the defendant for comparison.[183]  Unlike the wholly unconstitutional N.D.Cal. 08-90330MISC-RS order, the examples that were placed on the record are *(a)* actual warrants or are accompanied by actual warrants that *(b)* authorize **government agents** to conduct **searches** and **seizures** while *(c)* particularly describing what was to be searched/seized.  The noted available "similar" orders and/or warrants provide support for the defendant's arguments, not the government's.  Additionally, if the government is indeed habitually deceiving magistrates across the United States with applications for "similar" orders that are unconstitutionally ambiguous and directed solely at service providers, this is precisely the type of "systemic error or reckless disregard of constitutional requirements"[184] meriting a suppression remedy.

The government also claimed that at worst the government made "procedural errors," and "[t]here is no evidence of intentional misconduct[] [considering] agents were using a relatively new technology, and they faced a lack of legal precedent regarding the proper form of a warrant to obtain the location information they sought."[185]  First, the FBI has been using cell site emulators at least since the early 1990's when one was used to catch computer

---

182.   *Id.* (Dkt. #873, p. 63).

183.   *See Second Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 112, EXHIBIT 114, EXHIBIT 115, and EXHIBIT 116 (Dkt. #821-6).

184.   United States v. Herring, 129 S.Ct. 695, 704 (2009).

185.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 63).

hacker Kevin Mitnick.[186]  Simply because the defendant is the first to expose the FBI's illegal conduct does not mean that the technology was "new" to law enforcement or that the **fifteen years** following Mitnick's arrest was insufficient time for the government to figure out the legal implications.  Second, even if the government's longtime concealment of the technology from the public created a situation where it was "new" to the courts and lawmakers in the year 2008, there is still no support to find that long-standing Fourth Amendment principals were beyond the executive branch's comprehension as applied to the relevant investigative methods.  For example, there was nothing novel about the need to seek specific and particular authority in an order or warrant if the government intended to (1) search a wireless device in order to seize data contained within the device, (2) seize a suspect's Internet access service, electricity, wireless device, and computer for the government's own use, (3) search private home residences by electronically entering those residences in order to electronically seize a suspect's possessions, or (4) seize a suspect's real-time over-the-air encrypted signals for the purpose of accessing information within those signals allowing for location pinpointing.  "[T]he relevant inquiry is whether the state of the law at the time of the official conduct complained of was such as to give the [][agents] 'fair warning' that their conduct was unconstitutional – that a fair application of well-established legal principles would warrant such a conclusion."  <u>Young v. County of Los Angeles</u>, 655 F.3d 1156, 1167 (9th Cir. 2011).  "Otherwise, officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."  <u>Deorle v. Rutherford</u>, 272 F.3d 1272, 1286 (9th Cir. 2001).  *See also* <u>United States v. Johnson</u>, 457 U.S. 537, 560-61 (1982) (rejecting good-faith argument and applying the exclusionary rule to government misconduct falling under umbrella of unsettled Fourth Amendment case law).

Additionally, the government clearly engaged in misconduct considering it tailored the wording of the N.D.Cal. 08-90330MISC-RS order application to be ambiguous to serve

---

186.   *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 100-01), *Technical Explanations*, Section II(G)(1) (also noting how a single FBI agent claims to have used cell site emulators more than 300 times between the year 2000 and 2009).

1  the purpose of hiding the technology from the defendant and the public.[187]  Any

2  government actor who drafted or reviewed the proposed order and order application had the

3  ulterior motive of hiding its true purpose in order to prevent later Fourth Amendment

4  challenges that may expose the technology to the public.  This is clearly a case where "the

5  magistrate may have been misled by the terms of the request set forth in the affidavit, and

6  may not have noticed the conflict in the papers submitted to him."  Marks v. Clarke, 102 F.3d

7  1012, 1028 (9th Cir. 1996) (denying qualified immunity on Fourth Amendment challenge).

8  However, regardless of the above arguments, the good-faith exception simply does not apply

9  in light of the long list of reasons already articulated by the defendant in his *Motion To*

10  *Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 345-63),

11  *Argument*, Section V(G).

**Y.    Reply to the government's response RE: claim that the FBI
executed the N.D.Cal. 08-90330MISC-RS order.**

14      In its response, the government claimed that "the FBI... executed the [08-90330MISC-

15  RS] warrant..."[188] while failing to produce any evidence indicating that the FBI actually did

16  so.  *See* Beier v. City of Lewiston, 354 F.3d 1058, 1069 (9th Cir. 2004) ("[T]he mere

17  existence of a warrant provides little useful information to the officers.").  Even if the Court

18  rejects all of the defendant's arguments relating to the N.D.Cal. 08-90330MISC-RS order,

19  interprets the order as a "warrant," and more or less just agrees with the government, there is

20  still no evidence that the order was ever executed.[189]  While Fourth Amendment activity

21  _____

22  187.    *See* Motion To Suppress, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 195-97 and 204-05), *General Facts*, Section IV(B)(10) and (B)(15).

23  188.    *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 49).

24  189.    *See* Motion To Suppress, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 325), *Argument*, Section V(F)(1)(j) (The defendant argued that "the government is yet to offer any evidence indicating that the undisclosed FBI technical agents... had the actual *order* with them while locating the aircard[.]").  Even if having the order present during the search is not a Fourth Amendment requirement, the government still failed to provide evidence that the FBI technical agents met the necessary requirement of becoming fully familiar with the terms of the N.D.Cal. 08-90330MISC-RS order prior to engaging in Fourth Amendment activity.  *See* United States v. Whitten, 706 F.2d 1000, 1009-10 (9th Cir. 1983) ("Officers conducting a search should read the warrant or otherwise become fully familiar with its contents...").  This pitfall, in combination with other pitfalls reiterated in this subsection, results in the government failing to prove at Dkt. #873 that the N.D.Cal. 08-90330MISC-RS order was executed at all.

1    certainly took place, the government refuses to produce[190]—let alone identify—the three

2    FBI technical agents who operated the equipment used to locate the aircard.  Considering the

3    prosecution maintains that none of the primary case agents accompanied the FBI technical

4    agents while they operated the equipment,[191] there are no "non-privileged" agents who can

5    provide hearsay testimony establishing that the FBI technical agents actually executed the

6    order.  The government never filed a return with the issuing magistrate so there is no official

7    record of the order ever having been executed.[192]  The government never served the

8    defendant with a copy of the order at the completion of the aircard locating mission so there

9    is no evidence of the order's use to locate the defendant and his aircard.[193]  There is also no

10   seized evidence to cross reference and pair against the order's terms considering the

11   government destroyed all evidence obtained by the FBI technical agents.[194]  Considering

12   the government's response fails to articulate otherwise, it is now crystal clear that the three

13   FBI technical agents were not executing the N.D.Cal. 08-90330MISC-RS order but were

14   instead conducting warrantless searches and seizures while not executing any order at all.

15                                        * * * * *

16        This reply was drafted/prepared by the *pro se* defendant, however, he authorizes his

17   shadow counsel, Philip Seplow, to file this reply on his behalf using the ECF system.  The

18   defendant is appearing *pro se* and has never attended law school.  The defendant's filings,

19   however inartfully pleaded, must be liberally construed and held to less stringent standards

20   than formal pleadings drafted by lawyers.  *See* Haines v. Kerner, 404 U.S. 519, 520 (1972).

21   _____

22   190.   When "[t]he government adamantly refused to put on any witnesses at the evidentiary
     hearing[,]" the district court correctly concluded that "the government had failed to meet its
23   burden of proof..."  United States v. Batiste, 868 F.2d 1098, 1091-93 (9th Cir. 1988) (footnote
     omitted).

24   191.   *See September 22, 2011 Status Conference, Partial Transcript of Proceedings*, p. 36,
     14:56:09 – 14:56:48 [MR. BATTISTA] ("... There were tech agents out there.  They're the ones
25   who possessed the equipment, operated the equipment....  [The primary case agents] didn't see it.
     They didn't operate it.").

26   192.   *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1,
     p. 147-48), *Procedural History*, Section III(E).

27   193.   *See id.*, (Dkt. #824-1, p. 209), *General Facts*, Section IV(B)(18).

28   194.   *See Motion To Suppress, Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1,
     p. 204), *General Facts*, Section IV(B)(15).

1   Respectfully Submitted:

2

3                                          PHILP SEPLOW, Shadow Counsel, on
                                           behalf of DANIEL DAVID RIGMAIDEN,
4                                          Pro Se Defendant:

5

6                                          s/ Philip Seplow
                                           Philip Seplow
7                                          Shadow Counsel for Defendant.

8                         CERTIFICATE OF SERVICE

9

10          I hereby certify that on:              I caused the attached document to be

11   electronically transmitted to the Clerk's Office using the ECF system for filing and
     transmittal of a Notice of Electronic Filing to the following ECF registrants:

12

13   Taylor W. Fox, PC
     Counsel for defendant Ransom Carter
14   2 North Central Ave., Suite 735
     Phoenix, AZ 85004
15

16   Frederick A. Battista
     Assistant United States Attorney
17   Two Renaissance Square
     40 North Central Ave., Suite 1200
18   Phoenix, AZ 85004

19

20   Peter S. Sexton
     Assistant United States Attorney
21   Two Renaissance Square
     40 North Central Ave., Suite 1200
22   Phoenix, AZ 85004

23

24   James R. Knapp
     Assistant United States Attorney
25   Two Renaissance Square
     40 North Central Ave., Suite 1200
26   Phoenix, AZ 85004

27

28   By: s/ Daniel Colmerauer
     (Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))

*REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS; CR08-814-PHX-DGC*