1 | Daniel Rigmaiden
  | Agency # 10966111
2 | CCA-CADC
  | PO Box 6300
3 | Florence, AZ 85132
  | Telephone: none
4 | Email: none

5 | Daniel David Rigmaiden
  | Pro Se, Defendant

6

7 | **UNITED STATES DISTRICT COURT**

8 | **DISTRICT OF ARIZONA**

9

10 | United States of America,

11 |        Plaintiff,

12 | v.

13 | Daniel David Rigmaiden, et al.,

14 |        Defendant.

No. CR08-814-PHX-DGC

REPLY TO GOVERNMENT'S
RESPONSE TO MOTION FOR
DISCOVERY RE: DIGITAL EVIDENCE
SEARCH [Dkt. #911]

15

16 |        Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits *Reply To*

17 | *Government's Response To Motion For Discovery RE: Digital Evidence Search*.  The

18 | defendant's original motion is at Dkt. #890, his supplementary correction is at Dkt. #893, and

19 | the government's response is at Dkt. #911.  This filing is the defendant's reply.

20 |        On October 22, 2012, the government provided the defendant's court-appointed

21 | shadow counsel, Philip Seplow, various documents responsive to Dkt. #890.  Mr. Seplow

22 | brought the defendant the noted discovery on Friday, November 2, 2012.  The defendant

23 | reviewed the discovery on November 5, 2012.[1]  Referenced in this reply is a recently

24 | _____

25 | 1.      The defendant placed the relevant portions of the October 22, 2012 disclosure on the
   | record at *Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression*

26 | *Issues* (Dkt. #929-1).  Although the Court routinely disregards new evidence presented for
   | the first time in a reply, the whole point of filing a discovery motion is to obtain evidence

27 | helpful to the defense.  Not only is the new evidence relevant to the defendant's Fourth
   | Amendment arguments and upcoming *second* and possibly *third* supplements to his

28 | previously filed *Motion To Suppress* (necessity for supplements stems from new evidence), it
   | is also relevant to this reply considering the evidence will show that the government failed to
   | sufficiently comply with the defendant's "digital data search" discovery requests.

created government report, by an unknown author, documenting the case agents' efforts to comply with the defendant's discovery requests.[2]

   The noted government report is insufficient to comply with all of the defendant's discovery requests. Based on the reasoning below, the defendant is still requesting that the Court order the government to produce the requested discovery as further detailed throughout this motion.[3] However, it also appears as if IRS-CI Agent Tracy L. Daun and other government actors failed to preserve some of the requested evidence. Therefore, the defendant does not have access to the evidence he needs in order to solidify his "digital data search" suppression arguments and has simultaneously filed a short *Motion To Suppress All Digital Data Evidence As A Sanction For Failure To Preserve Evidence* (Dkt. #9??), which should be read in conjunction with this reply.

## I.   <u>REPLY</u>

### A.   Request for evidence No. 1.

The first category of evidence requested by the defendant is as follows:

All evidence relating to government agents/actors **providing** (and when/where they were provided) data originating from seized physical data storage devices to other government agents/actors—regardless of whether the government agents/actors are federal or state and regardless of whether the government agents/actors are involved in investigations relating to CR08-814-PHX-DGC or to other cases and/or investigations not resulting in charges/cases.

In response, the government provided a report on October 22, 2012 stating that IRS-CI Agent Daun provided the defendant's data to IRS-CI Agent Michael P. Fleischmann, IRS-CI Agent Denise L. Medrano, and FBI Agent Richard J. Murray by giving them their own

2.   The report is from the October 22, 2012 discovery set. The remainder of the documents provided by the government in response to the defendant's discovery request were copies of emails—most of which were duplicates from previous discovery sets.

3.   Through a separate motion, the defendant is also requesting that the Court impose sanction against the government for (1) the prosecution's deliberate concealment of discoverable evidence between December 9, 2011 and October 22, 2012, (2) the prosecution's attempt to conceal the agents' violations of the N.D.Cal. warrants, and (3) the prosecution's failure to comply with the defendant's "digital data search" discovery requests in a timely manner. The defendant has suffered prejudice. *See Motion Requesting Sanctions For Discovery Violations RE: Digital Evidence Search* (Dkt. #9??), filed simultaneously with this reply.

copies of the virtual machine clone of the defendant's entire computer system.[4][5]
However, the report raises more questions than it answers with respect to non-case agent government actors being provided with access to the defendant's data.  The report states that the virtual machine clone of the defendant's entire computer system, which includes copies of all DriveCrypt encrypted container files,[6] was copied to three separate physical locations: (1) "IRS-CI Case Agent VM," (2) "CIS VM" (Note: "CIS" acronym not defined), [7] and (3) an "FBI VM."[8]  While the report contains the noted generalized information, the government's disclosure contains no evidence indicating who had access to each of three physically separate[9] virtual machine clones of the defendant's computer system.  For example, where are the logs and reports of precisely who had access to the "CIS VM?"  Where are the logs and reports of precisely which FBI agents had/have access to the "FBI

---

4.    *See Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 01 (Dkt. #929-1, p. 3) ("The virtual machines each consisted of the IBM thinkpad computer, the 100GB external hard drive found in the apartment, the 500GB external hard drive found in the apartment and the 100GB external hard drive found in the storage unit.").  The report also states that "[n]o other computer media seized from the search warrants were accessible through the virtual machines."  *Id.*  However, this claim is irrelevant considering all other seized media were either blank or contained commercially available software, *i.e.*, installation CDs.

5.    The report also states that "Special Agent Daun is the only person in the government who has had access to the forensic images of the defendant's computers."  *Id.*, EXHIBIT 01 (Dkt. #929-1, p. 7).  However, the government creates confusion with this claim considering the "virtual machines" created by IRS-CI Agent Daun contain precisely the **same data** as the "forensic images."  For example, the first noted 100GB external hard drive contains the DriveCrypt encrypted container file, "filesalot.dcv," which can be decrypted and mounted as an encrypted virtual drive within the virtual machine.  *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues* EXHIBIT 01 (Dkt. #863-1, p. 16) ("Computer Forensic Report" by IRS-CI Agent Daun indicating that "filesalot.dcv" is contained on the 100GB external hard drive).  Additionally, each virtual machine copy allows the user to access a clone of the operating system running on the defendant's laptop, which includes the ability to run installed programs and analyze the installed environment.  To this effect, accessing a virtual machine clone of a seized computer system—both in the present case and in all other cases—is more intrusive than merely accessing a forensic image of a seized hard drive.  Of significance here, there is nothing in any of the relevant N.D.Cal. warrants permitting the government to seize and then access virtual machine clones of the defendant's entire computer system.

6.    *See* footnote No. 5, *supra*.

7.    The "CIS" acronym may refer to "Computer Investigative Specialist."

8.    *See Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 01 (Dkt. #929-1, p 5-7).

9.    By physically separate, the defendant means that each virtual machine clone was saved/loaded onto a separate physical computer running VMWare software.

REPLY TO GOVERNMENT'S RESPONSE TO MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH CR08-814-PHX-DGC

VM?"[10]  Furthermore, at one point, the case agents uploaded at least some of the

defendant's data to a network server accessible to numerous other government actors via an

unknown network[11]—where is the list of network user accounts corresponding to the

government actors who had access to the defendant's data saved on "Phosvr001" and other

file servers?  Where is the listing of all data uploaded to "Phosvr001" and other file servers?

Furthermore, there is a strong showing that the "FBI VM" copy, or data extracted therefrom,

was uploaded to an internal FBI network and shared with all other FBI agents for datamining

leads in other investigations—an investigative technique the FBI employs with other types of

seized data such as Pen/Trap data.[12]  There is also a strong showing that the virtual machine

clones and/or forensic images were uploaded to a National Security Agency datamining

database containing copies of all digital data seized by the FBI and other federal law

enforcement agencies involved in any and all domestic criminal investigations.[13]

---

10.     Notably, the government's report indicates that the "[t]he VM provided to the FBI... remains in the custody of the FBI in Phoenix." *Id.*, EXHIBIT 01 (Dkt. #929-1, p. 10). However, FBI Agent Murray (a primary case agent) now works at an FBI office in New Mexico.  Who are the agents that now have custody of the "FBI VM" in Phoenix?  Where are the reports showing their access history?

11.     *See id.*, EXHIBIT 03 (Dkt. #929-1, p. 17) (IRS-CI Agent Daun indicating that she uploaded data to a server named "Phosvr001," *i.e.*, precisely at: "\\Phosvr001\cis\Medrano_Fleischmann\20111220").

12.     For example, as is now public knowledge, the FBI maintains an all inclusive database containing the pen register and trap and trace data collected from **every** FBI investigation, which allows agents to use sophisticated datamining software to find leads by cross referencing otherwise uncorrelated telephone call records. *See Motion To Suppress*, *Memorandum Re: Fourth Amendment Violations* (Dkt. #824-1, p. 132), *Technical Explanations*, Section II(H)(6) (Explaining that the database associated with the FBI Telephone Applications System "maintains a record of all Pen/Trap data collected by the FBI since the time the database was created.").  Via this database, agents can conduct in depth searches of **all** Pen/Trap order responses provided by **all** telecommunications carriers in response to **every** court order the FBI has ever sought in **every** investigation.  This database is ongoing and forever growing.  Similar datamining databases likely exist for the type of seized digital data at issue in this reply.

13.     All federal law enforcement agencies continually upload other types of domestically seized data to an NSA network for the purpose of serving its datamining programs. *See* Gorman, Siobahn, *NSA's Domestic Spying Grows As Agency Sweeps Up Data*, The Wall Street Journal, (Mar. 10, 2008) archived version *available at* http://web.archive.org/web/20100104034453/http://online.wsj.com/public/article_print/SB120511973377523845.html (last accessed: Nov. 9, 2012) ("The NSA receives this so-called 'transactional' data from other agencies...").  It logically follows that the FBI would also upload data contained on all of its domestically seized physical data storage devices as the NSA, which is the leader of the U.S. Intelligence community, advances the policy to never delete anything because you never know when you might need it. *See Coast to Coast AM*,

REPLY TO GOVERNMENT'S RESPONSE TO
MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH
CR08-814-PHX-DGC

The government's disclosure falls short of compliance with the discovery request quoted in this subsection.  The defendant needs the requested evidence to further show (1) the extent of the government's protracted "exploratory rummaging / fishing exhibition," (2) violations of the N.D.Cal. warrants' "Computer Search Protocol," and (3) agents' general disregard for the defendant's privacy interest in his digital data.  For example, the more government actors who have access to clones of the defendant's entire computer system—containing intermingled private *out-of-scope* data unresponsive to the relevant warrants—and the longer those government actors had access to the *out-of-scope* data, the more privacy violations the defendant will be able to document for the record.  As the "Computer Search Protocol" will reflect, the relevant warrants had strict 30-day search window expiration dates as well as minimization requirements intended to limit exposure to *out-of-scope* data.

Notwithstanding the outstanding need for evidence, if the government failed to preserve the requested evidence,[14] said lack of preservation points to arbitrary and unrestricted access by government personnel to the defendant's *out-of-scope* data and, in any event, the government's failure to preserve evidence results in the defendant not having access to the evidence he needs to further support his "exploratory rummaging / fishing exhibition" argument and other related arguments.  Assuming a failure to preserve, *see Motion To Suppress All Digital Data Evidence As A Sanction For Failure To Preserve Evidence* (Dkt. #9??).

### B.   Request for evidence No. 2.

The second category of evidence requested by the defendant is as follows:

> All evidence relating to government agents/actors **providing** (and when/where they were provided) data originating from seized physical data storage devices to defendants and their attorneys in case Nos. CR08-814-PHX-DGC, CR08-312-PHX-JAT, and in all other federal and state cases.

---

radio interview of ex-NSA employee, Thomas Drake, *passim*, first aired Sept. 16, 2012, mp3 recording *available at* http://www.coasttocoastam.com/show/2012/09/16 (last accessed: Nov. 9, 2012) (Drake discussing the "never delete" policy).

14.   The noted report is also wholly insufficient considering it was created after-the-fact by the prosecution team.  The defendant needs agent reports, access logs, logs of names of agents who had access to the computers running the virtual machines, network login logs, chain of custody reports, *etc.*

The government failed to provide evidence responsive to this request or specify that said evidence does not exist.  Whether the government shared forensic images—which contain private *out-of-scope* data unresponsive to the relevant warrants—with other defendants and their attorneys is a valid Fourth Amendment issue.  In *Metter*, "[t]he Court agree[d] with Defendant that the release to the co-defendants of any and all seized electronic data without a predetermination of its privilege, nature or relevance to the charged criminal conduct only compounds the assault on his privacy concerns.  It underscores the government's utter disregard for and relinquishment of its duty to insure that its warrants are executed properly."  United States v. Metter, No. 10-CR-600 (DLI), Doc. 219, p. 17 (E.D.N.Y., May 17, 2011).

The government's **nonexistent** response to the defendant's discovery request noted in this subsection is insufficient.  If there is no evidence of sharing data with defendants and their attorneys in this and in other cases then the government must reply to the discovery request and specifically state that the evidence does not exist.  The evidence the defendant is looking for would be letters that accompanied discovery disclosures to said attorneys, agent reports regarding the disclosure, and/or chain of custody logs.  For example, when the defendant was provided physical hard drives containing forensic images of his digital data storage devices, the hard drives came with a memo explaining what was being provided.[15] The defendant needs the requested evidence to further show the government's general disregard for the defendant's privacy interest in his digital data.  *See* Metter, No. 10-CR-600 (DLI), Doc. 219, p. 17.

## C.     Request for evidence No. 3.

The third category of evidence requested by the defendant is as follows:

> All evidence relating to government agents/actors **accessing** (and when/where they were accessed) virtual machine clones originating from seized physical data storage devices.

15.     If the government is concerned with sharing said letters, *etc.* with the defendant, it should recall that prior to defendant Ransom Carter pleading guilty, every letter mailed to the defendant was CC'd to Mr. Carter's attorney, Taylor Fox.  Considering the government has no problem sharing correspondence directed at this defendant with other defendants, it should have no problem sharing other defendants letters, *etc.* with this defendant.

REPLY TO GOVERNMENT'S RESPONSE TO
MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH
CR08-814-PHX-DGC

REPLY TO GOVERNMENT'S RESPONSE TO
MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH
CR08-814-PHX-DGC

In response, the government provided a report on October 22, 2012 indicating (1) minimal dates and time of when the "IRS-CI Case Agent VM" and "CIS VM" were powered on and off, and (2) various dates and times of when "snapshots" were created from the "IRS-CI Case Agent VM" and "CIS VM." The government's report is significantly lacking. As the report states, the virtual machine software (*i.e.*, VMWare) was configured to only "keep[] a log of the last four (4) times the virtual machine was 'booted[.]'"[16] A log of only the last four times the virtual machine was started and stopped does not tell much. Where are the logs covering September 4, 2008 to October 7, 2008 (the earliest preserved access date) for the "IRS-CI Case Agent VM?" Where are the **8+ month-long** logs covering August 9, 2008 to March 26, 2009 (the earliest preserved access date) for the "CIS VM?" The report confusingly notes that the dates IRS-CI Agent Daun took snapshots "is a good indication that the virtual machine was viewed on that date."[17] However, anyone even mildly familiar with the VMWare software knows[18] that taking a snapshot is not a necessary prerequisite to viewing or accessing a virtual machine. In other words, while taking a snapshot may be sufficient to indicate that the virtual machine was viewed on a given date, it still says nothing to other dates noted in the minimal start/stop log entries listed in the report and it still says nothing to the unknown entries contained in the **8+ month-long** logs missing from the October 22, 2012 disclosure.

Finally, the government's report provides no start/stop log whatsoever regarding the virtual machine copy provided to the FBI.[19] What is the government hiding with respect to FBI agents accessing, copying, and sharing its virtual machine copy and the defendant's private *out-of-scope* data contained therein?

---

16.  *Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, <u>EXHIBIT 01</u> (Dkt. #929-1, p. 5).

17.  *See id.*, <u>EXHIBIT 01</u> (Dkt. #929-1, p. 7).

18.  The defendant implores the Court to read the VMWare user manual, which is freely available on the Internet. However, keeping on the safe side, the defendant is filing a motion for a computer / digital forensics expert in order to clear up what appears to be a deliberate attempt by the government to use the relevant technology as a sword to convolute and confuse the facts at issue.

19.  *See id.*, <u>EXHIBIT 01</u> (Dkt. #929-1, p. 5).

The government's disclosure falls short of compliance with the discovery request quoted in this subsection.  The defendant needs the requested evidence to further show (1) the extent of the government's protracted "exploratory rummaging / fishing exhibition," (2) violations of the N.D.Cal. warrants' "Computer Search Protocol," and (3) agents' general disregard for the defendant's privacy interest in his digital data.  For example, the more times government actors accessed clones of the defendant's entire computer system beyond the 30-day search window expiration dates, the more unauthorized searches/seizures the defendant will be able to document for the record and thus more privacy violations.  As explained at Dkt. #867, the relevant warrants had strict 30-day search window expiration dates.

Notwithstanding the outstanding need for evidence, if the government failed to preserve the requested evidence, that failure results in the defendant not having access to the evidence he needs to further support his "exploratory rummaging / fishing exhibition" argument and other related arguments.  Assuming a failure to preserve, *see Motion To Suppress All Digital Data Evidence As A Sanction For Failure To Preserve Evidence* (Dkt. #9??).

### D.     Request for evidence No. 4.

The fourth category of evidence requested by the defendant is as follows:

Please provide me with all evidence relating to government actors **accessing** (and when/where they were accessed) data and/or copies of data originating from physical data storage devices seized from (1) 431 El Camino Real, Apartment No. 1122, Santa Clara, CA 95050, and (2) storage unit No. A-47, CBD Indoor Mini, 570 Cinnabar Street, San Jose, California 95110 (hereafter collectively "seized physical data storage devices ").

In response, the government provided a report on October 22, 2012 indicating the following:

Special Agent Daun conducted her search to focus solely on those items listed in the Items to be Seized of the search warrant.  Her main search consisted of reviewing files and making determinations whether the file fell within the scope of the warrant.  If the file did appear to fall within the scope of the warrant, she marked it for inclusion in her final report.  If it did not appear to fall within the scope of the warrant, she ignored the file.  In the rare circumstances that keywords seemed appropriate, she attempted to use keywords to extract only those files that fell within the scope of the warrant. Additionally, all files identified through keyword searches were manually

1   reviewed prior to marking for inclusion in her reports.  To the best of her
    recollection, the only keywords used were to find credit card numbers.  In
2   order to verify this, she would need to re-open her analysis (and hence re-
    access the images).

3   *Fifth Submission Of Consolidated Exhibits Relating To Discovery And
4   Suppression Issues*, <u>EXHIBIT 01</u> (Dkt. #929-1, p. 7).

5        The government's report is significantly lacking.  First, the defendant's discovery

6   request applies to **all** government actors, not just IRS-CI Agent Daun.  Although the quoted

7   section of the government's report is lacking regardless, it does not even mention other

8   government actors – besides IRS-CI Agent Daun – with respect to viewing *in-scope* and *out-*

9   *of-scope* data.  As noted at the start of the government's report, at the very least IRS-CI Agent

10  Fleischmann, IRS-CI Agent Medrano, and FBI Agent Murray were all looking at the

11  defendant's data—both *in-scope* and *out-of-scope*—via the the virtual machine clones of the

12  defendant's entire computer system.

13       Second, the defendant requested evidence indicative of which **specific files** were

14  "looked at" in the forensic images as well as in the virtual machine clones.[20]  "[T]he

15  defense is entitled to know what **documents and files** the government **looked at** in the

16  search of the mirror images."  <u>United States v. Fu-Tain Lu</u>, No. CR-09-00341 RMW, Doc.

17  No. 112, p. 4 (N.D.Cal., Sept. 16, 2010) (emphasis added).  In *Lu*, the government at least

18  attempted to comply with the warrant's minimization requirements by only conducting

19  keyword searches to locate *in-scope* data.  *See id.*  The court in *Lu* found that "the method

20  used by Agent Zaborowski, assuming he made appropriately narrow word searches, [means

21  that] only those documents that had a likelihood of being within the scope of the warrant

22  were examined by human eyes.  Thus, potential Fourth Amendment concerns were

23  minimized."  *Id.* at p. 5.  In the present case, "the only keywords used were to find credit

24  card numbers"[21] and IRS-CI Agent Daun instead used her "human eyes" to manually look

---

20.   As explained in footnote No. 5, *supra*, the virtual machine clones contain files
identical to those contained in the forensic images.

21.   *Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression
Issues*, <u>EXHIBIT 01</u> (Dkt. #929-1, p. 7).  Note: the defendant has no qualm with the
government conducting adequately narrow keyword searches (of data content) to identify *in-*
*scope* files and thereafter using "human eyes" to view the matching files to confirm that they
are in fact *in-scope*.  However, skipping right to an arbitrary "human eye" review of a

at a multitude of the defendant's files—**possibly all of them**—in order to determine if any

given file fell within the scope of the warrant.[22]  IRS-CI Agent Daun's search method was

not even remotely effective to "locate and expose only those categories of files, documents,

or other electronically stored information that are identified with particularity in the

warrant..."  *E.g.*, N.D.Cal. warrant "Computer Search Protocol" (Dkt. #566-2, p. 17).

Therefore, the defendant can use the **full list** of files IRS-CI Agent Daun and other agents

"looked at" using their "human eyes" in order to show (1) the extent of the government's

protracted "exploratory rummaging / fishing exhibition," (2) violations of the N.D.Cal.

warrants' "Computer Search Protocol," and (3) agents' general disregard for the defendant's

privacy interest in his digital data.  *See* Fu-Tain Lu, No. CR-09-00341 RMW, Doc. No. 112,

p. 5 (Granting discovery with respect to what files were "looked at," in anticipation of

possible "reconsideration [of a suppression motion] if the defense discovers that the

Government did a search of the mirror images that was not reasonably designed to find only

documents, files or data described in the warrant[.]").  As a threshold matter, there is

evidence that IRS-CI Agent Daun's "human eye" exploratory rummaging allowed her to

learn that the defendant had an interest in outdoor activities, vitamins, and nutrition.[23]

---

multitude of files—as was done by IRS-CI Agent Daun—is a blatant Fourth Amendment violation and also a violation of the "Computer Search Protocol" contained in the relevant warrants.

22.    IRS-CI Agent Daun conducted her extensive "human eye" review of the content of a multitude of the defendant's files even while realizing early on that the defendant "tended to be kind of descriptive" with file and folder names corresponding to data responsive to the relevant warrants.  *See Fifth Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 04 (Dkt. #929-1, p. 21).  As a purely hypothetical example, if the defendant had a text file on his computer that contained IRS tax code, he would have named the file/folder something like "T:\information\taxes\IRS_tax_code.txt".  The defendant's practice of precisely naming his files to reflect content was so extensive and accurate that IRS-CI Agent Daun included the full file paths of the *in-scope* data she provided to an FBI computer programmer considering she believed the defendant's detailed and accurate file/folder labeling would be helpful to the programmer's analysis of the data. *See id.*

23.    *See id.*, EXHIBIT 03 (Dkt. #929-1, p. 18) (IRS-CI Agent Daun asked AUSA Frederick A Battista, "Do you care about the purchase of the outdoor equipment / clothes? Vitamins /nutritional stuff?").  IRS-CI Agent Daun would not have been able to gain knowledge of those areas of the defendant's life, **and then share that knowledge with others,** had she not been arbitrarily rummaging through the defendant's private data while failing to "make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified

1   Clearly, because those interests have nothing to do with the crimes alleged in the relevant

2   warrants, the noted email helps the defendant's Fourth Amendment arguments.[24]

3   Therefore, a **full list** of the *out-of-scope* files looked at by all government actors using their

4   "human eyes" will allow the defendant to locate similar examples and determine the full

5   scope of the government's exploratory rummaging.

6          Third, there is no need for IRS-CI Agent Daun to re-open her analysis and re-access

7   the images in order to reconstruct her near nonexistent keyword searches[25] considering the

8   government is required to turn over to the defense IRS-CI Agent Daun's **entire** *native-*

9   *digital-form* analysis anyways—the defendant will do the re-accessing and re-opening

10   himself.  In an issue of the *United States Attorneys' Bulletin*, published pursuant to CFR §

11   0.22(b), the government advised its own that, in the case of subpoenas issued to private

12   parties, "[p]rosecutors should demand documentation concerning the methods used by

13   subpoena recipients to preserve, collect, process, and produce data[ including] ...any forensic

14   tools and protocols employed, culling methods, search terms, review instructions and tools,

15   and chain of custody."[26]  The EOUSA's advice equally applies in reverse.  In the previously

16   provided "Computer Forensic Report," IRS-CI Agent Daun stated that she used Guidance

17   Software's EnCase v6 to analyze the forensic images, and she possibly may have also used

18   AccessData Forensic Toolkit.[27]  Therefore, the government should provide (1) the

19   _____

20   with particularity in the warrant..." *E.g.*, *Submission Of Documents Related To Original Northern District Of California 08-70460-HRL Search Warrant Used To Physically Search Apartment No.* 1122, "Computer Search Protocol For The Northern District Of California"

21   (Dkt. #566-2, p. 17).  At the very least, IRS-CI Agent Daun could have ignored the *out-of-scope* information and not shared it with other government actors.

22   24.   *See also First Supplement To Motion To Suppress RE: Search And Seizure Of Digital Evidence Under N.D.Cal. Warrants*, Section I (Dkt. #867, p. 8-10) (discussing *out-of-scope*

23   seizure of the defendant's personal correspondence with Jacqueline Gardiner and IRS-CI Agent Daun sharing the communication with other government actors involved in the case).

24   25.   As previously noted, "[t]o the best of [][IRS-CI Agent Daun's] recollection, the only

25   keywords used were to find credit card numbers[,]" which produced a very small amount of the totality of viewed and seized data.  *Fifth Submission Of Consolidated Exhibits Relating*

26   *To Discovery And Suppression Issues*, EXHIBIT 01 (Dkt. #929-1, p. 3).

27   26.   EOUSA, *United States Attorneys' Bulletin*, Electronic Discovery, "Investigations and Prosecutions Involving Electronically Stored Information," May 2008, Vol. 56, No. 3, p. 29.

28   27.   *See Third Submission Of Consolidated Exhibits Relating To Discovery And Suppression Issues*, EXHIBIT 01 (Dkt. #863-1, p. 6).

- 11 -

REPLY TO GOVERNMENT'S RESPONSE TO
MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH
CR08-814-PHX-DGC

installation files for EnCase v6, (2) the installation files for AccessData Forensic Toolkit,[28] and (3) all saved EnCase "evidence files" and all saved AccessData Forensic Toolkit "FTK reports" corresponding to searches/seizures done within the forensic images.  At least some records of what was accessed should be within the saved evidence files and reports corresponding to any given forensic image.  For example, within EnCase "evidence files," there should be a list of the files "looked at" by the examiner, a list of files bookmarked as *in-scope*, search terms employed during the analysis, dates and times the images were accessed, and other relevant information.[29][30]  Rather than risk further exploratory rummaging by having a government actor re-open a given analysis and forensic image, the government needs to provide the defendant with the saved analyses files so that he can open them in EnCase and/or AccessData Forensic Toolkit himself.

Notwithstanding the outstanding need for evidence, if the government failed to preserve the requested evidence, that failure results in the defendant not having access to the evidence he needs to further support his "exploratory rummaging / fishing exhibition" argument and other related arguments.  For example, if none of the saved forensic analyses contain listings of the *out-of-scope* files looked at by IRS-CI Agent Daun, then the defendant lacks the evidence he needs to solidify his argument that the government failed to effectively "locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant..."  *E.g.*, N.D.Cal. warrant

---

28.     Note to prosecution: AccessData Forensic Toolkit is different from the feeware FTK Imager software (having no report functionality) provided with the "reportless" forensic images previously disclosed to the defense.  Additionally, the listing/index of copied/seized files attached to IRS-CI Agent Daun's "Computer Forensic Report" is PDF document generated from the *native-digital-form* EnCase "evidence files" and/or AccessData Forensic Toolkit "FTK reports" addressed in this subsection.  In other words, unacceptable.

29.     For AccessData Forensic Toolkit, "FTK Reports contain a case summary that includes sections labeled 'Case Information,' 'File Overview,' and 'Evidence List.'  The FTK Reports also identify the bookmarks created during the forensic examination, which allows the examiner to identify specific documents found on the hard drives and to access the documents as a group."  United States v. Kavalchuk, 2011 U.S. Dist. LEXIS 122381, No. 09-cr-178-JD (D.N.H., Oct. 21, 2011).

30.     However, in this regard, the defendant would not be surprised if IRS-CI Agent Daun failed to properly configure the EnCase and FTK software.  In that case, *see Motion To Suppress All Digital Data Evidence As A Sanction For Failure To Preserve Evidence* (Dkt. #9??).

"Computer Search Protocol" (Dkt. #566-2, p. 17).  Assuming a failure to preserve, *see Motion To Suppress All Digital Data Evidence As A Sanction For Failure To Preserve Evidence* (Dkt. #9??).

* * * * *

Based on the points and authorities set forth herein, the defendant respectfully requests that his motion at Dkt. #890 be granted and that the Court order the government to produce sufficient discovery as further detailed in this reply.  For example, **(1)** reports and logs of precisely who had/has access to the three copies of the virtual machines, **(2)** reports and logs regarding the uploading of data to file servers for the purpose of sharing with other government actors, **(3)** a listing of all data uploaded to "Phosvr001" and other file servers, **(4)** a listing of username login account information (obviously, passwords not needed) for "Phosvr001" and other file servers, **(5)** reports and logs on where and how the FBI uploaded the "FBI VM," or data therefrom, to a central FBI server/database for the purpose of sharing said data with other FBI agents involved in other investigations, **(6)** reports and logs on the FBI uploading the "FBI VM," or data therefrom, to an NSA server/database for domestic spying/datamining purposes, **(7)** discovery letters and memos corresponding to sharing data with other defendants and their attorneys in this and in other cases, **(8)** the start/stop logs covering September 4, 2008 to October 7, 2008 (the earliest preserved access date) for the "IRS-CI Case Agent VM," **(9)** the **8+ month-long** start/stop logs covering August 9, 2008 to March 26, 2009 (the earliest preserved access date) for the "CIS VM," **(10)** the entire missing start/stop logs for the "FBI VM," **(11)** logs, reports, and listings of *each* and *every* file "looked at" by all government actors using their "human eyes," whether viewed in a forensic image *or* virtual machine clone **(12)** EnCase installation software and "evidence files" relating to the forensic analysis corresponding to each forensic image, **(13)** AccessData Forensic Toolkit installation software and "FTK reports" relating to the forensic analysis corresponding to each forensic image, and **(14)** all other relevant and helpful evidence (*see, e.g.*, *supra*) that should have been disclosed upon expiration of the N.D.Cal. warrants' 30-day search windows.

1   This reply was drafted by the *pro se* defendant, however, he authorizes his shadow

2   counsel, Philip Seplow, to file this reply on his behalf using the ECF system.  The defendant

3   is appearing *pro se* and has never attended law school.  The defendant's filings, however

4   inartfully pleaded, must be liberally construed and held to less stringent standards than

5   formal pleadings drafted by lawyers.  *See* <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972).

6   ///

7   ///

8   ///

9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

*REPLY TO GOVERNMENT'S RESPONSE TO*
*MOTION FOR DISCOVERY RE: DIGITAL EVIDENCE SEARCH*
*CR08-814-PHX-DGC*

Respectfully Submitted:

PHILP SEPLOW, Shadow Counsel, on behalf of DANIEL DAVID RIGMAIDEN, Pro Se Defendant:

s/ Philip Seplow
Philip Seplow
Shadow Counsel for Defendant.

CERTIFICATE OF SERVICE

I hereby certify that on:                    I caused the attached document to be electronically transmitted to the Clerk's Office using the ECF system for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Taylor W. Fox, PC
Counsel for defendant Ransom Carter
2 North Central Ave., Suite 735
Phoenix, AZ 85004

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Peter S. Sexton
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

James R. Knapp
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

By: s/ Daniel Colmerauer
(Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))