Daniel Rigmaiden
Agency # 10966111
CCA-CADC
PO Box 6300
Florence, AZ 85132
Telephone: none
Email: none

Daniel David Rigmaiden
Pro Se, Defendant

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| United States of America, | No. CR08-814-PHX-DGC |
|---|---|
| Plaintiff, | MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT |
| v. | |
| Daniel David Rigmaiden, et al., | |
| Defendant. | |

Defendant, Daniel David Rigmaiden, appearing *pro se*, respectfully submits *Motion to Dismiss For (1) Government's Prejudicial Extrajudicial Press Comments Severe Enough To Impeach Claimed Indifference Of Jurors, And/Or (2) Various Government Misconduct*. Through this motion, the defendant is requesting dismissal of the case with prejudice considering it is impossible for the defendant to receive a fair trial in **all** venues and, in any event, as a remedy/sanction for outrageous government misconduct and flagrant prosecutorial misconduct in violation of the defendant's due process rights resulting in substantial prejudice that cannot otherwise be cured.

## I.    INTRODUCTION

On April 8, 2010, the United States Department of Justice issued a press release titled, "'HACKER' INDICTED IN MASSIVE TAX, MAIL, AND WIRE FRAUD SCHEME,"[1]

---

1.    *See* U.S. Attorney's Office, District of Arizona, *press release No. 2010-060 (Rigmaiden, et al.)*, "'Hacker' Indicted In Massive Tax, Mail, And Wire Fraud Scheme," *available at* http://www.justice.gov/criminal/cybercrime/rigmaidenIndict.pdf (last accessed: Feb. 15, 2011)

wherein the government claimed that the defendant "employed sophisticated computer intrusion techniques... to attempt to bilk the government out of millions of dollars."  The government claimed that the defendant was a "self-described California-based 'Hacker'" who spent the last 20 months considering "an offer to cooperate with the government."  The noted claims are not only prejudicial, they are **government fabrications** given approval by the prosecution and IRS-CI case agents for dissemination to the press and public.

In this motion, the defendant establishes the following: **(1)** the USDOJ's extrajudicial comments contain government fabricated facts, **(2)** regardless of fabrication, the comments should have never been published in a USDOJ press release considering they are highly prejudicial in the effect that they convey to the public that the defendant admitted guilt, **(3)** the claims have been picked up by the press and continue to be echoed in news articles as recent as three years after the government's press circus, **(4)** the government's claims have so permeated American society via the Internet, there is not a venue in the country that can escape the prejudicial effects, **(5)** the comments create a presumption of prejudice that act to impeach the indifference of any and all jurors – meriting dismissal of the case with prejudice on Sixth Amendment grounds, and **(6)** even if the Court does not find wholly permeated, jury-tainting presumed prejudice at this time, the defendant is still entitled to the requested extraordinary relief of dismissal as a remedy/sanction for the government's misconduct and prosecutorial misconduct, which *(a)* violated the defendant's due process rights, and *(b)* caused substantial prejudice that cannot otherwise be cured.

## II.   FACTS

1.     The government indicted an unknown individual on July 23, 2008.[2]  On August 3, 2008, the government arrested the defendant and made him answer to the charges listed in the indictment.  The government then requested that the defendant confess to the crimes and enter into a cooperation agreement with government investigators.  Because the

_____

(EXHIBIT 01); *see also* FBI Phoenix Division, fbi.gov [website], *FBI — Hacker Indicted in Massive Tax, Mail, and Wire Fraud Scheme*, https://www.fbi.gov/phoenix/press-releases/2010/px040810.htm (last accessed: Apr. 16, 2013) (EXHIBIT 24).

2.     *See Indictment* (Dkt. #003).

defendant is innocent, he immediately turned down the government's request.  The

defendant's defense counsel in the Northern District of California, Nicholas Humy, informed

the defendant that he would forward the defendant's decision to the prosecution.  The

defendant was then transferred to Arizona and appointed a new attorney.

2.      While the defendant was incarcerated in Arizona, the government continued

with its **20-month** long "wait out period"[3] where it refused to prosecute the case in hopes

that the defendant would somehow become sick of pretrial incarceration and decide to

cooperate with the government.  Despite the Court's June 26, 2009 reasoning (Dkt. #111, p.

10-11 fn. 7), the prosecution's true intentions became clear upon issuance of the April 8,

2010 press release wherein the government claimed, "[t]he case remained sealed [over the

last 20 months] pending the Hacker's consideration of an offer to cooperate with the

government."  While quite telling, the government's claim is only a half-truth.  In reality, the

defendant maintained his innocence, rejected the government's cooperation offer from the

start, and had been demanding a speedy trial[4] and unsealing of the case for months.[5]  Even

if one were to accept the defendant's prior claim that his various defense counsel were

colluding with the government[6]—*e.g.*, by not officially forwarding notice of the defendant's

claim of innocence and rejection of cooperation[7]—the government was still made fully

aware of the defendant's position when, out of pure "wait out" frustration, the defendant filed

Dkt. #101 (motion to dismiss for speedy trial violation) and Dkt. #102 (motion to unseal the

case) on June 2, 2009—more than nine months prior to the defendant proceeding *pro se* and

---

3.      The period of time between the defendant's arrest on August 3, 2008 and the unsealing of the case on March 26, 2010 was approximately 20 months.

4.      *See Motion To Dismiss With Prejudice For Violation Of Sixth Amendment Speedy Trial Right* (Dkt. #101, **Jun. 2, 2009**).

5.      *See Motion To Unseal The Proceedings* (Dkt. #102, **Jun. 2, 2009**).

6.      *See Motion To Dismiss With Prejudice For Violation Of Sixth Amendment Speedy Trial Right* (Dkt. #101, p. 14) ("The delay in the instant case is a result of heavily weighted deliberate delays p[e]rpetrated through the government's misconduct in collusion with the defendant's previous defense counsel...").

7.      Or, for example, by refusing to let the defendant even see, let alone possess, the N.D.Cal. 08-90331MISC-RS and 08-90330MISC-RS orders which are now the primary focus of the case. *See* Dkt. #824-1, p. 209 ("The orders were eventually provided to the defendant by his subsequent defense attorney, Philip Seplow, on July 30, 2009.").

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

forcing the unsealing of the case,[8] and ten months prior to the April 8, 2010 press release.

3.   After the government learned of the defendant's December 2, 2009 motion to proceed under self-representation,[9] the prosecution quickly had the defendant re-indicted[10][11] with additional counts and a new charge of 18 U.S.C. § 1030, unauthorized access of a computer with intent to defraud.  Via a March 26, 2010 order,[12] the Court granted the defendant's prior June 2, 2009 *Motion To Unseal The Proceedings* (Dkt. #102). On April 8, 2010, the government issued its press release[13] containing the prejudicial extrajudicial comments that are at issue in this motion.  The press release is titled, "'HACKER' INDICTED IN MASSIVE TAX, MAIL, AND WIRE FRAUD SCHEME," wherein the government falsely claimed that the defendant is a "self-described California-based 'Hacker'" who "employed sophisticated computer intrusion techniques... to attempt to bilk the government out of millions of dollars."[14][15]  As previously noted, the government also falsely claimed in the press release that the defendant spent the last 20 months considering "an offer to cooperate with the government."[16]

4.   The prosecution later indicated that various government actors approved of the press release prior to dissemination.  Via letter dated September 8, 2010, the government indicated that the press release was "authorized by Acting Public Affairs Officer Wyn Hornbuckle[, t]he final draft was reviewed by [][]lead prosecutor, AUSA Frederick A.

---

8.   After numerous demands to numerous attorneys, the only way the defendant was able to facilitate due process was to proceed *pro se* and force the unsealing of the case.  The case was unsealed on March 26, 2010.  *See* Dkt. #255.

9.   *See Motion For Leave To Proceed Pro Se And To Place Philip Seplow Into Advisory Position* (Dkt. #159, Dec. 2, 2009).

10.   *See Superseding Indictment* (Dkt. #200, Jan. 27, 2009).

11.   Although denied by the Court (Dkt. #228), the government's motive for adding additional charges is explained by the defendant in his *Motion For Court Order Prohibiting Vindictive Superseding Indictment* (Dkt. #167 & #172).

12.   *March 26, 2010 Court Order* (Dkt. #255).

13.   *See* EXHIBIT 01.

14.   *Id.*, p. 1.

15.   The government accurately lists the defendant's charges as "a conspiracy charge, plus 35 counts of wire fraud, 35 counts of identify theft, one count of unauthorized access of a computer with the intent to defraud and two counts of mail fraud."  *Id.*

16.   *Id.*, p. 2.  Note: the period of time between the defendant's arrest on August 3, 2008 and the unsealing of the case on March 26, 2010 was approximately 20 months.

Battista] before it was released[, and] IRS-CI Special Agents Denise Medrano and Michael
Fleischmann also reviewed drafts of the release."[17]

5.      To date, the government has provided no evidence to the defense in support of
its extrajudicial claims that (1) the defendant used sophisticated computer intrusion
techniques during the alleged scheme, (2) the defendant is a self-described Hacker, or (3) the
case was kept sealed for 20 months because the defendant was racking his brain in an
attempt to decide whether to cooperate with the government's investigation.  Additionally,
regardless of whether the three noted claims are true, the government has provided no
justification for unethically disseminating to the press and public a hacking confession and
refusal to provide a statement—all violations of LRCrim 57.2(b)(2) and (6), "FREE PRESS -
FAIR TRIAL DIRECTIVES," the defendant's due process rights, and Sixth Amendment
right to an impartial and untainted jury.

6.      Via letters dated June 9, 2010[18] and June 27, 2010,[19] the defendant
requested discovery relating to the government's false claim that the defendant is a "self-
described California-based 'Hacker.'"  While the USDOJ press release refers to the defendant
as the Hacker **fifteen (15) separate times**, AUSA Battista indicated that the government is
"unaware of any item wherein [][the defendant] personally referred to [him]self as the
'Hacker' in any manner, e.g., verbally, in writing or via an e-mail, etc."[20]  More recently, the
government reiterated that "[t]here is no known evidence that defendant ever personally
referred to himself a[s] the 'Hacker.'"[21]

7.      In regards to the false claim of using "sophisticated computer intrusion
techniques," the *actual* alleged act referenced in the superseding indictment involved typing
a proxy IP address into a computer program's settings so that the program would access
websites without revealing the host computer's true IP address.[22]  This is not hacking, let

---

17.   *September 8, 2010 letter from AUSA Battista to Daniel Rigmaiden*, p. 1 (<u>EXHIBIT 02</u>).
18.   *June 9, 2010 letter from Daniel Rigmaiden to AUSA Battista* (<u>EXHIBIT 03</u>).
19.   *June 27, 2010 letter from Daniel Rigmaiden to AUSA Battista* (<u>EXHIBIT 04</u>).
20.   *July 21, 2010 letter from AUSA Battista to Daniel Rigmaiden*, p. 1 (<u>EXHIBIT 05</u>).
21.   *Government's Response To Defendant's Motion To Suppress* (Dkt. #873, p. 2, fn. No. 1).
22.   *See* Dkt. #566-1, p. 18, ¶ 68-69 (explanation by IRS-CI Agent Michael P. Fleischmann).

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH
TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

1  alone sophisticated computer intrusion techniques, as claimed in the USDOJ press release.

2  The act of typing a proxy IP address into a program does not require "hacking," rather, it is

3  basic and widespread, *i.e.*, anyone can learn in a matter of minutes by searching Google on

4  the phrase, "using a proxy IP address while web browsing."  Attached to this motion as

5  EXHIBIT 06 is a screenshot of where to type a proxy IP address into the Internet Explorer

6  web browser.  Likewise, lists upon lists of proxy IP addresses are publicly available on the

7  web at cost or for free, as shown by searching Google on the phrase, "list of proxy IP

8  addresses."  In fact, FBI IAU's analysis of three computers allegedly running proxy server

9  software—including the one alleged in the superseding indictment—produced evidence that

10  the respective proxy server IP addresses were obtained from the proxy list website,

11  http://virtual.proxy-shop.in.[23]  There simply is no evidence in the government's file to

12  support a claim at trial that the defendant used "sophisticated computer intrusion

13  techniques."  Nor is there an allegation in the superseding indictment in support of such a

14  claim.[24]

15      8.      In regards to the false claim that "[t]he case remained sealed [over the last 20

16  months] pending the Hacker's consideration of an offer to cooperate with the government,"

17  *see* ¶ No. 2, *supra*, for a full explanation of fabrication.

18      9.      Immediately after issuing the April 8, 2010 press release, various news outlets

19  took the government's bait and began to portray the defendant as a self-described Hacker

20  who used hacking skills to bilk the IRS out of millions of dollars and then refused to help the

21  government with its investigation.  This government instigated portrayal of the defendant

23.  *See* EXHIBIT 07 (FBI, Science And Technology Branch Investigative Analysis Unit (IAU) Technical Analysis Report for suspected proxy computers – discusses firewall entry for http://virtual.proxy-shop.in, "Website that sells proxy computer services").

24.  The indictment reads: "On or about March 21, 2008, in the District of Arizona and elsewhere, defendant DANIEL DAVID RIGMAIDEN knowingly and with intent to defraud accessed a protected computer used in interstate commerce and communication, without authorization from the computer's owner, a private individual and resident of Glendale, Arizona, and by means of such conduct, including the use of Internet Provider Address XX.XXX.XXX.106, accessed a Meridian Bank business checking account No. XXXXXX0007, which furthered the intended fraud of the United States, committed through the electronic filing of fraudulent income tax returns, and hereby ultimately obtained $68,000 in proceeds from the fraud from the Meridian Bank business checking account No. XXXXXX0007 on or about May 5, 2008." Dkt. #200 (superseding indictment), p. 32, ¶ 49.

was led by local and national news outlets in the form of both traditional print and online articles:[25]

> After gaining an informant's help, agents identified a person who called himself "Hacker" who was apparently telling Carter what to do, and they traced him to the San Jose area.  Eventually, they discovered that Rigmaiden was "Hacker" and arrested him...
> ….
> The case has been kept sealed while federal agents were trying to get Rigmaiden to cooperate, Burke said.
> …
> Burke said of Rigmaiden. "There were efforts to get the individual to cooperate.  That was a lengthy and ongoing process.  It is evident now ... that the individual chose not to cooperate and we're proceeding to trial."

Christie, Bob, *Feds say Calif. man stole identities of dead, used them to file for millions in tax refunds*, The Star Tribune (Minneapolis - St. Paul, Minnesota) (Apr. 8, 2010), *available at* http://www.startribune.com/templates/Print_This_Story?sid=90248552 (last accessed: Apr. 15, 2013) (EXHIBIT 08).
*See also* ABC News, *Feds: Calif. Man Stole IDs, Filed Fake Tax Returns; Feds say Calif. man stole identities of dead, used them to file for millions in tax refunds*, http://abcnews.go.com/US/wireStory?id=10322679 (last accessed: Feb. 15, 2011) (EXHIBIT 09).
_____

> Over the course of three years, the agencies knew Rigmaiden only by fictitious names and his handle of "Hacker."
> …
> The case was sealed until last month to give Rigmaiden time to consider cooperating with the government.  Apparently, he didn't play ball.

Stern, Ray, *Tax Fraud Suspect Wanted by IRS; Local Man Part of Elaborate Scheme to Steal Millions in Refunds*, The Phoenix New Times (Apr. 8, 2010), *available at* http://blogs.phoenixnewtimes.com/valleyfever/2010/04/tax_fraud_suspect_wanted_by_ir.php (last accessed: Feb. 15, 2011) (EXHIBIT 10).
_____

> During the 3 years Daniel David Rigmaiden ran the theft ring, he made more than $4 million through filing false tax returns...
> …
> Rigmaiden was arrested in California in August 2008, but the details of his complex operation were recently unsealed in federal court documents after Rigmaiden refused to cooperate with authorities, said U.S. Attorney Dennis Burke.

Hensley, JJ, *Feds: California man stole IDs, filed fake tax returns*, The Arizona Republic, p. B3 (Apr. 9, 2010) (EXHIBIT 11), *available at* http://www.azcentral.com/private/cleanprint/?1297800013333 (last accessed:

---

25.    If now, or at some point in the future, the below news article URLs are no longer current, it only means that the web addresses have changed.  The articles themselves can be forever located on the web by running a search on the defendant's name using a search engine.

Feb. 15, 2011) (<u>EXHIBIT 12</u>).

_____

Burke said "Hacker" Daniel Rigmaiden, 29, of Santa Clara, Calif., led a ring that filed bogus tax returns in Arizona and other states from 2005 to 2008.

Cross, Jim, *KTAR.com - Stolen IDs used in tax fraud scheme*, KTAR.com (Apr. 8, 2010), *available at* http://ktar.com/?nid=6&sid=1282105 (last accessed: Feb. 15, 2011) (<u>EXHIBIT 13</u>).

_____

A Santa Clara man was indicted Thursday in Arizona for allegedly using sophisticated computer intrusion techniques, identify theft, and wire and mail fraud to attempt to bilk the government out of millions of dollars.
…
In January 2008, the investigation started to focus on an individual operating above Carter known only as the "Hacker" and another co-conspirator above Carter in the scheme.
…
In July 2008, agents located the apartment in Santa Clara rented by the Hacker in the name of Steven Brawner.  On July 23, 2008, a 50-count indictment was returned under seal against the Hacker (a.k.a Brawner and Stout).

On August 3, 2008, the Hacker was arrested in Santa Clara after a foot and car chase.  A key to the Hacker's apartment was found in his pocket during his arrest.

KTVU, Channel 2, *Santa Clara Man Indicted for Massive Online Tax ID Fraud Scheme* (Apr. 8, 2010), *available at* http://www.ktvu.com/news/23092419/detail.html (last accessed: Feb. 15, 2011) (<u>EXHIBIT 14</u>).

_____

"Daniel David Rigmaiden was the leader of a sophisticated scheme in Arizona and elsewhere...
…
Authorities also learned about the connection between Rigmaiden and Carter. In January, Rigmaiden made it clear he will not cooperate with the investigation or lead agents to his former partner.

Johnson, Elias, *Suspects Collect Millions In Tax Return Fraud* (Apr. 8, 2010), *available at* http://www.kpho.com/news/23096519/detail.html (last accessed: Feb. 15, 2011) (<u>EXHIBIT 15</u>).

_____

According to authorities a Californian, 29-year-old self-described hacker named Daniel David Rigmaiden, aka Steven Travis Brawner, was the ringleader of the group.

Zetter, Kim, wired.com [website], *Identity Thieves Filed for $4 Million in Tax Refunds Using Names of Living and Dead | Threat Level | Wired.com* (Apr. 8, 2010), http://www.wired.com/threatlevel/2010/04/fake-tax-returns/ (last accessed: Apr. 16, 2013) (<u>EXHIBIT 16</u>).

In addition to the above, numerous other articles from 2010 remain permanently on the

Internet for the entire population to view—regardless of venue.

10.     Later, in the years 2011 and 2012, the press continued to feed off of the government's prejudicial extrajudicial comments made in April of 2010 while covering the case further:

> "Last year a Slashdot story mentioned the case of Daniel David Rigmaiden, or 'the Hacker.' With the help of an IMSI-catcher device, law enforcement had been able to locate and arrest the elusive 'Hacker,' leading to U.S. v. Rigmaiden. But far more elusive than the 'Hacker,' is the IMSI-catcher device itself — particularly the legalities governing its use....
>
> Slashdot.org [website], Secret Stingray Warrantless Cellphone Tracking (Oct. 27, 2012), http://yro.slashdot.org/story/12/10/27/144229/secret-stingray-warrantless-cellphone-tracking (last accessed: Nov. 28, 2012) (EXHIBIT 17).
>
> _____
>
> In 2008, self-describer hacker Daniel David Rigmaiden was arrested and charged with identity theft, unauthorized computer access, mail fraud and wire fraud for stealing more than $4 million through false tax filings.
>
> S., Charlene, phonearena.com [website], *Feds change defense in order to conceal details about its 'stingray' device* (Nov. 08, 2011), http://www.phonearena.com/news/Feds-change-defense-in-order-to-conceal-details-about-its-stingray-device_id23602 (last accessed: Apr. 16, 2013) (EXHIBIT 18). Note: One reader response to this article contains a recommendation that **the defendant be hanged** as a punishment.

11.     Most recently this year, the press once again fed off of the government's prejudicial extrajudicial comments made in April of 2010 while covering the March 28, 2013 hearing:

> The use of this technology is being challenged in the case of Daniel Rigmaiden, a "hacker" who was indicted on charges of conspiracy, wire fraud and identity theft in 2008. Rigmaiden has sought discovery evidence on how government agents were able to locate and track him and maintains that the use of a StingRay device to catch him was illegal as it was done without a warrant.
>
> Gosztola, Kevin, dissenter.firedoglake.com [website], *DOJ Hid Routine Use of 'Stingray' Surveillance Technology from Federal Magistrate Judges | The Dissenter* (Mar. 27, 2013), http://dissenter.firedoglake.com/2013/03/27/doj-hid-fact-that-stingray-surveillance-technology-routinely-used-from-federal-magistrate-judges/ (last accessed: Apr. 16, 2013) (EXHIBIT 19).
>
> _____
>
> The group will urge a federal court in Arizona to disregard evidence obtained by a stingray in what could be a test case for limiting the technology's use without a warrant. The case revolves around Daniel Rigmaiden, a hacker accused of leading a gang of sophisticated identity thieves which allegedly stole millions of dollars by filing bogus tax returns.

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

Carroll, Rory, *ACLU challenges 'stringray surveillance' that allows police to track cellphones | World news | guardian.co.uk*, The Guardian (Mar. 28, 2013), *available at* http://www.guardian.co.uk/world/2013/mar/28/aclu-stingray-surveillance-police-cellphones (last accessed: Apr. 16, 2013) (EXHIBIT 20).

_____

The move is in support of accused hacker Daniel Rigmaiden's motion to suppress evidence produced by stingray, which mimics a cell site to locate cell phone users and intercept conversations.

gantdaily.com [website], *ACLU backs suppression of 'stingray' evidence sought by hacker | GantDaily.com* (Mar. 28, 2013), http://gantdaily.com/2013/03/28/aclu-backs-suppression-of-stingray-evidence-sought-by-hacker/ (last accessed: Apr. 16, 2013) (EXHIBIT 21).

_____

Lye will be arguing the issue on Thursday in a federal case in Arizona, in support of a defendant charged with tax fraud and identity theft, Daniel Rigmaiden, known as "the Hacker" to acquaintances and federal agents, was tracked in part with use of a StingRay.

Nakashima, Ellen, *Little-known surveillance tool raises concerns by judges, privacy activists*, The Washington Post (Mar. 27, 2013), *available at* http://articles.washingtonpost.com/2013-03-27/world/38070419_1_magistrate-judge-federal-agents-stingrays (last accessed: Apr. 9, 2013) (EXHIBIT 22).

_____

If civil liberties advocates had their pick of who would become a case study in the use of 21st century phone tracking technology, they would probably not choose Rigmaiden.  The federal government alleges that under the alias "the hacker," he organized a complex, multi-state operation to defraud the Internal Revenue Service.  His co-conspirators never knew him by name[.]

Huffingtonpost.com, *Daniel David Rigmaiden Case Reveals Stingray Cell Phone Tracker's Covert Use* (Mar. 28, 2013), *available at* http://www.huffingtonpost.com/2013/03/28/daniel-david-rigmaiden-stingray_n_2973749.html (last accessed: Apr. 4, 2013) (EXHIBIT 23).

Notably, while under the influence of the government's April 8, 2010 prejudicial extrajudicial press comments, *The Huffington Post* assumed the defendant's guilt and suggested that civil liberties advocates "would probably not choose Rigmaiden" as a case to test the government's illegal use of cell site emulators.  Clearly, the government's fabrications are even prejudicing the defendant's pretrial Fourth Amendment defense efforts.

12.     On April 17, 2013, Google search engine results for ["daniel rigmaiden hacker] turned up 1,410 results.  None of the resulting web pages referring to the defendant as a hacker were in existence prior to the prejudicial April 8, 2010 USDOJ press release.

III.   **ARGUMENT**

The prejudicial seeds of deception planted by the USDOJ via its April 8, 2010 press release have blossomed into an unstoppable field of destruction like an out-of-control Monsanto crop hellbent on killing off butterflies and honeybees.  Through the noted press release, and through verbal comments made to the press by former U.S. Attorney Dennis Burke, *etc.*, the government labored to create a public impression that the defendant is guilty of the alleged crimes prior to commencement of trial.  Unlike other cases involving prejudicial extrajudicial comments made by the press in response to the government's *appropriate* assessment of allegations, the government in *Rigmaiden* is responsible for making *inappropriate* comments in an official USDOJ press release with said comments being continually echoed by the press three years later.  As further argued below, the government's actions require dismissal of the case with prejudice on two separate grounds: **(1)** the pretrial prejudicial extrajudicial comments have so permeated society via the World Wide Web that there is an unshakable presumption of prejudice acting to impeach any perceived indifference that may be held or claimed by any and all jurors in all venues in the United States (*i.e.*, a fair trial under the Sixth Amendment is impossible), and **(2)** in any event, due to the unprecedented government campaign to try the defendant in the press using fabrications published in an official USDOJ press release, the defendant is entitled to the requested extraordinary relief as a remedy/sanction for the government's misconduct and flagrant prosecutorial misconduct, which *(a)* violated the defendant's due process rights, and *(b)* caused substantial prejudice that cannot otherwise be cured.

        **A.    Voir dire or no voir dire, there is a wholly permeated presumption of prejudice rendering all venues incapable of hosting a fair trial for the defendant.**

Using false claims, the government labored to create a public impression of the defendant's self-confessed guilt, which continues to be echoed by the mainstream media three years later.  Due to the far reaching effects and permanency of web based news reporting, all jurors in all possible venues are now permanently tainted beyond any presumed or express claim of indifference, vis-a-vis the comments made by the USDOJ in April of

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH
TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

2010.  More than twenty years ago, Chief Justice Rehnquist warned that "[e]xtensive voir dire may not be able to filter out all of the effects of pretrial publicity, and with increasingly widespread media coverage of criminal trials, a change of venue may not suffice to undo the effects of statements such as those made by [a party in the litigation]."  Gentile v. State Bar of Nevada, 501 U.S. 1030, 1076 (1991).  While the Rehnquist logic may have only pointed to a mere possibility in the era of fleeting newsprint and prime time TV, it now fits squarely in line with the inevitable result of prejudicial extrajudicial comments made in reference to a high profile case being tried in the era of the Internet, web based reporting, and always-on smartphones.  For example, on April 17, 2013, searching Google on the phrase, ["daniel rigmaiden" hacker] produced 1,410 separate web page hits.[26]  Gone are the days where prejudicial extrajudicial comments are "not widely, prominently or frequently held up to the public over a substantial period of time."  United States v. Zovluck, 274 F. Supp. 385, 389 (S.D.N.Y. 1967).  In other words, to the wayside are venue-isolated black-and-white newsprint articles being mulched out of memory each week by the local recyclers.  Today, the World Wide Web creates an easily accessible and permanent public record of each and every echoed prejudicial government falsification as shown by the Google search engine and the news articles quoted in the *Facts* section of this motion.[27]

While the government's press release makes no claim of an actual confession made by the defendant, it unequivocally reads in that fashion.  By equating the alleged scheme to sophisticated computer intrusion techniques, preceded by a claim that the person charged is a self-described Hacker who spent 20 months considering law enforcement's cooperation offer, the USDOJ has effectively published a confession.  "During the period prior to trial, public statements... that infer the guilt of the person charged... may undermine the judicial process."  United States v. Engleman, 489 F.Supp. 48, 50 (E.D. Mo. 1980).  This is not a case where the USDOJ press release and resulting news stories "contain[] no confession or other blatantly prejudicial information of the type readers or viewers [][can] not reasonably be expected to

---

26.    *See Facts*, Section II, *supra* ¶ No. 12.

27.    Searching the term, "stingray" at YouTube.com will also reveal televised news coverage of the *Rigmaiden* case, vis-a-vis the StingRay, including on the Fox News channel.

shut from sight." <u>Skilling v. United States</u>, 130 S.Ct. 2896, 2917 (2010).  For example, the USDOJ press release itself refers to the defendant as the Hacker **fifteen (15) separate times** over three pages.  Just like in *Irvin*, after the press ate of this vile fruit, droppings of fertilized seed took root causing endless repetition of the government's highly prejudicial verbage. *Compare* <u>Irvin v. Dowd</u>, 366 U.S. 717, 726 (1961) ("In many of the stories petitioner was described as the 'confessed slayer of six[.]'").  By way of comparative example, the government's claim that a "self-described California-based 'Hacker'... employed sophisticated computer intrusion techniques... to attempt to bilk the government out of millions of dollars[,]"[28] is akin to claiming that a "self-described California-based 'Axe Murder'... employed the use of a large, finely sharpened axe... to attempt to take the lives of many people."  By way of further "Mad Libs" style comparison, the full linguistic cloak woven into the government's prejudicial public statements is entirely unraveled after substituting just a few more words from the April 8, 2010 *Rigmaiden* USDOJ press release (*compare to* <u>EXHIBIT 01</u>):

FOR IMMEDIATE RELEASE
Thursday, April 8, 2010

*Public Affairs*
*WYN HORNBUCKLE*
*Telephone: (602) 514-7573*
*Cell: (602) 740-2422*

### *'AXE MURDERER'* **INDICTED IN MASSIVE** *MURDEROUS RAMPAGE*

PHOENIX – Federal law enforcement officials... unveiled a 74-count superseding indictment... alleging a self-described California-based "*Axe Murderer*" named *Samuel Hartley* led a complex *murderous rampage* that employed *the use of a large, finely sharpened axe, hack saw, and a commercial grade incinerator*, among other techniques, to attempt to *take the lives of many people*.
…

From April through August 2008, investigators worked to identify and locate the *Axe Murder*....  In July 2008, agents located the apartment in Santa Clara rented by the *Axe Murder* in the name of *Mitch Green*....  On August 3, 2008, the *Axe Murder* was arrested in Santa Clara after a foot and car chase.  A key to the *Axe Murder's* apartment was found in his pocket during his arrest. On August 3 and 4, 2008, search warrants were executed in the *Axe Murder's* Santa Clara apartment and a storage unit in San Jose; investigators seized a *finely sharpened axe and hack saw...*

---

28.   *See* <u>EXHIBIT 01</u>.

…

The case remained sealed pending the *Axe Murder's* consideration of an offer to cooperate with the government.  On August 6, 2008, the *Axe Murder* was identified via fingerprint analysis as *Samuel Hartley.*

Considering the news articles covering the case continue to echo the government's prejudicial extrajudicial comments (*see Facts* section)—and given the significant amount of attention paid to *Rigmaiden* by the press, public, and legal industrial complex[29]—this is a case where "a jurors assurances notwithstanding, prejudice might be presumed [] [considering] the general atmosphere in the community or courtroom is sufficiently inflammatory... such that it is probable that the community harbors sentiment so poisoned against [][the defendant] as to **impeach the indifference of jurors** who [may or may not] display[] **no animus of their own**." Ybarra v. McDaniel, 656 F.3d 984, 993 (9ᵗʰ Cir. 2011) (emphasis added) (*citing* Murphy v. Florida, 421 U.S. 794, 802-03 (1975) (internal quotation marks omitted)).  In the era of the Internet, web based reporting, and always-on smartphones, the press echoing the government's prejudicial comments in web based news articles over the course of three years and counting is the equivalent of having the defendant's confession televised every minute of every day in every venue from now until the end of trial.  *See* Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963) (prejudice presumed considering defendant's confession was televised prior to trial).  Even if yet to be exposed directly, a potential juror or actual juror need only conduct a brief Google search on the defendant's name in order to eat from the vile fruits grown from the government's prejudicial extrajudicial comments.  Because a fair trial is now impossible in all venues, and will only become more impossible after the next fury of press coverage resulting from the Court's ruling on the defendant's *Motion To Suppress*, the case must be dismissed with prejudice; else the defendant's Sixth Amendment rights be violated.

---

29.    In fact, the news coverage has so permeated society, the front-page article in *The Wall Street Journal* regarding *Rigmaiden* (Sept. 22, 2011), vis-a-vis the StingRay, was cited in two of the *Amicus* briefs submitted to the Supreme Court in United States v. Jones, 556 U.S. ___, 181 L. Ed. 2d 911, No. 10-1259 (2012).

**B.  Dismissal of the case with prejudice is merited as a remedy/sanction for the government's unprecedented use of a USDOJ press release to push a series of fabrications creating a public impression that the defendant is guilty.**

Even if the defendant fails to meet the "presumed prejudice" standard in the context of an *all-venue-inclusive* tainted jury pool, there still exists both a due process violation and, in any event, incurable substantial prejudice as a result of the outrageous government misconduct and flagrant prosecutorial misconduct relating to the USDOJ press release. While granting dismissal of the case would be unprecedented in the context of government and/or prosecutorial misconduct involving prejudicial extrajudicial press comments,[30] it is equally unprecedented to have the USDOJ and a lead prosecutor disseminate a press release containing numerous **outright fabrications** acting to seed a "trial by newspaper."  As explained in the *Facts* section, these fabrications include: (1) the alleged offenses were committed using sophisticated computer intrusion techniques (*i.e.*, "hacking"),[31] (2) the accused is a self-described Hacker,[32] and (3) the so-called Hacker spent 20 months considering whether to cooperate with federal investigators after his arrest.[33]  The noted fabrications create a public impression that the defendant is not only guilty of the offenses listed in the indictment but has admitted guilt.  As a result, the defendant's right to due

---

30.    In <u>Mayola v. Alabama</u>, the Fifth Circuit held that law enforcement and a reporter working together to extract and publish a suspect's **voluntary comments** were "antics [] certainly worthy of censure and disciplinary action" but do not "require the abrogation of a conviction arrived at by a process not shown actually to have been unfair in any respect."  *Id.*, 623 F.2d 992, 1001-02 (5ᵗʰ Cir. 1980).  In <u>United States v. Mitchell</u>, the court noted that "[t]he dismissal of an indictment because of pre-indictment publicity would be unprecedented, and [in any event]... defendants have not made a sufficient showing that... the Special Prosecutor's office has been guilty of any significant misconduct."  *Id.*, 397 F. Supp. 166, 180 (D.D.C. 1974).  In <u>United States v. Abbott Laboratories</u>, the Fourth Circuit acknowledges that "[t]he district court made no finding of whether the charges in the... [government's] stories were true[,]" and, in any event, "[w]hat disciplinary action should be taken in this or any future case against responsible government employees or officials for the patent threat to defendants' right to a fair trial is not a question before us..."  *Id.*, 505 F.2d 565, 571 (4ᵗʰ Cir. 1974).  Unlike in *Mayola*, *Mitchell*, and *Abbott*, the government and prosecution in *Rigmaiden* approved and published entirely fabricated facts in an official USDOJ press release which were then disseminated directly to the news media and public via a press conference led by U.S. Attorney Burke.  In this subsection, the defendant will further establish the misconduct, resulting due process violation, and resulting substantial prejudice.

31.    *See Facts*, Section II, *supra* ¶ No. 7 (discussing evidence of fabrication).

32.    *See* Section II, *supra*, ¶ No. 6 (discussing evidence of fabrication).

33.    *See* Section II, *supra*, ¶ No. 8 & 2 (discussing evidence of fabrication).

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

process is violated and there is substantial prejudice to the defense that cannot be cured. This is the type of outrageous government misconduct meriting dismissal of the case with prejudice.  Additionally, the prosecution reviewing and approving the final draft of the USDOJ press release prior to dissemination is the type of flagrant prosecutorial misconduct meriting the same remedy of dismissal with prejudice.

### 1.  There was outrageous government misconduct in relation to the April 8, 2010 USDOJ press release.

In the context of outrageous government misconduct, the Ninth Circuit has "recognized that law enforcement conduct becomes constitutionally unacceptable when it 'shocks the conscience.'"  United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir. 1986). Among other situations, this conscience shocking government misconduct includes "cases where the crime is fabricated *entirely* by the police to secure the defendant's conviction rather than to protect the public from the defendant's continuing criminal behavior."  *Id.* (emphasis in original).  Unlike in *Bogart*, whether the government entirely fabricated the offenses listed in the indictment is not at issue in this motion.  Rather, via its April 8, 2010 press release, the government published an *entirely* fabricated overt act,[34] which was contributed to the commission of *all* of the alleged offenses, and then qualified through a second false claim that the defendant self-described himself[35][36] as the type of criminal who carries out the specific category of overt act.  As explained in Section III(A), *supra*, both the overt act and the defendant's self-labeling were untrue and, in any event, are not part of the overt acts listed in the indictment.  In other words, while fabrication of the actual alleged offenses in the *indictment* is not at issue in *this* motion, the overt act and confession published in the USDOJ *press release* were entirely fabricated in order to achieve the same ultimate goal sought in *Bogart*, *i.e.*, "to secure the defendant's conviction[,]" Bogart, 783

---

34.    The fabricated overt act was, "Daniel David Rigmaiden led a complex tax fraud conspiracy that **employed sophisticated computer intrusion techniques**..."  EXHIBIT 01 (emphasis added).

35.    The fabricated self-labeling was, "a **self-described** California-based **'Hacker'** named Daniel David Rigmaiden..."  *Id*.

36.    The press release also infers guilt with the claim that "[t]he case remained sealed pending the Hacker's consideration of an offer to cooperate with the government."  *Id*.

F.2d. at 1438, albeit through an unprecedented post-indictment avenue rather than common entrapment-style pre-indictment.[37]  The government's outrageous misconduct surrounding the USDOJ press release is a due process violation, goes against fundamental fairness, and shocks the universal sense of justice.

### 2. There was flagrant prosecutorial misconduct in relation to the April 8, 2010 USDOJ press release.

In the context of flagrant prosecutorial misconduct, a district court "may exercise its supervisory power to make it clear that the misconduct was serious... and that steps must be taken to avoid a recurrence of this chain of events."  United States v. Kojayan, 8 F.3d 1315, 1325 (9th Cir. 1993).  In the present case, there was flagrant prosecutorial misconduct when the lead prosecutor reviewed and approved of the fabrications contained in the USDOJ press release prior to its dissemination.[38]  This is not a case involving news stories that merely report on facts relating to the alleged crimes.[39]  Nor is this a case involving the press publishing accounts of a defendant's *actual* confession or comments.[40]  Rather, there was a

---

37.     Even if the Court rejects the defendant's bridging of the *Bogart* fabrication standard to the press release issue, there was still conscience shocking government misconduct nonetheless. Conventional conscience shocking activity of yesteryear had elements of physical or mental abuse by government actors.  *See, e.g.*, Rochin v. California, 342 U.S. 165 (1952).  However, modern day shock has a much lower standard.  Society's idea of tolerable government activity changes and evolves with time.  For example, gone are the days when dueling with muskets on the White House lawn, à l'outrance, was an accepted weekend activity.  Modern day sissified society should be shocked to the bone by the government's misconduct relating to the April 8, 2010 USDOJ press release.

38.     *See* Section II, *supra*, ¶ No. 4 (discussing prosecution's review and approval of USDOJ press release).

39.     *Compare, e.g.*, Murphy v. Florida, 421 U.S. 794, 795 (1975) (There were "news accounts about a prior felony conviction [][and] certain facts about the crime with which [][Murphy] was charged."); Ybarra, 656 F.3d at 993 ("Most of the coverage of Ybarra's case simply reported the facts of the crime and pretrial proceedings."); United States v. McNeill, 728 F.2d 5, 7 (1st Cir. 1984) (USAO press release that merely gave defendant's "name, address, age, previous occupation, a summary of allegations" and other mundane data.); United States v. Diehl-Armstrong, 739 F. Supp. 2d 786, 795 (W.D.Pa. 2010) ("[T]he overall tone and content of the news articles have, on balance, been factual and objective, as opposed to overtly hostile to the Defendant or slanted in favor of the Government.").

40.     *Compare, e.g.*, Irvin, 366 U.S. at 720-21 (Prosecutor and police issued press release containing actual, as opposed to fabricated, account of petitioner's confession to six murders.); Rideau, 373 U.S. at 724 (Public was exposed to actual, as opposed to fabricated, confession of crimes.); United States v. Rosado, 728 F.2d 89, 94 (2nd Cir. 1984) (FBI press release accurately describing appellants as "the remaining unincarcerated leadership of the FALN.").

government fabricated overt act and government fabricated confession published in a

USDOJ press release after the lead prosecutor's approval.  "To have the prosecutor himself

feed the press with evidence that no self-restrained press ought to publish in anticipation of a

trial, is to make the State itself through the prosecutor who wields its power a conscious

participant in trial by newspaper, instead of by those methods which centuries of experience

have shown to be indispensable to the fair administration of justice."  Stoble v. California,

343 U.S. 181, 201 (1952) (Frankfurter, J., dissenting).  Furthermore, regardless of

fabrication, the self-described Hacker comment (*i.e.*, an admission) and the comment

regarding the defendant's decision to not "cooperate" with investigators (*i.e.*, refusal to give a

statement)—regardless of when the decision was made—were both disseminated by the

prosecution in clear violation of LRCrim 57.2(b)(2) and (6), "FREE PRESS - FAIR TRIAL

DIRECTIVES."[41]  Just like the USDOJ as a whole, the prosecution's flagrant misconduct

surrounding the USDOJ press release is a due process violation, goes against fundamental

fairness, and shocks the universal sense of justice.

### 3. There was both a due process violation and substantial prejudice as a result of the noted government/prosecutorial misconduct. Dismissal of the indictment with prejudice is the only sufficient remedy.

"First, a district court may dismiss an indictment on the ground of outrageous

government conduct [or flagrant prosecutorial misconduct] if the conduct amounts to a due

process violation."  United States v. Chapman, 524 F.3d 1073, 1084 (9th Cir. 2008) (citation

and markup omitted).  Because the government's deliberate attempt to try the defendant in

the press acts to contaminate the trial—or, at the very least, damages the fundamental

fairness of the proceedings—the defendant's right to due process of law is violated.  *See*, *e.g.*,

---

41.    "From the time of arrest, issuance of an arrest warrant, or the filing of a complaint, information, or indictment in any criminal matter until the commencement of trial or disposition without trial, a lawyer or law firm associated with the prosecution or defense shall not release or authorize the release of any extrajudicial statement which a reasonable person would expect to be disseminated by any means of public communication relating to that matter and concerning: [(2)] The existence or contents of any confession, admission, or statement given by the accused, or the refusal or failure of the accused to make any statement; [and (6)] Any opinion as to the accused's guilt or innocence, or as to the merits of the case or the evidence in the case."  LRCrim 57.2(b)(2) and (6) (2010).

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

1  Kojayan, 8 F.3d at 1324-25 ("The prosecutorial misconduct in this case deprived the

2  defendants of due process of law.  It contaminated their trial, and we cannot say it was

3  harmless.").  In the present case, one would be hard pressed to claim that the April 8, 2010

4  USDOJ press release is "harmless"[42] and not in violation of the defendant's due process

5  rights.  Therefore, the appropriate remedy/sanction is dismissal with prejudice.

6       "Second, if the conduct does not rise to a level of a due process violation, the court

7  may nonetheless dismiss under its supervisory powers."  Chapman, 524 F.3d at 1084

8  (citation and markup omitted).  Under this standard, a court may dismiss an indictment "(1)

9  to implement a remedy for the violation of a recognized statutory or constitutional right; (2)

10 to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations

11 validly before a jury; and (3) to deter future illegal conduct."  United States v. Struckman,

12 611 F.3d 560, 574 (9th Cir. 2010) (citation and quotation marks omitted).  Dismissal of the

13 present case under the Court's supervisory powers is appropriate considering (1) the

14 defendant's statutory rights under LRCrim 57.2(b)(2) and (6) were violated, (2) the

15 government's prejudicial extrajudicial comments amount to improper considerations before a

16 jury, and (3) future misconduct of this nature needs to be strongly deterred.  However, "[t]he

17 defendant must demonstrate prejudice before the court may exercise its supervisory powers

18 to dismiss an indictment."  Id.  With that in mind, even if the Court finds that the defendant

19 failed to establish the type of presumed prejudice required to support dismissal in the context

20 of a wholly tainted jury pool, the defendant still continues to suffer substantial prejudice in

21 the context of government/prosecutorial misconduct.  In addressing a request for dismissal

22 under the court's supervisory powers, the Central District of California said that a defendant,

23 while establishing prejudice, "does not even need to demonstrate that the misconduct

24 undermines confidence in the trial.  **Any impact on the trial will suffice**."  United States v.

25

26 42.    The defendant found no clear cue in Ninth Circuit case law that a **due process violation**
   under the government/prosecutorial misconduct standard *requires* a showing of prejudice.  In
27 contrast, a showing of prejudice is required—vis-a-vis misconduct absent a due process
   violation—if a defendant requests dismissal under the court's supervisory powers.  Nevertheless,
28 the prejudice explained by the defendant in Section III(B)(3), *infra*, ¶ No. 2, can be applied in
   either context.

MOTION TO DISMISS FOR (1) GOVERNMENT'S PREJUDICIAL EXTRAJUDICIAL PRESS COMMENTS SEVERE ENOUGH
TO IMPEACH CLAIMED INDIFFERENCE OF JURORS, AND/OR (2) VARIOUS GOVERNMENT MISCONDUCT
CR08-814-PHX-DGC

1   Hector, 2008 U.S. LEXIS 38214, CR 04-00860 DDP (May 8, 2008, C.D.Cal.).  In the

2   present case, if a juror were to claim that he/she is capable of remaining impartial after

3   exposure to the government's prejudicial comments, or even denies exposure completely, we

4   will still never know for sure whether the juror's assurances are steadfast.  *See* DeLisle v.

5   Rivers, 161 F.3d 370, 386 (6th Cir. 1998) (Denying a new trial and change of venue but

6   agreeing with the defendant that "'we can never be sure' that the printing of [][prejudicial

7   material] did not taint the [judicial] process.").  While this may not be sufficient to presume

8   prejudice in the context of a wholly tainted jury pool, it is still sufficient to have an "impact

9   on the trial," Hector, 2008 U.S. LEXIS 38214, *i.e.*, in the context of establishing prejudice

10  for dismissal under the Court's supervisory powers as a remedy for government/prosecutorial

11  misconduct.  Likewise, because of the inherent and permanent unknowing caused by the

12  misconduct, there is no lesser remedy[43] that will act to erase the resulting prejudice outside

13  dismissing the indictment.

14          However, absent a due process violation, and if the Court declines to use its

15  supervisory power to dismiss the case entirely, a requested lesser remedy is **(1)** dismissal of

16  the charge of unauthorized access of a computer with intent to defraud and the identity theft

17  charges, *i.e.*, the charges most likely equated by a jury to the government's fabricated

18  hacking claim and hacker label, and **(2)** requiring that the USDOJ issue a new press release

19  containing a retraction[44] followed by a new press conference where U.S. Attorney John S.

20  Leonardo apologizes for his predecessor's feeding of fabrications to the press and public.

21                                              * * * * *

22          This motion was drafted by the *pro se* defendant, however, he authorizes his shadow

23  counsel, Philip Seplow, to file this motion on his behalf using the ECF system.

24          LRCrim 12.2(a) requires the following text in motions: "Excludable delay under 18

25  U.S.C. § 3161(h)(1)(D) will occur as a result of this motion or of an order based thereon."

26  43.    "A court may dismiss an indictment under its supervisory powers only... where no lesser
    remedial action is available."  Chapman, 524 F.3d at 1087 (citation and quotation marks omitted).
27  44.    *See* Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1168 (6th Cir. 1983)
    ("To prevent further dissemination to the public of what the FTC believed to be misleading
28  information, the agency in a press release made [][an] announcement [correcting the error].").

Respectfully Submitted:

PHILP SEPLOW, Shadow Counsel, on
behalf of DANIEL DAVID RIGMAIDEN,
Pro Se Defendant:

s/ Philip Seplow
Philip Seplow
Shadow Counsel for Defendant.

CERTIFICATE OF SERVICE

I hereby certify that on:                    I caused the attached document to be
electronically transmitted to the Clerk's Office using the ECF system for filing and
transmittal of a Notice of Electronic Filing to the following ECF registrants:

Taylor W. Fox, PC
Counsel for defendant Ransom Carter
2 North Central Ave., Suite 735
Phoenix, AZ 85004

Frederick A. Battista
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

Peter S. Sexton
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

James R. Knapp
Assistant United States Attorney
Two Renaissance Square
40 North Central Ave., Suite 1200
Phoenix, AZ 85004

By: s/ Daniel Colmerauer
(Authorized agent of Philip A. Seplow, Shadow Counsel for Defendant; See ECF Proc. I(D) and II(D)(3))

- 21 -