1                    **UNITED STATES DISTRICT COURT**

2                   **FOR THE DISTRICT OF ARIZONA**

3                   _____

4    **United States of America,**         )
                                           )
5                         Plaintiff,       )    **CR 08-00814-PHX-DGC**
                                           )
6         vs.                              )    Phoenix, Arizona
                                           )    **March 28, 2013**
7    **Daniel David Rigmaiden,**            )
                                           )
8                         Defendant.       )
     _____)

9

10

11

12

13        **BEFORE:  THE HONORABLE DAVID G. CAMPBELL, JUDGE**

14           **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15                     <u>**MOTION HEARING**</u>

16

17

18

19

20

21   Official Court Reporter:
     Patricia Lyons, RPR, CRR
22   Sandra Day O'Connor U.S. Courthouse, Suite 312
     401 West Washington Street, Spc. 41
23   Phoenix, Arizona  85003-2150
     (602) 322-7257

24

     Proceedings Reported by Stenographic Court Reporter
25   Transcript Prepared by Computer-Aided Transcription

1                       **A P P E A R A N C E S**

2    For the Government:

3            U.S. Attorney's Office
             By:  **FREDERICK A. BATTISTA**, ESQ.
4            By:  **JAMES KNAPP**, ESQ.
             40 North Central Ave., Ste 1200
5            Phoenix, AZ  85004

6            Federal Bureau of Investigation.
             Assistant General Counsel
7            Science & Technology Law Unit
             Engineering Research Facility–East
8            By:  **JOSEPH W. MAZEL**, ESQ.
             2501 Investigation Parkway
9            Quantico, VA  22135

10   The Defendant, Pro Per:

11           **Daniel David Rigmaiden**
             Central Arizona Detention Center – Florence
12           P.O. Box 6300
             Florence, AZ  85132

13

14   Shadow Counsel for the Defendant:

15           Law Office of Philip A. Seplow
             By:  **PHILIP A. SEPLOW**, ESQ.
16           2000 N. 7th St.
             Phoenix, AZ  85006

17

18   For ACLU of Northern California:

19           ACLU Immigrants Rights Project
             By:  **LINDA LYE,** ESQ.
20           39 Drumm St.
             San Francisco, CA 94111

21

22   For ACLU of Arizona:

23           ACLU (Phoenix)
             By:  **DANIEL J. POCHODA**, ESQ.
24           By:  **KELLY J. FLOOD**, ESQ.
             P.O. Box 17148.
25           Phoenix, AZ  85011

# P R O C E E D I N G S

THE COURTROOM DEPUTY:  Criminal case 2008-814, United States of America versus Daniel David Rigmaiden on for motion hearing.

MR. BATTISTA:  Good afternoon, Your Honor.  Fred Battista on behalf of the United States.  With me at counsel's table is AUSA James Knapp and FBI Counsel Joseph Mazel.

THE COURT:  Good afternoon.

THE DEFENDANT:  Daniel Rigmaiden, on behalf of himself.

THE COURT:  Afternoon.

MR. SEPLOW:  Good afternoon, Your Honor -- go ahead.

MS. LYE:  Afternoon, Your Honor.  Linda Lye, on behalf of amici.

MR. SEPLOW:  Philip Seplow, with Mr. Rigmaiden as shadow counsel.  I would request that at least one of his handcuffs be removed so he can write.

THE COURT:  Yeah, let's remove both of them for purposes of the hearing.

MR. SEPLOW:  And, Judge, Dan Colmerauer and Mary Kelly, my paralegal.

MS. LYE:  As well as my colleagues Kelly Flood and Dan Pochoda, from the ACLU of Arizona.

THE COURT:  All right.  Good afternoon to all of you.

1    Give me just a minute to get organized here.

2            Our purpose here this afternoon is for a hearing on

3    the motion to suppress, obviously, that you filed,

4    Mr. Rigmaiden, that is at Docket 824.  And there have been a

5    number of follow-on filings, including a supplemental

6    memorandum of law and some additional factual materials that

7    have been filed.  There are related motions that focus

8    primarily on the government's handling of digital evidence

9    after the search at issue in this case that we can talk about

10   as well.

11           After we had reviewed these materials, I concluded

12   that we didn't need to have an evidentiary hearing, as you-all

13   know, because I thought the factual materials submitted

14   primarily by you, Mr. Rigmaiden, was sufficient to lay the

15   foundation for the issues that needed to be decided.  So we

16   have scheduled this hearing in order for you-all to argue the

17   points you consider are most important.

18           I did send out an order and request to the

19   government's motion, specifying some issues that I thought

20   would be helpful for you to discuss.  But I'm interested in

21   hearing your points on the matters that are most important,

22   now that all of this has been briefed over the period of

23   several months.

24           I have read your motion, Mr. Rigmaiden, all 365 pages

25   of it, as well as the government's response and your reply and

1    the ACLU's brief.  And I can't say I read every memorandum on

2    all of the other motions, but I have reviewed the motions so

3    that I understand what's at issue in them.

4           So what I want to do, since you're the moving party

5    here, Mr. Rigmaiden, is give you the opportunity to review the

6    points you think are most important for me to focus on and

7    make any other arguments that you think I need to take into

8    account in ruling on these motions.  And after you've had a

9    chance to do that, then we've agreed that the ACLU should have

10   10 to 15 minutes to state their views as well.  And then I'll

11   hear from the government.

12          You can remain seated there, Mr. Rigmaiden, while you

13   go ahead and make your arguments.  So why don't we turn the

14   time over to you.

15          THE DEFENDANT:  Okay.  Thank you.

16          Before I get into the aircard locating mission and

17   the digital data search, I want to take a minute to address

18   one of the conventional challenges to the warrant to search my

19   home, and that is that it lacked probable cause tying that

20   location to the evidence they sought and the alleged crime.

21   Crimes.

22          The only claim in the warrant affidavit linking my

23   home residence to the alleged crimes is sought-after evidence

24   with a sentence reading, "Historical cell tower information

25   and other investigative techniques have led the investigation

1   team to the location of the Travis Rupard broadband access

2   card was in the Domicilio apartment complex."  That sentence

3   is followed by my precise home address.

4        Now, the first problem with this probable cause

5   statement is there is no reference how recent the data is.

6   They use the word "historical," which carries a presumption of

7   being in the past.  So in order to support a finding of

8   probable cause, there needs to be some type of temporal

9   reference point tying that data the government had to the

10  location that they're seeking to search.

11       And the second problem with this statement is that

12  there's no reference to the historical cell tower information

13  containing any location information.  Cell tower information

14  encompasses a wide range of data, and for the aircard

15  specifically, Exhibit 2 and 3 of Docket 587-1 shows it was

16  available.  And the location column is only one of many

17  columns of data.  So they should have been more specific in

18  what they were referring to.

19       But even if you can assume that "cell tower

20  information" means "location information," the government

21  failed to indicate how precise the information was.  In this

22  case, the cell tower information they had standing alone

23  pointed to an area the size of more than 6 million square

24  feet, and that is depicted at Exhibit 22 and 23 of Docket

25  587-2.  So given such a broad area that they're referring to,

1    it really doesn't support any claim of probable cause tying

2    that location to the sought-after evidence, just based on

3    historical cell tower information.

4          Other claims in the affidavit more or less only

5    relate to the renter of the apartment possibly providing false

6    information on a rental application.  But none of the

7    information provided -- if you went back to the alleged

8    scheme, the name used to rent the apartment wasn't linked

9    back, none of the addresses on there were linked back, none of

10   the information was linked back to the alleged scheme; and the

11   government didn't claim that it was in the affidavit.

12         And one remaining claim that could arguably help the

13   government is that Forensic Document Examiner William Flynn

14   conducted a preliminary review of the handwriting on the

15   apartment rental application and on the application used to

16   open a Sacramento post office box under the name of Patrick

17   Stout.  And based on the preliminary comparison, he determined

18   common authorship.  And I'm paraphrasing the affidavit.

19         Now, earlier on in the affidavit, the government

20   references a Patrick Stout, who picked up a shipment of money

21   at a FedEx Kinko's in Palo Alto, California.  But the Patrick

22   Stout that opened a Sacramento post office box wasn't at all

23   linked to the Patrick Stout who picked up the money.  And the

24   Sacramento post office box wasn't at all linked in to anything

25   that related to the alleged scheme.

1    So I don't think there is a sufficient link between

2  those two people.  They didn't -- the government didn't claim

3  they both have the same driver's license number or anything

4  along those lines.

5    But even if you could assume the two Patrick Stouts

6  are the same person, the government never corroborated the

7  reliability of its handwriting expert, other than to give his

8  name and claim that he was an expert.

9    And in *United States versus Rutherford*, 104 Federal

10  Supp. 2d 1190, District of Nebraska, the Court noted that a

11  forensic document examiner named Rauscher testified -- this is

12  an exact quote.  He said:  Unlike fingerprint identification,

13  there's no specific number of characteristics a forensic

14  document examiner is required to find before declaring that a

15  positive match has been made.  Rather, a match is declared

16  upon the subjective satisfaction of the forensic document

17  examiner performing the handwriting analysis based on his

18  education, training and experience.

19    Now, in this case, because the government provided no

20  information on Mr. Flynn's education, training and experience,

21  his analysis can't be held as reliable.

22    Additionally, forensic document examiners ranked

23  handwriting comparisons on a scale from 1 to 9, ranging from

24  no opinion to highly probable, and in this affidavit, in this

25  case, the government didn't give the comparison any type of

1    ranking, other than to say there was common authorship.

2         So the one thing tying the apartment to anything, if

3    you could even assume the two Patrick Stouts are the same, is

4    the handwriting analysis.  And that simply can't be held as

5    reliable.

6         THE COURT:  Mr. Rigmaiden, when you made that

7    argument, you paraphrased it to say he conducted a

8    "preliminary" analysis.  That word isn't in the affidavit, is

9    it?  Doesn't it say he just conducted an analysis in paragraph

10   106 of the affidavit?

11        THE DEFENDANT:  I'm fairly certain "preliminary" is

12   in there.

13        THE COURT:  Are you referring to paragraph 106 of the

14   affidavit where they describe the examination by Mr. Flynn?

15        THE DEFENDANT:  It's page 33 of Docket 566.

16   Actually, no, this is -- let me see --

17        THE COURT:  Yeah, it is page 33 of Docket 566-1.

18        THE DEFENDANT:  Okay.  I'm fairly certain the word

19   "preliminary" is in there.  Is it not --

20        THE COURT:  Okay.  It's not.

21        THE DEFENDANT:  Okay, I'm sorry.

22        THE COURT:  But I understand your other points.

23        THE DEFENDANT:  Okay.

24        All right.  So moving on to the digital data search.

25   And this was conducted under the same warrant used to search

1    my home, which was 08-70460; and also the warrant used to

2    search my storage unit, which was 08-70502.  Under these

3    warrants or under the digital search portion of the execution

4    of these warrants, I'm asking for a wholesale suppression of

5    all digital evidence and physical evidence seized under the

6    warrants used to search my home and storage unit, considering

7    the government conducted a general search into my private

8    digital data.

9            And in the alternative, I'm asking for suppression of

10   all digital evidence obtained in violation of the terms of the

11   warrants that acted to limit the scope of the authorized

12   searches.

13           The first term that the government violated was a

14   requirement that they complete their search no later than 30

15   days after execution of the warrants.

16           Now, between August 3rd and 4th of 2008, the

17   government executed the warrants and seized all physical

18   elements of my computer system from my home and a backup hard

19   drive from my storage unit.  The government then had 30 days

20   to complete the search of those devices, and that task was

21   designated to IRS CI Agent Daun.  The bottom line is that she

22   took 41 months to complete her search and seizure of data from

23   the seized storage devices, and the government's table at

24   Exhibit 1 of Docket 929-1 indicates that she searched the

25   drive as late as January 1st, 2012.

1          THE COURT:  What is Docket 929-1?

2          THE DEFENDANT:  That's a submission of exhibits.

3          THE COURT:  Your submission of exhibits?

4          THE DEFENDANT:  My submission of exhibits.

5          THE COURT:  Okay.

6          THE DEFENDANT:  And it's a piece of evidence that the

7   government provided that I put on the record.  I guess it's

8   not really evidence --

9          THE COURT:  Tell me what that cite is again.  It's

10  929-1 -- where?

11         THE DEFENDANT:  Exhibit 1.

12         THE COURT:  Okay.

13         THE DEFENDANT:  It's a table or timeline that the

14  government put together of the digital data search.  So it's

15  not exactly a piece of evidence, but it's what the government

16  claims occurred.

17         So I think the government taking 41 months to

18  complete that search and seizure is enough to at least grant

19  me suppression of all evidence obtained after the 30-day

20  deadline.  But it's what occurred during that 41-month period

21  that really drives in the fact that a fishing expedition

22  occurred.

23         First, rather than conduct the search within 30 days,

24  Agent Daun instead spent that time creating virtual machine

25  clones of my entire computer system, and then went on to hand

1    those out to three other case agents who weren't trained in

2    computer forensic investigations, and she didn't employ any

3    means to shield out-of-scope data from their indiscriminate

4    viewing.  So it was just as if they were sitting at my actual

5    home computer with it powered on with no type of software in

6    place that would normally be used to conduct a forensic

7    examination.

8          Although they were indiscriminately rummaging through

9    files beginning in September, which was roughly a month after

10   the search, using the clones, Agent Daun's forensic analysis,

11   which is an actual process of isolating in-scope data from

12   privileged files, wasn't started until February 2nd, 2009,

13   which is six months after the physical search.  So not only

14   was it not completed in 30 days; it wasn't even begun for six

15   months.

16         And then once she began, it then took her 219 days to

17   complete the analysis and isolate the in-scope data for

18   official seizure.  This concluded on September 8, 2009, and

19   she eventually copied all seized data to a series of DVDs and

20   a CD.

21         It took her 219 days to complete that analysis, even

22   while she admitted she could have been finished in 60 days.

23   This is something she stated in a February 27, 2009 e-mail, on

24   the record at Exhibit 1 of Docket 933-1.  And that's another

25   one of my submissions of exhibits.  That's the sixth

1    submission.  So that was an e-mail to AUSA Battista where she

2    indicated that she'd be done by late March or early April.

3            There's additional evidence that she could have been

4    done not only in 60 days, but within the required 30 days.

5    One piece of software that she had available was EnCase.  That

6    is software that's used to conduct forensic -- digital

7    forensics investigations on seized hard drives.  And a

8    document named EnCase Forensic Essentials, available at

9    guidancesoftware.com, page 113, under heading that says

10   "Processing Evidence Files," the manual states, and this is a

11   direct quote:  "The evidence processor let's you run in a

12   single automated session a collection of powerful analytic

13   tools.  Since you can run the evidence processor unattended,

14   you can work on other aspects of the case while this tool is

15   processing data."

16           So even if she was busy with this case, other expects

17   of this case or other cases altogether, she could have very

18   easily set the software up to complete the forensic

19   examination and run in the background while she devotes her

20   time to other tasks.

21           It was only after she finished her forensic analysis

22   that she instructed the other case agents to stop accessing

23   clones of my entire computer system.  This instruction came on

24   August 28th, 2009, which was approximately a year after she

25   provided them the clones.

1          But even after that instruction, she continued her

2     personal exploratory rummaging for an additional 28 months.

3     This is, again, reflected at Exhibit 1 of Docket 929-1.  So

4     that is a total of 41 months from the time of entry to the

5     last indication of when the government said that she actually

6     accessed the images.

7          The total amount of in-scope files that she seized as

8     a result of her forensic analysis was only about 5 percent of

9     nearly a quarter million files contained on my storage

10    devices, and I've come up with the 5 percent number by

11    combining all the files together; and it comes out to roughly

12    5 percent of all the files.  And the specific table is at

13    934-1, showing the specific amounts of files that were seized.

14         As far as the search of data through the forensic

15    analysis, that took her 371 days past the 30-day deadline as

16    permitted by the warrants used to search my home, and 370 days

17    past the deadline as permitted by the warrant to search the

18    storage unit.  So given the length of time the data was

19    searched and the fact only 5 percent of the data was in scope,

20    the timing violation alone supports a finding of

21    indiscriminate fishing even without pointing to any specific

22    files that were exposed -- or out-of-scope files that may have

23    been exposed.

24         The second term that the government violated was the

25    requirement that they use reasonable means to prevent exposure

1    to out-of-scope files while conducting the search of the

2    seized storage devices.  At Docket 935, page 3 and 4, the

3    government indicated that Agent Daun examined all files on the

4    seized storage devices.  And in the recent memorandum, they

5    reiterated that point.  That includes 95 percent of all files

6    that were out of scope.

7            After the government originally made its admission at

8    Docket 935, I was able to confirm that Agent Daun did, in

9    fact, expose 99.66 percent of all files on the T drive, going

10   by an analysis of file last accessed dates.  And that's

11   described in my technical declaration on the record at 961-1.

12           And the T drive is the drive that the government

13   seized the bulk of the evidence in the case.  So in other

14   words, on that drive, out of -- 53,342 files out of a total of

15   53,521 files were accessed by Agent Daun after my arrest and

16   after execution of the search warrants.

17           So for the T drive specifically, only 6.13 percent of

18   those files were later seized as in scope.  So we have Agent

19   Daun exposing 99.66 percent of the files, while a very small

20   portion of those are actually within the scope of the warrant.

21           The warrant also prohibited the government from

22   seizing any file from a period prior to January 1st, 2005.

23   Between 62.65 percent and 73.97 percent of all files on any

24   given seized drive were dated prior to that time period.  And

25   I explained this in my technical declarations on the record at

1    962-1, 963-1, 964-1, and 965-1.  For the T drive specifically,

2    which is a drive the government seized the bulk of the

3    evidence, 70.88 percent of all files were beyond just the

4    temporal scope of the warrant.

5           So right off the bat, the government could have very

6    easily only exposed 29.12 percent of files which would have

7    been after January 1st, 2005, as opposed to exposing 99.66

8    percent of the files.

9           It would have been very easy for Agent Daun to do

10   this using the software she had available.  And in her

11   computer forensic report on the record at Exhibit 1 of Docket

12   863-1, she indicates she was using AccessData/FTK, EnCase and

13   WinRAR.  And all three of these programs have options to avoid

14   files that fall within certain time periods, specifically for

15   complying with temporal scope limits contained in warrants.

16          For WinRAR, I explained how to use it to collect

17   files from only certain time periods at Docket 965-1.  And for

18   EnCase, the EnCase Forensic Essentials Manual, on page 260,

19   which is available at guidancesoftware.com, explains how to do

20   the same.

21          And for AccessData/FTK, their user guide, available

22   at accessdata.com, page 76 explains how to search files while

23   complying with temporal scope limits contained in warrants.

24          Now, as far as examining data content regardless of

25   dates, rather than conduct the human-eye review of nearly all

1    files, Agent Daun could have used AccessData/FTK, EnCase or

2    any other forensic software to identify and search only the

3    in-scope files.  For example, EnCase Forensic Essentials

4    Manual, page 263, explains how the stemming key word

5    feature -- search feature connects to the Guidance Software

6    server to access language packs that have lists of associated

7    words.

8           For example, searching on the word "swim" produces

9    results for "swim," "swims," "swimming," "swam," and "swum."

10   And there's other advanced keyword search features explained

11   in Appendix A of that same manual.

12          And they have lots of other features.  Page 126 says,

13   "File signature analysis, 157 -- or, actually, 156 has a "find

14   related," which allows for finding files related to an

15   already-identified in-scope file.

16          And at Docket 934-1, I explained how AccessData/FTK

17   has similar search features that would have allowed Agent Daun

18   to conduct the search without exposing her human eyes to 99.66

19   percent of all files.  And even if human-eye review wasn't

20   unavoidable, they could have easily gone back to the

21   magistrate and asked for authority to look at certain files

22   that they were interested in or they could have given the

23   files to a walled-off third party who could have conducted the

24   examination and only returned in-scope data to the case file.

25          Given the percentage of files that were out of scope,

1   that were exposed with, more or less, two-thirds of those

2   files plainly beyond the temporal scope of the warrant, the

3   minimization violation alone supports a finding of

4   indiscriminate fishing even without pointing to any specific

5   out-of-scope files.

6          But if you're not convinced that I've proven a

7   fishing expedition and I need to point to more specific files,

8   then I have pending discovery motions at 890 and 893.  And

9   when I filed those motions, they were kind of broader requests

10  considering the government hadn't responded yet; but since

11  then, I've narrowed those requests at Docket 930 and 938.  So

12  to find out what I'm precisely after, you'd have to go through

13  those motions.

14         But two specific categories of data I should point

15  out are, I'm asking for virtual machine clones of the three

16  physical computers used by the FBI and IRS that were dedicated

17  to holding the virtual machine clones of my computer system.

18  So this way I can conduct a forensic examination of the

19  computers used to access the clones.  And by doing so, I'll be

20  able to determine more information on what files were accessed

21  and how many times the clones were actually accessed.

22         For example, AccessData/FTK, which is digital

23  forensic software I would use to conduct the analysis, has a

24  feature which allows for analyzing Windows prefetch data,

25  which can be used to determine the number of times the VMware

1    software was ran on each computer.  And it was the VMware

2    software the government used to access the clones.

3           So by using the software in that manner, I can create

4    a more full list of the total number of times the government

5    accessed the clones, as opposed to the last four log-ons that

6    the government provided me in their discovery response.  And

7    the process of using prefetch data is explained in the

8    AccessData/FTK user guide on page 157.

9           The second category of data I want to emphasize is

10   the EnCase evidence files and all safe AccessData forensic

11   toolkit FTK reports corresponding to searches and seizures

12   done within the forensic images.  Specifically -- and this

13   wasn't mentioned in the motion because I didn't have access to

14   the manuals yet.  But I need the EnCase evidence cache files

15   for each seized drive, automatic backup files and case files.

16   That's for EnCase.

17          And for AccessData/FTK, I'm looking for the case

18   database, the backup files and temporary file folder.

19   Specifically, the backup files are most important, because as

20   an agent conducts a forensic examination, automatic backups

21   are being made.  So if Agent Daun had tagged or bookmarked an

22   out-of-scope file, and then later removed that tag or

23   bookmark, I could use the backups to determine precisely which

24   files were tagged and bookmarked in the past and possibly

25   later removed.

1          One other issue that's tied in with the digital data

2     search is the government failing to delete out-of-scope data

3     and wipe the seized storage devices, which is a requirement in

4     the warrants.  This is discussed in my motions at Docket 847

5     and 927.  I'm not going to go into too many details on this,

6     but I am going to add a couple of points to the process I

7     described at the end of the motions that I want the government

8     to follow to delete the data.  There are a couple of

9     categories of data that I left out.

10         One is they need to delete and overwrite file and

11    folder properties corresponding to all deleted files that were

12    deleted prior to the government seizing the storage devices.

13    And apart from the storage devices, they also need to delete

14    all residual data that may exist from their forensic

15    examinations, because that data would contain out-of-scope

16    data as well.  So that's what I'm asking for in my discovery

17    motion.  So before they delete it, I'd like to see it.

18         Okay.  Moving on to the aircard locating mission, the

19    government conceded that the aircard tracking operation was a

20    Fourth Amendment search and seizure.  That's a broad

21    concession.  So the way I read that concession is that it also

22    applies to historical cell-site information, realtime

23    cell-site information and the cell-site emulators.  The

24    government also agreed to not challenge my classification

25    under specific actions in separate searches and seizures.  And

1    this was discussed at the January 27th, 2012 status

2    conference.

3         So taking those concessions under advisement, I

4    identified and classified 19 separate Fourth Amendment

5    searches and seizures conducted by the government during the

6    aircard-locating mission as a whole.  Through the government's

7    concession, those 19 explained actions have been conceded by

8    the government as being sufficiently intrusive, and it caused

9    enough interference to require a warrant under the Fourth

10   Amendment.

11        The remaining issue is whether or not those Fourth

12   Amendment actions implicate my Fourth Amendment rights and

13   whether or not the government had sufficient authority from

14   the Court to back up their actions.

15        The primary reason why I needed to classify the 19

16   different Fourth Amendment searches and seizures is because

17   different government actions implicate different types of

18   Fourth Amendment protected interest.  For example, a seizure

19   under *Jacobson*, which is 466 U.S. 109, only implicates

20   property or possessory interest, while a *Katz*-style search and

21   seizure --

22        THE COURT REPORTER:  Excuse me.  Excuse me.

23        THE COURT:  Hold on.

24        (Court reporter clarification.)

25        THE DEFENDANT:  Under Jacobson, a Jacobson-styled

1    seizure only implicates property or possessory interest while

2    a *Katz*-style search and seizure implicates privacy interest.

3             Additionally, a *Place*-style seizure only implicates

4    liberty interest.  That is *U.S. versus Place*, 462 U.S. 696.

5             So as far as a seizure is concerned, I don't need to

6    have a reasonable expectation of privacy.  This is recently

7    reiterated by the Ninth Circuit in *Lavan versus City of Los*

8    *Angeles*, 693 Federal 3d 1022, where the Ninth Circuit said,

9    "Appellees need not show a reasonable expectation of privacy

10   to enjoy the protection of the Fourth Amendment against

11   seizures of their unabandoned property."  And the seizures

12   they're speaking of are seizures under *Jacobson* and *Place*,

13   which don't require a reasonable expectation of privacy.

14            So the government conducted at least eight different

15   seizures that would be classified under those two supreme

16   court cases.  So for those eight government actions, I don't

17   need to prove a reasonable expectation of privacy.

18            Although the government argues I had no privacy

19   interest, it's already conceded that I at least had a property

20   or possessory interest, which is all that is required to prove

21   those seizures.  And the government made that concession at

22   Docket 873, pages 60 to 61.  So for any government-conceded

23   Fourth Amendment action that intruded upon my property or

24   possessory or liberty interest, I've already proven that my

25   rights were violated and not somebody else's.

1          The government claims they used the Northern District

2    of California 08-90330 order in support of their use of

3    cell-site emulators.  Now, the first important point I want to

4    make is the government hasn't proven the order was actually

5    executed.

6          With an ordinary warrant, after execution, there's a

7    string of evidence showing it was actually executed.  In this

8    case, the government refuses to disclose the identities of the

9    FBI technical agents who operated the equipment.  It made no

10   return on the order to the Court, and they didn't leave a copy

11   of the order at my apartment after the aircard had been

12   located.

13         They also provided no evidence showing the order was

14   served on anyone, and all evidence obtained after using the

15   equipment was destroyed after my arrest.  The order also gave

16   the government authority to serve redacted versions of the

17   order on agents and Verizon.  So even if it can be assumed it

18   was executed, we don't really have any way of knowing what

19   version of the order was actually executed.  So the government

20   really hasn't met its burden of proving it was even executed.

21   And in *Beier versus City of Lewiston*, 354 Federal 3d 1058, the

22   Ninth Circuit said, "The mere existence of a warrant provides

23   little useful information to the officers."

24         In *United States versus Whitten*, 706 Federal 2d 1000,

25   the Ninth Circuit said, "Officers conducting a search should

1    read the warrant or otherwise become fully familiar with its

2    contents."

3              So the government hasn't provided any evidence that

4    they actually complied with those two cases.

5              But even if you found the order was executed, it

6    can't be avoided that it only authorized Verizon Wireless to

7    provide agents of the FBI data and information obtained from

8    the monitoring of transmissions related to the location of the

9    aircard.  There is nothing in the order that specifically

10   authorizes the government to do anything, let alone search and

11   seizure.

12             So apart from the fact there's no indication -- well,

13   besides the fact there's no indication the order was executed,

14   and apart from the fact it only authorizes Verizon to provide

15   information to the government, the order, as a whole, doesn't

16   authorize or command the search of any place or thing, and the

17   order does not authorize or command the seizure of any thing.

18             It can't be read to authorize any type of Fourth

19   Amendment search or seizure.  This issue is completely

20   separate from the orders -- or from the order not explaining

21   the technology at issue, which is a separate Fourth Amendment

22   violation altogether.

23             So there's two separate issues.  There's one that

24   there's not -- the searches and seizures aren't described.

25   And the other is that the cell-site emulator equipment wasn't

1    described and explained to the magistrate where they can make

2    a determination what type of Fourth Amendment activity might

3    result from its use.

4         So as far as the *Jacobson*- and *Place*-style seizures I

5    spoke of, which I'm going to emphasize today, but it doesn't

6    mean I'm conceding I didn't have -- or I'm not conceding the

7    government's claim that I have no reasonable expectation of

8    privacy.  I just feel like I've addressed that well enough in

9    my filings.

10        As far as the *Jacobson*-style seizure of the aircard,

11   host laptop computer and my Internet access service and the

12   electricity, the warrant should have specifically authorized

13   the government to seize those items.

14        Now, the government meaningfully interfered with my

15   possessory interest in the aircard and host laptop computer by

16   forcing those devices to connect to an FBI-controlled cellular

17   network, writing data to the aircard, disabling signaling

18   encryption and denying me access to the Internet.  Likewise,

19   denying me access to the Internet also meaningfully interfered

20   with my liberty interest in accessing the aircard --

21        (Court reporter clarification.)

22        THE DEFENDANT:  I'm sorry.

23        Denying me access to the Internet meaningfully

24   interfered with my liberty interest under *Place*.

25        Same with the electricity.  They meaningfully

1    interfered with my possessory interest in my electricity,

2    considering it was used to power some aspects of other

3    surveillance operation.

4           So even if the government could somehow get away with

5    not explaining the technology, I don't think they should.  I

6    think that in order to be in compliance with the Fourth

7    Amendment, they have to explain the technology.  If it can be

8    said that they can get away with that, at the very least they

9    should have listed the aircard, host laptop computer, Internet

10   access, and electricity as things they sought to seize.

11          Next, the order should have authorized the government

12   to conduct a *Katz*-style search of my -- of private residences

13   and other Fourth Amendment protected areas in order to seize

14   the aircard and precise location information.  The government

15   violated my reasonable expectation of privacy when it used

16   it's cell-site emulator equipment to send location finding

17   interrogation signals through the walls of my home in order to

18   search for the aircard.  That is the same as conducting a

19   physical search.

20          So the order simply authorizing Verizon to monitor

21   transmissions while the aircard is inside private residences

22   isn't sufficient to authorize the government actually sending

23   signals into the apartment to conduct a search for a specific

24   object.  In order to support the government's through-the-wall

25   electronic search, the order should have contained specific

1    authorization to search and seize specific items.

2           Next, the order should have authorized the government

3    to conduct a *Katz*-style search of the aircard and host laptop

4    computer for the purpose of seizing data stored on the

5    aircard's internal storage device and for the purpose of

6    seizing the aircard's encrypted over-the-air signals.  So the

7    government violated my reasonable expectation of privacy when

8    it used this equipment to remotely access and download data

9    from the aircard.

10          Now, there's nothing in the order that would

11   authorize the government to do that, so if they're logging

12   into somebody's digital device and actually hijacking data and

13   seizing it, then the orders should specifically authorize the

14   government to do that.  The government -- so it's the same

15   with the over-the-air -- with the encrypted signals, which

16   they later subjected to triangulation.  So, again, separate

17   from describing the technology; but at the same time, the

18   technology should be explained.

19          The fact that the order had a finding of probable

20   cause to use and monitor a mobile tracking device doesn't

21   carry over to any of the searches and seizures I just

22   discussed.  But even if it could, the operative section of the

23   order doesn't authorize or command use of a mobile tracking

24   device.  This was the same flaw that was discussed in *United*

25   *States versus Robinson*, 358 Federal Supp. 2d 975, District of

1    Montana.

2           But even if it did authorize use of a mobile tracking

3    device, cell-site emulators don't qualify as mobile tracking

4    devices, which are typically GPS devices attached to vehicles

5    to track their movements.  And the prosecution submitted a

6    declaration by FBI Agent Morrison claiming the devices they

7    used meet the statutory definition of a pen register and trap

8    and trace device, not a mobile tracking device.  While I don't

9    agree they meet that definition, I certainly agree with the

10   government it is not a mobile tracking device.

11          So if the parties are in agreement that the equipment

12   they used isn't a mobile tracking device, and the government's

13   trying to rely on an order that authorizes use of a mobile

14   tracking device, if it could be read as that, then there

15   really isn't anything supporting what they did.

16          And I've provided examples of other warrants that

17   don't suffer from most of these flaws, at Exhibit 114, 115 and

18   112 of Document 821-6.

19          As far as the government's good-faith claims, most of

20   them -- or actually all of them are irrelevant considering

21   majority of my arguments relate to scope and particularity

22   violations.  And there's no good faith for those types of

23   violations.  You can see *United States versus Leon*, 468 U.S,

24   page 918, Footnote 19, and page 920 of that case; and *United

25   States versus Hitchcock*, 286 Federal 3d at 1072.  That's a

1    Ninth Circuit case.

2         Additionally, the burden is on the government to show

3    good faith.  I'm not required to show an absence of good

4    faith, and there's no presumption of good faith.  You can see

5    *United States versus Michaelian*, 803 Federal 2nd 1042, where

6    the Ninth Circuit said, "The government, not the defendant,

7    bears a burden of proving that its agents' reliance upon the

8    warrant was objectively reasonable."  Nevertheless, they're

9    articulating numerous reasons as to why the good-faith

10   exception doesn't apply at Docket 824-1.

11        Now, the government's claim there are similar orders,

12   or orders similar to the one issued here, issued across the

13   country by other magistrate judges, I really don't think that

14   claim helps the government, because even if it was true, that

15   would just prove they're doing the same violation over and

16   over again.

17        In *United States versus Herring*, the Supreme Court

18   said, "Systemic error or reckless disregard for constitutional

19   requirements is a type of government conduct that merits a

20   suppression remedy."

21        And I know the government recently put some orders on

22   the record.  If you look at those orders, they more or less

23   suffer from the same flaws, although those orders actually

24   authorize the government to conduct searches.  So in that

25   sense, those orders are actually more in compliance with the

1    Fourth Amendment where the order in this case only authorizes

2    Verizon to conduct certain activities.

3         And if those orders do help the government, I should

4    note that all these orders are sealed, and if there are other

5    orders out there that may help my argument, there's no way I

6    would ever have access to those.  It would be easy for the

7    government to pick and choose orders that suit them while

8    ignoring the ones that might suit me.  But still I'm kind of

9    confused on the government's position on how those orders

10   would even help its case.

11        Next, I'm moving on to the 08-90331 order, which the

12   government used to operate its pen register and trap-and-trace

13   device.  Again, the government's admission that the entire

14   aircard locating mission was a Fourth Amendment search and

15   seizure should also encompass any data they obtained under

16   this order as well.

17        In the order application, AUSA Shawna Yen, in the

18   Northern District of California, indicated that she was only

19   after general geographical location or to verify the

20   identification and approximate location of the user of the

21   aircard.  Nothing in the order application properly advised

22   the issuing magistrate that the government's true intention

23   was to precisely locate the aircard and its user.  And

24   although the order authorized the government to obtain some

25   realtime cell-site sector location information, it didn't

1    authorize locating the aircard with precision or within Fourth

2    Amendment-protected areas.

3            THE COURT:  A little more slowly, Mr. Rigmaiden.

4            THE DEFENDANT:  Okay.

5            So as a baseline matter, I have a reasonable

6    expectation of privacy in my location and realtime cell-site

7    information showing my location, considering the aircard was

8    in my residence at the time the data was generated.

9            In order to obtain this information, the government

10   should have been authorized to conduct a *Katz*-style search of

11   the aircard in order to seize realtime geo location

12   information pertaining to the location of the aircard and its

13   user while inside private residences and while the aircard is

14   not engaged in the call.

15           Although this information was eventually provided by

16   Verizon, it was actually generated by the aircard upon FBI

17   instruction through the agents' surreptitious voice calls.  So

18   it really wasn't coming from Verizon; it was coming from the

19   aircard.  Therefore the order should have had -- authorized

20   the government to conduct a search of the aircard in order to

21   seize the information they were after.

22           And separate from the *Katz*-style search and seizure,

23   the government should have also been authorized to conduct a

24   *Jacobson*-style seizure of the aircard host laptop computer and

25   aircard Internet access service, and a *Place*-style seizure of

1    my Internet access service, considering they meaningfully

2    interfered with those possessions by having Verizon

3    reconfigure the aircard using over-the-air parameter

4    administration, which reads and writes data to the aircard so

5    it will respond to the FBI silent voice calls.  And they also

6    used silent voice calls to deny me access to the Internet for

7    six hours.

8            So because they were engaging in that activity, the

9    order should have specifically permitted the government to

10   seize my possessions in order to facilitate whatever it was

11   they were after.

12           And the third-party disclosure rule shouldn't apply

13   considering the information was being generated by the

14   government.  It wasn't being stored by Verizon, and they were

15   calling -- they were making calls to the aircard and forcing

16   it to generate the data.  And in *United States versus Forest*,

17   355 Federal 3d 942, the Sixth Circuit addressed precisely the

18   same situation and found the third-party disclosure rule

19   doesn't apply under those circumstances.

20           And the same good faith -- the same reason why the

21   good-faith argument doesn't apply to this order -- or its the

22   same as with the last order as with this order, and that's

23   that the majority of my arguments are scope-and-particularity

24   arguments, and there just isn't any good faith when the

25   government makes those types of violations.

1          But in addition to that, it violated the express

2     terms of the order for the pen register and trap-and-trace

3     device, which stated that they were forbidden from obtaining

4     any cell-site information that might be available when the

5     aircard is turned on but a call not in progress.  The aircard

6     doesn't engage in calls, so there's no way they could have

7     possibly obtained the data under any scenario.

8          And the other term they violated was the "after

9     receipt and storage" provision, and that is further described

10    at 824-1.

11         I'm going to briefly hit on some points with the

12    historical cell-site information.

13         Again, their overall concessions should apply to this

14    information, and I also have a reasonable expectation of

15    privacy in this information, considering the aircard was in my

16    home during the 38-day period that they were able to get

17    information on its location.

18         And I have privacy interests established by *United*

19    *States versus Karo*.  Any kind of third-party disclosure rule

20    discussed in *Smith versus Maryland* and the *United States*

21    *versus Miller* shouldn't apply here considering location data

22    is considered to be highly private in the same way

23    communications content is considered to be highly private.

24    And even in *United States versus Miller* and *Smith versus*

25    *Maryland*, the Supreme Court first examined the actual records

1    at issue before deciding that a third-party disclosure rule

2    should apply.  So if you conduct that analysis in this case,

3    you'll find that the records at issue are highly private based

4    on *United States versus Karo*.  So third-party disclosure rule

5    shouldn't apply.

6         And the orders they used didn't include the word

7    "location" anywhere in the applications or any relevant

8    context.  And there's nothing in the actual order indicating

9    that there were actual location information.  I go into more

10   of this in my motion at 824-1.

11        And even under the historic Communications Act, the

12   government could have obtained this information had they

13   followed 18 U.S.C. 2703(c)(1)(A) as opposed to 18 U.S.C.

14   2703(d) and (c)(2).  So the Stored Communication Act has an

15   option for the government obtaining warrants when someone's

16   reasonable expectation of privacy is implicated when they're

17   after records in the possession of a third party.

18        A final point I'm going to make is that the ACLU

19   brought up that -- the point that the government was

20   conducting a general search using its cell-site emulator,

21   considering it was forcing all devices in the area around my

22   apartment to connect to the device, although there's no

23   support in the case law for it.

24        I'm also asking for suppression of evidence based on

25   the violations of those uninvolved third parties, considering

1    the government destroyed evidence and those uninvolved third

2    parties will never have a chance to bring civil action against

3    the government.

4           And in addition to suppression in criminal cases, the

5    prospect of civil liability is another deterrent that the

6    Supreme Court has noted that prevents the government from

7    violating people's rights in the future.

8           So because these possibly thousands of people who

9    have their rights violated would never be able to bring any

10   kind of civil action, suppression in this case would be good

11   as a remedy for the violations of those uninvolved third

12   parties who -- in the future, I'm sure similar individuals

13   will have their rights violated in the same fashion if the

14   government continues with what they're doing.

15          Thank you.  That's all the arguments I have.

16          THE COURT:  All right.

17          THE DEFENDANT:  And I was going to give an

18   additional -- okay.

19          THE COURT:  Let me ask you a couple specific

20   questions, Mr. Rigmaiden.

21          THE DEFENDANT:  Yes.

22          THE COURT:  One of the arguments you made in your

23   motion and came back to in your reply was that the

24   government's use of the key that was taken from your

25   possession when you were arrested to see if it fit the lock in

 1    the apartment door was a Fourth Amendment violation.  What

 2    evidence do you think was generated as a result of that action

 3    if, in fact, it was a Fourth Amendment violation?

 4         THE DEFENDANT:  It confirmed that -- they could

 5    create the inference I was in that apartment, considering the

 6    key was in my pocket.  So they could present that to the jury

 7    and say -- have an agent take the stand and say:  We found

 8    this key in his pocket, and we took it to the apartment we

 9    thought he lived at, and it fit the key; so there's a

10    sufficient link between him and the apartment.

11         THE COURT:  Well, they already had a search warrant

12    at the time, right?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And when they executed the search warrant

15    later in the day, they found lots of evidence you were in that

16    apartment, right?

17         THE DEFENDANT:  Correct.

18         THE COURT:  But your argument is it's the evidence of

19    their checking the key against the lock that should be

20    suppressed, because that was a Fourth Amendment violation.

21         THE DEFENDANT:  Correct.

22         THE COURT:  Okay.

23         I think you've covered all my other questions.

24         Ms. Lye, why don't you go ahead with your --

25         MS. LYE:  Thank you.

1           May I approach, Your Honor?

2           THE COURT:  Yes.

3           MS. LYE:  Thank you, Your Honor.  May it please the

4    Court, Linda Lye for amici.  I would like to thank the Court

5    and Mr. Rigmaiden for allowing me to participate today.  We

6    raise a number of issues in our amicus brief, but I would like

7    to focus in particular on the so-called "stingray" device in

8    the search the government performed.  In particular, I would

9    like to make two main points.

10          First, that the government has a duty of candor under

11   the Fourth Amendment to explain to the Court when it is using

12   unfamiliar intrusive technology.  Stingrays illustrate the

13   danger when the government fails to do this.  Providing

14   information about unfamiliar technology is necessary for

15   judges to be able to perform their constitutional function of

16   assuring all aspects of the search are supported by probable

17   cause.

18          The second point I'd like to address is what did the

19   government do here?  There are two possibilities, but both

20   require suppression.

21          One possibility is that, as the government currently

22   contends, it obtained a warrant.  But if that is so, it failed

23   to live up to its duty of candor.

24          The other possibility is that the government, at the

25   time, did not actually obtain a warrant, and instead submitted

 1  two companion pen register applications and is simply now

 2  seeking to recharacterize those documents *post hoc*, based on

 3  the strategic decision it made during the course of the

 4  discovery proceedings to concede that the use of the stingray

 5  device was intrusive enough to constitute a search.

 6          I'd like to address now the government's duty of

 7  candor.

 8          The purpose of the Fourth Amendment's particularity

 9  requirement is to ensure that a magistrate is fully apprised

10  of the intended scope of the search so that the magistrate can

11  perform his or her constitutional function to assure all

12  aspects of the search are supported by probable cause.

13          Stingray devices operate unlike more familiar forms

14  of location-tracking technology, such as a GPS device or a

15  quest to a carrier to provide cell-site information of a

16  particular subscriber.  Those more familiar forms of location

17  tracking are targeted at a specific individual.  Stingray

18  devices, in the course of locating a suspect, also scoop up

19  information of unrelated third parties as to whom there is no

20  probable cause.

21          For the government to tell the Court that it has

22  probable cause to identify the location of a suspect, but then

23  to withhold the fact that it intends to use a stingray device

24  to locate the suspect would be equivalent to the government

25  telling the Court that it has probable cause to search the

residence of someone and provide a particular street address,

but then withhold all the while, full well knowing that that

street address is, in fact, a 10- or 20-unit building where

the government knows the defendant -- the suspect resides but

is unsure which unit the suspect resides in, and is going to

rummage through the 10 or 20 units until it gets to the right

one.  That sort of search would be anathema to the Fourth

Amendment and is the analog equivalent of what happened here.

The government attempts to rely on *Dalia*, but that case is

distinguishable.  It deals with issues regarding the manner of

execution of a search, of an otherwise lawful search, as

opposed to the more fundamental scope and particularity

questions at issue here.

In *Dalia*, the question was whether the Fourth

Amendment requires an order that authorizes the installation

of bugging devices to also expressly authorize the agents to

enter the premises in order to install the device.  The Court

held -- the Supreme Court held no, reasoning, among other

things, that such a requirement would be a, quote, empty

formalism, because it is implicit in an authorization to

install a bugging device that you have to enter the physical

premises to do so.

It is not implicit, by any means, at least not in

this day and time.  It is not implicit to federal magistrate

judges that the use of an unspecified mobile tracking device,

1    such as a stingray, would, in fact, scoop up third-party

2    information in the process of locating the suspect, therefore

3    explicit -- an explicit explanation of the technology is

4    required by the government.

5         We're not suggesting, Your Honor, that the government

6    has to provide at the warrant application state minute

7    technical details about how the technology works, but simply

8    basic information relevant to the constitutional questions.

9         In this proceeding, the government has already

10   conceded in public pleadings that the device operated as --

11   simulated a cell tower, sent and received signals to and from

12   the device, and also scooped up third-party information.  That

13   was the type of information about the process by which the

14   technology functions which should have been, could have been,

15   but was not presented to Magistrate, now Judge, Seeborg, when

16   these applications were submitted.

17        I'd like to turn now to what happened here.  Again,

18   there are two possibilities as to what the government did, but

19   both require suppression.  And this is especially so in light

20   of the May 2011 e-mail from the United States Attorney's

21   Office in the Northern District of California that we moved

22   for leave to submit to the Court earlier this week.

23        One possibility is, as the government now contends,

24   that order 08-90330 was, in fact, a warrant.  But if that is

25   so, the government, unfortunately, failed to live up to its

1    duty of candor to Judge Seeborg.  Nowhere did the affidavit

2    or -- or application explain how the mobile tracking device

3    worked.  It simply stated that the government wished to use a

4    mobile tracking device which would, quote, ultimately generate

5    a signal that fixes the geographic position, end quote, of the

6    device.  But there was no mention that in the process of doing

7    so, it scooped -- it would scoop up third-party information.

8           The government also confusingly used the identical

9    language in its affidavit in support of this application to

10   the language contained in the companion application, 08-90331,

11   submitted at the same time, to use a pen register.  This is

12   apparent from comparing paragraphs 42 of each affidavit.  A

13   reasonable reader, such as a federal magistrate judge, would

14   have therefore concluded that both applications were for pen

15   register devices.

16          We argued why --

17          THE COURT:  Let me ask you a question on that,

18   Ms. Lye.  I don't see how a magistrate judge could conclude

19   that they were both for pen register devices when the

20   application for 331 was specifically for a pen register

21   device, and only under the Stored Communications Act.  The

22   application for 330 was an application not only under the

23   Stored Communications Act, it was also an application under

24   Federal Rule of Criminal Procedure 41 that specifically sought

25   a probable cause finding and that named a different device,

1    the mobile tracking device.

2              MS. LYE:  Right.  So --

3              THE COURT:  So if the judge looks at those two, how

4    is he going to consider -- Judge Seeborg going to conclude

5    they're talking about the same equipment?  I understand

6    paragraphs 42 are the same in the two affidavits, but the

7    faces of the documents weren't at all the same.

8              MS. LYE:  That's true, because they were seeking

9    different forms of information.  So 90331 explicitly states --

10   and this is at page 3 of the order, lines 9 to 10 -- that the

11   agency was not authorized to obtain information from the

12   provider that would allow it to attempt to determine the

13   precise location of the user of the target device.  By

14   contrast, 90330 -- again, all of the order direct- -- language

15   directed at Verizon specifically said that the Court therefore

16   orders that Verizon Wireless shall monitor such transmissions,

17   including while the target is, quote, inside private

18   residences, garages and/or other locations not open to the

19   public or visual surveillance.

20              Therefore, because it required more specific

21   locational information, there would have been a good reason

22   for the government to provide a higher level of cause and

23   statutory and Rule 41 authority, but it was entirely

24   reasonable to read these as a pen register for general

25   information -- location information, and a pen register plus

1    for more specific location information.

2          We now know from -- but let's assume this was, in

3    fact, a warrant.  We now know that from the e-mail, the May

4    2011 e-mail from within the United States Attorney's Office in

5    the Department of Justice, that what the government did here

6    in terms of providing scant information about the mobile

7    tracking device was that this conduct was not isolated.

8    Miranda Kane, who was the chief of the criminal division,

9    writes, in May 2011, some three years after the July 2008

10   search at issue here, that, quote, many agents are still using

11   WIT technology, W-I-T.  This is another term for stingray

12   device.  Many agents are still using WIT technology in the

13   field, although the pen register application does not make

14   that explicit.  The e-mail also states that magistrates had,

15   quote, collective concerns about this practice.

16         So what we see is that if this order could be

17   construed as a warrant, suppression is necessary.  This is so

18   because what the government did here was not an isolated

19   incident based on some uncertainty about new technology.  It

20   was a practice that continued for at least three years until

21   the magistrates in that district expressed collective

22   concerns.

23         The Ninth Circuit in *Rettig*, R-E-T-T-I-G, held that

24   evidence should be suppressed where, as here, the government

25   withholds material information about the intended scope of the

1    search.

2          And that is so even if the -- and the Ninth Circuit

3    in *Rettig* is explicit about this.  Even if the magistrate

4    would have ultimately granted the warrant application, that's

5    not relevant.

6          The relevant question is:  Was all of the information

7    about the intended scope of the search presented to the

8    magistrate so that he or she could make an informed

9    determination about the scope of the search and how to

10   supervise the search.  The good-faith doctrine and

11   exclusionary rule, as the Supreme Court made clear in *Leon*,

12   the purpose of that -- of the suppression doctrine is

13   deterrence.

14         This case raises highly consequential issues in our

15   current technological era about the government's duty, its

16   obligations to the Court to be explicit, to be candid and

17   forthright when it is using forms of technology with which

18   courts are not familiar.

19         The government should have said not only what

20   information it wanted to obtain, the location of

21   Mr. Rigmaiden, but also what information it was going to

22   obtain in the process, the information of unrelated third

23   parties.

24         Suppression is necessary to ensure that the

25   government does not continue to withhold important information

1     about new surveillance technology from the judiciary.  The

2     principles supporting the conclusion that the government must

3     provide information about the basic technology are evident

4     from *Karo*, the beeper case.

5            The government in that case argued, we shouldn't have

6     to get a warrant when we're tracking someone's location,

7     because of the particularity requirement; we won't be able to

8     specify what location we're searching, because that is

9     precisely what we're trying to determine through the search.

10    And the Court rejected that argument and said, but it still

11    may be possible to at least describe to the Court what kind

12    of -- what kind of object the beeper is being placed into, and

13    other such basic information.

14           So the principle the Court laid out -- again, that is

15    consistent with what was articulated in *Dalia*, that you have

16    to give the courts a basic understanding of what the search is

17    going to look like.  When it comes to new technology, it can

18    often be a little bit of a black box to people who lack the

19    technical expertise.

20           A Magistrate Judge Owsley in the Southern District of

21    Texas has rejected applications, for example, for a cell tower

22    dump, to download all of the data from everyone from four cell

23    towers in order to determine where a suspect may have been at

24    a particular time.

25           The Court in that opinion explained that it is

1    essential for the U.S. attorney presenting the application to
2    have a basic understanding of the technology so that he or she
3    can understand the constitutional implications of the request,
4    because a request such as a cell tower dump implicates not
5    just the target, but hundreds, perhaps more, of unrelated
6    third parties.  Therefore, there is a duty of candor, and
7    suppression is necessary in order to ensure that in future
8    case, the government will be forthright and explicit.
9              I would just like to address why the alternative
10   reading -- I recognize that you expressed some reservation,
11   some scepticism about that, but the alternative reading is
12   that these two applications, 08-90330 and -90331, were never
13   intended to be a warrant, but were just pen register
14   applications.  The government's recent submission actually
15   confirms that these were not tracking device -- that 90330 was
16   not a tracking device warrant.
17             When the government wants a warrant, it knows how to
18   use the word "warrant."  Although the magic word "Rule 41" and
19   "probable cause" appears in 90330, the order language, as
20   Mr. Rigmaiden has pointed out, is all directed at Verizon.
21   There is nothing saying, therefore it is hereby ordered that
22   agents of the FBI may, blah, blah, blah.
23             If you look at the -- two of the orders submitted by
24   the government earlier this week, two from the District of
25   Arizona, the order language says exactly what you would expect

1    in a warrant.  It is captioned "Warrant for a Tracking

2    Device," unlike the document here.  It also says, "it is so

3    ordered that agents of the" -- redacted federal agency -- "may

4    install and use a mobile tracking device."  Again, there is no

5    similar language here.

6            If you look at what happened in connection -- again,

7    in light of the May 2011 e-mail from the Department of

8    Justice, one of the participants on that e-mail string from

9    the U.S. Attorney's Office in the Northern District points out

10   that in some cases, quote, a pen might have started out as

11   just a pen, and later the agents decided to use the order to

12   also attempt to locate the target, end quote, using a

13   stingray.

14           Respectfully, we submit, Your Honor, that is exactly

15   what happened here.  This means that if you construe 08-90330

16   to be a pen register, the stingray search was entirely outside

17   the scope, and the government's effort to point to that

18   document now as a warrant is a *post hoc* recharacterization.

19           It arises out of the government's strategic decision

20   during the course of this discovery -- the discovery in this

21   case to concede that the use of the stingray device was

22   intrusive enough to constitute a search.  But now, in light of

23   that concession, it is laboring to point to some kind of

24   document that it can call a warrant.

25           That kind of strategic decision and post hoc

1    recharacterization, we respectfully submit, is not the sort of

2    innocent mistake contemplated in by the Supreme Court in *Leon*.

3           So whether you construe, Your Honor, that 08-90330 as

4    a warrant or not, in either event, suppression is necessary.

5    The purpose of the suppression -- the exclusionary rule is

6    deterrence.  It is to ensure that the government, in future

7    cases, will be forthright with the judiciary and not withhold

8    important information that bears on the judiciary's

9    constitutional duty to supervise the search.

10          I'll be happy to address any questions.

11          THE COURT:  All right.  Thank you, Ms. Lye.

12          I think, Counsel, I'd like to go ahead and take a

13   break now for the benefit of the court reporter.  We'll resume

14   in ten minutes.

15          (Recess taken from 2:40 p.m. to 2:49 p.m.)

16          THE COURT:  Mr. Battista, are you going to be doing

17   the argument?

18          MR. BATTISTA:  Yes, Your Honor.

19          THE COURT:  I have quite a few questions for the

20   government.  And they focus on things that I'm wrestling with,

21   so maybe it makes sense for me to ask you those questions, get

22   your answers, and then have you look over your outline of the

23   argument and cover the points that haven't been covered by the

24   questions.  Does that make sense?

25          MR. BATTISTA:  That would be fine, Your Honor.

                    THE COURT:  Okay.

                    MR. BATTISTA:  Would it be appropriate for me to stay
at counsel's table?

                    THE COURT:  If you need your material, that's fine.
But we need to have you sit down and speak right into the mike
so everybody can hear you.  Or come up here, either one you
want to do.

                    MR. BATTISTA:  I'll stay seated with the microphone,
Your Honor.

                    THE COURT:  That's fine.

                    I'd like to start, Mr. Battista, with the document
the government has referred to as a tracking device warrant,
which is the order with the number 08-90330.

                    I have read this order many times, and I've read the
affidavit in support of it and have some specific questions.

                    I guess the first question I have is:  In your view,
where exactly does this order authorize the government to
conduct the aircard search?  What portion of the order grants
that authorization to the government?

                    MR. BATTISTA:  Your Honor, it does not -- obviously,
the order does not expressly authorize the government to
conduct the search as it expressly authorizes Verizon Wireless
to assist the FBI in its operation.

                    I think what happened here, Your Honor, is that,
obviously -- and when we look at the caption of the order, it

 1    specifically states it's an application -- let me get it in

 2    front of me.  It specifically states it's in the matter of the

 3    application of the United States of America for an order

 4    authorizing the use and monitoring of a mobile tracking

 5    device.

 6            And then it expressly identifies which tracking

 7    device.  And then if you -- in reading the order, the

 8    application, and the affidavit in conjunction, the only

 9    conclusion one can draw from this is that the government is

10    seeking the authorization to use and monitor a mobile tracking

11    device.  And there's no doubt the order, in particular, is

12    inartfully drafted.  But the sole purpose of the application,

13    order, and affidavit was to present sufficient probable cause

14    to the magistrate judge to permit the FBI to use and monitor a

15    mobile tracking device.

16            So in reviewing the caption, the order, the

17    application, and the affidavit, in looking at that all

18    together -- and the order does reference the application, and

19    the application does reference the affidavit.  In reviewing

20    all these together, it's the government's position that it --

21    that that's what the government was seeking and that's what

22    the magistrate judge authorized.  But we do recognize it is

23    inartfully drafted.

24            THE COURT:  From your comments, it sounds as though

25    you would assert that the magistrate judge reviewing this set

1    of documents would have inferred that what the government was

2    asking him to do is authorize the use of a mobile tracking

3    device even though it was never explained to him in exactly

4    those words, other than that caption that you've identified.

5    Is that your position?  Or is there something more explicit

6    that you think told him, Judge, when you sign this document,

7    you are authorizing the FBI to put a device in the field that

8    will track the aircard?

9            MR. BATTISTA:  Your Honor, I think the -- when we

10   look at the language in terms of not just the caption, but

11   also the -- particularly, the language of the application

12   where the United States through AUSA Yen is specifically

13   stating that the requesting -- they're submitting the

14   application in support of an order directing Verizon Wireless

15   to assist the agent of the FBI through the use of a -- the use

16   and monitoring of a mobile tracking device.

17           Again, it's inartfully drafted, but it is the

18   position of the government that the magistrate should have

19   been on notice as a result of that, particularly with the next

20   sentence where it states that, in the application at the end

21   of page 1, "The purpose of the installation of the mobile

22   tracking device is to track the physical location of the

23   target, and it will require the acquisition of realtime

24   cellular information."

25           So, again, it is inartfully drafted, but it is our

1    position that the affidavit, application, and order were

2    drafted for the primary purpose of obtaining the authorization

3    for the use and monitoring of a mobile tracking device.

4            Then, Your Honor, if you also look at page 2 of the

5    application, at the bottom, paragraph 1, where it talks about

6    cites pursuant to the Federal Rules of Federal Procedure

7    authorize -- paragraph 1, it cites Federal Rules of Criminal

8    Procedure, Title 18, and then also Title 28, "Authorized

9    special agents of the FBI for a period" -- they're asking for

10   an order directing that -- it authorized special agents of the

11   FBI for a period not to exceed 30 days unless extended by the

12   Court to direct Verizon Wireless to assist the agents in the

13   use of a mobile tracking device for the broadband access

14   cards.

15           So in other words, this could be read to show it is

16   the agents who are going to be using and monitoring the

17   device, and Verizon will be assisting them.

18           THE COURT:  All right.  If an order or a warrant does

19   not explicitly authorize a government agency to undertake a

20   Fourth Amendment search but indirectly refers to it, is that

21   sufficient authorization from a federal judge that the agency

22   can undertake a Fourth Amendment search?

23           MR. BATTISTA:  Your Honor, I believe in this case it

24   would be in that the agents went to the Northern District of

25   California to attempt to locate the aircard, which we had an

1    idea was in this district.  And the agents then, in

2    communication with the U.S. Attorney's Office there,

3    specifically asked for the appropriate pleadings to obtain

4    authorization to use and monitor a tracking device.  These

5    were the documents that were authorized by and approved by the

6    U.S. Attorney's Office for the Northern District of

7    California.  Led to believe that these were the documents that

8    were in common use at that time and relied upon by the agents.

9            So in this particular case, I think that if you read

10   the entire -- all three documents together, there should be a

11   sufficient basis for authorizing the use of the tracking

12   device.  But I do -- I do acknowledge that there is no express

13   authorization.

14           THE COURT:  All right.  Let me focus on a slightly

15   different aspect of this issue.  In preparation for today's

16   hearing, more than a year ago in our exchanges about discovery

17   that was going to be granted to Mr. Rigmaiden, the government

18   agreed that a number of facts would be assumed to be true for

19   purposes of today's hearing.  One of those is that the mobile

20   tracking device used by the FBI to locate the aircard

21   functions as a cell-site simulator:  "The mobile tracking

22   device mimicked a Verizon Wireless cell tower and sent signals

23   to, and received signals from, the aircard."  I'm reading from

24   my January 5th, 2012 order at Docket 723.

25           If I am to assume for purposes of today's hearing

1      that the device acted as a cell-site simulator and mimicked a

2      Verizon Wireless cell tower, then is it also reasonable for me

3      to assume that the device picked up information from many more

4      cell phones and aircards than just the defendant's; it would

5      have picked up information from cell phones and aircards that

6      were in that Verizon Wireless sector, right?

7              MR. BATTISTA:  Your Honor, in the course of seeking

8      the actual aircard, a general request for information would go

9      out, and there would be a collection of a small amount of data

10     relevant to other devices within the area.  And that's one of

11     the reasons why, at the end of the tracking mission, any

12     evidence or any information related to any third party's

13     device is destroyed.  And there was not -- that information

14     was only collected solely for the purpose of elimination

15     because of the nature of the way -- obviously, the way all

16     these devices work, they're all in communication with the

17     tower simultaneously.

18             So, obviously, when the cell-site simulator is

19     looking for the target -- in this case, the target aircard --

20     there will be some communication with other devices in the

21     area.

22             THE COURT:  Was that an important fact for Judge

23     Seeborg to understand before he granted this warrant?

24             MR. BATTISTA:  Your Honor, I don't know if it -- it

25     would depend on the judge.  Obviously, there's no evidence

1    that it was disclosed to the judge.  But, obviously, this

2    is -- the use of these devices is a very common practice, so

3    I'm not aware of that aspect of the device ever having caused

4    in the denial of an authorization to use this equipment.  And

5    in this particular case, there's no evidence that any third

6    party suffered any injury or harm, except for the temporary

7    notification that their cell site -- their cell phone was in

8    the area and possibly communicating with the tower or towers.

9         And, Your Honor, the magistrate -- in the order, the

10   order did note that at the conclusion of the tracking mission,

11   the investigating agency shall expunge all the data obtained

12   by this order, but it does not specifically mention

13   third-party data.

14        THE COURT:  And there's nothing in the application,

15   affidavit, or order that even hints of the fact that this

16   device would be picking up information from sources other than

17   the aircard, right?

18        MR. BATTISTA:  That's correct, Your Honor.

19        Your Honor, an additional point would be that it's my

20   understanding in consultation with the FBI that there's no

21   other way to do this.  In other words, there isn't a

22   technology such that one can seek to locate or identify a

23   particular device without coming into contact with the other

24   devices.  There's --

25        THE COURT:  Well, I understand that.  I don't think

1      the argument is that you should have used a different

2      technology.  The argument is that the intrusive nature of this

3      technology should have been more fully disclosed to the

4      magistrate judge.

5                  MR. BATTISTA:  I understand.

6                  THE COURT:  All right.  Can you help me understand,

7      Mr. Battista, exactly which steps the government took in this

8      effort you believe fall under this tracking device warrant,

9      330, and which steps the government took that you believe fall

10     under what you referred to as the trap-and-trace order,

11     Document 331.

12                 MR. BATTISTA:  Well, Your Honor, with the

13     trap-and-trace order, that is information that would be

14     supplied to the cell phone provider through the normal

15     operation of the aircard.  In other words, whatever type of

16     information that would normally be provided to the cell phone

17     provider through the aircard, that's what -- the type of

18     information that was requested under that, the order 90331.

19                 With respect to the mobile tracking device order,

20     then -- which also directs Verizon Wireless to assist the FBI

21     with -- one moment, Your Honor.

22                 Your Honor, it says that Verizon Wireless shall

23     provide the agents immediately on request with all

24     information, facilities, and technical assistance to ascertain

25     the physical location of the broadband access card.  So, Your

1    Honor, what the agents were obtaining from Verizon Wireless at

2    that point in time was, in a sense, more the -- closer to

3    realtime information.

4          In other words, when the agents contacted the

5    aircard, they were getting information that they were

6    generating -- that they would send a message to the aircard --

7    they would call the aircard, the aircard would generate a

8    message, and then Verizon Wireless was providing that

9    information to them, and in a very -- obviously, a very short

10   time frame.  They were also, then, receiving the cell tower

11   information, which was allowing them to get a better read on

12   where the device was located.

13         Obviously, the order 90331 had some limitations in

14   terms of what types of information could be provided under the

15   standard pen register trap-and-trace order, but it's our

16   position the 90330 order allowed Verizon Wireless to assist

17   the agents with additional information being generated by the

18   aircard and the aircard account when the agents were using

19   their equipment.

20         THE COURT:  So you're saying that while --

21         MR. BATTISTA:  Nothing additional, Your Honor.

22         THE COURT:  You're saying that while the mobile

23   tracking device operation was underway, while the agents were

24   in the field with the device, Verizon was feeding information

25   to them under both orders; some under the 331 trap-and-trace

1    order, and some under the 330 tracking device order; is that

2    right?

3              MR. BATTISTA:  Yes.

4              THE COURT:  Can you distinguish between the two kinds

5    of information?  What were they receiving under 331, and what

6    were they receiving under 330?

7              MR. BATTISTA:  Can I defer to one of our counsel

8    here?

9              THE COURT:  Yeah.

10             MR. MAZEL:  Your Honor, under both devices, they

11   would -- I'm sorry.  Under both orders, they would essentially

12   receive dialing, routing and signaling addressing information

13   that is generated as part of a normal cellular conversation or

14   cellular data transmission.  The -- you would receive the cell

15   tower it was most recently registered with.

16             All cellular devices are required to periodically

17   register so that a cell network knows where to send message

18   traffic to the closest or the most desirable tower for network

19   management purposes.

20             So the entire time it's -- different providers have

21   different parameters set up.  Periodically, each phone, by its

22   own operation, is required to register with the system to let

23   the system know the cell tower it's closest to.  That is

24   historical cell-site data.  Some providers, it could be an

25   average of every seven seconds.  It could be -- it differs and

1    even varies provider to provider based upon the amount of

2    traffic on the network at the time.

3         So it could receive information that is the IMEI of

4    the phone, which would be the unique identifier for the phone

5    and the cell tower it's closest to, because those are the

6    things the provider would most need in order to complete

7    conversations on its own network.

8         THE COURT:  And that would come under which order to

9    the agents at the time of the search?

10        MR. MAZEL:  We -- we'll actually use both types of

11   orders.  We will use -- you can receive it under a pen

12   register order because it is information that pertains to

13   dialing, routing, and signaling of a transmission.  So we can

14   rely upon the pen order.

15        You can also get it through the more precise location

16   information that you would need under a warrant.

17        In this case, the tracking order would be realtime or

18   precision location information, if you were, for example,

19   trying to triangulate off of three towers at the same time.

20        THE COURT:  Okay.  So can you distinguish for me the

21   kind of information that came under 331 and the kind that came

22   under 330?

23        MR. MAZEL:  One moment, Your Honor.

24        (Government side conferring.)

25        THE COURT:  Mr. Battista, while we're getting that

1    answer, let me ask you a couple of other questions.

2            Do you believe that -- well, my understanding is that

3    Judge Seeborg signed both of these orders on July 11, 2008.

4            MR. BATTISTA:  Yes, Your Honor.

5            THE COURT:  So he would have received them at the

6    same time and probably reviewed them at the same time; is that

7    right?

8            MR. BATTISTA:  That's correct, Your Honor.  It is my

9    understanding they were presented to him at the same time.

10           THE COURT:  Do you believe that the two orders

11   sufficiently distinguish for his benefit the kind of

12   information he was authorizing under one versus the kind of

13   information he was authorizing under the other?

14           In other words, would he, sitting there, understand

15   there's one category he's going to be giving you authority to

16   get under 331 and a different category he's authorizing you to

17   receive under 330?

18           MR. BATTISTA:  I may defer on this, Your Honor.

19           THE COURT:  All right.

20           MR. MAZEL:  Your Honor, essentially, the reason there

21   would be two different orders that we instruct our agents in

22   the field to follow is really based upon the privacy interests

23   that we're -- the area where there may be an expectation of

24   privacy.  If -- under the pen register trap and trace order,

25   this is information that's normally used to complete phone

1    calls on a system.  We get the same type of data under both

2    orders.

3            We generally recommend we use a search warrant at a

4    point where we think that we're going to reasonably be

5    interrogating a device within an area where there's a

6    reasonable expectation of privacy, because we're -- in going

7    into that area where there's a reasonable expectation of

8    privacy, we want to ensure a neutral and detached magistrate

9    has made a finding of probable cause at that point.

10           However, it's the same type of data that we're

11   getting in both missions, because based upon the transmissions

12   back and forth to the cell tower is what we would use to

13   direction-find the cellular device.

14           With a pen register order, we -- because the pen

15   register order doesn't include a finding of probable cause by

16   a magistrate, we will generally restrict our use there to

17   where we're not knowingly going into an area where there's a

18   reasonable expectation of privacy.

19           THE COURT:  All right.  And is that --

20           MR. MAZEL:  It's -- it's not -- I'm sorry.  It's not

21   the nature of the data; it's the nature of the interest.  And

22   the -- the nature of the -- the legal interests, the Fourth

23   Amendment -- you know, where you have an expectation of

24   privacy is where we would recommend using the search warrant

25   as opposed to just a pen register order.

1    THE COURT:  Well, if I understand what you're saying,

2    the kind of information you would seek under a trap-and-trace

3    order under the Stored Communications Act would be the kind of

4    information that cell phones routinely communicate to cell

5    towers in order to complete transactions.  Your view is that

6    because that is the nature of the information and because it

7    is kept by the wireless carrier, it is not entitled to a

8    reasonable expectation of privacy, and you can get that kind

9    of information through an order under the Stored

10   Communications Act.

11   MR. MAZEL:  Correct, it's express authority under

12   2703(d) as well as the pen register.

13   THE COURT:  Whereas if you're in the field trying to

14   track down a device, you may be generating a different kind of

15   information, not the kind of information that routinely is

16   used to make a call, but such as information generated in

17   response to a call you placed to the aircard.  That's getting

18   much more into the nature of information likely to identify

19   somebody, and so your view is that implicates privacy

20   interests more and, therefore, that should come under a

21   warrant.  Is that generally the line you're drawing?

22   MR. MAZEL:  Generally, yes, with the clarification

23   that when you call the device, you're still getting the same

24   type of data that you would have with any other cellular

25   transaction.

1        If it wasn't us calling it -- if it was, for example,

2    his mother or his brother, you would still get the same type

3    of information relating to the dialing, routing, and signaling

4    and addressing of the communication to be able to send it from

5    the network to the handset or the network to the aircard

6    device and back.

7        The reason the warrant is recommended in areas where

8    there may be an expectation of privacy is more a matter of --

9    not necessarily the nature and quality of the data, but the

10   fact that we're knowingly trying to locate the device in an

11   area where there is a reasonable expectation of privacy.  And

12   to avoid any type of, for example, *Kyllo* arguments, that type

13   of thing, we rely on the probable cause based order.

14        THE COURT:  It sounds as though the government, then,

15   is of the view that even information it gets from Verizon as

16   part of this operation may require Fourth Amendment

17   authorization because it is part of this active effort to

18   locate an individual.  So it still may be the same category

19   that normally can be obtained under the SCA, but because it's

20   in the context of a specific effort to locate somebody, the

21   same kind of information may be entitled to a Fourth Amendment

22   protection.

23        MR. MAZEL:  No, Your Honor.  The issue with the

24   Fourth Amendment protection is that the provider's information

25   would be third-party information.  The -- when we're actively

1    trying to locate a device in an area where there is an

2    expectation of privacy, we would be using our own tracking

3    device at that point.  And because we're operating the

4    tracking device and sending signals from our tracking device

5    to the device inside an area where there may be reasonable

6    expectation of privacy, they're not communicating with the

7    provider at that point anymore; they're communicating with our

8    device.

9            THE COURT:  Well, here's the concern I have about

10   that point:  Why, then, does the document 330 even mention

11   Verizon?  If you have already got authority under 331 to get

12   all of that information from Verizon, and it's not implicating

13   Fourth Amendment interests, why isn't 330 just focused on

14   authorizing the FBI to get that information directly with its

15   device?  Why is Verizon even in that order if there isn't some

16   Fourth Amendment concern about what's being obtained from

17   Verizon?

18           MR. MAZEL:  Your Honor, I'm going to defer to

19   Mr. Battista on that.

20           MR. BATTISTA:  Your Honor, I think even when they're

21   using the simulator, there may need to be some coordination or

22   contact with Verizon in order to assist them in doing that.

23   Because, obviously, they're seeking a Verizon aircard, and I

24   believe they just simply are coordinating and communicating

25   with Verizon during this process.

1          THE COURT:  Why couldn't they do that under the 331

2     order?

3          MR. BATTISTA:  Well, again, the 331 order is -- this

4     may be a situation of erring on the side of caution, because

5     you're in the process of potentially locating someone, let's

6     say, just within their residence; so that would be a basis of

7     just simply erring on the side of caution.

8          THE COURT:  Let me ask this question, Mr. Battista:

9     In your view, when the FBI was conducting this operation and

10    it was obtaining this information from Verizon in the process,

11    did it have to comply with the language in 331 that said it

12    could only get information from Verizon after receipt and

13    storage of the information?  Or, in your view, was the FBI

14    authorized to get information that had not been stored by

15    Verizon?

16         MR. BATTISTA:  Your Honor, I think that in light of

17    the 330 -- 9330, Your Honor, that it would authorize the FBI

18    to get the realtime information.  And, obviously, the language

19    is in 90331 because of the limitations that are applicable in

20    those types of orders.  So the second order, the search

21    warrant, the order issued on -- you know, based on probable

22    cause under 41(b) then allows the government to get additional

23    data that it may not have been permitted to get under the 331.

24         THE COURT:  So under that answer, it seems to me

25    you're saying 330 did authorize Verizon to give information to

1    the FBI that could not have been obtained under the Stored

2    Communications Act.

3          MR. BATTISTA:  I believe, yes, Your Honor.  Then the

4    question is whether or not was that reasonable under the

5    warrant.

6          THE COURT:  Well, and the question also -- I mean,

7    I'd asked a minute ago if some of the information coming from

8    Verizon was subject to the warrant, was a Fourth Amendment

9    search.  Sounds to me like it's possible that it was.

10          MR. BATTISTA:  Yes, Your Honor.

11          THE COURT:  Let me go back to the question I asked a

12    few minutes ago:  When Judge Seeborg sat down with these two

13    orders, what was there in the documents in front of him that

14    helped him understand the kinds of distinctions we've just

15    been talking about?

16          MR. BATTISTA:  I don't know if I could point to

17    anything explicit beyond what we've just talked about in that

18    the agents are -- under the warrant are going to be using and

19    monitoring the cell-site simulator; but, again, we're not,

20    obviously, disclosing the full nature of the cell-site

21    simulator.  But Verizon is being ordered to provide

22    information and assistance to the agents through the operation

23    of the cell-site simulator.  So that's the information that

24    the magistrate is being given with respect to that order.

25          THE COURT:  Mr. Rigmaiden has asserted that the

1    discovery in this case shows that the trap-and-trace device

2    that was used under the 331 order was the computer that the

3    FBI already had on-site, S. F. Martinez, and it just was

4    configured in order to capture information from Verizon

5    pursuant to this order.

6          MR. BATTISTA:  Excuse me, Your Honor.  I lost my

7    train of thought.  I apologize.  Could you --

8          THE COURT:  The question is:  Mr. Rigmaiden has

9    asserted that the trap-and-trace device that was actually used

10   under of the trap-and-trace order, 331, was a server in the

11   FBI's office that he refers to as S. F. Martinez, and it was

12   simply reconfigured in order to pick up information from

13   Verizon in light of this order.  Is that correct?

14         MR. BATTISTA:  Again, since I have the technical

15   expert here, I'm going to defer to Mr. Mazel on this question.

16   We have multiple experts.  We want to get this right, Your

17   Honor.  If you may indulge us for a minute.

18         MR. MAZEL:  Your Honor, in this case -- well, in all

19   cases where we use the cellular location equipment, the -- we

20   need to get the dialing, routing, and signaling and addressing

21   nearest -- the signaling and addressing information to

22   determine the closest tower, the tower the individual is

23   most -- last operated.  And then we would then put our

24   simulator in the vicinity to begin the location mission with

25   our device.  The information that's received from a pen trap

1    order goes to a server that's located on FBI property, and

2    then that information is then provided out to the field to

3    help initiate the location mission.

4           THE COURT:  So the answer is yes, Mr. Rigmaiden is

5    correct that that -- that was the trap and trace device that

6    was used?

7           MR. MAZEL:  The trap and trace device is actually

8    used by Verizon.  But then the information from the device is

9    transmitted to FBI headquarters -- I'm sorry, to the

10   appropriate FBI facility.  So the trap and trace device itself

11   was not the server.  The data was transmitted by Verizon to

12   our server.

13          THE COURT:  All right.  A couple other questions,

14   Mr. Battista.  Mr. Rigmaiden has argued that there is no

15   evidence in this case that the warrant, Document 330, or Order

16   330, was used in the process of the mobile tracking device

17   operation, was in the hands of the agents or was actually

18   giving them guidance in the process.  What is your response to

19   that?

20          MR. BATTISTA:  Your Honor, obviously the government

21   is not willing to disclose the identity of the technical

22   agents, but there are witnesses who have observed the

23   technical agents doing their activities and can hearsay the

24   fact that they personally have spoken to the technical agents,

25   and the technical agents were provided a copy of the order and

1    reviewed the order.  And it's also, obviously, standard

2    procedure for these technical agents.  They're not going to

3    operate this equipment without first seeing an order, because,

4    obviously, of the nature of its capabilities.

5         So the government, through -- if the Court needs it,

6    the government is prepared through hearsay testimony to say

7    that the agents had been spoken to, they were provided a copy

8    of the warrant, they did review the warrant, they were

9    observed operating the equipment, the results of operating the

10   equipment were provided to the agents; and the agents, as the

11   Court and Mr. Rigmaiden well know, then conducted their

12   follow-up investigation.

13        THE COURT:  Is there evidence, in your view, that the

14   executing agents had the affidavit in their possession in

15   addition to the order?

16        MR. BATTISTA:  One moment, Your Honor.

17        I don't know, Your Honor.

18        THE COURT:  All right.  So for purposes of any

19   particularity argument that I deal with, I should not look to

20   the affidavit to cure any particularity problems; I need to

21   just look at the face of the order.  Do you agree with that?

22        MR. BATTISTA:  Well, but, Your Honor, the agents, the

23   technical agents, would have in terms of -- well,

24   particularity in terms of how the search was to be conducted

25   or in terms of what the search was to be for?  Because in

1    terms of particularity with respect to what the search is for,

2    obviously, the order itself is quite clear.

3         THE COURT:  Well, there's a whole series of

4    particularity problems that Mr. Rigmaiden has identified, and

5    it seems to me if we don't know that the affidavit was in the

6    possession of the executing officers, then I need to limit my

7    analysis as to the sufficiency of the warrant in stating with

8    particularity what was to be searched or how it was to be

9    searched for to the face of the 330 order.  I can't look at

10   the affidavit for that purpose.  Do you agree with that?

11        MR. BATTISTA:  Yes, Your Honor.

12        Your Honor, under *Karo*, it is the government's

13   position with respect to particularity, there's three things

14   that are issued: the object to be tracked, the probable cause

15   to track the item, and the length of time to track it.  That

16   those are the three issues with respect to particularity.

17   And, obviously, those are satisfied on the face of the order.

18        THE COURT:  Well, I understand you're arguing that

19   the order is sufficiently particular.  I just wanted to make

20   sure you agreed that as I do that analysis, I need to look at

21   the face of the order and not the affidavit, because we don't

22   know if it was in the possession of the executing agents.  It

23   sounds like you agree with that.

24        MR. BATTISTA:  Yes, Your Honor.  And I don't know how

25   long this hearing is going to go, but I might be able to get

1  that answer.

2          THE COURT:  All right.  Well, let's keep forging

3  ahead.  Let's talk about the search of the computer hardware.

4          Is it the position of the government that the

5  government's conduct in this case complied with the protocol

6  that was made a part of the 330 warrant in this case?

7          MR. BATTISTA:  Again, Your Honor, are you talking

8  about the search warrant for the apartment?

9          THE COURT:  I apologize.  It wasn't the 330 warrant.

10  It was the search warrant for the apartment.

11          MR. BATTISTA:  Search warrant for the apartment.

12          THE COURT:  Yeah, and I'm talking about the Northern

13  District of California protocol that was attachment C to that

14  warrant.  Is it the government's position that you complied

15  with that protocol?

16          MR. BATTISTA:  Yes, Your Honor.  But we do -- as I

17  have stated, I recognize that the language is subject to an

18  alternate interpretation.  But we read that -- we read the

19  protocol to require the identification on each device of some

20  evidence that was subject to seizure pursuant to the warrant,

21  and that was clearly done within the first 30 days.

22          THE COURT:  Have you got a copy of the protocol in

23  front of you?

24          MR. BATTISTA:  Yes, Your Honor.

25          THE COURT:  Would you turn, please, to page 2,

1    Paragraph 5.

2            Paragraph 5 says, in the first sentence, "The

3    government must complete an off-site search of a device that

4    agents removed in order to search for evidence of crime as

5    promptly as practicable and no later than 30 calendar days

6    after the initial execution of the warrant."

7            What do you think the word "complete" means in that

8    sentence when it says the government must complete an off-site

9    search of a device?

10           MR. BATTISTA:  Again, Your Honor, the interpretation

11   was that it had to be completed to determine if there was

12   evidence.  But I understand that there can be a different

13   interpretation, and I acknowledge that.

14           THE COURT:  Well, so just to make sure I understand

15   the government's position, what you're saying is when the

16   agents were in Mr. Rigmaiden's apartment and found a hard

17   drive and concluded they couldn't reasonably search the hard

18   drive in the apartment, they were authorized by the protocol

19   to take the hard drive out of the apartment and to do a search

20   of it out of the apartment and make a mirror of it if

21   necessary.

22           But your position is all they had to do was find

23   something relevant on the hard drive; and if they found

24   something relevant on the hard drive, then they had completed

25   the search of that hard drive for purposes of this sentence --

1          MR. BATTISTA:  Yes, sir.

2          THE COURT:  -- they could keep the mirror image of

3    that hard drive, and they could, page by page, go through the

4    rest of it for the next three years, right?

5          MR. BATTISTA:  Yes, Your Honor.  Searching for

6    evidence of -- which was done, searching for evidence listed

7    in the search warrant.

8          THE COURT:  There's a sentence which appears farther

9    down.  It's actually the third sentence in this paragraph

10   after the long second sentence, which says, "Within a

11   reasonable period, not to exceed 60 calendar days after

12   completing the authorized search of the device, the government

13   also must use reasonable efforts to destroy and to delete from

14   any devices or storage media or copies that it has retained or

15   made, copies of any data that are outside the scope of the

16   warrant but that were copied or accessed during the search

17   process, unless there's law that allows them to retain it."

18          That sentence suggests that by 60 days, the

19   government has to have completed distinguishing between

20   evidence on the hard drive that is within the scope of the

21   warrant, and evidence on the hard drive that is not within the

22   scope of the warrant, and it has to destroy the latter

23   category, right?

24          MR. BATTISTA:  Yes, Your Honor.

25          THE COURT:  And that would be impossible under the

1    scenario -- under the way in which the government reads the

2    order; namely, if you found something relevant, you could keep

3    it for three years and search it and decide during that

4    three-year period what was or was not within the scope of the

5    warrant, right?

6              MR. BATTISTA:  Yes, Your Honor.

7              THE COURT:  If I conclude that the government did not

8    comply with the Northern District of California protocol, what

9    is the remedy?

10             MR. BATTISTA:  Well, Your Honor, first of all, any

11   evidence that was found within the 30 days, the government

12   would argue would not be subject to suppression.

13             Second, if the Court were to find that the government

14   did not comply and sought some type of -- to take some type of

15   action, the government is willing to, since we have a mirrored

16   image, original mirrored images of the equipment, the

17   government is willing to, with new agents, submit a new

18   affidavit for a search warrant to the Court to do the search

19   all over.  In other words, simply redo the search and follow

20   whatever protocols the Court would require.

21             THE COURT:  Are you aware, Mr. Battista, of case law

22   that says when the government commits a Fourth Amendment

23   violation, one of the remedies is to give the government a

24   do-over?

25             MR. BATTISTA:  Your Honor, I would say it is not a

1    Fourth Amendment violation; it is a violation of protocol of

2    the agreement that the government has with the Court, and it

3    would be within the Court's discretion to decide whether or

4    not that action would be appropriate.

5         THE COURT:  Well, the protocol was incorporated into

6    the warrant in this case, right?

7         MR. BATTISTA:  Yes, Your Honor.

8         THE COURT:  So the limitations in the protocol were

9    limitations in the warrant.  Do you agree with that?

10        MR. BATTISTA:  Yes.

11        THE COURT:  And if the government didn't comply with

12   the protocol, then it exceeded the scope of the warrant.  But

13   you're saying that's not a Fourth Amendment violation, to

14   exceed the scope of the warrant?

15        MR. BATTISTA:  Again, Your Honor, it's our position

16   that it is an agreement with the Court with respect to a

17   protocol in terms of how the search would be conducted.  I

18   don't have any authority to cite to you at this point.

19   Except -- one moment, Your Honor.

20        THE COURT:  Sure.

21        MR. BATTISTA:  Your Honor, we're attempting to find

22   an answer for you on that.

23        THE COURT:  Okay.  You can let me know the answer in

24   a minute.  Let me ask you a few other questions.

25        Mr. Battista, the -- your brief -- I'm switching

1    subjects now to the fact that the FBI expunged data it

2    obtained during the aircard-locating mission.  Your brief says

3    that it did so pursuant to established FBI policy, but there's

4    no citation.  What policy is it that you're referring to?

5         MR. BATTISTA:  Your Honor, I believe the defendant

6    has cited to the policy that was disclosed to him pursuant to

7    his request.

8         THE COURT:  Okay.  So you agree that the policy he's

9    describing is the FBI policy?

10        MR. BATTISTA:  That's correct, Your Honor.

11        Your Honor, with respect to the original question --

12   the other question that was pending with respect to the

13   violation of the term -- potential violation of the term with

14   respect to the search protocol, on page 64 of our response, we

15   cited *Richardson versus Wisconsin*, and that was a case where

16   the agents in that particular case had a search warrant, but

17   acted as if it was a no-knock warrant, so in a sense did

18   not -- were not authorized to conduct a no-knock warrant by

19   the Court.  But that violation of the terms of the warrant did

20   not result in suppression.  And it's the government's

21   understanding that this was the finding even though the

22   magistrate judge had specifically refused a no-knock warrant.

23        THE COURT:  Okay.

24        Mr. Rigmaiden -- I'm jumping around a bit here,

25   but -- because my notes aren't very well organized.

1    Mr. Rigmaiden has asserted that as part of the

2    aircard-locating mission, Verizon itself wrote data to the

3    aircard and, in fact, reprogrammed the aircard so it would

4    respond to the government's device.  Does the government

5    contend that there is any portion of the 330 order that

6    authorized the government to have Verizon write new data to

7    the defendant's aircard?

8              MR. BATTISTA:  I think, Your Honor, the one sentence

9    that I mentioned earlier on page 3 of the order, the second

10   full paragraph, where Verizon is ordered to provide the agents

11   immediately on request with all information, facilities and

12   tactical assistance needed to ascertain the physical location

13   of, basically, the target broadband access card.

14             THE COURT:  Is there anything about that language

15   that would have alerted Judge Seeborg to the fact that he was

16   authorizing the FBI to have Verizon reprogram the defendant's

17   aircard?

18             MR. BATTISTA:  No, Your Honor.  It does not state

19   that.

20             THE COURT:  All right.  A few other questions.

21             MR. BATTISTA:  How about an easy one?

22             THE COURT:  All right.  Here's an easier one.  It's a

23   small matter, but it concerns the lock in the door.

24             MR. BATTISTA:  Yes, Your Honor.

25             THE COURT:  Do you contend that was done pursuant to

1    the search warrant?

2           MR. BATTISTA:  Yes, Your Honor.  The timing of this

3    is that the agents had -- we had the search warrant in hand.

4    The key was seized during search incident to arrest.  We had

5    the warrant, the federal warrant to arrest the defendant.  He

6    is in custody.  So the key is now in our possession.

7           What happened, Your Honor, as we stated in the facts,

8    is that the agents -- obviously, we were standing back from

9    the apartment because we were obviously attempting to identify

10   the occupant in the apartment.  Once we believed we had

11   identified the occupant in the apartment and, obviously, now

12   our cover is blown, the agents went to the apartment, checked

13   the key with the lock, and never left the apartment from that

14   point.  They did not enter because they did not have the entry

15   team.  But an agent stayed out in front of the apartment and

16   secured it from that point forward.

17          So it would be my position that we began the search

18   pursuant to the warrant at that time, and we never stopped

19   until we were done, Your Honor.  So in other words, once that

20   key went in the lock, the search started and the agents

21   maintained security of the apartment until we packed up and

22   left.

23          Thank you for that question.

24          THE COURT:  All right.

25          One other question.  Justices on the Supreme Court

1    have suggested that using a beeper in a car to track a vehicle

2    for 28 days violates the Fourth Amendment because you are

3    obtaining information about the private details of a person's

4    life: where they go, when they go there, who they see.  If

5    that's a violation of the Fourth Amendment, then why isn't

6    obtaining historical cell-site data for a 38-day period that

7    would allow you to determine essentially the same information,

8    not a Fourth Amendment violation?

9         MR. BATTISTA:  Well, again, Your Honor, obviously,

10   it's the position of the government that these are records in

11   the possession of a third party; and second, it's the position

12   of the United States that in this particular case, due to the

13   fact that this particular aircard account is maintained under

14   a false identity of a living person that the defendant

15   actually used in order to obtain the account, used the actual

16   social security number of the living person, that the

17   defendant had no expectation of privacy in that account.

18        And as we also made the point in our latest filing

19   with the Court, it's the position in this particular case that

20   the government is not aware of the defendant having any lawful

21   source of income.  So that another factor for the Court to

22   take into consideration with respect to the issue of

23   expectation of privacy is that not only is the defendant using

24   a false identity to maintain this account, he's using money

25   that he's stolen from others in order to maintain the account.

1          THE COURT:  All right.  I think that has covered all

2     of my questions, Mr. Battista.  Why don't you share with me

3     any other thoughts you wanted to from your outline that you

4     think I should consider.

5          MR. BATTISTA:  Sure, Your Honor.  And I will try to

6     be brief.

7          Your Honor, just very briefly, several points to

8     respond with respect to the defendant's argument that the

9     affidavit in support of the search warrant for the apartment

10    does not state sufficient probable cause.  We, obviously,

11    believe that it does.

12         With respect to the defendant's allegations of the

13    agent, particularly Special Agent Daun conducting

14    indiscriminate fishing expeditions, regardless how the Court

15    rules, Agent Daun has followed specific protocols, and she was

16    required to examine a significant amount of information, but

17    she was always doing that with an eye towards seeking evidence

18    specifically identified in the search warrant.

19         Obviously, we take the position that any historical

20    records, Your Honor, are not Fourth Amendment searches.  We do

21    recognize in this particular case that a significant amount of

22    data was gathered as a result of those records, but they're

23    records in the hands of a third party.

24         With respect to the issue that the Court addressed

25    with respect to the operation of the cell-site simulator

1    gathering information about third parties, we acknowledge that

2    occurred.  It's required because of the nature of the device.

3    The evidence was destroyed; no action was taken; no harm has

4    fallen to any other person.  There was no other results as a

5    result of that, due simply to the fact that these other

6    devices came into contact with the cell-site simulator.

7            With respect to the e-mail that the ACLU has

8    mentioned, I will point out that the conversation in the

9    e-mail discusses the -- only discusses the possible use of

10   this type of equipment through the use of a trap and trace or

11   pen trap order.  And, Your Honor, there are different parts of

12   the country where the FBI successfully obtains authorization

13   for the use of these types of devices solely through the use

14   of a standard trap and trace and pen order, taking the

15   position that these types of devices, the simulators, are just

16   a different type of trap and trace order.  And, obviously,

17   there's a battle going on in the country, but there's no

18   discussion in those e-mails about the use of the -- of a

19   warrant or Rule 41 or no discussion of any -- even any type of

20   hybrid -- hybrid pleadings.

21           Your Honor, while -- it's clear by the pleadings,

22   particularly with respect to 90330, that there was not a full

23   disclosure to the magistrate judge with respect to the nature

24   and operation of the device.  But, again, Your Honor, that was

25   done because of the sensitive nature of the device in terms of

1    concerns out of the disclosure to third parties.

2            Obviously, if the magistrate judge had had questions,

3    he would have been entitled to answers, as any magistrate

4    judge.  If they have questions, they're entitled to answers.

5    If they're not satisfied with their answers or they have

6    concerns, they can also deny the requests.  As parties on the

7    other side have noted, there are times when the magistrate

8    judges do deny the requests.

9            THE COURT:  Well, but the burden is on the government

10   to provide information sufficient to justify the warrant,

11   right?

12           MR. BATTISTA:  That's correct, Your Honor.

13           THE COURT:  It's not the magistrate's burden to

14   ferret that out while he's got the agents in his office.

15           MR. BATTISTA:  That's correct, Your Honor.

16           I just very briefly want to touch on this, and I know

17   there's been very little mention of this.  But with respect to

18   the defendant's expectation of privacy, this, Your Honor, is a

19   very unique case.  The defendant does a very nice job talking

20   about his expectation of privacy with respect to the

21   individual items and case law with respect to the individual

22   items in the case: the aircard, the apartment, the aircard

23   account.  But I think, Your Honor, it is appropriate for us to

24   just take a minute to this case and look at this particular

25   defendant and his conduct and see whether or not -- in this

1    unique set of circumstances, whether or not the defendant is

2    entitled to an expectation of privacy.

3         We have a situation where the defendant assumes the

4    identity of the living person, Mr. Rupard, including using his

5    social security number to obtain and maintain the aircard

6    account.  So that's one false identity.

7         He then obtains the apartment, so then he assumes a

8    second identity of a deceased person, Mr. Brawner, including

9    using his social security number, through a -- through page 1

10   of a fraudulent tax return in order to obtain the lease for

11   the apartment.  He also provides what appears to be a facially

12   valid California driver's license in the name of Brawner, but

13   that driver's license bears a number in California that is

14   assigned to another living person.

15        So now with the aircard and the apartment, that is

16   three different identities that the defendant is using.

17        He purchases the computer, which he stores in the

18   apartment and uses with the aircard.  He purchases that in the

19   identity of a Mr. Johnson.  So that is a deceased person.

20   That's a fourth identity.

21        He obtains the storage unit in the name of a another

22   false identity, Aldridge.  And in support of that, he provides

23   another fraudulent California driver's license with the

24   driver's license number that is assigned to another living

25   person in California.  So that is the fifth and sixth

1    fraudulent identity that he's using.

2          In order to obtain his ill-gotten gains, the $68,000

3    he obtained through the submitting of fraudulent tax returns,

4    he used the identity of Patrick Stout, another living person,

5    to go and obtain those funds.

6          The driver's license he used to backstop Patrick

7    Stout had a driver's license that also traced back to another

8    living California person.  So that is the seventh and eighth

9    fraudulent identity that the defendant's using.

10         With respect to Mr. Stout, he assumed Mr. Stout's

11   false identity to file fraudulent tax returns in Mr. Stout's

12   name and caused Mr. Stout hardship as a result of the fact

13   Mr. Stout had trouble filing his own tax returns.

14         The defendant assumed the identity of numerous living

15   persons in the furtherance of his scheme and filed tax returns

16   in their name and then got returns from the government, then

17   by -- thereby violating the privacy interests of many other

18   living people.

19         The defendant also used the computer and the aircard

20   to move through a personal computer in a residence in Arizona

21   in order to check the balance on one of the bank accounts that

22   was involved in the fraud.  So he then invaded the privacy of

23   a family here in Glendale, Arizona by going through their

24   computer in order to -- in furtherance of the fraud.

25         So we have a defendant who is assuming numerous

1   fraudulent identities of both living and deceased people.

2   He's funding all of these activities through money that he's

3   stolen.

4           So in a sense, the government's thinking is that in

5   terms of an expectation of privacy, if you steal a car and

6   you're caught driving the car and your computer is in the car,

7   you have no expectation in the search of that car.

8           Now, if you steal a thousand dollars and walk down

9   the street to a car dealer and give a false identity and take

10  that thousand dollars and give it to the car dealer, and now

11  you have converted that stolen money to a car, should you

12  really have an expectation of privacy in that car now?  And

13  it's the position of the government, Your Honor, in this

14  incredibly unique case, that a person who acts as the

15  defendant has acted, that he should not be found to have any

16  expectation of privacy in the apartment, the -- particularly

17  the aircard account, or the computers, either in the home or

18  the storage unit.  This is an extremely unique case.

19          Now, the defendant takes the position that he held

20  himself out in these public personas, people who knew who he

21  was.  Obviously, the people with the apartment knew him as

22  Brawner.  The storage unit folks knew him as Aldridge.

23  Verizon Wireless knew him as Travis Rupert.  But the problem,

24  Your Honor, is like, that is a great one-way street for the

25  defendant, because as long as it's to his benefit, as long as

1    he can use these identities in furtherance of his schemes to

2    violate other people's privacy rights and steal money from the

3    government, it's great.  But as soon as he no longer needs

4    those identities or as soon as he believes he is subject to

5    detection, he can walk away from those identities and never be

6    found.  Or practically never be found.  It took the five

7    agents that are here in the courtroom months and months to

8    locate him, and he obviously did not want to be found.

9         So let's say the apartment complex that he rented

10   under a false identity, if he trashed the apartment, stole all

11   the appliances, skipped on the rent and decided to drop the

12   identity of Mr. Brawner, that apartment complex would have no

13   recourse whatsoever against Mr. Rigmaiden.

14        I think it's a very safe assumption that if

15   Mr. Rigmaiden wanted to drop out of sight and change

16   identities, he could have done it instantaneously.  We know he

17   could have done that, because when we executed the search

18   warrant for the storage unit, we found a facially valid U.S.

19   passport in the name of Johnson.  Mr. Rigmaiden has

20   successfully obtained a United States passport in the name of

21   a deceased person.  And when we did the search, we also found

22   the original death certificate for this individual.

23        He had over $70,000 in cash and valuable coins in

24   that storage unit.  So if we had missed Mr. Rigmaiden when we

25   attempted to arrest him on that day and he made it to that

storage unit and gotten that -- obtained that passport and

$70,000 in cash, and, oh, by the way, a backup computer with

all of his information, all of his -- the information that he

would need to pick up right where he'd left off and continued

to commit all of those crimes, he could have assumed a new

identity and disappeared within 24 hours.

So in this extremely unique case, Your Honor, when

you look at all of these identities and all of the conduct of

the defendant and the defendant -- the fact that the defendant

had absolutely no respect of the privacy of others -- in other

words, he's -- it's the position of the government that he's

using all this equipment -- the apartment, the aircard, the

computer, the electricity -- which, the electricity, he also

obtained under using the false identity of Brawner.  And when

he applied for the electricity, he had to provide

Mr. Brawner's social security number, and he also had to

provide a driver's license number.  And that driver's license

number comes back to a living third person in California.

He's even using a false identity to get the electricity, Your

Honor.

So looking at all those things together, Your Honor,

this is an extremely unique case where I think it would be

appropriate to find that Mr. Rigmaiden just simply has no

expectation of privacy in anything in this case.  Or at the

very least, anything related to the aircard account.

1              THE COURT:  Let me ask you a question on that,

2      Mr. Battista.  I have to take into account the Ninth Circuit's

3      decision about the motel room, right?  Where an individual had

4      falsely and fraudulently rented a motel room, and the Ninth

5      Circuit said the person had a reasonable expectation of

6      privacy in that room until steps were taken to evict that

7      individual.

8              What do I do with that law under the argument you

9      just made?

10             MR. BATTISTA:  Your Honor, I think one of the key

11     facts with respect to the hotel room is that it's much easier

12     for a hotelier to evict a person.  That's a simple product.  A

13     person can be out within 24 hours.  But particularly with

14     respect to the apartment, it would not be so easy for the

15     landlord to attempt to evict the defendant.  So there's a much

16     greater burden.  I think if you're balancing the expectations

17     of the person who rents the hotel room versus the hotelier,

18     it's very simple to initiate those procedures, whereas with an

19     apartment it's not as simple.

20             And then also, too, with respect to the hotel cases,

21     we don't have all of those -- all these other facts.  So I

22     recognize the hotel cases are significant precedent for the

23     Court to take into consideration.  But when we look at those

24     cases, we don't have all of the other facts that we have with

25     respect to Mr. Rigmaiden's conduct in this case.

1          THE COURT:  If I were to conclude that under Ninth

2     Circuit law, under that case, Mr. Rigmaiden had a reasonable

3     expectation of privacy in the apartment even though he rented

4     it under a false name, given the fact the aircard and computer

5     were in the apartment, is it your contention that the

6     government could reach into that apartment electronically,

7     where he had a reasonable expectation of privacy, in order to

8     learn the location of the aircard and the computer within that

9     apartment?

10         MR. BATTISTA:  No, Your Honor.  Not -- if -- if it's

11    within an area that he has a reasonable expectation of

12    privacy, I don't believe --

13         THE COURT:  So if I conclude he had a reasonable

14    expectation of privacy in the apartment, then it's irrelevant

15    as to whether he did or did not with respect to the computer

16    and the aircard, right, because they were in the apartment?

17         MR. BATTISTA:  That is correct.

18         THE COURT:  So just to make sure I understand your

19    position, the only way I can decide this case on the ground

20    that the defendant did not have a reasonable expectation of

21    privacy is if I conclude he did not have that expectation in

22    the aircard, the laptop, or the apartment.  Do you agree?

23         MR. BATTISTA:  That's correct --

24         THE COURT:  I have to find all three were outside of

25    any reasonable expectation of privacy.

1           MR. BATTISTA:  Just separating out, Your Honor,

2     obviously, the aircard account records were in the possession

3     of a third party.

4           THE COURT:  Right.  I understand, but that's a

5     separate argument.  That's the third-party argument.

6           Okay.  Did you have other points you wanted to make?

7           MR. BATTISTA:  Your Honor, just a few very brief

8     points.  Just kind of some miscellaneous facts, that in this

9     particular case with respect to the actual tracking mission,

10    Your Honor, that this was not an extensive mission, that the

11    tracking mission was completed within the course of -- at the

12    very most, several days.  So this is not an extensive mission

13    along the lines of the *Jones* case.

14          There were denials -- when the Court is considering

15    whether or not the actions of the agents pursuant to the

16    warrant with respect to the aircard were reasonable, the

17    government acknowledges there were denials of service.  But

18    the denials of service, there's no evidence of any significant

19    denials of service.  And had there been denials of service --

20    if the -- if the defendant had suffered a serious denial of

21    service, obviously, that would have been a tip-off to him, and

22    we may not be sitting here in this room.

23          With respect to the destruction of evidence, Your

24    Honor, we did that after the aircard mission.  That was done.

25    Obviously, there was a term in the warrant, in the order,

1    ordering that the evidence be destroyed.  The agents did that

2    in good faith to protect any data that relates to third

3    parties.  There was not any knowing *Brady* violation.  There

4    was -- I'm not aware of any activity by the agents attempting

5    to prejudice the defendant or his defense in any manner.

6         A simple point the defendant in his -- makes a point

7    in his brief that he was not conducting any business in the

8    residence.  Clearly, he was conducting business of violating

9    many people's privacy rights and committing the frauds against

10   the government.

11        I don't have anything else for you, Your Honor.

12        THE COURT:  All right.  Thank you, Mr. Battista.

13        Mr. Rigmaiden, do you need ten minutes to respond?

14        THE DEFENDANT:  Yes.  Before I do that, can I use the

15   restroom, please.

16        THE COURT:  Sure.  Let's go ahead and take a

17   ten-minute break.

18        (Recess taken from 4:11 p.m. to 4:18 p.m.)

19        THE COURT:  All right.  Mr. Rigmaiden.

20        THE DEFENDANT:  I don't know how relevant it is, but

21   the government's claim that they -- they're not aware of any

22   source of legitimate income, I can point to sources of

23   legitimate income between 2005 and 2008, which was the period

24   of the alleged conspiracy.  And some of that evidence was

25   actually seized by Agent Daun, so I think they would be aware

1    of some of that.  So if that is relevant, I'd like the

2    opportunity to get that data from the storage devices and put

3    that on the record.

4            Another claim the government made was that in

5    affecting these uninvolved third parties, that they only

6    downloaded a small amount of information from the devices, but

7    they actually had to make the devices connect to their

8    cell-site emulator.  And even just for a brief period of time

9    during that time period, those users wouldn't be able to make

10   outgoing calls, because they would get routed straight to the

11   FBI's equipment.  And in this case, they weren't using it in a

12   "man in the middle" formation.  So any call that any of those

13   third parties would have tried to make would have been

14   blocked, and they wouldn't have been able to get through.  So

15   in addition to getting data from these third parties, they're

16   also violating their possessory interests and their devices.

17           And I don't know how relevant the claim that no other

18   technology exists where they can conduct these tracking

19   operations without involving other third parties.  Possibly,

20   the government's not aware of the technology.  Or maybe it

21   doesn't exist.  I'm not sure.  But if it's relevant, I can put

22   technology on the record where it would be possible to conduct

23   this type of operation without affecting third parties.

24           As far as the government equating the search protocol

25   violations to a no-knock violation, with no-knock warrants or

1    when the government doesn't have a no-knock warrant and

2    actually conducts a search without knocking, the Supreme Court

3    found that that's not a "but for" unattenuated cause of

4    obtaining the evidence.  But in this case, the violations of

5    the warrants actually resulted in them obtaining the evidence,

6    so that case isn't on point with what they're claiming.

7                 THE COURT:  Well, let me ask you a question on that.

8                 THE DEFENDANT:  Okay.

9                 THE COURT:  Do you contend that the government's

10   exceeding the time periods in the Northern District of

11   California protocol is a "but for" unattenuated cause of their

12   finding evidence?

13                THE DEFENDANT:  Yes.

14                THE COURT:  How so if they could have obtained

15   exactly the same evidence in their possession merely by

16   extending the warrant?  They had the evidence in their

17   possession.

18                THE DEFENDANT:  Well, it has to be -- in order for my

19   reasonable expectation of privacy to continue to not exist, it

20   has -- the evidence they have has to remain in the

21   uninterrupted possession of law enforcement.  So once the 30

22   days is extinguished, according to the warrant, their

23   legitimate possession was interrupted, and my reasonable

24   expectation of privacy was restored.  So in that sense, the

25   warrant establishes -- the terms of the warrant establishes my

1    reasonable expectation of privacy.  That's discussed in a

2    Ninth Circuit case, *Hell's Angel Motorcycle Club.*  I don't

3    have the direct cite.  I think it's in my notes somewhere --

4              THE COURT:  It's in the briefs as well.

5              Is that the 2004 decision?

6              THE DEFENDANT:  Yeah.

7              THE COURT:  It's in the briefs.

8              THE DEFENDANT:  So that's my counterargument on that.

9    I don't have anything further to add on that.  Could I give a

10   few minutes to Ms. Lye?  She wanted to --

11             THE COURT:  Yeah, that's fine.

12             Go ahead, Ms. Lye.

13             MS. LYE:  Thank you, Your Honor.  I just want to

14   address two points.  Counsel for the government stated that he

15   was not aware of any courts denying permission to use a

16   stingray.  There were two cases in which -- and both were

17   cited in our briefs.  One in which the Court denied permission

18   to use a stingray.  One is --

19             THE COURT:  But -- I'm familiar with those, Ms. Lye.

20   Neither of those was a search warrant request, right?

21             MS. LYE:  That's correct.  In both of those cases,

22   they were statutory applications.  In the Central District of

23   California case, the Court found that it did not fall under

24   the definition of a pen register, but then expressed concerns

25   about the procedure the government was proposing to use, in

1    part because of the third-party issue.  Quote, telephone

2    numbers and calls made by others than the subjects of the

3    investigation could be inadvertently intercepted.

4            And in the Southern District of Texas case, the

5    magistrate expressed concern that there was not sufficient

6    information presented about the basic nature of the

7    technology, the same argument we make here.

8            The other point I want to address is the government's

9    argument that essentially no third party was harmed because

10   they destroyed the data, they didn't prosecute anyone.  A sort

11   of no harm, no foul rule.  Respectfully, that is not the rule

12   under the Fourth Amendment.  The Fourth Amendment was adopted

13   in reaction to revulsion against the writs of assistance used

14   by the British, the roving commissions to search wherever and

15   whenever they pleased.  The point of the Fourth Amendment is

16   to prevent such general rummaging and exploratory searches.

17           The Ninth Circuit in *Rettig*, R-E-T-T-I-G, expressly

18   rejected the sort of no harm, no foul argument being made by

19   the government here.  That case involved the police really

20   wanting evidence of a cocaine violation, unsuccessfully

21   getting that warrant, going to a different judge and seeking a

22   warrant for evidence of marijuana violations.

23           We're not suggesting that the government engaged in

24   forum shopping here, but the court's analysis in *Rettig* is

25   instructive.  It specifically said, it may well be that if the

1   government had presented to the magistrate the full intended

2   scope of the search, i.e., as to both the cocaine and

3   marijuana violations, the magistrate may have granted the

4   application.

5           But the point the panel held in an opinion authored

6   by then-Judge Kennedy was that that was pertinent information,

7   the intended scope of the search, that the magistrate should

8   have been apprised of so that he could supervise the search.

9           Here, there are consequences for supervision of the

10  third-party data.  Not just what you do once you collect it,

11  but over collection at the outset.  What was the broadcast

12  radius of this device?  Some devices, according to

13  manufacturers, can be up to several kilometers.  This was an

14  apartment building.  There were likely many, many people

15  located within their residences at the time of this search.

16  This is the sort of information that Judge Seeborg should have

17  been apprised of so he could supervise the search.

18          Finally, *Leon*.  The Supreme Court in *Leon* and other

19  cases make clear that the purpose of the exclusionary rule is

20  not to cure the invasion of the rights of those people who

21  have been unlawfully searched.  The purpose of the

22  exclusionary rule is deterrence, to set the rule going

23  forward.  That is exactly why it is essential for this Court

24  to suppress in this case, to establish a clear deterrent and

25  to make sure that in future cases, the government is

1    forthcoming with the federal judiciary.

2              Thank you, Your Honor.

3              THE COURT:  All right.  Thank you.

4              THE DEFENDANT:  Could I make two other brief points?

5              THE COURT:  Sure.

6              THE DEFENDANT:  There's a case, I cited it earlier,

7    *Lavan versus the City of Los Angeles*.  In that case, the Ninth

8    Circuit said, "Violation of the city ordinance does not

9    vitiate the Fourth Amendment's protection of one's property,

10   or otherwise the government could seize and destroy any

11   illegally parked car or unlawfully unattended dog without

12   implicating the Fourth Amendment."  So this, in a way,

13   responds to Mr. Battista's arguments about alleged fraudulent

14   activity.

15             And also, in the *United States versus Young*, 573

16   Federal 3d 711, in that case the defendant used a fraudulent

17   credit card that wasn't his, so in that sense it was a

18   fraudulent source of income as well, and the Ninth Circuit

19   still found he had a reasonable expectation of privacy, even

20   in light of that fraudulent purchase.

21             THE COURT:  Okay.  All right.  Thank you all for your

22   arguments.  I will take this under advisement and get you a

23   decision in the next few weeks.  Thanks.

24             (End of transcript.)

25                       *  *  *  *  *

1                    **C E R T I F I C A T E**

2

3          I, PATRICIA LYONS, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6

7          I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion

9    of the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control, and to the best

12   of my ability.

13

14         DATED at Phoenix, Arizona, this 29th day of April,

15   2013.

16

17

18

19

20                              s/ Patricia Lyons, RMR, CRR
                                Official Court Reporter
21

22

23

24

25